# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| STEWARD HEALTH CARE SYSTEM, LLC, *et al.*, | ) | Bankruptcy Case: 24-90213 |
| | ) | |
| Debtors.[1] | ) | Case No.: 4:25-cv-01584 |
| | ) | |

## APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL (INCLUDING MOTION FOR IMMEDIATE STAY PENDING HEARING ON THE EMERGENCY MOTION FOR STAY PENDING APPEAL)

Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lydon, and Dr. Sridhar Ganda, Dr. A. Ana Beesen, Dr. Benjoy Zachariah, Dr. Barry Arkin, Dr. Bruce Kriegel and Dr. Gary Miller, for themselves and others similarly situated ("**Appellants**"), move for an emergency stay pending appeal ("**Motion**") of the *Order (I) Directing Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors; (II) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets; (III) Authorizing Termination of Trusts; and (IV) Granting Related Relief* ("**Turnover Order**") that the United States Bankruptcy Court for the Southern District of Texas [Houston Division] ("**Bankruptcy Court**") entered on April 2, 2025. ECF 4418.[2] In support of the Motion, to the extent that the Motion cannot be heard prior to 11:59 p.m. on April 11, 2025, the Appellants also seek an immediate stay of the Turnover Order pending a hearing on the Motion. In support of this Motion, Appellants respectfully state the following:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[2] Unless otherwise specified, this Motion uses "ECF" to refer to a Docket Entry Number in the lead bankruptcy case of the Steward Health Care System, LLC's jointly administered chapter 11 cases, 24-90213.

## PRELIMINARY STATEMENT

In the absence of a stay pending appeal, the $62 million of disputed funds at issue in this case are gone, perhaps forever. The Turnover Order becomes effective at 11:59 p.m. on April 11, 2025. In that event, the Appellants—whose labor earned that money and who invested those earnings in two of the Debtors' retirement plans—will suffer a potentially permanent loss of retirement savings. As detailed below, that is the very definition of irreparable harm. This is not in dispute. Following the Bankruptcy Court's oral ruling below, the Debtors and their allegedly secured debtor-in-possession lender ("**DIP Lender**") admitted, although somewhat belatedly and reluctantly, that as soon as the Bankruptcy Court's order granting their turnover motion is effective, the $62 million will be immediately spent to pay the DIP Lender and, should anything remain after that, to pay administrative costs (i.e. professional fees) of the Debtors' liquidating chapter 11 cases; indeed, the lender claims that the entire $62 million of deferred earnings will then be its collateral, which, the relevant loans having matured, it can seize and apply at any time. Declaration of Robert Keach in Support of Motion ("Keach Decl.") ¶¶ 4-5.[3]

The Debtors, in contrast, will not be harmed by maintaining the status quo. The funds are now, by virtue of a stipulation long ago reached between the Appellants and the Debtors, in segregated, interest-bearing accounts, not to be disbursed pending a court order or consent of the Appellants. The only "harm" will be a slight delay in paying either the DIP Lender or bankruptcy professionals—both of whom have already earned millions of dollars from these cases—a delay mitigated by the interest earned. The Debtors have contended that they need the funds to "operate,"

---

[3] Following these admissions, the Bankruptcy Court considered Debtors' proposed order eliminating entirely the automatic 14-day stay of the Turnover Order under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure. Appellants requested that the 14-day period not be shortened so that Appellants could seek the relief sough in this Motion. The Bankruptcy Court shortened the 14-day period to 10 days, such that the Turnover Order becomes effective on 11:59 p.m. on April 11, 2025, expressly to permit the Appellants some time to seek this stay.

but they are operating nothing but the final days of a liquidating chapter 11 case.  The hospitals and other assets that could be sold have been sold, the ones that could not be sold have been, tragically, closed, apparent victims of the alleged financial mismanagement of the Debtors.  The Debtors even "sold" (assigned) the rights to provide "transition services" to the buyers of hospitals, as the Debtors could not continue to provide such services.  All that remains is the Debtors' desire to confirm a liquidating plan and to pursue, through some post-confirmation trust or other device, certain litigation in the hopes of generating a few additional scraps to pay pennies to creditors, an unnecessarily expensive process that could be more efficiently and cheaply accomplished by converting the cases to chapter 7 liquidation cases, a result that certain creditors have already sought.  In the face of the near-certain loss of the Appellants' retirement savings, the lender and the professionals can and should wait for their final payments.

A stay is further compelled because of the Appellants' high likelihood of success on appeal.  Both procedural and substantive errors of law abound regarding the proceeding from which this appeal arises.  The contest over the funds, premised on a dispute as to whether the subject retirement funds were or were not so-called "top hat" plans (a dispute recognized universally, including by the Fifth Circuit and courts in this district, as involving complex factual issues and demanding full and detailed discovery and a complete evidentiary record formed in litigation conducted under the Federal Rules of Civil Procedure, usually in a class action), could not, as a matter of law, be conducted in a compressed, accelerated and limited discovery "contested matter" under section 542 of title 11 of the United States Code ("**Bankruptcy Code**")and Rule 9014 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**").  Settled law—in the Fifth Circuit, other circuits, this district, and across the nation—provides that a section 542 based "turnover action" cannot be used to adjudicate a dispute as to the title or ownership of assets.

Relatedly, Rule 7001 of the Bankruptcy Rules mandates an adversary proceeding—a full blown civil action under the normal rules of civil procedure—in any action to determine an interest in property, and that same rule mandates an adversary proceeding in any action seeking equitable remedies, as the Appellants sought here. The Bankruptcy Court ignored settled law and those rules when it adjudicated this dispute in an absurdly accelerated contested matter, the compressed timetable driven solely by the Debtors' claims of "needing" the money to fund the chapter 11 cases, and in ignoring the class action commenced by the Appellants that immediately mooted the contested matter under settled law. The Bankruptcy Court committed fatal legal error in doing so.

The Appellants, as detailed below, also filed a motion to withdraw the adversary proceeding under the mandatory withdrawal provisions of 28 U.S.C. §157(d) because the adjudication of the dispute involves material consideration of only the Employee Retirement Income Security Act ("**ERISA**") and its relevant case law, and implicates not a single provision of the Bankruptcy Code. Some critical legal issues under ERISA in this case are not settled in the Fifth Circuit. Article III considerations—as detailed in circuit court precedent discussed below—then mandated that the Bankruptcy Court was ***barred*** from taking any action that would moot or inhibit the District Court's decision regarding whether to withdraw the reference, such as deciding the Debtors' "turnover" motion. The Bankruptcy Court's task was—under the applicable local rule—to recommend whether or not withdrawal of the reference should occur and then await the District Court's decision. The Bankruptcy Court's decision to proceed to decide the turnover motion that, under section 157(d), must be decided by the district court flies in the face of Article III (the constitutional underpinning of section 157(d)) and was beyond its constitutional and statutory authority. This too was fatal legal error.

The proceeding below progressed on an unrealistic accelerated timetable despite the

Debtors' discovery abuse, abuse acknowledged by the Bankruptcy Court (and in fact rewarded by the compressed timetable). The Debtors—faced with an order under Rule 2004 of the Bankruptcy Rules to produce relevant documents (an order that the Debtors never objected to or sought to modify)—produced virtually no meaningful documents for three months and then engaged in what the court below found was a "documents dump" on the eve of the then-scheduled March 11, 2025 hearing. Notwithstanding that finding, the Bankruptcy Court denied the Appellants' motion for a stay and simply rescheduled the hearing for March 26, 2025. The Debtors continued to produce long-overdue documents, including producing critical documents on the very eve of the newly-scheduled hearing. The few depositions that could be scheduled, for both sides, took place in the nine days before the hearing, including multiple depositions on the day before the hearing. Multiple critical witnesses, identified for the first time in those eve-of-hearing depositions could not be deposed. The Appellants, in the midst of this procedural chaos, filed a motion to continue the hearing, which the Bankruptcy Court denied. This refusal to extend due process to the Appellants (and thus to reward the Debtors' violations of Bankruptcy Rule 2004) was also legal error.

The Bankruptcy Court also committed errors of law in ruling—in the face of considerable contrary evidence (including the testimony of the Debtors' own witnesses) and despite abbreviated and incomplete discovery—that the subject deferred compensation plans were top hat plans exempt from ERISA's protections, including that the funds deferred are held for the exclusive benefit of the plans' participants. Retirement plans, including deferred compensation plans, are presumptively subject to all of ERISA's protections. Top hat plans—which must be "unfunded" and the eligibility for which must be limited to a "select group of highly compensated or management employees"—are a "rare species" of plan that is excepted from ERISA's substantive

protections. The Fifth Circuit has acknowledged the reason for the exception: "ERISA's regulation of top hat plans is more relaxed because of Congress' view that 'high echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interests.'" Owens v. W. & S. Life Ins. Co., 717 Fed. Appx. 412, 418 (5th Cir. 2018) (quoting Alexander v. Brigham & Women's Physicians Org., Inc., 513 F.3d 37, 43 (1st Cir. 2008)). As the courts in this District have ruled, courts thus scrutinize that such plans are sufficiently select and consider multiple quantitative and qualitative factors, all of which must be supported by evidence presented by the employer which, at all times, has the burden of proof to establish that the plan fits the very narrow exception and includes only employees who can in fact protect themselves and appreciate and absorb any risks. That the documents provide that the plans are top hat plans or recite the right words on selectivity, or include warnings about the risk of such plans, is never sufficient. Rather, the facts regarding management and administration of the plans must demonstrate, by a preponderance of admissible evidence, that the top hat exception applies. Consistent with the statute's purpose, as recognized by the Fifth Circuit, courts consider—in addition to the math surrounding selectivity—whether the employees eligible for plan inclusion have negotiating leverage regarding the creation and operation of the plan, and whether the employees are the type that have regular access to critical financial information about their employer and the operation of the plans themselves.

As detailed below, in some circuits these issues of leverage and access to information are dispositive; the Fifth Circuit has not yet decided this question. As even a cursory view of the Bankruptcy Court's ruling reveals, the Bankruptcy Court simply ignored this precedent dictating the proper consideration of such plans, and ignored uncontested evidence—most from the mouths of the Debtors' own witnesses—that the employees eligible for plan inclusion had no negotiating

leverage or opportunity to negotiate whatsoever and that such employees also had no access to information permitting them to make informed decisions about risk. (The fact that the Debtors continued to solicit new deferrals of compensation and that such deferrals continued when the Debtors were hopelessly insolvent and on the eve of bankruptcy proves this point and may constitute fraud.) The Bankruptcy Court also ignored uncontroverted evidence that the Debtors administered the plans as if they were fully funded and maintained for the exclusive benefit of the participants. Despite universal case law that these cases cannot be decided on the documents, the Bankruptcy Court did just that, finding that the plans were mere contracts to be enforced pursuant to their terms. Despite apparently acknowledging that case law placed the burden of proof on the Debtors, the Bankruptcy Court in fact placed that burden on the Appellants, ruling that the plan language prevailed unless the Appellants proved otherwise. The Bankruptcy Court's hyper-textual approach—which included defining "select" by using a dictionary as being merely selected by the employer (rather than considering the established case law)—ignored the purpose of ERISA and the exception for top hat plans, and the entire body of relevant ERISA case law. This too was legal error.

Finally, the Bankruptcy Court committed reversible legal error by failing to rule prior to and during the ultimate hearing on a critical issue of whether certain documents and testimony were barred by assertions of attorney-client privilege or were rather admissible because of the Debtors' waiver of the privilege (by using a reference to legal advice in the declaration of a witness and by producing the relevant documents under circumstances which negate any claim to "inadvertence") and/or the ERISA fiduciary exception to the privilege, which provides that counsel advising as to the administration of retirement plans have as their clients the plan participants and not the sponsoring employer. Both the Appellants and the Debtors sought such a ruling. The court

compounded that failure by apparently ignoring case dispositive evidence that such a ruling would have admitted without restriction. Critically, one series of emails alleged to be privileged was dispositive on the issue of compliance with top-hat eligibility standards and should have been admitted into evidence. Even the admittedly non-privileged sections of that email chain show that the Debtors made eligible in 2019 (for the 2020 plan year) over 100 employees—mostly nurses and physician's assistants—who were in no sense highly compensated, and that the Debtors were aware that this risked the top hat status of the plans. The eligibility threshold then established was never increased from 2020-2024, each year resulting in an even higher number of employees being eligible for the plans who were admittedly neither management nor highly compensated employees. The lack of a ruling prevented follow up on this issue with multiple witnesses during the hearing not to mention with witnesses that the Appellants never got to depose. A portion of the Appellants' expert's report dealt specifically with the consequences of this chain of emails and the advice revealed therein. Not ruling on the privilege issue and apparently ignoring the evidence in question was legal error.

Considerations of public interest mandate a stay, including the strong public interest in protection of retirement assets expressed by ERISA itself and the fundamental public interest in due process of law. Article III considerations also implicate public interest. These considerations frankly dwarf the primary consideration of the court below: enforcing contracts "as written" (which in this case ignores ERISA law). Appellants ask this Court to issue a stay prior to April 11 at 11:59 p.m. to allow them to appeal the decision below before their retirement savings are spent to fund this liquidating chapter 11 case.

## **RELIEF REQUESTED**

1.      Appellants request that the Court issue an immediate stay of the effectiveness of the Turnover Order pending resolution of this Motion; and

2.      Appellants request that this Court stay the effectiveness of the Turnover Order pending its appeal without requiring a bond.  Appellants can and will brief the issues on an expedited basis.

**JURISDICTION BASIS AND PROCEDURAL PREDICATES FOR RELIEF**

3.      **Jurisdiction.**  Appellants timely filed their notice of appeal of the Turnover Order ("**Appeal**") on April 3, 2025 under Bankruptcy Rules 8002(a) and 8003(b).  ECF 4421.[4]  This Court has jurisdiction under 28 U.S.C. § 158(a).

4.      **Procedural Conditions Precedent Satisfied**.  Bankruptcy Rule 8007(b)(1) authorizes this Court to stay the effect of the Turnover Order pending the Appeal.  Appellants moved the Bankruptcy Court for a stay pending appeal on April 2, 2025 ("**Motion to Stay Pending Appeal**") immediately following the Bankruptcy Court's oral ruling on the same day.  The Bankruptcy Court, following argument on April 2, 2025, denied the Motion to Stay Pending Appeal after finding that (1) Appellants did not show a likelihood that the Appeal would succeed, (2) denying a stay would promote the public policy of enforcement of contracts, and (3) while harm would unquestionably occur to Appellants, Debtors might be harmed by the requested stay (because of the alleged need to fund the liquidation).  The Bankruptcy Court found that Appellants would suffer severe and irreparable injury without a stay but did not conclude that such an injury tipped the balance of factors in favor of a stay.  *See* Bankruptcy Rule 8007(b)(2)(B).

5.      The Court should grant the Motion for the reasons set forth below, and in support of this Motion, Appellants submit the Bankruptcy Court's Oral Decision supporting its Turnover

---

[4] During the Bankruptcy Court's Oral Decision, on April 2, Appellants ordered the Decision Transcript on the most expedited basis the court's reporting service offered (twenty-four hours).  At the end of the day on April 3, Appellants were informed that the Decision Transcript would be available on April 4.  The Decision Transcript remained unavailable throughout April 4 and through the April 5-6 weekend.  Appellants will file the Decision Transcript as soon as it becomes available.

Order ("**Oral Decision**" or "**Decision Transcript**"), the transcripts from the evidentiary hearing, the deposition transcripts admitted into evidence on the record at the hearing, as well as the declarations submitted and accepted as evidence at that hearing, as well as any other evidence cited throughout this Motion. *See* Bankruptcy Rule 8007(b)(3)(A)-(C).

## BACKGROUND[5]

### A.     Debtors' Bankruptcy & Appellants' Deferred Compensation.

6.     Steward Health Care System, LLC and certain of its affiliates ("**Debtors**") sponsored two deferred compensation plans: the (1) Steward Health Care Deferred Compensation Plan ("**Steward Plan**") and (2) the IASIS Healthcare Executive Savings Plan ("**IASIS Plan**," and with the Steward Plan, the "**Plans**"). Appellants are certain Participants in the Plans.

7.     Debtors allegedly maintained assets meant to fund Debtors' obligations under the Plans in one of two "Rabbi Trusts" pursuant to either the *Amended and Restated Rabbi Trust Agreement* ("**Steward Trust Agreement**") or the *IASIS Healthcare Executive Savings Plan Trust Agreement* ("**IASIS Trust Agreement**," with Steward Trust Agreement, the "**Trust Agreements**").[6]

8.     The IASIS Plan was frozen in 2017, and no participant deferrals have been made into it since 2017. On May 6, 2024 ("**Petition Date**"), Debtors filed for relief under Chapter 11 of the Bankruptcy Code, and both Plans were terminated. No participant deferrals have been made into the Steward Plan since the Petition Date.

---

[5] This appeal presents serious constitutional issues and substantial legal questions under the Constitution, Title I of ERISA and the Bankruptcy Code that require a complete understanding of this case's procedural posture, how this case fits within the structures imposed under the Bankruptcy Code and Bankruptcy Rules, and the legal landscape concerning "top hat" plans, which ERISA excludes from its regulatory scheme. Appellants thus provide a detailed description of the procedural history.

[6] Evidence adduced at and in preparation for trial on this matter revealed that Debtors did not hold the IASIS Plan's assets in a Rabbi Trust or any other trust. Declaration of Brian R. Hogue ISO Motion (Hogue Decl.) at ¶ 4, Ex. 2 (Mar. 26 Tr.) at 126:12-22 (Lombardo Cross Examination), 168:18-172:1 (Potter Cross Examination); ¶ 8, Ex. 6 (Trial Ex. 115 (Feb. 20, 2024 email)).

**B.      Debtors Seek an Order Compelling Trustees to Turnover Appellants' Earned but Deferred Compensation to Pay the DIP Lender & Other Professionals.**

9.      On November 11, 2024, approximately six months after termination of the Plans, Debtors filed a *Motion for an Order (A) Directing Trustees to Turn Over and Deliver Trust Assets or Proceeds thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights over Such Assets, (c) Authorizing Termination of Trusts, and (D) Granting Related Relief*.  ECF 3277 ("**Turnover Motion**").  The Debtors argued that the plan assets were Debtors' property because the Plans were "top hat" plans exempt from the fiduciary protections of ERISA rather than assets held in trust for the exclusive benefit of the plan participants and their beneficiaries (the admitted outcome if the Plans are not top hat plans).

10.      Without an objection, the Bankruptcy Court would have granted the Turnover Motion.  *See, e.g.*, Proc. for Complex Cases in the S.D. Tex. (Jan. 1, 2023) ¶ 44.  Accordingly, Appellants objected to the Turnover Motion on December 17, 2024.  ECF 3497 ("**Turnover Objection**").  In the middle of the first sentence of the Turnover Objection, Appellants footnoted and highlighted a clear reservation of all rights to pursue equitable and other relief ***in a class action*** in the event pre-litigation discovery revealed evidence that the Plans were not top hat plans.  ECF 3497 n.2.  If discovery revealed a good-faith basis to allege that the Plans were not "top hat" plans, as it eventually did, class action litigation was required to resolve the disputed material facts and legal and equitable issues necessary to determine top hat status and to afford class-wide affirmative relief.[7]

---

[7]    As detailed below, a turnover motion cannot be used to establish ownership over disputed assets. Debtors needed to use a lawsuit—an adversary proceeding—to establish their rights to the property in dispute.  Likewise, the Turnover Objection is not an affirmative request for relief.  Appellants needed an adversary proceeding to get the class-wide declaratory and equitable relief establishing plan participants' exclusive rights to the plan assets.

**C.    Appellants' Pre-Litigation Discovery Reveals that Plans are not Top Hat Plans.**

11.    As stated in the Turnover Objection, Appellants initiated pre-litigation discovery under Bankruptcy Rule 2004 concurrently with the filing of the Turnover Objection.  On December 24, 2024, Appellants filed a *Notice of Rule 2004 Examination and Request for Production of Documents*.  ECF 2560.  On December 31, 2024, Appellants filed an *Amended Notice of Rule 2004 Examination and Request for Production of Documents*.  ECF 3581 ("**2004 Notice**").  In so doing, Appellants purposefully did not proceed with discovery under Bankruptcy Rule 9014 (the procedure applicable to a contested matter).[8]  The Debtors never objected to the 2004 Notice, and by local rule, the 2004 Notice acquired the force or an order of court.  Local Rule 2004-1(e) ("If no response is served, the notice to conduct an examination under this rule is deemed ordered, without requiring the entry of an order.").

12.    In January 2025, at the Debtors' request, Appellants stipulated that Debtors could monetize the assets held in the Rabbi Trusts to avoid any risk of investment losses and place the proceeds (approximately $62 million) ("**Plan Assets**") in segregated interest-bearing accounts.  The stipulation was filed on January 24, 2025.  ECF 3806 ("**Monetization Stipulation**").  Pursuant to that stipulation, the Plan Assets cannot be disbursed or pledged without the Appellants' consent or an order of court, and Appellants reserved all rights to contend that the Plan Assets were held in trust for the exclusive benefit of the plan participants notwithstanding the monetization.

---

[8] Other than their Turnover Objection, the Appellants ***never*** participated in or litigated in the contested matter because should a class action be commenced due to a bona fide dispute as to the ownership of the Trust Assets, a turnover motion under Section 542 of the Bankruptcy Code would be moot as an improper procedural vehicle to decide the question. See discussion under Argument, *infra* at C.1.  The Appellants litigated within the contested matter following the Bankruptcy Court's denial of their motion for a stay on March 7, 2025 under protest and because they were left with no choice but to prepare for the rescheduled March 26, 2025 hearing while also seeking to stay and/or continue that hearing so that its motion to withdraw the reference could be adjudicated.  Despite the motion to withdraw the reference now having been fully briefed, the Bankruptcy Court has still not issued a recommendation to the district court, and the district court has not had an opportunity to rule on that motion.  Local Rule 5011-1.

13.    By January 29, 2025, having focused primarily on the monetization, Debtors acknowledged and agreed that they had not made material progress in producing documents under the 2004 Notice.   The Appellants had prepared and were ready to file a motion to compel production and request for sanctions.   Because of their lack of progress, and to avoid the filing of the motion to compel, Debtors agreed to postpone the evidentiary hearing on the Turnover Motion ("**Turnover Hearing**") to March 11, 2025.

14.    The Debtors failed to produce significant material documents in February 2025. Following additional meet and confer sessions, and additional pressure from the Appellants, on or around Saturday March 1, 2025, Debtors dumped 13,388 pages of documents on Appellants. Appellants reviewed the documents as quick as humanly possible, the documents production (while still materially incomplete) revealing that Appellants had a good-faith basis in law and fact to allege that the Plans were not "top hat" plans.   The following chart summarizes the Debtors' pace of production:

| Production | Date of Production | No. of Documen | No. of Pages |
|---|---|---|---|
| SHC_Purohit_000001-SHC_Purohit_000103 | 1/2/2025 | 12 | 103 |
| SHC_Purohit_002 | 1/20/2025 | 6 | 23 |
| SHC_Purohit_003 | 1/22/2025 | 3 | 64 |
| SHC_Purohit_004 | 1/31/2025 | 60 | 698 |
| SHC_Purohit_005 | 2/7/2025 | 5 | 7710 |
| SHC_Purohit_006 | 2/20/2025 | 5 | 28 |
| SHC_Purohit_007 | 2/20/2025 | 43 | 1137 |
| SHC_Purohit_008* | 2/21/2025 | 685 | 4065 |
| SHC_Purohit_009 | 2/27/2025 | 20 | 139 |
| SHC_Purohit_010 | 3/1/2025 | 1514 | 13388 |

15.    Two days after the document dump—and little more than 2 months after reserving the right to do so—on March 3, 2025, Appellants initiated the required adversary proceeding by filing a class-action complaint seeking the equitable relief they had reserved the right to seek in the Turnover Objection.   In short, the Appellants did exactly what they said from the outset that they would do.

**D.**    **Appellants' Putative Class Action Seeks to Establish Plan Participants' Ownership over Plan Assets and Equitable Relief under ERISA, but the Bankruptcy Court Nonetheless Decides to Continue with Contested Matter, Rejects Adversary Proceeding, and Refuses to Stay Contested Matter to Allow for a District Court Ruling on the Motion to Withdraw Reference.**

16.    With the filing of the adversary complaint, Appellants filed a motion seeking mandatory withdrawal of the reference under 28 U.S.C. §157(d) because the adversary complaint required detailed consideration of ERISA. *Purohit, et al. v. Steward Health Care Systems, LLC, et al*, Case No. 4:25-ap-03066, ECF 1 ("**Adversary Complaint**"); ECF 3 ("**Motion to Withdraw**").  At the same time, Appellants moved the Bankruptcy Court for an order staying the Turnover Hearing pending resolution of the Motion to Withdraw.  ECF 4089 ("**First Emergency Stay Motion**").  The First Emergency Stay Motion and Motion to Withdraw presented to the Bankruptcy Court the various constitutional and jurisdictional bases requiring a pause of the Turnover Hearing so that a District Court, as it must, could decide whether reference of the Adversary Proceeding would be withdrawn and the Turnover Motion stayed or dismissed (or merged into the Adversary Proceeding).  For example, by granting the Turnover Motion, the Bankruptcy Court would have determined that the Plans to be "top-hat" plans under ERISA which would raise potential estoppel or preclusion problems for Appellants adversary complaint seeking to establish that the Plans were not top hat plans under ERISA.  If the later determination must be decided by an Article III court, then the Bankruptcy Court cannot frustrate the Article III court's power to do so.  The Bankruptcy Court was in fact barred from proceeding with the Turnover Hearing until an Article III court determined whether it—not the Bankruptcy Court—had to adjudicate the issues, as detailed below.

17.    A stay of the Turnover Hearing was particularly important in this case.  The Adversary Complaint asserted claims that did not implicate the Bankruptcy Code and sought relief under ERISA, a non-bankruptcy statute.  Because the Adversary Complaint raised substantial legal

matters of first impression in the Fifth Circuit that would also require a detailed and complex presentation of evidence to resolve, the Adversary Complaint mandated withdrawal of the reference upon request for that relief.  When a motion to withdraw the reference is filed, typical practice in other circuits would require the clerk of the bankruptcy court to immediately transfer the motion to the District Court for consideration.  Unlike most districts, however, the Southern District of Texas Bankruptcy Rules provide that the Bankruptcy Court presiding over the matter first considers a motion to withdraw the reference and files a report and recommendation that then gets transferred to the District Court.  Local Bankruptcy Rule 5011-1 ("Unless the district court orders otherwise, the matter will first be presented to the bankruptcy judge for recommendation.").  General Order 2012-6 of the United States District court for the Southern District of Texas implements that rule.  Because of this procedure, Appellants could not get the Motion to Withdraw heard on an expedited basis in front of the District Court.

18.     So that the District Court would have an opportunity to consider the Motion to Withdraw the Reference, Appellants filed the First Emergency Stay Motion asking that Bankruptcy Court pause the Turnover Hearing in favor of allowing the Motion to Withdraw to be decided.

19.     On March 5, 2025, Debtors filed a reply in support of the Turnover Motion and response to Appellants' Turnover Objection.  ECF 4105.

20.     Debtors also continued to dump documents on Appellants on March 4, March 5, and March 6, as the following chart shows:

| Production | Date of Production | No. of Documen | No. of Pages |
|---|---|---|---|
| SHC_Purohit_011 | 3/4/2025 | 1623 | 4664 |
| SHC_Purohit_012 | 3/5/2025 | 9 | 1587 |
| SHC_Purohit_013 | 3/6/2025 | 1123 | 5433 |

21.    On March 7, 2025, the Bankruptcy Court heard argument on the First Emergency Stay Motion ("**Stay Hearing**").  While acknowledging the Debtors' discovery abuse, the Bankruptcy Court nonetheless equally blamed Appellants for not moving to compel the production of documents sooner if Debtors were being dilatory in their production (rather than meeting and conferring with the Debtor to resolve discovery issues as is the usual and expected practice). Amazingly, and despite a clear and unbroken record to the contrary, and the Appellants expressed reservation of rights (not to mention settled case law making a contested matter improper), the Bankruptcy Court stated that Appellants had somehow "waived" the right to bring an adversary proceeding to have the issues determined.  The Appellants contested any such conclusion as without any legal or factual basis.  As detailed below, apparently emboldened by the Bankruptcy Court's statements, Debtors continued to engage in discovery abuses up to the day before the eventual evidentiary hearing.

### E.    The Bankruptcy Court Gives Appellants Three Weeks to Develop a Record & Prepare for Trial, Even Though Debtors Had Not Completed Document Production.

22.    After denying the First Emergency Stay Motion, the Bankruptcy Court nonetheless partially acknowledged the prejudice that Debtors' last-minute document dumps caused Appellants.[9]  The Bankruptcy Court ordered that Debtors complete document production by March 9 (a Sunday) and then set the Turnover Motion for a full evidentiary hearing on March 26 ("**Turnover Evidentiary Hearing**").  ECF 4166 (Minute Order).  Under this ruling, Appellants had just 16 days to review yet-unproduced documents, depose witnesses, retain experts, and

---

[9] Hogue Decl. ¶ 3, Ex. 1 (Mar. 7 Tr.) at 58:6-16 ("The Court: But what about the 4,000 documents that just got produced recently, according to Mr. Keach?  How do I deal with that issue?  Kind of . . . what he's going to say is it's because you knew you were coming in front of me so you decided to just back them . . . all in, back up the truck and dump all the docs right before you showed up so you can say you produced everything."); 59:3-4 ("The Court: I know, but I'm talking about the timing of the doc dump."); 59:14-16 ("The Court: How do I deal with a doc dump - - something that's ben out there for three months and there's 4,000 pages that get dropped on these folks.").

prepare for trial while at the same time protecting their rights and ensuring a complete record.[10]
Before concluding the Sale Hearing on March 7, the Bankruptcy Court stated that it would not
otherwise order or compel any particular discovery, but the parties could file motions to compel if
needed.[11]

23.     Debtors dumped more documents on Appellants on March 9, as expected:

| Production | Date of Production | No. of Documen | No. of Pages |
|---|---|---|---|
| SHC_Purohit_014 | 3/9/2025 | 1 | 1 |
| SHC_Purohit_015 | 3/9/2025 | 1222 | 14286 |

24.     Because settled law provides that a turnover motion under Section 542 of the
Bankruptcy Code cannot be used when the ownership of the assets sought to be turned over is in
dispute, and could not be a vehicle for the relief sought by Appellants, Appellants, on Monday,
March 10, 2025, sought an emergency status conference with the Bankruptcy Court on whether
the Turnover Motion had to be converted to an adversary proceeding even if the matter went
forward on the ordered schedule.  ECF 4180.  The Bankruptcy Court did not schedule the requested
conference.

25.     In light of the Bankruptcy Court's silence, Appellants filed with the United States
District Court for the Southern District of Texas an *Emergency Motion for an Order Staying
Hearing on Turnover Motion* ("**Second Emergency Motion to Stay**"), to which the Debtors
responded.  *Beesen, et al. v. Steward Health Care Systems LLC, et al.*, Case No. 4:25-mc-
00461(Filed Mar. 13, 2025) (ECF 1 (Second Emergency Motion to Stay), ECF 27 (*Opposed
Emergency Motion for Order Setting Hearing on Emergency Motion to Stay*), ECF 32 (*Response*

---

[10] Hogue Decl. ¶ 3, Ex. 1 (Mar. 7 Tr.) at 60:19-24 (The Court: "I'm now hearing 13 witnesses.").

[11] Hogue Decl. ¶ 3, Ex. 1 (Mar. 7 Tr.) at 75:3-20 ("The Court: You may want to schedule a deposition . . . but they
have the right to say . . . they can . . . whatever they want. . . .  I just - - I - - Without knowing anything more, I think
less is more with me on that point.").

*in Opposition to Emergency Motion for Order Setting Hearing on Emergency Motion to Stay*),
ECF 34 (*Response in Opposition to Emergency Motion for an Order Staying Hearing on Turnover
Motion*); ECF 37 (*Reply in Support of Emergency Motion for an Order Staying Hearing on
Turnover Motion*); ECF 40 (*Supplement in Support of Emergency Motion for an Order Staying
Hearing on Turnover Motion*)).

26.    On March 21, 2025, the District Court heard argument on the Second Emergency
Motion to Stay. Id. (3/21/2025 Minute Entry). On March 24, 2025, the District Court denied the
Second Emergency Motion to Stay. Id. at ECF 46. The District Court ruled that the Bankruptcy
Court "has presided over the proceedings and is deeply familiar with the factual and procedural
complexities of the case" and that Appellants could not show their likelihood of success on the
Motion to Withdraw the Reference solely because it "has not been fully briefed in the Adversary
Proceeding." Id. The District Court also found no harm because Appellants had other tools—like
this very Motion—to protect their interests in the event the Bankruptcy Court granted the Turnover
Motion. The District Court assumed that if the Bankruptcy Court granted the Turnover Motion
then a stay could be granted and an appeal could be sought. Id. The District Court did not reach
the other legal and constitutional issues raised by the Appellants.

**F.    Continued Discovery Abuse Further Prejudiced Appellants.**

27.    Meanwhile, between March 7 and March 26, left with no other choice, Appellants
took or defended a total of ten (10) depositions, the last one concluding after hours on March 25,
2025, the literal eve of the March 26 evidentiary hearing. Throughout this time, discovery
continued to reveal new evidence, including previously undisclosed documents and material
witnesses, including members of the Debtors' board of directors, facts that contradicted Debtors'
prior representations to the Bankruptcy Court and Appellants that the board was not involved in

critical decisions about the Plans.  Obviously, there was no time for follow-up discovery on such revelations.

        *i.*        ***The Bankruptcy Court Fails to Reach Critical Privilege Issues Despite Debtors' Use of Privilege as Sword and Shield.***

28.      On March 11, 2025, the Debtors moved to seal the Stay Hearing because a case-dispositive series of email ("**Disputed Emails**") was referenced at the March 7 hearing that Debtors only subsequently attempted to claw back, baselessly claiming that the Disputed Emails were protected by the attorney-client privilege and that Debtors had inadvertently produced those documents.  ECF 4203, 4206 ("**Motion to Seal**").  Debtors requested that the Bankruptcy Court rule before 9:00 a.m. on March 14, 2025.  Appellants responded on March 13, 2025 demonstrating—as detailed below—that the case-dispositive Disputed Emails central to the Motion to Seal did not contain privileged materials and that the Debtors had waived the privilege in multiple ways in any event.  ECF 4216 ("**Opposition to Motion to Seal**").  The Bankruptcy Court did not rule on the Motion to Seal prior to the evidentiary hearing.

29.      Debtors continued to attempt to "claw back" additional allegedly privileged documents over the following weeks, apparently focusing on the particulars of document production for the first time despite the presence of a small army of lawyers from two large firms representing the Debtors in discovery.  By the end of this process, based on the Debtors wholly unsubstantiated claims, Debtors had apparently "inadvertently" produced hundreds of pages of allegedly privileged material, most prominently including the search terms "attorney" or "counsel" and including advice on the administration of the Plans.  This required depositions to be done under protective stipulations, trial exhibits to be submitted under seal, and various requests for relief to be done under seal in order to preserve the issue for ruling.

30.    Nonetheless, on March 14, 2025, Debtors amazingly submitted a declaration from Ms. Anne-Marie Driscoll—the former Vice President, Total Rewards & HR Operations of Debtor Steward Health Care Systems LLC—in support of the Turnover Motion in which she stated that she had sought and obtained legal advice in 2019 on plan-eligibility issues central to the Turnover Motion, an apparent direct reference to the Disputed Emails that had been referred to at the March 7 Stay Hearing and the basis of the spurious Motion to Seal.  The only basis of including this reference was to induce a fact finder to infer that such advice was followed to make the Plans "top hat" plans.  ECF 4229 ("**Driscoll Declaration**") at ¶ 23 ("I specifically sought legal advice related to the requirements of top hat plans and the meaning of 'highly compensated.'").  Debtors' strategic decision to use counsel's advice offensively is a waiver of privilege over the subject matter of "the requirements of top hat plans and the meaning of 'highly compensated.'" [12]  *See e.g.*, Ward v. Succession of Freeman, 854 F.2d 780, 787-88 (5th Cir. 1988) ("Where . . . a party asserts as an essential element of his defense reliance upon the advice of counsel, we believe the party waives the attorney-client privilege with respect to all communications, whether written or oral, to or from counsel concerning the transactions for which counsel's advice was sought." (internal quotation omitted)).

31.    On March 18, 2025, Appellants filed a Supplement to their Opposition to the Motion to Seal because the Driscoll Declaration constituted a privilege waiver under hornbook

---

[12] As explained below, one of the several necessary conditions for being an ERISA-exempt "top hat" plan is that the plan must be primarily for a select group of highly compensated employees.  One of the many disputes between Debtors and Appellants involves whether the Plans were for "highly compensated employees."  If Debtors' attorneys advised plan administrators that "highly compensated" required a certain threshold salary for employees to be eligible for the Plans but the administrators used a lower threshold eligibility standard, then that evidence would have resolved the Turnover Motion in favor of Appellants and would seriously impeach if not altogether controvert any documents or testimony that the Plans met the highly compensated requirements imposed under ERISA law.  In addition, reliance on advice of counsel is a defense to claims asserting breach of ERISA fiduciary duties. *See* Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 300–01 (5th Cir. 2000).

law.  ECF 4244 ("**Supplemental Opposition to Motion to Seal**").  Notwithstanding the Driscoll Declaration and the Supplemental Opposition, the Bankruptcy Court did not rule on the question.

32.     Given the Bankruptcy Court's silence, Appellants filed a motion to compel the production of the allegedly "clawed back" documents as well as a privilege log.  ECF 4312 ("**Motion to Compel**").  The Bankruptcy Court, however, neither granted nor denied the Motion to Compel, before or during the Turnover Evidentiary Hearing.

33.     At the Turnover Evidentiary Hearing, Debtors continued to use privilege as a sword on these issues, and the Bankruptcy Court refused to rule on the issue.  The Bankruptcy Court finally apparently acknowledged that Debtors had waived the privilege.  Hogue Decl. ¶ 4, Ex. 2 (Mar. 26 Tr.) at 91:1-4  ("The Court: You're really opening doors.  I'm just telling you.  The email is looking more and more fresh in my mind.  The doors are just getting wide open here.  We'll see where this goes.").  Despite the issue being raised multiple times during the hearing, however, the Bankruptcy Court never expressly granted or denied the Motion to Compel or the Motion to Seal. Whether or not the court considered the privileged material is unknown.  The Bankruptcy Court's Turnover Decision suggests that it did not, but even this is uncertain.  At a minimum, the lack of rulings resulted in an incomplete trial record.  For example, a material section of the report of the Appellants' expert addresses was redacted.  This part of the report was also case dispositive in favor of the Appellants.  Hogue Decl. ¶ 7, Ex. 5 (Expert Report of S. Van Meter (filed under seal)). This part of the expert report was not mentioned by the Bankruptcy Court in its ruling.

> ii.     ***Appellants Learn of New Witnesses and Document Custodians Contrary to Debtors' Representations to Appellants and the Bankruptcy Court.***

34.     In addition, Ms. Driscoll in her Declaration and deposition testimony testified that Patrick Lombardo ***and the Board of Directors*** decided to raise the required salary to participate in the SHC Plan to $180,000.00.  ECF 4229 ¶ 23 ("Ultimately, Patrick Lombardo, in consultation

with the Board, determined to raise the required salary to participate in the SHC Plan to $180,000."). This statement revealed for the first time that Board members were directly involved in this decision and the decision to admit nurses and physicians' assistants to the Plan, which directly contradicted Debtors' representations to the Bankruptcy Court regarding their reasons for not disclosing the identities of the board members until early March.

35.     Prior to the Stay Hearing, Appellants repeatedly sought from Debtors the identity and contact information of Debtors' Board members so that they could be deposed. At the Stay Hearing, Appellants argued that Debtors failed to produce this information and insufficient time remained for obtaining documents from members of the Board and deposing them as necessary. As a basis to keep the Turnover Hearing on a fast track and to suggest that Appellants manufactured the issue as a delay tactic, Debtors represented to the Court: "[W]e don't have anything from the board of directors. . . . Well, we told them in February, or January, that they weren't involved. It was—we gave them the board minutes that delegated authority in 2015 or '16 to the vice president of HR." Hogue Decl. ¶ 3, Ex. 1 (Mar. 7 Tr.) at 37:15-21.

36.     When Appellants deposed Ms. Driscoll on March 19, 2025, they learned for the first time that Ralph de la Torre—a then board member and CEO—was also involved in key administration decisions related to the Plans and specifically eligibility issues, including the decision to make eligible certain nurses and physicians' assistants, categories of employees that Driscoll described as "mid-level" employees. Hogue Decl. ¶ 6, Ex. 4 (Driscoll Deposition Tr.) at 44:25-45:10; 118:22-119:5. When Appellants sought his deposition, they were informed that he was no longer employed by the Debtors and no longer on the board (and was represented by other counsel). Appellants had no time to secure testimony or obtain documents from him or others because of Debtors inaccurate representations to Appellants and, more critically, the Court. In the

Motion to Compel—which the Bankruptcy Court did not rule on—Appellants sought an order compelling production of documents responsive to their requests involving Debtors' board members—the documents and document custodians that Debtors told the Court on March 7 did not exist.

### iii.    After the Deadline to Finish Production, Debtors Continue to Produce Material up to the Eve of the Turnover Hearing.

37.    The late "rolling production" documents also included documents that corrected previously produced documents, the lists of plan eligible employees for each plan year, that were relevant and material to, and relied upon, in the creation of both expert reports and were discovery relevant to the reports. For example, on Friday March 21, 2025 at 7:48 p.m. CT, Debtors confirmed that their expert Dr. Krock would sit for a remote deposition on March 24, 2025 at 1 p.m. On March 18, 2025, Debtors filed the declaration of Dr. Krock which submits testimony related to analysis and conclusions drawn from spreadsheets that Debtors produced of raw data related to the Debtors' employees, their eligibility for the Plans, and their participation in the Plans. ECF 4258. Less than 10 minutes after confirming the deposition of Dr. Krock, Debtors (at 7:56 p.m. CT) produced "New Eligibility Files" that impacted Appellants' expert and their examination and ability to examine Dr. Krock.

38.    Even worse, the day before the trial, on March 25, Debtors produced a spreadsheet of data important to expert analysis on various aspects of the Plans and admitted that the "haste" of the proceedings—haste that Debtors demanded—was the culprit in Debtors failing to produce the data with the set produced on March 24.

### iv.    The Bankruptcy Court Rejects Appellants' Plea for More Time to Secure Rulings & Complete Discovery.

39.    Appellants tried to ameliorate the effect of Debtors' discovery abuses through a continuance of the March 26 hearing so that Appellants could take additional necessary depositions

and compel production of additional documents relevant and material to the dispute.  On March 24, 2025, Appellants filed an Emergency Motion to Continue the hearing, ECF 4289, which the Court denied by minute order on March 25, 2025.  ECF 4310.

40.    As noted above, Appellants filed their Motion to Compel on March 25, 2025, which the Bankruptcy Court did not rule upon before or during the hearing on Turnover Motion.  ECF 4312.

## G.    The Turnover Hearing and Turnover Decision.

41.    On March 26, 2025, the Bankruptcy Court held an evidentiary hearing on the Turnover Motion in which it admitted nearly 300 exhibits, heard live testimony from five (5) witnesses, and took into evidence eleven (11) witness declarations and related deposition transcripts for the eleven witnesses (which constituted cross examination).  The need to use written testimony from the majority of witnesses was completely driven by the compressed timetable.

42.    On April 1, 2025, the Bankruptcy Court notified the parties that it had reached a decision on the Turnover Motion and that it was prepared to announce that decision at 3:00 p.m. CT on April 2, 2025 from the bench.  At the scheduled time, the Court announced that it would grant the Turnover Motion and read into the record its reasoning.  Even though Appellants expedited the transcript order so that it could make the present Motion, the transcript was not ready as of 3:30 pm April 7.

## H.    The Bankruptcy Court Denies Appellants' Request for a Stay Pending Appeal and Shortens the Automatic 14-day Stay the Bankruptcy Rules Provide.

43.    After the Bankruptcy Court announced its decision, the Appellants pointed out that, under the Debtors' proposed order, the Debtors could immediately spend and intended to spend, without further court supervision, all of the Plan Assets to pay the bankruptcy professionals and lenders. The Debtors' proposed order provided for an unprecedented, and likely unconstitutional,

waiver of the 14-day automatic stay of the effectiveness of the Bankruptcy Court's order under Bankruptcy Rule 6004(h).  As noted above, the Debtors and their lender conceded that this was the intent of the proposed order. *See* Keach Decl ¶¶ 4-5.

44.     Appellants moved for an order staying the effect of the Turnover Order pending appeal ("**Motion for Stay Pending Appeal**"), which the Bankruptcy Court denied.  In denying the Motion for Stay Pending Appeal, the Bankruptcy Court concluded that (1) Appellants could be irreparably harmed without a stay; but (2) Appellants would not succeed on an Appeal; and (3) public policy favored denying the stay.

45.     Alternatively, Appellants asked that the Bankruptcy Court adhere to the 14-day automatic stay of the effectiveness of its order that the Bankruptcy Rules provide so that Appellants could seek meaningful review of the Bankruptcy Court's Turnover Order.  The Bankruptcy Court, in part, granted that request and ordered that its Turnover Order would become effective on 11:59 CT on April 11 so that the Appellants could pursue this Motion.

46.     In an attempt to further ameliorate the harm and mitigate the damage that the Turnover Order would cause Appellants if a stay could not be obtained by the midnight hour on April 11, 2025, Appellants asked the Bankruptcy Court to require Debtors to disclose any transfers of Plan Assets and the identity of transferees so that funds could be traced and transferees could be put on notice of claims.  The Bankruptcy Court did not grant or deny that request.

## LEGAL STANDARDS

47.     Motions to stay Bankruptcy Court orders pending appeal "are not rare and are specifically provided for in the rules."  Citadel Equity Fund Ltd. v. Serta Simmons Bedding, LLC (In re Serta Simmons Bedding, LLC), Adv. Proc. No. 23-09001, 2023 WL 4275019, at *1 (S.D.

Tex. June 29, 2023), *appeal dismissed sub nom.* <u>Matter of Serta Simmons Bedding, L.L.C.</u>, No. 23-20309, 2023 WL 9056061 (5th Cir. July 31, 2023).

48.     The Bankruptcy Rules require that, absent exigent circumstances, a motion to stay a Bankruptcy Court order pending appeal be first presented to the Bankruptcy Court.  Fed. R. Bankr. Proc. 8007(a).  If appellants satisfy that procedural prerequisite or satisfy the conditions that allow direct first-time access to the District Court, then appellants can seek an order staying the effect of a Bankruptcy Court's order from the District Court where the appeal is pending.  Fed. R. Bankr. Proc. 8007(b).  As detailed above, Appellants first sought a stay in this case from the Bankruptcy Court and have met all procedural prerequisites for seeking a stay from this Court.

49.     The District Court considers four factors when evaluating a motion for a stay pending appeal:

> (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest.

<u>In re First S. Sav. Ass'n</u>, 820 F.2d 700, 709 (5th Cir. 1987).  *See also* <u>Serta Simmons</u>, 2023 WL 4275019, at *2 (applying standards to bankruptcy appeals) (citing, among others, <u>Thomas v. Bryant</u>, 919 F.3d 298, 303 (5th Cir. 2019); <u>First S. Sav. Ass'n</u>, 820 F.2d at 709 n. 10); <u>All. for Hippocratic Med. v. Food & Drug Admin.</u>, No. 23-10362, 2023 WL 2913725, at *4 (5th Cir. Apr. 12, 2023) (citing <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009)).  Under this framework, while "no factor is dispositive, the likelihood of success and irreparable injury factors are 'the most critical.'" <u>All. for Hippocratic Med.</u>, 2023 WL 2913725, at *4 (quoting <u>Nken</u>, 556 U.S. at 434).

50.     In the Fifth Circuit, the likelihood of success on the merits prong is satisfied by a demonstration that the case presents one or more serious legal questions, and the other three factors

tilt decidedly in the movant's favor.  Serta Simmons, 2023 WL 4275019, at *2 (quoting First S. Sav. Ass'n, 820 F.2d at 709 n.10 (emphasis in original)); *accord* Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981) ("[T]he movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious question is involved and show that the balance of the equities weighs heavily in favor of granting the stay."); Mounce v. Wells Fargo Home Mortgage (In re Mounce), Adversary No. 04-5182, 2008 WL 2714423, at *2 (Bankr. W.D. Tex. July 10, 2008) ("[T]he movant's burden on the first prong may be lightened—say, from 'probable' to 'merely possible'—if, for the remaining three prongs (commonly referred to collectively as the 'balance of equities'), the movant makes a compelling case that, in all likelihood, the movant will suffer irreparable harm in the absence of a stay pending appeal, and that any harm to other parties will be minimal in comparison to the harm to be suffered by the movant.").  That standard is unquestionably met here.  The balance of the equities unquestionably favors the Appellants, for whom the absence of a stay results in potentially catastrophic loss.

51.    Regarding that balance of equities, and specifically the second factor, irreparable injuries are those "for which compensatory damages are unsuitable."  Wildmon v. Berwick Universal Pictures, 983 F.2d 21, 24 (5th Cir. 1992).  However, "a ***theoretical right*** to recover money damages ***will not constitute an adequate legal remedy*** where difficulties in the collection of any judgment render that remedy illusory."  Pipkin v. JVM Operating, L.C., 197 B.R. 47, 56 (E.D. Tex. 1996) (emphasis added) (quoting Winston v. General Drivers Local 89, 879 F. Supp. 719, 725 (W.D. Ky. 1995)).  It is thus "appropriate to award an injunction where 'it is shown that a money judgment will go unsatisfied absent equitable relief.'"  Pipkin, 197 B.R. at 56 (citing

Alvenus Shipping v. Delta Petroleum (U.S.A.) Ltd., 876 F. Supp. 482, 487 (S.D.N.Y.1994);

Collins v. Aggreko, Inc., 884 F. Supp. 450, 452 (D. Utah 1995)).

52.     Particularly in the case of a chapter 11 debtor distributing proceeds to third parties

while the authorizing order is on appeal, the likely distribution of disputed funds has been found

to constitute irreparable harm:

> In the bankruptcy context, courts have held that distributions to
> creditors, while a claim allowance dispute is on appeal, may
> constitute irreparable harm because it will dissipate the only assets
> available to satisfy the claim. . . . [W]hen an existing fund has been
> dedicated to satisfaction of competing claims, distribution of the
> fund before the court's determination is final and no longer subject
> to modification or reversal on appeal may constitute irreparable
> harm to the appellant.

In re Yormak, No. 2:15-bk-04241-FMD, 2021 WL 2935842, at *4 (Bankr. M.D. Fla. July 13,

2021) (quoting In re Wolf, 558 B.R. 140, 144 n. 5 (Bankr. E.D. Pa. 2016))).

53.     As to the fourth factor, public policy weighs heavily in favor of protecting

retirement funds.  *See*, *e.g*., Hayden v. Freightcar Am., Inc., No. CIVA 3:2007-201, 2008 WL

400696, at *4 (W.D. Pa. Feb. 11, 2008) (noting the "public policy of protecting pensions under

ERISA")*; see also* Karpik v. Huntington Bancshares Inc., No. 2:17-CV-1153, 2021 WL 757123,

at *6 (S.D. Ohio Feb. 18, 2021) (noting that "the protection of retirement funds is a great public

interest") (quoting Fastener Dimensions, Inc. v. Mass. Mut. Life Ins. Co., No. 12cv8918 (DLC),

2014 WL 5455473, at *9 (S.D.N.Y. Oct. 28, 2014)); In re Broadwing, Inc. ERISA Litig., 252

F.R.D. 369, 381 (S.D. Ohio 2006) ("Protecting retirement funds of workers is of genuine public

interest[.]").  Moreover, no citation is needed to establish the significant public interest in affording

legitimate claimants due process of law.

## ARGUMENT

### A.    Appellants—as the Bankruptcy Court Acknowledged—Will Suffer Irreparable Harm without a Stay.

54.    Denial of the stay could result in Appellants' total loss of retirement savings that they have unquestionably earned from their labor, notwithstanding an eventual win on appeal.  If this Motion is not granted, Debtors will use all of the spend all of the Plan Assets immediately after April 11, as they and their lender conceded, and there is substantial risk that Appellants will not be able to recover the Plan Assets which would require at a minimum asset tracing and expensive litigation to claw back the assets from transferees, even assuming a legal basis to do so.

55.    In response to the Motion to Stay Pending Appeal, the Debtors and DIP Lender admitted that the Plan Assets would be immediately disbursed to pay the DIP Lender's balances due and Debtors' administrative expenses, including the fees of bankruptcy professionals.  Based on those representations, the Bankruptcy Court acknowledged—as it had to on the record created live before it—that Appellants would suffer sudden, irreparable, and severe harm without a stay.

56.    If the Court denies this Motion, Debtors will dissipate the Plan Assets to bankruptcy professionals and the DIP Lender on or as soon after 11:59 p.m. on April 11, 2025 as possible. While the Appellants could seek disgorgement of the Plan Assets from transferees if Appellants are successful on appeal, Appellants may not succeed in recovering those funds—either due to legal obstacles or the transferees' creditworthiness.  This is harm that courts have found to be irreparable under similar circumstances.  *See* Yormak, 2021 WL 2935842, at *4 (quoting Wolf, 558 B.R. at 144 n. 5); *see also* Pipkin, 197 B.R. at 56; Zehr v. Osherow, No. 5:18-CV-355-DAE, 2019 WL 266973, at *3 (W.D. Tex. Jan. 17, 2019).  The very purpose of a stay is to prevent precisely this kind of irreversible harm—to preserve the status quo while this Court or the Fifth

Circuit finally determines the true legal ownership of the Plan Assets, which will remain in interest-bearing trust accounts until then.

**B.**    **Granting the Stay Pending Appeal Will Not Unduly Harm the Debtors.**

57.    The entry of an order staying the Turnover Order will not cause substantial injury to the Debtors or any other party to this proceeding.  This factor has also been expressed as determining whether the balance of the equities tips in favor of the moving party, with the court balancing the likelihood of irreparable harm to the moving party against the likelihood of substantial harm to the other parties.  *See* BDC Cap., Inc. v. Thoburn Ltd. P'ship, 508 B.R. 633, 636, 640 (E.D. Va. 2014).

58.    The Debtors' chapter 11 cases are "liquidating" cases.  The Debtors are converting their few remaining assets to cash, assessing the claims against them, and distributing the proceeds of their assets in accordance with the provisions of the Bankruptcy Code.  There is no business to reorganize—no jobs to save.  The "harm" the Debtors stand to suffer is a mere pause of their ability to pay their professionals and lenders from these funds, but the record reveals that the Debtors continue to collect other funds and monetize other remnant assets.  If not reaching the Plan Assets triggers a default under the Debtors' debtor-in-possession ("**DIP**") financing facility, the DIP Lender could seek to convert the Debtors' chapter 11 cases to chapter 7, as have other creditors in this case.[13]  But in that scenario, the Debtors would be no worse off, and their creditors might be better off, since conversion would be cheaper by far than the pointless exercise of confirming a liquidating plan just to exculpate professionals and others and to create a post-confirmation trust to do the work that a chapter 7 trustee can do for less.

---

[13] *See, e.g.*, *Brighton Marine, Inc's Emergency Motion (I) to Compel Payment of Funds Held in Trust; (II) to Compel Compliance with the Transition Services Agreement; (III) to Permit Set Off; or Alternatively (IV) for Conversion to Chapter 7 of the Bankruptcy Code* filed on March 20, 2025.  ECF 4271.

59.     First, there is nothing left to restructure or reorganize: the question is merely whether the Debtors liquidate in chapter 11 or in chapter 7.  Creditors entitled to payment will eventually receive any payment to which they are entitled under the Bankruptcy Code.  And, in this case, the DIP Lender has routinely extended the maturity date of the DIP as the litigation over the Turnover Motion proceeded and has an agreement with Debtors that such an extension can be obtained over email. *See, e.g*, ECF 4232 (Notice of Extension of Maturity Date to March 28); ECF 4400 (Notice of Extension of Maturity Date to April 4, 2024).

60.     The Plan Assets are in an interest-bearing account.  To the extent the Plan Assets are deemed Debtors' property, these Plan Assets will go towards paying off already incurred professional fees and extensions of credit that the DIP Lender has already made, as Debtors and the DIP Lender conceded on the record.  More money will be there when this appeal resolves than is there today because of the interest being earned.

61.     In addition, there is no fact in evidence—and the Bankruptcy Court acknowledged that it could not accept as a fact—that delay pending appeal will prevent further financing efforts related to bankruptcy administration, delay recovery of assets for creditors, prevent future creditor recovery, or result in the DIP lender taking any adverse action that will make creditors any worse off than they would otherwise be if the money gets disbursed to professionals and lenders.  The Debtors have already retained, for example, counsel to pursue claims for the benefit of creditors on a contingency basis.

62.     When balancing the harms, then, this Court is presented with one conclusion: the balance of harms favors granting this Motion because the harm to Appellants remains catastrophic and certain while the harm to Debtors is likely nonexistent and speculative at best.

**C.      Appellants Are Likely to Succeed on the Merits of Their Appeal; At a Minimum, Substantial and Serious Questions of Law Exist to be Resolved Upon Appeal.**

    **1.    The Bankruptcy Court Committed Reversible Legal Error by Allowing Use of a Contested Matter Under Section 542 of the Bankruptcy Code to Resolve a Dispute over Title to or Ownership of the Plan Assets.**

    63.    The Bankruptcy Court committed reversible error by resolving a dispute over asset ownership through a turnover motion brought under section 542 of the Bankruptcy Code.  Settled law in this district—and nationwide—prohibits a bankruptcy court from resolving ownership disputes via section 542.  *See, e.g.*, S. Cal. Pub. Power Auth. v. Ultra Res., Inc., No. 4:19-cv-00090, 2020 WL 13413726, at *1 (S.D. Tex. Mar. 27, 2020) (stating that "[i]t is settled law that turnover actions under § 542 cannot be used to demand assets whose title is in dispute." (quoting United States v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir. 1991), *cert denied*, 502 U.S. 1048 (1992)); Tow v. HBK Main St. Invs., L.P., (In re ATP Oil & Gas Corp.), No. 12-36187, 2015 WL 1093568, at *3 (Bankr. S.D. Tex. Mar. 11, 2005) (Isgur, J.).

    64.    The same principles are well settled in other circuits and districts.  Stanziale v. Pepper Hamilton, LLP (In re Student Fin. Corp.), 335 B.R. 539, 554 (D. Del. 2005) (to "state a claim for turnover of property under § 542, a plaintiff must allege that transfer of the property has already been avoided or that the property is otherwise the undisputed property of the bankruptcy estate"); Charter Crude Oil Co. v. Exxon Co. (In re Charter Co.), 913 F.2d 1575, 1579 (11th Cir. 1990) (agreeing with the bankruptcy court and holding that the turnover of funds pursuant to § 542 was improper when title to funds in dispute was governed by non-core, non-bankruptcy law).  Accordingly, turnover claims for disputed assets are routinely dismissed as not ripe.  *See* Schlossberg v. Madeoy (In re Madeoy), 576 B.R. 484, 505 (Bankr. D. Md. 2017); Pry v. Maxim Glob. Inc. (In re Maxim Truck Co. Inc.), 415 B.R. 346, 357 n. 4 (Bankr. S.D. Ind. 2009) ("[T]he

Trustee's remedy under § 542 for turnover . . . only ripens upon a determination by the Court that the property in dispute is, in fact, property of the estate.").

65.    In this case, Appellants legitimately claimed exclusive rights to the Plan Assets because the Plans were subject to ERISA's substantive protections and, under ERISA, the Plan Assets were held for the exclusive benefit of Appellants.  Debtors, on the other hand, claimed ownership of the Plan Assets alleging that the Plans were so-called "top hat" plans.  As detailed below, resolving who owned the Plan Assets could not be accomplished by simply reviewing the plan documents, but rather required a detailed factual and legal analysis.

66.    The rushed all-day hearing, the hundreds of exhibits submitted, the number of depositions taken, and the live testimony presented at the evidentiary hearing shows one thing for certain: a legitimate dispute existed over who owned the assets, and that dispute required resolving factual disputes.  Until those disputes were resolved, which required full blown litigation in an adversary proceeding (and Appellants contend, litigation before a district court), no undisputed estate property existed as to which the Bankruptcy Court could order turnover.  Section 542 could not be used to determine whether the Plan Assets were property of the Debtors' estate.  *See* S. Cal. Pub. Power Auth., 2020 WL 13413726 at *2 ("Because the title of this property is contingent upon the Court's interpretation of the contracts governing the net profit interest payments, there is no property to turn over under § 542.").  The matter could only proceed as an adversary proceeding with the full complement of discovery and due process rights provided under the applicable Bankruptcy Rules.  *See* In re TransAmerican Natural Gas Corp., 978 F.2d 1409, 1416 (5th Cir. 1992) (citing 9 Collier on Bankruptcy, ¶ 9014.05 (15th ed. 1992); In re Wood & Locker, Inc., 868 F.2d 139, 142 (5th Cir.1989)) (noting that contested matters afford less procedural protections than adversary proceedings and are designed for adjudication of simple issues often on an expedited

basis).  Indeed, Bankruptcy Rule 7001 expressly provides that disputes to determine an interest in property must be adjudicated in an adversary proceeding.  Fed. R. Bankr. Proc. 7001(2) ("The following are adversary proceedings . . . a proceeding to determine the . . . extent of . . . [an] interest in property.").

67.     In addition, Appellants sought equitable relief under ERISA.[14]  Such relief is only available in an adversary proceeding.  Fed. R. Bankr. Proc. 7001(7) ("The following are adversary proceedings . . . a proceeding to obtain . . . equitable relief").[15]  The Bankruptcy Court erred as a matter of law in denying the Appellants' request to proceed pursuant to a timely filed adversary proceeding.  *See* ECF 4089 (First Emergency Stay Motion); Hogue Decl. ¶ 3, Ex. 1 (March 7 Tr.) at 66-73 (denying First Emergency Stay Motion).[16]

## 2.  The Bankruptcy Court's Refusal to Stay Consideration of the Turnover Motion Pending Resolution of Appellants' Motion to Withdraw the Reference is Reversible Error and Violates Article III Principles.

68.     The Turnover Order, if allowed to stand, arguably moots the Motion to Withdraw the Reference before a district court can even decide it.  However, the district court's sole and

---

[14] Appellants initiated a lawsuit as an adversary proceeding on March 3, 2025.  Case No. 25-03066.

[15] The Bankruptcy Court's refusal to stay the hearing on the Turnover Motion in favor of an adversary proceeding and to allow proper discovery prejudiced Appellants' rights to due process.  The Bankruptcy Court shoehorned a timely filed class action lawsuit into a 3-month timetable for completing all discovery in a fact-intensive dispute.  No time was given to resolve discovery disputes.  When issues continued to arise, Appellants sought relief in the form of a continuance (which was denied) and in the form of an order compelling production (which was ignored).  As explained above, Debtors misrepresented that board members had nothing to do with the issues involved in this dispute on March 7, only for Appellants to find out that the board included material fact witnesses related to the administration of the Plans on March 19.  Appellants wanted a continuance to notice the depositions of these new witnesses that Debtors had told the Court did not exist and moved to compel the production of documents from the Debtors that would be in these custodians' possession, custody or control. All to no avail.

[16] At the Oral Decision, the Bankruptcy Court seemed to suggest based on obviously question-begging circular reasoning that Section 542 was appropriate because the Turnover Motion sought an order that would direct a third-party Trustee, who did not object, to turn over Debtor's property. But the Bankruptcy Court's statements prove Appellants' point: a third-party trustee has possession of the Plan Assets that, if Appellants are correct, the trustee holds for the exclusive benefit of plan participants.  At that point, an adversary proceeding is necessary to determine whether Debtors or Appellants and those similarly situated hold ultimate title.  Until ownership gets determined in an adversary proceeding, there is nothing for the third-party trustee to turn over and no authority to do so.

exclusive authority to decide a motion to withdraw the reference is grounded in Article III, and the absolute necessity of access to an Article III court prescribed by multiple opinions of the Supreme Court. Only a district court can decide the Motion to Withdraw the Reference; the Bankruptcy Court cannot do so, directly or indirectly. Even though the filing of a motion to withdraw the reference does not automatically stay proceedings in the bankruptcy court, Fed. R. Bankr. Proc. 5011(c), a bankruptcy court is nonetheless barred from taking any action in such proceedings that would interfere with or moot the district court's ultimate decision on the motion to withdraw the reference. As the Eleventh Circuit definitively held, the bankruptcy court cannot take any action, including even issuing an order dismissing the entire chapter 11 case, that preempts the district court's ruling on a motion to withdraw the reference without running afoul of Article III:

> Therefore, the district court did not err when it found that Article III barred the bankruptcy court from issuing a Section 305 order [dismissing the case] and granted the plaintiff's motion to withdraw the instant case from the bankruptcy court.
>
> The bankruptcy court exists to provide debtors and creditors with a specialized forum for the prompt and speedy resolution of bankruptcy proceedings. There is no question that they perform necessary and useful service by minimizing the dislocation suffered by individual debtors and creditors as well as the economy as a whole. Nevertheless, Congress has vested original jurisdiction over cases and proceedings under Title 11 in the district courts. The bankruptcy courts obtain jurisdiction over Title 11 cases or proceedings only by referral at the discretion of the district courts, and the district court may withdraw such reference for cause. As discussed above, this is not a hollow requirement. Nevertheless, the cause prerequisite should not be used to prevent the district court from properly withdrawing reference either to ensure that the judicial power of the United States is exercised by an Article III court in order to fulfill its supervisory function over the bankruptcy courts.

In re Parklane/Atlanta Joint Venture, 927 F.2d 532, 538 (11th Cir. 1991). The Adversary Complaint seeks determination of Appellants' ownership and rights to the Plan Assets, which necessarily requires a determination of the rights and responsibilities of Appellants and Debtors

under ERISA–and only ERISA. That triggers mandatory withdrawal of the reference at Appellants' request. The Turnover Order nonetheless declared Debtors to be the owners of the Plan Assets after a truncated and abbreviated process that deprived Appellants of the due process to which they were entitled. The Bankruptcy Court was, however, barred under Article III from issuing that ruling in the face of the pending Motion to Withdraw the Reference. The Bankruptcy Court lacked constitutional authority to so rule, and its doing so offended the Article III principles articulated by the Eleventh Circuit. The Turnover Order must be vacated.[17]

### 3. The Bankruptcy Court's Failure to Rule on Critical Privilege Issues Prejudiced Appellants' Substantial Rights Because Appellants Could not Develop a Complete Record or Introduce or Elaborate on Case-Dispositive Emails at Trial.

69.    As explained above, Debtors' Motion to Seal claimed that certain case-dispositive Disputed Emails were attorney-client privileged materials that Debtors inadvertently produced to Appellants . The Disputed Emails are not privileged and there was waiver even if they had been. The Appellants sought to have the issue determined via the Motion to Compel. The Bankruptcy Court's failure to decide the issue prior to or during the Turnover Evidentiary Hearing was legal error.

---

[17] In addition, as set forth in the Adversary Complaint, the matter before the Bankruptcy Court was based entirely in ERISA and was, at best, within the court's "related to" jurisdiction; the matter does not arise in the bankruptcy case or Code or arise under the Bankruptcy Code. Again, as set forth in the Adversary Complaint, the Appellants expressly did not consent to the Bankruptcy Court entering a final judgment in the matter, and at no time thereafter did Appellants consent to the Bankruptcy Court entering final judgment by action, inaction or waiver. The Appellants litigated below because they were left with no choice and protested that lack of choice at every stage, including via the Motions for Stay, the Motion for Continuance, and the Motion to Withdraw Reference. In opening argument before the Bankruptcy Court on March 26, counsel stated to the court that all such arguments were preserved and not waived by proceeding. Accordingly, in light of this and the additional Article III concerns noted above, the Turnover Order should be treated as recommended findings of fact (to the extent it contains any such findings) and recommended conclusions of law. *See* 28 U.S.C. § 157(c).

### i. Debtors have not Carried their Burden to Demonstrate Disclosure of the Disputed Emails was Inadvertent.

70.     Debtors have not and cannot show that the Disputed Emails were inadvertently produced, and therefore destruction or claw-back of those unredacted emails is not required under the protective order that governed discovery in this case ("**Protective Order**").

71.     "The burden to demonstrate attorney-client privilege is on the party asserting privilege." Corona v. Chevron Corp., No. H-07-3190, 2008 WL 11483069, at *2 (S.D. Tex. June 18, 2008).

72.     Under the terms of the Protective Order, any production of alleged privileged or otherwise protected material must have been "inadvertently produce[d]" to claim the Protective Order's protection against waiver of the applicable privilege or protection.  Motion to Seal, Ex. C ¶ 27.  Further, the Protective Order specifically requires that "[i]t is the ***Producing Party's burden to show*** that it took ***reasonable steps to prevent disclosure*** of privileged material as required by Rule 502 of the Federal Rules of Evidence."  Id. (emphases added); *see also* Corona, 2008 WL 11483069, at *2 (stating that, under federal common law of privilege, "the party seeking to preserve privilege has the burden to demonstrate that the circumstances surrounding disclosure favor continued protection").

73.     Debtors have not even attempted to prove either that the Disputed Emails are privileged or that their production of those Disputed Emails was inadvertent and was subject to reasonable steps to prevent disclosure as required by the Protective Order.  Rather, Debtors merely assert, with no further analysis, that the contents of the Disputed Emails are subject to the attorney-client privilege and that they were inadvertently disclosed.  *See* Motion to Seal at 2, 5-8. Accordingly, Debtors have failed to satisfy their burden of proving inadvertent production or use

of reasonable steps to prevent disclosure of the allegedly privilege material as required by the Protective Order.

74.     Nor could Debtors satisfy their burden of showing inadvertence and reasonable steps to prevent disclosure under the circumstances of this case.  Debtors produced five separate versions of the Disputed Emails on February 21, 2025 in a relatively small set of 685 documents that was or should have been subject to a privilege review by Debtors' counsel, which is comprised of two different prominent international law firms who are no strangers to this sort of privilege review.  *See* ECF 4216 ("**Opposition to Motion to Seal**"); ECF 4217 (Keach Decl. ISO Opposition to Motion to Seal) at ¶ 4.  Moreover, this was not a situation where there was a single stray missing redaction—rather, every time that the Disputed Email chain was produced, it was produced in unredacted form.  Id. at ¶ 5.

75.     In addition, several weeks passed between the time that the Disputed Emails were produced and when Appellants submitted the unredacted version of the Disputed Emails as part of their exhibit list in anticipation of the Stay Hearing.  Despite Appellants' submission of a version of the Disputed Emails as a proposed exhibit prior to the Stay Hearing, Debtors remained silent and continued not to assert any privilege as to the Disputed Emails even though they had the opportunity to do so.  Even after Appellants' counsel generally discussed the Disputed Emails during the Stay Hearing, Debtors continued to fail to assert any objection on the record at the Stay Hearing as to the Disputed Emails on the grounds that they were protected by the attorney-client privilege.  *See* Pedersen v. Kinder Morgan, Inc., 344 F.R.D. 452, 458 (S.D. Tex. 2023) (allowing deposition of ERISA plan attorney to proceed and placing burden on defendants to object on the record at the deposition to any questions they believe fell outside the fiduciary exception).  It was not until after the Stay Hearing that Debtors requested that Appellants destroy any unredacted

versions of the Disputed Emails as inadvertently produced under the Protective Order, and not until days later that they notified the Court of their objection to the discussion of the Disputed Emails at the Stay Hearing.

76.    Under these circumstances, Debtors cannot show that the production of the allegedly privileged Disputed Emails was inadvertent or subject to reasonable steps to prevent disclosure and preserve any alleged privilege.  The Disputed Emails were part of a relatively small production that should have been relatively easy to review for privilege (a search for "attorney" would have revealed all 5 copies); the Disputed Emails were nevertheless produced in unredacted form not just once, but five times; and Debtors had several opportunities to object to the unredacted Disputed Emails and assert attorney-client privilege after the unredacted version of the Disputed Email was submitted as an exhibit ahead of the Stay Hearing, but nevertheless failed to do so.

### ii.    *The Disputed Emails are Subject to the Fiduciary Exception and thus not Protected by Attorney-Client Privilege.*

77.    Even if the Disputed Emails were inadvertently produced (which they were not), they are not subject to a claim of privilege because the fiduciary exception to the attorney-client privilege applies.  Accordingly, the unredacted versions of those emails do not need to be destroyed or clawed-back.

78.    In the Fifth Circuit, "[w]hen an attorney advises a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator."  Wildbur v. ARCO Chem. Co., 974 F.2d 631, 645 (5th Cir. 1992).  Accordingly, "an ERISA fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration."  Id.

79.    Debtors' reliance on Tolbert v. RBC Capital Markets, Corp., No. H-11-0107, 2012 WL 1067629, at *4-5 (S.D. Tex. Mar. 28, 2012) as support for a finding that the Disputed Emails

are not subject to the fiduciary exception to the attorney-client privilege is misplaced.  The district court's decision in that case was based on the defendants' particular pleadings and exhibits, which it found were sufficient to show that the ERISA plan in that case was a top hat plan for purposes of that discovery dispute in the early stages of the litigation.  Id. at *5.  That was a fact-specific determination based on the specific pleadings and exhibits at an early stage of discovery in that case.  Tolbert simply did not address or decide which party has the burden of proving that an ERISA plan is a top hat plan and thus not subject to the fiduciary exception, particularly in later stages of the litigation.

80.    Here, for the reasons articulated in detail in the Turnover Objection, Appellants have raised a significant question as to whether the Plans are top hot plans and Debtors should not be able to simply rely on their assertion that those plans are top hat plans to avoid the general fiduciary duties under ERISA.

81.    Further, "Defendants bear the burden of proving that the [ERISA] Plan is a top hat plan."  Browe v. CTC Corp., 331 F. Supp. 3d 263, 294 & n.8 (D. Vt. 2018), *aff'd in part and vacated in part on other grounds*, Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021); *see also* Daft v. Advest, Inc., 658 F.3d 583, 596-97 (6th Cir. 2011) (observing that "the defendant-employer typically advocates for the top-hat status of an ERISA plan in order to avoid statutory liability, and therefore the defendant-employer typically bears the burden of proof on this issue in the district court"); MacDonald v. Summit Orthopedics, Ltd., 681 F. Supp. 2d 1019, 1023 (D. Minn. 2010) (concluding that "Defendants bear the burden of showing that the Plan is a top hat plan"); Deal v. Kegler Brown Hill & Ritter Co. L.P.A., 551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) (observing that "[t]he burden is on Defendant to show that the . . . Plan is a top hat plan"); Alexander v. Brigham & Women's Physicians Org., Inc., 467 F. Supp. 2d 136, 142 (D. Mass. 2006), *aff'd*, 513

F.3d 37 (1st Cir. 2008) (noting that defendant "has the burden of proving that [deferred compensation plans] were each top hat plans"); Virta v. DeSantis Enters., Inc., No. 94-CV-1378, 1996 WL 663970, at *3 (N.D.N.Y. Nov. 7, 1996) ("Defendants have failed to controvert plaintiffs' evidence that this Plan was not administered as a Top Hat plan, and they bear the burden of proof on this affirmative defense"); In re New Century Holdings, Inc., 387 B.R. 95, 110 (Bankr. D. Del. 2008) ("The burden of establishing the existence of a top hat rests on the party asserting that it is a top hat plan."); Carrabba v. Randalls Food Mkts., Inc., 38 F. Supp. 2d 468, 476-78 (N.D. Tex. 1999) (stating that it was defendant's burden to prove ERISA plan was a top hat plan and holding that defendant failed to meet that burden despite evidence that the plan was intended to be a top hat plan). *But see* Sikora v. UPMC, 876 F.3d 110, 113 (3d Cir. 2017) (applying the opposite burden). Accordingly, the Plans are presumptively not top hat plans until proven otherwise, and the administrators of those Plans are presumptively ERISA fiduciaries until proven otherwise. *See* Crawford v. Guar. State Bank & Tr. Co., No. 22-2542-JAR-GEB, 2024 WL 2700668, at *7 (D. Kan. May 24, 2024) (applying fiduciary exception to ERISA plan that otherwise met criteria as a top hat plan, where the plan explicitly designated the Board of Directors as an ERISA fiduciary). Until Debtors satisfied their burden of establishing that the Plans are, indeed, top hot plans, the Bankruptcy Court should have applied the default rule that the ERISA plan administrators are acting as fiduciaries to the plan beneficiaries and therefore any communications with the plan administrator's counsel concerning plan administration are not subject to the attorney-client privilege. *See* Wildbur, 974 F.2d at 645.

82.    The Disputed Emails here relate to plan administration and thus fall within the scope of the fiduciary exception. Indeed, the Disputed Emails discuss the appropriate salary level for eligibility for the Steward Plan. *See* Motion to Seal, Ex. B (filed under seal).

83.     Moreover, the threshold for eligibility is not set forth in the Plans, but is rather set by the administrators annually at their discretion and the list of eligible employees is constructed by the Debtors' administrative staff on an annual basis.  It does not require an amendment to the Plans and is not an element of the "construction" of the Plans.

84.     Because Debtors could not establish that the Disputed Emails are privileged, *see* Corona, 2008 WL 11483069, at *2, the Disputed Emails were admissible at the Turnover Evidentiary Hearing.

### iii.     *Debtors used Privilege as a Sword in the Driscoll Declaration & at Trial and Waived the Privilege.*

85.     As explained above, the Debtors waived the attorney-client privilege over the entire subject matter of the Disputed Emails with the Driscoll Declaration and certain trial testimony.

86.     Based on Debtors' strategic decision to use attorney-client privileged communications offensively through Driscoll's direct testimony in the form of a declaration and the trial testimony of Mr. Lombardo, Debtors waived attorney-client privilege over the subject matter of the Disputed Emails.

### iv.     *Even if Attorney-Client Privilege Applied, Debtors' Proposed Redactions to Disputed Emails Are Overbroad.*

87.     Even if the fiduciary exception does not apply to the Disputed Emails, the attorney-client privilege does not apply to the entirety of those emails—as the Debtors admit by their production of a redacted version thereof—and portions of Debtors' proposed redactions clearly fall outside the scope of any attorney-client privilege.

88.     "The burden of demonstrating the applicability of the privilege rests on the party who invokes it." Hodges, Grant & Kaufmann v. U.S. Gov't, Dep't of the Treasury, IRS, 768 F.2d 719, 721 (5th Cir. 1985).  Moreover, "[b]lanket assertions of privilege are also unacceptable in the context of attorney-client privilege because courts have a duty to narrowly construe assertions of

privilege." In re Royce Homes, LP, 449 B.R. 709, 726 (Bankr. S.D. Tex. 2011); *see also* SEC v.

Microtune, 258 F.R.D. 310, 315 (N.D. Tex. 2009) ("[T]he privilege does not protect documents

and other communications simply because they result from an attorney-client relationship.").

89.     To the extent that portions of the Disputed Emails neither convey any legal advice

nor are for the primary purpose of securing legal advice or assistance in a legal proceeding, those

portions of the Disputed Emails are not privileged.  *See* Motion to Seal, Ex. B (filed under seal).

90.     Accordingly, Debtors' proposed redactions are overly broad, and the clearly non-

privileged portions are not subject to the Protective Order.

91.     The Bankruptcy Court's failure to rule on the privilege issues, and to affirmatively

admit the Disputed Emails also impacted whether a portion of the report of the Appellants' expert

was admissible.

92.     In reliance on the Disputed Emails, Appellant's expert included in his report an

independent analysis of the employee compensation data from 2020-2025. He concluded that to

reach an eligibility ratio of 3.5:1, Debtors' eligibility threshold would have had to have been in the

range of $297,000 to $356,000 depending on the year—significantly higher than Debtors' actual

eligibility threshold of $150,000 to $180,000. He further concluded that even with an eligibility

threshold of $200,000, Debtor's eligibility ratio would have fallen between 2.0:1 and 2.4:1

depending on the year. Not ruling on this issue, and in particular the admissibility of

emails/documents that go to the heart of quantitative issues in dispute, was, therefore, reversible

error.

### 4.  The Bankruptcy Court Ignored Well-Settled Legal Principles under ERISA in Granting the Motion for Turnover.

93.     The Bankruptcy Court simply ignored the correct legal standards under ERISA

when it determined that the Plans were top hat plans outside of ERISA's broad regulatory ambit.

A review of those standards makes clear the Bankruptcy Court's reversible errors of law.  At a minimum, there are multiple serious and substantial issues of law that deserve to be resolved upon appeal.

94.    Whether the Plans are so-called "top hat plans" exempt from the substantive protections of ERISA requires substantial interpretation of several ERISA provisions and federal courts' interpretations of those provisions.  Chief among the material ERISA provisions that must be applied and interpreted are:

> **29 U.S.C. § 1002(3),** defining "employee benefit plans" under ERISA;
>
> **29 U.S.C. § 1051(2)**, exempting from the substantive requirements of ERISA any plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees";
>
> **29 U.S.C. §§ 1081(a)(3), 1101(a)(1)**, exempting the type of plan described in 29 U.S.C. §§ 1051(2) from ERISA's participation, vesting, funding and fiduciary requirements;
>
> **29 U.S.C. § 1103(c)(1) and the "exclusive benefits rule,"** prescribing that the assets non-exempt plans shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants;
>
> **29 U.S.C. § 1056(d)**, protecting plan assets by preventing voluntary or involuntary transfer or alienation; and
>
> **29 U.S.C. § 1132(a)(3)**, prescribing equitable remedies available for ERISA violations.

95.    ERISA represents a comprehensive regulatory scheme that Congress created for the express purpose of creating minimum standards that assure the equitable character of employee retirement plans and their financial soundness.  29 U.S.C. § 1001(a)-(c).  To that end, unless a statutory exception applies, assets of employee benefit plans under ERISA never inure to the benefit of any employer, shall be held for the exclusive purpose of providing benefits to participants, and are subject to various participation, vesting, funding, and fiduciary requirements

that protect plan asset against mismanagement or improper alienation.  *See, e.g.*, 29 U.S.C. §§ 1002(3); 1056(d); 1081(a)(3); 1101(a)(1); 1081(a)(3); 1132(a)(3).  One of the few exceptions to these rules is for so-called "top hat" plans.  The term "top hat" does not appear in ERISA; it is a "colloquial term used to refer to certain unfunded plans specially exempted from ERISA's participation, vesting, funding, and fiduciary requirements."  In re Alpha Nat. Res., Inc., 554 B.R. 787, 793 (Bankr. E.D. Va. 2016) (internal quotation omitted); *see also* Reliable Home Health Care, Inc. v. Union Cent. Ins. Co., 295 F.3d 505, 512 (5th Cir. 2002) (explaining the exception under ERISA for top hat plans).  According to ERISA, a top hat plan is "a plan which is **unfunded *and*** is maintained by an employer primarily for the purpose of providing deferred compensation for a **select group of management or highly compensated employees**." 29 U.S.C. § 1051(2) (emphasis added).  The rationale behind excluding top hat plans from ERISA's substantive requirements is that "certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan [and] would therefore, not need the substantive rights and protections of ERISA."  Alpha Nat. Res., 554 B.R. at 793 (internal quotation omitted).

96.    The determination as to whether a deferred compensation plan is a "top hat" plan turns on (among other things) whether it was sufficiently selective under 29 U.S.C. § 1051(2). Whether a deferred compensation plan is sufficiently selective to qualify as a "top hat plan" is a detailed factual and legal analysis involving several qualitative and quantitative factors, each prescribed by federal courts interpreting ERISA.  *See* New Century Holdings, 387 B.R. at 110. Among those factors are: "(1) the percentage of the total workforce eligible to participate in the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual

language of the plan agreement (qualitative)." Tolbert v. RBC Capital Markets Corp., No. CIV.A. H 11-0107, 2015 WL 2138200, at *9 (S.D. Tex. Apr. 28, 2015*) ("***Tolbert II****");* *see also* Browe v. CTC Corp., 15 F.4th 175, 194 (2d Cir. 2021) (explaining that courts must consider quantitative and qualitative factors when analyzing whether a plan is "maintained primarily for a select group of management or highly compensated employees" (quoting 29 U.S.C. § 1051(2))).

97.    Determining if a plan is a top hat plan involves a ***fact-specific and fact-intensive inquiry***.  As the statute and relevant guidance from the Department of Labor requires, and consistent with the rationale for the exception, an apparent majority of courts look at <u>three</u> distinct and indispensable requirements, as to all of which the party asserting that the plan is a top hat plan has the burden of proof.  To be designated a "top hat" plan, ERISA requires the court to determine (1) whether the plan is "unfunded"; (2) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a *select* group of management or highly compensated employees"; and (3) whether the employees participating in the alleged "top hat" plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply." Guiragoss v. Khoury, 444 F. Supp. 649, 658-659 (E.D. Va. 2006) (emphasis supplied); *see also* Bakri v. Venture Mfg Co., 473 F. 3d 677, 678-80 (6th Cir. 2007) (three elements cited; court finds plan not a top hat plan); Alfa Laval, Inc. v. Nichols, Civil No. 3:06CV306, 2007 WL 984111 (E.D. Va. 2007) (citing three-part analysis); Carrabba, 38 F. Supp. 2d at 476-78 (citing three-part test and finding plan not a top hat plan).  Critical to the issue of negotiating leverage and substantial influence is whether eligible participants have access to information that permits them to understand the underlying business and also appreciate and plan for risk. *See* Colburn v. Hickory Springs Mfg. Co., 448 F. Supp. 3d 512, 527 (E.D.N.C. 2020) ("As high-ranking employees, they had access to information

concerning their rights and obligations, so they did not need the extra protections afforded by ERISA." (citing Fed. Reg. 34530)).[18]

98.     As explained in detail above, the burden is on the party seeking to establish top hat status to prove all of the elements.  *See* supra, ¶ 81.

99.     A failure to prove any element mandates a finding that the plan is not a top hat plan. Moreover, in applying the three-part test, courts must take into account that "ERISA is a remedial statute that should be liberally construed in favor of employee benefit fund participants.  To that end, exemptions from . . . ERISA coverage should be confined in their narrow purpose."  Khoury, 444 F. Supp. 2d at 659 (internal quotations omitted).

100.    The "top hat" issue can never be decided merely based on the language of the deferred compensation plans and any accompanying rabbi trusts, but rather the decision depends on evidence that the plan has been consistently administered in a manner consistent with the purpose of the exception for top hat plans: "Rather, the management and administration of the plan must demonstrate that [the] top hat exception applies."  Callan v. Merrill Lynch, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *12 (S.D. Cal. Aug. 30, 2010); *see also* Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits Plan, No. 16-cv-00486-EDL, 2016 WL 11187255, at *13 (N.D. Cal. July 25, 2016) ("True, the language of the Compensation Agreement attempts to mirror the ERISA top hat definition.  However, tracking the language is not enough; the Plan must also operate as a top hat plan.").

---

[18] Other courts, when analyzing the "selectivity" requirement, consider whether the participants in a deferred compensation plan had a "substantial influence" over the particular "terms and provisions of the plan, such that they did not need the full panoply of protections provided by ERISA" as but one of the considerations to be weighed and balanced in determining selectivity rather than as a standalone and separate required element.  Tolbert II, 2015 WL 2138200, at *5-8 (collecting cases and leaning toward position that the "substantial influence" factor is part of the selectivity analysis without deciding point).  Thus, for these courts, ability to influence the plan, knowledge and bargaining leverage is part of the second of only two required elements, but is nonetheless a material consideration in the selectivity analysis.

101.    Furthermore, analysis of the language and implementation of a plan in determining its top hat status requires extensive discovery and a full factual record.  *See* Perkins v. PM Realty Group, L.P., No. CV H-24-0566, 2024 WL 4171349, at *4 (S.D. Tex. Sept. 12, 2024) (relying on the fact-intensive nature of top hat determination to hold "[p]lan language alone is not sufficient to establish that the primary purpose of the plan is to provide deferred compensation for a select group of management or highly compensated employees" and finding that any disposition required extensive discovery and an evidentiary record); Tolbert v. RBC Capital Markets Corp., 758 F.3d 619, 127 (5th Cir. 2014) ("**Tolbert I**") (explaining that top hat analysis involves multiple factual determinations); Tolbert II, 2015 WL 2138200, at *3-5 (top hat inquiry, including selectivity factor is "multifaceted" and involves "qualitative and quantitative elements."); Tao v. Wu, No. C 11-3248, 2012 WL 1123540, at *1 (N.D. Cal. Apr. 3, 2012) ("The question of whether, in practice, the [deferred compensation] plan functioned as a top hat plan—and therefore was, in fact a top hat plan—is fundamentally a factual one, and it must be resolved with a proper factual and evidentiary record.").

102.    Whether a plan is qualitatively selective is dependent on "the nature of [participants'] employment duties, the compensation disparity between top hat plan members and non-members, and the actual language of the plan agreement." Khoury, 444 F. Supp. 2d at 660. The mere statement that a plan is for "select employees" is not sufficient.  *See* Tolbert II, 2015 WL 2138200, at *10 (holding that a plan statement that is limited to a select group of management or highly compensated employees is "not dispositive"); Virta, 1996 WL 663970, at *3 (same).  Nor is it sufficient to state that all qualifying employees are "managers."  *See* Virta, 1996 WL 663970, at *3.  Rather, the ***nature*** of the duties of qualified employees, as opposed to non-qualifying employees, is critical.  *See* id. (emphasis added) (holding that plan offered to lower-wage

employees, cooks, and the "managers" of one-man departments was not a top hat plan); *see also* Key v. Warren Averett, LLC, No. 2:19-cv-01443-JHE, 2021 WL 12240918 (N.D. Ala. Sept. 30, 2021) (holding that participants' titles are not dispositive as to whether someone was truly management and that a material number of non-qualifiers (more than 10%) destroyed top hat status); Browe, 15 F.4th at 196-97 (considering "indicia of management status" when determining selectivity of participants and finding that many eligible employees "had minimal management responsibilities" and therefore were not eligible despite titles ).

103.    The qualitative analysis likewise requires "comparing the compensation of plan participants to that of non-participants." Barry v. Wells Fargo & Co., No. CV 3:17-00304-JFA, 2018 WL 9989652, at *2 (D.S.C. Oct. 10, 2018).   "To come within the compass of the top-hat provision, the employer must be able to show a *substantial* disparity between the compensation paid to members of the top-hat group and the compensation paid to all other workers." Alexander, 513 F.3d at 46 (emphasis added) (determining that participants were comparatively highly compensated because their incomes were roughly five times that of non-participants).

104.    Comparing the *average* salary of a participant to the *average* salary of a non-participant alone, however, is insufficient. Berry, 2018 WL 9989652, at *2.  Indeed, an average salary can be skewed significantly by one or two outliers within a pool of participants, statistically stretching the disparity between participants and non-participants in a way that does not reflect the true divergence (or lack thereof) between the salaries of participants and non-participants. *See* id. at *4 (noting that "averages 'can mask wide divergence in compensation and show little regarding whether participation is restricted to highly compensated individuals'" (quoting Daft v. Advest, Inc., 2008 WL 190436, at *6 (N.D. Ohio Jan. 18, 2008*), rev'd on other grounds*, 658 F.3d 583

(6th Cir. 2011))).  Thus, in order to make a determination as to whether the plan is sufficiently selective, "the compensation data must be individualized." Id.

105.    Rather than comparing averages, a "[m]ore relevant [calculation] would . . . be[] a comparison of the salary earned by employees minimally qualifying for participation in the Plan against the average salary of all [company] employees." Daft, 2008 WL 190436, at *6. As the Daft court noted:

> Rather than the average salary, the range of salaries is more useful. Carrabba v. Randalls Food Markets, Inc., 38 F.Supp.2d 468, 477 (N.D.Tex.1999) cited in Bakri, 473 F.3d 677; see also Starr v. JCI Data Processing, Inc., 757 F.Supp. 390, 394 (D.N.J.1991) (considering the range of salaries and not the averages); Belka v. Rowe Furniture Corp., 571 F.Supp. 1249, 1253 (D.Md.1983) (noting the potential of averages to skew the numbers and considering median salaries). As Carrabba was cited in the case that laid out the Sixth Circuit test, the Court considers it more persuasive.

Id. at *7; see also Fishman v. Zurich Am. Ins. Co., 539 F. Supp. 2d 1036, 1045 (N.D. Ill. 2008) ("But on analysis it would seem that a set of comparisons of the average employee's compensation with that of *each* Plan participant would far better inform a decision on whether the Plan satisfies the "primarily" criterion of Section 1051(2).  By contrast, a bottom-line comparison of averages with averages provides less—and less reliable—input.") (emphasis in original).

106.    Despite the clear admonition that whether or not a plan qualifies as a top hat plan cannot be decided on the documents alone, even a cursory review of the ruling by the Bankruptcy Court shows that is precisely what the court below did.  Ultimately, the Bankruptcy Court simply found that the plan documents were contracts that needed to be enforced and simply ignored, or paid mere lip service to, the substantial body of ERISA case law cited above.  The Bankruptcy Court similarly ignored substantial evidence that the Plans were not top hat plans because they were consistently administered in a fashion contrary to established principles under ERISA.

107.    First and foremost, the Bankruptcy Court ignored uncontroverted evidence that beginning in the 2020 plan year, the Debtors made eligible for participation in the Steward Plan hundreds of nurses and physician's assistants, mid-level employees who were unquestionably not management employees and not highly compensated, and Debtors' management kept the eligibility threshold for the Steward Plan lower to insure their eligibility and with full knowledge that keeping the eligibility threshold below $200,000 made the Steward Plan ineligible for top hat status.  See Key v. Warren Averett, LLC, No.: 2:19-cv-01443-JHE, 2021 WL 12240918 (N.D. Ala. Sept. 30, 2021) (making eligible a category of employees known as "principals" and whose salaries were in the $120,000 range destroyed alleged top hat status of plan). Similarly, the court ignored evidence that the eligibility threshold of base salary of $180,000 that was knowingly too low in 2020 obviously continued to be too low for all subsequent plan years as average salaries of the general employee population otherwise rose by comparison. *See* Hogue Decl. ¶ 7, Ex. 5 (Expert Report of Scott Van Meter (filed under seal)).  This evidence was case dispositive and ignoring it was an abuse of discretion as well as legal error.

108.    In addition, Debtors admitted ***no evidence*** that the only eligible employees were employees holding and capable of exercising enough power and influence over the Plans or with access to critical financial information about the Debtors such that they were capable of appreciating the risks the Plans imposed.  Instead, the uncontroverted and admitted evidence showed only that eligible and actual plan participants had no influence or bargaining power and did not have access to information or understand the risks associated with the Plans.  This evidence was provided by the Debtors' witnesses. Hogue Decl. ¶ 4, Ex. 2 (Mar. 26 Tr.) at 216:13-21 (Dr. Purohit Direct).   Ms. Driscoll testified in her deposition—admitted as cross examination testimony—that employees were never given an opportunity to negotiate plan terms when the

Steward Plan was amended and restated, and that no employee was ever given an opportunity to influence the administration of the plan thereafter.  Hogue Decl. ¶ 6, Ex. 4 (Driscoll Deposition Tr.) at 92:1-93:3.  Mr. Lombardo and Ms. Potter concurred.  Hogue Decl. ¶ 4, Ex. 2 (Mar. 26 Tr.) (Lombardo Cross) at 124:25-125:15, (Potter Direct) at 167:14-20.  Every witness for the Appellants corroborated this testimony. Hogue Decl. ¶ 4, Ex. 2 (Mar. 26 Tr.) at 216:13-21 (Dr. Purohit Direct);  Hogue Decl. ¶ 10, Ex. 8 (Thomas Decl.) at ¶ 6; Hogue Decl. ¶ 11, Ex. 9 (Paggioli Decl.) at ¶¶ 4-5; Hogue Decl. ¶ 12, Ex. 10 (Lydon Decl.) at ¶¶ 4, 6; Hogue Decl. ¶ 13, Ex. 11 (Beesen Decl.) ¶¶ 4, 6.

109.    In this case, the Bankruptcy Court committed reversible error when it failed to consider whether the Plans' participants had any influence to negotiate compensation agreements or otherwise had access to the tools and transparency necessary to protect their interests and appreciate and plan for the risk involved in participating in the Plans.  Repeating as mantra "text is alpha," the Bankruptcy Court noted that ERISA only requires plans to be "unfunded" and for a "select group of management or highly compensated employees."  The Bankruptcy Court turned to Merriam Webster and used its definition of "select" (chosen from a number or group by fitness or preference) to conclude that "select group of management or highly compensated employees" means that top hat status requires only that the employer choose to make eligible for plan participation some subset of its management or employees with high compensation.  The Fifth Circuit's cannons of statutory construction do not compel this radical result and departure from well settled ERISA law. United States v. Moore, 71 F.4th 392, 395 (5th Cir. 2023) ("Plain meaning is always the start."); United States v. Koutsostamatis, 956 F.3d 301, 306 (5th Cir. 2020) ("Text should never be divorced from context."); Asadi v. G.E. Energy (USA) L.L.C., 720 F.3d 620, 622 (5th Cir. 2013) (noting context means both immediate clause and "the broader context of the statute

as a whole."); <u>Kornman & Assocs., Inc. v United States</u>, 527 F.3d 443, 451 (5th Cir. 2008) (holding courts may "deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress.").

110.    Here, the only "evidence" that the Bankruptcy Court relied upon to find that the Plans were unfunded were that the Trust Agreements said they were unfunded.  Appellants, however, put into evidence an email from the Steward employee considered an expert on the IASIS Plan that stated that assets under the Plans were not in either a rabbi trust or a secular trust.  Hogue Decl. at ¶ 4, Ex. 2 (Mar. 26 Tr.) (Potter Cross Examination) at 168:18-172:1; Hogue Decl. ¶ 8, Ex. 6 (Trial  Ex. 115 (Feb. 20, 2024 email)).  This evidence controverts that the IASIS Plan was "unfunded" under the supposedly relevant trust agreement.  No contrary evidence was introduced by the Debtors. Debtors did not object that the document was hearsay, and the evidence came in for the truth of the matter asserted.  In addition, Appellants submitted uncontroverted evidence that distributions were made to participants under the Steward Plan when Debtors were unquestionably insolvent.  Because Appellants and others were being preferred in administration of the plan to general creditors at a time of insolvency, thus ignoring the very provision of the alleged trust that makes the plan potentially unfunded, the Debtors were administering the Plans as funded.  The Bankruptcy Court, however, relied only on the terms of the supposedly relevant Trust Agreement and based on those terms alone found the Plans to be unfunded, completely disregarding the uncontroverted evidence that the plans were otherwise administered.  The Bankruptcy Court's conclusion ignores well settled law and constitutes legal error.

111.    In addition, the Debtors' witnesses stated that the Debtors made no inquiry as to whether any eligible employee had any actual management responsibilities, but rather simply made eligible all vice presidents and up who met the compensation standard. No effort was made to

determine whether employees managed anyone or anything. Hogue Decl. ¶ 4, Ex. 2 (Mar. 26 Tr.) (Potter Cross Examination) at 176:6-177:9. This, too, is fatal to top hat status, but was ignored or given no weight by the Bankruptcy Court.

112.    The Appellants' expert—whose testimony the Bankruptcy Court found credible— applied the rule of the <u>Daft</u>, <u>Fishman</u>, and <u>Berry</u> decisions in determining that the Steward Plan was not sufficiently selective and that there was no material disparity between the average salary of the entire employee population and the minimum compensation necessary for plan eligibility. The Debtors' expert ignored this test. Instead, Debtors submitted as evidence their expert's calculations and conclusions that the average salary of eligible plan participants was a multiple of the average salary of the employee population as a whole. In doing so, the Debtors' expert failed to eliminate part-time employees from his calculation of the average salary for the entire population and relied on data that the Appellants' expert characterized, without serious opposition from the Debtors, as unreliable. But more critically, the Debtors' expert and the Bankruptcy Court both disregarded the admonition of the case law on the distortive effect of relying on a calculation of the average salary of eligible plan participants. In doing so, both relied on <u>Alexander v. Brigham & Women's Physicians Org., Inc.</u>, 513 F.3d 37 (1st Cir. 2008), but the First Circuit opinion provides no such support. While the court made a comparison based on average salaries, it did so only after finding that the subject plan was clearly selective on other grounds; the plan was limited to unquestionably highly compensated surgeons whose net practice income ("**NPI**") exceeded a certain cap, insuring that only a very few members of the physician population were eligible, most making nearly half a million dollars annually. The First Circuit found that the eligible group was highly compensated both relatively and absolutely under any standard. <u>Alexander</u>, 513 F.3d at 46. The court's passing reference to comparative averages as an indication of disparity was in no way

an endorsement of using such a test or a rejection of the inescapable logic of <u>Daft</u> and progeny regarding the distortive effect of averages.

113.    Finally, and without limitation, the Bankruptcy Court erred because, while giving lip service to the Debtors having the burden of proof on all issues, the court clearly allocated that burden to the Appellants.  Under the court's "the contract is the contract" mindset and hyper-textual approach to the ERISA statutes, the language of the relevant plan documents prevailed unless the Appellants overcame the presumption in favor of that language.  A classic example of the burden reversal was the court's statement in the ruling that there was "no evidence that the IASIS trustee stopped managing the assets" as a basis for finding the IASIS Plan to be unfunded. But there was no evidence that the IASIS trustee continued to manage the assets after 2017, and the uncontroverted evidence established that the IASIS Plan assets were not in the Rabbi Trust as the Debtors claimed.  It was for the Debtors to prove unfunded status, not for the Appellants to prove funded status, but the court below placed this burden on Appellants.  While the Appellants contend that they did that in any event, it was legal error for the Bankruptcy Court to, in reality, allocate that burden of proof to Appellants.

### D. Public Policy Favors Granting the Stay.

114.    Public interest weighs heavily in favor of granting the stay.  At its core, this case concerns whether an employer can evade federal protections designed to safeguard employees' deferred compensation—money that belongs to workers, not corporate creditors.  The decision in this case will have ramifications far beyond Appellants.  If the Debtors succeed in distributing the Plan Assets before an Article III Court has had an opportunity to review the bankruptcy court's legal conclusion on ERISA issues, it will send a dangerous signal to employers nationwide that they can repurpose employee deferred compensation, secure in the knowledge that they can later claim any assets set aside to fund deferred compensation distributions as part of their bankruptcy

estate. This Court should reject such a precedent and prevent distribution of funds that may never be recoverable even if Appellants succeed in their appeal.

115.    If the stay is denied and the Debtors are allowed to act on the Turnover Order before the appeal is fully adjudicated, it would undermine public confidence in ERISA's protections and incentivize other struggling employers to raid employee funds under the guise of financial restructuring. Such an outcome would erode the fundamental purpose of ERISA—to ensure that employees, not corporate creditors or bankruptcy professionals, benefit from the compensation they have rightly earned. *See*, *e.g.*, Hayden, 2008 WL 400696 at *4 (noting the "public policy of protecting pensions under ERISA"); *see also* Karpik, 2021 WL 757123 at *6 (noting that "the protection of retirement funds is a great public interest") (internal citations omitted); Broadwing, 252 F.R.D. at 381 ("Protecting retirement funds of workers is of genuine public interest[.]")

116.    Moreover, denying the stay would undermine trust in the integrity of the judicial process. Appellants have presented serious legal and factual disputes that warrant full and fair adjudication. The Appellants were denied the due process they deserve and have a right to. If this Court denies the stay and these funds are transferred and spent, the Appellants may never recover what is rightfully theirs. The justice system does not serve the public interest when it allows irreversible harm to occur before the legal process runs its proper course.

117.    In response to the oral motion to stay in front of the Bankruptcy Court, Debtors did not articulate a clear public-policy purpose supporting denial of the stay. The Bankruptcy Court, however, found that "honoring contracts" is a public policy that deserves respect and appears to have found it to outweigh the above-articulated harm. This finding underlines that the Bankruptcy Court decided this case on the documents alone and disregarded the evidence. But, in any event,

granting the stay does not dishonor contracts, and the policy of generally honoring them does not outweigh the great harm to Appellants.

**E. The Court Should Not Condition the Stay Pending Appeal on a Bond.**

118.    Under Bankruptcy Rule 8007(c), courts have discretion as to whether to condition a stay on a bond or other security pending appeal.  Because the Debtors themselves suffer no harm by a stay of the Order for the reasons set forth above, Appellants should not be required to post a bond.  The Appellants are individual employees and retirees who cannot fund or collateralize a bond in any event; imposing a bond requirement is tantamount to denying the Motion.  The Court, therefore, should not order a bond or other additional form of security during the stay.

## CONCLUSION

Appellants respectfully request that this Court stay the effectiveness of the Order pending a hearing on this Motion and, further, pending this Appeal.

Dated:  April 7, 2025　　　　　　/s/ Allan B. Diamond　　　　　　　　　
　　　　　　　　　　　　　　　　Allan B. Diamond, Esq.
　　　　　　　　　　　　　　　　Christopher D. Johnson, Esq.
　　　　　　　　　　　　　　　　Diamond McCarthy, LLP
　　　　　　　　　　　　　　　　909 Fannin Street, 37th Floor
　　　　　　　　　　　　　　　　Houston, TX  77010
　　　　　　　　　　　　　　　　Telephone: (713) 333-5100
　　　　　　　　　　　　　　　　Facsimile: (713) 333-5199
　　　　　　　　　　　　　　　　Email: allan.diamond@diamondmccarthy.com
　　　　　　　　　　　　　　　　　　　chris.johnson@diamondmccarthy.com


　　　　　　　　　　　　　　　　Robert J. Keach, Esq., *admitted pro hac vice*
　　　　　　　　　　　　　　　　Lindsay K. Milne, Esq.
　　　　　　　　　　　　　　　　**BERNSTEIN, SHUR, SAWYER & NELSON**
　　　　　　　　　　　　　　　　100 Middle Street
　　　　　　　　　　　　　　　　P.O. Box 9729
　　　　　　　　　　　　　　　　Portland, ME  04104-5029
　　　　　　　　　　　　　　　　Telephone: (207) 774-1200
　　　　　　　　　　　　　　　　Facsimile: (207) 774-1127
　　　　　　　　　　　　　　　　Email: rkeach@bernsteinshur.com
　　　　　　　　　　　　　　　　　　　lmilne@bernsteinshur.com

　　　　　　　　　　　　　　　　*Counsel for the Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing pleading has been electronically served on April 7, 2025, to counsel for Defendants/Appellees as follows:

| | |
|---|---|
| Clifford Carlson | Clifford.carlson@weil.com |
| Robert Berezin | Robert.berezin@weil.com |
| Taylor Dougherty | taylor.dougherty@weil.com |
| Kara.Hafermalz | Kara.hafermalz@weil.com |
| David Cohen | davidj.cohen@weil.com |

 _/s/ Allan B. Diamond_