**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 24-90213 (CML) |
| STEWARD HEALTH CARE SYSTEM, | ) | (Jointly Administered) |
| LLC, *et al.*, | ) | |
| Debtors.[1] | ) | Case No.: 4:25-cv-01584 |
| | ) | |

**DECLARATION OF BRIAN R. HOGUE IN SUPPORT OF**
**PLAN PARTICIPANTS' MOTION TO STAY PENDING APPEAL (INCLUDING**
**MOTION FOR IMMEDIATE STAY PENDING HEARING ON**
**MOTION TO STAY PENDING APPEAL)**

I, Brian R. Hogue, being over 18 years of age and competent in all respects to testify, having personal knowledge of the facts set forth below unless otherwise stated, and under penalty of perjury, hereby state, swear, and affirm the following:

1.      I am a lawyer at Diamond McCarthy, LLP, co-counsel to Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lydon,  Dr. Sridhar Ganda, and Dr. A. Ana Beesen (collectively, the "**Participants**"), participants in certain deferred compensation plans sponsored by the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "**Debtors**"). I am a member in good standing of the state bars of Texas and New York and am admitted to practice in the United States Bankruptcy Court and the United States District Court for the Southern District of Texas.

2.      I am familiar with the facts, circumstances, and proceedings in this case relevant to this declaration, which I submit in support of *Appellants' Emergency Motion for Stay Pending*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

*Appeal (Including Motion for Immediate Stay Pending Hearing on the Emergency Motion for Stay Pending Appeal).*

3.      I attach and file under seal as Exhibit 1 to this declaration a true and correct copy of the transcript of the March 7, 2025 ("**Stay Hearing**") hearing before the Hon. Christopher M. Lopez, United States Bankruptcy Judge, on, among other matters, the *Emergency Motion of Certain Participants for an Order Staying the Contested Matter Relating to the Turnover Motion* (ECF 4089 ("**First Emergency Stay Motion**")).

4.      I attach as Exhibit 2 a true and correct copy of the transcript of the Turnover Hearing that took place on March 26, 2025 before the Hon. Christopher M. Lopez, United States Bankruptcy Judge, on among other things the Debtors' *Motion for an Order (A) Directing Trustees to Turn Over and Deliver Trust Assets or Proceeds thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights over Such Assets, (c) Authorizing Termination of Trusts, and (D) Granting Related Relief* (ECF 3277 ("**Turnover Motion**")) and Appellants' Turnover Objection.

5.      I attach as Exhibit 3 a true and correct copy of the transcript of the Turnover Hearing that took place on March 27, 2025 before the Hon. Christopher M. Lopez, United States Bankruptcy Judge on , among other things, the Turnover Motion and Turnover Objection.

6.      I attach and file under seal as Exhibit 4 to this declaration a true and correct copy of the transcript of the Deposition of Ann-Marie Driscoll-Waszczuk ("**Driscoll Deposition**"), which was taken on March 19, 2025 in Andover, Massachusetts.

7.      I attach and file under seal as Exhibit 5 a true and correct copy of the Expert Report of K. Scott Van Meter dated March 24, 2025.

8.      I attach and file as Exhibit 6 a true and correct copy of an email produced by Debtors dated February 20, 2024 that Appellants offered into evidence and the Bankruptcy Court admitted as Participants' Trial Exhibit 115.

9.      I attach and file under seal as Exhibit 7 a true and correct copy of an email produced from Debtors included in the Disputed Emails that Appellants introduced into evidence at the Turnover Hearing under seal at Participants Trial Exhibit 51 subject to Debtors' privilege objections in the Motion to Seal.

10.      I attach and file as Exhibit 8 a true and correct copy of the Declaration of James D. Thomas that the Bankruptcy Court admitted into evidence as Participant's Trial Exhibit 7.

11.      I attach and file as Exhibit 9 a true and correct copy of the Declaration of Diane Paggiolli that the Bankruptcy Court admitted into evidence as Participant's Trial Exhibit 9.

12.      I attach and file as Exhibit 10 a true and correct copy of the Declaration of Peter Lydon that the Bankruptcy Court admitted into evidence as Participant's Trial Exhibit 10.

13.      I attach and file as Exhibit 11 a true and correct copy of the Declaration of A. Ana Beesen, which the Bankruptcy Court admitted into evidence as Participant's Trial Exhibit 11.


Solemnly affirmed and signed this 7th day of April, 2025, under the penalties of perjury.


                                        /s/ Brian R. Hogue
                                        Brian R. Hogue

# EXHIBIT 1

# Filed Under Seal

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-90213-11 |
| | § | HOUSTON, TEXAS |
| STEWARD HEALTH CARE SYSTEM, | § | WEDNESDAY, |
| LLC, | § | MARCH 26, 2025 |
| DEBTORS. | § | 9:04 A.M. TO 6:30 P.M. |

**<u>MOTION HEARING DAY ONE</u>**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:                         SEE NEXT PAGE

COURTROOM DEPUTY/ERO:            YESENIA LILA

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

**<u>APPEARANCES</u>:**

```
FOR DEBTORS, STEWARD HEALTH        WEIL GOTSHAL & MANAGES, LLP
CARE SYSTEM, LLC, ET AL.:          Robert Berezin, Esq.
                                   Taylor R. Dougherty, Esq.
                                   767 Fifth Avenue
                                   New York, NY 10153
                                   212-310-8021

                                   GROOM LAW FIRM
                                   Samuel Levin, Esq.
                                   Shai Bronshtein, Esq.
                                   1701 Pennsylvania Avenue, NW
                                   Washington, DC 20006
                                   202-857-0620


FOR MANISHA PUROHIT AND            DIAMOND McCARTHY, LLP
VARIOUS PLAN PARTICIPANTS:         Allan Brent Diamond, Esq.
                                   Brian Hogue, Esq.
                                   Justin Strother, Esq.
                                   909 Fanin Street
                                   37th Floor
                                   Houston, TX 77010
                                   713-333-5100

                                   BERNSTEIN SHUR
                                   Robert J. Keach, Esq.
                                   Lindsay Z. Milne, Esq.
                                   Paul McDonald, Esq.
                                   100 Middle Street
                                   West Tower
                                   Portland, ME 04100
                                   207-774-1200



        (Please also see Electronic Appearances.)
```

3

**INDEX**

OPENING STATEMENTS:                Page
 By Mr. Berezin                     13
 By Mr. Keach                       25


| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PATRICK LOMBARDO | | | | |
| By Mr. Bronshtein | 46 | . | . | . |
| By Ms. Milne | . | 102 | . | . |
| KATCHENA POTTER | | | | |
| By Mr. Bronshtein | 137 | . | 195 | . |
| By Mr. Keach | . | 168 | . | . |
| MANISHA PUROHIT | | | | |
| By Mr. Diamond | 202 | . | 229 | . |
| By Mr. Berezin | . | 216 | . | . |
| JOSEPH KROCK | | | | |
| By Mr. Bronshtein | 235 | . | 302 | . |
| By Mr. McDonald | . | 273 | . | . |
| SCOTT VAN METER | | | | |
| By Mr. Strother | 305 | . | 349 | . |
| By Mr. Levin | . | 333 | . | . |


EXHIBITS:                          Admitted

Exhibits 1 through 140              43
Exhibits 140 through 145           44
Exhibits 146 through 150           45

***

1          **HOUSTON, TEXAS; WEDNESDAY, MARCH 26, 2025; 9:04 A.M.**

2               THE COURT:  Good morning, everyone.  This is Judge

3     Lopez.  Give me about 20 seconds, I'll turn on my camera and

4     we'll get started.

5          (Pause in the proceedings.)

6               THE COURT:  It takes a while for the Chevy to get

7     started.  Hold on a second, yeah.

8          (Pause in the proceedings.)

9               THE COURT:  All right.  Okay.  Good morning.  I'm

10    going to call the Steward Health Care case, 24-90213.  Why

11    don't I take appearances of parties.  I'd also encourage you

12    to make electronic appearances as well.  Good morning.

13               MR. BEREZIN:  Good morning, Your Honor.  Robert

14    Berezin, Weil Gotshal & Manges, on behalf of the Debtors.  I'm

15    here with our co-counsel Samuel Levin and Shai Bronshtein from

16    the Groom law firm.

17               THE COURT:  Okay.  Good morning.

18               UNIDENTIFIED SPEAKER:  Good morning.

19               THE COURT:  Good morning.

20               MR. DIAMOND:  Allan Diamond with Diamond McCarthy.

21    I'm here this morning with various co-counsel in my office.

22    There's Mr. Justin Strother --

23               THE COURT:  Good morning.

24               MR. DIAMOND:   -- Mr. Brian Hogue, and then our co-

25    counsel, Mr. Robert Keach and Ms. Lindsay Milne.

1                THE COURT:  Good morning.

2                MR. DIAMOND:  Good to be here.  Thank you, Your

3        Honor.

4                THE COURT:  Good morning.

5                Anyone else in the courtroom wish to make an

6        appearance?

7            (No audible response.)

8                THE COURT:  Okay.  If you're on the line, this is

9        kind of an in-court hearing, but I'll keep the line open.

10               How do you wish to proceed, Counsel?

11               MR. BEREZIN:  Your Honor, the parties have met and

12       conferred, so what we would suggest, if it's acceptable to the

13       Court, that we would start with the motion to seal the

14       privilege issues and motion argument.

15               THE COURT:  Is there contested -- is that contested,

16       the motion to seal, sir?

17               MR. BEREZIN:  I believe, yes, it is, Your Honor.

18               THE COURT:  Why don't we just -- oh, you mean the

19       motion to seal stuff?

20               MR. BEREZIN:  Yeah, essentially the privilege issue

21       as to whether certain documents (A) are privileged under ERISA

22       or not, and (B) even if they were, did the Debtors waive that

23       privilege through the inadvertent production.

24               THE COURT:  Got it.  Okay.

25               MR. BEREZIN:  And some of those exhibits would be at

6

1   play which is why the parties thought it would be best to

2   start with that.

3           THE COURT:  Okay.

4           MR. BEREZIN:  If it pleases the Court.

5           THE COURT:  All right.  No, no, no worries.  I just

6   wanted to make sure I understood.  Okay.

7           MR. BEREZIN:  Okay.

8           MR. KEACH:  Your Honor, just to add to that.  Robert

9   Keach for the participants.  We also filed a motion to compel

10  which crystalizes that same issue because --

11          THE COURT:  Uh-huh.

12          MR. KEACH:  -- it wasn't all fully encompassed in

13  the motion to seal the record.  But we agree with counsel that

14  that's a threshold issue.

15          THE COURT:  So --

16          MR. KEACH:  The way -- just to inform the Court, the

17  way we proceeded in discovery was to essentially designate

18  times when we were encroaching on those documents and asking

19  questions about them --

20          THE COURT:  Uh-huh.

21          MR. KEACH:  -- but allow the witnesses to talk

22  about them and then we would -- that way the information would

23  be in the Record pending Your Honor's ruling.

24          THE COURT:  Okay.

25          MR. BEREZIN:  Yes, we agree with that, Your Honor.

1    And so we would have that argument.  The parties have, in

2    terms of the exhibits, the parties have stipulated to the

3    admissibility of the exhibits on their Exhibit List, so we

4    would just move those exhibits into evidence.  And then we

5    would go to the openings, Your Honor had indicated 30 minute

6    openings per side, and then from there --

7              THE COURT:  If it's really all that -- if you really

8    need 30 minutes.  I don't -- I don't see this as a -- well,

9    you can use up to 30 minutes.

10             MR. BEREZIN:  Understood, Your Honor.

11             THE COURT:  All right.  But if you can do it in 20,

12   that's even better.

13             MR. BEREZIN:  We'll do our best, I'm sure.  After

14   openings in terms of witnesses there are 5 live witnesses in

15   total on both sides.  One housekeeping note is that the

16   parties agreed that for certain witnesses they could -- their

17   testimony would go in by Declaration --

18             THE COURT:  Uh-huh.

19             MR. BEREZIN:   -- and the cross and redirect through

20   their deposition testimony so --

21             THE COURT:  That makes sense.

22             MR. BEREZIN:  Okay.  And then after all of that we

23   would have closings.

24             THE COURT:  Okay.  In terms of --

25             MR. DIAMOND:  Your Honor?

1            THE COURT:  Yes, Mr. --

2            MR. DIAMOND:  One more along the same housekeeping

3    lines.  We've all submitted Declarations of the witnesses who

4    are not going to be appearing live here today.  I don't know

5    if the Court has already deemed those admitted or you want us

6    to present those and propose for admission so that they're in

7    the Record?

8            THE COURT:  I have not read anything just out of

9    respect and not knowing what was going to come in or not come

10   in.  So I think formally just introducing even if the parties

11   agree to it would be better for me.

12           MR. BEREZIN:  Okay.

13           THE COURT:  Thank you.

14           MR. BEREZIN:  Yeah.

15           MR. DIAMOND:  Yep.

16           THE COURT:  Okay.

17           MR. DIAMOND:  Okay.  So with that --

18           THE COURT:  And I will tell everyone based upon what

19   you're telling me we're going to finish today.  We're -- even

20   if we've got to 9:00, 10:00 o'clock at night, be ready to go.

21   So, and I want everybody to be ready to go at least till 9:00

22   tonight to see if we can get it done based upon everybody's

23   deal.  If we've got to pick back up in the morning, I've got

24   some time, but I want to make sure that we're using our time

25   efficiently.

9

1          We'll stop at noon, take about a 45 minute lunch

2      break.  You're more than welcome to loosen ties, bring food, I

3      don't care about any of that.  If we need to get rooms, let's

4      just get rooms, but let's -- I want to make sure that we're

5      being efficient with our time.

6          And you should assume for purposes of kind of what

7      I've read, I haven't read -- you know, I didn't read exhibits.

8      Right.  They're kind of pre -- think about exhibits that may

9      be admitted, not admitted, I didn't know what I was going to

10     do.  But in terms of case law in this circuit and outside of

11     this circuit, other cases where this stuff has been litigated

12     at the Bankruptcy Court level, at the District Court level, at

13     the appellate level, you should assume I'm incredibly familiar

14     with all of that.  So you can go right into -- mention the

15     cases and go right into it if you want to.

16         You should -- but you should establish your Record.

17     I know I'm incredibly comfortable with top hat plans and how

18     they work under ERISA.  But I got it that you may want to

19     establish a Record, so go ahead and do it.  But at some point

20     when we argue at the end you should assume that I'm incredibly

21     familiar with this, and you can go and we can get deep into

22     the weeds on some of this stuff.  Okay?  For everybody.

23         MR. DIAMOND:  Thank you, Your Honor.

24         MR. BEREZIN:  Yes, Your Honor.

25         MR. KEACH:  One final housekeeping.  I think, Rob,

1    you mentioned there was 5 live witnesses.  I think there's 6

2    total.  One of them, Your Honor --

3              MR. BEREZIN:  You're correct, I apologize.

4              MR. KEACH:  Yeah, no, no worries.  One of them, Your

5    Honor, is Dr. Purohit, one of our witnesses, and I just want

6    to advise the Court we've tried to accommodate each other and

7    work out -- she's on a plane right now, she left at like 5:00

8    o'clock this morning from Phoenix on her way here, so we might

9    take her out of order because she has to --

10             THE COURT:  I think that's completely fine.

11             MR. KEACH:   -- get back for a surgery so.

12             THE COURT:  No, that's completely --

13             MR. KEACH:  Yeah.

14             THE COURT:   -- that's completely understandable.

15   Completely understandable.  Let's keep going.  Okay.

16             MR. BEREZIN:  Okay.  Your Honor, then we'll -- I'll

17   turn it over to my colleague, Taylor Dougherty, who will

18   handle the motion, our motion to seal which is the privilege

19   issue we talked about.

20             THE COURT:  Okay.

21             MR. BEREZIN:  Okay.

22             MS. DOUGHERTY:  Good morning, Your Honor.  Taylor

23   Dougherty, Weil Gotshal & Manges, on behalf of the Debtors.

24   If it's okay with Your Honor, we were going to take first the

25   issue of the -- whether or not the underlying emails are, in

11

1    fact, privileged, which a key issue there is the fiduciary

2    exception for ERISA plans, and my colleague, Sam Levin, was

3    going to handle that issue if it's okay for him to start with

4    that.

5            THE COURT:  Well, the question of whether -- don't I

6    need to determine first whether this is a top hat plan first?

7    In other words, if it's -- if it's a true top hat plan, then

8    it's exempt from the fiduciary under ERISA.  So how do I take

9    that without -- how do I deal with that up front without

10   dealing with the objection that's been made?

11           MS. DOUGHERTY:  Yes, Your Honor, and so Mr. Levin

12   can speak to this more fully.  But the Debtors' position and

13   our understanding under the case law is that for purposes of

14   establishing whether or not the fiduciary exception applies we

15   are not obligated to make -- there may not be a final

16   determination that the plans at issue are, in fact, top hat

17   plans, but rather we need to just meet a *prima facie* showing

18   that they are, in fact, top hat plans, and it's the Debtors'

19   position that we have done so in our briefing to date.

20           But I'll turn it over to Mr. Levin --

21           THE COURT:  I know, but I'm not -- all right, I got

22   it.  I guess my point is I can't say that something is subject

23   to an exception and then whether or not -- establishing --

24   they've got to prove -- or you -- they've got to prove that

25   this plan that you all put out is not a top hat plan.  And if

12

1    that's the case, then it comes in, if not, then it doesn't

2    come in.  But I can't make the call right now.  I'm not -- in

3    other words it's sealed until it's determined that it's not

4    sealed.

5            MR. BEREZIN:  We agree with that, Your Honor.

6            THE COURT:  Yeah, that's my ruling.  It's --

7            MS. DOUGHERTY:  Okay.  Great.

8            THE COURT:    -- let's get to openings.

9            MS. DOUGHERTY:  Thank you, Your Honor.

10           THE COURT:  And I want to be really clear, as of

11   right now there's a *prima facie* case that's based on -- the

12   Debtors -- so the Debtors don't have to come in.  There's an

13   objection to the plan saying that it's not subject -- that it

14   is subject to ERISA and it's not a true top hat plan.

15   Someone's got to approve that.  And maybe you've got to put on

16   the case that -- you know, it's your motion so you're going to

17   have to prove that it is one.

18           But until we know I'm not unsealing something and

19   then sealing it on the back end.  Maybe the documents come in,

20   and the evidence comes in and then we have to figure out what

21   to do on the back end.  But as of right now it's sealed until

22   I determine otherwise.  And then the ramifications of that,

23   and we'll figure out what happens on the back end.  So as of

24   right now let's just get into openings.

25           MR. LEVIN:  Understood, Your Honor.  If I could just

1    make one more brief additional point.  We do have a backup

2    argument that even if it --

3            THE COURT:  You don't have to.  I won't -- yeah, I'm

4    ready for openings.  Don't lose the argument for it with the

5    opening --

6            MR. BEREZIN:  Just so I understand, Your Honor, and

7    the process, witnesses who were questioned in their deposition

8    under our stipulation about the privileged information.

9            THE COURT:  They can't -- yeah, you can't talk about

10   it until -- but at some point if I get uncomfortable that this

11   is not a true top hat plan, then --

12           MR. BEREZIN:  Got it.

13           THE COURT:  -- then --

14           MR. BEREZIN:  Understood.

15           THE COURT:  -- then folks can -- the door may get

16   opened and it comes in.

17           MR. BEREZIN:  Understood, Your Honor.

18           OPENING STATEMENT ON BEHALF OF THE DEBTORS

19           MR. BEREZIN:  Again, for the Record, Robert Berezin,

20   Weil Gotshal & Manges, representing the Debtors.  Your Honor,

21   Steward had two deferred compensation plans, one was the

22   Steward Health Care Deferred Compensation Plan, and the other

23   was an IASIS Healthcare Executive Savings Plan.  That IASIS

24   was acquired in 2017, the plan was frozen, so for practical

25   purposes from that point on there is one plan.  But both of

14

1    those plans had a trust, Rabbi Trust, one had $11 million in

2    it and the other about 51 million, and those amounts are now

3    in designated accounts awaiting a ruling from the Court.

4           Today we have testimony, Your Honor, from three

5    Steward current or former employees.  They were part of

6    Steward Health Care's HR Department, the team that handled all

7    of the benefit plans for Steward.  Collectively their

8    knowledge covers the period from 2014 to the present.

9           We will present live testimony of Mr. Pat Lombardo,

10   who was an Executive Vice President at IASIS before it was

11   acquired by Steward, and then upon that acquisition in 2017 in

12   October he became Executive Vice President of HR at Steward.

13   And as the Executive Vice President Mr. Lombardo was

14   responsible for overseeing decisions relating to the benefit

15   plans at Steward.

16          We will have by Declaration Ann Marie Driscoll.

17   Ms. Driscoll left Steward in 2020 and was unable to join the

18   hearing.  As we agreed she will -- her testimony will come in

19   by Declaration.  Ms. Driscoll was Director and then Vice

20   President in HR, and she reported to Mr. Lombardo.

21          She was responsible for assisting in the

22   administration of the Steward Rabbi Trust starting in 2014 all

23   the way through February of 2020.  Among other things

24   Ms. Driscoll determined whether employees were eligible to

25   participate in the plan based on title and salary, and she's

15

1    testified that -- she will testify about that.

2          Kat Potter is our final witness from Steward.

3    Ms. Potter is a Director of Benefits at Steward to this day in

4    the HR Department.  She has held that position since 2018.

5    She too helped administer the deferred compensation plans and

6    fills in the gap in terms of the day-to-day and workings of

7    the plan through the current.

8          These witnesses will testify about the deferred

9    compensation plans and will provide evidence about whether the

10   plans were unfunded and maintained primarily to provide

11   deferred compensation for a select group of management or

12   highly compensated employees.

13         We'll start, Your Honor, with the evidence of what

14   the plan and trust documents said.  Could we pull up ECF 4306-

15   1?

16         THE COURT:  I need to give someone privilege.  Who

17   should I give it to -- or are you using the hard screen, now

18   do you --

19         MR. BEREZIN:  Cara --

20         UNIDENTIFIED SPEAKER:  Cara Acramals (phonetic).

21         MR. BEREZIN:   -- Acramals.

22         THE COURT:  Gotcha.

23      (Pause in the proceedings.)

24         THE COURT:  There is one question for you up front.

25   What was the legal effect of the final wage order authorizing

16

1        the termination of the -- I authorized the Debtors to

2        terminate the, what was defined as the deferred comp plans

3        which are basically these plan here.  And now you're asking in

4        this motion again to kind of -- it feels like you're trying to

5        terminate them again, and I'm trying to understand the legal

6        distinction between -- or just so that we have a clean Record

7        in my -- as well for me, the difference between what you asked

8        for then and what you're asking for now.

9             MR. BEREZIN:  Yes, Your Honor.  What we asked for

10       then was to terminate the plans which essentially froze those

11       plans in place, employees would not long defer income into

12       those plans.  Whatever was in the Rabbi Trust, both trusts,

13       would remain in the Rabbi Trust.

14            This motion is to obtain authority to take

15       possession, custody and control of those Rabbi Trust assets

16       and utilize them in the case as part of property of the

17       estate.

18            THE COURT:  The plan is then now -- that froze the

19       money in the trust, no additional -- and now you're asking

20       essentially to kind of dissolve the trust, get rid of the

21       trust -- relief the trustee of any duties, get the money kind

22       of back into a Debtor account if you will --

23            MR. BEREZIN:  Yes, although --

24            THE COURT:     -- controlled account.

25            MR. BEREZIN:  That's correct, Your Honor, although

17

1    the parties did stipulate a few months ago that the monies

2    could be taken out of the trust and put into designated

3    accounts.

4              THE COURT:  That's -- okay.  No, no, no, I agree.

5    Just kind of let it sit there somewhere and then figure out

6    what to do with it afterwards.

7              MR. BEREZIN:  Exactly, Your Honor.

8              THE COURT:  Yep, I got it.  Okay.

9              MR. BEREZIN:  Okay.

10              THE COURT:  Thank you.

11              MR. BEREZIN:  Yes, Your Honor.  So if we could look

12    at ECF 4306-1, that's Exhibit 2, and go to Bates stamp, I

13    guess it's 56 through 57, it's Section 9.01.

14         (Pause in the proceedings.)

15              MR. BEREZIN:  Okay.  Yeah, it's just loading.  While

16    it's loading I'll just continue, Your Honor.  Section 9.01 is

17    titled Unfunded Plan, and it states the plan is for a select

18    group of management or highly compensated employees.  It

19    states all payments pursuant to the plan shall be made from

20    the general funds of the employer.

21              It states no participant shall have under any

22    circumstances any interest in any particular property or

23    assets of the employers as a result of participating in the

24    plan.  And the employer Section 9.01 of the plan states can

25    establish a trust but the assets of that trust are subject to

18

1    the claims of the employer's creditors.

2         If we could go to Section 9.04 of the Steward Health

3    Care Rabbi Trust.

4         Okay.  Section 9.04, Your Honor, is titled Rabbi

5    Trust, it states the assets of such Rabbi Trust with respect

6    to benefits payable under the plan shall remain subject to the

7    claims of general creditors.  The IASIS plan which is Exhibit

8    1, ECF 4306, has similar language at Sections 3.01 and 6.02.

9         Could you please bring up ECF 4306-19, which is

10    Exhibit 20.  And go to the Bates number ending 68.

11         Your Honor, this is the agreement for the Steward

12    Rabbi Trust, the trust agreement.  At Paragraph 6 it states

13    that the trust assets remain subject to the claims of

14    Steward's creditors in the event of insolvency, and at Section

15    3.2 of the trust agreement it states Steward's Rabbi -- it

16    states at all times during the continuance of this trust as

17    provided in Section 1.1D hereof, the principal and income of

18    the trust shall be subject to the claims of general creditors

19    of the company under federal and state laws if the company,

20    Steward, or the trustee determines it has become insolvent,

21    which is defined as unable to pay its debts when due, or upon

22    a filing for bankruptcy.

23         The IASIS trust documents have similar language.

24    That's Section 1.4 of Exhibit 27 found at ECF 4306-27.

25         The evidence will show that Steward's Rabbi Trust

19

1       assets held corporate-owned life insurance policies.  Those

2       policies were owned by Steward and it is the sole beneficiary

3       of -- or was the sole beneficiary of those policies.  Those

4       policies can be found at ECF 4306-22, Exhibit 22, and ECF

5       4306-23, Exhibit 23.

6              The evidence will also show, Your Honor, that these

7       policies, consistent with the plan, were purchased with funds

8       from Steward's general account in an amount equal to the

9       compensation participants deferred on a bi-weekly basis, as we

10      will show.  One example of a wire transfer from Steward's

11      corporate accounts to the life insurance company is at ECF

12      4306-20, and that's Exhibit 21 and at Bates number 3569.

13             Ms. Potter and Mr. Castello will testify that each

14      pay period amounts deferred were calculated by payroll and

15      then Steward wired an amount equal -- an equal amount of

16      money, pardon me, from its general account to those life

17      insurance companies.

18             Now mechanically, Your Honor, Steward kept track of

19      amounts that participants deferring using accounts.

20             Could you please call up ECF 4306-1, Exhibit 2.

21             This is the Steward plan again, Your Honor.

22             And if you could proceed to Section 5.01.

23             To track how much compensation each participant

24      deferred the plan provided that deferred compensation accounts

25      should be utilized.  But the plan is crystal clear in Section

1    5.01 that the creation of deferred compensation accounts is to

2    be "utilized solely as a device for the measurement and

3    determination of amounts to be paid to the participant

4    pursuant to the plan.

5           The IASIS plan had similar provisions, Section 2.13

6    and 5.01, that's ECF 4306, Exhibit 1 at Bates 8 and 17.

7           As far as the plan documents that were provided to

8    participants, an annual enrollment email was sent to all

9    eligible employees using the plan criteria.  Each enrollment

10   email included a plan at a glance.

11          Could you pull up ECF 4307-3, which is Exhibit 53.

12          This is an example, Your Honor, of a plan at a

13   glance.

14       (Pause in the proceedings.)

15          MR. BEREZIN:  Okay.  There it is.  So at the very

16   bottom, Your Honor, of the plan at a glance there is a -- sort

17   of a column that says, Status of the plan, and it reads,

18   Unlike a 401(k) plan, if Steward Health Care becomes

19   insolvent, Steward's creditors will have access to your plan

20   account.  You will have rights of a general unsecured creditor

21   in such event.

22          We will show, Your Honor, that eligible employees

23   also could access a webpage that contained a plan summary,

24   plan document, and the plan at a glance under the plan

25   resources tab on the online enrollment site.  An example is at

21

1    ECF 4306-9, Exhibit 10.

2          Could you please pull up ECF 4306-12, which is

3    Exhibit 13.

4          This, Your Honor, is an example of a 2023 plan

5    summary for the 2023 -- I'm sorry, 2024 plan year.

6          And if you could go to 13354, once you get it.

7          And this is a section titled Security of Deferred

8    Compensation.  Yes.  Okay.  So under Security of Deferred

9    Compensation the plan summary states, The plan is considered

10   both unfunded and unsecured, making your employers promise to

11   pay the value of your deferred compensation plan accounts and

12   additional retirement income in unfunded and unsecured promise

13   to pay in the future.

14         As a participant you are an unsecured general

15   creditor of Steward Health Care and its subsidiaries, and your

16   payments must come from the assets of the corporation.  The

17   company has established a Rabbi Trust with which to pay

18   benefits under the plan to provide the maximum security

19   permitted by law.

20         Can you please bring up same exhibit, the 20 -- but

21   Bates 13350.

22         Your Honor, as you can see, the evidence will also

23   show that participants who elected to defer income paid no

24   taxes on the deferred amounts or the gains that were made on

25   the deferred amounts unless and until they received a

1    distribution years down the road.  And the reason they paid no

2    taxes is because they did not have, from an IRS perspective, a

3    property interest in the monies and they were at risk the

4    entire time until they actually had physical possession of the

5    distributions.

6            Turning to the evidence about the eligibility

7    criteria used by Steward and how it limited the plan to a

8    select group of executives or highly paid executives.

9            The annual plan at a glance document sent by the

10   plan administrator via email to eligible employees set forth

11   the eligibility criteria each year.  Prior to plan year 2020

12   you had to be an executive, specifically a vice president or

13   above, or a physician, and you had to make more than $150,000.

14   You can see an example at ECF 4307-43, Exhibit 93.

15           From plan year 2020 onward all participants had to

16   earn at least $180,000, Your Honor.  They had to be a vice

17   president or above, they had to be a physician, nurse

18   practitioner, physician assistant, or certified registered

19   nurse anesthetist.  You can see an example of the criteria at

20   ECF 4307-7, Exhibit 57.

21           So using that criteria we will show that the plan

22   was sufficiently selective.  We started with getting company

23   data from the Kronos payroll system.  This is the system that

24   Steward used to process payroll.  Ms. Potter, who will be

25   testifying, was involved in obtaining this data, and we then

1     provided it to our economist, Dr. Joe Krock, who you will hear

2     from as well.

3            Mr. -- Dr. Krock generated the data to show the

4     percentage of eligible employees to total employees, and the

5     percentage of participating employees, so those eligible that

6     decided to participate, to the total employees, as well as the

7     average salary compared to the required minimum eligible

8     salary, so we used 180,000 from the period 2019 forward.

9            Dr. Krock will testify that for the Steward plan,

10    the percentage of eligible employees to total employees ranged

11    from just 3.4 percent to 4.3 percent in the period 2019 to

12    2024.  The percentage of participating employees to the total

13    number of employees was only .2 percent to .5 percent in that

14    period.  And the eligible salary was 4.4 times to 4.6 times

15    greater than the total average salary of all employees.  The

16    evidence will show that these results are sufficiently

17    reliable to conclude that the plan was selective enough to

18    qualify as a top hat plan.

19           A word about bargaining power, or the ability to

20    change plan terms.  Your Honor, as we've briefed, this is but

21    1 factor in deciding if a plan was for a select group of

22    executives or highly compensated employees.  The evidence will

23    show that this was a voluntary plan.  Participants in the plan

24    was optional.  Each year elections had to be affirmatively

25    made.  Every year.  And how much participants deferred was

24

1      entirely up to them.  They could defer as little as 2 percent

2      of their compensation if they so chose.

3              The plan was offer to highly paid, highly educated,

4      highly trained healthcare professionals.  They were told in

5      plain language they had an unsecured promise with bankruptcy

6      risk.  Highly paid employees, like the objecting physicians,

7      had sufficient wherewithal to decide whether to participate or

8      not to participate.

9              Now the objectors have represented, including to the

10     District Court recently, that they have a strong case after

11     receiving thousands of documents, deposing the 3 most

12     knowledgeable people about the deferred compensation plan.

13     But the evidence will show that the plans were clearly

14     unfunded based on what the operative documents indisputably

15     say, based on how Steward used its cash and assets to create

16     the Rabbi Trust, based on how participants did not pay taxes

17     when they deferred compensation each year.

18             Now a word about insolvency.  Employee deferrals

19     continued up until the Chapter 11.  That's a fact.  All that

20     time Steward continued its practice of transferring cash equal

21     to the deferrals from its general accounts to the insurance

22     policies Steward owned.  That didn't change either.  Employee

23     distributions continued during that period.  The plan

24     continued to function, that's the evidence.

25             The unfunded language in the operative documents

25

1    didn't change.  The enrollment documents to eligible employees

2    about the risk did not change.  The taxes they avoided did not

3    change.  The Rabbi Trust assets were Steward's corporate

4    assets and therefore became property of the estate.

5         The evidence will show, as I mentioned, a very, very

6    small fraction of employees were eligible.  This was a top hat

7    plan.  In all events it was plainly unfunded, and as a result

8    there's no remedy under ERISA, constructive trust, reformation

9    that legally can wrest assets of the estate and convert them

10   essentially to assets of the participants.  As unfortunate as

11   it is that we're in this situation, and it is unfortunate,

12   Your Honor, but the law is the law and the facts are the

13   facts.  Thank you.

14        THE COURT:  Thank you.

15      (Pause in the proceedings.)

16        THE COURT:  Just take the --

17      OPENING STATEMENT ON BEHALF OF THE PARTICIPANTS

18        MR. KEACH:  Good morning, Your Honor.  Robert Keach

19   for the participant.  I'm going to be brief and to the point,

20   and I'm going to save the presentation of evidence for the

21   presentation of evidence.

22        But let me go to the last point first.  Well, the

23   fact that these plan purported to operate normally during the

24   period of insolvency is not a credit.  It's proof that they

25   were treated as funded.  So the evidence that was just

26

1    suggested to you as somehow definitive is an admission against

2    interest.

3            The fact that they continue to distribute money to

4    beneficiaries during insolvency means that they actually

5    preferred beneficiaries during insolvency over the general

6    unsecured creditors who, according to the plan documents would

7    have had an equal claim to those assets during insolvency.

8    That means they prioritized beneficiaries during the period of

9    insolvency and prioritizing beneficiaries during the period of

10   insolvency when you have assets in a Rabbi Trust means you're

11   administering the plan as if it is, in fact, funded.

12           And that brings me to my sort of basic point in

13   opening, Your Honor.  As District Courts in this district, and

14   as virtually every court that's looked at this issue has

15   concluded, you cannot decide these cases based on merely what

16   the documents say.  That is a starting point, not an ending

17   point.

18           Nor is it ever enough that the documents contain

19   warnings to the participants regarding the effects of

20   insolvency, or even -- or is it ever enough that the

21   recipients received those warnings.  You'll certainly get

22   testimony from the Declarations presented by our clients, by

23   our witnesses that they do not fully appreciate the risk, and

24   in many cases, while tendered, those warnings did not -- were

25   not fully aware of them.  But that's not a definitive point

27

1    either.  If they simply stood up and said, Here are our

2    documents and we presented these warnings to the recipients,

3    and rested, they would lose.

4        As Your Honor knows from the cases the critical

5    issue is not what the documents say, that's never enough.  The

6    critical issue is how were the plans administered, and how did

7    the company conduct itself vis-à-vis the participant and

8    beneficiary.  And on that point and on the point about how the

9    plan was formulated and administered, the Debtors clearly fail

10   in their burden of proof.

11       Let's start with the fact that negotiating power and

12   the fact that plans are voluntary have nothing to do with one

13   another.  All deferred compensation plans are voluntary.  If

14   that was enough to establish negotiating power, negotiation

15   power wouldn't ever be a factor.  They're always voluntary, so

16   that's an irrelevant consideration.

17       What you will hear from their witnesses, and we can

18   start with Ms. Driscoll, who was administering these plans

19   through 2020 when she left, who testified at her deposition

20   that no participant ever had an opportunity to bargain

21   anything with respect to the formation of these plans, no

22   participant ever had an opportunity to bargain anything with

23   respect to amendments to the plans, and no participant ever

24   had an opportunity to bargain or negotiate anything with

25   respect to the administration of the plans even as it related

1   to them personally.  They had no leverage to do so, they had

2   no opportunity to do so.  There is not a single shred of

3   actual evidence that the participants had any negotiating or

4   bargaining leverage whatsoever.  And that's from the mouths of

5   their witnesses.

6           Our witnesses will emphatically and unanimously

7   concur with that assessment coming out of the mouths of their

8   witnesses.  There were no opportunities for negotiation, there

9   was no negotiating leverage.

10          And more importantly, Your Honor, and this is

11  critical, the cases that really looked at negotiation

12  leverage, and I'll speak in a second about how the cases deal

13  with that in 2 different ways, but the cases that dive into

14  this issue of the factor of negotiation leverage also point

15  out that another really important factor is information.

16          One of the reasons, these plans are limited not to

17  every highly compensation employee and not to every management

18  employee, but to a select group of management or highly

19  compensated employees.  In other words, if you extend the plan

20  to every management person, which they did here, and every

21  person they consider highly compensated, which they purported

22  to do here but failed, the plan would fail to qualify as a top

23  hat plan.

24          The law requires that the people in the plan be a

25  subset of those categories, not all of them.  And there's a

29

1    really good reason for that.  The reason these plans need to

2    be limited to a select group of management personnel and a

3    select group of very highly compensated personnel, is that

4    it's critical that they have access to the information about

5    the company's finances that permits them to manage their risk.

6    In this case it's clear that none of the participants had the

7    information about Steward that would have permitted them to

8    manage their risk.

9         Quite to the contrary, Your Honor.  And frankly this

10   extends even to some of the people administering the plan who

11   are below the board and senior management positions.  But

12   quite to the contrary what was happening in this case, and

13   this goes to counsel's point about the normalcy of operation

14   during insolvency, it is not, again, a credit that they were

15   soliciting new enrollment into the plan in the fall of 2023

16   when Steward was hopelessly insolvent under the definition

17   contained in the Rabbi Trust.

18        That means they were soliciting enrollment and

19   deferral from people knowing, at least at the senior

20   management level of the company, knowing that the deferrals

21   that they were about to make would be ones that if this were

22   treated as a top hat plan they would never see as retirement

23   benefit.

24        That is 1 of 2 things.  It is either treating these

25   plans as funded, or it's fraud.  And they can choose which it

1    is.  But either way the remedy is to treat these assets as

2    belonging to the beneficiaries.  And we'll -- I'll get to the

3    point of remedies in a second.

4           But on this critical issue of negotiating leverage

5    over which they will present you with no evidence from any

6    witness whatsoever.  Mr. Driscoll said there was no

7    negotiating leverage, no negotiating opportunity.

8    Mr. Lombardo said there was no negotiating leverage, no

9    negotiating opportunity.  And all of our clients will say the

10   same thing.  There's not a shred of evidence to the contrary.

11          And how did the courts deal with that?  This is an

12   issue that Your Honor can decide, but I think ultimately it

13   doesn't matter which of the two approaches Your Honor takes.

14          One approach, in the *Carolis* (phonetic) in the

15   Northern District of Texas is to treat bargaining leverage as

16   critical irreducible third element of the definition of top

17   hat plan, and that's based on the Department of Labor's famous

18   letter ruling to that effect.

19          THE COURT:  How do I think about the Department of

20   Labor rulings in light of *Locabright* (phonetic)?

21          MR. KEACH:  I think there have been two ways of

22   approaching it.  One is to treat it as informative, and I

23   think those -- the courts that do treat it that way fall into

24   the category of the opposing view which is, again, I think not

25   helpful to our opponent, and that is that negotiating leverage

1    is an essential element of selectivity, but an element of

2    selectivity to be balanced with other elements as opposed to a

3    dispositive factor.

4            Not surprisingly we favor the first, we think the

5    Department of Labor ruling is only 1 source of that -- of that

6    principle.

7            THE COURT:  Your argument is that the word select by

8    implication means that the person who is -- that that select

9    group would have negotiating power.

10           MR. KEACH:  And it also goes to the very reason why

11   this exception exists.  All right.  The reason Congress

12   created the top hat exception in the first place is, remember

13   the presumption is that every retirement plan is subject to

14   ERISA and subject to specifically the fiduciary obligations

15   under ERISA.  You can't, you know, waive your way out of it.

16   And the reason for that is the understanding of the potential

17   for abuse of participants who put their life savings into

18   these plans.  And so they're protected essentially against

19   themselves.

20           The exception for top hat plans acknowledges that

21   there is a very small subset of employees who have the

22   knowledge, bargaining leverage, you know, management level

23   position such that they're aware of the company's financial

24   position, they're in a position to negotiate their own

25   employment contract and they're in a position to negotiate

1   security around that, and more importantly, and this is the

2   reason why compensation has to be very high, not just what we

3   might think as objectively some number, is that these are

4   people who can afford the loss.

5          And what you're going to hear from our people is

6   they can't, and they didn't have any knowledge, and more

7   importantly they had no access to information.  And those are

8   the 3 elements that permit Congress to say, Okay, we won't

9   give these people protection whether they want it or not.

10  We'll let them protect themselves because they can't.

11         But that's not the case here.  And I think the basis

12  for treating negotiating leverage as an independent factor is

13  a recognition of the very reason we have an exception in the

14  first place.  But I think whether you treat it as a factor in

15  selectivity or you treat it as dispositive, the participants

16  win this case because, as I said, there is no evidence

17  whatsoever that any of these parties had bargaining leverage.

18  The fact that they're highly educated in medicine does not

19  make them highly educated in finance.

20         The fact that this was voluntary is irrelevant.

21         THE COURT:  If that was the standard, then no one

22  would be held to a car loan either.  Right?  I just -- at what

23  point do you draw the line?  I get the point, but at what

24  point do you draw the line.  People get mortgages all the time

25  and they sign documents that say what they say, people get car

1    loans all the time.  And, you know, bankruptcy judges have to

2    deal with that all the time, and sometimes the docs say what

3    they say, if you don't make the payments, someone goes and

4    picks up the car and -- there are just -- everybody has to

5    live with consequences of what's on the paper.

6          MR. KEACH:  Sure.  I understand --

7          THE COURT:  I get the legal argument that they may

8    not fall within the definition of what a select group is, and

9    select group may have meaning, but at some point words have to

10    matter on pieces of paper.  And the fact that they knew it or

11    didn't know it, I'm struggling to understand what that means.

12          MR. KEACH:  Sure, and I'm happy to address that.

13    And I think the analogy is interesting, but it only goes so

14    far.  But if I take the consumer analogy, and those places

15    where the federal government steps in and imposes regulations

16    as to what you have to tell consumers and what you don't have

17    to tell consumers and how you have to administer those loans,

18    when those standards are not met, then the consumers have

19    remedies.

20          That's also true here, what Congress said around top

21    hat plans was that if you religiously meet the standards, if

22    you only admit the people you're supposed to admit and then

23    administer the plan the way you're supposed to, then the words

24    will have meaning.  When you don't, the words don't protect

25    you.  And I think that's the way that analogy works.

1        Your Honor, with respect -- you know, and again,

2   I'll save the detailed preview of the evidence because Your

3   Honor's going to hear the evidence and you don't need to hear

4   it from me, you want to hear it from the sources of the

5   evidence.  But again, no evidence on bargaining power.

6        On the issue of -- and as Your Honor knows from

7   reading the cases, essentially the plan has to be unfunded.

8   We'll establish that they treated this plan as funded.  With

9   respect to its limitation to a select group of highly

10  compensated or management employees, as Your Honor knows the

11  cases break that into several quantitative and qualitative

12  factors.

13       I've addressed bargaining power, I won't reach that

14  again.  But with respect to this issue of qualitative data

15  analysis you're not going to hear anything about those factors

16  and being employees or Steward, although they'll tell you what

17  the standard was that they applied.  But nothing they're going

18  to say supports how they arrive at that standard by

19  quantitative or qualitative analysis.

20       Subject to where Your Honor eventually lands on the

21  privilege issue, we do think there's pretty clear evidence

22  that they didn't meet that standard as they were advised to

23  meet it.  And by the way, just let me take a detour on the

24  privilege issues since I didn't speak to it.  I think that the

25  operation of the fiduciary exception to the privilege ought to

1    operate the same way the burden of proof operates and that

2    is -- and top hat plans are presumptively not top hat plans

3    until they're proven otherwise in the face of a credible

4    challenge.

5             THE COURT:  And who says that, where did that rule

6    come from?

7             MR. KEACH:  I think that's in the burden of proof

8    cases.  Every case has looked at burden of proof other than

9    possibly the 3rd Circuit, although I think that authority is

10   questionable.

11            THE COURT:  Okay.

12            MR. KEACH:  All right.  And if -- and again, I think

13   that's consistent with the ERISA structural presumption

14   itself, Your Honor.  Right?  What ERISA says is everything is

15   subject to all of the fiduciary standards and all the

16   substantive protections unless it's an exception.  So if you

17   prove the exception, you're outside of those protections.

18            I think the burden of proof here mirrors that

19   presumption and I think the operation of the fiduciary

20   exception to privilege should mirror that presumption.  And I

21   think the way to handle this, and I think Your Honor basically

22   said this, is this stuff is in the Record and Your Honor will

23   consider it or not consider it depending on where you feel the

24   *prima facie* case is at the time.

25            And I think that's -- I think that's acceptable.

36

1    And I think that's consistent with, again, the ERISA

2    presumption, generally the burden of proof, and that segues

3    into the privilege, otherwise you'd be completely hamstrung.

4    The very evidence you would need to decide the privilege you

5    couldn't get to, you know, and I support that.

6         On the -- on the qualitative analysis though with

7    respect to the data what you will find is that everything they

8    have on that is coming from their expert, and what you will

9    find about their expert is, Number 1, he didn't do any of the

10   work himself, none of those calculations are his.  He was a

11   very late entry into the game and I appreciate that's because

12   this has been a very accelerated process, and Your Honor's

13   from us on that, and obviously we preserve rights on that.

14        THE COURT:  Uh-huh.

15        MR. KEACH:  But the -- but you'll hear that he came

16   in very late and you'll also hear that the data that he used

17   to produce his report, and that there's been no amendment to

18   the report that I'm aware of, is badly flawed and completely

19   unreliable.  What you'll hear from our expert is that his math

20   is badly flawed and completely unreliable.  There's no set of

21   reliable data on which we're aware of that you can get to

22   anywhere close to the disparity ratio that counsel just

23   articulated.

24        Based on our analysis of that data, or I should say

25   our expert's analysis of that data, particularly now amendable

37

1    based on the deposition testimony of witnesses we just got

2    yesterday, the ratio of the average salary of people

3    ineligible to be in the plan to the eligibility threshold for

4    the plan, which is what you measure, the measurements that

5    counsel articulated find no place in the case law.

6         But when you look at that ratio, it's consistently

7    under 2 to 1, and there are years when it was at 2 to 1 based

8    on the assumptions we originally had dealt with.  But based on

9    testimony from yesterday it's clearly under 2 to 1 in every

10   year.  The lowest permissible ratio for those numbers has

11   always been 2 to 1.  There's one case that got there, and most

12   of the courts, in fact the vast majority of the courts require

13   that ratio to be much higher than 2 to 1.  Indeed, again, you

14   will find, I won't go to the ratio because this would relate

15   to the privilege issue, but you will find that the advice

16   received is consistent with what I just said.

17        More importantly the qualitative analysis requires a

18   clear disparity between the people in and the people out.

19   This is described by the case law and by ERISA experts as a

20   natural break essentially in the compensation.  The highest

21   paid people tend not to be a few dollars ahead of the people

22   below them, they tend to be significantly higher.

23        What you will find in this case is there's no nature

24   break.  There's, in fact, no disparity whatsoever.  You're in

25   the plan at 180 if you have the right title, you're outside

38

1    the plan at 179,999 if you don't.  That's not the way these

2    plans work.

3            More importantly, Your Honor, what you'll find, and

4    the cases are very clear on this, just calling somebody

5    something doesn't make them a management employee.  It's

6    consistently true in the cases that simply giving somebody a

7    title, and if that's the depth of your analysis on

8    eligibility, it's completely legally insufficient.  And what

9    you'll hear in the testimony, this was testimony from

10   Ms. Driscoll, also testimony from Ms. Potter, is that there

11   was no consideration in Steward as to whether or not the

12   people they made eligible by title had any management

13   responsibility whatsoever.

14           There was no discussion internally about what these

15   people actually did, or how many people they managed, or

16   whether they managed anybody other than themselves.  That's an

17   insufficient basis upon which to include people in the plan.

18   Again, it goes to the very purpose.  Just slapping a title on

19   somebody doesn't make them a senior manager.  If every vice

20   president were senior manager, every bank employee I've ever

21   met was a senior executive.  It's not a sufficient basis to --

22   upon which to be selective.

23           So what you will find based on the actual evidence,

24   and a lot of it coming out of the mouths of Steward's own

25   witnesses, is that they failed on the qualitative factors,

1    they failed on the quantitative factors and they completely

2    and utterly have no evidence whatsoever on the management

3    factor and the leverage factor and the knowledge factor.

4            And critically, Your Honor -- I'll go back to a

5    point I've already made, but just to touch on it briefly and

6    then I'll conclude -- what was happening here during

7    insolvency, again, is not some element of proof by the

8    Debtors.  It's not a plus in their column.  It's deeply

9    troubling.

10            I had the pleasure of taking Ms. Potter's deposition

11   yesterday, and I found her to be incredibly credible.  And

12   when confronted with the first day Declaration testimony of

13   Mr. Castello, who is a witness for the Debtor, about the state

14   of the Debtor's liquidity in 2023 and about the fact that they

15   were defaulting with vendors and then defaulting on settlement

16   agreements they had made with vendors and defaulting on their

17   funded debt, as to whether or not when they made the

18   distributions based on loans against the policies in 2024,

19   whether that violated the terms of the trust, her response

20   was, Apparently that's true.

21            When I asked whether or not when they solicited new

22   enrollees, and more importantly solicited people to re-defer,

23   in other words to put off distributions they would have

24   received in '23, in the plan year '24 whether they were

25   actually soliciting people to put money into a retirement plan

40

1    that they would never see again because the Debtor was

2    insolvent if the plans were treated as top hat plans.  And she

3    said, Apparently so.  And I asked her if that bothered her and

4    she said, Yes, a little bit.  And I don't think she really

5    meant a little bit, but we'll get to that.

6          But that's not a plus.  That puts these Debtors in

7    the position of either they were doing the right thing and

8    they knew these were no longer top hat plans and had not been

9    for some time, or again, at least at the seniormost management

10   level what was happening was fraudulent.

11         One last point on the IASIS plan, Your Honor.  We

12   are dealing with 2 plans here.  Much of what you've heard

13   about administration applies only to the Steward plan.  The

14   IASIS plan was frozen in 2017, it has not in any meaningful

15   sense been administered other than distributions have been

16   paid out of the plan.

17         But the testimony that we've received and the

18   documents that have come in, and again, this has been very

19   truncated discovery, the discovery that we took yesterday

20   revealed new witnesses and new documents that we would pursue

21   if we were doing this in normal course.  But the documents

22   that were produced had said an interesting thing, which I

23   think goes directly to their burden, and that is that the

24   document that counsel showed you on the screen that is

25   supposed to be the IASIS Rabbi Trust, the witnesses testified,

41

1    and these are their witnesses, not ours, and these are the

2    words of their employees, not our clients, was that the IASIS

3    funds, the investments, were not held in the Rabbi Trust after

4    2017.

5        There's an email directly responsive from the

6    administer -- the people administering this process, that the

7    IASIS assets were not held in either a Rabbi Trust or a

8    secular trust, that they were held in an independent -- a

9    separate trust.  That separate trust document has not been

10   produced, we don't know what it says, but we know that at

11   least out of the words of the administrator it was not a Rabbi

12   Trust.

13       And we would submit, Your Honor, that since 2017 and

14   since they admit that nobody's been deferring income into the

15   IASIS trust, Number 1, the IASIS plan is not a deferred

16   compensation plan, hasn't been since 2017, which means if it's

17   not a deferred compensation plan, it can't by definition be a

18   top hat plan.  Secondly, the only evidence we have is that

19   that trust document no longer applied to it, that some other

20   trust document applied, and it was held in some other trust.

21       But it remains a retirement plan because the assets,

22   by everybody's admission, were being held to distribute to

23   beneficiaries and their -- participants and beneficiaries.

24   And as a retirement plan, that's not a deferred compensation

25   plan for top hat purposes.  It's completely subject to ERISA's

42

1    fiduciary provision, which means that the money in the trust,

2    the funds and investments in the trust are held for the

3    exclusive benefit of the participants and their beneficiaries

4    as a matter of law.

5         And with that, Your Honor, I will -- we will get to

6    the point.  Thank you.

7         THE COURT:  Thank you very much.

8         Why don't we do the housekeeping and get the docs

9    in.

10        MR. BEREZIN:  Your Honor, again, pursuant to an

11   agreement between the parties we would ask the Court to admit

12   into evidence the exhibits that are listed on the Debtors'

13   Amended Witness and Exhibit List, which is at ECF Number 4342.

14        THE COURT:  All right.  Let me just pull it up for a

15   second.

16     (Pause in the proceedings.)

17        THE COURT:  You said 4342?

18        MR. BEREZIN:  4342, Your Honor.

19        THE COURT:  4342 is an amended again.  Now you mean

20   4341?

21        MR. BEREZIN:  4341, Your Honor.

22        THE COURT:  No, that's their stuff.

23        MR. BEREZIN:  No?

24        THE COURT:  4342 is an amended agenda according to

25   what I see.

43

1          MR. BEREZIN:  Anybody know what this is?

2          THE COURT:  4332, how about that one?

3          MR. BEREZIN:  4331, Your Honor.

4          THE COURT:  That's the -- 4331 is an Exhibit List.

5     Hold on.

6          (Pause in the proceedings.)

7          THE COURT:  Oh, okay.  This has exhibits.  This is

8     the list, it's a list like 1 through infinity, let's see, 1

9     through 140, and then everything else after that is like any

10    other pleading stuff.  So 4331?

11         MR. BEREZIN:  4331, Your Honor, yes.

12         THE COURT:  1 through 140?

13         MR. BEREZIN:  Yes, Your Honor.

14         THE COURT:  Okay.  Any objection to the admission of

15    the docs listed at 4331, 1 through 140?

16         UNIDENTIFIED SPEAKER:  No objection.

17         THE COURT:  Okay.  Thank you.

18         (Exhibits Nos. 1 through 140 received in evidence.)

19         THE COURT:  And in terms of -- yeah, movant -- the

20    opponent's side any witness and exhibits that you want to --

21    or any exhibits, excuse me, that you want to have admitted?

22         MS. MILNE:  Yes, Your Honor.  Lindsay Milne,

23    Bernstein Shur, on behalf of certain participants.  Our

24    Exhibit List here at Docket 4315 and 431 -- excuse me, the

25    first one is 4315, the second one is 4323, and we understand

44

1    that's (indiscernible).

2              THE COURT:  You said 4315 and --

3              MS. MILNE:  4323.

4              THE COURT:  Okay.  4315 I'm looking at Exhibits 1

5    through -- it looks like 1 through 139.  I'm just going to

6    take them one at a time.  It looks like there's 139 on that.

7    Any objection to the admission of those documents?

8              MR. BEREZIN:  No, Your Honor.

9              THE COURT:  Okay.  I'm going to go to 4323.  And

10   that has 140 through 145.  Any objection to the admission of

11   140 to 145?

12             MR. BEREZIN:  No, Your Honor.

13             THE COURT:  Okay.

14        (Exhibit Nos. 140 through 145 received into evidence.)

15             THE COURT:  All right.  So I have admitted ECF 4331,

16   1 through 140, ECF 4315, 1 through 139, ECF 4323, 140 through

17   145.

18             Does that sound about right to folks?

19        (No audible response.)

20             THE COURT:  Anything else?  Yes.

21             MR. HOGUE:  Yes, Your Honor.  Brian Hogue.  We filed

22   two Supplemental Exhibit Lists this morning and that takes us

23   to Exhibits 146 to 150, 150 will be the terminal one.  I don't

24   have an ECF number for the --

25             THE COURT:  It looks like 43 -- I'm just looking at

1    the -- you filed a supplemental Exhibit List at 4340 but the

2    docs are really at 4341 which -- for all intents and purposes,

3    and it has -- lists 140 through -- oh, no, that lists 140

4    through 145.  Let's see, 4341 -- so you're 4340 just has the

5    actual docs, 4341 has Exhibits 146 through 150.

6                MR. HOGUE:  Yes, Your Honor, that would be our

7    exhibits right now.

8                THE COURT:  Okay.  Any objection to the admission of

9    146 through 150?

10               MR. BEREZIN:  No, Your Honor.

11               THE COURT:  Okay.

12         (Exhibits Nos. 146 through 150 received in evidence.)

13               THE COURT:  So I've got 1 through 150 essentially on

14    opponent's side, 1 through 140 Debtor's side.  Okay.

15               MR. BEREZIN:  That's correct.

16               THE COURT:  They are admitted.  Okay.

17               MR. BEREZIN:  So, Your Honor, we'll proceed with our

18    first witness, Mr. Pat Lombardo.

19               THE COURT:  Okay.  Mr. Lombardo, why don't you come

20    on up.  No, no, no, you get front seat, Mr. Lombardo.

21               MR. BRONSHTEIN:  He's out in the hall.

22               THE COURT:  Oh, you're questioning.  That's why you

23    have papers in your hand, oh, yeah.

24               THE COURT:  Mr. Lombardo, you get the front seat.

25    Okay.  All right.  If you can please raise your right hand.

1          (Witness sworn.)

2              THE COURT:  Okay.  We'll let the Record reflect the

3     witness has been properly sworn in.

4              Just so we can do a mic check, can you please just

5     adjust the mic and state your name for the Record and spell

6     your last name.

7              THE WITNESS:  Patrick Lombardo, L-O-M-B-A-R-D-O.

8              THE COURT:  Can you just get -- see if you can get

9     the mic just a little bit -- you're kind of pointing a

10    direction -- maybe get a little closer.  Just spell your last

11    name again?

12             THE WITNESS:  L-O-M-B-A-R-D-O.

13             THE COURT:  That sounds good.  Okay.

14             MR. BRONSHTEIN:  Good morning, Your Honor.  Shai

15    Bronshtein from the Groom Law Group on behalf of the Debtors.

16             THE COURT:  Okay.  You may proceed.

17                          DIRECT EXAMINATION

18    BY MR. BRONSHTEIN:

19    Q    Good morning, Mr. Lombardo.

20    A    Good morning.

21    Q    Are you currently employed, sir?

22    A    Yes.

23    Q    And what is your position?

24    A    It's Executive Vice President, or actually it's Chief

25    Human Resources Officer at American Hospital Systems.

1    Q    Do you have any other jobs at the moment?

2    A    Yes, I'm serving as a consultant for Steward Health Care.

3    Q    How long have you been serving as a consultant for

4    Steward Health Care?

5    A    Since December.

6    Q    Before you were a consultant for Steward were you an

7    employee?

8    A    Yes.

9    Q    When did you being working at Steward Health Care?

10    A    October of 2017.

11    Q    And when did you leave Steward Health Care?

12    A    December of 2024.

13    Q    When you began working at Steward Health Care what was

14    your position?

15    A    I was the Senior Vice President of Human Resources when I

16    started.

17    Q    Did you hold that position the entire time you were

18    there?

19    A    At some point my title changed to Executive Vice

20    President of Human Resources.

21    Q    Do you recall when that was exactly?

22    A    I do not.

23    Q    At a high level what were your responsibilities as a

24    senior vice president and executive vice president at Steward?

25    A    Just at a high level compensation was part of my

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN

1    responsibilities, employee relations, recruitment and

2    retention, benefits, labor relations.

3    Q    And focusing specifically on benefits were you

4    responsible for any retirement plans while you worked at

5    Steward?

6    A    Yes.

7    Q    Which ones in particular?

8    A    The 401(k), there was a defined benefit pension plan in

9    the -- for the Massachusetts nurses, and the deferred

10   compensation plan.

11   Q    If I refer to the deferred compensation plan as the SHC

12   plan, will you know what I'm referring to?

13   A    Yes.

14   Q    And is that the deferred compensation plan, one of them

15   at issue in this case?

16   A    Yes.

17   Q    Which of those plans took up the most of your time?

18   A    The 401(k) plan.

19   Q    And what was that?

20   A    The Committee that I served on had a lot of

21   responsibilities so we had quarterly meetings and there just

22   seemed to be a lot to do to ensure that that plan ran

23   correctly.

24   Q    Did anyone report to you while you are a senior and

25   executive vice president?

1     A    Yes.

2     Q    Roughly how many people?

3     A    It was 6 or 7.

4     Q    And what would have been the titles of people who

5     reported to you?

6     A    There was a Vice President of Human Resources -- yeah,

7     you want names or --

8     Q    No that's okay.

9     A     -- there's a vice president of Human Resources, there

10    was a vice president of benefits, there was a director of

11    benefits, there were regional vice presidents of Human

12    Resources that served it the various regions.  There were like

13    generalist type human resource positions.

14    Q    Where did vice presidents fall in the hierarchy of

15    Steward management?

16    A    Right below me, pretty high up in the organization.

17    Q    And what sorts of responsibilities do vice presidents

18    generally have?

19    A    Well, vice president of benefits for example had

20    responsibilities for running the day-to-day requirements of

21    those plans.  They had open enrollment type requirements.  The

22    regional vice presidents of Human Resources in the region had

23    similar responsibilities to my own within the regions,

24    employee relations, daily labor relations types of things.  So

25    pretty high level.

1    Q    Did you consider the vice presidents with whom you

2    interacted to be management at Steward?

3    A    Yes.

4    Q    Who did you report to at Steward Health Care?

5    A    Dr. De la Torre.

6    Q    Who is Dr. De la Torre?

7    A    He's the Chief Executive Officer of Steward Health Care.

8    Q    Did you report to him the entire time you worked at

9    Steward?

10   A    There was periods of time when that changed to Sanjay

11   Shetty when he was named the -- I believe he was named the

12   President of North America, and then later on for a short

13   period of time Mark Rich.

14   Q    Before you were a senior vice president at Steward where

15   did you work?

16   A    At IASIS Healthcare.

17   Q    Was IASIS eventually acquired by Steward?

18   A    Yes.

19   Q    How long did you work at IASIS?

20   A    Oh, just 5 -- just around 5 months.

21   Q    When did you being working at IASIS?

22   A    Well, I'd have to count back, but it's 5 months before

23   October of 2017 when I got hired at Steward.

24   Q    What was your position at IASIS?

25   A    I was the Senior Vice President of Human Resources.

1     Q     And what were your responsibilities at IASIS?

2     A     Very similar to the ones that I explained, employee

3     relations, compensation, recruitment and retention, benefits.

4     Q     Did that include a deferred compensation plan as well?

5     A     Yes.

6     Q     If I refer to that as the IASIS plan, will you know what

7     I'm referring to?

8     A     Yes.

9     Q     And you understand that that's one of the plans at issue

10    in this case?

11    A     Yes.

12    Q     Were you on any Committees as part of your work at

13    Steward?

14    A     Yes.

15    Q     Which Committees?

16    A     The 401(k) Committee that I just spoke about, and then

17    initially we had an Integration Committee that integrated the

18    IASIS hospitals into the Steward hospitals upon acquisition.

19    Q     Were there any other Committees you were a part of?

20    A     No.

21    Q     Other than Ralph de la Torre did you ever communicate

22    with members of the board of Steward?

23    A     Yes, on occasion.

24    Q     And who -- who were those people?

25    A     That would have been the secretary of the board, Herb

1  Holtz.

2  Q    I want to focus your attention on the administration of

3  the SHC plan.  When did you begin that role?

4  A    Upon hire in October of 2017.

5  Q    Did you understand that SHC plan was governed by

6  particular documents?

7  A    Yes.

8  Q    A plan document in particular?

9  A    Yes.

10        MR. BRONSHTEIN:  All right.  Could we please pull up

11  ECF Number 4306-1, this is marked as Exhibit 2 and has just

12  been admitted.

13  BY MR. BRONSHTEIN:

14  Q    Mr. Lombardo, looking at what's labeled as Page 2 at the

15  bottom of this page, do you recognize this document?

16  A    Yes.

17  Q    And what is this document?

18  A    It's the amended and restated plan document for the

19  deferred compensation plan.

20  Q    Did it establish the parameters of the plan?

21  A    Yes.

22  Q    Looking at the first paragraph do you see where it says,

23  Purpose and effective date?  Under Article 1.

24        THE COURT:  Can we make this a little bigger, even -

25  - let's see if I can shrink some folks here.  Thank you.

1              THE WITNESS:  Are you referring to the purpose of

2       the amended and restated, that paragraph?

3       BY MR. BRONSHTEIN:

4       Q    Yep.  Could you read where it begins, The plan provides.

5       A    The plan provides a select group of management and highly

6       compensated employees, within the meaning of ERISA, Section

7       201(2), 301(a)(3) and 401(a)(1), of company with the

8       opportunity to elect to defer receipt of specific portions of

9       compensation and to have these deferred amounts treated as if

10      invested in specific hypothetical investment benchmarks.

11      Q    And you can stop right there.  What did a select group of

12      management and highly compensated employees mean in your

13      understanding?

14      A    Of the plan they were highly compensated positions and

15      executives.

16      Q    And what titles at Steward would have fallen into the

17      management category?

18      A    I'm not sure I --

19      Q    Did you understand what employees at Steward would be

20      considered management as part of this plan?

21      A    Yes, top executives and certainly physicians, so senior

22      vice presidents, executive vice presidents who met the salary

23      requirement.

24      Q    Would that apply to vice presidents as well?

25      A    If they met the salary requirement, yes.

1    Q    Can you give some examples of types of employees who
2    would not qualify as management under this plan?
3    A    There's many, most hourly employees, maintenance workers,
4    radiology technicians, lab technicians, nurses, transporters,
5    there would be lots of plans that would not qualify.
6    Q    Would corporate directors fall into that management
7    category?
8    A    No.
9    Q    Did corporate directors have management authority at
10   Steward?
11   A    Some did.
12   Q    How did you determine who was a highly compensated
13   employee for purposes of the plan?
14   A    The salary threshold.
15   Q    And when you started the plan what was the salary
16   threshold?
17   A    $150,000.
18   Q    In your understanding how faithful was Steward to
19   actually enforcing these eligibility requirements to join the
20   top hat plan?
21   A    They were completely faithful, 100 percent.
22   Q    Now you read the line, Hypothetical investment
23   benchmarks.  What did that mean that the money was invested in
24   those?
25   A    That the compensation was deferred but unfunded, so the

1    hypothetical investments had a line up that the could choose

2    from their investments.  But the money was not set aside and

3    put into like an account or anything like that.

4    Q    So did you understand whether deferred monies were

5    actually put into accounts in the names of individuals?

6    A    I did, there was no money put into the accounts of

7    individuals.

8    Q    Looking at Page 7 of this document, this is using the

9    pages at the bottom, Page 7 of 15, the part that says, Section

10   301.  Do you see that?

11   A    Not yet.

12   Q    Oh, still flipping.

13   A    Okay.  I see Section 301.

14   Q    Okay.  And do you see where it says, Administration under

15   Article 3?

16   A    Where it says, Administrative duties or administration

17   down in the fourth line?

18   Q    There we go, sorry, we had to scroll.  You're right under

19   Article 3 there.

20   A    Are you referring to administration in the fourth line?

21   Q    Yes, where it says, Administrative duties.  Do you see

22   that?

23   A    Yes, I see that.

24   Q    Okay.  Could you please read the first sentence there?

25   A    Wait, it just -- okay.

1    Q    Are you able to see it?

2    A    I can it now, yes.

3    Q    Okay.  Are you able to read where it says, The management

4    board?

5    A    Yes.

6    Q    Could you please read that, sir?

7    A    The management board of Steward Health Care System, LLC

8    may delegate some or all of its powers and duties to 1 or more

9    persons or Committees as it sees fit to the fullest extent

10   permitted by law.

11   Q    Do you know whether or not Steward's board delegated

12   authority for administration of the plan?

13   A    Yes.

14   Q    To whom did it delegate that authority?

15   A    It delegated it to me.

16   Q    Do you know whether the board established particular

17   rules for the plan?

18   A    Yes.

19   Q    What rules did it establish?

20   A    The physicians that were allowed, the physicians and

21   executives that were allowed and the salary threshold.

22   Q    While you were at Steward was there ever a specific

23   Committee that was responsible for this plan?

24   A    No.

25   Q    Going to what's marked as Page 8 --

1              MR. BRONSHTEIN:  And see if we can scroll up,

2      please?

3      BY MR. BRONSHTEIN:

4      Q    Do you see where it's marked Section 4.01?

5      A    Yes.

6      Q    Could you read that first sentence, please?

7      A    Participation.  Participation in the plan shall be

8      limited to physicians and executives who 1) meet such

9      eligibility criteria as the board shall establish from time-

10     to-time, including the requirements that such executive is a

11     member of a select group of management and highly compensated

12     employees within the meaning of ERISA, Section 201(2),

13     301(a)(3) and 401(a)(1).

14     Q    And you can stop right there.  Are those the requirements

15     that you were just discussing that the board set?

16     A    Yes.

17     Q    And what again was the dollar amount when you started at

18     Steward?

19     A    150,000 base salary.

20     Q    Do you know how that dollar amount was chosen?

21     A    No, I don't.

22     Q    Did you have any involvement in setting that dollar

23     amount?

24     A    No, I didn't.

25     Q    Going to Page 9 of Exhibit Number 2, see where it says

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                    58

1        Section 5.01?

2        A    Yes.

3        Q    Can you read that first full sentence -- and, sorry, go

4        onto the next page, Page 10, could you read the first full

5        sentence that starts with, A participant.

6        A    Let me just flip that -- can you go back?

7        Q    I apologize, this was, sorry, Page 9.  The first, yes,

8        we're at the first, where it starts at the top of the page,

9        the first full sentence, A participant.

10       A    My top of the page starts with, Amount would otherwise.

11       Q    Sorry, do you see where -- the second line down --

12       A    Yes, I see it.

13       Q     -- that's part of the way down.

14       A    Second sentence, yes.

15       Q    Yep.

16       A    A participant's accounts shall be utilized solely as a

17       device for the measurement and determination of the amounts to

18       be paid to the participants pursuant to this plan and shall

19       not constitute or be treated as a trust fund of any kind.  The

20       board shall determine the balance of each deferral account as

21       of each valuation date by adjusting the balance of such

22       deferral account as of the immediately preceding valuation

23       date to reflect changes in the value of the deemed investments

24       thereof, credits and debits and distributions pursuant to

25       Article 6 with respect to such account since the preceding

1     valuation date.

2              To the extent that an employer is required to

3     withhold any taxes or other amounts from the deferred amount

4     pursuant to any state, federal or local law, deferred amounts

5     shall be reduced for such withholdings only to the extent that

6     there is not sufficient cash compensation payable to the

7     participant at the time that such withholding much be made and

8     such withholdings conforms to Code Section 409(a).

9     Q    So going back to the top of that, a participant's account

10    shall be utilized solely as a device for the measurement and

11    determination.  Did you understand what that meant?

12    A    Yes.

13    Q    What did that mean?

14    A    The account was a measurement and not real dollars in the

15    account.

16    Q    Looking down at the next section, 5.02, where it begins,

17    Hypothetical investment benchmarks.

18    A    Yes.

19    Q    Was that regarding that account that you were just

20    talking about?

21    A    Yes.

22    Q    And what did the hypothetical investment benchmarks refer

23    to?

24    A    That they were not real dollars, it was just what it

25    says, a hypothetical investment.

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                60

1    Q    Can we go, please, to Page 13?  Do you see at the bottom

2    of this page Section 9.01?

3    A    Yes.

4    Q    Could you read that first sentence after Unfunded plan?

5    A    Yes.  This plan is intended to be an unfunded plan

6    maintained primarily for the purpose of providing deferred

7    compensation for a select group of management or highly

8    compensated employees within the meaning of Section 201, 301

9    and 401 of ERISA.

10   Q    And did you have an understanding of what an unfunded

11   plan meant?

12   A    Yes.

13   Q    What did you understand that to mean?

14   A    That the dollar stayed in the operating budget and

15   didn't -- did not fund the account, that no dollars were

16   transferred.

17   Q    No dollars were transferred to whom?

18   A    To the participants of the plan.

19   Q    At which time?

20   A    At the time of enrollment and each pay that -- whatever

21   amount that they defer at any time.

22   Q    Can you read the next sentence, All payments pursuant?

23   A    All payments pursuant to the plan shall be made from the

24   general funds of employers and no special or separate fund

25   shall be established or other segregation of assets made to

1    assure payments.

2    Q    Did you understand what that meant?

3    A    Yes.

4    Q    What did it mean?

5    A    That all distributions when it became time for

6    distributions were made from the general fund and the

7    operating expense -- or the operations of the company and it

8    was not from any of the funds in the deferred compensation

9    plan.

10   Q    And during your time, your roughly 7 years as executive

11   vice president and SVP at Steward, did you understand whether

12   Steward complied with that requirement of the plan?

13   A    Yes, they did.

14   Q    Can you read the next sentence?  No participant or other

15   person.

16   A    Yes, no participant or other person shall have under any

17   circumstances any interest in any particular property or

18   assets of employers as a result of participating in the plan.

19   Q    And what did you understand that to mean?

20   A    That no participants had any of the assets, they didn't

21   own any of the assets in the plan.

22   Q    And during your time at Steward do you know whether the

23   plan ever deviated from that requirement?

24   A    No, I don't -- no.

25   Q    And can you read that last sentence, Notwithstanding.

1   A    Notwithstanding the foregoing -- hold on, it just

2   flipped -- I'm sorry, I lost it.

3   Q    At the very bottom --

4   A    I got it.

5   Q     -- Notwithstanding --

6   A    Notwithstanding the foregoing employers may but shall not

7   be obligated to create 1 or more --

8   Q    Then we go to the next page.  And then could you continue

9   reading at Grantor?

10  A    Grantor -- grantor trust, the assets of which are subject

11  to the claims of the employers, creditors, to assist it in

12  accumulating funds to pay its obligations under the plan.

13  Q    Do you know whether Steward had established such a trust

14  as a part of the SHC plan?

15  A    Yes, they did.

16  Q    Was that what you refer to as a Rabbi Trust sometimes?

17  A    Yes, it is.

18  Q    Did you understand what types of assets the Rabbi Trust

19  held?

20  A    Yes.

21  Q    What types of assets did it hold?

22  A    The Rabbi Trust held company-owned life insurance

23  policies.

24  Q    Were those life insurance policies for the benefit of any

25  particular participants?

1    A    No.

2    Q    Who was names as the beneficiary?

3    A    Steward.

4    Q    Were taxes withheld from deferred income that

5    participants elected to defer into the compensation plan?

6    A    Some.

7    Q    Which taxes were withheld?

8    A    FICO was withheld, income taxes were not.

9    Q    Do you understand why income tax was not withheld?

10    A    Because it's deferred compensation.

11    Q    All right.  Can we please go to ECF Number 4306-19, this

12    is Exhibit 20.  Are you able to see that, Mr. Lombardo?

13    A    Yes.

14    Q    Do you recognize what this is?>

15    A    Yes.

16    Q    What is it?

17    A    It's the Rabbi Trust agreement.

18    Q    And is this the Rabbi Trust agreement related to the SHC

19    plan?

20    A    Yes.

21    Q    Now looking down to the, 1, 2, 3, 4, 5, 6th whereas,

22    Whereas the company desires.  Do you see that?

23    A    Yes.

24    Q    And could you read that provision?

25    A    Whereas the company desires to continue the trust as

1        amended and restated herein under the terms of which assets

2        transferred from the former trustee and new contributions

3        shall be held therein subject to the claims of the company's

4        creditors in the event of the company's insolvency as herein

5        defined until paid to the plan participants and their

6        beneficiaries in such a manner and at such a time as specified

7        by the plan.

8        Q    What did you understand the phrase, Subject to the claims

9        of the company's creditors in the event of the company's

10       insolvency to mean?

11       A    In the case of a bankruptcy that creditors would have

12       access to the funds.

13       Q    Access to the funds in the Rabbi Trust?

14       A    Yes.

15       Q    Looking down, skipping 1 whereas and going to the next

16       whereas, Whereas it is the intention.  Do you see that line?

17       A    There's 2 of them that start off with Whereas it is the

18       intention.

19       Q    Sorry, this is the one -- one up from the bottom.

20       A    Okay.

21       Q    Excuse me, Whereas it is the intention of the parties.

22       Do you see that line?

23       A    I do, yes.

24       Q    Okay.  Could you please read that?

25       A    Whereas it is the intention of the parties that this

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                65

1       trust shall continue to constitute an unfunded arrangement and
2       shall not affect the status of the plan as an unfunded plan
3       maintained for the purpose of providing deferred compensation
4       for a select group of management or highly compensated
5       employees for purposes of title 1 of the Employee Retirement
6       Income Security Act of 1974 as amended.
7       Q    Did you understand that select group of management and
8       highly compensated employees to refer to the same categories
9       that we were discussing before?
10      A    Yes.
11      Q    And what was your understanding of unfunded as used again
12      in this sentence?
13      A    Same as we discussed earlier.  The Plan is unfunded.  No
14      dollars are transferred into any participants accounts.
15      Q    Going to page 4 of Exhibit 20, Section 2.3.
16           (Pause in the proceedings.)
17      Q    Do you see that Mr. Lombardo?
18      A    Yes.
19      Q    Would you please read the first sentence of Section 2.3?
20      A    "The company may make payment of benefits directly to
21      Plan participants or their beneficiaries as they become due
22      under the terms of the Plan.  The company shall notify the
23      trustee of its decision to make payment of benefits directly
24      prior to the time amounts are payable to participants or their
25      beneficiaries."

1    Q    And you can stop there.  And I just had a couple

2    questions about that.  What did you understand it to mean that

3    the company may make payments of benefits directly to plan

4    participants?

5    A    There were distribution periods that were elected by

6    participants when they enrolled in the Plan.

7    Q    Did the company have to make those distributions from a

8    particular source?

9    A    No.  They -- no.

10   Q    Could it have made them from the trust?

11   A    Yes.

12   Q    And could it have made it from the company's general

13   account?

14   A    Yes.

15   Q    Did Steward ever make distributions with funds outside

16   the trust?

17   A    Outside the trust, meaning from their general funds?

18   Q    Yes.

19   A    Yes.

20   Q    How often?

21   A    Every time but one that I can remember.

22   Q    Now, going to Section 3.2.  Just a little bit further

23   down the page.

24   A    I see it.

25   Q    Could you read that first sentence there?

1     A    "At all times during the continuance of this" -- it just

2     flipped.  Hold on, 3.2.  "At all times during the continuance

3     of this trust as provided in Section 1.1(d) hereof, the

4     principal and income of the trust shall be subject to the

5     claims of general creditors of the company under Federal and

6     State law as set forth below."

7     Q    What did that refer to?

8     A    That the trust was subject to creditors in the case of a

9     bankruptcy -- any assets that were in the trust.

10    Q    Going forward to page 7.  Do you see Section 8.5?

11         (Pause in the proceedings.)

12    A    Yes, I see it.

13    Q    Could you read 8.5, please?

14    A    "Trustee shall have, without exclusion, all powers

15    conferred on trustees by applicable law unless expressly

16    provided otherwise herein provided, however, that if an

17    insurance policy is held as an asset of the trust, the trustee

18    shall not have no power to name a beneficiary of the policy

19    other than the trust to assign the policy as distinct from

20    conversion of the policy to a different form other than to a

21    successor trustee or to loan to any person the proceeds of any

22    borrowing against such policy."

23    Q    What did you understand what that last sentence to mean?

24    A    I understood that this last sentence that no individual

25    could take a loan from the trust.

1    Q    Do you recall that you were asked about that sentence at
2    your deposition yesterday?
3    A    I do.
4    Q    Do you recall what you responded?
5    A    My response at my deposition was, I don't know what that
6    meant.
7    Q    So why is your answer different today?
8    A    I knew that we made a distribution out of the trust.  And
9    I re-read this thing three or four different times after my
10   deposition because I knew that we wouldn't have done anything
11   that we weren't advised to do or weren't allowed to do.  So I
12   was trying to make sense out of this provision.
13        And as I read it, I understood it to mean that no
14   individual could take a loan from the trust.
15   Q    To your understanding, did Steward follow the
16   requirements of the trust agreement?
17   A    Absolutely, yes.
18   Q    Now, in your Declaration you stated that you were
19   responsible for overseeing the administration of the Plan.
20   What did you mean by that responsibility?
21   A    High level administration.  The way it worked I had high
22   level of administration of the plan.  And there were -- the
23   vice president's of benefits handle the day-to-day type things
24   of the plan.
25   Q    And who was the vice president of benefits who handled

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN

69

1   the day-to-day of the plan?

2   A    It was Ann Marie Driscoll (phonetic) and then Kachena

3   Potter (phonetic).

4   Q    Was Ms. Potter a vice president?

5   A    No, I believe her title was Director of Benefits.

6   Q    Do you recall roughly when Ms. Driscoll was the vice

7   president?

8   A    It was late 2019 or 2020.  I don't recall to be honest

9   the exact date.

10  Q    And what were the core day-to-day responsibilities

11  associated with the plan?

12  A    Enrollment, identifying those people who would have been

13  eligible to participate in the plan and then making sure that

14  they were contacted during opening enrollment to let them know

15  that they were eligible for the plan.

16       When it became time for distributions, it would be

17  time -- they would put those distribution reports together and

18  submit them for payment.  Responsibilities like that.

19  Q    How many times were distributions made each year?

20  A    Once.

21  Q    And was it the same time period each year?

22  A    Yes.

23  Q    Roughly what time period was that?

24  A    Beginning of February, February 1st.

25  Q    When did Steward calculate the amount of the

1      distributions that it needed to pay?

2      A    On February 1st.

3      Q    Were the distributions the same amount each year?

4      A    No.

5      Q    What did the amount of the distribution depend on?

6      A    Evaluations from the investments that they selected.

7      Q    Did it depend on any action the participants took?

8      A    Yes.  What their distribution schedule would look like,

9      yes.

10     Q    And was it Steward or the participants who decided when

11     they would get distributions?

12     A    It was decided by the plan.  It was designated by the

13     plan.

14     Q    From where did Steward generally pay distributions?

15     A    Out of their operating fund.

16     Q    And I think I heard you say that one time it was paid

17     differently; is that right?

18     A    Yes.

19     Q    And when was that?

20     A    It was around March or April of 2024.

21     Q    Do you recall what the size of the 2024 distribution was?

22     A    I do.

23     Q    What was it?

24     A    Around $9 million.

25     Q    How did the size of that distribution compare to prior

1    distributions?

2    A    It was a greater.  It was more than the normal

3    distributions.

4    Q    Was it a little more, much more?  Do you recall?

5    A    Oh it was at least twice as much as a normal

6    distribution.

7    Q    How did Steward ultimately get the funds to pay that

8    distribution?

9    A    Took a loan from the -- the company owned life insurance

10    policies.

11    Q    Was taking money from the life insurance policies at all

12    contrary to the term of the trust, in your understanding?

13    A    No, it was not.

14    Q    Was it contrary to the plan?

15    A    No, it was not.

16    Q    Who made that decision to take that those funds from

17    loans against life insurance policies held by the Rabbi Trust?

18    A    The final decision was made by John Castellon (phonetic).

19    Q    How many times did enrollment occur each year?

20    A    Once.

21    Q    And what time of year did that occur?

22    A    Open enrollment usually occurred around October, early

23    November.  And for January 1 enrollment period.

24    Q    Who, at Steward, was responsible for managing that

25    enrollment?

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                    72

1    A     The benefit -- vice president of benefits and the

2    director of benefits.  Ann Marie Driscoll and Kachena Potter.

3    Q     Did you know what they did -- Ms. Driscoll and

4    Ms. Potter -- to determine who was eligible to participate in

5    the plan?

6    A     Yes, they ran reports from payroll and looked at base

7    salaries and determined who was eligible based on the criteria

8    of the plan.

9    Q     Once they determine who was eligible to participate, do

10   you know whether they communicated that fact to the eligible

11   employees?

12   A     Yes, they did.

13   Q     Did Ms. Potter and Ms. Driscoll work with anyone else in

14   creating these eligibility lists?

15   A     They worked with payroll.

16   Q     Did they work with anyone outside of Steward?

17   A     Yes, they worked with NFP.

18   Q     And do you know how NFP and Ms. Driscoll and Ms. Potter

19   communicated with eligible employees?

20   A     By email.

21   Q     And did they send them an email during that plan

22   enrollment process?

23   A     Yes.

24           MR. BRONSHTEIN:  Can we pull up 43 -- ECF number

25   4307-10? It's Exhibit 60.

73

1              (Pause in the proceedings.)

2     BY MR. BRONSHTEIN:

3     Q    Mr. Lombardo, are you able to see that okay?

4     A    Can you make it a little bigger?  Thank you.

5     Q    And do you see who this is from?

6     A    Yes this one is from Gwendoline Walker.  She was also a

7     vice president of benefits.  She was originally at IASIS

8     (phonetic) and then came to Steward.

9     Q    Did she work with Ms. Potter and Ms. --

10    A    Yes.

11    Q    -- and Ms. Driscoll?

12    A    Yes.

13    Q    Do you see the cc line?

14    A    Yes.

15    Q    Is that your email address?

16    A    Yes.

17             MR. BRONSHTEIN:  Can we turn to page 3 of this

18    document?

19             (Pause in the proceedings.)

20    BY MR. BRONSHTEIN:

21    Q    As we're scrolling down, did you catch a glimpse of any

22    of that long list of email addresses?

23    A    I did yes.  I saw the big list.

24    Q    Do you have any idea what that list is?

25    A    I would think that it would be the participants -- the

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                    74

1    eligible participants.  Those that were eligible to

2    participate.

3    Q    So do you see the subject line?

4    A    Yes.

5    Q    What is the subject?

6    A    2019 Steward Healthcare Deferred Compensation Plan

7    Enrollment Announcement.

8    Q    Was this the first year that you were responsible for

9    overseeing the plan?

10   A    2019, no.

11   Q    Can I ask you to go back to the first page for a moment?

12        (Pause in the proceedings.)

13   Q    Do you see where -- do you see where is says "sent",

14   Mr. Lombardo?

15   A    Yes.

16   Q    And what's the date that it was sent?

17   A    October 22nd, 2018.

18   Q    So, if it's sent in 2018 but it's for the 2019 plan, what

19   does that mean?

20   A    It would have been sent out with open enrollment

21   announcements to prepare for the 2019 plan.

22   Q    Got it.  Did you discuss this or similar emails with

23   Ms. Driscoll?

24   A    Yes.

25   Q    With any others?

75

1    A   Yes.

2    Q   And did you review the contents generally before they

3    went out?

4    A   Yes.  I always peruse the contents before.

5            MR. BRONSHTEIN:  If we could go briefly to page 4.

6    Towards the middle of the page.

7            (Pause in the proceedings.)

8    BY MR. BRONSHTEIN:

9    Q   Do you see, Mr. Lombardo, where it says, "Personalize

10    Consultation?"

11    A   Yes.

12    Q   What is that referring to?

13    A   It's -- it's recommending that -- to get personal

14    consultation regarding participation in the plan.

15    Q   And can you just read that first sentence?

16    A   "Prior to completion of the enrollment process, be

17    certain that you have carefully reviewed your elections for

18    accuracy and they cannot be altered once you've completed

19    enrollment -- once your enrollment -- completed enrollment has

20    been submitted as Steward Healthcare and NFPEV do not provide

21    financial advice.  Please contact Alan Vlotten (phonetic) to

22    schedule a conference call or individual consultation.

23         "As a financial planner, Alan can assist you in

24    determining how this plan might enhance you overall financial

25    picture as well as educate you on the various investment

1    options available in the plan."

2    Q    And did you now who Mr. Vlotten was?

3    A    Yes.

4    Q    Who was he?

5    A    He was a financial adviser that worked with many of our

6    physicians.

7    Q    Did Steward pay Mr. Vlotten?

8    A    No.

9    Q    Was he associated with Steward or have any formal

10   relationship with the company?

11   A    No.

12   Q    Do you know why Steward was recommending that eligible

13   employees seek out financial advice?

14   A    Yes, I think it's to be cautious to make sure that they

15   understand the implications of this plan.

16   Q    Why did you think they should be informed in that way?

17   A    Because it's unfunded, unsecured, and there's a risk

18   involved with this plan.

19   Q    Was that different than a 401(k) plan?

20   A    Very much.

21   Q    Were there attachments to this email?

22   A    I'm sure -- I don't know.

23              MR. BRONSHTEIN:  All right, why don't we go back to

24   page 3?

25              (Pause in the proceedings.)

1    BY MR. BRONSHTEIN:

2    Q    Do you see where it says attachments?

3    A    Yes.

4    Q    And what does it describe as being attached to this

5    email?

6    A    The plan at a glance.

7              MR. BRONSHTEIN:  Okay, can we please pull up ECF

8    number 4307-11?  It's Exhibit 61.

9         (Pause in the proceedings.)

10   BY MR. BRONSHTEIN:

11   Q    Are you able to see that Mr. Lombardo?

12   A    Yes.

13   Q    What is this document?

14   A    This is the 2019 Plan at a Glance for the deferred

15   compensation plan.

16   Q    Would you have reviewed this document before it went out

17   to eligible employees?

18   A    Yes.

19   Q    What was the purpose of this document?

20   A    To give the people who were eligible to participate a

21   high level understanding of what the plan was.

22   Q    Do you know who wrote the document?

23   A    No, I don't.

24   Q    Do you know whether anyone from NFP was involved in

25   creating the document?

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                    78

1    A    I'm sure they would be, yes.

2    Q    Do you know whether any attorneys were involved in

3    creating the document?

4    A    I'm sure it would be reviewed by attorneys, yes.

5    Q    And can you -- let's scroll down to the bottom of this

6    one page document.

7         (Pause in the proceedings.)

8    Q    Do you see, Mr. Lombardo, where it says status of the

9    plan?

10   A    Yes.

11   Q    Could you read that, please?

12   A    Sure.  Unlike a 401(k) plan, if Steward Healthcare

13   becomes insolvent, Steward's creditors will have access to the

14   plan account.  You will have the rights of a general unsecured

15   creditor in such event.

16   Q    What did you understand that language to mean?

17   A    That if Steward was bankrupt that the participants of the

18   plan become general creditors and there's -- and there's no

19   funds distributed other than what they would receive from

20   being general unseucred creditors.

21   Q    Why would the one page plan summary that was sent to

22   participants have that language?

23   A    Because we wanted to give every -- we wanted to make sure

24   that everyone understands this particular part of the plan.

25   Q    And why was that so important?

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                79

1     A     Because it's, as I said earlier, there's a risk to this

2     plan.  We would want to make sure everyone understood that

3     risk.

4     Q     From your time on the 401(k) Committee, did you

5     understand whether there were different amounts that could be

6     contributed into the deferred compensation as opposed to a

7     401(k)?

8     A     Yes.

9     Q     What was the limit, in general, for the 401(k) plan

10    contribution?

11    A     In around $28,000 or $30,000 depending on the year and

12    depending if the participant qualified for a type of

13    contributions.

14    Q     Was there a dollar cap on how much an employee could

15    contribute into the deferred compensation plan?

16    A     No.

17    Q     Did any eligible employees ever talk to you or ask you

18    questions about the plan at a glance?

19    A     No.

20    Q     Did any of the eligible employees ever ask you questions

21    as the senior vice president of HR about the risks associated

22    with the plan?

23    A     No.

24    Q     Were there any other documents that were provided to

25    eligible employees to help them choose whether to participate

80

1    in the plan?

2    A    Yes.

3    Q    What other documents would have been provided?

4    A    They would receive a plan summary description.

5              MR. BRONSHTEIN:  Can we please go to ECF number

6    4306-14?  This is Exhibit 15.

7              (Pause in the proceedings.)

8    BY MR. BRONSHTEIN:

9    Q    Mr. Lombardo, are you able to see that?

10   A    Could use it just be one peg bigger.  There we go.  Yes,

11   I can see it.

12   Q    Have you seen this document before?

13   A    Yes.

14   Q    Is this the plan summary that you were just referring to?

15   A    Yes.

16   Q    Is it for the same plan year?

17   A    Yes.

18   Q    And what was the purpose of the plan summary document?

19   A    To give them a more complete picture of what the deferred

20   compensation plan was and how it operated.

21   Q    Just looking at page 6 of this document.  This is page 6

22   of 7.

23             (Pause in the proceedings.)

24   Q    Do you see where it says, "Security of the deferred

25   compensation?"

81

1    A    Yes.

2    Q    Can you read that please?

3    A    "As this is a non-qualified deferred compensation plan,

4    it is considered both unfunded and unsecured making your

5    employers promise to pay the value of your deferred

6    compensation plan account or accounts and the additional

7    retirement income and unfunded and unsecured promise to pay in

8    the future.

9        "As a participant, you are an unsecured general creditor

10    of Steward Healthcare and its subsidiaries.  And your payments

11    must come from its assets of the corporation.  Company has

12    established a Rabbi Trust to hold assets with which to pay

13    benefits under the plans to provide the maximum plan security

14    permitted by law."

15    Q    Where it says, "unfunded and unsecured promise to pay in

16    the future", what did you understand that to mean?

17    A    It was deferred compensation so it would be paid in the

18    future.  Distributions would be paid in the future.

19    Q    And what does "a promise to pay" mean?

20    A    It means that under the plan, there's a promise to pay

21    provided there's not -- it's able to pay.

22    Q    And where it says that "payments must come from the

23    assets of the corporation," what did you understand that to

24    mean?

25    A    It comes -- the distributions are paid from the operation

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                    82

1    fund of the company.

2    Q    And, again, why was it important to have this language in

3    this slightly longer plan summary?

4    A    Same reason.  Just to give everyone a complete and

5    accurate picture of what this plan was.

6    Q    Did any eligible employees ever discuss this with you?

7    A    No.

8    Q    To your knowledge, did the operation of the plan deviate

9    from this unfunded and unsecured language in any way?

10   A    It did not.

11   Q    Did employees who were eligible to participate in the

12   plan receive similar documents each year during the enrollment

13   process?

14   A    Yes.

15   Q    And did you review those generally?

16   A    Yes.

17   Q    Did those documents have similar information relating to

18   the security of participants investments?

19   A    Yes.

20   Q    And, in any other, did an eligible employee approach you

21   to discuss that?

22   A    No.

23   Q    Would you have been someone who they could have

24   approached to ask questions about the plan?

25   A    I could have been.  But most people that --

83

1          MS. MILNE:  Objection, Your Honor.  Speculative.

2          THE COURT:  Sustained.

3    BY MR. BRONSHTEIN:

4    Q    Did employees have to participate in the SAC plan?

5    A    No.

6    Q    Did some employees choose to participate in certain

7    years, but not others?

8    A    Yes.

9    Q    Were employees required to receive any portion of their

10   compensation in the deferred compensation plan?

11   A    I'm sorry.

12   Q    Were employees required to receive any portion of their

13   compensation into the deferred compensation?

14   A    No.

15   Q    Who set the amount that each individual deferred into the

16   plan?

17   A    The board, Steward's board.

18   Q    Well, that was the amount that they could select.  But in

19   a given plan year, who would select how much --

20   A    Oh, I'm sorry.  The participant themselves.

21   Q    Was there any penalty for employees choosing not to

22   participate in the SAC plan?

23   A    No.

24   Q    Were you aware that Steward, at a certain point, matched

25   a 401(k) contributions of employees?

1    A    Yes.

2    Q    And was there ever a time that Steward determined to stop

3    doing that?

4    A    Yes.

5    Q    When Steward eliminated the 401(k) match and made a

6    discretionary, how did physicians react?

7    A    Negatively.

8    Q    And what did Steward do?

9    A    They provided an option for that -- an equal match to be

10   put into their deferred compensation plan or take it as a

11   bonus and have it grossed up.

12   Q    Did some physicians exercise their option not to have the

13   money put into the deferred compensation plan?

14   A    Yes.

15   Q    And did some physicians exercise that option to put the

16   money into the deferred compensation plan?

17   A    I don't believe any one -- I don't know.

18   Q    Did there come a time when eligibility thresholds -- that

19   salary threshold and that title threshold change?

20   A    Yes.

21   Q    When was that?

22   A    October of 2019.

23   Q    Do you recall who's initiative that change to the plan

24   was at?

25   A    Yes, there were physicians who were requesting from the

85

1          SMG human resources person to open it up to additional

2          physicians.

3          Q    What was SMG?

4          A    Sorry, Steward Medical Group.

5          Q    How did Steward Medical Group, SMG, fit into the Steward

6          Company?

7          A    It was part of the Steward Company.

8          Q    And what did SMG have peruse over?  Who was part of that

9          group?

10         A    Mostly physicians, nurse practitioners, physician

11         assistants.

12              MR. BRONSHTEIN:  Can we look at, please, ECF Number

13         4306-5.  And this is admitted as Exhibit 6.

14              (Pause in the proceedings.)

15         BY MR. BRONSHTEIN:

16         Q    Mr. Lombardo, do you recognize this?

17         A    Yes.

18         Q    Is this the change to the plan that we were just

19         discussing?

20         A    I'd like to take a moment to read it.

21              (Pause in the proceedings.)

22         A    Yes.  There it is, yes.

23         Q    Looking at the next page, page 3 of the exhibit.

24              (Pause in the proceedings.)

25         Q    Do you see a signature there?

1    A    Yes.

2    Q    Whose signature is that?

3    A    It's mine.

4    Q    Looking at the next page.  What is -- what are we seeing

5    here in Exhibit A?

6    A    This is the change to the plan.

7    Q    And whose signature is on this page?

8    A    I can't make that signature out.  I don't know.

9    Q    Do you know who's position or who -- what the position of

10   the person is who signed this?

11   A    The Secretary of the Board.

12   Q    Going back to page 2 for a moment.  The fourth whereas

13   down the page where it says, "Whereas the Secretary having

14   been authorized."  Do you see that?

15   A    Yes.

16   Q    Could you just read that line for us?

17   A    "Whereas the Secretary, having been authorized to take

18   actions on behalf of the board, wishes to amend the plan to

19   include ineligible classes of employees -- physician

20   assistants, nurse practitioners, and certified nurse --

21   certified registered nurse anesthetics effective October 1st,

22   2019."

23   Q    After this amendment, were those individuals able to --

24   with those job titles able to participate in the plan?

25   A    If they met the salary requirement, yes.

1    Q    Was the salary threshold changed at all at the same time

2    as this amendment?

3    A    Yes.

4    Q    How was it changed?

5    A    Changed to $180,000.

6    Q    Did those physicians, nurse practitioners, physicians

7    assistants, CRNA, did they have supervisory duties over other

8    hospital staff?

9    A    In some cases yes.  In the physician practices, yes.

10    Q    How would you describe those physicians generally?

11    A    They were high level positions.

12    Q    Now you mentioned the salary threshold changing to 180.

13    Do you recall who at Steward was involved in that change to

14    $180,000?

15    A    The entire process or just the decision?

16    Q    The entire process.

17    A    Ann Marie Driscoll would have been involved in that.

18    There was outside legal counsel involved in that.  NFP was

19    involved in that   I was involved in that.  And the board was

20    involved in that.

21    Q    And do you understand why that threshold was raised from

22    150 to 180?

23    A    Yes.

24    Q    And why was that?

25    A    To make sure that we always met the top status of the

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                88

1    plan it was only available to highly compensated employees.

2    Q    Were numbers other than $180,000 considered as the new

3    threshold?

4    A    Yes.

5    Q    And did Ms. Driscoll or anyone else do an analysis of how

6    many employees would be added based on those different

7    thresholds?

8    A    Yes.

9              MR. BRONSHTEIN:  Would you please go to ECF number

10    4306-7.

11             MR. KEACH:  Your Honor, may I interrupt for a

12    moment?

13             THE COURT:  Uh-huh.

14             MR. KEACH:  Because this testimony implicates one of

15    the privilege issues.  And directly -- is directly implicated

16    by Mr. Lombardo's testimony with respect to the fact that they

17    received advice on this particular issue of raising the

18    threshold.

19             And as Your Honor knows, there's an email that's

20    been challenged that goes directly to this point.  We think

21    that email ought to be admissible. It is also, frankly,

22    referenced in the Driscoll Declaration that they are purposely

23    admitting after this, not before.

24             But given the witnesses reference to legal advice;

25    given his reference to the alleged reasons why the threshold

1    was raised I think this is an opportunity where those emails,

2    that testimony has to come in, in the interest of fairness and

3    because they can't reference the legal advice and then not let

4    us get to what the legal advice was.

5            They can't use it as justification for this, when we

6    know that's not true.  And we would suggest that email come in

7    as evidence.

8            THE COURT:  Counsel?

9            MR. BRONSHTEIN:  Your Honor, to be clear, we are not

10   going to reference the content of the legal advice or what the

11   legal advice was.  Our position is that --

12           THE COURT:  That's his point, right, that you're

13   going to talk around it, but not -- but then they should be

14   able to talk about it.

15           In other words, he's going to say I had legal

16   advice, but no one is going to say what the legal advice was.

17   Is that as far as you're going or are you going to go further

18   on this?

19           MR. BRONSHTEIN:  That's -- I believe that's as far

20   as I'm going on this.

21           THE COURT:  If he's saying he had legal advice I

22   don't think the doc come in.  You go any further, you may open

23   the door.  And I'm going to let it in.  We'll see where this

24   goes.

25           MR. KEACH:  Thank you, Your Honor.

1    BY MR. BRONSHTEIN:

2    Q    Okay.  So looking -- if we can look at Exhibit 8.

3         (Pause in the proceedings.)

4    Q    So is this that analysis that we were just discussing?

5    A    Yes.

6    Q    And is that the analysis that Ms. Driscoll did?

7    A    Yes.

8              MR. BRONSHTEIN:  All right, we can take that --

9              MR. KEACH:  Your Honor, I know you just ruled, but

10   he just went a step further, right.  And he can reference the

11   Driscoll Declaration if he would like.  But the implication of

12   that last question and answer was that Ms. Driscoll did this

13   analysis.

14             And that email completely contradicts the point that

15   she did this as a matter of analysis.  They got legal advice.

16   They rejected that legal advice and they moved forward.

17             THE COURT:  I'll let you put it on cross and see if

18   it comes in.  We'll see where this goes.

19             MR. KEACH:  Thank you, Your Honor.

20        (Pause in the proceedings.)

21   BY MR. BRONSHTEIN:

22   Q    Mr. Lombardo, were you -- when you made your decisions

23   relating to the $180,000, were you relying on the fact that

24   Ms. Driscoll had sought legal advice?

25             MS. MILNE:  Objection, Your Honor.

1             THE COURT:  You're really opening doors.  I'm just

2      telling you.  The email is looking more and more fresh in my

3      mind.  The doors are just getting wide open here.  We'll see

4      where this goes.

5             MR. BEREZIN:  Your Honor, may I stipulate to

6      something to take this off the table?

7             THE COURT:  No you can't take anything off the

8      table.  Whatever is on the table, is on the table.  But you

9      may stop other stuff from coming in.  We'll see where this

10     goes.

11     BY MR. BRONSHTEIN:

12     Q    Mr. Lombardo, did you discuss the change to the $180,000

13     salary threshold with the board?

14            MS. MILNE:  Objection, Your Honor. I appreciate

15     we're trying to be efficient, but this (indiscernible).

16            THE COURT:  That is leading.

17            MR. BRONSHTEIN:  I'm sorry, I just couldn't

18     understand that objection.

19            THE COURT:  It was leading.  You can just get a

20     little --

21     BY MR. BRONSHTEIN:

22     Q    Other than Ms. Driscoll, did you discuss -- did you

23     discuss the change in salary with anyone else at Steward?

24     A    Yes.

25     Q    Who did you discuss it with?

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN

92

1    A    Doctor De la Torre.

2    Q    And how many conversations did you have with Mr. De la

3    Torre?

4    A    Just one.

5    Q    Did you have any -- strike that.  Do you recall

6    approximately how many nurse practitioners, physician

7    assistants, and CRNA's became eligible after this change?

8    A    I don't recall the number, no.

9    Q    Do you recall roughly the magnitude of how many?

10    A    It was small.  I know it was a small number, but.

11    Q    And do you recall how many of them ended up participating

12    in the plan?

13    A    Even a smaller number, yes.  I don't recall the number.

14         (Pause in the proceedings.)

15    Q    Turning briefly to the IASIS plan.  During the time that

16    you were at IASIS, did you become familiar with that plan?

17    A    Briefly yes.  I looked at that plan.

18    Q    When IASIS was acquired by Steward, what happened to the

19    IASIS plan?

20    A    It was frozen.

21    Q    Was anyone allowed to make contributions following that/

22    A    No.

23         MR. BRONSHTEIN:  Would you please pull up ECF number

24    4306.  It's Exhibit 1.  And could we please go to page 5 of

25    the document?

1          (Pause in the proceedings.)

2     BY MR. BRONSHTEIN:

3     Q    Looking at the top of the page, Section 1.01.  Could you

4     please read that?

5     A    Yes.  "IASIS Healthcare LLC hereby establishes as of the

6     effective date an unfunded deferred compensation plan for a

7     select group of management or highly compensated employees of

8     the participating companies entitled "The IASIS Healthcare

9     Executive Savings Plan."

10    Q    And then going down to Section 1.02, could you read from

11    the plan and stop at the first parenthetical?

12    A    "The plan is intended to be an unfunded plan maintained

13    by a participating companies, primarily for the purpose of

14    providing deferred compensation for a select group of

15    management or highly compensated employees."

16    Q    And then looking at the purpose, Section 1.03, could you

17    read just that first sentence that ends again with the

18    parenthetical?

19    A    "The purpose of this plan is to provide a select group of

20    management or highly compensated employees of the

21    participating companies a, with an opportunity to defer all or

22    part of the compensation payable to such employees and b, with

23    supplemental benefits equal to the amount that cannot be paid

24    to such employees from the savings plan on account of certain

25    internal revenue codes."

1    Q    Going to page 9 of this document, to Section 2.13.

2         (Pause in the proceedings.)

3              THE COURT:  Can you tell me the doc number for this

4    one?  Is it 4306-1?

5              MR. BRONSHTEIN:  So I have it as 4306, Exhibit 1.

6              THE COURT:  Let me just note that 4306 -- and I know

7    it's been admitted -- but I don't think it was actually filed.

8    I think your 4306-1 is actually Exhibit 2.  As it starts, it

9    may just need to be filed on the Docket.

10             MR. BRONSHTEIN:  I think it's just 4306 without a

11   dash.  Is that possible?

12             THE COURT:  That may be the answer.  Hold on.

13        (Pause in the proceedings.)

14             THE COURT:  Oh, yep you're right.  Got it.  It's

15   there, got it.  Thank you.

16   BY MR. BRONSHTEIN:

17   Q    So looking at page 9.

18             MR. BRONSHTEIN:  Is the Court ready to proceed on

19   this?

20             THE COURT:  Yes, thank you.  Thank you.

21   BY MR. BRONSHTEIN:

22   Q    Mr. Lombardo, do you see Section 2.13?

23   A    Yes.

24   Q    Do you see about two-thirds of the way down it says, "A

25   participants deferred compensation account?"

1    A    Yes.

2    Q    Can you just read that part?

3    A    "A participants deferred compensation account shall be

4    utilized solely as a device for the determination and

5    measurement of the amounts subject to vesting provisions in

6    this plan to be paid as deferred compensation benefits to the

7    participant or his beneficiary pursuant to the plan."

8    Q    And what did you understand that to mean?

9    A    The same as we talked about earlier, its hypothetical

10   account.

11   Q    Can we look at page 13, please?

12        (Pause in the proceedings.)

13   Q    The Section 3.01.

14   A    Yes.

15   Q    Are you able to see that?

16   A    Yes.

17   Q    And could you just read the Section 3.01?

18   A    "The eligible group of employees shall be those employees

19   whose annual rate of basic compensation is expected to be at

20   least equal to the current compensation threshold for

21   determination of highly compensated employees under code

22   Section 414(q)(1)(b) and whose job classifications is one of

23   the following.  Chief Executive Officer, Chief Operating

24   Officer, Chief Nursing Officer of a hospital, a corporate

25   officer at the director level or above.  Or a physician

1      employed by a participating company or such other employees

2      determined by the Committee to be eligible for participation

3      as indicated in appendix A, which shall be attached to and

4      made part of the plan as set forth herein and which maybe

5      amended from time-to-time by action of the Committee.

6          "Each such eligible employee shall become a participant

7      in the plan as of the entry date coinciding with or

8      immediately following the satisfaction of these requirements

9      for participation in the plan."

10     Q    And what did you understand this paragraph to refer to?

11     A    It's identifying who is eligible to participate in the

12     plan.

13     Q    Going to page 22.

14         (Pause in the proceedings.)

15     Q    Do you see Section 6 point (indiscernible)?

16     A    Yes.

17     Q    So the third sentence begins, "While the participating

18     company."  Do you see that?

19     A    Yes.

20     Q    Could you just read that sentence stopping at

21     "notwithstanding?"

22     A    "While the participating company may, in the discretion

23     of the Committee, make investments in the funds designated by

24     the Committee as investment funds in amongst equal or unequal

25     to participants deferred compensation accounts hereunder,

PATRICK LOMBARDO - DIRECT BY MR. BRONSHTEIN                97

1       the --

2       Q    Sorry, did you loose it?

3       A    Yes.  Do you want me to continue?

4       Q    Yes.

5       A    "The participating company shall not under any obligation

6       make such investments and any such investments shall remain an

7       asset of the participating company subject to the claims of

8       its general creditors."

9       Q    And what did this provision mean?

10      A    It's identifying the same that we were talking about

11      under the Steward plan that the dollars subject to bankruptcy

12      and becoming part of -- and not secured.

13      Q    Can you read Section 6.03, unfunded status?

14      A    "The Plan is intended to be unfunded for purposes of both

15      ERISA and the Code."

16      Q    What is that referring to?

17      A    the same as it's an unfunded plan where assets are not

18      actually put into the participant -- people whose

19      participation -- who participates accounts.

20      Q    Do you know whether there was a trust set up pursuant to

21      this plan?

22      A    Yes, there was.

23      Q    Do you know what kind of trust that was.

24      A    Legal as a Rabbi trust as well.

25              MR. BRONSHTEIN:  Can we go to, please, ECF number

1    4306-27.

2         (Pause in the proceedings.)

3    BY MR. BRONSHTEIN:

4    Q    And looking at page 5.

5         (Pause in the proceedings.)

6    Q    Do you recognize this document, Mr. Lombardo?

7    A    Yes.

8    Q    What is it?

9    A    Rabbi Trust document, I believe.

10        MS. MILNE:  Objection, Your Honor.

11        I apologize.  The first (indiscernible).

12        MR. BRONSHTEIN:  We can go back to the first page.

13        MS. MILNE:  (Indiscernible).

14        (Pause in the proceedings.)

15        MS. MILNE:  Thank you.

16   BY MR. BRONSHTEIN:

17   Q    All right, so back to page 5, please.

18        (Pause in the proceedings.)

19   Q    Do you see Section 1.4, Mr. Lombardo?

20   A    Yes.

21   Q    Could you read just the first section of that?

22   A    "The principal of the trust and any earnings thereon

23   shall be held separate and apart from other funds of company

24   and shall not be used exclusively for those -- for the uses

25   and purposes of the plan participants and general creditors as

1    herein set forth."

2    Q    And could you just read from "and shall" one more time?

3    I think you might have --

4    A    I'm sorry.

5    Q    Can you read in the middle of that sentence "and shall be

6    used" one more time?

7    A    Yes.  Let me get there.  "And shall be used exclusively

8    for the uses and purposes of plan participants and general

9    creditors as herein set forth."

10   Q    What did it mean that the trust assets would be used

11   exclusively for participants and general creditors?

12   A    That those were the only two that had access to those

13   funds and they would only be used to -- for the participants

14   or general creditors in the case of a bankruptcy.

15   Q    Mr. Lombardo, did you understand the SHC plan to be a top

16   hat plan?

17   A    Yes.

18          MS. MILNE:  Objection, Your Honor.  Calls for

19   (indiscernible).

20          THE COURT:  He's the executive vice president of

21   human resources, I think he can -- I'm just taking it as his

22   understanding not that it actually is and it satisfies ERISA

23   and all that stuff.

24          MR. BRONSHTEIN:  And that's what we're asking, Your

25   Honor.

1    BY MR. BRONSHTEIN:

2    Q    What was your understanding with respect to the ERISA

3    plan?

4    A    That is was a top hat plan as well.

5    Q    Did you have any understanding whether the changes in

6    2019 changed the status of the SAC plan?

7    A    It did not change the status of the plan.

8            MR. BRONSHTEIN:  I'll pass the witness.

9            THE COURT:  Okay.  Let me just ask the witness, do

10   you need a few minutes or --

11           THE WITNESS:  I'm okay, Your Honor. Thank you.

12           THE COURT:  Let me ask the other side.  Do you need

13   a few minutes to kind of get ready or?

14           MS. MILNE:  That would be great Your Honor.

15           THE COURT:  Okay.  Why don't we just take a five

16   minute break and then let's just -- I'll remind you, sir, that

17   you're under oath and speak with no one about your testimony,

18   Mr. Lombardo.

19           Let's come back in about five minutes and then let's

20   work until about noon and just keep going from there.  Are you

21   going to need any tech or --

22           MS. MILNE:  Mr. Ho, Your Honor is going to help.

23           THE COURT:  Put up exhibits.  Okay.  It takes me

24   forever to find people so no, no.  Everyone keep going.  I

25   will use this time efficiently to find you Mr. Ho.

1          MR. UNKNOWN:  And, Your Honor, you had indicated

2     earlier this morning that perhaps you would be able to provide

3     rooms for us both?

4          THE COURT:  Yes. Let me get -- yeah I'm going to go

5     work on that.

6          MR. UNKNOWN:  Thank you, Your Honor.

7          THE COURT:  Mr. Ho where are you on this thing?

8     When I tell you I'm bad at this, I really mean it.

9       (Recess taken from 11:19 a.m. to 11:32 a.m.)

10          THE COURT:  Counsel, I'll give you the option.  If

11     you want to start or if you want to wait on your colleague I'm

12     more than happy to either way.  It's up to you.

13          MS. MILNE:  Thank you, Your Honor.

14          THE COURT:  Absolutely.

15       (Pause in the proceedings.)

16          THE COURT:  Before we get -- I think we've covered

17     the getting the breakout rooms.  If there's anyone that needs

18     anything else, just let us know and we'll -- my policy in the

19     afternoon is I don't care, just don't bring granola in here

20     something that is crunchy.

21          Other than that I don't really care and loosen ties

22     and all that stuff.  Let's just keep working.

23          Ms. Milne are we good?  All right, counsel whenever

24     you're ready to start.  And I'll remind you, Mr. Lombardo,

25     you're still under oath.

1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  Okay.

3              MS. MILNE:  Thank you, Your Honor.

4                          CROSS-EXAMINATION

5    BY MS. MILNE:

6    Q    Good morning, Mr. Lombardo.

7    A    Morning.

8    Q    As you may recall, my name is Lindsey Milne on behalf of

9    certain participants in the Deferred Compensation Plan.

10        Mr. Lombardo, earlier this morning we discussed a Rabbi

11   trust agreement.  I'd like to bring that up.  That's Trial

12   Exhibit 147, please.

13        (Pause in the proceedings.)

14   Q    Do you recall looking at this briefly this earlier this

15   morning, Mr. Lombardo?

16   A    Yes.

17   Q    Had you seen this trust agreement prior to preparing for

18   your recent deposition?

19   A    Yes.

20   Q    So to confirm, you had seen this trust agreement prior to

21   preparing for your deposition?

22   A    Yes.

23   Q    Okay.

24             THE COURT:  Mr. Lombardo, can I just get you to

25   speak a little bit more into the mic?  I want to be sure we

1       just have a clean record.  Thank you.

2                I think your answer was yes.

3                THE WITNESS:  Yes.  Yes, Your Honor.

4                THE COURT:  Okay, thank you.  I apologize Ms. Milne.

5

6       BY MS. MILNE:

7       Q    And do you recall being deposed yesterday?

8       A    Yes.

9       Q    Do you recall being under oath yesterday?

10      A    Yes.

11      Q    And you understand that you're under oath right now?

12      A    I do.

13      Q    Okay.

14                MS. MILNE:  Can we please bring up Mr. Lombardo's

15      deposition transcript?  And call up page 93.

16           (Pause in the proceedings.)

17      BY MS. MILNE:

18      Q    Mr. Lombardo, let's look at the bottom of page 92 where

19      we marked Exhibit 14.  Do you see that in the middle of the

20      page?

21      A    I do.

22      Q    Okay.  So --

23                MS. MILNE:  actually let's go to the third page of

24      the PDF, which is in the itemization of the exhibits, please.

25           (Pause in the proceedings.)

1          MS. MILNE:  And, so actually I was hoping to stick

2     with the deposition transcripts, please.  And if we look at

3     the third page of the PDF, there's a list of exhibits.

4          (Pause in the proceedings.)

5          MS. MILNE:  Thank you.

6     BY MS. MILNE:

7     Q    Mr. Lombardo, do you see that the court reporter had

8     marked an Exhibit 14 as a trust agreement?

9     A    Yes.

10    Q    Okay and turning back to page 93 of your deposition

11    transcript.

12         (Pause in the proceedings.)

13    Q    First question at the top of the page I asked, "Okay,

14    let's start with that one.  Do you know who the trustee of the

15    Rabbi trust was?"

16    A    No, I do not.

17    Q    Okay.  And my next question.  "Have you seen this trust

18    agreement prior to preparing for your deposition recently?"

19    And your answer there was no; is that right?

20    A    Yes.

21    Q    Okay.  I'll ask my question again.

22    A    I was just mistaken.  I reviewed that -- this trust

23    agreement at some point during my tenure at Steward.

24    Q    And that some point prior to March of 2025, which we're

25    in right now?

1    A    I'm sorry.  Ask that again.

2    Q    Approximately when did you review that Rabbi Trust --

3    A    I honestly don't remember.  I was at Steward seven years,

4    so I came across it at some point and just perused it.

5    Q    Okay, so you were mistaken yesterday when you --

6    A    I was mistaken, yes.  I apologize.

7    Q    Thank you.  Okay, turning to your testimony about the

8    change to SHC plan in September of 2019.  Did you personally

9    solicit legal counsel for administering that amendment to the

10   plan?

11   A    No.

12   Q    Did you ask anyone to solicit counsel?

13   A    I did not ask anyone to solicit legal counsel that I

14   recall.

15   Q    Thank you.  Did anyone report to you that they had

16   solicited legal counsel?

17   A    Yes.

18   Q    Who was that?

19   A    Ann Marie Driscoll.

20   Q    And who did Ms. Driscoll report she had solicited counsel

21   from?

22   A    What counsel did she use?

23   Q    That's right.

24   A    I believe it was McDermott Wills.

25   Q    And did she report that the legal counsel she received to

1    you?

2    A    Yes.

3    Q    What was that legal counsel?

4    A    It's --

5              MR. BRONSHTEIN:  Objection, Your Honor.  This is

6    exactly what we've been covering.

7              THE COURT:  Counsel?

8              MS. MILNE:  If I may respond, Your Honor.

9              THE COURT:  Of course.

10             MS. MILNE:  Mr. Lombardo has testified that he

11   relied in directly on advice of counsel here.  We're entitled

12   to examine what that counsel was to determine whether or not

13   this plan qualifies as a top hat plan.

14             MR. BRONSHTEIN:  And, Your Honor, we would just

15   respond whether -- whatever the counsel's advice was, it's not

16   really at issue here.  Whether some other lawyer either

17   talking to them or in the past, advised that it was a top hat

18   plan was not or whatever, it doesn't change the fact whether

19   the plan, as constituted, as administered, was, in fact, a top

20   hat plan.

21             THE COURT:  That's your legal argument though,

22   right?  That's not really what's relevant in terms of the

23   questioning that's before me right now.  That's your

24   conclusion on the issues before me.

25             But you, I think, he said he relied on legal

1      counsel.  The question is for what did he rely on the legal

2      counsel for.  And I think the door got opened as to that

3      question.

4               But as to whether everything the lawyer said, I

5      don't think the door got opened. So I think he said he relied

6      on legal counsel for a -- or something was communicated to

7      him.  That may not open the door, but he said he relied on

8      legal counsel to make a determination.

9               I think you've got to then figure out what he relied

10     on legal counsel for and whether that door got opened.  I

11     don't think it -- I don't think it got wide open.  I just

12     think he did say he relied on legal counsel for something, on

13     the advice.

14              And then the question then got asked again.  And it

15     got pushed, despite my statement about opening the door.  The

16     door then got opened after I said not to open it.  And then --

17     so now we're here.  So I think you get to asked the question.

18              MS. MILNE:  Thank you, Your Honor.

19     BY MS. MILNE:

20     Q    Do you recall receiving a report from Ms. Lombardo about

21     the counsel she received on September 16th, 2019?

22     A    Do you mean Ms. Driscoll?

23     Q    I'm sorry, Ms. Driscoll.  Yes, I do.  Thank you.

24     A    Can you ask that again?  I'm sorry.

25     Q    Certainly since I used the wrong witnesses name.  Do you

1      recall having received a communication from Ms. Driscoll about

2      counsel she received when analyzing?

3      A    Yes.

4      Q    Okay.

5               MS. MILNE:  Will you please pull up Trial

6      Exhibit 47?

7               MR. BRONSHTEIN:  Your Honor, if we could just for a

8      moment.  I thought your instruction at this point was to ask

9      on what did he rely.

10              THE COURT:  That's correct.

11              MR. BRONSHTEIN:  Okay.  And this -- I think we're

12     going to the privileged communication.  Isn't there one step

13     removed here?

14              THE COURT:  Yeah.  That's correct.  I think we've

15     then got to figure out -- again this is -- again I've got to

16     wait for someone to object, so.

17              I think the question then becomes what did he rely

18     on when he was asked the question on direct.  When he said he

19     relied.  That's the question.

20     BY MS. MILNE:

21     Q    Mr. Lombardo, was the course of action that you

22     ultimately took consistent with the legal advice that you

23     received?

24              THE COURT:  That doesn't get you there.  Right,

25     everybody relies on lawyers to then go do stuff, right.  But

1    that's not going to get you there.

2    BY MS. MILNE:

3    Q    Mr. Lombardo, in exercising the discretion that the board

4    delegated to you to administer the deferred compensation plan,

5    what actions did you take?

6    A    I don't understand your question.  Action regarding the

7    plan?

8    Q    In September of 2019, you recall that there was an

9    amendment to the SHC plan; is that right?

10    A    Yes.

11    Q    Okay.  And the board had delegated authority to you to

12    administer the SHC plan generally; is that right?

13    A    Yes.

14    Q    Okay.  So would the amendment to the SHC plan that

15    occurred in 2019 had been under your authority?

16    A    The board approved that amendment.

17    Q    But the board delegated authority to you to administer

18    the plan, right?

19    A    To implement, yes.

20    Q    Okay.  And was the plan amended in 2019?

21    A    Yes.

22    Q    Okay.  Who made the decision on how to amend the plan?

23    A    The information that I received was from Ann Marie

24    Driscoll.

25    Q    And what information was that?

1    A    On the additional positions to be included into the plan

2    and the recommended salary cap.

3    Q    And what was the recommended salary cap?

4    A    180,000.

5    Q    And that was Ms. Driscoll's recommendation to you/

6    A    Yes.

7    Q    Do you know how she came to the $180,000 figure?

8    A    She spoke with others.

9    Q    Which others?

10   A    She spoke to NFP and she spoke attorneys.

11   Q    And who is NFP?

12   A    They were the record keepers of the deferred compensation

13   plan.

14   Q    And which attorneys did she speak to?

15   A    Which attorney?  I believe it was Attorney Erwitz

16   (phonetic) from McDermott Wills.

17   Q    And what did those attorney tell her about the level of

18   compensation?

19            MR. BRONSHTEIN:  Objection, Your Honor.

20            THE COURT:  Yeah, I think that doesn't get you in

21   there.  He didn't rely on it.  You're just -- that doesn't get

22   you there.  That doesn't get you there.

23   BY MS. MILNE:

24   Q    How did you make your determination about whether to

25   proceed with an amendment to the DCH -- excuse me, the SHC

1    plan at $180,000?

2    A    Based on Ann Marie Driscoll's recommendation.

3    Q    And what -- did you ask Ms. Driscoll what her

4    recommendation was based on?

5    A    I don't recall.

6    Q    Did you do any other work to make your determination to

7    amend the plan?

8    A    No, I trusted her diligence.

9         MS. MILNE:  Can we pull up Trial Exhibit 67, please?

10   This is not a disputed email.

11        (Pause in the proceedings.)

12   BY MS. MILNE:

13   Q    Do you recognize that email?

14   A    Yes.

15   Q    Okay.  The second email from the top is from

16   Ms. Driscoll; is that right?

17   A    Yes.

18   Q    When Ms. Driscoll sought the legal advise that she

19   describes there, that was at your direction, right?

20   A    I don't recall if I gave her the direction to get the

21   legal advice or if she did that on her own.

22   Q    But typically, when Ms. Driscoll sought legal advice, it

23   would be at your direction, right?

24   A    Not typically.  She would act independently.

25   Q    Okay.

PATRICK LOMBARDO - CROSS BY MS. MILNE

112

1        MS. MILNE:  Can we pull up Mr. Lombardo's deposition

2   transcript, please.

3   BY MS. MILNE:

4   Q    Mr. Lombardo, is it your testimony that when Ms. Driscoll

5   received legal advice that it was not typically at your

6   direction?

7   A    It's my -- I don't recall.

8   Q    Let's look at page 24 of the deposition transcript,

9   please.

10       (Pause in the proceedings.)

11  Q    My question at the top.  "Can you think of any time when

12  you thought you needed to consult legal advice without asking

13  you to divulge what that advice was?"

14       Answer, "There were time when Ann Marie sought legal

15  advice."

16       Question, "And would that have been at your direction?"

17       Answer, "Yes."

18  A    I don't think that answer says exclusively.  She would

19  have sought legal advice sometimes on my -- at my request and

20  sometimes independently she would.

21  Q    And so it's your testimony today that when she sought

22  legal advice in September of 2019, it was not at your

23  direction?

24  A    I just don't recall.

25  Q    Okay.  And when you received her report of legal advice,

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1    you made no independent determination about that proposal from

2    Ms. Driscoll?

3    A    No, I trusted her diligence.

4         (Pause in the proceedings.)

5    Q    Did you adapt the legal -- Ms. Driscoll's proposal which

6    was based on legal advice?

7    A    Did I implement the $180,000?

8    Q    No, did you implement the proposal that came from counsel

9    that Ms. Driscoll relayed to you.

10        MR. BRONSHTEIN:  Objection, Your Honor.  He hasn't

11   said that he's done that.  That miss characterizes what he

12   said.

13        THE COURT:  I think she's asking a different

14   question.  I don't think he's answered.  You can answer the

15   question.

16        THE WITNESS:  Please repeat the question.

17   BY MS. MILNE:

18   Q    Did Ms. Driscoll propose to you that Steward should

19   follow the counsel that she received?

20   A    I don't recall.

21        MS. MILNE:  Let's bring up Trial Exhibit 67, please.

22        (Pause in the proceedings.)

23   BY MS. MILNE:

24   Q    You just looked at this a moment ago.  Ms. Driscoll

25   states in the second email from the top.  Quick calculations.

1        Of the 1,005 potential eligibles, 71 are below 175; 82 are

2    below 180; and 184 are below 200K.

3        I would suggest that we move the salary threshold to 180K

4    that way we don't jeopardize the top hat status of the plan.

5    Of the 82 that will be ineligible, they are mostly Nps, Pas,

6    and a few CNRAs.

7        Did I read that correctly?

8    A    Yes.

9    Q    Okay.  Do you know where the thresholds that Mr. Driscoll

10   identifies in that email came from?

11   A    No.

12   Q    Did you ask any questions about where those thresholds

13   came from?

14   A    No.  I trusted her diligence.

15   Q    The email below is from Joe Erwitt (phonetic) at

16   McDermott, Will and Emory, is that right?

17   A    Yes.

18   Q    And that bottom email is forwarded from Mr. Erwitt's --

19   excuse me, from Ms. Driscoll -- Ms. Driscoll forwards email

20   from Mr. Erwitt's to you when reporting on her analysis; is

21   that right?

22   A    Yes.

23   Q    Okay.  So when Ms. Driscoll sent her September 18th, 2019

24   email at 2:41 p.m. to you, you had the benefit of seeing the

25   analysis of counsel at the bottom of that email; is that

1    right?

2    A    Yes.

3    Q    Did you look at that counsel?

4    A    I don't recall.

5    Q    Do you typically not look to the bottom of emails when

6    making decisions?

7    A    Sometimes I don't.  With her recommendation in that

8    second sentence, I would have trusted that she did the due

9    diligence.  So I may not have gone any further.

10        (Pause in the proceedings.)

11            MS. MILNE:  Your Honor, given the privilege dispute,

12   would it be alright to take a three minute pause on this

13   cross?  We don't even need to step out of the courtroom?

14            THE COURT:  Pause?

15            MS. MILNE:  To confer with my team.

16            THE COURT:  Oh, of course.  Yeah of course.

17            MS. MILNE:  Thank you so much.

18        (Pause in the proceedings.)

19            THE COURT:  Whenever you're ready.

20            MS. MILNE:  Thank you, Your Honor.  I just didn't

21   want to interrupt your time.

22            THE COURT:  Oh, no, no.  I was waiting on you-all.

23            MS. MILNE:  I appreciate the reprieve.

24   BY MS. MILNE:

25   Q    Mr. Lombardo, do you know for what purpose Ms. Driscoll

PATRICK LOMBARDO - CROSS BY MS. MILNE

1    sought legal advice?

2    A    Because she was -- there was a request to add positions

3    to the deferred compensation.

4    Q    And do you know why that required speaking with counsel?

5    A    Well she wanted to make sure that we didn't do anything

6    that was not consistent with the plan or to qualify as a top

7    hat plan.

8    Q    And do you know if she relied on that advice when

9    preparing her proposal to you?

10   A    I don't know whether she -- I can't speak to what she

11   relied on.

12   Q    Did you ask her whether she relied on counsel's advice?

13   A    No, I trusted her diligence.

14   Q    Did she report to you whether she did rely on counsel's

15   advice?

16   A    I don't recall.

17   Q    Okay.

18        (Pause in the proceedings.)

19   Q    When did the 2024 distribution under the Steward Deferred

20   Compensation Plan come due?

21   A    It came due on February 1st.

22   Q    And was it paid on February 1st, 2024?

23   A    No.

24   Q    Okay.  Do you recall there being vendor issues throughout

25   2023?

1    A    Yes.

2    Q    Do you recall instances where vendors stopped supplying

3    goods to Steward in 2023?

4    A    Yes.

5    Q    Were the 2024 deferred compensation distributions

6    ultimately made?

7    A    Yes.

8    Q    Do you remember about when they were made?

9    A    March or April.

10   Q    Of 2024?

11   A    Yes.

12   Q    And did you authorize loans against life insurance

13   policies in order to fund this distribution?

14   A    Yes.

15   Q    Okay.  Did you speak with anyone in order to make that --

16   in order to authorize those loans?

17   A    Yes.

18   Q    Who did you speak with?

19   A    John Cassalano (phonetic).

20   Q    Okay.  And what did Mr. Cassalano say?

21   A    Okay to move forward.

22   Q    Did you have the authority to authorize those loans,

23   yourself?

24   A    I don't know.

25   Q    So it's your testimony that you're not sure today whether

1    you had the authority to authorize those loans?

2    A    I presumed that I did.  Yes, I change my answer to I did.

3    Q    So you did have authority to authorize loans?

4    A    I would think so.

5    Q    Okay.

6         MS. MILNE:  Let's bring up the deposition

7    transcript, please.  I'd like to go to page 92.

8         (Pause in the proceedings.)

9    BY MS. MILNE:

10   Q    First question at the top of the page.

11        (Pause in the proceedings.)

12        MS. MILNE:  Can we go to the prior page?

13        (Pause in the proceedings.)

14   BY MS. MILNE:

15   Q    I'll come back to that question.  Did you receive any

16   advice in connection with making that distribution?

17   A    Yes.

18   Q    Who did you receive advice from?

19   A    Kachena Potter.

20   Q    From anyone else?

21   A    Not directly, no.

22   Q    Earlier today, you had testified that you received advice

23   in connection with making a distribution.  Were you referring

24   to the advice from Ms. Potter?

25   A    I would want to go back and look at exactly what the

1    question and answer was.

2    Q    Okay.

3    A    What I was referring to.

4    Q    Did you receive legal advice in connection with making

5    the distribution in February, excuse me, in 2024?

6    A    No.

7    Q    Okay.  Did you receive legal advice in connection with

8    preparing the plan at a glance document?

9    A    I did not.

10   Q    Did anyone else at your direction?

11   A    Not at my direction

12   Q    Are you aware of anyone else received legal advice in

13   connection with preparing plan at a glance?

14   A    I'm not aware that they had.  I can presume, but I'm not

15   aware.

16   Q    Okay.  And who prepared the plan at a glance?

17   A    It would have been NFP and in conjunction with Ann Marie

18   Driscoll.

19   Q    And did Ms. Driscoll ever tell you that she received

20   advice in connection with helping to prepare that plan at a

21   glance?

22   A    I don't recall.

23        THE COURT:  Can I ask, just one more time.  Just who

24   NFP is just for clarification purposes.

25        THE WITNESS:  They're the record --

PATRICK LOMBARDO - CROSS BY MS. MILNE

1       THE COURT:  Please speak into the mic, I just want
2   to --
3       THE WITNESS:  Sorry.  They're the record keepers of
4   the deferred compensation plan.
5       THE COURT:  Oh, okay.  Thank you, thank you.
6   BY MS. MILNE:
7   Q    During your seven years at Steward, as either senior or
8   executive vice president of HR, you made market adjustments
9   from time-to-time; is that right?
10  A    Yes.
11  Q    And a market adjustment is an analysis of the wages paid
12  to similarly qualified employees in the market; is that right?
13  A    Yes.
14  Q    and part of the market adjustment was a determination on
15  how to implement any changes that would be required from the
16  result of our analysis; is that right?
17  A    Yes.
18  Q    Okay.  And you testified that you understand it to be a
19  requirement of a top hat plan that such a plan be made
20  available only to highly compensated employees; is that right?
21  A    I don't remember what my exact testimony was, but top hat
22  plan would have salary requirement as well.  And be made
23  available to highly -- certain groups of highly compensated
24  employees.
25  Q    Okay.  But you relied on advice of counsel to identify

1    the level of that highly -- high compensation?

2    A    I relied on Ann Marie Driscoll's diligence.

3    Q    Okay.  Did you have an understanding that there was a

4    ratio that was relevant in analyzing whether an employee was

5    highly compensated?

6    A    Yes.

7    Q    Okay.  And did you understand that the average salary of

8    an employee is relevant in that ratio?

9    A    Yes.

10   Q    And you had acknowledged that salaries in the market

11   fluctuate from time-to-time; is that right?

12   A    Yes.

13   Q    And that salary fluctuation was part of the market

14   adjustment that you did in a different capacity from time to

15   time?

16   A    Market adjustments that I was responsible for and did

17   were people who were not qualified -- generally not qualified

18   for the Deferred Compensation Plan.  They were hourly

19   employees.  They were for nurses, they were for red techs,

20   they were for lab techs, they were for positions like that.

21        I did not do market studies, market comparisons for

22   executives.

23   Q    Okay.  And those market studies for the employee groups

24   you just described, those employees would be included on the

25   overall censes, is that right?

1    A    Yes.

2    Q    And so their salaries or their hourly wages would be

3    included when calculating that ratio that's relevant to top

4    hat status; is that right?

5    A    I don't know.  But I would presume that answer would be

6    that, yes.

7    Q    And you could recall only one time in your seven year

8    tenure that you requested or received advice on whether salary

9    eligibility requirements were sufficient high to comply with

10   top hat status?

11   A    I received one time in my seven years to change that,

12   yes.

13   Q    Okay.  And did you ever consider whether during a seven

14   year time when salaries fluctuate, you should have sought

15   counsel as to whether the salary requirement for top hat

16   status was sufficient?

17   A    No.  Ann Marie Driscoll and NFP would have been reviewing

18   that on a regular basis.

19        (Pause in the proceedings.)

20        THE COURT:  Ms. Milne before you kind of keep going,

21   how much longer do you think you have or is it -- does it make

22   sense to take a break now or if you've got another 10 minutes,

23   lets push through.

24        MS. MILNE:  I think it would make sense to take a

25   quick break, Your Honor. I don't think I have much more than

1     30 minutes.

2              THE COURT:  Yeah, lets go ahead just so we can make

3     sure that we, you know, -- let's just go ahead and take our

4     break.

5              (Recess taken from 12:02 p.m. to 12:52 p.m.)

6              THE COURT:  All right.  Good afternoon, everyone.

7     This is Judge Lopez.  We are back on the Record in Steward.  I

8     think -- Naomi, I think you just need a witness.

9              Mr. Lombardo, good afternoon.  I'll remind you that

10    you are still under oath, sir.

11             MR. LOMBARDO:  Yes, Your Honor.

12             THE COURT:  Okay.  Counsel, whenever you're ready.

13             MS. MILNE:  Thank you, Your Honor.

14                    CROSS-EXAMINATION (CONT'D)

15    BY MS. MILNE:

16    Q    Good afternoon now, Mr. Lombardo.

17    A    Afternoon.

18    Q    Do you recall Ms. Driscoll ever referring to the

19    practitioners who were going to be added to plan as mid-

20    levels?

21    A    Yes.

22    Q    Okay.  Did you discuss that term with her?

23    A    I don't recall if we discussed that term.

24    Q    Do you know what she meant when she described mid-level?

25    A    I do.

1    Q    What did she mean to your understanding?

2    A    Her mid-level practitioners.  That's medical terminology

3    for a mid-level practitioner.  It doesn't mean that they're a

4    mid-level employee.  They're highly -- they are executives in

5    nature.  They are the -- mid-level does not refer to anything

6    other than how they practice.

7    Q    And what titles to the best of your understanding were

8    included in Ms. Driscoll's description of mid-level

9    practitioners?

10   A    Nurse practitioners, physician assistants and CRNA's --

11   Q    Okay.

12   A    -- certified registered nurse assistant.

13   Q    Anyone else would be included as far as you know in the

14   category of mid-level medical professionals?

15   A    None come to mind right now.

16        THE COURT:  I'm just going to take this back on, and

17   turn my camera back on, and I promise to give it back to you,

18   just to make sure people --

19        MS. MILNE:  All set to continue here?

20        THE COURT:  Yes.

21        MS. MILNE:  Okay, great.

22        THE COURT:  Now people get to see my face again.

23        MS. MILNE:  Perfect.

24   BY MS. MILNE:

25   Q    Mr. Lombardo, in connection with the amendment to the

PATRICK LOMBARDO - CROSS BY MS. MILNE                125

1     deferred compensation plan in the fall, 2019, do you recall
2     ever speaking with prospective participants about any
3     amendments they would like to see to the plan?
4     A     No.
5     Q     Do you recall anyone reporting to you that they had
6     solicited any feedback from perspective participants?
7     A     Any feedback, no, I don't recall any feedback.
8     Q     Did anyone tell you that any participants had offered
9     revisions to the plan amendment?
10    A     No, no one told me that that I recall.
11    Q     In your experience having administered deferred
12    compensations plans both at IASIS and at Steward, were
13    prospective plan participants or current plan participants
14    ever solicited for input in how the plan would work?
15    A     Not to my knowledge.
16    Q     Could we put up exhibit, Trial Exhibit 146-5, please?
17          In the CC fields here, Mr. Lombardo, is that your email
18    address?
19    A     Yes.
20    Q     Okay.  Take a moment if you need it.  Have you seen this
21    email before?
22    A     I don't remember this one.
23    Q     Okay.  Have you had a moment to look at it, or would you
24    like more time?
25    A     I'd like another moment.

1    Q    Okay.

2    A    Okay.

3    Q    The bottom email is from Melissa McCollum (phonetic), is

4    that right?

5    A    I can only see -- there, now I can see it.  Yes.

6    Q    Okay.  Would you please read the first bullet in

7    Ms. McCollum's email?

8    A    If the Steward Rabbi Trust doesn't contain assets of the

9    IASIS deferred comp plan, are the IASIS assets then in a

10    separate trust.  If so, can you please provide us detail

11    regarding that trust including the trust document.

12    Q    Okay.  Thank you.  And then Ms. Gwendolyn Walker responds

13    to Ms. McCollum up above, is that right?

14    A    Yes.

15    Q    And Ms. Walker is the VP of benefits at Steward at the

16    time of this email, is that right?

17    A    She's one of the VP's, yes.

18    Q    Thank you.  And do you know what Ms. Walker did prior to

19    her employment at Steward?

20    A    Yes, she was at IASIS as a benefits vice president.

21    Q    Okay.  Was she there when you started at IASIS?

22    A    Yes.

23    Q    Do you know how long she had been at IASIS?

24    A    I don't know.

25    Q    Okay.  Would you please read Ms. Walker's response to

1    Ms. McCollum, starting with I am researching my emails?

2    A    I am researching my emails.  Please find attached the

3    definition of Rabbi Trust and sentence from Kathy Stilldy

4    (phonetic).

5    Q    And that next sentence there?

6    A    To answer his question, while the non-qualified plan

7    assets are held by a trustee, they are not held in a Rabbi

8    Trust, or a secondary trust.

9    Q    Did you respond to Ms. Walker's email?

10   A    Not that I recall.

11   Q    Did you have any reason to believe that her conclusion,

12   that the assets were not held in Rabbi Trust was incorrect?

13   A    I have no idea what this was about, so no, I don't have

14   any reason to draw conclusions here.

15   Q    Okay.  Do you recall doing any further analysis into

16   whether there was or was not a Rabbi Trust in connection with

17   the IASIS plan?

18   A    I don't recall.

19   Q    Could we put up trial Exhibit 67, please.  You may recall

20   this document from before the break, Mr. Lombardo.

21   A    Yes.

22   Q    The top email is an email between you and Ms. Driscoll.

23   The second one from the top is from Ms. Driscoll to you,

24   describing some quick calculations.  Do you know whether

25   Ms. Driscoll considered granting the threshold to $200,000?

1    A    I remember that $200,000 was considered in some of her

2    calculations.

3    Q    Okay.  Did you discuss the possibility of the threshold

4    increasing to $200,000, with Ms. Driscoll?

5    A    I don't recall our conversations.

6             MS. MILNE:  All right.  Might that be why

7    Ms. Driscoll did a calculation of eligibility at the $200,000

8    threshold --

9             MR. BRONSHTEIN:  Objection, calls for speculation.

10             THE COURT:  I think he said he didn't know so I do

11    think it calls for speculation based on his prior answer.

12             MS. MILNE:  Based on the fact that you relied on

13    Ms. Driscoll and her calculations, would you expect that

14    Ms. Driscoll would have -- strike that.

15             Can you think of any reason that Ms. Driscoll would

16    have proposed a $200,000 threshold in her email if it wasn't

17    to increase the minimum compensation, the minimum threshold to

18    $200,000?

19             MR. BRONSHTEIN:  Objection, that's again calling for

20    speculation.

21             THE COURT:  Sustained.

22             MS. MILNE:  Your Honor, if I may respond to that.  I

23    was asking the witness if he could think of any reason why

24    Ms. Driscoll would be considering a $200,000 threshold?

25             THE COURT:  That calls for speculation, Counsel.

1      You can ask another question.

2                    MS. MILNE:  Okay.  Thank you, Your Honor.

3      BY MS. MILNE:

4      Q    Do you know whether the $200,000 figure in the quick

5      calculation was in any way related to legal advice

6      Ms. Driscoll received?

7      A    I don't know.

8      Q    Okay.  Could we please put up Debtor's Exhibit 44?

9           Do you recognize this document, Mr. Lombardo?

10     A    No.

11     Q    This is the testimony of Ms. Driscoll.  We're at

12     paragraph 23, please.  Would you read the highlighted

13     sentence?

14     A    I and Patrick Lombardo discussed increasing the required

15     salary threshold.  I specifically sought legal advice related

16     to requirements of the top hat plans and the meaning of highly

17     compensated.

18     Q    Does that refresh your recollection as to whether

19     Ms. Driscoll was seeking legal advice relating to the

20     requirements of top hat plans, and the meaning of highly

21     compensated?

22     A    I believe her Declaration.  It doesn't spark my memory of

23     this discussion.

24     Q    Okay.  You don't have any recollection of what

25     Ms. Driscoll was referring to in her sworn statement there?

1   A    Well, I know what she's referring to in her sworn

2   statement.  It says it right there.  But I don't have any

3   recollection of my conversations with Ms. Driscoll then.

4         MS. MILNE:  All right.  Thank you, Your Honor.

5   That's all I have for Mr. Lombardo.

6         THE COURT:  Okay.  Any Redirect?

7         MR. BRONSHTEIN:  No Redirect, Your Honor.

8         THE COURT:  Okay.  Mr. Lombardo, thank you very much

9   for your time, sir.

10         MR. LOMBARDO:  Thank you.

11      (Witness steps down.)

12         MR. BRONSHTEIN:  And Your Honor, at this point, we'd

13   ask that Mr. Lombardo be excused to the extent the

14   participants don't need him in their case-in-chief.

15         THE COURT:  Okay.  Mr. Lombardo, as a pretty screen

16   right there, I think that's a great place that we should all

17   go.  Have a good day.

18         MR. LOMBARDO:  I'm going to make a run for it.

19         MR. BRONSHTEIN:  Thank you.  And Your Honor, at this

20   time, the Debtors are calling Katchena Potter.

21         THE COURT:  Okay.

22         MR. BRONSHTEIN:  She may just be right outside.

23         THE COURT:  She may be outside.

24         MS. MILNE:  Your Honor, housekeeping matter.  I

25   apologize.  While --

1          THE COURT:  No worries.

2          MS. MILNE:  -- Ms. Potter is being located, could we

3     move to admit Mr. Lombardo's deposition testimony, and I think

4     the Declarations as an exhibit?

5          THE COURT:  Mr. Lombardo's depo --

6          MS. MILNE:  I understand perhaps it was not included

7     in our Exhibit List, which would have been encompassed in the

8     stipulated admissions this morning.  Any issue with admitting

9     Mr. Lombardo's deposition transcript?

10          MR. BRONSHTEIN:  No objection, Your Honor.

11          THE COURT:  Okay.  So as long as somebody can

12     identify for me where -- is it on the Docket somewhere?

13          MR. HOGAN:  Yes, Your Honor.  We had pled that fact

14     during the proceedings this morning.  We were really hustling

15     with the court reporter if these depositions -- if it was

16     ready because (indiscernible).  So they are -- should be the

17     last -- it should be another supplement from us.

18          THE COURT:  Okay.  Let's see, 4345, and it looks

19     like that got uploaded just a little while ago.  It looks like

20     it's -- yeah, Exhibit 151 would be the transcript of the

21     deposition of Mr. Lombardo with exhibits.

22          MALE SPEAKER:  Yes, sir.  Thank you.

23          MR. BRONSHTEIN:  That's fine, Your Honor.  We just

24     had one other housekeeping.

25          THE COURT:  Okay.  I will admit what's at

1    Docket 4345, which is Exhibit 151, into the Record.  Okay.

2              MS. MILNE:  Thank you, Your Honor.

3              THE COURT:  Mr. Berezin?

4              MR. BEREZIN:  Yes.  So Your Honor, our second

5    witness by agreement is appearing -- well, her direct exam is

6    coming in through her Declaration.  This is Ann Marie

7    Driscoll.  And that Declaration is Exhibit 44, and it's at

8    Docket 4300-5.

9              THE COURT:  Exhibit 44, at Docket 4300-5?

10             MR. BEREZIN:  That's correct, Your Honor.

11             THE COURT:  I thought -- wait.

12             MR. BEREZIN:  Well, I guess you already admitted

13   them.

14             THE COURT:  I just want to confirm that that's

15   the -- just take a quick look, 4300-, just one moment.

16   4300 --

17             MR. BEREZIN:  Dash five, should be dash five.

18             THE COURT:  But I don't think I admitted 4300 docs.

19   I admitted 4331 docs from your side.  One through 140 was what

20   I admitted.  It may already be in there.  I'm just -- I see a

21   Declaration at Exhibit 44, so it could be 4331-44?  I don't

22   know if it's the same one.  Docket 4229?

23             MR. BEREZIN:  Yes, Your Honor --

24             THE COURT:  Okay.

25             MR. BEREZIN:  -- it's the same one.

1           THE COURT:  Then that's admitted into the record,

2      but just so I'm clear, I thought we were doing -- I thought I

3      heard someone else's name, and now we're going to do Driscoll

4      as housekeeping.  I just want to make sure that we have a

5      clean record so go ahead.

6           MR. KEACH:  We have no objection to the Driscoll

7      Declaration going in.  This was done by stipulation in

8      advance.  So long as her -- essentially that's the direct

9      exam.  Ms. Driscoll is unavailable witness for both parties.

10           THE COURT:  Oh, got it.

11           MR. KEACH:  All right.  And so by stipulation, her

12      Declaration is going in, and then her deposition and all the

13      deposition exhibits are going in as our cross by stipulation.

14           MR. BRONSHTEIN:  And whatever redirect we would have

15      had.

16           MR. KEACH:  Correct.

17           THE COURT:  Okay.

18           MR. KEACH:  And obviously as with all the

19      depositions that get admitted as cross, the depositions

20      contain within them objections.  Those objections are

21      preserved.

22           THE COURT:  And where can I find -- is her

23      Declaration -- excuse me, her depo, is it uploaded already?

24           MR. KEACH:  Her deposition and exhibits I believe

25      were uploaded, and Brian has the coordinates.

1          THE COURT:  Okay.

2          MR. BEREZIN:  And that is one of the transcripts

3    that was subject to our stipulation.  Questions were asked

4    about the privileged material.

5          THE COURT:  Understood.

6          MR. BEREZIN:  Okay.

7          THE COURT:  And that's -- yeah.

8          MR. BEREZIN:  And those are all reserved.

9          THE COURT:  So Driscoll, Exhibit 44, I'm just -- so

10   I can keep it straight in my head, the counter to that would

11   be the cross, or if you will, would be --

12          MR. HOGAN:  The deposition transcript, is that --

13   our exhibit, well, one, and her exhibit bundle --

14          THE COURT:  So you said -- so it'd be like 4315-12,

15   or something?

16          MR. HOGAN:  I will look up the -- I don't have the

17   ECF number, but --

18          THE COURT:  So it would be Exhibit 12?

19          MR. HOGAN:  Yes, sir.

20          THE COURT:  Can you just give me one second, I

21   guess.  I've got it.  Your Exhibit 12 is the deposition

22   transcript of Ann Marie Driscoll and all exhibits as that

23   Exhibit 12.

24          MR. HOGAN:  Yes, sir.

25          THE COURT:  Okay.  Perfect.

1          MR. KEACH:  And Your Honor, just one other

2    housekeeping, that deposition actually contains what we now

3    refer to as the Driscoll stipulation which is the stipulation

4    to which we allowed testimony subject to the possible claims

5    of privilege, subject to Your Honor's future rulings on the

6    point.

7          THE COURT:  Yeah, got it.  Thank you.  So does that

8    conclude kind of housekeeping on Ms. Ann Marie Driscoll?

9          MR. BEREZIN:  Yes, Your Honor.  That does.

10          THE COURT:  Subject to the rulings and all --

11    everything contained within there.

12          MR. BEREZIN:  That is correct, Your Honor.

13          THE COURT:  Let me ask you.  At the -- just last

14    housekeeping question, 4312, well, that's 4315-12, are all the

15    exhibits filed on the Docket as well?

16          MR. HOGAN:  Yes, Your Honor.  12-2, which is -- I

17    think this is Docket Entry 4315, Number 24, Exhibit 12, part

18    one.  That's the transcript.

19          THE COURT:  Well, I see it.

20          MR. HOGAN:  Number 25 is admitted at 12, part two.

21    Part two is a (indiscernible) all deposition exhibits.

22    There's 51 pages --

23          THE COURT:  I see it.  I'm opening it now just to

24    confirm that it's on my end as well.  Yeah, I see it, the part

25    one and part two.  Thank you very much, very helpful.

1        MR. HOGAN:  Thank you, Your Honor.

2        THE COURT:  Okay.  Yes, I've got it.  Thank you.

3   Okay.  Counsel?  Okay.  In terms of -- what am I doing on this

4   for your side, for your direct, in terms of tech.  Are you

5   going to show exhibits or --

6        MR. BRONSHTEIN:  There will be a few exhibits.

7        THE COURT:  And who should I give the presenter role

8   to?

9        MR. BRONSHTEIN:  So that would be --

10       THE COURT:  I'm sorry.  Who do I give it to?

11       MALE SPEAKER:  (Indiscernible).

12       THE COURT:  You on this, you log in.  I don't see

13   you, with your name on it.  While we're going that, let me

14   swear the witness in.

15       Ma'am, can you raise your right hand?

16      (Witness sworn.)

17       THE COURT:  Okay.  We'll let the Record reflect the

18   witness has been properly sworn in.

19       Just can you do a mic check, just make sure the mic

20   is pointing in your direction, get a little closer to the mic,

21   and just state your name, and spell your last name for the

22   record?

23       MS. POTTER:  My name is Katchena Potter, and my last

24   name is spelled P-O-T-T-E-R.

25       THE COURT:  Thank you very much.  I think once we

1      get the -- there she is.  You got it.  I'm on it.  Counsel,

2      whenever you're ready to start.

3                    MR. BRONSHTEIN:  Thank you, Your Honor.

4                         DIRECT EXAMINATION

5      BY MR. BRONSHTEIN:

6      Q    Good afternoon, Ms. Potter.

7      A    Afternoon.

8      Q    Ms. Potter, are you currently employed?

9      A    Yeah.

10     Q    Where?

11     A    At Steward Health Care.

12     Q    What is your position at Steward Health Care?

13     A    I'm the director of benefits.

14     Q    How long have you worked at Steward Health Care?

15     A    Since October, 2011.

16     Q    Have you always been the director of benefits?

17     A    No.

18     Q    What previous position did you hold?

19     A    Well, a variety of positions, senior manager of benefits

20     and analytics, benefits manager, benefits advisor.

21     Q    And so for how many years have you worked in benefits at

22     Steward?

23     A    Since 2011.

24     Q    In your position as director of benefits, did anyone

25     report to you?

1    A    Yes.

2    Q    About how many people would you say reported to you?

3    A    Over the years, maybe between one and five people.

4    Q    Who did you report to?

5    A    Initially, I reported to Ann Marie Driscoll, and once she

6    departed the organization, I reported to Pat Lombardo.

7    Q    So when did you start reporting to Mr. Lombardo?

8    A    In February, 2020.

9    Q    At a high level, Ms. Potter, what were your areas of

10   responsibility as a director of benefits?

11   A    Benefit enrollment and eligibility and compliance

12   reporting, auditing and overall just overseeing benefit

13   related issues or items for my region.

14   Q    In that role, were you responsible for any retirement

15   plans?

16   A    Yes.

17   Q    Which ones?

18   A    We had two grandfather pension plans, one active pension

19   plan, 401(k) plan and the deferred comp plan.

20   Q    When you say the deferred comp plan, if I refer to that

21   as the HSC plan, will you know what I'm referring to?

22   A    Yeah.

23   Q    And you understand that that's the plan at issue in this

24   case --

25   A    Yeah.

KATCHENA POTTER - DIRECT BY MR. BRONSHTEIN

1    Q    -- or one of the plans I should say?  Which one of those

2    retirement plans took up most of your time?

3    A    I would say the nurses pension plan.

4    Q    And why did the pension plans take up so much of your

5    time?

6    A    Because I had to calculate eligibility for the nurses,

7    and it was very time exhaustive.

8    Q    Are you aware of another deferred compensation plan at

9    Steward beyond the HSC plan?

10   A    Yes.

11   Q    And do you know what that plan is referred to as?

12   A    I believe it was IASIS executive savings plan.

13   Q    Did you have any responsibilities with respect to that

14   plan?

15   A    I did not.

16   Q    Did you know whether there was a trust associated with

17   that plan?

18   A    I do not.

19   Q    Did you ever talk to anyone about that plan as part of

20   your job at Steward?

21   A    Not as part of my role, no, but anecdotally, I would get

22   information about it.

23   Q    Were you ever copied on communications related to that

24   plan?

25   A    I may have.

1   Q    Did you engage in those communications?

2   A    No, it wasn't my role.  I stayed out of it.

3   Q    Were you familiar with the payroll processes at Steward

4   Health Care?

5   A    Generally.

6   Q    And are you familiar with roughly how much Steward

7   processed in payroll each year?

8   A    Yes.

9   Q    About how much did Steward process in payroll each year?

10  A    About 2.6, to 2.8 billion.

11  Q    Ms. Potter, when did your responsibility for the HSC plan

12  start?

13  A    About the time that Ann Marie left the organization so

14  that would have been February, 2020.

15  Q    And what were your primary responsibilities with respect

16  to the HSC plan?

17  A    At that time, it would have been recording the deductions

18  that were taken by participants, or the contributions, and

19  sending that information over to the record-keeper NFP.

20  Q    Were you responsible for enrollment duties related to the

21  plan?

22  A    Yes.

23  Q    And were you responsible for distributions associated

24  with the plan?

25  A    Yes.

1    Q    How many times were distributions paid each year?

2    A    One time each year.

3    Q    And was that the same in all the years that you were

4    responsible for the plan?

5    A    Yeah.

6    Q    Was the same amount of distribution paid each year?

7    A    No, it varied.

8    Q    What did the amount of the distribution depend on?

9    A    When the distributions were scheduled to be paid out.

10   Participants could essentially elect when they wanted those

11   funds to be issued to them.

12   Q    When was the amount due calculated each year?

13   A    On February 1st.

14   Q    Do you recall what the size of the distribution was in

15   2024?

16   A    I do.

17   Q    What was it?

18   A    It was 9.1 million.

19   Q    How did that distribution compare to prior years?

20   A    In all the times that I had handled distributions, that

21   was the biggest amount I'd seen.

22   Q    Do you understand why it was so much bigger that year?

23   A    I don't.  I just assumed it had to do with the scheduling

24   of, you know, when participants elected to get those

25   distributions issued to them.

1    Q    Did Steward or participants decide whether to take a

2    distribution?

3    A    The participants decided that.

4    Q    Do you know how Steward ended up obtaining the funds to

5    pay that distribution in 2024?

6    A    Yes, I do.

7    Q    How did Steward obtain those funds?

8    A    We took a loan off of the life insurance policies in the

9    trust.

10   Q    Did you -- were you involved in that decision to take a

11   loan?

12   A    Not in the decision, no.

13   Q    Was that part of your responsibilities?

14   A    Not at all.

15   Q    Did you talk to anyone at Steward about taking the loans

16   on those policies?

17   A    Yes, I would have talked to my boss, Pat Lombardo.

18   Q    Did you understand where those policies were held?

19   A    Not really.

20   Q    That was outside the scope of your job?

21   A    Yeah, it was.

22   Q    Do you know whether Pat ultimately approved those loans?

23   A    Yes, he did.

24   Q    And when you say Pat, are you referring to Mr. Lombardo?

25   A    Mr. Lombardo.

KATCHENA POTTER - DIRECT BY MR. BRONSHTEIN                143

1    Q    In connection with those loans, did you review the trust

2    or plan documents?

3    A    No, not really, no, I did not.

4    Q    Would that have been within the scope of your

5    responsibilities?

6    A    I don't think so.

7    Q    How many times did enrollment occur each year?

8    A    One time, during the time I was administering.

9    Q    When during the year did enrollment occur?

10   A    Typically in the fall before the next calendar year.

11   Q    Who was responsible for managing that enrollment process?

12   A    I was.

13   Q    Do you know who was responsible before you took it over?

14   A    Ann Marie Driscoll.

15   Q    Did you talk to Ann Marie, or Ms. Driscoll when you took

16   over?

17   A    Yeah, she essentially gave me in writing some of her

18   duties and you know, during -- I think maybe like a week, I

19   worked directly with her to just get a handle on everything

20   that she was responsible for that would be coming my way.

21   Q    Did she explain specifically how enrollment worked?

22   A    I don't think at the time she specifically mentioned it

23   because it would have been in February, so it was a long way

24   off.

25   Q    The enrollment would have been in February?

1    A    No, when she left, it was in February so we were a ways

2    off from October, or the fall, 2020.

3    Q    So was one of your jobs with respect to enrollment

4    determining who was eligible to participate in the plan?

5    A    Yes.

6    Q    I want to walk through that process.  Where did you start

7    that process of determining eligibility?

8    A    I probably would have started with running a report out

9    of our HRIS system, Coronos (phonetic), and then I would have

10   downloaded into Excel.  I would have likely moved that

11   information into Access, so that I could run a variety of

12   queries.

13       And then I would -- well, at least the first time I did

14   it, I wanted to be sure I understood which roles, which

15   positions would have been involved or eligible for the plan.

16   So I remember creating a table with job titles just so I had

17   it for myself going forward.

18       And then I would run a report, you know, get the

19   population that I was expecting to get.  If there were

20   anything, or any roles that were ambiguous that I couldn't

21   really determine if they were eligible or not.  I would confer

22   with my colleagues in HR, who may be able to tell me.

23       And so I would have, you know, consulted with them to get

24   my entire list vetted before getting it over to the record-

25   keeper NFP, so that they can create participant profiles in

1    their enrollment system.

2    Q    Going back to the beginning of your answer, you referred

3    to something called Coronos?

4    A    Yes.

5    Q    Can you explain what that is?

6    A    It's our HRIS system so it's a system where we have all

7    employee demographic information, salary information,

8    timekeeping information so when employees clock in and clock

9    out.  It's also the system where you can see your paycheck,

10   things like that.

11   Q    Did you put that information that you just described into

12   Coronos yourself?

13   A    No.

14   Q    Who did?

15   A    We have HRS colleagues that do the data entry.

16   Q    Can you explain what I think I hear you saying HRIS?

17   A    HRIS, yes, HR information systems.

18   Q    And what was Coronos generally used for?

19   A    Generally, like I said timekeeping, so employees used

20   that to clock in and clock out, payroll reporting.  It's where

21   we put the deductions for benefits.  We put it into that

22   system so that when they run payroll, the deductions would

23   come out and people would get paid.

24   Q    Were paychecks generated based on data that was housed in

25   Coronos?

1    A    Yes.

2    Q    And did you rely on the data in Coronos to do your job?

3    A    Yes, often.

4    Q    Was it important that the information in Coronos be

5    accurate and reliable?

6    A    Absolutely.

7    Q    Going back to the eligibility spreadsheets that you

8    referred to, what data did you download from Coronos into

9    those spreadsheets?

10   A    It was just a basic -- what we would call an all employee

11   dump so it had a variety of demographic information about

12   every employee.

13   Q    And once you had that dump, what was your next step?

14   A    Yeah, so I would move it into Access, and query off of it

15   there so I would assign the criteria for eligibility so I'm

16   looking for base salaries, 180,000 and above.  I'm looking for

17   specific physician titles.

18        Executives were eligible for participating in the

19   deferred comp plan as well as nurse practitioners, physician

20   assistants, CRNA's, and NP's.  So all of those specific roles

21   would have to be a part of the data that I was ultimately

22   extracting.

23   Q    How did you know which titles to use when you filtered

24   the data?

25   A    Yeah, I didn't know at first, so I -- once I had my list

1    of employees that fit the criteria for 180,000 and above, I

2    took all their titles.  I made myself a list.  I called it the

3    job title table.

4        And I would just cross check it with what had, you

5    know -- some spreadsheets from before, and you know, whether

6    they eligible.  So I did some of that.  And then anything that

7    was questionable, I reached out to some of my HR colleagues to

8    help.

9    Q    Was this a manual process, or an automated process?

10   A    Oh, it's very manual.

11   Q    How long did it take you make one of those lists?

12   A    Probably the better part of a day.

13   Q    Do you remember how many employees those lists might have

14   started with before you whittled it down?

15   A    Yeah, it could have been -- I know it was upwards of

16   maybe couple thousand employees but once I whittled it down, I

17   probably had, I don't know, 12-1500.

18   Q    You mentioned the $180,000 salary.  How did you know

19   about that threshold?

20   A    Yeah, so when I first had -- you know, was doing this

21   process, I relied on the -- there was like a plan highlight

22   sheet that was provided to me by NFP.  So it included the

23   eligibility criteria including the salary and the titles that

24   were eligible to participant in the plan.  So I relied on that

25   heavily at first.

1   Q    Did you discuss those requirements with anyone else at
2   Steward?
3   A    Yes.
4   Q    Who did you discuss them with?
5   A    I would probably have discussed it with the senior HR,
6   senior VP of HR, Grant Hoffman and his team which included
7   Marie Alexander.  I also probably would have discussed it with
8   the senior VP of HR for the corporate division which would
9   have been Melissa McCollum.
10  Q    As you were creating this document, did you save working
11  files?
12  A    Yes, I did.
13  Q    And when you created those working files, what did you do
14  with employees who'd been terminated over the past year?
15  A    Yeah, so I start with the full list, and typically I
16  would, you know, whittle it down to what I believed to be the
17  eligible population.  But right before I'm turning it over, I
18  am looking for terminated employees so that I can take them
19  out of the data.
20  Q    And when you say turning it over, who were you turning it
21  over to?
22  A    I would be turning it over to NFP, to create the profiles
23  in their enrollment system.
24  Q    Did you remove any other data before sending those files
25  over to NFP?

1    A    Yes, so just for my own ease, I had included the salary

2    information.  I would include the job title so that I had that

3    at my fingertips.  And then I would remove that because that

4    wasn't information that NFP needed to create the participant

5    profiles.

6    Q    Did you ever save that final file that you sent to NFP?

7    A    Yes.

8    Q    Was it important for that file that you sent to NFP to be

9    accurate?

10   A    Absolutely.

11   Q    Why?

12   A    You wouldn't want them to communicate with employees that

13   weren't eligible in the plan.

14   Q    From whom did you learn how to put together those

15   eligibility files?

16   A    I think anecdotally from Ann Marie, but eventually came

17   up with my own process.

18   Q    Do you know whether you used a similar methodology to the

19   one she had employed?

20   A    I'm not sure if I did but I certainly would have tried to

21   create my own process that would have been identical to hers.

22         MR. BRONSHTEIN:  And I want to show you an exhibit.

23   Your Honor, this one has personably identifiable information

24   on it, in the sense of names and salaries.  So I'm wondering

25   if we can show it just in the courtroom?

1          THE COURT:  Yeah, I would be able to -- if you

2     connect to the hardware, it will just show in the courtroom

3     but it won't show on the screen.  But if you put it on

4     GoToMeeting, everyone will see it so don't --

5          MR. BRONSHTEIN:  It's got to be --

6          THE COURT:  -- do it that way.

7          MR. BRONSHTEIN:  Let me see if we have -- this is

8     Exhibit 133.

9          THE COURT:  You can't put it on GoToMeeting.  If

10    there's a way to kind of plug into one of those things, and we

11    can give you access.

12         MR. BRONSHTEIN:  Thank you.

13         THE COURT:  You've got the access now so if you plug

14    into the right thing, it'll show whatever's on your screen so

15    just be aware that you're plugged right into it now so -- it's

16    got to be one in there.

17         THE CLERK:  In here?

18         THE COURT:  Yeah.

19         THE CLERK:  Okay.

20         THE COURT:  Yeah, it should be out already unless --

21    it may be on the other side, you think.

22         THE CLERK:  Oh, it's the media.  We can take it out

23    from one of these maybe?  No.

24         THE COURT:  Don't trust me.

25         MR. BRONSHTEIN:  Do we have a hard copy?  I can use

1    that.  Oh, we don't.

2              THE COURT:  Why don't we do this, what's the exhibit

3    number?  Do you have a bunch of these, or just --

4              MR. BRONSHTEIN:  There's only going to be three,

5    Your Honor.  It's Exhibits 133, 120 and 29.

6              THE COURT:  Which --

7              MR. BRONSHTEIN:  And I can give you the ECF number.

8              THE COURT:  What's the ECF number?  I can

9    probably --

10             MR. BRONSHTEIN:  The ECF numbers are 4332-38.

11             THE COURT:  4332 --

12             MR. BRONSHTEIN:  Three, eight.

13             THE COURT:  Is it Exhibit 133?

14             MR. BRONSHTEIN:  I have it as 133.

15             THE COURT:  Okay.  Hold on a second.  Let me see if

16   I can --

17             MALE SPEAKER:  Just see what happens.  I think

18   you're probably right.

19             THE COURT:  No.

20             MR. BRONSHTEIN:  And then the others are 4332 --

21             THE COURT:  Hold on.  I can bring it over, and that

22   may make everyone's life a little easier.  Okay.  No, this is

23   just internally, and no one on GoToMeeting can see this.

24   BY MR. BRONSHTEIN:

25   Q    Ms. Driscoll, are you able to see what's been marked as

1    Exhibit 133?

2    A    Ms. Potter.

3    Q    And --

4    A    But I can see it.  I'm Ms. Potter.

5    Q    Oh, I apologize, Ms. Potter, excuse me.  And so this

6    is -- I'll represent this is like a PDF printout of what was

7    an Excel spreadsheet just for purposes of production.  Do you

8    recognize what this is?

9    A    I do.

10   Q    And is this one of those eligibility files that we were

11   discussing?

12   A    Yeah.

13   Q    Did you prepare this document?

14   A    Yes, it's likely.

15   Q    Approximately when?

16   A    It would have been in October, of each year for the

17   upcoming plan year.

18   Q    And it looks like because this is a PDF, not all of

19   the -- well, let me ask you this.  About how many columns did

20   you have in your eligibility files, do you remember?

21   A    I don't but it's a lot more than this.  This is what,

22   seven columns.  I'm pretty sure I had maybe 12 to 15.

23              MR. BRONSHTEIN:  Are we able to scroll down, Your

24   Honor?

25              THE COURT:  Yeah.  No, you just -- I don't -- you

1     tell me where to go.

2              MR. BRONSHTEIN:  I'm just trying to see how -- I

3     apologize.

4              THE COURT:  No.

5              MR. BRONSHTEIN:  I'm trying to see how the

6     additional columns were -- there we go.  Okay.  They're just

7     off the page.  Okay.

8     BY MR. BRONSHTEIN:

9     Q    Do these look like more of the columns, Ms. Potter?

10    A    It is, yeah.

11    Q    And could we scroll down one more, please.  Are these

12    additional columns?

13    A    Yeah.

14    Q    Okay.  Could we scroll down just one more?  And are these

15    the remainder of the columns?

16    A    Yeah.

17    Q    And I apologize for the presentation of this.  Can you

18    tell whether this was one of the working files or the final

19    files that you had created?

20    A    This would have been a working file.

21    Q    How could you tell that this was a working file and not a

22    final file?

23    A    Because I -- for the columns that I was going to be

24    removing, I made them yellow so -- and there's salary

25    information in here and NFP didn't need that so I would have

1    excluded that as well.

2    Q    Did you generate similar files each year?

3    A    Yes.

4         MR. BRONSHTEIN:  And I apologize, Your Honor.  This

5    would require pulling up five more documents --

6         THE COURT:  No, keep going.

7         MR. BRONSHTEIN:  -- to show her.  Is that okay?  So

8    could we pull up 4332-23?

9         THE COURT:  Dash what?

10        MR. BRONSHTEIN:  Two, three, the 2019 Steward Health

11   Care deferred compensation plan eligibility enrollment census

12   is what it would say there.

13        THE COURT:  Is this it?

14        MS. POTTER:  Yes.

15   BY MR. BRONSHTEIN:

16   Q    Ms. Potter, does this look like one of the draft

17   eligibility files?

18   A    No, this doesn't look like --

19        MR. KEACH:  Objection --

20        THE COURT:  Yeah.

21        MR. KEACH:  -- to form, also with respect to

22   foundation.  (Indiscernible).

23        THE COURT:  I think that's fair.

24   BY MR. BRONSHTEIN:

25   Q    Do you recognize this, Ms. Potter?

1    A    I do.

2    Q    And what does this appear to be?

3    A    This appears to be the census that I would have to send

4    to NFP.

5          MR. BRONSHTEIN:  Can we please pull up 4332-24?

6    Apologies, one moment, Your Honor.  I apologize.  That was my

7    mistake.  Could we please pull up instead 4332-35?

8          THE COURT:  Dash 35?

9          MR. BRONSHTEIN:  Yes.  Thank you.  And this was what

10   was produced as 2018 Steward Health Care deferred compensation

11   plan enrollment eligibility census.

12   BY MR. BRONSHTEIN:

13   Q    Ms. Potter, do you recognize this?

14   A    I do.

15   Q    What is it?

16   A    What I would -- I think I named it the eligibility

17   census, and I would have had the date, whatever -- I'm sorry,

18   the year that it pertained to.

19   Q    Can you tell whether this is a draft or the final file?

20   If we could scroll down.

21   A    Okay.  Some salary information is in there so that is a

22   draft.

23   Q    Okay.  Can we please pull up 4332-36, the 2019 Steward

24   Health Care deferred compensation plan enrollment eligibility

25   census.  Ms. Potter, do you recognize this?

1    A    I do.

2    Q    I think if we could scroll down.  What is this,

3    Ms. Potter?

4    A    Same file, the eligibility file.

5    Q    I'm sorry?

6    A    The eligibility file.

7    Q    Is this is a final file, or a draft file?

8    A    No, again because it has salary information, it is a

9    working file.

10    Q    Can we please pull up 4332-37?  Do you recognize this,

11    Ms. Potter?

12    A    Yes.

13         MR. BRONSHTEIN:  And if we could please scroll down

14    to the next two pages?

15         THE COURT:  You want me to go down one more page?

16         MR. BRONSHTEIN:  Yes.

17         THE COURT:  Okay.

18    BY MR. BRONSHTEIN:

19    Q    Ms. Potter, do you recognize this file?

20    A    I do.

21    Q    What is it?

22    A    The eligibility file.

23    Q    Is it a final version or a draft version?

24    A    It would have been a draft because it includes salary

25    information.

1  Q    Can we please pull up 4332-38, Steward Health Care

2  deferred compensation plan enrollment (indiscernible)?

3       Ms. Potter, do you recognize this file?

4  A    I do.

5  Q    If we could please scroll through the next two pages.  Do

6  you recognize this file?

7  A    I do.

8  Q    And what is this?

9  A    An eligibility file, still in draft because it includes

10 salary information.

11 Q    And do you know whether this was a final file or a

12 working file?

13 A    It's a working file.

14 Q    How can you tell?

15 A    Because it has the salary, it has, you know, the

16 eligibility markers.

17           MR. BRONSHTEIN:  Could we please pull up 4332 --

18           THE COURT:  Counsel, can you just get to the mic?  I

19 just want to make sure we have a good clean record for you?

20           MR. BRONSHTEIN:  Oh, I apologize.

21           THE COURT:  No worries.

22           MR. BRONSHTEIN:  Could we please pull up 4332-39?

23 And if we could scroll down.

24           THE COURT:  Scroll down to the next page, or just --

25           MR. BRONSHTEIN:  Yes.

1           THE COURT:  -- scroll down.

2           MR. BRONSHTEIN:  Please.

3           THE COURT:  Okay.  I just don't want to get a head

4   of you.

5           MR. BRONSHTEIN:  Thank you.

6   BY MR. BRONSHTEIN:

7   Q    Ms. Potter, do you recognize this file?

8   A    Yes.

9   Q    And Your Honor, if we could scroll to the next page, and

10  then one more?  Ms. Potter, what is this file?

11  A    An eligibility file.

12  Q    And can you tell whether it's a working file or a final

13  file?

14  A    It would be a working file.

15  Q    And could we next go to 4332-41?  Ms. Potter, do you

16  recognize this one?

17  A    I do.

18  Q    And if we could scroll down to the next two pages, and

19  one more?  Ms. Potter, do you recognize this as one of the

20  annual eligibility files?

21  A    Yes.

22  Q    And do you know whether it's a draft or a final file?

23  A    It's a draft.

24  Q    If we could next go to 4332-42, the 2024 Steward Health

25  Care deferred compensation plan enrollment eligibility census?

1      Ms. Potter, do you recognize this file?

2      A    I do.

3      Q    Is this -- or what is it?

4      A    It looks like an eligibility file.

5      Q    If we could please scroll to the next page, and then one

6      more?  Do you recognize whether this is a draft file or a

7      final file?

8      A    I do.  It's a draft.

9           MR. BRONSHTEIN:  Thank you.  Could we next please

10     pull up Exhibit 4332-23?

11          THE COURT:  Dash two, three?

12          MR. BRONSHTEIN:  Yes, please.

13          THE COURT:  Okay.

14     BY MR. BRONSHTEIN:

15     Q    And Ms. Potter, I apologize.  With the technology issues,

16     I was asking some bad questions earlier, but could we scroll

17     down to the next page please?  Ms. Potter, do you recognize

18     this file?

19     A    I do.

20     Q    And what is this file?

21     A    It looks like an eligibility file.

22     Q    Do you know if it's a draft file or a final file?

23     A    Can you scroll one more?  Okay.  Looks like the same

24     information, and it doesn't have salaries so it would have

25     been a final file.

1    Q    And so this would have been one of the ones sent to NFP?

2    A    Yes.

3    Q    Can we please pull up 332-24?  Ms. Potter, do you

4    recognize this?

5    A    I do.

6    Q    And what is it?

7    A    An eligibility file.

8    Q    And if we could scroll down to the next page, please.

9    And one more.  Ms. Potter, do you know whether this was a

10    working file or a final file?

11    A    It looks like a working -- I'm sorry, a final file but

12    there are some -- it looks like there's a couple of additional

13    columns included.

14    Q    Do you know for certain whether it's a working or a final

15    file?

16    A    Without salary information, I would say it's a final file

17    but it may have been edited afterwards.

18    Q    And if I use working file and draft file, would you

19    understand those to be synonymous?

20    A    Yes.

21    Q    If we could please go to dash 25?  This is the 2022

22    Steward Health Care deferred compensation plan eligibility

23    enrollment census.  Could we please scroll to the next page?

24    Ms. Potter, do you recognize this file?

25    A    Yes.

1   Q    What is it?

2   A    The eligibility file.

3   Q    Can you tell whether it is a working version or a final

4   version?

5   A    It looks to be a final version.

6        MR. BRONSHTEIN:  And can we go to dash 27, please,

7   Your Honor.

8        THE COURT:  Counsel, I just want you to get -- make

9   sure that mic is pointing in your direction.  If you point in

10  the direction, it should pick you up just fine.  I just want

11  to make sure we have a good record.  Thank you.

12  BY MR. BRONSHTEIN:

13  Q    And could we please scroll down one page?  Ms. Potter, do

14  you recognize this file?

15  A    Yes.

16  Q    And what is it?

17  A    It looks like an eligibility file.

18  Q    Can you tell whether it is a working file or a final

19  file?

20  A    Can you scroll down a couple pages, please?  Okay.

21  There's no salary information so it would be a final file.

22  Q    Which would have been sent out?

23  A    Correct.

24       MR. BRONSHTEIN:  If we could finally go to dash 28?

25       THE COURT:  Oh, 28.

1              MR. BRONSHTEIN:  Two, eight.

2    BY MR. BRONSHTEIN:

3    Q    Ms. Potter, do you recognize this file?

4    A    I do.

5    Q    What is this?

6    A    An eligibility file.

7    Q    And can you tell whether it's a working file or a final

8    file?

9    A    Can you scroll down a little bit, please?

10             THE COURT:  Sure.

11             MS. POTTER:  Okay.  No salary information so that

12   would be a final file.

13             MR. BRONSHTEIN:  Thank you.

14             Could we please pull up Exhibit 29, which is ECF

15   number 4311?

16             THE COURT:  Is this personably identifiable

17   information, too?

18             MR. BRONSHTEIN:  Yes, it does, Your Honor.

19             THE COURT:  You said 4311?

20             MR. BRONSHTEIN:  Yes, and this is my last series of

21   these.

22             THE COURT:  No worry.  Let's see.

23             MR. BRONSHTEIN:  If we could please go to the next

24   page?  And actually, I apologize.  Could we go to 4311-2?

25   BY MR. BRONSHTEIN:

163

1    Q    Ms. Potter, do you recognize this?

2    A    I do.

3    Q    And what is it?

4    A    It looks to be a full employee list.

5    Q    And what makes you think it's a full employee list?

6    A    Because I helped in creating this data.

7    Q    And where did this data, to create a full employee list,

8    come from?

9    A    It would have been run out of Coronos.

10   Q    And how did you get the data from Coronos into these

11   spreadsheets?

12   A    We just ran a report.

13   Q    And I'd like to go -- could we try 4311-1?  I'm just not

14   seeing the headings in this.  And to the next page?  Thank

15   you.  So looking at the first column, do you see where it says

16   E-M-P-N-O?

17   A    Yes.

18   Q    What does that refer to?

19   A    That refers to the Coronos assigned unique ID for all of

20   our employees that are put into the system.

21   Q    And do you see -- skipping a column to where it says full

22   name, what is that?

23   A    It looks to be employee names, last name, comma, first

24   name with middle initial.

25   Q    Do you see the next column where it says employment

1    status?

2    A    Yes.

3    Q    What does that refer to?

4    A    It looks to be a location name.

5    Q    And the -- sorry, a location name?

6    A    A location name, and it looks to be the EIN for that

7    location.

8    Q    And when you say the location name, what location is that

9    referring to?

10   A    Hospital locations, work locations.

11   Q    The next column labeled annual salary, what does that

12   reflect?

13   A    It would be the base salary for each employee.

14   Q    And do you see the column labeled W-2 earnings?

15   A    Yes.

16   Q    What information is in that column?

17   A    It's actually mislabeled.  It should be gross earnings.

18   Q    And do you know whether that's the same or different as

19   the similarly labeled column in the eligibility files that we

20   looked at?

21   A    It would be different.

22   Q    Sorry, the --

23   A    Gross earnings would be different than the salary

24   information that was in my file.

25           MR. BRONSHTEIN:  Sorry.  Let me ask it a different

1   way.  Did you use W-2 earnings consistently, or inconsistently
2   to mean gross compensation?
3              MR. KEACH:  Objection to form.  (Indiscernible).
4              THE COURT:  I agree.
5   BY MR. BRONSHTEIN:
6   Q    Did you use this title, Ms. Potter?
7   A    I'm sorry, which title?
8   Q    Did the title W-2 earnings?
9   A    Yes.
10  Q    And what did you understand when you used W-2 earnings in
11  these spreadsheets to mean?
12  A    Net earnings but I later found out that it was gross
13  earning.
14  Q    How did you determine that this column actually
15  represented gross earnings?
16  A    Because we took some examples and looked at it in
17  Coronos, or out of Coronos, to verify.
18  Q    And the last two columns that say job code and job title,
19  what do those refer to?
20  A    So job code is the unique code assigned to each job in
21  the Coronos system, and then job title would be the title that
22  correlates with that code.
23  Q    And Exhibit 29 includes, we saw on the first page, 2020.
24  Did you see that --
25  A    Yeah.

1  Q    -- year?

2  A    Yes.

3  Q    Did you generate information just like this for each

4  year?

5  A    Yes.

6  Q    Ms. Potter, do you know whether employees had to

7  participate in the HSC plan?

8  A    I do.  They did not have to participate.

9  Q    Did some employees participate in certain years but not

10  others?

11  A    Yes.

12  Q    Who was it that set the amount of money that participants

13  deferred?

14  A    The participants themselves.

15  Q    Was there any penalty for choosing not to participate?

16  A    No.

17  Q    Did employees pay income tax on the money that they

18  deferred into the -- at the time of deferral?

19  A    No, they did not.

20  Q    Ms. Potter, did you have access to Steward's balance

21  sheets?

22  A    No, I do not.

23  Q    Did you have any reason to believe in 2023 that Steward

24  was insolvent?

25  A    No, I didn't.

1    Q    Had Steward, during your time there, ever had trouble

2    paying its bills?

3    A    Yes, it's happened, you know, a few times.

4    Q    And what happened when that happened in the past?

5    A    We would always come out of it.

6    Q    Did your view about Steward's potential insolvency ever

7    change?

8    A    Eventually.

9    Q    Roughly when did that happen?

10   A    In the spring, 2024.

11   Q    Before that, did you personally consider Steward to be

12   insolvent?

13   A    Not at all.

14   Q    Did any of the plan participants ever ask you about

15   Steward's solvency?

16   A    No, they did not.

17   Q    Did any of the plan participants or eligible employees

18   raise questions for you about the security of their

19   investments?

20   A    No, they did not.

21   Q    Were you someone at Steward who would be able to answer

22   those sorts of questions?

23   A    No, not myself.

24   Q    Who could people have gone to with such questions?

25   A    About the insolvency of Steward?

1    Q    No, I'm sorry.  About the HSC plan?

2    A    Oh, they could have gone to NFP, or there was a gentleman

3    by the name of -- I think his name was Mr. Ballatin

4    (phonetic).  They could outreach to him.  I believe that was

5    more for financial advice though.

6    Q    Was there anyone at HR that they could have spoken with

7    about the HSC plan in particular?

8    A    No, because we had a really good relationship with NFP so

9    we would defer everybody directly to them with questions.

10           MR. BRONSHTEIN:  One moment, Your Honor, please?  At

11   this point, I'll pass the witness.

12           THE COURT:  Okay.  Let me just take this down.  And

13   you want to begin with cross examination.  Ms. Potter, if at

14   any point you need a break or something, just let me know,

15   okay.  All right.

16                        CROSS-EXAMINATION

17   BY MR. KEACH:

18   Q    Good afternoon, Ms. Potter.

19   A    Hi.  Good afternoon.

20   Q    It's been a long time.  Do you know who Gwendolyn Walker

21   is?

22   A    Yes, I do.

23   Q    And who is Gwendolyn Walker?

24   A    She was my colleague.  She also handled benefits but for

25   a separate region than mine.

KATCHENA POTTER - CROSS BY MR. KEACH

1    Q    Was she also known as Ginger Walker?

2    A    Yeah, yes, she was.

3    Q    And did Ms. Walker work at IASIS before she worked at

4    Steward?

5    A    She did.

6    Q    And did you generally look to Ms. Walker for expertise

7    with respect to the IASIS plan?

8    A    With respect to the IASIS plan, no.  I mean she really

9    was the only point of contact for that plan since it was, I

10   think, frozen, or -- so she really was the only person of

11   contact.

12   Q    All right.  So I think you may have misunderstood my

13   question because I think you answered it the way I thought you

14   would because you did in fact look to Ms. Walker for

15   information about the IASIS plan?

16   A    Well, yes, because --

17   Q    Yeah.

18   A    -- she's the only person that was --

19   Q    Right.  So just to be clear, when questions arose

20   internally at Steward about the IASIS plan, or when those

21   questions were tendered to you, you generally sought

22   Ms. Walker's advice?

23   A    I would defer it to her.

24   Q    Can you see what is on the screen at the moment?

25   A    Yes, I can.

KATCHENA POTTER - CROSS BY MR. KEACH

1    Q    And if we can scan down to the original question?  So

2    this is a question tendered by Melissa McCollum to Ms. Walker,

3    and to you, subject IASIS deferred compensation question,

4    correct?

5    A    Yes.

6    Q    First let's start with Melissa McCollum.  She is

7    described as the senior vice president for human resources.

8    Was she the senior vice present for human resources for

9    Steward Health, or for some other entity?

10    A    For Steward Health Care, or what we would consider

11    corporate.

12    Q    Okay.  And her question -- she has two questions.  And

13    the first question is if the Steward Rabbi Trust doesn't

14    contain assets of the IASIS deferred comp plan, are the IASIS

15    assets then in a separate trust, question mark.

16        If so, can you please provide us details regarding that

17    trust, parens including the trust document, close parens.  Did

18    I read that correct?

19    A    Yes.

20    Q    And is this the kind of question you would have deferred

21    to Ms. Walker?

22    A    Absolutely.

23    Q    All right.  Just scan up please Brian.  And does this in

24    fact reflect that you passed this question -- or that

25    Ms. Walker, I should say answered this question for you?

KATCHENA POTTER - CROSS BY MR. KEACH

1    A    She did.  She answered the question.

2    Q    All right.  And looking at the second line of her answer,

3    it says to answer his question, while the non-qualified plan

4    assets are held by a trustee, they are not held in a Rabbi

5    trust or a secular trust.  Do you see that?

6    A    I do.

7    Q    Did I read it correctly?

8    A    Yes.

9    Q    And did you understand this to be Ms. Walker's answer to

10   the first question below that we read?

11   A    I'm not sure I understood it to be the answer to the

12   first or the second question.  I just knew she answered it and

13   I didn't have to.

14   Q    Well, the first question was if the Steward Rabbi trust

15   doesn't contain assets of IASIS, are they in a separate trust.

16   A    Right.

17   Q    And she seems to answer yes, they're in a separate trust,

18   right?

19   A    Correct.

20   Q    Okay.  Do you have any reason to doubt Ms. Walker's

21   answer here?

22   A    No.

23   Q    Did you ever personally follow up on it?

24   A    No.

25   Q    You trusted that Ms. Walker was correct?

1    A    Certainly.

2    Q    All right.  You were taken through a number of

3    eligibility lists and schedules that you prepared, both in

4    draft and final form?

5    A    Yeah.

6    Q    And I want to talk a little bit about the chronology of

7    the formation of those documents and how they sort --

8    A    All right.

9    Q    -- came to us.

10    A    Sure.

11    Q    So I do understand that you first produced, or you first,

12    I should say, transferred to counsel for production to me and

13    my clients a series of those eligibility lists for plan years,

14    at least 2019 to '24.

15    A    Yes.

16    Q    And you did that approximately two months ago, correct?

17    A    Yes.

18    Q    All right.  And did you have occasion recently to

19    question whether or not you -- that the ones that were sent a

20    couple of months ago were in fact not the ones that you

21    intended to send?

22    A    Yes.

23    Q    All right.  And did you discover that while preparing for

24    your deposition?

25    A    Yeah.

1    Q    And you had to actually physically occurred yesterday,
2    correct?
3    A    Yeah.
4    Q    That's my quip at the start of cross-examination.  And
5    was it the Friday, was it last Friday when you first
6    discovered that the information that you had sent was not what
7    you intended to send?
8    A    It was, yeah.
9    Q    Okay.  And when you discovered that, what were you doing?
10   A    I was cross checking a list that had been given to me
11   against the data, and so that's when I realized I sent
12   information that included terminated employees which should
13   have been removed before I sent it.
14   Q    So the -- in other words, the eligibility lists were
15   inaccurate in the sense that they included terminated
16   employees who would no longer be eligible because they were no
17   longer actually employees, right?
18   A    Right.
19   Q    Okay.  And when you discovered that error, what did you
20   do?
21   A    I let Mr. Bronshtein know.
22   Q    Okay.  Mr. Bronshtein being one of Debtor's counsel?
23   A    Yes.
24   Q    Yeah.  And do you understand that last Friday was the
25   first time they -- well, let me withdraw that question.  Did

1    you send to Debtor's counsel the spreadsheets you did intend

2    to send, the replacement spreadsheets?

3    A    I did.

4    Q    And do you understand that the first time they

5    transmitted them to us was last Friday?

6    A    That would make sense.  That's when I sent it to them.

7    Q    Okay.  When you transferred those, the new versions, did

8    you include an eligibility list for the 2020 plan year?

9    A    Yes, I believe I did.

10   Q    Okay.  And so if we didn't receive the 2020 plan year on

11   Friday, it's not because you didn't send it?

12   A    Right.

13   Q    Okay.  I think when I asked you yesterday in your

14   deposition if you had seen a draft or even a final version of

15   the Debtor's proposed expert report, you said you had read it,

16   correct?

17   A    I'd seen it.

18   Q    Right.  And the version you had seen was prepared with

19   the first set of spreadsheets, not the replacement ones,

20   correct?

21   A    Yes.

22   Q    Ms. Potter, with respect to determining eligibility,

23   there were two criteria you had to look at, correct?

24   A    Yes.

25   Q    And one of those criteria was base salary, correct?

1    A    Yes, it was.

2    Q    And one of those criteria was job title?

3    A    Yes.

4    Q    With respect to base salary, what does base salary mean?

5    A    So in our HRAS system, Coronos, there is a field for

6    hourly salary, and then there's a field for base salary.  And

7    so the base salary is the annualized version of both the

8    calculation of the hourly rate times the number of hours that

9    the employee works.

10   Q    And base salary may be more or less than actual salary

11   received by that person during the year, correct?

12   A    That is true.

13   Q    And is it fair to characterize it essentially as

14   projected salary at the time?

15   A    It would be fair to say that it's an annual salary, yes.

16   Q    And circumstances may in fact occur that would result in

17   that particular employee making less than the base, correct?

18   A    It could, yeah.

19   Q    Has that happened in your experience?

20   A    Yes.

21   Q    And with respect to job title, I think you've testified

22   that in order to be eligible for the plan, for non-medical

23   personnel, we'll start there for now, an individual would have

24   to be a vice president or above?

25   A    Yes.

KATCHENA POTTER - CROSS BY MR. KEACH

1    Q    All right.  And that criteria you inherited when you

2    became in charge of this process, correct?

3    A    Yes.

4    Q    It existed before you arrived in the job?

5    A    Yes.

6    Q    Have you personally ever examined whether or not the

7    titles, the vice president and up titles, actually involved

8    real managerial responsibility?

9    A    No.

10   Q    Are you aware of whether anybody at Steward has ever

11   looked into whether or not the titles that are included for

12   eligibility involve any actual managerial responsibility?

13   A    I can only guess but I'm sure someone had.

14   Q    Well, do you assume someone has because that would make

15   sense, or because you know that that happened?

16   A    It would make sense.

17   Q    All right.  So we can't presume that it happened because

18   lots of things in the world don't --

19   A    Correct.

20   Q    -- make sense, right?

21   A    For sure.

22   Q    All right.  But you have no personal understanding that

23   anybody ever did any analysis as to whether these titles

24   actually translated to real managerial responsibility?

25   A    I have no knowledge.

KATCHENA POTTER - CROSS BY MR. KEACH                    177

1    Q    And you didn't do it?

2    A    I did not do it.

3    Q    And you didn't do it each year you determined

4    eligibility?

5    A    No, I did not.

6    Q    And therefore it's possible that somebody could have been

7    a vice president that managed himself or herself and no one

8    else, right?

9    A    Or a private, yeah, sure.

10   Q    Ms. Potter, you were involved, and I mean that in the

11   general sense.  We'll get more specific.  In the process by

12   which loans were taken out against the life insurance policies

13   that were assets of the Steward plan, Rabbi Trust, in 2024, in

14   order to fund distributions, correct?

15   A    Yeah.

16   Q    And let's just provide a little background for the record

17   about how the insurance policies actually came to be assets of

18   the Rabbi Trust, right.  In your experience in the enrollment

19   process, are the individual employee participants asked in

20   addition to enrolling in the plan, if they are willing to

21   consent to be an insured for purposes of a life insurance

22   policy?

23   A    Yeah.

24   Q    And so the life insurance policies that end up in the

25   plan are actually life insurance policies on the lives of the

1    participants, correct?

2    A    Yeah.

3    Q    And without the participant's consent to be insured,

4    those policies don't exist?

5    A    Yes.

6    Q    That's correct, right?

7    A    That is correct.

8    Q    With respect to the funding of premiums, right, are you

9    aware as to where the money comes from for the premiums to be

10   paid on those policies?

11   A    I don't think I understood it fully but I believe it's

12   the contributions that are taken from the participants pay,

13   that are sent to the trust.

14   Q    Right.  So the fact that the way deferred compensation

15   works, right, is that the employee actually defers being paid

16   in the cashflow from not paying the employee results in the

17   cashflow that permits the purchase, among other things, of the

18   insurance policies?

19   A    Okay.

20   Q    Is that what you understand?

21   A    That's my understanding, yeah.

22   Q    So with respect to the loans in 2024, do you recall

23   seeing in an email regarding those loans, and we can pull up

24   if we need to, to refresh your recollection, that the reason

25   that that had to happen was because Steward was cash poor at

1    the time?

2    A    Yes.

3    Q    And by cash poor, you mean they didn't have enough

4    cashflow to fund the distribution, correct?

5    A    That is --

6              MR. BEREZIN:  Objection, Your Honor, lacks

7    foundation.

8              MR. KEACH:  I'll build one.

9              THE COURT:  Okay.

10   BY MR. KEACH:

11   Q    How did you come to understand that the loan insurance,

12   loans were -- excuse me, the life insurance loans were needed?

13   A    We did not have enough money to issue the distribution.

14   Q    And you understood that from talking to people inside

15   Steward with knowledge of the cashflow situation, is that

16   correct?

17   A    That is correct.

18   Q    And who did you talk to?

19   A    It would likely have been Mr. Lombardo.

20   Q    And Mr. Lombardo was your boss?

21   A    Yeah.

22   Q    And so based on Mr. Lombardo's communications to you that

23   Steward did not have sufficient funds to fund the

24   distributions, the decision was made to borrow against the

25   life insurance policies on the lives of the participants that

1    were the assets of the Rabbi Trust?

2    A    Yeah.

3    Q    Is that correct?

4    A    That is correct.

5    Q    All right.  Was the loan idea your idea, or

6    Mr. Lombardo's idea?

7    A    It was not my idea.  I don't know if it was

8    Mr. Lombardo's idea, but at his direction, I looked into

9    whether that was possible.

10   Q    So if Mr. Lombardo testified in his Declaration, or at

11   his deposition, or otherwise, that that was your idea, he's

12   mistaken about that, correct?

13   A    Certainly.

14   Q    And did Mr. Lombardo ask you inquire about the

15   possibility of making loans, or excuse me, of accomplishing

16   loans against the policies?

17   A    When you say accomplishing, do you mean making that

18   transaction?

19   Q    Did he task you with essential making the transaction

20   happen?

21   A    Yes.

22   Q    And what did you do when you were tasked with that job?

23   A    I would have probably reached out to NFP, to inquire and

24   make sure that that could happen.

25   Q    And who did you talk to at NFP about that?

1     A     Ed Kroll (phonetic).

2     Q     All right.  And what's Mr. Kroll's role at NFP?

3     A     I'm not sure of his exact title but I believe he is

4     our -- he's our account manager essentially.

5     Q     And he's the person you generally go to with these kinds

6     of questions as it relates to the Steward plan?

7     A     Yes.

8     Q     And what was his response with respect to the ability to

9     borrow against these policies?

10    A     I believe he said we could.

11    Q     And did he email you about that, or was that a phone

12    call?  How did you communicate with one another?

13    A     I don't recall.  We would typically email but I think

14    something of that nature may have involved a conference call.

15    Q     Okay.  When we talk about borrowing against the policies,

16    just to be clear, did you understand that each of life

17    insurance policies has a cash surrender value, correct?

18    A     Yes, I do now.

19    Q     All right. Did you know that then when you were doing

20    this?

21    A     No, it was really at that point in time foreign to me.

22    So I didn't really know but I was learning.

23    Q     And did you learn that actually during the process of

24    making these loans happen?

25    A     Yeah.

1    Q    All right.  So when we talk about borrowing against the

2    policy, what we're really talking about is borrowing against

3    the cash surrender value of each policy, correct?

4    A    Yeah.

5    Q    And the result is of course unless that loan is repaid,

6    the cash surrender value of that policy decreases, correct?

7    A    I didn't know that either, but I would surmise that yes,

8    that would be true.

9    Q    Did you personally examine the Steward plan documents on

10    the subject of these loans?

11    A    I did not.

12    Q    Did you ask NFP to do so?

13    A    I would have thought that that would have been part of

14    their responsibilities, for sure.

15    Q    But just to go to my question, did you specifically ask

16    them to do so?

17    A    No.

18    Q    Do you know if they did?

19    A    I don't know.

20    Q    Ms. Potter, I'm going to -- let me show you a document,

21    and ask you if you recognize this document?

22    A    Yes.

23    Q    And do you understand that this is the so-called Rabbi

24    Trust Agreement that accompanies the Steward Health Care

25    System's deferred compensation plan?

KATCHENA POTTER - CROSS BY MR. KEACH                    183

1      A     Yes.

2      Q     And just to be clear, you did not personally consult this

3      document prior to the loan process being undertaken?

4      A     Correct.

5      Q     Can we go to 3.1?  And did we cover this provision in

6      your deposition yesterday?

7      A     We did.

8      Q     All right.  So you're familiar with it at least from the

9      standpoint of having read it yesterday?

10     A     Yeah.

11     Q     And in 3.1, this document says trustee.  Do you

12     understand that to be the trustee of the Rabbi Trust?

13     A     Yes.

14     Q     All right.  Trustee shall cease payment of benefits to

15     plan participants and their beneficiaries if the company is

16     insolvent.  Company shall be considered insolvent for purposes

17     of this agreement if, A, the company is unable to pay its

18     debts as they become due, or B, the company is subject with

19     pending proceeding as a Debtor under the United States

20     Bankruptcy Code.  Did I read that correctly?

21     A     Yes.

22     Q     And again, you didn't look at this prior to doing the

23     loan transaction?

24     A     No, I didn't.

25     Q     And the loan transaction resulted in distributions being

KATCHENA POTTER - CROSS BY MR. KEACH

1    made to participants, correct?

2    A    Yes, it did.

3    Q    And did you look at this before those distributions were

4    made?

5    A    No, I did not.

6    Q    And again, we looked at this section of the trust at your

7    deposition yesterday, correct?

8    A    We did.

9    Q    And so you've at least seen it once --

10   A    Yeah.

11   Q    -- yesterday?  And I'm just going to look at 8.5, and

12   this was read earlier in the trial, but I think you were

13   sequestered at the time so I'll read it.

14   A    Okay.

15   Q    All right.  Well, let me ask, you were not present in the

16   courtroom during Mr. Lombardo's testimony, were you?

17   A    No, I wasn't.

18   Q    All right.  Section 8.5 says the trustee, and again that

19   refers to the trust of the Rabbi Trust, correct?

20   A    Uh-huh.

21   Q    The trustee -- yes?

22   A    Yes, sorry.

23   Q    The court reporter has a hard time with uh-huh's.

24   A    Apologies.

25   Q    No worries.  The trustee shall have without exclusion all

KATCHENA POTTER - CROSS BY MR. KEACH

185

1    powers conferred on trustees by applicable law unless

2    expressly provided otherwise herein, provided however that if

3    an insurance policy is held as an asset of the trust, the

4    trustee shall have no power to name a beneficiary of the

5    policy other than the trust to assign the policy as distinct

6    from conversion of the policy to a different form, other than

7    to a successor trustee, or to loan to any person the proceeds

8    of any borrowing against such policy.  Do you see that?

9    A    I do.

10   Q    Did anybody ever advise you that loans to any person of

11   the proceeds of any borrowing against such policy were

12   prohibited by the trust?

13   A    Can you repeat that one more time?

14   Q    Sure.  Prior to your accomplishing the loans and making

15   the distributions, did anyone at Steward or NFP inform you

16   about section 8.5 prohibition on such loans?

17   A    They did not.

18   Q    Okay.  And when I first showed you this at your

19   deposition yesterday, were you surprised to see it there?

20   A    Initially, yes, I was surprised.

21   Q    All right.  And you said initially.  Did you want to

22   qualify your answer?

23   A    Yeah, it just seemed to state that, or at least in my

24   understanding initially, that we weren't allowed to take

25   loans.

1    Q    All right.  And you said initially.  Do you have a

2    different understanding as you sit here today than the one you

3    had yesterday?

4    A    Well, I do because it does say now loan to any person,

5    and the loan wasn't to a person.  It was to pay the

6    distributions for 2024.

7    Q    Well, the loan was to Steward, right?

8    A    Right.

9    Q    And Steward is a corporation?

10   A    Right.

11   Q    Or a limited liability company?

12   A    Right.

13   Q    You understand the concept of person includes corporate

14   entities?

15   A    No, I didn't.

16   Q    All right.  So if I were to tell you in the law that

17   person can include a corporate entity, would that change your

18   changed opinion?

19   A    Yeah, it might, yeah.

20   Q    Did anybody talk to you after your deposition yesterday

21   and attempt to persuade you that your original understanding

22   of this provision was wrong?

23   A    I'm sorry, say that again?

24   Q    Did -- since yesterday, since your deposition, have you

25   talked to anybody who's attempted to explain to you this

1   provision?

2   A    It was mentioned, yes.

3   Q    And who mentioned it to you?

4   A    I believe I first heard it by Emily Gerard.

5   Q    All right.  Emily Gerard is one of the counsel for the

6   Debtor, correct?

7   A    Yeah.

8            MR. KEACH:  And Ms. Gerard explained to you that

9   your understanding of this provision --

10           MR. BEREZIN:  Objection, Your Honor.  He's asking to

11  go into privileged conversations.

12           MR. KEACH:  She's revealed that this is the reason

13  for her changed opinion, and you've got --

14           MR. BEREZIN:  Counsel talking to a --

15           MR. KEACH:  Excuse me.  Counsel, I'm talking.  You

16  have counsel, talking to a witness after her deposition,

17  attempting to change the testimony she gave in the deposition.

18  I think I'm entitled to ask what counsel said to her.

19           THE COURT:  I don't think you are.  I think you

20  can -- I think we can rely on the fact that she one thing in

21  the deposition.  She talked to her lawyer, and now she's

22  saying something else.  And I'll take it for what it is.

23           I don't think we need to get into the privileged

24  conversations.  I can determine, for me, you know, her

25  analysis of this is one thing.  My analysis of the text is

1    what ultimately -- what y'all are going to have to try to

2    convince me on.

3         The document says what it says, person is person,

4    company is company, trustee is trustee.  The words will say

5    what they say and they'll have the legal meanings.  But we can

6    determine everything from there.

7         Her, a non-lawyer, analysis of this is irrelevant

8    except that he may say, but it's irrelevant for purposes of

9    whether this was violated one way or the other.  But I

10   certainly can take it for what it's worth that she spoke to

11   someone after the deposition and the person -- her testimony

12   is what it is.  She said one thing in the deposition.  Now

13   she's saying something else, and I'll take it for what it is.

14        MR. KEACH:  Well, I think she's returned to her

15   deposition interpretation as well, Your Honor.  But we can --

16        THE COURT:  That very well may be.

17        MR. KEACH:  Her testimony will be what her testimony

18   is.  I agree with that.  I'll move on.

19   BY MR. KEACH:

20   Q    Did anybody other than counsel talk to you about this?

21   A    No.

22   Q    Since yesterday?

23   A    No.

24   Q    Talk about it -- you didn't talk about it with

25   Mr. Lombardo?

KATCHENA POTTER - CROSS BY MR. KEACH

1    A    I did not.

2    Q    Okay.  Do you recall at your deposition yesterday, I

3    showed you what's known as the first day Declaration from

4    Mr. Castelano (phonetic)?

5    A    Sorry, can you say that one more time?

6    Q    Do you recall yesterday I showed you a Declaration from a

7    Mr. Castelano?

8    A    Yes.

9    Q    All right.  And it was a Declaration that he had filed in

10   connection with what are called first day motions in this

11   case?

12   A    Yeah.

13   Q    And you were careful and you read through it reasonably

14   carefully?

15   A    Yes.

16   Q    And then we focused on a couple of paragraphs that

17   described Steward's severe liquidity issues in 2023.  Do you

18   recall that?

19   A    I do.

20   Q    And was that the first time you understood the degree to

21   which Steward was unable to pay its debts as they came due in

22   2023?

23   A    Yes, I think it was.

24   Q    And I asked you if reading those paragraphs of

25   Mr. Castelano's first day Declaration led you to conclude that

1    Steward was insolvent under the definition in the Rabbi Trust

2    we just looked at.  Do you recall that?

3    A    Yeah.

4          MR. BEREZIN:  Objection to relevance, Your Honor.

5    It doesn't matter what the witness thinks of Mr. Castelano's

6    Declaration.

7          MR. KEACH:  The whole issue of what they did while

8    insolvent, Your Honor, goes to the issue of what the plans

9    funded or not funded.

10         THE COURT:  I'll give you a little leave around it.

11    BY MR. KEACH:

12    Q    And you were involved in the enrollment for the 2024 plan

13    year, correct?

14    A    Yes.

15    Q    And when was that enrollment period taking place?

16    A    I believe it was November 1st, to the 30th, or

17    thereabouts, 2023.

18    Q    And was there also an enrollment for what's referred to

19    as a re-deferral during that period?

20    A    Not during that period.

21    Q    Do you recall when the enrollment for re-deferral

22    occurred?  What is early 2024?

23    A    Yes, I believe it was.

24    Q    Okay.  January, 2024?

25    A    Yes.

1    Q    And you were directly involved in attempting to enroll

2    people for the plan for the 2024 plan year, correct?

3    A    Directly involved, I don't know that I would say directly

4    involved.

5    Q    Well, one of your jobs is supervise the enrollment

6    period, right?

7    A    Yes.

8    Q    And so to the extent that there were communications being

9    made regarding enrollment, you're involved in reviewing those

10   communications?

11   A    Yes.

12   Q    Ms. Potter, I'm going to -- there's a document on your

13   screen.  Do you recognize this document?

14   A    Yes, I do.

15   Q    Is this is a draft of the re-enrollment email that would

16   have been sent in the fall, 2023, for the 2024 plan year?

17   A    Not a re-enrollment.  It would have been the draft that

18   went out as initial communication to eligible participants.

19   Q    Yeah, I misspoke about re-enrollment.  So it's the

20   enrollment communication for the 2024 plan year?

21   A    Yes.

22   Q    And you would send this to anybody that you had

23   determined to be eligible to be in the plan?

24   A    Yes.

25   Q    All right.  And if you can scan down, Brian.  This email

1    is the kind of email that gets sent as part of the enrollment

2    process?

3    A    Yes, it is.

4    Q    And that enrollment process occurred pursuant to

5    communications like this in the fall, late fall, 2023?

6    A    Yes.

7    Q    Okay.  And another document in front of you.  Can you

8    identify what this document is?

9    A    All right.  Can you -- okay.  That would have been an

10    email letting participants know that their enrollment was now

11    available, and that they could log into the NFP participant

12    site to make their elections.

13    Q    And that -- this again is typical of the enrollment

14    communications that have been used historically?

15    A    Yes.

16    Q    And this would have been the one specifically for the

17    fall enrollment period, 2023, for the 2024 plan year?

18    A    Yes.

19    Q    And again this would have been sent to all potentially

20    eligible participants, right?

21    A    Not potentially eligible, eligible.

22    Q    To the people on your eligibility list?

23    A    Correct.

24    Q    All right.  And Ms. Potter, do you recognize this

25    document?

1    A    Yes.

2    Q    And what is this document?

3    A    This is the plan highlight sheet that gives some very

4    high level information at a glance regarding the plan,

5    eligibility, etcetera.

6    Q    And we discussed this yesterday, but let me ask you

7    directly here.  What was your working understanding of what

8    happened to the participants' contributions in the event

9    Steward Health became insolvent?

10   A    That they would not be secured, and that participants who

11   had balances would have to file a claim and become creditors

12   like everyone else.

13   Q    And so their potential entire retirement balance was at

14   risk, correct?

15   A    Their deferred comp balance was at risk, yes.

16   Q    Let me get to the bottom.  Do you see on this document

17   the category called status of plan?

18   A    Yes.

19   Q    And it says unlike the 401(k) plan, if Steward Health

20   Care becomes insolvent, etcetera, do you see that?

21   A    Yes, I do.

22          MR. KEACH:  And based on what you saw in

23   Mr. Castelano's Declaration what we've referred to, you were

24   sending this when Steward was already insolvent, weren't you?

25          MR. BEREZIN:  Objection, Your Honor, again it's

1      asking her to interpret someone else's Declaration.  It's not

2      her contemporaneous knowledge, so it's not relevant.

3              THE COURT:  Yeah, at least she can speak to her

4      understanding if any.

5              MS. POTTER:  Do you mind repeating the question?

6      BY MR. KEACH:

7      Q    Sure.  Based on what you now know, or now understand,

8      were you sending this when Steward was already insolvent under

9      the terms of the trust?

10     A    I was sending this unaware that we were insolvent so yes,

11     I did send that but I was not aware of the condition -- the

12     financial condition of the corporation.

13     Q    And you now are though, right?

14     A    I am, yes.

15     Q    And do you now understand you were sending it while the

16     company was insolvent?

17     A    Yes.

18     Q    And does that concern you?

19     A    I think it should concern everybody.

20     Q    Because essentially you were put in the position of

21     soliciting enrollment, continued deferral of compensation from

22     people who might never see that money?

23     A    I don't know that I agree with that.

24     Q    Which part don't you agree with?

25     A    Soliciting.  It's voluntary participation.

1   Q    Sure.  Let me change to a more neutral term.  You were

2   sending this opportunity to enroll, right?

3   A    Right, yes.

4   Q    To people and essentially inviting them to make the

5   choice of deferring further income when in fact they might

6   never see that deferred income as a retirement benefit due to

7   insolvency, correct?

8   A    That is true.

9           MR. KEACH:  May I have just one moment, Your Honor?

10          THE COURT:  Of course.

11          MR. KEACH:  Thank you.  I'll conclude, Your Honor.

12          THE COURT:  Okay.  Any Redirect?

13          MR. BRONSHTEIN:  Pardon, just one moment.  Very

14   briefly, Your Honor.

15                    REDIRECT EXAMINATION

16   BY MR. BRONSHTEIN:

17   Q    Ms. Potter, Mr. Keach had asked you some questions about

18   the loans that were taken on the life insurance policies.  Do

19   you recall those?

20   A    Yes.

21   Q    Did you know whether all participants in the plan had a

22   life insurance policy as part of the plan?

23   A    Before asking, or --

24   Q    At any point?

25   A    I think I knew that there was loan -- life insurance

1    policies, I'm sorry, but I don't think I knew how many there

2    were.  So I wasn't sure if it was on everybody or not.

3    Q    Before 2024, had you had any involvement with those

4    loans -- or excuse me, with those life insurance policies?

5    A    No.

6    Q    Were you at all involved with the premiums being paid on

7    those life insurance policies?

8    A    I believe if they were being sent to the matrix, then

9    yes, that was part of my job.

10   Q    Well, let me ask you this.  Were you responsible for

11   sending payments to the life insurance policies?

12   A    I was responsible for submitting the remittances for the

13   deferrals.  Is that one and the same?

14   Q    And do you know where the remittances to pay the premiums

15   came from in Steward's accounts?

16   A    I did not.

17   Q    Do you know whether there were any life insurance

18   policies that were taken out on individuals who did not

19   participate in the HSC plan?

20   A    No, I don't, no.

21   Q    Mr. Keach asked you some questions about the Rabbi Trust.

22   Before he had shown it to you, had you studied that document?

23   A    No, I hadn't.

24          MR. BRONSHTEIN:  Was it part of your responsibility

25   to understand the terms of the trust?

1           MR. KEACH:  Your Honor, (indiscernible) a minor

2       issue.  I actually asked her about (indiscernible).

3           THE COURT:  I think that's fair.

4           MR. BRONSHTEIN:  Thank you.

5           Ms. Potter, could we take a look at 4306-19, please?

6           THE COURT:  Oh, I probably need to give you

7       someone -- do I need to -- is that --

8           MR. BRONSHTEIN:  Okay.  Thank you, Your Honor.

9           THE COURT:  Yeah.  I think you are still presenter.

10          MR. BRONSHTEIN:  Here we go.

11      BY MR. BRONSHTEIN:

12      Q    Ms. Potter, do you recognize this as the document that

13      Mr. Keach showed you?

14      A    Yes.

15      Q    And which trust did you understand this to refer to, or

16      which plan I should say?

17      A    Which plan, this is Steward Health Care deferred comp

18      plan.

19      Q    And was it part of your responsibilities to review this

20      document at any point?

21      A    No.

22      Q    Whose responsibility was it at Steward to be familiar

23      with those terms?

24      A    I'm not sure.

25      Q    You just know it wasn't yours?

1    A    It wasn't mine.

2              MR. KEACH:  Objection, Your Honor, she can't answer

3    the question (indiscernible).

4              THE COURT:  Sustained.

5              MR. BRONSHTEIN:  All right.  Can we pull up, please,

6    146-5.

7    BY MR. BRONSHTEIN:

8    Q    Ms. Potter, do you remember that Mr. Keach showed you

9    this email?

10   A    Yes.

11   Q    Did you follow up with Ms. Walker about this email?

12   A    I don't think I did, no.

13   Q    And did you have any independent knowledge about the

14   trust that she was referring to?

15   A    No, I did not.

16   Q    Do you have any idea whether what she said was accurate?

17   A    I don't.

18             MR. BRONSHTEIN:  Nothing further, Your Honor.

19             THE COURT:  Any further cross?

20             MR. KEACH:  Nothing from me, Your Honor.

21             THE COURT:  Thank you very much for your time,

22   Ms. Potter.

23             MS. POTTER:  All right.  Thank you.

24             MR. KEACH:  Your Honor, I --

25             MR. BRONSHTEIN:  And Your Honor, I apologize.  Could

1      we ask that Ms. Potter be excused if the participants don't

2      intend to use her?

3              MR. KEACH:  Fine (indiscernible).

4              THE COURT:  Ms. Potter, thank you very much for your

5      time.

6          (Witness steps down.)

7              THE COURT:  Yes, Mr. Keach?

8              MR. KEACH:  I think, and I'll defer to Mr. Diamond,

9      but I think we're at the point we could (indiscernible).

10             THE COURT:  Okay.  Why don't we just take a short

11     five minute break and then we'll get set up?

12             And who's doing the direct on the witness, that's --

13     okay.  So I will make sure that you then -- make sure that you

14     have -- we'll come back in about five minutes.  Thank you.

15         (Recess taken from 2:35 p.m. to 2:41 p.m.)

16             THE COURT:  Just one quick housekeeping question.

17     For the rest of the afternoon, I just have to kind of gauge AC

18     and all this stuff so no one burns in the evening.  I know

19     that there were some other -- we have one more.  We have a

20     live witness here.  And then after that --

21             MR. BEREZIN:  Three more.

22             THE COURT:  Three more witnesses are -- but I know

23     some are coming in through Declarations plus cross, or is it

24     just --

25             MR. BEREZIN:  No, these --

1           THE COURT:  -- all the way live and cross on all

2     three?

3           MR. BEREZIN:  These are all live.  So, we have this

4     witness --

5           THE COURT:  But is it a live direct and cross for

6     each of those witnesses?

7           MR. BEREZIN:  Oh, thank you, Your Honor.  You're

8     right.

9           So, Mr. Castellano is coming in in his direct

10    through a Declaration.  I believe that both experts are going

11    to have a live direct and cross.

12          THE COURT:  Okay, okay.  So, we have this additional

13    witness who's coming out of order now.

14          And is this an expert or a fact witness?

15          MR. DIAMOND:  No, this is a fact witness, Your

16    Honor.

17          THE COURT:  Fact witness.

18          MR. DIAMOND:  It's one of the plan participants.

19          THE COURT:  Oh, okay.  Okay, thank you.

20          Castellano and then two experts.  So, there's four

21    more witnesses?

22          MR. DIAMOND:  Yes.

23          MR. BEREZIN:  Yes, Your Honor.

24          THE COURT:  And just -- I'll add a 20 percent to

25    what you're telling me, but in terms of time, how late are we

1     going tonight?  What does it look like?

2              MR. BEREZIN:  Can I have a moment, Your Honor?

3              THE COURT:  Yeah.  Yeah, absolutely.

4              MR. BEREZIN:  Everyone's gone.

5              MR. DIAMOND:  And Your Honor, on that front, I'm

6     going to try to be actually quite expeditious with this next

7     witness, because as --

8              THE COURT:  I want everybody to take their time.  I

9     just need to know in terms of staffing and AC --

10             MR. DIAMOND:  Sure

11             THE COURT:  -- and that kind of stuff and.

12             MR. DIAMOND:  Yeah, the only comment I was going to

13    make, Your Honor, and I'll have the witness answer this when

14    she takes a stand, but she's --

15             THE COURT:  She's got a flight.

16             MR. DIAMOND:  -- she's flown in from 4:00 this

17    morning.  She's got surgeries tomorrow.  So, she's got a

18    flight out at Intercontinental at 6:27.

19             THE COURT:  So, let's get her up so not to waste her

20    time and use efficient time on that.  We can always ask

21    additional questions.

22             MR. DIAMOND:  I appreciate that, Your Honor.

23             THE COURT:  Yeah.  No, no.

24             MR. DIAMOND:  That's why I said I'm going to move

25    rather quickly.

KATCHENA POTTER - REDIRECT BY MR. BRONSHTEIN          202

1          THE COURT:  I appreciate that.

2          Let's get the witness on, and then we can talk about

3    this afterwards.  I don't want her to miss her flight.

4    Traffic gets funky in about two hours.

5          MR. DIAMOND:  Thank you very much, Your Honor.

6    Appreciate that.

7          THE COURT:  Okay.

8          MR. DIAMOND:  So, I would call Dr. Manisha Purohit

9    to the stand.

10          THE COURT:  Okay.

11          Okay, good afternoon.  Can you please raise your

12    right hand?

13       (Witness sworn.)

14          THE COURT:  Okay, please be seated and we can do a

15    mic check.  Just get it close to you.

16          And if you can state your name for the record and

17    spell your last name.

18          THE WITNESS:  It's Manisha Purohit.  Last name is P-

19    U-R-O-H-I-T.

20          THE COURT:  Perfect.  Thank you very much.

21          Counsel, whenever you're ready.

22          MR. DIAMOND:  Great.  Thank you, Your Honor.

23                    DIRECT EXAMINATION

24    BY MR. DIAMOND:

25    Q    Good afternoon, Dr. Purohit.

1           Just very brief background.  You are a married woman?

2      A    Yes.

3      Q    Okay, and do you have children?

4      A    Yes.

5      Q    How many?  What are their ages?

6      A    I have three children.  One is 25 years old.  She's in

7      medical school, wants to pursue as a medical doctor.  I have

8      twins who are in high school, 16 years old.

9      Q    And are you an active practicing physician?

10     A    Correct.

11     Q    And where do you practice?

12     A    I practice at HonorHealth.

13     Q    And where is that located?

14     A    Arizona.

15     Q    Now, I understand you have a number of surgeries in the

16     morning.  And so, we're going to try to get you through this

17     as quickly as we can, so you can catch your flight back to the

18     Phoenix area.

19     A    Thank you.

20     Q    Appreciate you coming.

21          You are one of the named Plaintiffs in the lawsuit

22     filed in this court related to your status as a plan

23     participant in both the IASIS and the Steward Healthcare

24     Deferred Compensation Plans; is that correct?

25     A    Correct.

MANISHA PUROHIT - DIRECT BY MR. DIAMOND

1   Q    You said you are employed by HonorHealth.  Did I catch
2   that right?

3   A    Correct.

4   Q    Okay, and how long have you been employed with
5   HonorHealth?

6   A    September 2024.

7   Q    And prior to that time, with whom were you employed?

8   A    Steward Healthcare.

9   Q    How long were you employed by Steward Healthcare?

10  A    Eight years.

11  Q    Before Steward Healthcare, where were you employed?

12  A    IASIS Healthcare.

13  Q    And how long were you at IASIS?

14  A    Six years.

15  Q    At which Steward hospitals were you affiliated and
16  conducted your medical practice with your patients?

17  A    It was Mountain Vista Medical Center, Tempe St. Luke's,
18  and they also acquired Florence Hospital.  So, I used to take
19  ER calls from there.

20  Q    And these are all in the greater Phoenix, Arizona area?

21  A    Correct.

22  Q    What is your specialty area of medical practice?

23  A    I'm an OBGYN.

24  Q    Would you briefly describe for the Court, please, your
25  medical practice over the years with IASIS and Steward with

1   respect to what you do with your patients?

2   A    Over two decades, I have dedicated my life to women's

3   health services, providing them high quality of care to

4   thousands of women, and delivered thousands of babies.

5         And I was approached by IASIS Healthcare because I'm

6   the only female OBGYN at that time who was specializing in

7   robotic surgeries.  So, the CEO approached me saying that,

8   "hey, would you like to do some surgeries at my center? And if

9   you would like to visit and see our hospital?"  So, I was in

10  private practice five and a half years before I was with the

11  IASIS Healthcare.  So, when I went to the hospital, I started

12  doing some surgeries.  I was trained in robotic surgeries, so

13  I loved it.  So, they approached me in 2012 saying that, "Hey,

14  are you interested if we make you the department chairwoman of

15  OBGYN, would you be able to build this department of OBGYN?"

16  I took over that challenge and I made it very successful.

17  Q    And over the years, were you offered an opportunity at

18  IASIS and Steward Healthcare to defer some of your

19  compensation?

20  A    Uh-huh.

21  Q    That was yes?

22  A    Correct.

23  Q    Okay, and did you do so?

24  A    Yes.

25  Q    Why?

MANISHA PUROHIT - DIRECT BY MR. DIAMOND

1    A    So, I was in private practice for five and a half years.

2    I couldn't save any money at that time.  So, when I got the

3    opportunity that they approached me saying that, "You have

4    401K benefits and a Deferred Compensation Plan," I wanted to

5    proceed with that.

6    Q    Other than the pandemic years in 2020 and 2021, how much

7    of your compensation at Steward Healthcare did you decide to

8    defer under their Deferred Compensation Plan?

9    A    I did not proceed in 2020 and 2021.

10    Q    Yeah.  Other than those two years, do you recall what

11    percentage of your income you deferred under the IASIS and

12    Steward Healthcare plans?

13    A    I contributed 75 percent of my max salary.

14    Q    And why did you do that 75 percent?

15    A    As I said, I was in private practice.  I couldn't save

16    any money.  I have three kids.  I have a family to take care.

17    I wanted to really do this strategically and financially to

18    save my future retirement and secure my family.

19    Q    Did you speak with anyone at IASIS during the time you

20    were there about the Deferred Compensation Plan that you were

21    offered?

22    A    I got this deferred compensation plan through the HR.

23    Q    And through IASIS's HR?

24    A    Correct.

1    Q    And do you recall who you spoke with in the HR department

2    there?

3    A    Amy.

4    Q    Do you have a last name?

5    A    No.

6    Q    At the time that the Deferred Compensation Plan at IASIS

7    was offered to you, what information was provided to you about

8    the plan?

9    A    So, when I got that paper from Amy about the Deferred

10   Compensation Plan, there was a number written on it.  I tried

11   calling them twice.  I didn't get any feedback from them.

12   Nobody called me back.  So, I went back to Amy again that,

13   "Hey, nobody's responding to this. Can you help me?"  So, she

14   told me that, "This is a great beneficial plan for physicians

15   and all the physicians are enrolling it if you want to save

16   the money."  She said, "You can go up till 20, 25, 50, or

17   75 percent of your savings and save it for the future. When

18   you retire or resign, you will be able to access that plan and

19   your funds after you pay your taxes."  So, I asked her, "How

20   many physicians enrolled?" "There like a lot of physician

21   subspecialties are there, like orthopedics, cardiology, ER."

22   So, I took her word, and I went online and signed the form.

23   Q    Okay, and the form that you're referring to is the

24   enrollment form?

25   A    Correct.

1   Q    Did anyone at IASIS at that time ever sit down with you

2   or otherwise explain to you the risks associated with the

3   plan, including what would happen if the company was in

4   financial distress?

5   A    No.

6   Q    Were you presented with documents for the IASIS Deferred

7   Compensation Plan?

8   A    No.

9   Q    But you signed up for it, correct?

10  A    Correct.

11  Q    When do you recall that IASIS was taken over by Steward

12  Health?

13  A    2017.

14  Q    Were you offered a Deferred Compensation Plan by Steward

15  Health?

16  A    So, what happened, it took a year.  I was trying to find

17  out where is my deferred compensation money is.  There were no

18  answers.  So, I called the HR and there was such a high

19  turnover with Steward, there were people changing.  So, I

20  didn't even know if there's HR I should contact in Arizona or

21  it was in Boston.  So, finally, in 2018, they sent me an email

22  that, "Your plan, the IASIS Health Plan is managed by Steward

23  Healthcare, and we offer the same plan. If you are ready to

24  enroll, this is the time."  It was the month of October and I

25  enrolled it.

1    Q    Okay.  So, you signed up for the Deferred Compensation

2    Plan that was being offered by Steward Healthcare at that

3    time?

4    A    Correct.

5    Q    And how did you sign up for it?

6    A    By going online.

7    Q    Did you ever speak with anyone at Steward Healthcare's HR

8    department about their Deferred Compensation Plan?

9    A    No.

10    Q    What was your understanding at the time as to how the

11    Steward Deferred Compensation Plan would work?

12    A    I had no understanding.  I just had the understanding

13    from the IASIS plan what I was told, and I took that into

14    account because it was the same.

15    Q    Did anyone at Steward Healthcare ever sit down with you

16    or explain to you, whether in the HR department or otherwise,

17    what the risks would be in you signing up for this plan?

18    A    No, sir.

19    Q    Why did you decide to defer your compensation during the

20    various years that you were employed at Steward?

21    A    Again, to secure my retirement and the family's future.

22    My husband had the job which did not offer 401K or any

23    retirement benefits.  So, this was my way of saving money for

24    both of us and for our family.  And I do take care of my

25    parents, also.  So, I have children to take care, plus I have

1    parents to take care, and it was the future for both of our

2    retirement to save up that money and keep doing so.

3    Q    And you decided to defer 75 percent of your compensation.

4    I take it that the 25 percent that you did not defer, that you

5    couldn't defer, was sufficient for you to live off of?

6    A    So, we really made a lot of sacrifices, lived on a very

7    tight budget, and my family and children understood that we

8    had to do what we had to do to survive and secure our future

9    financial retirement.

10   Q    Dr. Purohit, do you have an understanding, at any point

11   in time, including right now, of what it means to be a general

12   unsecured creditor of a company?

13   A    Frankly speaking, Allan, I never understood these terms

14   until the bankruptcy was filed and I'm hearing all these

15   things in the proceedings.  That vocabulary was not known to

16   me before.

17   Q    Do you have an understanding of what it means when a

18   company is insolvent?

19   A    No, sir.  Now, I understand.

20   Q    Do you know what it means when a company cannot pay its

21   debts as they come due?  Have you ever heard that phrase

22   before?

23   A    No, sir.  As I said, I'm hearing everything now.

24   Q    Did anyone at Steward ever explain to you that if the

25   company was to go into bankruptcy proceedings, all of your

1    deferred compensation retirement money could be at risk and

2    never get repaid?

3    A    No, sir.

4    Q    Did you participate in the Steward Deferred Compensation

5    Plan in 2020?

6    A    No, sir.

7    Q    And did you participate in the plan in 2021?

8    A    No.

9    Q    Is there a reason that you -- well, let me strike that.

10   After 2021, when is the next year that you recall

11   participating and contributing to the Deferred Compensation

12   Plan for Steward?

13   A    2022.

14   Q    And 2023?

15   A    Correct.

16   Q    And did you also contribute in 2024?

17   A    Correct.

18   Q    Okay.  And in those years, 2022, 2023, and 2024, what

19   percentage of your income did you defer?

20   A    I kept it the same, 75 percent.

21   Q    Okay.  And in 2020 and 2021, the two years that you did

22   not defer your compensation under the Steward plan, why did

23   you make that decision?

24   A    They were the pandemic years, and Steward took away the

25   25 percent of my salary.  So, I could not contribute anything.

MANISHA PUROHIT - DIRECT BY MR. DIAMOND                    212

1    Q    Prior to making your contribution to the Deferred

2    Compensation Plan in 2024, were you told, if anything, about

3    Stewards Healthcare's overall financial health?

4    A    No.

5    Q    Do you recall -- did anybody at Steward Healthcare in and

6    around the end of 2023 or 2024 have any discussions with you

7    about what was happening at your hospitals?

8    A    So, there was a lot of supply chain issues.  A lot of

9    surgeons were frustrated because we didn't have instruments,

10   we didn't have drapes.  I was jeopardizing patient care.  So,

11   we had a VP who flew from Boston.  Her name was Amy, and she

12   was an internist.  And I asked her frankly, because she had a

13   meeting with me, and I said, "Physician to physician, what do

14   you think? Are we in crisis? Should I worry about?"  I told

15   her, "I have deferred compensation savings. Can somebody even

16   tell me what's going on?"  And she said, "No, Arizona market

17   is very strong. We are never going to go away from here.

18   Steward Healthcare is there to stay."  And I took her word,

19   trusted her, and I continued with my deferred compensation

20   plan.

21   Q    And towards the end of 2023 and the beginning of 2024,

22   were there any issues at the Arizona hospitals at which you

23   practiced where there was expressed concern over the ability

24   of the hospitals to continue?

25   A    So, when she told me the health market was good in

1    Arizona, but then we are going to sell some hospitals in Utah,

2    that money flow is going to be better in Arizona, it never

3    improved.  So, we got more frustrated.  I had a general

4    surgeon, Dr. Lopez, almost left us.  He was the Program

5    Director for the surgery.  And it came to such a crisis that

6    it was worrisome.  And then we had a town hall meeting which

7    was there at that time.

8    Q    Let me ask you a few questions about this town hall

9    meeting.  First off, what do you mean by a town hall meeting?

10   A    It was a virtual meeting.

11   Q    Okay, and who organized this town hall meeting?

12   A    Dr. Weinstein, Joseph Weinstein, cardiologist.

13   Q    At Steward?

14   A    Correct.

15   Q    And the town hall meeting you said was virtual?

16   A    Virtual.

17   Q    And who were the invited participants to the town hall

18   meeting?

19   A    All the physicians.

20   Q    And when you say all the physicians, are you talking

21   about all of the physicians at a particular hospital or a

22   group of hospitals?  What do you mean?

23   A    They were Mountain Vista, basically.

24   Q    What was your understanding of the purpose of the town

25   hall meeting?

1    A    So, these were the executive leaders, Dr. Joseph

2    Weinstein and Ralph de la Torre.  He was the chairman of the

3    board.  He was there too.  And they were answering the

4    questions to whoever was typing the questions.  So, I started

5    typing my question that, "What's going to happen to my

6    Deferred Compensation Plan? Are we in crisis?"  So, they were

7    looking at the questions and they were answering.  And my

8    question was not answered.  So, I again typed up the same

9    thing.  I said, "Sir, I have a Deferred Compensation Plan. Are

10   we in crisis? What's next?"  It was not answered.  All they

11   kept saying that, "We are not going anywhere. We are strong in

12   Arizona. Arizona will be sold, but nothing else is going to

13   happen. So don't listen to the rumors. You work hard."  And we

14   continued to work hard.

15   Q    And what, to the best of your recollection today, was

16   said by either Dr. Weinstein, or Dr, de la Torre, or others

17   that were leading the conversation during the town hall about

18   Steward's situation?

19   A    Well, after two months, they just declared the bankruptcy

20   without even no warning.  There was no transparency when it

21   was even asked physician to physician to at least tell them

22   the truth.  Now, that was the difference.  When I was with

23   IASIS Healthcare, at least between four months, the CEO

24   approached the physician saying, "Hey, you have a choice. We

25   are selling this to Steward Healthcare. You want to retire or

1    you want to resign or whatever you want to do, or you can look

2    for another job, but this is the choice you have.  But it's

3    getting sold to Steward Healthcare."  I never got that

4    transparency from Steward Healthcare.  None of these board

5    members were honest to me.

6    Q    When, to the best of your recollection, did this town

7    hall meeting take place?

8    A    It was the end of 2023 or beginning.  Because I remember

9    in 2023, she came.  It was right during that summer.  The heat

10   was bad in Arizona and she's like, "How do you guys live in

11   Arizona? It's so hot."  So, I remember that.

12   Q    Did the subject of any prospective bankruptcy by Steward

13   Healthcare come up during the course of that town hall

14   meeting?

15   A    No, sir.

16   Q    Is there anything else that you can recall about the town

17   hall meeting that was important to you in deciding whether to

18   contribute your 75 percent for 2024?

19   A    I trusted that.  I thought they were honestly giving me

20   the answers, as IASIS told me, and we went with the flow and

21   it was correct, versus telling me after two months that their

22   filing bankruptcy.

23   Q    Did anyone, at any point in time after the town hall

24   meeting, at Steward say, give you any information whatsoever

25   about risks that you might have with respect to your 2024

1    deferred compensation?

2    A    No, sir.

3    Q    By the way, who is Dr. Weinstein?  You've referred to him

4    that he was leading the town hall meeting.

5    A    He was a board member.

6    Q    At Steward Healthcare?

7    A    Correct.

8    Q    Other than Dr. Weinstein and Dr. de la Torre, do you

9    recall whether there was any other board members at Steward

10   Healthcare present for the town hall meeting?

11   A    There was such a high turnover, because Amy, that person

12   who was the VP of the Steward Healthcare had left.

13   Q    In all the years, Dr. Purohit, that you deferred a

14   portion of your compensation into the IASIS and Steward

15   Healthcare Deferred Compensation Plans, did you ever try to

16   negotiate different terms to the plan?

17   A    I did not even know that I could do that.

18   Q    And I was just -- you may have just answered my next

19   question, but I was going to ask if you didn't, why didn't

20   you?

21   A    I didn't know.

22        BY MR. DIAMOND:  I'll pass the witness.

23        THE COURT:  Cross-examination?

24                    CROSS-EXAMINATION

25   BY MR. BEREZIN:

MANISHA PUROHIT - CROSS BY MR. BEREZIN

217

1    Q    Good afternoon, Doctor.  My name is Rob Berezin.  It's

2    very nice meeting you, unfortunately, under these

3    circumstances.  I just have a few questions for you.

4         Now, I believe you testified you began working at Steward

5    in 2017?

6    A    Yeah.

7    Q    Is that yes?

8    A    Yes, sorry.

9    Q    Thank you.  No, no.  No problem.

10        And after you transitioned from IASIS to Steward,

11   the next year, you had the option of enrolling in the in the

12   Steward Deferred Compensation Plan?

13   A    Correct.

14   Q    Okay.  And every year after that, you had, during the

15   fall enrollment, an option to enroll or not?

16   A    Correct.

17   Q    And you received an open enrollment email, I believe,

18   around that time; is that correct?

19   A    Correct.

20   Q    Okay.  And obviously, no one had Steward instructed you

21   to participate in the Deferred Compensation Plan?

22   A    Correct.

23   Q    Okay.  And each year you were able to decide how much you

24   wanted to contribute; is that correct?

25   A    Correct.

MANISHA PUROHIT - CROSS BY MR. BEREZIN                    218

1   Q    And there was a range, I think, 2 percent to 75 percent;
2   is that right?
3   A    As I said, I saw 25, 50, and 75.  As I said, that was
4   told to me and that's what I went with.
5   Q    I see.  From the IASIS, your time at IASIS?
6   A    Uh-huh.
7   Q    Understood.
8   A    Correct.
9   Q    And when you participated in the Deferred Compensation
10  Plan each year, did you pay taxes on the money that you
11  deferred?
12  A    No.
13  Q    Okay.  Now, you testified that you worked at it sounds
14  like several hospitals in the Arizona market.
15           Is that right?
16  A    Correct.
17  Q    And it sounds like your specialty was in this robotic
18  surgery?
19  A    Correct.
20  Q    Which sounds incredibly impressive, and I'm sure it is.
21  A    Yes, sir.
22  Q    And there was an instrument involved called Da Vinci; is
23  that right?
24  A    Correct.
25  Q    Can you explain the issues that you experienced with the

1    supply, getting a steady supply of Da Vinci instruments so

2    that you could do the surgeries with those robotics?

3    A    Correct, as simple as drapes.  We drape the robotic Da

4    Vinci so we can operate.  The drapes were not there.  So, if

5    the drapes will come for one month, then the instruments were

6    lacking.  So, it was either or.  We couldn't proceed with

7    robotic surgeries.  So, I still wanted to provide the care.  I

8    was still a surgeon with minimally invasive surgery.  So, I

9    still continued doing the laparoscopic surgeries, but I had to

10   reserve some of my complex cases for Da Vinci.  So, every

11   three months or four months I'll get the drapes and they will

12   say, "Hey, Doctor, you have 3 or 4 cases you can add and

13   finish those surgeries."  So, I would reserve all the complex

14   cases for Da Vinci and did all the minor surgeries with

15   laparoscopic.

16           So, at least, I didn't want the hospital to run down

17   because it was bad because we were losing a lot of patients,

18   we were down in surgeries, and was concerning.  I built the

19   whole women's health center starting from that to high-risk

20   OB, and I introduced five years ago with Steward Health Care

21   menopause care.  I'm really good at hormone replacement

22   therapy, which I introduced with the pallets.  So, patients

23   travel to come to that.  So, I really didn't want to really

24   run this program down, because it was coming to the point

25   where I was really worried about my patients, jeopardizing the

1    care.  And especially on labor and delivery, we were missing

2    instruments.

3    Q    And when did these supply issues begin?  What year?  Do

4    you remember?

5    A    It was 2023.  It was started in -- so, I started

6    gradually from July and I would say -- see, how it was in

7    April, I could get all the cases done.  Then I couldn't do

8    endometrial ablation, which is a simple 30 minute procedure.

9    They said, "We don't have tubing."  I said, "What do you mean

10   we don't have tubing?"  So, the patients who came in bleeding,

11   it was crucial for me to complete that procedure in 30 minutes

12   and take care of them, but I couldn't do those procedures.

13   So, at that time, initially, it started, but it started

14   gradually getting worse after that.

15   Q    And what were you told about the reasons for the supply,

16   lack of supplies that you perform these procedures?

17   A    So, being honest, when the VP came from Boston, she was

18   honest that, you know, Steward has spread their wings far

19   above and beyond.  They wouldn't have spent so much money

20   buying another hospitals.  They never reinvested in the growth

21   of the hospital.  And that was my little worrisome, that

22   frustration that, you know, we are building to do everything

23   what we can to keep this hospital running and why we are not

24   reinvesting.  We are making money in this hospital, why we are

25   not growing.  We should be growing and concern about that

1    hospital and not funding other hospitals because it was

2    jeopardizing that care.  Focus on west coast then, you know.

3    Worry about whatever hospitals you have on the other side.

4    Let that hospital come up and do things, but don't keep

5    funding from this hospital to the other hospital and run down

6    the programs.

7    Q    And that, I believe you testified, that was Amy, who's a

8    vice president from Boston?

9    A    Correct.

10   Q    And she came in the summer --

11   A    Correct.

12   Q    -- of 2000 -- is that --

13   A    2023.

14   Q    Okay.  So, the summer of 2023.

15         And then by the time of this town hall meeting, I

16   think you testified it was either late 2023 or early 2024, she

17   has left Steward?

18   A    Yeah, left Steward.

19   Q    I see.

20         And it sounds like by the time you get to that town

21   hall meeting, the concern among the physicians seemed to be

22   widespread; is that fair?

23   A    Correct.

24   Q    And they're very upset because there wasn't the growth

25   that you expected in the hospitals?

1    A    And we were losing staff because they were not getting

2    paid.

3    Q    Yes, you testified on direct that during the pandemic

4    that, the 2020 and 2021 years, I take it your compensation was

5    reduced by 25 percent?

6    A    Uh-huh, correct.  Because most of the surgeries were

7    down.  Patients you could only do was emergency surgeries.

8    Q    I see, I see.  Right.  So, during COVID, you're reminding

9    me that hospitals were suffering because people wouldn't go in

10   because they're afraid.

11   A    Correct.

12   Q    Okay, let's -- I'm just going to show you a couple

13   documents.

14        You participated in a Deferred Compensation Plan

15   while you were employed at IASIS; is that correct?

16   A    Correct.

17   Q    Now, you participated for one year not all of the years,

18   right?

19   A    Correct.

20   Q    Okay.

21   A    My twins were young.  So, I had to pay and I didn't have

22   much chance to save.  So, when I found the opportunity I could

23   save, I did.

24   Q    I get it.

25        And for the IASIS plan, I asked you about the

1     Steward plan, but you weren't required to participate in it?

2     It was an option?

3     A    Correct.

4     Q    Okay, can we pull up Exhibit 1?  Its Docket No. 4306.

5            Doctor, this is the IASIS Healthcare Savings Plan,

6     and this is a document you would have reviewed as part of your

7     enrollment, correct?

8     A    I would have signed the document when I filled it up.

9     Q    And isn't it, though, a document that you would have

10    reviewed at the time of your enrollment in the IASIS plan?

11    A    So, as I said, the way it popped up on my computer

12    screen, when honest, it was just a document to fill it out.

13    Q    Okay, let's just take a look at your deposition and see

14    if this refreshes your memory.

15           BY MR. BEREZIN:  Can we pull up the Doctor's

16    deposition, Page 56, Lines 14 through 16?  Can you blow that

17    up?

18    BY MR. BEREZIN:

19    Q    Yeah.  So, you see at Line 14, "Did you review it as part

20    of your enrollment in the IASIS plan?"  That's the question.

21    And you answered, "I would have at that time."

22           Do you see that?

23    A    Correct.

24    Q    Does that refresh your recollection?

25    A    As I said, I don't remember.  If I've done it, I've done

1      it.

2      Q    Understood.

3            BY MR. BEREZIN:  Could we turn, keep in that

4      document, to Section 1.02?  Sorry, to the Exhibit 1, Docket

5      No. 4306.  We're done with the deposition.

6      BY MR. BEREZIN:

7      Q    And we're looking for the intent and status of plan in

8      Section 102.  You see under "Intent of the Plan," the very

9      first sentence says, "The plan is intended to be an unfunded

10     plan."

11           Do you see that?

12     A    Correct, I see that

13           BY MR. BEREZIN:  Can we can we go to Section 6.02

14     for a moment?  Okay, there it is.  Okay.

15     BY MR. BEREZIN:

16     Q    So, just going to focus your attention on -- so, if you

17     go down about 11 lines, it begins on the left side, "The

18     assets of the trust" --

19     A    Got it.

20     Q    You see that?  So, it says, "The assets of the trust with

21     respect to benefits payable to the employees of each

22     participating company shall remain the assets of such

23     participating company, subject to the claims of its general

24     creditors."

25           You see that?

MANISHA PUROHIT - CROSS BY MR. BEREZIN                225

1    A    I see that.

2              BY MR. BEREZIN:  And could we pull up Docket No.

3    4306-27?

4    BY MR. BEREZIN:

5    Q    Now, Doctor, this is the IASIS Healthcare Executive

6    Savings Plan Trust Agreement that's in evidence.  And you

7    reviewed or would have reviewed this document as part of your

8    enrollment in the IASIS plan, too, correct?

9    A    As I said, I do not recall.

10   Q    Okay, let's look at just 1.4 for a moment.  And Section

11   1.4 states, "The principle of the" -- oh, hold on one second.

12   Sorry, the second sentence actually.  "Plan participants and

13   their beneficiaries shall have no preferred claim on or any

14   beneficial ownership in any assets of the trust."

15             You see that?

16   A    I see that.

17   Q    Let's go to Exhibit 66, please.  That's Docket

18   No. 4307-16.  Doctor, as you testified, you participated in

19   the Steward Healthcare Deferred Compensation Plan and you have

20   reviewed the Steward Healthcare Deferred Compensation Plan

21   document, correct?

22   A    As I said, I signed the document.  Would I remember

23   because nothing was explained to me?  So, I did what I could.

24   Q    Understood.

25             BY MR. BEREZIN:  Why don't we just quickly pull up

1      Dr. Purohit's deposition transcript, please?  Just go to page

2      39, line 14.

3      BY MR. BEREZIN:

4      Q    See if this may refresh your recollection, Doctor.  You

5      see Line 14 there, and it starts with, "Okay"?

6      A    As I said, I do not --

7      Q    I'll just --

8      A    Yeah, okay.

9      Q    I'll read and then you can answer.  "Have you reviewed

10     the Steward Healthcare Deferred Compensation Plan document,"

11     question.  Answer, "Correct."

12            Was that the question and your answer?

13     A    I told her that last time that I could not recall.  So,

14     she just said, "Answer whether you reviewed it or not."  I

15     said I would have.

16     Q    Understood.  Thank you. Doctor.

17            BR MR. BEREZIN:  Can we then turn back to Docket No.

18     4307-16, which is the Steward Health Care plan document?  And

19     if we could go to Section 3.04?

20     BY MR. BEREZIN:

21     Q    You see it says, "3.04, Participant duty to review

22     information?"  Do you see that?

23     A    I see that.

24            BY MR. BEREZIN:  Can we go to Section 9.01 of the

25     plan agreement for Steward?

MANISHA PUROHIT - CROSS BY MR. BEREZIN

227

BY MR. BEREZIN:

Q    And so, 9.01 is titled "Unfunded Plan," and it states the

first sentence, "The plan is intended to be an unfunded plan

maintained primarily for the purpose of providing deferred

compensation," and it goes on.  You see, the second full

sentence says, "All payments pursuant to the plan shall be

made from the general funds of employers, and no special or

separate fund shall be established or other segregation of

assets made to assure payment. No participant or other person

shall have, under any circumstances, any interest in any

particular property or assets of the employers as a result of

participating in the plan."

        Did I read that correctly?

A    Yeah, I see that.

Q    Now, Doctor, you enrolled in the plan I believe you

testified online?

A    Correct.

Q    Okay.

        BY MR. BEREZIN:  Can we please pull up Docket number

4307?

BY MR. BEREZIN:

Q    Just one moment, Doctor.

    (Pause in the proceedings.)

BY MR. BEREZIN:

Q    By the way, Doctor, you mentioned at the town hall

1    meeting, one of the statements made by the representatives of

2    corporate, Dr. Weinstein or others, was that there was a sale

3    of a Utah hospital.  Can you explain --

4    A    That was brought up by the VP when she was from Boston

5    who visited.  She told me that, not in the town hall meeting.

6    Q    Thank you.

7         Can you just explain what it is that she said about

8    the selling of the Utah hospital, what that had to do --

9    A    So, they were not doing that great, and they were going

10   to sell those hospitals and the money flow will be better if

11   their hospitals are sold.  So, we will get the supply chain

12   back.

13   Q    I see.  So, she was basically saying Steward has assets

14   it can sell to provide more liquidity to the Arizona

15   hospitals?  Is that right?

16   A    Correct.

17   Q    Okay, all right.  So, if you could just take a look at

18   the Exhibit -- which one is this?  It's Exhibit 50, and this

19   is a participation, confirmation, and agreement email.  And I

20   just want you to take a look at it and tell us if this is the

21   email or the kind of form of the email that you received each

22   year.

23   A    Yeah, I remember that.

24   Q    Okay, and if you look at -- and I take it you clicked,

25   "Yes"?

1    A    Correct.

2    Q    Okay, and you see the words next to "Yes," "I hereby

3    acknowledge that I have received and reviewed a copy of

4    Steward Healthcare Deferred Compensation Plan documents and

5    the accompanying plan summary, and I hereby agree to defer the

6    portion of my compensation under the terms as indicated and

7    understand that pursuant to the terms of such deferral

8    election, I relinquish my right to receive deferred amounts

9    until the dates or events specified, subject to the terms of

10   the plan. I further understand that this deferral election is

11   binding and irrevocable"?  You see that?

12   A    Correct, I see that.

13   Q    Okay, and the first sentence, "I hereby acknowledge, I

14   received and reviewed a copy of the documents," you checked

15   yes to that when you enrolled, correct?

16   A    Correct.

17   Q    Doctor, thank you so much for your time and coming here.

18   We really do appreciate your service and what you do.  Thank

19   you.

20   A    Thank you.

21            BY THE COURT:  Any redirect?

22            MR. DIAMOND:  Very short follow-up.

23            THE COURT:  Okay.

24                         REDIRECT EXAMINATION

25   BY MR. DIAMOND:

1    Q    Doctor, do you have any understanding at all of what is

2    meant in the deferred compensation documents as "unfunded"?

3    A    No.

4    Q    Do you have any formal financial education of any kind?

5    A    No, sir.

6    Q    Do you have any working or other experience in the

7    financial industry?

8    A    No, sir.

9    Q    Do you have any understanding of what it means to be

10    either a general or an unsecured creditor of Steward

11    Healthcare as it relates to your deferred compensation

12    contributions?

13    A    No, sir.

14    Q    Did anyone at Steward ever, at any point in time in all

15    the years that you worked for them, explain any of these

16    concepts to you?

17    A    No, sir.

18            BY MR. DIAMOND:  That's all I have, Your Honor.

19            THE COURT:  Okay, any further?

20            MR. BEREZIN:  Nothing further, Your Honor.

21            THE COURT:  Doctor, thank you very much for your

22    time.

23            THE WITNESS:  Thank you.

24        (The Witness steps down.)

25            MR. DIAMOND:  Your Honor, we're going to call, at

1    this time, our next witness -- he's coming -- Dr. Krock.

2                   THE COURT:  Okay.

3                   MR. MCDONALD:  May it please the Court?

4                   I'm a latecomer to today's proceedings, Your Honor.

5    I'm Paul MacDonald representing the objectors as well.

6                   Before we begin, I would like to move to exclude

7    Mr. Krock's testimony under Federal Rule of Evidence 702,

8    because it simply does not meet the reliability standard set

9    forth in the rule as further explained by the Supreme Court

10   decisions in Daubert and Kumho Tire.

11                  THE COURT:  Okay.

12                  MR. MCDONALD:  If I may make an offer of proof to

13   explain the basis of the motion?

14                  THE COURT:  Okay.

15                  MR. MCDONALD:  Dr. Krock's main charge was to

16   determine the average salaries of the Steward employees and

17   then run certain computations to determine average salaries

18   over different plan years.  You heard today I believe

19   Ms. Potter testify that she had supplied some data, and this

20   data was transmitted to Mr. Krock and his team at Stout.  This

21   data consisted of a census run, which was the entire

22   population of the Steward system, with salary, compensation,

23   history, and things like that, and then a separate set of

24   documents that listed similar information by different plan

25   years.  So, there were two sources of documents that Dr. Krock

1    worked upon, okay?  What Dr. Krock did was he found in doing

2    his data review or his team did, that there were

3    inconsistencies in the data, and they had to apply some sort

4    of a methodology to correct for deficiencies in the data.

5    Well, Dr. Krock submitted a Declaration which he refers to as

6    his expert report.  It is based entirely on the data that was

7    sent to him prior to putting together his Declaration and

8    report, which was March 18th of this year.  We learned since

9    the submission of his report --

10                THE COURT:  Uh-huh.

11                MR. MCDONALD:  -- and I think you heard it here

12    today from Ms. Potter, that the information that he got was

13    incorrect.  In his deposition, he referred to those documents

14    that he received.  His understanding now is that they were

15    drafts, and there is new information, presumably more accurate

16    information regarding salary, history, and gross compensation

17    for all of the employees, which necessarily will affect the

18    computations that he has made.  And all we have before the

19    Court is a Declaration that is based on the old incorrect

20    data.  So, we would argue that under Rule 702, there are not

21    sufficient facts and data upon which Dr. Krock can offer an

22    expert testimony.  We believe that the methodology is also

23    flawed.  You will hear that from our expert, Mr. Van Meter.

24                THE COURT:  And what does Mr. Van Meter testifying

25    about?

1              MR. MCDONALD:  Essentially, he's going to critique

2     the work that Dr. Krock did, and then he's going to offer some

3     alternative scenarios to the scenarios that that Dr. Krock

4     ran.

5              THE COURT:  So, if Krock doesn't testify, does Van

6     Meter testify then?

7              MR. MCDONALD:  I think I'd have to regroup with my

8     team on that, but I don't know that he will need to.

9              THE COURT:  Can I run the numbers myself based upon

10    the data?

11             MR. MCDONALD:  You could.

12             THE COURT:  Do I have a spreadsheet that that can

13    show me what the numbers are, or do you need an expert

14    testimony?  Do I strike both of them at the same time?

15             MR. MCDONALD:  You need expert testimony to do it,

16    Your Honor, because here's a lack of complete correlation

17    between the census and the eligibility documents, and that's

18    why Dr. Krock applied his bespoke, in his words, methodology

19    to reconcile the two.  So, there are inconsistencies --

20             THE COURT:  Krock doesn't testify and Van Meter's

21    critiquing Krock, do I strike them both?

22             MR. MCDONALD:  May I have a moment?

23             THE COURT:  I'm not saying I should or I shouldn't,

24    but I mean, I can -- if what you're telling me -- then you're

25    going to make me look at this and say, "You know what, some

1     folks are making 300K, some folks are making 30. Statute says

2     what it says." Just be careful what you're, everyone, just

3     careful what you're asking me, because then you're leaving it

4     to -- I think we have a fair gunfight and we see where this

5     goes. Well, let me not use that word. I think we have a fair

6     fight and see where it goes.

7          MR. MCDONALD: Your Honor, if I may, I think you can

8     strike Dr. Krock's preferred testimony, and Mr. Van Meer can

9     still testify.

10         THE COURT: I'm sure you do. I know you do.

11         (Laughter.)

12         THE COURT: No, I understand. I'm going to overrule

13    the objection. This may be unreliable once we get there, but

14    I don't know if it's reliable or not yet because I haven't

15    heard it yet. But I did hear the testimony that there may be

16    some incomplete analysis. I don't know. I don't think -- at

17    this point, I think everybody testifies and we see where this

18    goes. And maybe I find both unreliable, but I think I'm going

19    to let him in and it will either assist the Court or not. But

20    I think I can, as the trier of fact, I think I can make the

21    determination whether it's helpful to me or not.

22         So, I'm going to overrule the objection and let's

23    proceed.

24         MR. BRONSHTEIN: Could the Court swear the witness,

25    Your Honor?

1          THE COURT:  Yeah.  Oh, that's true.

2      (Laughter.)

3          THE COURT:  Please raise your right hand.

4      (Witness sworn.)

5          THE COURT:  Okay, and just -- you sound like it

6  works just well, but just for the record, can you state your

7  name and spell your last name?

8          THE WITNESS:  Sure, my name is Joseph Krock.  Last

9  name is K-R-O-C-K.

10          THE COURT:  Okay, and we'll let the Record reflect

11  the witness has been properly sworn in.

12          Counsel, you may proceed.

13          MR. BRONSHTEIN:  Thank you, Your Honor.

14          Good afternoon, Dr. Krock.

15          THE WITNESS:  Good afternoon.

16                    DIRECT EXAMINATION

17  BY MR. BRONSHTEIN:

18  Q    Dr. Krock, where are you currently employed?

19  A    I'm employed at a company called Stout.

20  Q    And what is Stout?

21  A    Stout's a global consulting firm that provides a number

22  of different consulting areas.  We have an investment banking

23  group, evaluation group.  We have a disputes group that I'm

24  part of.  We have a bankruptcy group as well.

25  Q    What's your position at Stout?

1    A    I'm a Managing Director.

2    Q    How long have you held that position?

3    A    With Stout, we joined in 2022.  My company was acquired

4    by them, but I've had a Managing Director position with my

5    prior company, the Claro Group, since 2012, I think.

6    Q    Dr. Krock, what is your educational background and what

7    degrees do you hold?

8    A    I graduated from the University of California, Santa

9    Barbara in 2004 with a degree in economics and mathematics.  I

10   moved on to the University of Chicago.  I received a master's

11   degree from the University of Chicago in economics in 1996,

12   and then I graduated from the University of Chicago with a PhD

13   in economics in 1999.

14   Q    Dr. Krock, how would you describe your field of work?

15   A    My field of work is generally economic consulting, and

16   the type of work that I do is more along the lines of heavy

17   quantitative analysis of data and then applying that to

18   economic issues across the board in a wide variety of

19   different matters and industries.

20   Q    And how many years have you worked in what you called

21   heavy quantitative analysis?

22   A    It's been 26 years since I graduated from Chicago.

23   Q    Do you ever have to make adjustments to data in order to

24   analyze it as part of your work?

25   A    We see that happen very often.  I mean, even going back

1    into the graduate school days, data is never clean and

2    pristine.  And so, you need to develop methodologies to clean

3    it in the best way that you can and be able to support that

4    process.

5    Q    How would you describe your general approach to complex

6    data?

7    A    I first look at the data, actually observe it.  I'll run

8    frequencies and other types of analyzes to see if there are

9    any tendencies of the data, sort it in different ways, and

10   that helps you identify things that don't look normal in the

11   data.

12   Q    Have you ever served as an expert on complex data

13   analysis in a lawsuit?

14   A    I have.

15   Q    And have you ever testified as an expert on complex data

16   analysis in a trial?

17   A    I have.

18   Q    Have you ever been qualified as an expert on complex data

19   analysis?

20   A    I have.

21   Q    Has a judge ever rejected your expert opinion?

22   A    No one has rejected my opinion.

23   Q    And has a judge ever refused to qualify you as an expert?

24   A    No.

25            BY MR. BRONSHTEIN:  At this time, Your Honor, we

1    would move Dr. Krock be allowed to testify and qualified as an

2    expert on data analysis.

3              THE COURT:  Any objection?

4              MR. MCDONALD:  Your Honor, just subject to the

5    motion we made previously, the same objection we would assert

6    again to Dr. Krock's testimony.

7              THE COURT:  Understood.

8              Okay, he's qualified as an expert.  The objection is

9    overruled.

10             MR. BRONSHTEIN:  Thank you, Your Honor.

11   BY MR. BRONSHTEIN:

12   Q    Dr. Krock, what was your assignment in this case?

13   A    My assignment generally was to calculate the average

14   annual salary for a couple of different groups of employees

15   for Steward Health, and then perform some additional

16   calculations.

17   Q    Who gave you that assignment?

18   A    The assignment was given to me by counsel for Steward.

19   Q    As part of your assignment, did anyone explain the nature

20   of the case?

21   A    I only have the highest-level understanding of the case.

22   I don't know anything other than it's a bankruptcy case.

23   Q    Did anyone explain that your assignment had anything to

24   do with the top hat plan?

25   A    I've heard the word, but I'm not familiar with that term.

JOSEPH KROCK - DIRECT BY MR. BRONSHTEIN

1    Q    Did anyone explain to you the legal requirements of a top

2    hat plan?

3    A    No.

4    Q    Do you independently have any knowledge of what those

5    requirements are?

6    A    I do not.

7    Q    Have you read any cases or been instructed in any law

8    about top hat plans?

9    A    I have not.

10   Q    Were you told that there were particular targets or

11   thresholds to try to reach in terms of the calculations that

12   you were doing?

13   A    No.

14   Q    Did you otherwise have any understanding of targets or

15   goals that you were trying to reach in your calculations?

16   A    No.

17   Q    Did you understand that there were two different plans at

18   issue in this case?

19   A    I do.

20   Q    What are those two plans?

21   A    The two plans that I understand are in it are the SHC,

22   the Steward Healthcare plan, and the IASIS plan, the I-A-S-I-S

23   plan.

24   Q    So, focusing first on the SHC plan, what information did

25   you rely on for your analysis of that plan?

1    A    We were provided two general sets of data.  One was the

2    census data, which was information for the entire set of

3    employees, and then a series of files that were the

4    eligibility files for various years for Steward Health.

5    Q    Focusing first on the census data, what sorts of

6    information did that include?

7    A    That included information about each employee.  Name, ID,

8    number, location, job, various bits and pieces of information

9    like that, and then it also included a column that was the

10    annual salary and a column that was listed as W-2 earnings,

11    but as we came to understand that, that was actual gross

12    earnings amount for the employees.

13    Q    How did you come to reach that understanding that it

14    actually reflected gross compensation?

15    A    We had a conversation with Katrina Potter, and she let us

16    know that that column was actually gross earnings and not

17    anything related to W-2.

18    Q    How was the data for the census data presented to you?

19    A    The census data was a large Microsoft Excel file.  It

20    contained multiple tabs for each of the years from 2017

21    through 2024.

22    Q    Do you know who generated that data?

23    A    I believe that Ms. Potter generated that data.

24    Q    And do you know how Ms. Potter generated that data?

25    A    I don't know specifically, but I understand that she

JOSEPH KROCK - DIRECT BY MR. BRONSHTEIN

1    pulled that information directly from their payroll system,

2    their Kronos payroll system.

3    Q    Turning next to the eligibility data you referred to,

4    what did that include?

5    A    It included much of the same information as the census

6    file.  I understand that the census file was used to develop

7    the eligibility file.  So, much of the same information was in

8    the file that we used, and then it also included some

9    information about the participation of employees that were

10   within the eligibility file.

11   Q    And how was that data presented to you?

12   A    Again, it was Excel files that were separated on a year

13   by year basis.

14   Q    Do you know who generated that data?

15   A    I believe that was generated by Ms. Potter as well.

16   Q    And do you know how Ms. Potter generated the eligibility

17   data?

18   A    I generally have an understanding that she reviewed the

19   census data and identified people that would be included in

20   the eligibility data.

21   Q    Do you know when Ms. Potter had generated those

22   spreadsheets?

23   A    My understanding is that those were generated in the

24   normal course of business.  So, they would have been generated

25   at the time that the plan was being reviewed.  That's my

1    understanding.

2    Q    Dr. Krock, did you learn after filing your Declaration

3    that some of the files you reviewed for your report were not

4    final?

5    A    Yeah, the Friday before my deposition, I was notified

6    that there were final versions of the eligibility files that

7    were identified after I filed my report.

8    Q    And were there any changes to the census data?

9    A    There were no changes to the census data.

10   Q    Do you have an understanding of what changed in the

11   eligibility files from the ones you saw to the final files

12   from Friday?

13   A    Our review shows that the salary information was removed

14   from the eligibility files in the final version of it, and

15   then there was a certain number of individuals that were

16   removed from the final file that were in the draft file.

17   Q    Do you know why those individuals were removed?

18   A    I don't, no.

19   Q    Did you adjust your expert opinion at all based on those

20   new files?

21   A    No.

22   Q    And why not?

23   A    In our review, there was no substantive change in the

24   amounts and averages if we had used one or the other.  And so,

25   it would not make a difference, a material difference between

1    what we'd previously done and what would have been done with

2    the other file.

3    Q    When you say "no substantive change," what do you what do

4    you mean by that?

5    A    The end results would not change in a meaningful way.

6    Q    Would they change at all?

7    A    They would be different but not change.  They wouldn't be

8    -- wouldn't be a large difference.

9    Q    Beyond those spreadsheets that you referred to, did you

10   rely on information from any other source?

11   A    Only discussions with Ms. Potter.

12   Q    And what did Ms. Potter tell you generally in those

13   discussions?

14   A    She gave us a sense of what was in the data, how to

15   interpret portions of the data, the best way to interpret the

16   data.

17   Q    Did you believe it was necessary to look at other

18   information for purposes of this assignment?

19   A    My understanding is that this was the best available data

20   to use.  And in terms of being able to vet the data, it would

21   be an onerous process to try to audit the entire file with

22   some other data.

23   Q    When you looked at the census data, what was your initial

24   impression of it?

25   A    My initial impression was that much of the data was

JOSEPH KROCK - DIRECT BY MR. BRONSHTEIN

1    exactly what you would expect it to be.  We saw annual

2    salaries that would be in the range of an annual salary for

3    any typical industry, values that are in the tens to hundreds

4    of thousands of dollars and up.  There was -- and we also had

5    the gross earnings information.  So, we could compare those

6    two.  And so, we saw that that everything seemed to line up

7    fine for a large portion of the data.  And then there's some

8    edge cases where the data was a little bit different and

9    raised some questions.

10   Q    And so, what sorts of edge cases did you see?

11   A    We saw that there was a few of the values were listed

12   that were clearly not annual salaries.  We saw annual salary

13   values that were in the tens of dollars and less, hundreds of

14   dollars up into the low thousands of dollars that were clearly

15   not annual salaries.  And so, that that would raise one

16   question as to what those are.

17   Q    And we'll get back to that in a moment.  But first, did

18   you ever see single employees who were listed multiple times

19   in the record?

20   A    Yes, we also saw a number of times that individuals had

21   multiple records for the same year.

22   Q    How did you address instances where an employee had

23   multiple records in the same year?

24   A    We took the maximum salary for that person for that year

25   out of the set of salaries that were there.

1  Q    And what effect would that have tended to have on the

2  data?

3  A    That would tend -- well, if we had summed it, then the

4  averages probably would be larger. but some of the salaries

5  looked duplicative or would generate some extraordinarily high

6  salaries.  And so, on one end, there could be a pretty large

7  overstatement.  On the other end, this would give us, as

8  opposed to any other item, would give us the highest salary

9  that was reasonable.

10 Q    Now, turning back to the low salaries that you mentioned,

11 can you give us a sense of how low those salaries were?

12 A    Yes, there were salaries that were -- a few of the values

13 in there were in the like cents, $0.21, but most of them were

14 in the range of kind of typical hourly rates in the tens of

15 dollars up to the thousands.

16 Q    Did you discuss with Ms. Potter or anyone else what those

17 low salaries might mean?

18 A    We did.

19 Q    And what did you learn?

20 A    She told us that those were for the employees who were

21 hourly, that those would represent their hourly or -- well, it

22 was hourly, per diem, or weekly employees.  Those would be the

23 rates that they were paid at the periodicity that they're

24 working.

25 Q    Was there any other information in the spreadsheets that

1    could be used to understand those low salaries?

2    A    We did have -- the gross compensation was one of the

3    items that we had to be able to look and compare it to.

4    Q    And what did you determine based on comparison -- excuse

5    me -- comparing the salary information and the gross

6    compensation information?

7    A    There are quite a few individuals that had those low

8    salaries that had gross compensation that was substantial.

9    And so, we felt like if we had used just the annual salary, we

10    would be omitting people that actually were earning a

11    considerable amount of money.

12    Q    So, how did you ultimately address that disparity in your

13    analysis?

14    A    We developed a set of rules in our comparison of those

15    two items to determine which would be the most reliable

16    determinant of the annual average or the annual salary for

17    each individual rather than the total amount that those

18    individuals were paid.

19    Q    Did you set a threshold for deciding between using one

20    versus the other?

21    A    We did.

22    Q    And what was that?

23    A    That threshold was if the gross compensation was greater

24    than 130 percent of salary, we would use the gross

25    compensation.  Otherwise, we would use the maximum salary.

1     Q    How did you arrive at that 130 percent figure?

2     A    Initially, we looked at the data and noticed that there

3     was a kind of falloff in the compensation, that differential

4     between the gross compensation and the annual salary.  We also

5     know that gross compensation can overstate salary because it

6     also includes other information or other payments, such as

7     overtime, bonuses, other compensation that can be paid.  And

8     so, using gross compensation alone would lead to an

9     overstatement of that annual salary, which is what our target

10    was at the end of the day.

11    Q    And again, was that in your analysis of the census data

12    or the eligibility data?

13    A    That was in the census data.

14    Q    Did you ever discuss that 130 percent conclusion with

15    Ms. Potter?

16    A    Yes, we had a conversation about that as well.

17    Q    And what did she have to say about that?

18    A    She had noted that there were employees that were getting

19    paid bonuses and that gross compensation would be influenced

20    by overtime and other compensation.  And we asked her if that

21    30 percent or 130 percent buffer would be sufficient so that

22    we would be able to identify, you know, the salary rather than

23    some other number that was higher than the salary.  And she

24    said that that seemed very reasonable to her.

25    Q    Were there ever inconsistencies between an employee's

1    reported salary in the census data and in the eligibility

2    data?

3    A    There were a few instances where they were different,

4    yes.

5    Q    And what did you do in those instances?

6    A    We used the data in the eligibility file as the annual

7    salary for that person.

8    Q    Why did you choose to use the eligibility file as opposed

9    to the census file?

10   A    We understand that Ms. Potter and her process would go

11   through the census data and create the eligibility data.  And

12   then in her review of those employees, she may change that

13   salary to be the actual salary that it was.

14   Q    Did you ever encounter employees with zero values in both

15   salary and gross compensation?

16   A    We did.

17   Q    And what did you do in those cases?

18   A    We removed those individuals from our analysis.

19   Q    Were there any employees that you did not include in your

20   analysis at all based on their salary?

21   A    We set a cutoff based on a minimum wage idea that if

22   people were part time employees, we wanted to remove them from

23   the analysis because it would bias the averages down.  And so,

24   we set a minimum amount based on the minimum wage.

25   Q    What was that amount?

1    A    It depended on the year.  We took an average of the

2    minimum wage for all 50 states across the US.  We annualized

3    that.  We multiplied each rate by 2,080 hours.  Then, we

4    averaged it across those 50 to come up with the average

5    minimum wage salary.  And then, we rounded that to the nearest

6    thousand dollars.  So, it ranged from like $18,000 to I think

7    $21,000 depending on the year.

8    Q    And again, was this change applied to the eligibility

9    data or the census data?

10   A    That was the census data.

11   Q    And what effect did excluding employees making less than

12   that threshold have on the data that you analyzed?

13   A    It would remove some of the people and the average would

14   tend to -- if you took the average out of everybody and then

15   you removed those individuals, the average would be higher

16   having removed those individuals.

17   Q    Which average would be higher?

18   A    The average for the total set of employees.

19   Q    And the average of what?

20   A    Oh, the average of their annual salary.

21   Q    And taking a step back, what was your overall goal in

22   this data cleanup of the census file?

23   A    Our goal was to identify the annual average or the annual

24   salary for each individual, and then find the average annual

25   salary across the employees in total, and then the eligible

1    and participating employees as well.

2    Q    And how did you satisfy yourself that the information was

3    sufficiently accurate?

4    A    It was our review of it.  It seemed accurate through the

5    review.  Our discussions with Ms. Potter gave me great comfort

6    in that the data and the method that we used was a reasonable

7    way to analyze the data.

8              BY MR. BRONSHTEIN:  Can we please pull up ECF No.

9    4300-3, and this has been admitted as Exhibit 42.

10   BY MR. BRONSHTEIN:

11   Q    Mr. Krock, do you -- or excuse me.  Dr. Krock, do you

12   recognize this?

13   A    I do.

14   Q    What is this?

15   A    This would be a copy of my Declaration.

16             BY MR. BRONSHTEIN:  All right, if we could please go

17   to Table 1?

18   BY MR. BRONSHTEIN:

19   Q    And before we discuss this table, Dr. Krock, are the

20   adjustments that we just discussed listed in your Declaration?

21   A    They are.  They might not be artfully displayed, but

22   they're in there.

23   Q    Looking at Table 1, what does this represent?

24   A    So, the top part of Table 1 is a listing of the employee

25   counts from the data and the second table at the bottom

1  displays the averages for various categories of employees and

2  some other information.

3  Q    Looking at the -- my apologies.  Let me just pull this up

4  in hard copy.

5         So, looking at the top table, you said that was the

6  employee count?

7  A    Yes.

8  Q    And what data did you rely on to create this table?

9  A    For the total employees, we use the census data.  For the

10  eligible and participating employees, we used the eligibility

11  files.

12  Q    You see where it says plan year in the upper left of that

13  table?

14  A    I do.

15  Q    What does that refer to in terms of the data?

16  A    So, that refers to the effective plan date.  As I

17  understand it, that would be the year that the plan was

18  effective for and that the prior year's census data would be

19  used to make the determination of who was eligible in the plan

20  year, the subsequent year.

21  Q    So, for instance, in Plan Year 2019, can you tell us

22  which eligibility file did you use and which census file did

23  you use?

24  A    We would use the 2019 eligibility file.  That would be

25  the Plan Year 2019.  And my understanding is that Ms. Potter

1      would use the 2018 census file to generate the 2019

2      eligibility file.

3      Q    Looking at the first row that says total employees, which

4      data did you use to calculate that?

5      A    That was the census data.

6      Q    Did that data change with the new information you

7      received last Friday?

8      A    It did not.

9      Q    Looking at the next row, eligible employees?

10     A    Yes.

11     Q    Which data did you use to calculate that?

12     A    We used the eligibility files for that one.

13     Q    Would that data have changed based on the information you

14     received last Friday?

15     A    My understanding is that there would be fewer eligible

16     employees based on the final data.

17     Q    Looking at the participating employees, do you see that?

18     A    I do.

19     Q    And which files did you use to calculate that?

20     A    That we used the eligibility files for.

21     Q    Looking at the next row, percent of eligible employees,

22     what does that mean?

23     A    That is -- we divided the number of eligible employees by

24     the number of employees to find out the percentage of all

25     employees that were eligible employees.

1    Q    So, not to be too in the weeds on it, but which two rows

2    would you divide there?

3    A    It would be eligible employees the second row and divide

4    by the top row of total employees.

5    Q    Did you understand the significance of that calculation

6    for this case?

7    A    I do not.

8    Q    Looking at the next row, percent of participating

9    employees, what does that refer to?

10   A    That's a similar calculation as the one we just talked

11   about.  It is dividing the number of participating employees

12   by the number of total employees to find the percentage of all

13   employees that were participating in the plan.

14   Q    And not to belabor the point, but why don't we just focus

15   on 2023?  So, how many total employees were there at Steward

16   that year?

17   A    There were 33,789 employees that year.

18   Q    And based on the data you reviewed, how many of those

19   employees were actually eligible to participate in the SHC

20   plan?

21   A    There were 1,348 employees eligible that year.

22   Q    And how many of Steward's employees actually participated

23   in the SHC plan that year?

24   A    65.

25   Q    And then, what percentage of all of Steward's employees

JOSEPH KROCK - DIRECT BY MR. BRONSHTEIN

254

1    were eligible to participate?

2    A    That would be 40 percent, which would be 1,348 divided by

3    33,789.

4    Q    And sorry, maybe I misheard you.  What did you say?

5    A    1,348 divided by 33,789.

6    Q    And what percentage was that?

7    A    4 percent.

8    Q    And then what percentage of all of Steward's employees

9    actually participated in the plan?

10    A    That would be 0.2 percent, which was 65 divided by

11    33,789.

12    Q    So, can you tell us, had you used the files that

13    Ms. Potter found on Friday, how would your data have changed

14    or how would your conclusions have changed?

15    A    The number of total employees would not change at all.

16    The number of eligible employees would go down.  And so, then

17    the percentages would go down.

18    Q    Looking at the next table, I think you called this the

19    salary numbers?

20    A    This is our average calculations.

21    Q    So, looking again at the first row, what is the total

22    average salary?

23    A    So, after our processing, cleaning the data, we

24    calculated the average salary by year for, in that case, all

25    employees.

1    Q    And which data did you use to analyze that?

2    A    The census data.

3    Q    And was that impacted at all by the new files?

4    A    No.

5    Q    Looking at the ineligible average salary, what does that

6    mean?

7    A    That is the average -- after we identified the eligible

8    employees, we looked at them in the census file, took out the

9    eligible employees.  Everyone that's leftover would be part of

10   the ineligible group, and we calculated the average salary for

11   those individuals.

12   Q    And then what's the eligible average salary?

13   A    So, the eligible average salary was the average salary

14   that we generated for the salaries that they had in the

15   eligibility file that we used.

16   Q    And how did you calculate that?

17   A    That was we took the average that was in the annual

18   salary column for the eligible employees.

19   Q    Looking at the next row, the participating average salary

20   data, what is that?

21   A    That was calculated similarly.  That's the average for

22   the 134 participating employees in the eligibility file.

23   Q    And for those last two rows, the eligible and

24   participating, would those numbers have changed based on the

25   new files that came in last Friday?

1    A    The new file didn't include salary information, so we

2    would have to go back and recalculate.  It would be different.

3    Q    Do you know how they would be different?

4    A    They go up and they go down.  Some of them are higher and

5    some of them are lower.

6    Q    Do you have any sense of whether that difference is

7    significant or material?

8              BY MR. MCDONALD:  Objection; vague.

9              THE COURT:  Sustained.

10   BY MR. BRONSHTEIN:

11   Q    Looking at the last row, what is eligible versus total

12   salary?

13   A    So, we were asked to divide the eligible average salary

14   by the total average salary.  And so, we did that for each of

15   those years.

16   Q    And so, that's dividing Row 3 by Row 1?

17   A    That's correct.

18   Q    And again, not to belabor it, but just to highlight, if

19   we could look at 2023, what was the total average salary in

20   that year of all Steward employees?

21   A    That average is $81,869.

22   Q    And what is the ineligible average salary in that year?

23   A    $71,110.

24   Q    And then, what was the average salary of those employees

25   who were eligible to participate in the plan?

1    A    $360,888.

2    Q    And then, what was the average salary for those employees

3    who did participate in the plan?

4    A    $395,788.

5    Q    And then, what was the ratio of the eligible employee

6    salary to the average salary of all employees?

7    A    So, we divided 360,888 by 81,869, and the answer is 4.4

8    times.

9            BY MR. BRONSHTEIN:  And if we could pull up the

10   appendix?

11   BY MR. BRONSHTEIN:

12   Q    Dr. Krock, you included an appendix in your report which

13   you titled a Table of Appendix Table 1.  What was this?

14   A    This is effectively the same set of calculations that

15   were in the original Table 1, but without performing any of

16   the data cleaning in the census file.

17   Q    And when you say the data cleaning, is that the

18   methodological approach you took that we discussed earlier?

19   A    That's correct.

20   Q    Why did you prepare this table?

21   A    It's mainly to show that if we didn't go through the

22   process of this data, there are a bunch of observations which

23   would drag the averages down and would not be a good

24   representation of the average salaries.

25   Q    And so, looking at the salaries in particular, is this

1       just an average of everything that was in the data?

2       A    Yes.  For each year, it was a simple average of all of

3       the, everything in the average salary column.

4       Q    What did this tend to show with regard to the total

5       average salary?

6       A    That it's considerably lower than after we had cleaned

7       the data and that it's being influenced by a lot of very small

8       values in the data.

9       Q    And how about for the ineligible data?

10      A    There's no change to the -- well, for the ineligible

11      data, it again is lower because it's being dragged down by

12      those smaller values because it's also coming out of the

13      census data.

14      Q    What about with the eligible average salary?  Did that

15      change?

16      A    That did not change because we had salaries in the

17      eligibility file.

18      Q    And how about participating?

19      A    Again, that that comes from the eligibility file so it

20      doesn't change.

21      Q    And so, if you hadn't done your cleanup methodology, what

22      would that do to the eligibility versus total salary ratios?

23      A    It would increase it considerably.

24      Q    And what did you take away from comparing Table 1

25      regarding salaries to this appendix?

1     A     It gave me comfort that the process that we undertook was

2     a sound process and provided numbers that are more reasonable

3     with regard to the salaries for the individuals.

4     Q     And I'd like to back up to Table 2.

5           Do you see that, Dr. Krock?

6     A     I do.

7     Q     And what is this table showing?

8     A     This is our analysis of the IASIS plan data.

9     Q     What did you -- what data did you rely on to analyze the

10    IASIS plan?

11    A     We received two files for the IASIS plan.  One was the

12    census data for 2017 and the other file was the eligibility

13    data for 2017, or was participating data.  Sorry.

14    Q     Did you have to adjust the census data at all?

15    A     The only adjustment we needed to make is that there were

16    hourly employees included in it which indicated that -- and

17    their salary was their actual hourly rate.  And so, we needed

18    to annualize that so it would be better reflect an annual

19    amount.  And so, we multiplied that by 2,080.

20    Q     Where did you find the 2,080 figure?

21    A     That was in the file, in the census file.

22    Q     Did you have to make any adjustments to the participant

23    data?

24    A     We did not.

25    Q     Were there any inconsistencies or gaps in the data?

1    A    This data was much cleaner.  We did not have to perform

2    anything else.

3    Q    So, looking at this table, why does it only say 2017?

4    A    That, as far as I know, is the only data that is

5    available.

6    Q    And so, do you see where it says "total employees?"

7    A    I do.

8    Q    What does that mean?

9    A    That's the total number of employees that are in the

10   census file.

11   Q    And where do those employees work?

12   A    They work for Stout -- or sorry, that's me.  Steward.

13   Q    Well, did you understand where this data was coming from,

14   or sorry, which plan this was related to?

15   A    It was related to the IASIS plan.

16   Q    And so, does the next line that says "participating

17   employees," did you understand what that was?

18   A    Those were the employees who were participating in the

19   IASIS plan.

20   Q    And the next line where it says "percentage of

21   participating employees," do you see that?

22   A    I do.

23   Q    And so, what was that telling you?

24   A    So, we divided the number of participating employees by

25   the total number of employees.  So, 44 divided 9,481, and the

1    answer would be 0.5 percent.

2    Q    The next line says "participating average salary," or

3    excuse me, "total average salary."  What was that?

4    A    That's the simple average salary for those 9,481

5    employees in the census data.

6    Q    How did you calculate that?

7    A    It was if you summed all of their salaries and then

8    divide it by the number of employees, you would arrive at that

9    number.

10   Q    Did you make any adjustments or changes to the data to

11   get that number?

12   A    No, we did not.

13   Q    The next time, participating average salary, what is

14   that?

15   A    That's the same calculation but only limited to the

16   participants in the file.  And so, we would sum all of their

17   salaries for that group and then divide it by 44.

18   Q    And did you have to make any adjustments to that data to

19   reach your conclusion?

20   A    We did not.

21   Q    The next line, participating versus total salary ratio,

22   what is that?

23   A    That is the -- we divided the participating average

24   salary by the total average salary to calculate that number.

25   Q    And so, what did you find that number to be?

1    A    So, we divided $338,991 by $68,255 and arrived at 5.0

2    times.

3    Q    Are you aware that there was another expert retained in

4    this case?

5    A    I am.

6    Q    And who was that?

7    A    That would be Mr. Van Meter.

8    Q    Did he submit a report or Declaration?

9    A    He did.

10   Q    Did you review his report?

11   A    I did.

12   Q    Did his report include an analysis of the census data?

13   A    It did.

14        BY MR. MCDONALD:  Your Honor, I'm going to object to

15   this line of questioning.  We've had no advance notice that

16   this *** Dr. Krock's testimony.

17        MR. BRONSHTEIN:  Your Honor, their expert

18   Declaration came in I believe on Monday at 12:45, and the

19   deposition of their expert occurred last night and ended at I

20   believe about 5:00.

21        THE COURT:  Yeah, just wanted the timeline.  He's

22   right.  Doesn't come in.

23        MR. BRONSHTEIN:  Okay.

24        THE COURT:  Well, I should say we all agreed to this

25   timeline.  I know that there were objections to it but we

1   waited three and a half months to have today's date.  And

2   discovery schedules, I didn't get involved in.  I did extend

3   the time to allow for additional depositions to take place.  I

4   don't see any supplemental Declarations on the record.  So,

5   folks are going to live with the Declarations that they made

6   and the depositions, and I'll just take it for what it's

7   worth.  You can bring it in on cross.

8           MR. BRONSHTEIN:  Very well.  Thank you, Your Honor.

9           THE COURT:  All right.

10          MR. BRONSHTEIN:  One moment, please.

11          THE COURT:  Yeah.

12          MR. BRONSHTEIN:  Pass the Witness.

13   4:08:22

14

1    4:00 p.m.

2    Q    And then what was the ratio of the eligible employee

3    salary to the average salary of all employees?

4    A    So we divided 360,888 by 81,869 and that is a -- and the

5    answer is 4.4 times.

6         MR. BRONSHTEIN:  And if we could pull up the

7    appendix.

8    BY MR. BRONSHTEIN:

9    Q    Dr. Krock, you included an appendix in your report which

10   you titled in the table of Appendix Table 1.  What was this?

11   A    This is effectively the same set of calculations that

12   were in our -- the original Table 1, but without performing

13   any of the data cleaning in the census file.

14   Q    And when you say the "data cleaning," is that the

15   methodological approach you took that we discussed earlier?

16   A    That's correct.

17   Q    Why did you prepare this table?

18   A    It's mainly to show that if we didn't go through the

19   process of this data, there are a bunch of observations which

20   would drag the averages down and would not be a good

21   representation of the average salaries.

22   Q    And so looking at the salaries in particular, is this

23   just an average of everything that was in the data?

24   A    Yes.  For each year, it was a simple average of all of

25   the -- everything in the average salary column.

1    Q    What did this tend to show with regard to the total

2    average salary?

3    A    That it's considerably lower than after we had cleaned

4    the data, and that it's being influenced by a lot of very

5    small values in the data.

6    Q    And how about for the ineligible data?

7    A    There's no change to the -- well, there -- for the

8    ineligible data, it again is lower because it's being dragged

9    down by those smaller values because it's also coming out of

10   the census data.

11   Q    What about with the eligible average salary; did that

12   change?

13   A    That did not change because we had salaries in the

14   eligibility file.

15   Q    And how about participating?

16   A    Again, that comes from the eligibility file so it doesn't

17   change.

18   Q    And so if you hadn't done your cleanup methodology, what

19   would that do to the eligibility versus total salary ratios?

20   A    It would increase it considerably.

21   Q    And what did you take away from comparing Table 1

22   regarding salaries to this appendix?

23   A    It gave me comfort that the process that we undertook was

24   a sound process and provided numbers that are more reasonable

25   with regard to the salaries for the individuals.

1    Q    Now I'd like to back up to Table 2.  Do you see that,

2    Mr. or Dr. Krock?

3    A    I do.

4    Q    And what is this table showing?

5    A    This is our analysis of the IASIS plan data.

6    Q    What did you -- what data did you rely on to analyze the

7    IASIS plan?

8    A    We received two files for the IASIS plan.  One was the

9    census data for 2017, and the other file was the eligibility

10   data for 2017, or it was participating data.  Sorry.

11   Q    Did you have to adjust the census data at all?

12   A    The only adjustment we needed to make is that there were

13   hourly employees included -- included in it, which indicated

14   that the -- and their salary was their actual average or their

15   actual hourly rate -- and so we needed to annualize that so it

16   would better reflect an annual amount.  And so we multiplied

17   that by 2,080.

18   Q    Where did you find the 2,080 figure?

19   A    That was in the file, in the census file.

20   Q    Did you have to make any adjustments to the participant

21   data?

22   A    We did not.

23   Q    Were there any inconsistencies or gaps in the data?

24   A    This data was much cleaner.  We did not have to perform

25   anything else.

1    Q    So looking at this table, why did you -- why does it only

2    say 2017 on it?

3    A    That, as far as I know, is the only data that is

4    available.

5    Q    And so do you see where it says total employees?

6    A    I do.

7    Q    What does that mean?

8    A    That's the total number of employees that are in the

9    census file.

10   Q    And where did those employees work?

11   A    They worked for Stout -- or for -- sorry -- Steward.

12   Q    Well, did you understand where this data was coming from

13   -- or sorry -- which plan this was related to?

14   A    It was related to the IASIS plan.

15   Q    And so does -- the next line that says participating

16   employees, did you understand what that was?

17   A    Those were the employees who were participating in the

18   IASIS plan.

19   Q    And the next line where it says percentage of

20   participating employees, do you see that?

21   A    I do.

22   Q    And so what was that telling you?

23   A    So we divided the number of participating employees by

24   the total number of employees.  So 44 divided by 9,481.  And

25   the answer would be 0.5 percent.

1    Q    The next line says participating average salary -- or,

2    excuse me -- total average salary.  What was that?

3    A    That's the simple average salary for those 900 -- 9,481

4    employees in the census data.

5    Q    How did you calculate that?

6    A    It was, if you summed all of their salaries, and then

7    divided by the number of employees, you would arrive at that

8    number.

9    Q    Did you make any adjustments or changes to the data to

10   get that number?

11   A    No, we did not.

12   Q    The next line, participating average salary, what is

13   that?

14   A    That's the same calculation, but only for -- limited to

15   the participants in the file.  And so we would sum all of

16   their salaries for that group and then divide by 44.

17   Q    And did you have to make any adjustments to that data to

18   reach your conclusion?

19   A    We did not.

20   Q    The next line, participating versus total salary ratio,

21   what is that?

22   A    That is the -- we divided the participating average

23   salary by the total average salary to calculate that number.

24   Q    And so what did you find that number to be?

1      A     So we divided $338,991 dollars to -- by $68,255 and

2      arrived at 5.0 times.

3      Q     Are you aware that there was another expert retained in

4      this case?

5      A     I am.

6      Q     And who was that?

7      A     That would be Mr. Van Meter.

8      Q     Did he submit a report or Declaration?

9      A     He did.

10     Q     Did you review his report?

11     A     I did.

12     Q     Did his report include an analysis of the census data?

13     A     It did.

14            MR. MCDONALD:  Your Honor, I'm going to object to

15     this line of questioning.  We had no advance notice that this

16     -- inquiry --

17            MR. BRONSHTEIN:  Your Honor, their expert

18     Declaration came in, I believe, on Monday at 12:45, and their

19     -- the deposition of their expert occurred last night and

20     ended at, I believe, about 5:00 o'clock.

21            THE COURT:  Debtors wanted the timeline.  He's

22     right.  It doesn't come in.

23            MR. BRONSHTEIN:  Okay.

24            THE COURT:  Well, I should say we all agreed to this

25     timeline.  I know that there were objections to it, but we

1    waited three and a half months to have today's date and

2    discovery schedules I didn't get involved in.

3          I did extend the time to allow for additional

4    depositions to take place.  I don't see any supplemental

5    Declarations on the record.  So folks are going to live with

6    the Declarations that they made and the depositions and I'll

7    just take it for what it's worth.  You can bring it in on

8    cross.

9          MR. BRONSHTEIN:  Very well.  Thank you, Your Honor.

10          THE COURT:  All right.

11          MR. BRONSHTEIN:  One moment, please?

12          THE COURT:  Yeah.

13          MR. BRONSHTEIN:  We'll pass the witness.

14          THE COURT:  Okay.  Before we get into cross, maybe I

15    can do just high-level housekeeping.  I know we said we were

16    going to do this in terms of timing.

17          How much cross do you think you have, counsel?

18    I won't hold you to it.

19          MR. MCDONALD:  I would anticipate --

20          THE COURT:  Yeah, yeah.  No, no.  I won't hold you

21    to it.

22          MR. MCDONALD:  -- an hour.

23          THE COURT:  Okay.  An hour.  And then I'd suspect

24    about the same amount of time for Van Meter going back and

JOSEPH KROCK - DIRECT BY MR. BRONSHTEIN

1    forth in connection with the experts; does that sound about

2    right?

3              MR. BRONSHTEIN:  Our cross certainly won't be as

4    long as an hour.

5              THE COURT:  Huh?

6              MR. BRONSHTEIN:  Our cross won't be --

7              THE COURT:  Will or will not?

8              MR. BRONSHTEIN:  Will not be.

9              THE COURT:  How much direct do you have on Van

10   Meter; do you have a sense?

11             MR. STROTHER:  Your Honor, I'll be presenting

12   Mr. Van Meter.  An hour, maybe a little less.

13             THE COURT:  I'm informed that there may be some --

14   they're working on minute courtroom, and so we may get some

15   drilling.

16             So I think what makes the most sense is let's finish

17   the experts today, come back in at 9:00, finish Castellano, do

18   closings, and then I'll have a better sense as to when I can

19   rule at that point.

20             I don't know what I don't know.  But maybe we can

21   start at 9:00 a.m. with Castellano, we'll cross, and 30-minute

22   closings each side.

23             And then at that point, I'll let you know what I

24   think I can do in terms of a ruling.  But I reserve the right

25   to obviously, once I get into the -- there's a lot of exhibits

1     that I need to review, and I'm going to review a bunch of them

2     tonight and tomorrow.

3              But I'll be in a position to let you know in terms

4     of when I can do that.  But let's just proceed like, I don't

5     know, until, you know, 7:15, 7:30.  We're going to have to,

6     you know, the fun may start.

7              So I think let's just keep working.  Let's finish

8     the experts today.  Let's let them go where they need to go,

9     and then we'll finish with Castellano in the morning.  Okay?

10    All right.

11             Yes, counsel.

12             MR. MCDONALD:  Thank you, Your Honor.

13             THE COURT:  Unless you needed a five-minute break or

14    something, I can -- or let me -- I should ask the witness.  Do

15    you need a --

16             THE WITNESS:  If I can just get a water would be

17    about the only -- thank you.

18             THE COURT:  Whenever you're ready.

19             MR. MCDONALD:  Your Honor, just a bit of

20    housekeeping before I begin because I was not here earlier.

21             THE COURT:  Yes.

22             MR. MCDONALD:  I typically, if I'm going to be

23    impeaching a witness using their deposition transcript, I will

24    ask for permission to approach and go up.  But I notice things

25    are going up on the screens here.

1          THE COURT:  I think --

2          MR. MCDONALD:  What does Your Honor prefer?

3          THE COURT:  No, no, no.  It's your preference.

4          MR. MCDONALD:  Okay.

5          THE COURT:  Yeah.  Counsel, in terms of showing

6    documents, how do you with to proceed on that?  I know that if

7    you're -- you may approach the witness on -- to impeach.  How

8    do you wish --

9          MR. MCDONALD:  We'll use the screens --

10          THE COURT:  You'll use the screens for --

11          MR. MCDONALD:  -- for the exhibits.

12          THE COURT:  You've got it.  Okay.  I always forget

13    what -- who's left and who's right on this thing.  I will --

14    I'll let you -- you'll do it right.

15                         CROSS-EXAMINATION

16    BY MR. MCDONALD:

17    Q    Good afternoon, Mr. Krock.

18    A    Afternoon.

19    Q    Nice to see you again.

20    A    Good to see you.

21    Q    Is it fair to say that you're a professional expert

22    witness?

23    A    That's fair.

1    Q    Approximately 90 to 95 percent of all of your working

2    professional life has been engaged as an expert witness in

3    litigation or prospective litigation matters?

4    A    It -- most of my consulting engagements and other work is

5    related to litigation.

6    Q    But isn't it 90 to 95 percent of it is expert witness

7    testimony?

8    A    Not necessarily testimony, but it's related to litigation

9    and it's there, but a large part of my job is that, in that

10    range.

11    Q    Now you work for a company called Stout.  When Stout was

12    originally engaged by the Debtors in this matter, you were not

13    part of the original Stout team; isn't that right?

14    A    I was not.

15    Q    Okay.  And what happened was there was a hearing that was

16    scheduled in this matter which then got postponed, and the

17    person who was going to be the Stout testifying expert had a

18    scheduling conflict.  So you got brought in essentially at the

19    11th hour?

20    A    Well, not the 11th hour, but it was late in the game.

21    Q    Late in the game.  You were brought in approximately a

22    week and a half before your Declaration was submitted?

23    A    That sounds right.

24    Q    And the Stout employee who was originally tapped to be

25    sitting in that witness chair today was Jeff Buchakjian?

1      A      That's correct.

2      Q      And Mr. Buchakjian had been working for some period of

3      time on this engagement before he, if you will, lateraled the

4      ball to you; is that right?

5      A      I'm not sure how long he'd been working on it, but he had

6      been working on it before I did.

7      Q      Several weeks, though, right?

8      A      I don't know -- have any idea how much time he worked on

9      it.

10             MR. MCDONALD:  May I approach the witness, Your

11     Honor?

12             THE COURT:  Of course.

13     BY MR. MCDONALD:

14     Q      Dr. Krock, I'm going -- you gave a deposition in this

15     case on Monday, correct?

16     A      I did.

17     Q      And you were under oath.

18             THE COURT:  Counsel, I just want to make -- for

19     this, I just want to make sure the record -- we've got a mic

20     that can pick you up.  Yeah, I appreciate it.  I just want to

21     make sure that we can all -- that the mics pick you up.

22             MR. MCDONALD:  Shall I repeat those last series of

23     questions, Your Honor?

24             THE COURT:  That'd be great.  Thank you.

25             MR. MCDONALD:  All right.

1   BY MR. MCDONALD:

2   Q    Mr. Stout [sic], you were deposed.  You gave a deposition

3   in this case this past Monday?

4   A    I'm Mr. Krock or Dr. Krock.

5   Q    Dr. Krock, yes.

6   A    Yes, I did.

7   Q    And you were under oath?

8   A    I was.

9   Q    And you gave truthful answers to all of my questions --

10  A    I did.

11  Q    -- that day?

12  A    I did.

13  Q    All right.  I'm going to ask you to turn to page 18 of

14  your deposition.

15  A    Okay.

16  Q    And I'm going to start reading from line 17 of page 18 of

17  your deposition.

18       "Tell me more about the conversation with Jeff.  He just

19  described the assignment and whether it was something that was

20  appropriate for me to step in and help out on, the general

21  state of the data, what source of analysis were contemplated

22  that were needed, and what the -- the calculations needed to

23  make it ultimately."

1         Question, "Had any of these Stout employees done any work

2    on the matter before this call with you and Jeff?"  Answer,

3    "Yes, they had."

4         Question, "What had they done up to this point?  They

5    looked at data, identified some issues with the data,

6    performed some calculations along the way."

7         Now I want to back up to page 18, line 2.  "How long had

8    Stout been working on the matter before Jeff contacted you?  I

9    don't know the specific, but they had been working for a few

10   weeks before I got contacted at least."

11        Did I read that correctly?

12   A    You did.

13   Q    You don't need that transcript right now, sir.  I may

14   come back to it.  You can just put it down.  Now

15   Mr. Buchakjian had been working with two other Stout employees

16   before you came on board, an Alex Borman and a Hung Nguyen.

17   A    It was Alex Boerema --

18   Q    Boerema.

19   A    -- Boerema and Hung Nguyen, yes.

20   Q    Okay.  Had you ever worked with Mr. Buchakjian before?

21   A    I don't recall if I have or not.

22   Q    Had you ever worked with Alex Boerema before?

23   A    I have not.

24   Q    Okay.  Had you ever worked with Hung Nguyen before?

25   A    I have.

1    Q    Prior to you coming on board, Mr. Boerema and Mr. Nguyen

2    had analyzed the data that had been provided to Stout by

3    Ms. Potter; is that right?

4    A    They have been analyzing it, yes.

5    Q    Okay.  So you were engaged or took over approximately

6    March 7th?

7    A    I don't know.  Can't remember the specific date, but

8    probably around then.

9    Q    Perhaps I can refresh your recollection.  There was a

10   hearing in this courtroom on March 7th, and that was the date

11   that the Court rescheduled the hearing that we're having today

12   to today.

13        And if I understood your testimony the other day, you

14   told me that Mr. Buchakjian found out he couldn't handle this

15   hearing today because of a scheduling problem.

16        So does that refresh your recollection that you were

17   engaged on this matter no earlier than March 7th of this year?

18   A    Certainly on the no earlier side.  It took a couple of

19   days to -- on the back and forth between him and me to get me

20   fully involved in it, but that's a fair date.

21   Q    Okay.  So March 7th was a Friday.  Did he call you the

22   following Monday?

23   A    I think he called me either Friday or Saturday.

24   Q    Okay.  And when did you finally connect with him?

1    A    I think we talked briefly on Friday or Saturday, and then

2    he got me involved with the team probably Monday.

3    Q    Okay.  And then your report was submitted on the 18th?

4    A    That's correct.

5    Q    Now, Mr. Buchakjian had been working with Mr. Nguyen and

6    Mr. Boerema, but you brought in another player on the Stout

7    team to help you out; is that right?

8    A    We substituted Mr. Nguyen out of the team and brought in

9    Mike Detzel.

10   Q    Why did you do that?

11   A    We were trying -- it was not a good working relationship

12   with Mr. Nguyen.

13   Q    Why not?

14   A    He -- we were having issues just trying to get him to

15   give us this -- he's much of a programmer and not much of an

16   analyst.  And so he -- trying to get things on an expedited

17   basis out of him was not easy.  And so Mike was a better

18   option for what we needed.

19   Q    Isn't it true that prior to you coming on board,

20   Mr. Nguyen had been analyzing the data, and then when you came

21   on board, you basically scrapped everything that he had done

22   and started over?

23   A    Yes.  I think that's probably a good statement.

24   Q    Why did you do that?

1    A    There was no kind of final analysis on what we had done.

2    And so it was all kind of draft work product.  And it's -- any

3    sort of analysis that you do is you have iterations on it

4    until you figure out what you think is the right way to do it,

5    which is what we did.

6    Q    So you started over and got the whole analysis done in a

7    week, week and a half?

8    A    Yeah.

9    Q    All right.

10         MR. MCDONALD:  Can we get Exhibit 5 on the screen,

11   which is the Declaration of Dr. Krock?

12   BY MR. MCDONALD:

13   Q    I want to -- you broke up your Declaration into two

14   different categories.  One was the SHC plan and one was the

15   IASIS plan.  So we'll take this questioning in that order, if

16   that works for you.  Okay, Dr. Krock?

17   A    That's fine with me.

18   Q    All right.  So your SHC plan analysis begins --

19         MR. MCDONALD:  -- if we can scroll down to paragraph

20   13.  Okay.  Go up.

21   BY MR. MCDONALD:

22   Q    All right.  If we look at paragraph 12 of your

23   Declaration, you identify the documents that Stout relied on

24   in performing its analysis, right, for the SHC plan?

25   A    That's correct.

1    Q    Okay.  And those you've previously told the Court
2    consisted of census files and eligibility files?
3    A    That's correct.
4    Q    And you got all of those documents from Ms. Potter?
5    A    Through counsel from Ms. Potter.
6    Q    And you didn't look at any other documents in performing
7    your analysis of the SHC plan; isn't that right?
8    A    That's correct.
9    Q    And you didn't discuss with Ms. Potter whether there were
10   any other species of documents that might be available for you
11   to look at to perform this analysis?
12   A    She informed us that this was the most complete data
13   available.  And so there was no more discussion on other
14   documents.
15   Q    But we heard from your earlier testimony that data was
16   not really that complete in some instances, right?  There were
17   discrepancies between the census numbers and the eligibility
18   files, correct?
19   A    I don't know if incomplete's the right word, but there
20   were discrepancies between those two files.
21   Q    Okay.  Which is what led you to have to employ the
22   methodology that you employed to come up with your
23   calculations, right?

1   A    No, that -- the methodology we applied was just to the

2   census data.  It didn't have anything to do with the

3   eligibility files.

4   Q    Well, you had to adjust for gaps in the data; isn't that

5   fair?

6   A    I don't think there were gaps in the data.  The data

7   represented something that was in annual salaries.  I wouldn't

8   call it a gap.

9   Q    Were there inconsistencies in the data?

10  A    Other values, there was inconsistencies between the gross

11  compensation and salary, but that would be expected given the

12  nature of gross compensation.  But the salaries, as we found

13  out, were not salaries so --

14  Q    Could you take a look at paragraph 14 of your

15  Declaration.  Don't you say in that paragraph that you

16  identified inconsistencies and gaps in the plan census and

17  eligibility data?

18  A    I do.

19  Q    You just told us there weren't any gaps in the data,

20  though.

21  A    The intention of that is with the salaries that were

22  blank but okay.

23  Q    So I want to go back to the question I asked you

24  previously.  You didn't inquire with Ms. Potter whether or not

25  there were any other documents that Steward might be able to

1    access to enable you to reconcile some of the gaps and the

2    inconsistencies in the data that you had been provided; isn't

3    that right?

4    A    I did not.

5    Q    You had one conversation with Ms. Potter?

6    A    I did.

7    Q    Did you speak to anyone else at Steward about this

8    engagement?

9    A    I did not.

10    Q    The documents that you received from Ms. Potter after you

11    had completed your Declaration, that led you to conclude

12    ultimately that the documents that you used in performing your

13    analysis and preparing your Declaration were, in fact, just

14    drafts?

15    A    I was informed that what we had received initially were

16    drafts and that the second set were the final version.  But I

17    don't know that I would conclude that.  I was told that.

18    Q    Okay.  But that's -- you termed them drafts.  You told me

19    they were drafts in your deposition; isn't that right?

20    A    That's how they were described to me.

21    Q    All right.  And just to be clear, it was the drafts that

22    you used to perform the analysis in your Declaration?

23    A    That's what we had available to us at the time.

24    Q    You didn't perform any of the data analysis that is

25    revealed in your Table 1, did you?

1    A    The Table 1 was created at my direction by my staff.

2    Q    Your staff took the data from the spreadsheets that you

3    had received from Ms. Potter and put them into your own,

4    Stout's own licensed data management program and reconstituted

5    the data; is that fair?

6    A    That's fair.

7    Q    You didn't do any of that work?

8    A    No.

9    Q    And you didn't produce any of the results of that work

10   along with your Declaration?

11   A    No.

12   Q    You didn't provide any of that information to your

13   counsel; and therefore, we never saw any of it, did we?

14   A    I'm not aware that it was produced to my counsel so --

15   Q    It wasn't, was it?

16   A    I don't know.

17   Q    Well, who would know?

18   A    Counsel.

19   Q    No, I'm talking about it being produced from Stout to

20   counsel.  Are you telling me you don't know whether or not it

21   was produced from your company to your counsel?

22   A    I don't.

23   Q    Would anybody on your team know?

24   A    Possibly, if it was produced.

1    Q    All right.  I want to move to the methodology that you

2    employed, and you employed that because there were

3    peculiarities in the information that you had received from

4    Ms. Potter; isn't that right?

5    A    That's correct.

6    Q    One of the main problems was that you couldn't determine

7    the annual salary for all of the employees in the census; is

8    that right?

9    A    Well, I mean, we know the annual salary for most of the

10   employees in the data.  For a portion of the employees, there

11   is data that's not reflective of an annual salary.  And so

12   that's the reason why we employed our methodology was for the

13   places where those issues existed.  But for the most part, the

14   data was fairly good.

15   Q    Right.  But there were places where you weren't able to

16   determine the annual salary, and that's why you employed this

17   methodology of the 130 percent up or down, right?

18   A    That's true.

19   Q    The work that you did in employing this methodology to

20   account for the fact that you didn't have complete annual

21   salary information for all the employees, it's not reflected

22   anywhere in your report, is it?

23   A    Repeat the question.

24   Q    The work that you did to account for the fact that there

25   was not annual salary information for all the employees, the

1    methodology that you employed, none of the results of that

2    methodology are reflected in your report; is that right?

3    A    I'm not sure what you mean by results.

4    Q    Well, you had to reconstitute the data and then come up

5    with new salary information for certain employees for whom you

6    didn't have salary information; isn't that right?

7    A    Well, we're not creating anything new.  We're using some

8    of the information that's in there in the data set that we

9    already have.

10        So it's not new, but we're using an item that relates

11   roughly to an annual salary.  So we developed that methodology

12   to account for that, those issues.

13   Q    You employed your methodology to assign an annual salary

14   number for some employees for whom you had been unable to do

15   that; isn't that right?

16   A    Some of the individuals did not have annual salary that

17   represented an annual salary.  So we used the gross

18   compensation for those individuals.

19   Q    But you -- for some, you had to employ a different

20   methodology, which was this 130 percent factor that you

21   applied up or down for some employees, right?

22   A    And that's the main -- that 130 percent is mainly to

23   account for those people that have no salary.

24   Q    Right.  You had to compute it based on your methodology

25   and assign a new annual salary amount for certain employees.

1    A    There's no computing going on.  It's either a piece of

2    information that's in there or not.  It's a decision.

3    Q    It's a decision to assign an annual salary number for

4    some employees for whom you couldn't otherwise divine it based

5    on the documents that you would have received from Ms. Potter;

6    isn't that right?

7    A    We have the gross salary.  It's part of the documents.  I

8    -- I'm not sure I'm understanding your question.

9    Q    Isn't it your testimony that you had to assign new salary

10    information to certain employees in order to make the

11    computations that show up in your Table 1?

12    A    It is part of the process and data cleaning that we do

13    that, and then we perform the calculations.  It's not -- we

14    can do the calculation much like Mr. Van Meter did the

15    calculation.  But, you know, it's one way to do it and to

16    include more people.

17    Q    I'm not sure why we're fighting over this.  Either I'm

18    not understanding your testimony or you're just not willing to

19    concede a point.

20        Didn't you assign annual salary numbers to some employees

21    for whom you didn't otherwise have an annual salary number in

22    order to perform your calculations?  Yes or no?

23    A    I think I'm stuck on your -- to perform the calculations.

24    But we assigned a number to those individuals that we didn't

25    have an annual salary for.  Yes.

1    Q    All right.  And nowhere in your report can we determine

2    which employees you did that for, can we?

3    A    If you -- you could figure it out through the doing the

4    data analysis, yes, but it's not explicitly in the report.

5    Q    We don't know which ones you had to apply the methodology

6    to or not, do we?

7    A    Not explicitly in the report.

8    Q    What is the Stout file, if you will, comprised of for

9    this project; what is in it?

10   A    I haven't specifically looked at the Stout file.  I know

11   that we generally keep the documents that receive the data.

12   We may have some working files in there, other information.

13   But I have not looked at the file for this particular case.

14   Q    And that's because Mr. Boerema and others did the

15   analysis work and not you?

16   A    I was not involved in the details of many of the

17   calculations, but I did look at the data.  But the specific

18   calculations that are in my report are -- were done by them,

19   yes.

20   Q    So you don't even know what's in the file?

21   A    I cannot specifically say, no.

22   Q    Now, you talked about this -- and I'm assuming we're

23   understanding each other when I'm using this shorthand -- the

24   130 percent factor.

25   A    Sure.

1     Q     We're on the same page there?

2     A     Yes.

3     Q     Okay.  I believe you testified earlier that you ran that

4     by Ms. Potter and she thought it was the right number.

5     A     She thought it was a reasonable number, yes.

6     Q     Is that the reason you chose the 130 as opposed to some

7     other percentage?

8     A     We presented that number to her, and she said that it

9     sounded good to her.

10    Q     Did she make the decision to use that number?

11    A     No.

12    Q     It was a joint agreement between the two of you?

13    A     We had developed the number and we're getting a blessing

14    on it.  But we had figured that that was the right number, and

15    she agreed with it.

16    Q     Well, you had developed a bunch of other numbers, too,

17    didn't you?

18    A     Well, we performed sensitivity analysis, --

19    Q     Right.

20    A     -- but --

21    Q     Right.

22    A     -- that was to see whether or not the results change.

23    Q     Right.  So you applied different percentages to the data,

24    and did you present those to Ms. Potter?

25    A     No.

1    Q    Okay.  Then how did the 130 percent come about?

2    A    We had through, like I said, looking at the data through

3    what we know, we developed that number.  We thought that that

4    was the right number.

5         We presented it to her, and it's just an idea for her.

6    She's not looking at any of the data when we're talking to

7    her.  She said that that sounded like a reasonable number to

8    use.

9    Q    And did you ask her why she thought it was a reasonable

10   number?

11   A    She explained that gross compensation includes other

12   parts of compensation -- bonuses, overtime, other types of

13   compensation that would overstate an annual salary.  So to use

14   gross compensation when it's close to the annual salary would

15   be an overstatement of the annual salary when it's much

16   further away from the annual salary that draws into question

17   whether that annual salary is the right number or not.

18   Q    If you had had more time to dig into the Steward records,

19   wouldn't you have been able to get actual facts regarding

20   everybody's salary as opposed to making these projections as

21   to salary information?

22   A    I don't -- I would not call them projections, but I would

23   say that it would be an incredible -- incredibly onerous task

24   to try to audit every single person's salary when we're

25   talking about 32,000 people every year.

1    Q    But it's doable.

2    A    Definitely not in the timeline we had.  So it's --

3    Q    So the time --

4    A    -- something that would take years to do, would be my

5    opinion.

6    Q    Well, what's your base for saying it would take years to

7    do?  Do you have any information about what Steward's records

8    look like?

9    A    That would probably be the starting point of why it would

10   take years is to try to dig up that information.

11   Q    But you certainly couldn't do it because you were on a

12   compressed timetable.

13   A    That sure could be part of it.

14   Q    So you only worked with the draft documents that

15   Ms. Potter was able to get you because you were on the tight

16   timetable, right?

17   A    Well, all of what we're talking about is the census data,

18   and there's no draft or final in the census data.  So that has

19   no relevance to our analysis.

20   Q    Well, you employed your methodology because you didn't

21   have information regarding bonuses, right?

22   A    No.

23   Q    Didn't you say that one of the reasons that you applied

24   the 130 percent methodology was because you didn't have

1    information regarding bonuses, shift differentials, and

2    overtime?

3    A    No, that's what's included in gross compensation.  We

4    have an annual salary amount and we have gross compensation.

5    That's not why we have to employ the --

6    Q    Right.  But you weren't able to distinguish between the

7    annual salary and the other aspects of compensation; isn't

8    that right?

9    A    We only had gross compensation and annual salary.

10   Q    Right.  You had no bonus information.

11   A    No.

12   Q    You had no shift differential information.

13   A    No.

14   Q    You had no overtime information.

15   A    No.

16   Q    But you don't know whether or not Steward had the ability

17   to pull that information together, do you?

18   A    I would not know.

19   Q    All right.  One of the things you decided to do in

20   performing your calculation was remove from the total number

21   of employee calculation all of those that had 0 or null values

22   in their salary or gross compensation figures.

23   A    That was not for our counts.  That was for our average

24   calculation.

25   Q    Okay.  You took them out for your average calculation.

1    A    Yes.

2    Q    But you left those people in for the number of employees.

3    A    Yes.

4    Q    All right.  Go to paragraph 16 of your Declaration,

5    Dr. Krock.  This was another part of the methodology that you

6    employed was that you identified salary amounts that were

7    below the average annualized minimum wage amounts for each

8    year.  And then you removed those employees from the average

9    salary calculation.

10        And isn't it true that essentially the salary cutoff for

11   those people was about $18,000 a year?

12   A    It depended from year to year, but it was right around

13   there.

14   Q    Okay.  So essentially when you did your calculations, you

15   removed from the set everybody making less than $18,000 a

16   year?

17   A    Yeah.  It was between 18 and 21,000.  Yes.

18   Q    And you testified today that the way you determined what

19   that right number was, that you had took an aggregate of 50

20   states' minimum wage laws and regulations, and then you

21   averaged those out?

22   A    That's correct.

23   Q    Do you recall telling me at your deposition that the way

24   you did that was that you looked at the Department of Labor

25   statistics?

1    A    I was -- we had talked about the process and at the

2    deposition, I was unclear on exactly what we had done.  And

3    then they refreshed my recollection since then.

4    Q    Right.  Because you actually didn't do it; it was your

5    team that did it.

6    A    I -- under my direction, yes.

7    Q    When you excluded certain employees from the data on

8    which you performed your calculations, did you account for

9    full-time versus part-time employees?

10   A    We don't have any designation for full time and part

11   time.  Part of it was the -- this cutoff of 18,000 would take

12   some of those people out.  But we had no additional

13   information to identify a part-time or full-time person.

14   Q    Did you ask anybody at Steward for that information?

15   A    No.

16   Q    Do you know how many employees were excluded from your

17   calculations based on this $18,000 minimum wage cutoff?

18   A    I don't know specifically.

19   Q    Doesn't show up anywhere in your Declaration, does it?

20   A    No.

21   Q    All right.  Let's talk about the IASIS plan.  Am I

22   correct in understanding that the analysis of the IASIS plan

23   data was done in a similar format to the way you analyzed the

24   SHC plan data?

JOSEPH KROCK - CROSS BY MR. MCDONALD                    295

1          And by that, I mean you took data from Ms. Potter, a

2     census spreadsheet and an eligibility spreadsheet, you fed

3     them into your Stout program and essentially reconfigured the

4     data so that it was more easily analyzed by you.

5     A    We put it into our SQL database and you -- but there's no

6     -- it translates the data directly, you know, into it.  It's

7     not moving the data around or anything.

8     Q    Fair point.  And that wasn't my intent to suggest that

9     you had changed the data.  You put it into your data

10    management system so that you could do other things with it

11    than you could in a naked Excel file.

12    A    That's correct.

13    Q    Now, if we look at your Declaration, it's two paragraphs

14    in total that talk about the analysis that you did with

15    respect to the IASIS plan.  And nowhere in there is there any

16    identification of anything you did other than apply the data

17    as presented in the documents that Ms. Potter presented to

18    you; isn't that right?

19    A    I -- it was brought to my attention at the deposition

20    that one bullet item was not included in there that should

21    have been included, and that was the annualization of the

22    hourly data.

23    Q    So you annualized the hourly data for the IASIS plan as

24    you had with the SHC plan, but it never made its way into to

25    your report.

1    A    We did not annualize the SHC plan.  This was just we --

2    in the IASIS data, we knew the difference between full-time

3    and part-time employee or hourly and salaried employees.

4         And the employees who were identified as hourly had a

5    rate, and so we annualized those rates.

6    Q    I'll accept your clarification.  So you excluded from

7    your analysis the lower-earning employees in both plans, but

8    you did it differently with respect to the SHC plan and the

9    IASIS plan.

10   A    I'm not sure I understand the question.

11   Q    Well --

12   A    Exclude.  You said excluding.  I don't --

13   Q    Yes.  You did not -- for the SHC plan, you didn't include

14   in your calculations those employees making roughly less than

15   $18,000 a year.

16   A    For the SHC, yes.

17   Q    Yes.  You did the same thing for the IASIS plan, but you

18   had -- you -- those part-time people, those low-level salary

19   people were excluded because you actually knew what their

20   salaries were?

21   A    No.  We didn't.  We're talking about hourly rates versus

22   --

23   Q    Yes.

24   A    -- salaries.

25   Q    Yes.

1 A So I don't think that -- this has anything to do with --

2 Q You excluded the hourly rate people.

3 A No.  We used those people.

4 Q Okay.  Then I'm confused.  I thought you told us that

5 when you did the IASIS plan analysis, you excluded some

6 employees.

7 A I don't recall that.

8 Q Did you make any adjustments to the data regarding the

9 IASIS plan having to do with hourly rates of certain

10 employees?

11 A That's what we've been talking about --

12 Q Right.

13 A -- is that we annualized their hourly rates, so

14 multiplied their hourly rate by 2,080 to generate a salary --

15 Q Okay.

16 A -- and that's the salary we used for that person.

17 Q But you annualized the hourly rate.

18 A Correct.

19 Q Okay.  But you don't explain that in your Declaration, do

20 you?

21 A That's correct.

22 Q Which employees did you do that for?

23 A The ones that were identified as hourly.

24 Q Where from the materials that you've produced to us can I

25 find out who those employees are?

1    A    It's in the census file.

2    Q    All right.  You did a table, Table 2, which appears in

3    paragraph 17 of your Declaration on page 6 of the Declaration,

4    a summary of information that your counsel went through for

5    plan year 2017, right?

6    A    Yes.

7    Q    And for the SHC plan, you presented in Table 1 your

8    calculations for years 2019 through 2024, correct?

9    A    That's correct.

10    Q    You have no information to -- you haven't provided

11    similar analysis with respect to plan year 2018; isn't that

12    right?

13    A    I do not have data for 2018.

14    Q    I think this was clear, but just want to make sure that

15    it is.  Let's look at your Table 1.  If you had applied this

16    analysis that's set forth in your Declaration to the newly-

17    produced data that you got from Ms. Potter after you had

18    completed the Declaration, which of the -- which rows would

19    have their figures changed?  Tell me by name.

20    A    The rows that would change would be: the number of

21    eligible employees, so that would be the second row on the top

22    item; the ineligible average salary would be a little bit

23    different because there would be more people that were

24    ineligible; the eligible salary, average salary would be a

1    little bit different because there was no salary information

2    in that.

3    Q    Just --

4    A    And --

5    Q    -- tell me which lines would change without the

6    commentary, please.

7    A    Sure.  The eligible salary, eligible average salary.  And

8    I don't think that the participating average salary would

9    change, but I'm not 100 percent sure about that.

10   Q    Is that it?

11   A    And then the ratio at the bottom, depending on how those

12   things change -- would change.

13   Q    Is that it?

14   A    I believe so.

15            MR. MCDONALD:  May I have one minute?

16            THE COURT:  Of course.

17            MR. MCDONALD:  Just a little bit more.

18   BY MR. MCDONALD:

19   Q    Almost done, Dr. Krock.

20   A    Okay.

21   Q    So let's go -- stay on Table 1.  How did you determine

22   the various categories of data to present in your tables?

23            In other words, did anybody tell you to calculate the

24   total employees, the eligible employees, the participating

25   employees, on and on and on, the names of the rows?  Did

JOSEPH KROCK - CROSS BY MR. MCDONALD

1    anybody tell you to do that?

2    A    Yes.  We had discussions with counsel about which rows to

3    present.

4    Q    What do you recall of those discussions?

5              MR. BRONSHTEIN:  Objection to the extent that's

6    asking for -- to reveal privileged information.

7              MR. MCDONALD:  To the extent that it goes to

8    assumptions that the expert relied upon in formulating his

9    opinions in his report, I think that's fair game.

10             THE COURT:  Counsel?

11             MR. BRONSHTEIN:  I think, Your Honor, that he can

12   discuss the assumptions that Dr. Krock made.

13             But going into the conversations that Dr. Krock had

14   with counsel to try to figure out what an attorney might have

15   said is improper.

16             MR. MCDONALD:  I think Rule 26(b) specifically says

17   that attorney work product protection otherwise available to

18   an expert doesn't apply to conversations with counsel that

19   deal with assumptions made by the expert.

20             I don't have my rule book with me, so if I have

21   misstated the rule, I apologize, but that's my recollection of

22   what Rule 26(b) provides.

23             MR. BRONSHTEIN:  And Your Honor, my colleague

24   reminded me, it's assumptions given to the expert as opposed

25   to discussions about those assumptions with counsel.

1          THE COURT:  I'd need to go back and look at the rule

2     to be honest with you.  I will -- maybe on the break, I'll

3     take a look on the rule and I'll give you a ruling.  I've

4     never seen anyone go there, but here we are.

5          I will -- I've -- why don't during the break, I go

6     back and just take a look at the rule, and I'll give you a

7     ruling after that.  But continue with your questioning.

8          MR. MCDONALD:  I have nothing further at this time,

9     Your Honor.

10          THE COURT:  Okay.  And subject to you being able to

11     ask --

12          MR. MCDONALD:  Yes.

13          THE COURT:  -- additional questions.

14          MR. MCDONALD:  Yes.

15          THE COURT:  Yeah.  Okay.

16          Any redirect?

17          MR. BRONSHTEIN:  I just have about three questions.

18          THE COURT:  Okay.

19          MR. BRONSHTEIN:  Would you like me to do them now?

20          THE COURT:  Okay.  Yeah.  Why don't we do that, and

21     then we'll take about a 15-minute break and just let folks

22     understand our -- check out our lovely vending machines and

23     then go from there.

24          Go ahead, counsel.

25                    REDIRECT EXAMINATION

1    BY MR. BRONSHTEIN:

2    Q    Dr. Krock, in calculating the average salaries, did Stout

3    actually generate salary numbers for each individual employee?

4    A    No, we used the data that was available to us in the data

5    set.

6    Q    And so for each individual employee, did Stout assign one

7    of the numbers in the data?

8    A    Yes, it was either the annual salary or the gross

9    earnings that was in the data set.

10    Q    And so when you referred to the 130 percent calculation,

11    were you changing either the salary information or the gross

12    compensation information?

13    A    No, it was only that if the gross compensation was larger

14    than the annual compensation by 100 -- by more than 130

15    percent, we would pick the gross compensation; otherwise, we

16    would use the annual salary.

17            MR. BRONSHTEIN:  Nothing further, Your Honor.

18            THE COURT:  Okay.  Thank you.

19            I want you to -- counsel, just cite the exact rule

20    you want me to look at.

21            MR. MCDONALD:  26(b)(4)(C).

22            THE COURT:  26(b)(4)(C).  And then one of these IIs,

23    you think, apply?  You've got it.  I'll take a look at that.

24            So what I would ask, Dr. Krock, is just hang around

25    and I will make a ruling.  And either you'll answer a few more

1       questions or I will let you know.  But I'll just tell you that

2       you're still under oath, and I don't want you to speak with

3       anyone about your testimony until it's completed.  Okay?

4                    THE WITNESS:  Okay.

5                    THE COURT:  All right.  Folks, we'll take a break.

6       Thank you.

7            (Recess taken from 4:59 p.m. until 5:19 p.m.)

8                    THE COURTROOM DEPUTY:  All rise.

9                    THE COURT:  All right.  We are back on the Record in

10      Steward.

11                   Mr. Krock, I do think you get to answer the question

12      about whether there were any assumptions that counsel gave you

13      that you relied on in preparing your report.

14                   Counsel, go ahead and ask.  I believe that was the

15      question --

16                   MR. MCDONALD:  That is the question, yes.

17                   THE COURT:  -- at issue.

18                   MR. MCDONALD:  Yes.

19                   THE COURT:  Yeah.  So why don't you go ahead and

20      answer that question.  That is -- you can answer that

21      question.

22                   THE WITNESS:  Okay.  They provided to us the

23      categories of things that they wanted us to analyze, so the

24      various categories.

25                   And then they told me that if I had to make a

JOSEPH KROCK - REDIRECT BY MR. BRONSHTEIN                304

1      judgment call, that to pick a higher salary value than a lower

2      salary value, and that's all.

3              MR. MCDONALD:  I have no further questions.

4              THE COURT:  Thank you very much.

5              Any further question?

6              MR. BRONSHTEIN:  No further Redirect.

7              THE COURT:  All right.  Thank you very much for your

8      time, Mr. Krock.

9              THE WITNESS:  Thank you.

10          (Witness steps down.)

11             THE COURT:  All right.  Who's next?

12             MR. BRONSHTEIN:  I think we're -- pursuant to Your

13     Honor's earlier statement, we're going to go out of order --

14             THE COURT:  Yeah.

15             MR. BRONSHTEIN:  -- end with Castellano, and just so

16     we have back-to-back experts.

17             THE COURT:  Yeah.

18             MR. BRONSHTEIN:  So it's their witness.

19             THE COURT:  Yeah.

20             MR. STROTHER:  Your Honor, Justin Strother for

21     objectors and we'll call to the stand Mr. Scott Van Meter.

22             THE COURT:  Okay.  Thank you.

23             Mr. Van Meter, can you raise your right hand.  Do

24     you swear to tell the truth, the whole truth, and nothing but

25     the truth?

1          THE WITNESS:  I do.

2          THE COURT:  Okay.  Thank you very much.  We'll let

3     the record reflect the witness has been properly sworn in.

4          And you may have heard I like doing mic checks.  So

5     if you could please just pull the mic close to you and state

6     your name for the record and spell your last name.

7          THE WITNESS:  My name is Scott Van Meter,

8     capital V-A-N, space, capital M-E-T-E-R.

9          THE COURT:  Thank you.

10          Counsel, whenever you're ready.

11          MR. STROTHER:  Thank you, Your Honor.

12                    DIRECT EXAMINATION

13     BY MR. STROTHER:

14     Q    Mr. Van Meter, how are you this evening?

15     A    I'm good.  Thank you.

16     Q    You've been in the courtroom during the proceedings all

17     day today?

18     A    I have.

19     Q    And so you've heard all of the various witnesses,

20     including Dr. Krock, testify?

21     A    I have.

22     Q    Okay.  Would you briefly introduce yourself by way of

23     your educational and professional background?

24     A    Yes.  I have a Bachelor of Science in Accounting and

25     Business Administration.  I also have a Juris Doctorate, a JD.

1    I practiced law for a number of years doing commercial

2    litigation as well as bankruptcy and restructuring work.  And

3    for the last almost 30 years, I've been doing consulting work.

4    Q    For whom do you currently work?

5    A    I work for a firm called HKA Global.

6    Q    What is HKA Global?

7    A    It's a consultancy.  We have -- it's a global

8    consultancy.  We have 41 offices in 17 countries.  It was

9    created by a spin out of the claims disputes group from Hill

10   International.

11       And over the last two or three years, we've been growing

12   by adding additional forensic accountants and folks more on

13   the traditional commercial litigation, economic damages, et

14   cetera.

15   Q    You said that you not only have a JD but you started off

16   practicing law?

17   A    So I started off in public accounting.  So I was a --

18   Q    Okay.

19   A    -- CPA first and then practiced law for a number of

20   years.

21   Q    Where did you practice?

22   A    In Florida, I was with a firm called Stearns Weaver

23   Miller Weissler Alhadeff & Sitterson.  Should have slowed that

24   one down a little bit.  In Houston, I worked with Bracewell

25   and Patterson.

1    Q    What was your practice at Bracewell?

2    A    Bankruptcy and restructuring.

3    Q    Okay.  Do you have any consulting or expert experience

4    relevant to financial and data analysis matters?

5    A    I do.

6    Q    Could you describe that to the Court, please?

7    A    Yes.  I've been involved -- well, first of all, I'm

8    certified in financial forensics through the American

9    Institute of Certified Public Accountants.

10        I also am a certified insolvency and restructuring

11   advisor through the AIRN.  I've also worked on a number of

12   antitrust and other matters where complex data analysis was

13   required, including creation and cleanup of huge data sets and

14   then doing a series of multiple regression models either to

15   calculate damages or to otherwise identify relationships in

16   the data.

17   Q    Have you been designated as an expert before in data

18   analysis and statistical analysis matters?

19   A    I have.

20   Q    Including in federal court?

21   A    Yes, I'm -- I think last year -- I think early last year,

22   I testified in District Court in Minneapolis.

23   Q    Approximately how many times have you been designated as

24   an expert in your fields of expertise?

25   A    I've been designated well over 100 times.  Don't always

1     get to testify, but I've testified quite a few times as well.

2     Q    Are you familiar with what a top hat plan is?

3     A    I've become -- well, I am familiar with it for a number

4     of reasons.

5     Q    Well, and let's -- to be clear to the Court, you've not

6     been asked to opine on whether the plans at issue in this

7     matter are top hat plans or not, have you?

8     A    That's correct.

9     Q    But you do have some familiarity.  What's that?

10    A    I have some personal experience.  I was in a qualified

11    deferred compensation plan before, as well as in some of the

12    bankruptcy cases I've been involved in as a financial advisor,

13    there have been deferred account plans that we've had to deal

14    with.

15         I didn't personally, you know, necessarily deal with

16    issues such as these, but they're -- they were there.

17              MR. STROTHER:  Your Honor, at this time, we'd offer

18    Mr. Van Meter as an expert in data analysis under Federal Rule

19    of Evidence 702.

20              THE COURT:  Any objection?

21              MR. LEVIN:  No objection.

22              THE COURT:  He's qualified.

23              MR. STROTHER:  Thank you.

24    BY MR. STROTHER:

25    Q    Mr. Van Meter, can you tell the Court who retained you to

1    provide testimony on this matter?

2    A    I was retained by counsel for the participants in this

3    matter.

4    Q    And for what specific purpose were you retained?

5    A    I was asked -- well, initially it was to the extent

6    possible, look at available data and analyze various salary

7    compensation data as divided between either eligible or

8    ineligible employees with regard to these deferred

9    compensation plans.  I was --

10   Q    Do you recall when you were first retained?  Today is

11   March 27th, I think.

12   A    It was not that long ago.  I do remember having my first

13   conversation about the case on March 16th.  Had a -- then had

14   a call on March 18th where we were retained.

15   Q    And were you asked to review Dr. Krock's report in this

16   matter?

17   A    I was.

18   Q    That's a short timeframe, but did you have enough time to

19   do what it is you wanted to do to accomplish your engagement?

20   A    As I said in my deposition yesterday, we had enough time

21   to do what we did that's documented in the report.  We did not

22   have enough time or access to data to do additional analyses

23   that I wanted to perform.

24   Q    Well, let's get there in a moment.  Let me ask you

25   instead, what documents and data did you review?

1    A    So initially we received pleadings, some of the key

2    pleadings in the case -- the motion to terminate the trust and

3    turn over the funds.

4        There was also the complaint in the adversary proceeding.

5    And then, I believe we were provided -- I can't tell you that

6    I spent a lot of time on the pleadings associated with the

7    motion in the District Court.

8    Q    Okay.  What information would you have liked to have

9    reviewed?  Or, let me ask it a different way.  Was there --

10    did you ask for anything else that you weren't able to get?

11    A    Well, I did leave off the fact that the operative

12    documents, which was the same eligibility spreadsheets and the

13    census data that Dr. Krock relied upon in his Declaration.

14        When I -- when we started looking at the data, we

15    realized that there was census data on each employee that

16    would have been of interest because it would have helped us to

17    better analyze, for example, which state minimum wage law

18    applied because there was no state data.

19        And there may have been other information related to

20    actual job responsibilities or -- and/or lines of

21    organizational lines that each employee was related to, to

22    determine what their actual job responsibilities were.

23    Q    And you didn't have access to that information?

24    A    No.

25    Q    If you did, do you think it would have taken you years to

1    crunch that information and audit it?

2    A    Well, one, we wouldn't have audited it.  We would have

3    looked at the relationships in the data.  And much like

4    Dr. Krock did, and what we ended up doing, we would use that

5    data to create summaries of what is included in the census

6    data for purposes of stratifying and identifying other

7    relationships in the data.

8    Q    Were you able to determine whether or not the eligibility

9    data and census data were accurate?

10   A    We were not for two reasons.  One, obviously, there was

11   insufficient time to do any sort of audit, so in order to

12   determine whether there -- whether the data was accurate.

13        But also, we noted discrepancies between the individuals

14   that were listed on the eligibility data and the census data.

15   And what's important about that is that there were individuals

16   listed on these eligibility spreadsheets which were supposedly

17   prepared from the census data that did not appear in the

18   census data.

19        And the initial work that we did indicated, you know,

20   hundreds of people who were in the -- on the eligibility

21   spreadsheets but not in the census data.

22   Q    Did you summarize that finding and your other findings in

23   a report?

24   A    I did.

25             MR. STROTHER:  Could you please show the first page

1    of Exhibit 145.

2    BY MR. STROTHER:

3    Q    Mr. Van Meter, is this your report that we've been

4    discussing?

5    A    It appears to be, yes.

6    Q    And from memory, do you know where the findings regarding

7    the discrepancies between the census data and the eligibility

8    data appear in your report?

9    A    It's Table 1.

10        MR. STROTHER:  Would you show Table 1.  I believe

11   it's on --

12        THE WITNESS:  Not to be confused with Figure 1.

13        MR. STROTHER:  Yeah.  Page 12 perhaps?  Not Figure

14   1.

15   BY MR. STROTHER:

16   Q    Mr. Van Meter, I don't want to ask you a whole bunch of

17   questions about this now because it's out of place in my

18   outline, but I do want you to tell me if this is the table

19   that you were just talking about.

20   A    It is.

21   Q    Okay.  We'll come back to that in a few minutes.  Let me

22   first instead ask you, can you give me a brief introduction to

23   what your opinions are about Dr. Krock's analysis?

24   A    Just a brief overview?

25   Q    Briefly.

1    A    I would say -- well, I break it down between disclosure

2    issues as well as methodological issues or results -- result-

3    specific outcomes.

4    Q    Can you define what you mean by disclosure issues?

5    A    Yes.  The Krock Declaration was -- did not contain the

6    types of disclosures, meaning schedules or references, that

7    you would expect to see in a situation where significant

8    amounts of data scrubbing or cleansing was done.

9        In addition, it did not include some of the key inputs

10   used to calculate his summary table.  It did not include any

11   schedules or appendices to identify, say, excluded records or

12   things of that nature.

13       And it's also my understanding that when asked, he

14   doesn't know if those -- that data even exists.

15   Q    And still staying at the 40,000-foot level, can you

16   define what you mean by a methodological or result-related

17   issue?

18   A    Yes.  So as we got into the data, one example would be

19   for -- is the inconsistency between the eligibility data and

20   the census data.

21       If I had looked at that discrepancy and I saw that it

22   went the other way, that there were more people in the census

23   than the eligibility data, I would say that makes perfect

24   sense.

25       But it went the other way.  And that means there are

1    people on the eligibility sheet supposedly pulled from census

2    data that do not show up in the census data.

3    Q    Okay.

4    A    And so that raises a completeness issue.  That raises --

5    it raises questions about whether the outcomes are accurate or

6    could be materially misstated, especially considering if those

7    -- and we can get into the numbers later -- but if their

8    compensation was significantly higher or significantly lower

9    than the averages, it would have affected those outcomes.

10   Q    Well, let's take those two components one at a time and

11   dig a little deeper.  Okay?

12   A    Okay.

13   Q    Starting with the disclosure issues.  I'm not asking you

14   to enumerate them right now, but I do want to go through each

15   of them.  So tell me, what's the first disclosure issue that

16   you recall having an issue with Dr. Krock's report.

17   A    So -- I don't know if I can remember them, but the first

18   --

19   Q    Well, I mean, they don't have to be in the order that you

20   listed them.

21   A    So going through the manner, just the way he presented

22   his methodology, there are a number of items that he states

23   that he did but does not provide the -- either a number but

24   like a result, or the outcomes of the analysis that would

25   indicate the impact on the data as a whole.

1    Q    So before you give me your first example, let me ask you

2    this question.  Is that unusual for an expert report of this

3    nature?

4    A    Yes.  Especially considering the size of this data set,

5    well over 250,000 records, close to 300,000 records, you would

6    expect to have some sort of a reconciliation in an appendix

7    somewhere so that, for example, an opposing expert could

8    validate or replicate the results.

9    Q    When you say that you would as an expert expect to see

10    that, can you be more specific about how frequent or

11    infrequent someone an expert not including the information has

12    been in your experience?

13    A    It's very rare to not have that information made

14    available.

15    Q    What problems does it cause you as an expert who's been

16    retained to evaluate the opposing expert's report if you don't

17    know what their calculations are, what they excluded, or what

18    they changed?

19    A    It makes it difficult to validate their approach.  So the

20    first thing we try to do is understand what the other expert

21    did so that we can then either evaluate the assumptions made,

22    evaluate the calculations made, things of that nature, which

23    it may result in no critique whatsoever.

24         But sometimes, that's better than nothing else because at

25    least then we can move to the next step without having to

1    waste more and more time trying to figure out what they did.

2    Q    So can you give me an example of one of the disclosure

3    issues that you observed or failure to disclose issues?

4    A    Well, one -- and it was talked about quite a bit today --

5    was this -- he utilized the term average minimum wage amount.

6    It was undefined.  There was not a schedule attached to --

7    that indicated how that was calculated.

8         There was -- it didn't even indicate which states or

9    whether federal minimum wage rates were used over what period.

10   And it didn't indicate as a result of that what the number

11   was.

12        It didn't say so we excluded everything under 18,000.

13   There was a lot of testimony about 18,000, but that was not in

14   the Declaration.  So for purposes of doing our calculation, we

15   didn't know what we were shooting at.

16        We didn't have the parameters that he used, and we didn't

17   have the final solution that he used.  So it made -- it

18   created issues with trying to understand what he had done.

19   Q    Okay.  What's another one of the failure to disclose

20   issues?

21   A    There's -- the other failure to disclose was he mentioned

22   having discussions with Ms. Potter over some issues that I

23   think were critical to his outcomes.

24        However, he didn't explain what it is that he discussed

25   with her or what he agreed to do as a result of that.  The

1    only indication is that somehow the 130 percent ratio that he

2    used, he discussed it with her.

3    Q    That ratio that Dr. Krock mentioned, is this the 130

4    percent that you were just saying?

5    A    Yes.

6    Q    And to your knowledge, is that -- has that been peer

7    reviewed?

8    A    Not to my knowledge.

9    Q    Does it have any scientific basis to your knowledge?

10    A    No.

11    Q    And you sat here in the courtroom.  Did you hear

12    Dr. Krock give either of those as a basis?

13    A    No.

14    Q    Did Dr. Krock disclose how he treated executive

15    compensation when he prepared his mathematical conclusions?

16    A    He didn't.

17    Q    Does that trouble you?

18    A    It does.  In the census data, there were listings of

19    individuals who we came to find out were executives.  Their

20    compensation data was deleted.  It was either -- it was blank.

21        And there is nothing in his Declaration that indicated he

22    either assigned a value or excluded them from the

23    compensation.  So it's uncertain whether those numbers were

24    included in, say, the numerator or denominator, whether there

25    was any value assigned to it.

1     The report was completely silent with regard to how he

2     dealt with missing executive compensation numbers.

3     Q    So what could that do?  What potential problems could

4     that cause in the preparation of an eligibility ratio?

5     A    One, the number.  Changes the -- one of the key inputs.

6     And the dollar amounts also change the outcome of one of the

7     key inputs.

8     Q    Did Dr. Krock disclose what he did when he observed that

9     there were multiple records for a given employee?

10    A    No, he didn't.  He didn't.  I mean, we saw that there

11    were multiple -- there were employee IDs that had multiple

12    records.  And we say multiples because it wasn't just

13    duplicates.  Some -- I think we saw one that had seven or

14    eight entries.

15    Q    And to be clear, is that for a given year or over a

16    period of time?

17    A    For a given year.

18    Q    Okay.

19    A    So obviously, employees had multiple records in different

20    years, but this was in the -- within the same year.  And he

21    didn't -- he said that they identified them but -- and there

22    was nothing disclosed as to what they did with them and/or how

23    they chose the one to use.

24    Q    Did Dr. Krock disclose what he did with regard to

25    observing that there were terminated employees in the working

1    versions of the data sets that he had been provided?

2    A    No.  And in all fairness at the time he did his work, he

3    did not know that that those were necessarily the working

4    versions versus the final.

5    Q    Let me ask you some questions about the second group of

6    issues that you had.  Can you give me an example of the

7    methodological and result-oriented problems you observed?

8    A    I mentioned one earlier, which is the kind of the average

9    minimum wage issue.  He talked about a methodology for dealing

10   with that.

11        He doesn't provide the inputs or the outcomes, so he

12   doesn't either say how he calculated it by reference to the

13   data sets that he used, nor does he give an outcome that could

14   be used either to maybe potentially back into it.

15        It's very important because minimum wage laws across the

16   country are very diverse.  Some are very low, some are non-

17   existent, and some are, you know, rely on federal minimum

18   wage.  And those numbers do differ quite a bit across the

19   board.

20        And just one more point on that.  He -- I don't think he

21   necessarily described what he then did with the wage, that

22   average wage.

23   Q    Okay.  Did you do an independent analysis of the data

24   sets?

25   A    We did.

1    Q    Did you and your team attempt to replicate Dr. Krock's
2    results?
3    A    We did.
4    Q    Were you able to?
5    A    We were not.
6    Q    Do you know why?
7    A    Well now in hindsight, it's for some of the reasons we've
8    just discussed, which is the fact that we didn't have, for
9    example, the average minimum wage calculation that we could
10   replicate knowing which would give us the same records that he
11   excluded.
12        So therefore, we had to guess at what that level was.
13   And all the other things we just discussed, they all --
14   because we didn't have that information, we were guessing at
15   what he did.  And we got -- we may have gotten close to his
16   numbers, but we couldn't match them.
17   Q    Well, before we go to your independent analysis, do you
18   have an opinion about whether Dr. Krock's conclusions are
19   based upon reliable data or not?
20   A    I think that because of the number of issues, the fact
21   that he was using non-final data, the fact that there were
22   unexplained anomalies with regard to the data in the -- on the
23   eligible list versus the census data, it does create a lack of
24   reliability.
25   Q    Okay.  Let me ask you, what did you do?  What was your

1    approach to cleaning and analyzing the same data sets?

2    A    Very similar to what Dr. Krock has now testified that

3    they did.  We looked at the data visually, scrolled through

4    the data, we sorted it in different ways, we did totals, we

5    looked at numbers, et cetera.

6          Keep in mind, we were doing that also with an eye toward

7    trying to match up to what he had done.  We saw there were

8    differences, recognized that there, like, for example, were

9    multiples that needed to be identified and removed, and a

10   number of other processes for purposes of, for example, there

11   were a large number of zeroes for salary data that needed to

12   go away.

13         There were blanks and things of that nature.  And so we

14   did a significant amount of work to clean that data up, all of

15   which is documented in Appendix C of my report.

16              MR. STROTHER:  Brian, would you go to page 29 of the

17   PDF?

18   BY MR. STROTHER:

19   Q    Mr. Van Meter, is this Appendix C that you were just

20   talking about?

21   A    It is.

22   Q    And does this appendix list everything that -- and I

23   guess it's in the name -- does this list everything that you

24   and your team did to clean the data?

25   A    It does, broken down by the census data and the

1   eligibility data.

2   Q    Well, let's go through some of your key findings if you

3   don't mind.  Let's start with Table 1.

4        MR. STROTHER:  That was, I think, on page 12, Brian.

5   BY MR. STROTHER:

6   Q    Mr. Van Meter, could you explain to the Court, first of

7   all, what is Table 1?  And I'll have some follow-up questions.

8   A    Okay.  So Table 1 is a comparison of the unique -- this

9   is after cleaning the data, identifying the unique employee

10  IDs in the census data and comparing that to the unique

11  employee IDs in the eligibility data.

12  Q    So I don't want to beat a dead horse, but I do want to

13  make sure that we all know what we're talking about when we're

14  talking about census data and eligibility data.

15       So is there a plain human term for census data?

16  A    The census data is the comprehensive file with all of the

17  payroll information for the employees.

18  Q    So these numbers in the three columns under census data,

19  do they represent human lives, like one person, one employee?

20  A    That's correct.

21  Q    Okay.  And the eligibility data, what is that?

22  A    So my understanding, based on what was disclosed in

23  Dr. Krock's report, as well as obviously now with a lot of

24  testimony, that's -- that was a subset of the census data

25  culled by or pulled by Ms. Potter, and then further procedures

1    performed by Ms. Potter were made to identify those

2    individuals that would be eligible according to the terms of

3    the deferred compensation plan.

4    Q    Okay.  So I interrupted you.  You were telling me a

5    little bit more about what you and your team did to create

6    Table 1.  So would you please continue with that?

7    A    Yes.  So again, after cleaning the data, we also combined

8    all of the census data because they were on separate workbooks

9    or separate tabs in the workbook, and -- as well as the

10   eligibility data, after doing the cleaning process, which is

11   detailed in Appendix C.

12        We then also added identifiers and flags as far as which

13   record was in what year and whether it was an eligibility file

14   or whether it was a census file.

15        And then we just did a simple comparison and lookup sort

16   of function that said, okay, the unique employee IDs in the

17   eligibility data, do they show up in the census data and vice

18   versa.

19   Q    So let me first begin with the census data.  I see three

20   columns there.  When you say that you've compared the two sets

21   and you look at a difference, are you talking about the third

22   column that says not in elig data?

23   A    Yes.

24   Q    Okay.  So can you tell me in specific terms what does,

25   say, in 2020 when there are 35,060 people in the census data

1    and not in the eligibility data, what does that mean?

2    A    I'm sorry.  Which year?

3    Q    2020.

4    A    Okay.  So the 2020 census data year census data was used

5    to determine the 2021 eligibility.  So what we did is just a

6    comparison back and forth.  We said, okay, there are 36,000

7    unique IDs in the census data.

8         For that year, there were 1,126 eligible or IDs in the

9    eligible data, which means that there were 35,000 records in

10   the census data that did not find its way into the eligibility

11   data.  Makes sense.

12   Q    Okay.  So if everything were hunky dory, you can't see me

13   if I walk around the corner.

14            MR. STROTHER:  Brian, can I use your cursor real

15   fast?

16   BY MR. STROTHER:

17   Q    So I put the cursor on the found in eligibility data for

18   2020, and it's -- what's the number there?

19   A    1,126.

20   Q    So if everything were hunky dory, would you expect that

21   number to be right there as well?

22   A    Should be the same.

23   Q    So tell me what's going on here.  Why are there 87

24   employees that appear in the eligibility data but aren't in

25   the census data for the year 2020?

1    A    Well, I know part of the answer, but there's still a

2    remainder that remains unknown.

3    Q    Okay.  Tell me the part of the answer.

4    A    Well, after receiving the updated files on the

5    eligibility files, the final, the way it was explained to us

6    is that there were terminated employees on the original or the

7    working files that should have been excluded and were excluded

8    on the finals.

9         So when we received those, when we were given that

10   explanation, we assumed that these differences would go away,

11   and they did not.

12   Q    So I think that Ms. Potter testified and used the term

13   maybe draft -- draft spreadsheet and final spreadsheet.  Those

14   are the way I remember them.  Is that --

15   A    I don't recall specifically.  I just remember in

16   receiving the data, it was working file versus final.

17   Q    So I'll use working and final --

18   A    Okay.

19   Q    -- for my questions right now.  Does your Table 1 include

20   any of the working file information?

21   A    Only in one situation.

22   Q    What situation?

23   A    And that was for the 2020 eligibility year.

24   Q    Okay.  So I randomly picked 2020 earlier.  So --

25   A    Well, that's the census data year.

1    Q    Okay.  Oh, okay, okay.  And you said the eligibility data

2    year.

3    A    Correct.

4    Q    Understood.  So you're talking about the row that ends in

5    74 over there in the far right-hand side?

6    A    That's correct.

7    Q    The other numbers -- the 338, 87, 78 and et cetera -- are

8    those based upon final or working files?

9    A    Those are based on the final eligibility files.

10    Q    Okay.  So that's what you mean, like the final files

11    didn't fix the problem?

12    A    That's correct.

13    Q    But did you have an opportunity for the census data year

14    2019, eligibility data year 2020, to find out if there was a

15    significant material difference between the working file and

16    final file such that that abnormality in the final column goes

17    away?  And that number's 74 for us right now, right?

18    A    Correct.  And so when we received the updated or the

19    final file for the 2020 eligibility year, and we applied that,

20    that -- the 74 went down to 52.

21         So there were 22 records in the working file that were

22    eliminated in the final, but there still remains 52 records

23    that are unaccounted for.

24    Q    In your opinion, what possible reasons are there for that

25    discrepancy for all those years?

1    A    I really -- actually, I have no idea.  In the testimony

2    that I've heard, I thought maybe we'd hear why that was.  Has

3    not -- it has not cleared that up.

4    Q    Does that impact or influence your opinion about whether

5    Dr. Krock based his conclusions on reliable or unreliable

6    data?

7    A    It can -- well, yes.  It's an outstanding anomaly that

8    could have material impacts.  If those, for example, either

9    were highly, highly compensated employees or very low

10   compensated employees.  It would impact his outcomes.

11   Q    And --

12   A    And I raised this primarily for the fact that nothing was

13   said about it.  Nothing even in the hearing today.

14   Q    So you've read Dr. Krock's report and you heard his

15   testimony today?

16   A    Yes.

17   Q    Do you know whether he's even observed that there is this

18   disturbing anomaly?

19   A    From what I've heard and seen, he has not.

20   Q    Let me take you to Table 2 on page 13.  Can you please

21   tell us what Table 2 is?

22   A    So -- and the description of this is above -- but what we

23   saw is that there were quite a large number of zeroes or other

24   values that were so low that it was clear that they could not

25   be annual salaries.

1          And I think even Dr. Krock testified to that.  And so one

2     of my criticisms of Dr. Krock is he didn't tell us when he

3     excluded records below a certain amount, how many were there.

4          And so I did an analysis to determine, well, what's the

5     magnitude here?  Because we have these large data sets of like

6     35,000 records.

7          If we, you know, where should we do this analysis to

8     determine like how much bad data is there in here?  And so we

9     did a -- used as a comparative a minimum wage for a,

10    quote/unquote, full-time employee using the bare, bare

11    minimum.

12         So we used the federal minimum wage rate of 7.25,

13    multiplied that by what works out to be 130 hours a month

14    because under IRS regulations, to be a full-time employee or

15    to be considered a full-time employee, you have to work 30

16    hours a week or an average of 130 per month.

17         So using that, we calculated a bare minimum wage of

18    $11,310.  And so we made the determination that anything below

19    that clearly could not have been a full-time employee; and

20    therefore, it should not be considered in the analysis.

21         And so the purpose of this table is to show just, you

22    know, how much, how many records that was, which is a

23    significant percentage of the records contained in each year's

24    census data.

25    Q    Thank you.

1          MR. STROTHER:  Let's go to Table 3 then, which is on

2     page 14, I think, Brian.

3     BY MR. STROTHER:

4     Q    Can you tell me what Table 3 represents?

5     A    Yes.  So after doing our work and determining which

6     salaries should be included, which did include a threshold

7     salary, which I assume to be 35,000 -- that's based on some

8     information which I think was confirmed through testimony

9     recently.

10    Q    So I'm smiling a little bit because we had an issue a

11    little earlier about whether it's discoverable what

12    assumptions an expert was given by counsel.  So can you tell

13    me where the 35,000 that you used came from?

14    A    From counsel.

15    Q    Okay.

16    A    I mean, as far as a starting point.

17    Q    And can -- did you kick the tires on that 35,000

18    assumption?

19    A    Yes.  We asked for -- okay.  is there -- is there

20    deposition testimony?  Is there anything that would support a

21    number in that range?  Because it could -- I was thinking in

22    terms of looking at the data myself, you know, what would that

23    number be?

24         And looking at, say, the state minimum wages in the

25    states that the company operated in, there were much higher

SCOTT VAN METER - DIRECT BY MR. STROTHER

330

1    minimum wages than, say, the federal minimum wage.

2    Q    Okay.  I interrupted you.  So you started with a base of

3    35,000.

4    A    Yes.  And so excluding anybody making less than $35,000

5    and also excluding any compensation number for the executives

6    that had been identified -- that we identified through various

7    W-2 documents, not the census data W-2, but the W-2 data

8    documents that we received -- and to the extent there was

9    salary data for those executives in the data set, we took it

10   out, and basically calculated the average salary, excluding

11   executives above $35,000.

12   Q    Why did you exclude the executives for Table 3?

13   A    For -- I don't -- I had heard some either conflicting

14   information about whether they should be involved or included

15   or excluded.

16        And because I didn't have any information from Dr. Krock

17   as to whether he included them or excluded them, I decided I

18   would actually do it two ways.

19        I would exclude it for -- and that's what's on Table 3.

20   And then later on, we'll talk about what it looks like when

21   you include it.

22   Q    Understood.  Okay.  Let's continue with Table 3.  What

23   are your findings here in Table 3?

24   A    Well, both in discussing with counsel but also based on

25   some of my own research that I had done with regard to top hat

1      plans, I thought that a comparative of the average salary to

2      the eligibility threshold would be more informative.

3              MR. LEVIN:  Objection, Your Honor.  He's not here to

4      opine on what the proper ratio is to determine a top hat plan.

5              MR. STROTHER:  Your Honor, we don't offer him for

6      that.  I don't think he was giving his opinion on whether it

7      was proper or not.

8              THE COURT:  Yeah, I didn't understand that either.

9              You can answer the question.

10             THE WITNESS:  What I thought it would be an

11     informative analysis would be to say, okay, well, what is the

12     average salary as a -- in regard to the eligibility threshold.

13             And the part that I conferred with counsel on is

14     that it -- and because it didn't really matter to me; I just

15     did the calculation -- but that it was indicated to me that

16     there were -- there was at least some case law that says, you

17     know, a ratio such as this at 2 or below is the lowest that

18     any Court has identified -- or 2 or above, excuse me, is the

19     lowest that any Court has identified this type of ratio.

20             And so I thought that would be informative for the Court

21     to understand a different relationship of the data versus the

22     -- just an average of eligible versus average of ineligible.

23     BY MR. STROTHER:

24     Q   So that last line here in Table 3 that starts off in 2019

25     with 1.8x and goes all the way to 2025, also at 1.8x, that's

1      the result of your calculations?

2      A      That is.

3      Q      Okay.

4              MR. STROTHER:  Brian, would you scroll down to Table

5      4?

6      BY MR. STROTHER:

7      Q      Mr. Van Meter, what's Table 4?

8      A      So Table 4 is almost identical to what we just discussed,

9      except this does include compensation data for executives.

10     What we identified, what we noted, is that of the 19

11     executives that we had W-2 information for -- and let me make

12     sure it's clear -- we only had W-2s for the 2024 year for

13     compensation year.

14          In each year, the names or the employee identification

15     numbers showed up at varying levels either -- sometimes it was

16     17, 18.  We never hit the full 19.  But there was -- the names

17     were there.  There just wasn't any compensation data for most

18     of them.

19          I think there were only six or seven that actually

20     contained compensation data.  And even for those, not for

21     every year.  And so what we did is we -- I'm sorry.  You asked

22     me what we did.

23     Q      Yeah.  So I take it then that -- well, let me ask the

24     question this way.  Does the average salary for each year,

25     including executives, differ from the average salary each year

333

1     excluding executives?

2     A     It does.

3     Q     Okay.  Does it make a difference with regard to the

4     ultimate calculation of the eligibility ratio, including or

5     excluding executives?

6     A     Well, using a one decimal point rounding, it makes no

7     difference at all.

8                MR. STROTHER:  Brian, can you show Table 3 and Table

9     4 at the same time?

10    BY MR. STROTHER:

11    Q     So if the Court were to take a look at the bottom line of

12    each of those charts, would they be identical?

13    A     Yes.

14    Q     Okay.  I said chart; I meant table.  You understood what

15    I meant?

16    A     Yes.

17    Q     Okay.  Mr. Van Meter, before I pass the witness, because

18    you've been in the courtroom all day, do you -- did you

19    observe or hear anything that would significantly modify your

20    opinions as they're expressed in your report?

21    A     No.

22    Q     Okay.

23                MR. STROTHER:  I pass the witness, Your Honor.

24                THE COURT:  Okay.

25                         CROSS-EXAMINATION

1    BY MR. LEVIN:

2    Q    Good evening, Mr. Van Meter.

3    A    Good evening.

4              MR. LEVIN:  Can we pull back up his report?

5              THE COURT:  Hold on a second.

6              Counsel, can you just state your name for the Record

7    just so we've got a clean record?

8              MR. LEVIN:  Sam Levin from Groom Law Group on behalf

9    of the Debtors.

10             THE COURT:  Okay.  You should have the presenter

11   role.  If not, let me know.

12             MR. LEVIN:  And if we could go to Figure 1 on page 9

13   of Mr. Van Meter's report.

14   BY MR. LEVIN:

15   Q    Mr. Van Meter, this is a table that you took from

16   Dr. Krock's Declaration, correct?

17   A    That's correct.

18   Q    And the last line in Figure 1 is entitled "Eligible

19   Versus Total Salary Ratio," correct?

20   A    Correct.

21   Q    Is it your understanding that this represents Dr. Krock's

22   calculation of the average salary of employees eligible to

23   participate in the SHC plan divided by the average salary of

24   all employees?

25   A    Yes.

SCOTT VAN METER - CROSS BY MR. LEVIN

1    Q    And for each year between 2019 and 2024, Dr. Krock

2    calculated a ratio between 4.6x and 4.4x, correct?

3    A    Correct.

4    Q    And in the preparation of your report, you attempted to

5    replicate Dr. Krock's results in Figure 1, Correct?

6    A    That's correct.

7    Q    And you were unable to do so?

8    A    Correct.

9    Q    Okay.

10   A    And just to be clear, some of the numbers, especially

11   like the top table, were just the number of records in a

12   particular spreadsheet.  So those did match, but once it came

13   to massaging the -- or cleaning the data, they stopped

14   matching.

15   Q    So am I understanding you correctly that the top line

16   that says total employees, that's in the 30,000-plus range,

17   you were able to replicate those?

18   A    Not -- no.  Because he excluded different employees than

19   we did.

20   Q    Sorry.  Could you repeat what you were able to replicate?

21   A    I don't recall now which specifics, but the one that

22   stands out is eligible employees because that was on a

23   spreadsheet, and that was kind of a fixed number.

24   Q    Understood.  And you chose not to include in your report

25   the numbers you arrived at when you tried to replicate

1    Dr. Krock's calculations, correct?

2    A    Correct.

3    Q    Okay.  And you also did not produce your underlying work

4    papers showing the results of your attempt to replicate

5    Dr. Krock's results in Figure 1, correct?

6    A    Correct.  Because we didn't keep that analysis because we

7    were -- we switched over to doing the other analysis.

8    Q    And why did you switch over to doing the other analysis?

9    A    Because we couldn't -- the only reason why we even did

10   this was to attempt to replicate it for purposes of

11   determining whether the data sets that we're starting with

12   were the same.

13        And we realized that they're not.  So we jettisoned even

14   trying to match his work because it's not really relevant to

15   what I was going to do other than to make sure the data sets

16   matched.

17   Q    And --

18   A    And so we just switched gears and said, let's -- we're

19   going to do it ourselves.  We're going to do it our own way

20   and ignore what he did.

21   Q    And when you say it's not relevant to what you were

22   doing, is that because you were instructed by counsel to

23   calculate a different eligible -- eligibility ratio than what

24   Dr. Krock was attempting to calculate?

25   A    I wasn't instructed by counsel to do that.  I was -- in

1    consultation with counsel, we made the determination, and I

2    thought that that would be a more informative one.

3    Q    Okay.  And in your attempt to replicate Dr. Krock's

4    calculations that are displayed in your Figure 1, did any of

5    the eligible versus total salary ratios in that last line of

6    Figure 1 fall below 4 percent?

7    A    My memory is no.  I don't believe so.

8    Q    And you do not have an opinion, correct, on whether or

9    not this approach to eligible versus total salary ratio is the

10   correct way to make a calculation in the context of a top hat

11   plan as opposed to the way you calculated your eligibility

12   ratio, correct?

13   A    That's correct.

14   Q    Okay.

15        MR. LEVIN:  Could we go to page 13, please?

16   BY MR. LEVIN:

17   Q    And you describe in paragraph 34 the ratio of the overall

18   average salary to the eligibility threshold as the methodology

19   that you employed to calculate your eligibility ratio,

20   correct?

21   A    That's correct.

22   Q    And then that's the approach that's ultimately reflected

23   in Tables 3, 4, and 6 of your report?

24   A    That's correct.

25   Q    Okay.  And the difference in approach between your ratio

1    and Dr. Krock's ratio is that you are using the minimum

2    eligibility threshold as the numerator and Dr. Krock is using

3    the average eligible employee salary as the numerator,

4    correct?

5    A    That's correct.

6    Q    Okay.  And I believe you testified you made the decision

7    to use that ratio based on input from counsel and materials

8    that you looked at that you believed were published by the

9    Department of Labor; is that correct?

10   A    I believe I said -- I did say something along those lines

11   at my deposition yesterday.  So, yes.  So I had done my own

12   independent research as far as just commentary on top hat

13   plans issues that various bodies.  That particular one that I

14   spent the most time with was the, I think, a report on -- by

15   the Department of Labor on issues that were being addressed

16   with top hat plans.

17   Q    And do you recall whether or not that publication gave

18   any explicit guidance as to how to calculate this ratio?

19   A    No, it did not.  It -- but it -- all -- and all I told

20   you yesterday was I used that for purposes of understanding

21   what the issues are and the -- candidly, the public policy

22   behind why there needs to be some differentiation, meaningful

23   differentiation, for a top hat plan.

24   Q    And I believe you also just testified that you understood

25   from counsel there were cases that said you need to have, you

1    know, approximately at least a 2x ratio; is that correct?

2    A    I think the way I said it, and what I -- the way I heard

3    it from counsel was, you know, the lowest he's ever seen or

4    they've ever seen was 2 -- 2x.

5         MR. LEVIN:  Could we pull up ECF 4105?  And then if

6    we could turn to paragraph 67 on page 26.

7    BY MR. LEVIN:

8    Q    And do you see that there are a couple cases cited there

9    that talk about averages in the context of top hat plans?

10   A    Yes.

11        MR. STROTHER:  Your Honor, I object to him asking

12   about the Debtors and my case law cited by the Debtors.  He's

13   not an expert on the law.

14        THE COURT:  Counsel, what's your response?

15        MR. LEVIN:  He brought up that he was told that

16   there were cases that talked about a 2x ratio.  And so we had

17   cited cases that talked about a 2x ratio.  And so I just

18   wanted to ask him a couple of questions about that.

19        THE COURT:  I don't think it's necessary.  I think

20   you can make those arguments to me.

21        MR. LEVIN:  Okay.

22   BY MR. LEVIN:

23   Q    Mr. Van Meter, you talked about some issues related to

24   the amount of time you had to do your work during your direct

25   examination, correct?

1    A    Can you clarify your question?

2    Q    You testified during your direct that you believe you had

3    some limitations on the work you could do because of the

4    amount of time that you had available, correct?

5    A    One, obviously, time did play a role, but I also said it

6    was in the lack of certain data that I would have liked to

7    have seen.

8    Q    Okay.  And the first contact you had from anyone

9    regarding this matter was an email you received from counsel

10    for the participants, Mr. Diamond, on March 14th, 2025,

11    correct?

12    A    Yes.  Late that evening.

13    Q    Okay.  Are you aware of any reason that Mr. Diamond could

14    not have brought this matter to your attention earlier than

15    March 14th, 2025?

16    A    I do not.

17    Q    And you have been professional friends with Mr. Diamond

18    for more than 25 years, correct?

19    A    Correct.

20    Q    And either he or his firm have retained you as an expert

21    in at least five prior cases, correct?

22    A    I did struggle with all the numbers, but yes, roughly,

23    maybe.  And we are currently working with Diamond McCarthy on

24    a completely different matter.

25    Q    And both you and Dr. Krock performed what you refer to as

1    a data cleanup, correct?

2    A    That's correct.

3    Q    And in your experience, is it common for experts to

4    perform data cleanup?

5    A    Absolutely.

6    Q    And is it fair to say that at a high level, you don't

7    take issue with Dr. Krock's general approach to cleaning up

8    the data?

9    A    At a high level?

10    Q    Correct.  If we could go to paragraph 31 of your report.

11    And you state in paragraph 31 that because of the

12    inconsistencies in the data, the data is incomplete and

13    potentially unreliable, correct?

14    A    Yes.

15    Q    And the issues that you're referring to in paragraph 31

16    are those that you describe in more detail in paragraphs 31,

17    32, and 33, relating to the overlap between participants in

18    the eligibility files and low salaries that were 0, blank, or

19    below the minimum wage threshold, correct?

20    A    Just to have a clear record, I think you said 31, 32, 33,

21    but 32, 33, yes.

22    Q    And you have no reason to believe that any of the salary

23    or compensation data that were in spreadsheets that you

24    reviewed that was above $11,310 was not an accurate reflection

25    of those employees' actual compensation, correct?

1      A    Could you ask the question again?

2      Q    Sure.  You have no reason to believe that any of the

3      salary or compensation data that were in the spreadsheets you

4      reviewed that was above $11,310 was not an accurate reflection

5      of those employees' actual compensation, correct?

6      A    Well, since we're talking about salary data, I don't know

7      that that's an accurate statement.

8      Q    Do you recall, Mr. Van Meter, that I deposed you

9      approximately 24 hours ago?

10     A    Yes.

11     Q    Okay.

12          MR. LEVIN:  If we could go to Exhibit 128.

13          THE COURT:  You've been having a lot of fun, Mr. Van

14     Meter.  I can --

15          THE WITNESS:  You've got to love the work.

16          MR. LEVIN:  And then if we could turn to page 104.

17     BY MR. LEVIN:

18     Q    And starting at 104, line 14, do you see that I asked

19     you, "Do you have any reason to believe that any of the salary

20     or compensation data that were in the spreadsheets you

21     reviewed that was above the 11,310 threshold was not an

22     accurate reflection of the real underlying data?"

23          And then your answer was, "As far as -- as far as whether

24     that was their actual compensation?"  I said, "Correct."  And

25     you said, "No, I don't have any issue with that.  The issue is

1   how they were categorized."

2        And then it goes on to you were referring there to full

3   time versus part time, correct?

4   A    Yes, but I think what I was trying to communicate there

5   was the data came from the data set, which is the Kronos

6   system, I came to find out today, that is an accurate -- what

7   was on that spreadsheet is an accurate reflection of the data

8   that was in the Kronos system.  That's what I was trying to

9   communicate to you there.

10  Q    Do you -- so -- and if we look at page 105, line 3, the

11  questioning continues.  "So in other words, you don't take

12  issue with the compensation numbers and the data.  You were

13  just not able to verify whether those represented full-time

14  salaries, part-time salaries, or an hourly wage; is that

15  correct?"

16  A    Yes.

17  Q    And you --

18  A    And that was the primary issue, but that's why I

19  defaulted to a $35,000 threshold, --

20  Q    Okay.

21  A    -- which is the rest of my testimony.

22  Q    And do you stand by that testimony at lines 105, 3 to

23  105, 9?

24  A    Yes, I'm -- yes.

25  Q    And what's the relationship between that and what you

1    just said about why you decided to go with a $35,000

2    threshold?

3    A    Just because the way that data looked, for example, the

4    11-5 might have been, as Dr. Krock identified, significantly

5    lower than their overall compensation.

6         So the more we looked at the data, especially at the

7    lower ends, it became, you know, more questionable as whether

8    that -- the number under the salary column actually

9    represented a salary or did it represent per diem or a part-

10   time rate or piecemeal sort of pay.

11        So that's, I mean, that's all I'm trying to say.  I'm

12   just saying it just raised some questions that probably could

13   have used some additional analysis.

14   Q    And both you and Dr. Krock applied conceptually minimum

15   exclusions for data below the minimum wage threshold.  You

16   just used different minimum wage thresholds, correct?

17   A    Correct.

18   Q    Okay.  And in paragraph --

19        MR. LEVIN:  Sorry, if we could go back to his

20   report.  And if we could go to paragraph 33, please.  Could we

21   scroll down so we can see all of paragraph 33.

22   BY MR. LEVIN:

23   Q    And in paragraph 33, you state that based on your

24   approach, the absolute minimum salary that a full-time

25   employee could earn consistent with the federal minimum wage

1    is $11,310, correct?

2    A    Correct.

3    Q    Okay.

4         MR. LEVIN:  Can we go to paragraph 35.

5    BY MR. LEVIN:

6    Q    So notwithstanding that you determined that that minimum

7    was 11,310, you instead decided to exclude in your

8    calculations anyone with a salary of less than $35,000 as an

9    approximate cutoff for the minimum compensation level for

10   full- time employees, correct?

11   A    That's correct.

12   Q    Okay.  And how did this $35,000 number that you

13   ultimately used for your cutoff, how did that number first

14   come to your attention?

15   A    In a discussion with counsel.

16   Q    Okay.  And did counsel tell you that they believed they

17   had seen some testimony or something that indicated that the

18   lowest full-time employee salary at Steward specifically was

19   somewhere between $35- and $40,000?

20   A    Correct.

21   Q    Okay.  And then they told you they couldn't find whatever

22   document or deposition testimony they thought they'd seen,

23   correct?

24   A    Correct.  And they asked me then just to make that

25   assumption.  I was trying to make a -- do a calculation and

1    find the supporting data for it, and instead they asked me to

2    just make that assumption.

3    Q    Now, you had some criticisms of Dr. Krock for

4    inadequately disclosing the basis of his minimum wage

5    calculation, correct?

6    A    Correct.

7    Q    And I believe you testified during your direct

8    examination that after you learned there was no support that

9    counsel for the participants could find for this $35,000

10   number that they gave you, you kicked the tires, and that's

11   part of how you decided to come to rely on the $35,000,

12   correct?

13   A    Kicked the tires?

14   Q    I thought that was your phrase during your testimony.

15   A    I don't recall using that phrase.

16   Q    Did you do anything along those lines other than taking

17   counsel's instruction or suggestion that it should be $35,000

18   because of some document that they couldn't find?

19   A    I do recall that we looked at -- like if it was 30 or if

20   it was 40, if it actually made any difference to the

21   calculation.  It did not.

22   Q    Okay.  So we just spent a bunch of time criticizing

23   Dr. Krock for a disclosure issue that is similar to what you

24   did and it doesn't matter; is that your testimony?

25   A    No, it's not similar at all.

1    Q     What is not similar?

2    A     I just very clearly stated I made an assumption to use

3    35,000.

4    Q     But did you -- I thought you testified on your direct

5    examination that you then also looked at some state law

6    minimum wage information after you learned that there was no

7    document that was Steward-specific to support $35,000; is that

8    correct?

9    A     Well, I also subsequently came to find out that

10   Ms. Potter testified that the -- that for purposes of

11   determining full-time employees, that look to -- that they

12   would look to the Massachusetts minimum wage, which is 17.50.

13        And if you use the same calculation with 2,080 hours, the

14   number comes out to be 36,400.

15             MR. LEVIN:  Could we go to page 12, please?

16             I'd also like to move to strike that answer as

17   nonresponsive to my question.

18             THE COURT:  Sustained.

19             MR. LEVIN:  Can we scroll down so that Table 1 is

20   visible?

21   BY MR. LEVIN:

22   Q     So, Mr. Van Meter, I just want to make sure I understand

23   what this data represents in your table.  So there's a column

24   that says census data.  And then it's got years 2018 through

25   2024, correct?

1    A    Correct.

2    Q    Okay.  And so this 32,639 number, that's the total number

3    of employees at Steward in 2018, correct?

4    A    More technically, that's the number of unique employee

5    IDs in the data set.

6    Q    And the total number of unique employee IDs that were

7    identified as eligible in the same year was only 1,146,

8    correct?

9    A    Correct.

10   Q    And there's a similar disparity if we look at other

11   years.  For example, in 2022, the total unique employee IDs

12   was 3,789 participants -- or sorry, employees at Steward

13   overall.

14   A    33,000, you mean.

15   Q    33,789.  I apologize if I got that wrong.  And then the

16   total number of unique employee IDs of those who are eligible

17   was just over 1,200, correct?

18   A    Correct.

19              MR. LEVIN:  No further questions.  Thank you.

20              THE COURT:  Okay.

21              Any further Direct?

22              MR. STROTHER:  Very brief Redirect, Your Honor.

23              THE COURT:  Absolutely.  Take your time.

24              MR. STROTHER:  Your Honor, would you let Mr. Hogue

25   take over --

1          THE COURT:  Oh, absolutely.  Let's see if I did this

2     right.

3          Yesenia, did I do it right, giving them the access?

4     I usually get left and right wrong on this thing.  Yeah.

5                    REDIRECT EXAMINATION

6     BY MR. STROTHER:

7     Q    Mr. Van Meter, I want you to look again at paragraph 35

8     on page 13 of your report.

9          MR. STROTHER:  Yeah.  No, to paragraph 35 on

10    page 13.

11    BY MR. STROTHER:

12    Q    You just received a series of questions about your using

13    an assumed cutoff of $35,000, which is here in paragraph 35,

14    right?

15    A    That's correct.

16    Q    And I believe you received some questions about how you

17    and Dr. Krock used different thresholds, correct?

18    A    Correct.

19    Q    Do you recall that line of questions?

20    A    I do.

21    Q    So would you clarify what is your -- what was your --

22    what is your complaint about what Dr. Krock did as far as

23    choosing a cutoff?

24    A    He didn't disclose the parameters by which he calculated

25    it, nor did he disclose what the number was, based on his

1    calculation.

2    Q    Did you hear Ms. Potter testify today that they use

3    36,400?

4              MR. LEVIN:  Objection.  This is outside the scope of

5    his report.  And I believe the other side made a similar

6    objection to questions that we tried to ask our expert.

7              THE COURT:  I've got to call it fair.  He's right.

8              MR. STROTHER:  Okay.

9    BY MR. STROTHER:

10   Q    Mr. Van Meter, --

11             MR. STROTHER:  -- would you please show me Table 3,

12   Brian.

13   BY MR. STROTHER:

14   Q    If you were to use, let's say, 36,400 as a cutoff here,

15   would your top row showing the average salaries go up or go

16   down?

17   A    It would go up.

18   Q    Maybe not by much, but it would go up, right?

19   A    Correct.

20   Q    What would happen to the eligibility ratios, the row that

21   says 1.8 and 1.7?

22   A    It would go down slightly.

23   Q    Go down slightly.  Okay.

24             MR. STROTHER:  I pass the witness.

25             THE COURT:  Any further questions?

1          MR. LEVIN:  No.  No, Your Honor.

2          THE COURT:  All right.

3          Thank you very much for your time.

4     (Witness steps down.)

5          THE COURT:  Okay.  Why don't we break for the night?

6     Come back at 9:00 a.m.

7          You're more than welcome to leave your stuff exactly

8     where it is.  No one's going to be in the courtroom.  We're

9     just going to close it.  Just -- I'd just ask that you take

10    the trash.  Just place it outside.

11         MR. STROTHER:  Your Honor?

12         THE COURT:  Yes.

13         MR. STROTHER:  May Mr. Van Meter be officially

14    released?

15         THE COURT:  Absolutely.  Thank you very much.  All

16    right, folks.  Thank you very much.  Have a good evening.

17    You're excused.  I'm just going to sit here and clean up as

18    well.

19         MR. STROTHER:  What time are we supposed to be here

20    tomorrow?

21         THE COURT:  We'll start at 9:00 a.m.  Thank you.

22    (Proceedings concluded at 6:30 p.m.)

23

24

25                          * * * * *

1          I certify that the foregoing is a correct transcript

2     to the best of my ability produced from the electronic sound

3     recording of the proceedings in the above-entitled matter.

4        /S./  MARY D. HENRY

5     CERTIFIED BY THE AMERICAN ASSOCIATION OF

6     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

7     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

8     JTT TRANSCRIPT #69736

9     DATE FILED:  MARCH 30, 2025

# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-90213-11 |
| | § | HOUSTON, TEXAS |
| STEWARD HEALTH CARE SYSTEM, | § | THURSDAY, |
| LLC, | § | MARCH 27, 2025 |
| DEBTORS. | § | 9:06 A.M. TO 10:21 A.M. |

## **MOTION HEARING DAY TWO**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:           YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**<u>APPEARANCES</u>:**


FOR DEBTORS, STEWARD HEALTH            WEIL GOTSHAL & MANAGES, LLP
CARE SYSTEM, LLC, ET AL.:              Robert Berezin, Esq.
                                       Taylor R. Dougherty, Esq.
                                       767 Fifth Avenue
                                       New York, NY 10153
                                       212-310-8021

                                       GROOM LAW FIRM
                                       Samuel Levin, Esq.
                                       Shai Bronshtein, Esq.
                                       1701 Pennsylvania Avenue, NW
                                       Washington, DC 20006
                                       202-857-0620


FOR MANISHA PUROHIT AND                DIAMOND McCARTHY, LLP
VARIOUS PLAN PARTICIPANTS:             Allan Brent Diamond, Esq.
                                       Brian Hogue, Esq.
                                       Justin Strother, Esq.
                                       909 Fanin Street
                                       37th Floor
                                       Houston, TX 77010
                                       713-333-5100

                                       BERNSTEIN SHUR
                                       Robert J. Keach, Esq.
                                       Lindsay Z. Milne, Esq.
                                       Paul McDonald, Esq.
                                       100 Middle Street
                                       West Tower
                                       Portland, ME 04100
                                       207-774-1200



(Please also see Electronic Appearances.)

1        <u>**HOUSTON, TEXAS; THURSDAY, MARCH 27, 2025; 9:06 A.M.**</u>

2        THE COURT:  Good morning, everyone.  This is Judge

3  Lopez.  I'm going to call the continuation of the hearing in

4  Steward Health Care.

5        Good morning, everyone.

6        MR. BEREZIN:  Good morning, Your Honor.

7        We just had a quick housekeeping matter, which we

8  may have the same one.  It's just to make sure that the

9  depositions of the plaintiffs are moved into evidence.  It may

10  be unnecessary because they were on our -- the debtors'

11  exhibit list, which has already been moved into evidence.  So

12  it's really just housekeeping, if the Court -- if it pleases

13  the Court, to just make it clear.

14        THE COURT:  Well, yeah.  My understanding is that

15  they're coming on, right?  They're coming in.

16        MR. HOGUE:  Correct.

17        MR. BEREZIN:  Yes.

18        MR. HOGUE:  I had the other half of this

19  housekeeping matter yesterday, when we were remitting the

20  exhibits.

21        THE COURT:  Oh, yes, yes.  Okay.

22        MR. HOGUE:  And Your Honor, I believe, had a

23  preference for us to highlight which direct was coming in

24  through Declaration at the appropriate time --

25        THE COURT:  I did.

4

1          MR. HOGUE:  -- and allow my friend over here then to

2    admit the depositions as the cross.  So I was just going to

3    stand up here and admit the Declarations.  If you want the ECF

4    numbers, it would be:

5          4315-19, Exhibit 7, the Declaration of Dr. James

6    Thomas;

7          ECF 4315-21, Trial Exhibit 9, the Declaration of

8    Dr. Diane Paggioli;

9          ECF 4315-22, Trial Exhibit 10, the Declaration of

10    Dr. Peter Lydon;

11          And then 4315-23, Trial Exhibit 11, Declaration of

12    Dr. Ana Beesen.

13          Those were the four --

14          THE COURT:  Okay.

15          MR. HOGUE:  -- that we will be submitting through

16    Declaration.

17          THE COURT:  Thank you.  They're admitted.

18       (Objectors' Exhibit 7, ECF 4315-19 received in evidence)

19       (Objectors' Exhibit 9, ECF 4315-21 received in evidence)

20       (Objectors' Exhibit 10, ECF 4315-22 received in evidence)

21       (Objectors' Exhibit 11, ECF 4315-23 received in evidence)

22          MR. BEREZIN:  Okay.  And then these are the four

23    deposition transcripts that come in for cross-examination of

24    those witnesses by agreement among the parties:

25          Peter Lydon's deposition transcript is Exhibit 123

5

1    at ECF Number 4332-29;

2              The deposition transcript of James Thomas, Exhibit

3    125, ECF Number 4332-31;

4              The deposition transcript of Ana Beesen, Exhibit

5    126, ECF Number 4332-32;

6              And Diana [sic] Paggioli, Exhibit 127, ECF Number

7    4332-33.

8              THE COURT:  Okay.  They are admitted.

9         (Debtors' Exhibit 123, ECF 4332-29 received in evidence)

10        (Debtors' Exhibit 125, ECF 4332-31 received in evidence)

11        (Debtors' Exhibit 126, ECF 4332-32 received in evidence)

12        (Debtors' Exhibit 127, ECF 4332-33 received in evidence)

13             THE COURT:  Thank you.

14             MR. BEREZIN:  Thank you, Your Honor.

15             MR. HOGUE:  Thank you, Your Honor.

16        (Pause in proceedings)

17             MR. BEREZIN:  Your Honor, debtors call John

18   Castellano to the stand.  We will be proffering his direct

19   testimony through his Declaration.

20             THE COURT:  Is the Declaration already in?

21             MR. BEREZIN:  The Declaration is already in

22   evidence, but for the record, it is Exhibit 43, ECF Number

23   4300-4.

24             THE COURT:  Okay.

25             MR. HOGUE:  Obviously, we have no objection to the

1      Declaration coming in, Your Honor.

2              THE COURT:  Okay.  Can we just go right to cross

3      then?  I don't -- we don't --

4              MR. KEACH:  Your Honor, I'm going to save the Court

5      even more time.  We have no questions for Mr. Castellano.

6      After deliberating last night and reviewing the entire record

7      and deliberating again this morning, we've decided that we

8      have no further questions for Mr. Castellano, happy to have

9      the record rest on his Declaration.

10              THE COURT:  Okay.  Okay.  Well, just so we're clear,

11      the Castellano Declaration is in, no cross on the Castellano

12      Declaration.

13              Can I consider the evidentiary record closed at this

14      point?

15              MR. BEREZIN:  Your Honor, we may have a few

16      questions for Mr. Castellano, if we might, just going to the

17      issue of the urgency.  Your Honor did have that issue before

18      you last -- I think it was last week.  We would appreciate the

19      opportunity t ask him a few questions about that.

20              MR. KEACH:  Your Honor, I think that's highly

21      irregular.  We had a Declaration of what Mr. Castellano was

22      going to say, what his direct testimony is; we have no cross.

23      There's no basis for further questioning.

24              THE COURT:  No, I agree.  Let's go to closings.

25              Well, let me ask.  Do you all need a minute to do --

1    to confer on housekeeping, in terms of exhibits that need to

2    come in or not, or can I consider the evidentiary record

3    closed, with all 280 some exhibits.

4         (Laughter)

5         THE COURT:  Do we need some more?

6         (Laughter)

7         THE COURT:  No.

8         MR. KEACH:  No.  Your Honor, I think three's been a

9    pretty review of that from our side.  We're comfortable that

10   everything that was supposed to be in is in.  And if the other

11   side is okay, I think we can consider the record closed.

12        THE COURT:  Okay.  I'll let everyone confirm.

13        (Pause in proceedings)

14        (Participants confer)

15        MR. BEREZIN:  Yes.  I think we're ready to start.

16        THE COURT:  All right.

17        MR. LEVIN:  Thank you.

18        THE COURT:  Oh, I can consider the evidentiary

19   record closed.

20        MR. BEREZIN:  Yes, Your Honor.

21        THE COURT:  Okay.  The evidentiary record is closed.

22        MR. KEACH:  From the participants' standpoint it's

23   closed.

24        THE COURT:  Okay.  Thank you.

25        MR. BEREZIN:  Your Honor, for the record, Robert

1    Berezin, Weil, Gotshal & Manges, on behalf of the debtor.

2    Your Honor -- the debtors.

3         Your Honor, before my colleague delves into the

4    legal issues, if I may say a few words.  This was not a motion

5    brought lightly, but the facts and law weigh heavily in the

6    debtors' favor and the relief is essential for all creditors.

7         The plans were operated as a top hat plan,

8    consistent with the unambiguous operative documents.  Because

9    these are unfunded plans, that alone is enough to grant the

10   relief because the remedy for any violation is not

11   reformation, constructive trust, or anything else, other than

12   an unsecured claim.

13        My colleague will address the issues raised by the

14   objectors and will show that the objectors have raised

15   immaterial factual issues, coupled with arguments unsupported

16   by law.

17        I yield the podium to Samuel Levin.

18        MR. LEVIN:  Good morning, Your Honor.  Sam Levin

19   from Groom Law Group on behalf of the debtors.

20        The relevant statute here, 29 U.S.C., Section

21   1101(a)(1), sets forth two requirements for a top hat plan:

22   It must be unfunded and it must be maintained by an employer,

23   primarily for the purposes of providing deferred compensation

24   for a select group of management or highly compensated

25   employees.

1          I'd like to start with the test for selectivity, as

2     set forth in the Southern District of Texas' Tolbert decision,

3     along with many other cases, that emphasize four factors

4     courts generally look to in determining selectivity:

5          The percentage of the total workforce eligible to

6     participate in the plan;

7          The nature of the employment duties;

8          The compensation disparity between top hat plan

9     members and nonmembers;

10          And the actual language of the plan documents.

11          We don't believe there is any serious dispute on

12     factors one, the percentage of the total workforce eligible to

13     participate in the plan, or factor four, the actual language

14     of the plan agreement.

15          The percentage of the workforce that was eligible to

16     participate here was below five percent, which is well below

17     the thresholds discussed in the case law that we cite in

18     Paragraph 69 of our reply, which is ECF 4105.  Those cases

19     summarize other cases that show that you can have up to 15

20     percent of your employees eligible, and that still can qualify

21     as a select group.

22          Objectors sought to challenge Dr. Krock's ability to

23     testify on the grounds that there were revised eligibility

24     files that were produced after he completed his Declaration.

25     But as Dr. Krock testified, the difference in the final

1    eligibility files were that there were even fewer eligible

2    employees in the final version.  That would only make the

3    percentages of eligibles even lower and make the debtors' case

4    even stronger.

5        With respect to the fourth factor, while plan

6    language is not dispositive, all of the plan and trust

7    documents make clear that the plans were intended to be

8    unfunded and select plans, so that weighs in the debtors'

9    favor.

10        That leaves factors two, nature of employment

11    duties; and, three, compensation disparity between plan

12    members and nonmembers.

13        The debtors don't need to win on both.  The

14    statutory test is disjunctive; it has to be, either a select

15    group of management, or highly compensated employees.  So, if

16    either of the other two factors weigh in our favor with the

17    other two factors I've already discussed, the debtors should

18    win.

19        Let's talked about the compensation disparity as

20    expressed in a ratio.  Everyone agrees there should be a ratio

21    and everyone agrees that the denominator should be the average

22    salary of all employees.  The only question is what to do

23    about the numerator.

24        As we argue, the numerator should be the average

25    salary of all eligible employees; or, similarly, the average

1    salary of all participants.  Objectors argue that the

2    numerator should be the minimum salary to meet the eligibility

3    threshold.  Objectors have not cited a single case in support

4    of their position that the minimum eligibility threshold

5    should be used.  On the other hand, there are lots of cases

6    that support our approach.

7            For example, in Paragraph 67 of our reply, Docket

8    4105, we cited to two Court of Appeals cases, Alexander from

9    the First Circuit and Demery from the Second Circuit, that

10    compared the average salary of participants to the average

11    salary of all employees, a ratio of around 2.0 is sufficient

12    under Demery and other cases.

13            Some courts, including the Alpha Natural Resources

14    court, use average eligible salaries, like Dr. Krock showed in

15    his analysis, rather than average participant salaries.  We

16    chose eligibility because it is generally more conservative

17    than average participants' salaries because those who choose

18    to participate tend to be among the higher end of the already

19    high-earning eligible employees.  So, under either approach,

20    we easily satisfy the standard with ratios over 4.0.

21            Notably, while Mr. Van Meter quibbled with

22    Dr. Krock's methodology, he chose not to present his own

23    alternative calculation of the ratio that Dr. Krock

24    calculated, and the reason is that, no matter how you slice up

25    the data, you can't get a ratio under 2.0 or anywhere close to

1       2.0 under the methodology that we believe is appropriate for

2       calculating the ratio.

3              I'd like to show one demonstrative, if we could pull

4       this up.

5              (Participants confer)

6              MR. LEVIN:  So, Your Honor, these are just two

7       tables taken from each expert's report.  We have Krock Table 1

8       and Van Meter Table 4.  These tables have each expert's

9       respective ratios.

10             Now, while Mr. Van Meter did not want to show this

11      Court what would happen if he used his numbers to calculate

12      the ratio that Dr. Krock calculated, it's self-evident, it's

13      just simple math.

14             Almost all of the testimony this Court heard from

15      the experts was about how to calculate the average salary of

16      all employees, which had the alleged inconsistencies and

17      issues with low salary numbers and zeros and blanks and people

18      below the minimum wage.  But there was no testimony about that

19      being an issue in the eligible average salary.

20             So, if we use Mr. Van Meter's own numbers for the

21      average salary, as reflected in his Table 4, and we substitute

22      them in place of Dr. Krock's numbers, we can see that the

23      ratios are still more than sufficient.  So to take 2024 as an

24      example, Mr. Van Meter found that the average salary should --

25      for all employees should be 90,353, instead of mister -- or

1    Dr. Krock's seventy-one thousand eleven ten.  And so, if we

2    take the three hundred and seventy-one -- oh, sorry.  In 2024,

3    Dr. Krock found that the total average was 85,257.  I

4    apologize about that.

5                THE COURT:  All right.  Can we --

6                MR. LEVIN:  So --

7                THE COURT:  Can we just start again --

8                MR. LEVIN:  Sure.

9                THE COURT:  -- with the analysis?  Just walk me

10    through the numbers again, just to make sure I'm following

11    you.

12                MR. LEVIN:  Okay.  So the -- what we're trying to

13    do, conceptually, is, while Mr. Van Meter did not recreate all

14    of the calculations in Dr. Krock's table, he did make a

15    determination as the average salary.

16                So, if you look at the top line of Van Meter

17    Table 4, that has an average salary for each of the years.

18    Dr. Krock, using -- as you heard a lot about yesterday, came

19    up with a total average salary, which was the first line of

20    his chart, using a different methodology.  And so, Your Honor,

21    the point I just want to make is let's substitute in Mr. Van

22    Meter's numbers in Line 1 for Dr. Krock's numbers in Line 1.

23    And if we were to then rerun the ratios, what would we get?

24                And just to give you an example, in 2024, if we

25    substitute in 90,353 for 85,257, and then we divide the

1    eligible average salary of 371,971, by Mr. Van Meter's number

2    of 90,553 [sic], that comes up to 4.1X.  So it's still a very

3    comfortable ratio for us.

4           And if, instead, it should be the ratio of the

5    participants -- the participating employee's average salary,

6    as opposed to eligible, you can rerun that ratio, too.  That

7    would be the 345,857 number divided, again, by Mr. Van Meter's

8    90,353.  That comes out to 3.82, still very comfortable.

9           But Your Honor, even if we take the exact ratios

10   that Mr. Van Meter calculated using his unsupported approach,

11   objectors still don't win.  So this is the number at the

12   bottom of his chart.  The quantitative threshold in the case

13   law is around 2.0.  It's not an exact cut-and-dry threshold

14   and it's not, by itself, dispositive.  But even under Mr. Van

15   Meter's calculations, you can see, in most of the years that

16   he calculated his ratio for, the plan was at 2.0 or above.

17          And keep in mind that this is not a ratio that any

18   court has ever applied in this manner.  And the only reason

19   his ratios are as low as they are is because he excluded all

20   employees with under $35,000 because, as you heard yesterday,

21   he was under the impression that counsel for objectors had a

22   document that suggested that was proper that nobody has ever

23   seen.  So, even with that arbitrary approach, the numbers

24   still are not low enough to show that this is not a top hat

25   plan.

1           Nor, Your Honor, would there be any basis to just

2      throw out and ignore all of this data because of some alleged

3      consistencies.  Mr. Van Meter conceded that experts do the

4      types of data cleanup that were done here basically all of the

5      time.  It's very common.  And there were no material data

6      cleanup issues with respect to the IASIS plan -- or with

7      respect to the IASIS data, and there does not appear to be any

8      dispute that the IASIS plan meets the selectivity requirement.

9           And finally, on selectivity, Your Honor, we don't

10     need to win the nature of the employment duties factor because

11     this is a disjunctive test, and we win on highly compensated

12     alone.  But we should also win, if necessary, on the nature of

13     the employment duties factor.

14          During the opening yesterday, counsel for the

15     objectors said that, if the participants here were considered

16     management, than so, too, would bank vice presidents; and,

17     therefore, the test would have no meaning.

18          I'd like to read a brief quote from the Second

19     Circuit's decision in Demery v. Extebank, which is one of the

20     leading top hat plan cases.  And that quote is:

21          "While Plan ... participants did include assistant

22     vice presidents and branch managers, and therefore swept more

23     broadly than a narrow range of top executives, it was

24     nonetheless limited to highly valued managerial employees."

25          That's 216 F.3d 283, at 289.

16

1          Counsel for objectors also said that the

2    participants needed to be supervisors.  The Alpha Natural

3    Resources case that I believed I mentioned once earlier held

4    supervisory responsibilities are not required and explained

5    that cases where the employment duties were deemed

6    insufficient included individuals who have no managerial

7    capacity, such as a clerk or a secretary.

8          Of course, many of the participants here, including

9    the objectors, did have supervisory responsibilities.  For

10   example, Dr. Lydon testified that he, quote, "organized the

11   schedule for and supervised" a team of people.  That's at ECF

12   4300-9, Exhibit 48 at 21, Lines 7 to 10.

13         This was a group of highly trained, highly

14   experienced professionals, and it was a small percentage of

15   them.  That satisfies the test.  Whether they were highly

16   trained or -- and highly experienced in finance is not the

17   test.

18         There was also a lot of discussion during objectors'

19   opening statements yesterday about bargaining power.  Even

20   though the statute clearly only sets forth two requirements,

21   unfunded and selectivity, they want you to add in what they

22   describe as a third, independent, irreducible element that

23   does not appear anywhere in the statutory text.  As the First

24   Circuit held in its 2008 decision in *Alexander v. Brigham*, if

25   Congress wanted to add that requirement, Congress would have

1    put it in the text of the statute.

2         We are not aware of a single case, Your Honor, not

3    one, in which a court has held that, where a plan met the

4    selectivity requirement, it was nevertheless disqualified as a

5    top hat plan because of bargaining power.  That didn't happen

6    in the lead case objectors rely on, *Carrabba*.  The bottom line

7    holding from *Carrabba* was, quote:

8         "The furthest the court can go is ... express the

9    conclusion that it cannot find from the evidence that the

10   participants of the MSP were 'a select group' out of the

11   broader group of management employees or the broader group of

12   highly compensated employees."

13        That's from *Carrabba*, 38 F. Supp. 2d at 478.

14        And the Court then went on to discuss bargaining

15   power as a part of that selectivity analysis.

16        And the Tolbert case that I mentioned earlier, from

17   the Southern District of Texas, expressly addressed this issue

18   and interpreted *Carrabba* as making clear that bargaining power

19   is, at most, an element of selectivity, not a separate

20   requirement.

21        You also heard about -- Your Honor also heard about

22   a Department of Labor opinion letter, that's DOL Opinion

23   Letter 90-14A, which is cited in *Carrabba*.  The DOL opinion

24   letter also doesn't say bargaining power is an independent

25   requirement and it's not a formal regulation; and, even if it

1    were, it wouldn't be entitled to any deference post Loper.

2         There are a couple of cases, primarily from the

3    Eastern District of Virginia, which do say, in dicta, that

4    bargaining power is an independent third requirement.  But the

5    actual facts of those cases, the courts found that the plans

6    independently failed selectivity, and so they never had to

7    actually hold that a top hot plan was disqualified, even

8    though it met the selectivity requirements.

9         Counsel for objectors also said that the relevant

10   bargaining power inquiry was whether there was power to

11   negotiate the terms of the plan.  I'd like to quote what the

12   most recent Eastern District of Virginia case that says

13   bargaining power may be an independent requirement says about

14   what the relevant bargaining power is.  Quote:

15        "The key to this non-statutory factor is the

16   employee's overall ability to negotiate his or her

17   compensation [and] it is irrelevant whether in fact the

18   employee negotiated the agreement at issue."

19        That's *In Re Alpha Natural Resources*, 554 B.R. 787,

20   at 797.  So the inquiry is their ability to negotiate their

21   compensation, generally, not specifically, their ability to

22   negotiate the terms of a top hat plan.

23        But even if a relevant inquiry was whether

24   participants had the ability to negotiate the terms of the top

25   hat plans, we asked the objectors at their depositions what

1    they would have changed if they had the ability to negotiate

2    their participants [sic] in the plans.  Here's what they said:

3          Dr. Lydon, quote, "I don't know."  That's at ECF

4    4332-29, Exhibit 123, at Page 54, Lines 19 to 23.

5          Dr. Beesen, quote:

6          "I would have never joined the plan.  I wouldn't

7    change it, I just never would have joined it."

8          That's ECF 4332-32, Exhibit 126, at Page 74, Lines 2

9    to 11.

10         Dr. Paggioli, quote, "I would have reviewed it with

11   my financial advisor."  That's ECF 4332-33, Exhibit 127, at

12   Page 84, Lines 8 to 16.

13         The Court in In Re Colonial Bank Corp. Group [sic],

14   436 B.R. 695, 708, in rejecting a similar bargaining power

15   argument, held, quote:

16         "In the instant case, the respondents who testified

17   stated that if they had possessed the ability to negotiate the

18   terms of the plan, there is nothing they would have changed."

19         I'd also like to mention that some participants did

20   specifically negotiate to be able to participate in the plan.

21   That's detailed in Driscoll Declaration, which is ECF 4300-5,

22   Exhibit 44, at Paragraph 22.

23         Finally, on bargaining power, counsel for objectors

24   said that all deferred compensation plans were voluntary.

25   That is not accurate.  There is no such ERISA or Internal

1    Revenue Code requirement.

2              With respect to the unfunded element of the

3    statutory test, the Fifth Circuit has held that an unfunded

4    plan is one in which participants do not have a legal right

5    any greater than that of a unsecured creditor to a specific

6    set of funds from which the employer is, under the terms of

7    the plan, obligated to pay the deferred compensation.  That's

8    *Reliable Home Health Care*, 295 F.3d 505, at 513.

9              The plan and trust documents are clear that the

10   participants have no ownership interests in the trust assets

11   and have no greater rights than general unsecured creditors.

12             The corporate life insurance policies in the Steward

13   rabbi trust are owned by Steward and Steward is the sole

14   beneficiary.  The life insurance policies are at ECF 4306-22,

15   Exhibit 22; ECF 4306-23, Exhibit 23; and then ECF 4300-4,

16   that's Mr. Castellano's Declaration, further conforming --

17   confirming the ownership of the life insurance policies.  That

18   ownership is dispositive under Reliable Home Health Care,

19   where the Fifth Circuit held that the purchase of life

20   insurance policies did not make the plans funded because the

21   insurance policies were not owned by the participants.

22             Moreover, the plan documents are clear and

23   Ms. Driscoll's Declaration confirms that plan accounts were

24   kept for bookkeeping purposes only and that no separate

25   accounts were maintained for individual participants with any

1    money in them.  Ms. Driscoll's Declaration is at ECF 4300-5,

2    and what I just -- Exhibit 44, and the portion I just

3    mentioned is at exhibit -- Paragraph 14.

4              The other evidence about how the plan functioned

5    also shows that it was entirely unfunded and that participants

6    had no assets to trace, which, as I'll talk about in a moment,

7    is dispositive of some of the objectors' constructive trust

8    theories.

9              The only evidence from witnessed with knowledge on

10   that issue testified the rabbi trust was funded from Steward's

11   general commingled account.  That's the Driscoll Declaration,

12   Exhibit 44, at Paragraph 18; the Castellano Declaration,

13   Exhibit 43, at Paragraph 8; and the Lombardo Declaration,

14   Exhibit 41, at Paragraph 11.

15             There was some questioning of Ms. Potter on this

16   topic.  She, ultimately concern -- confirmed she had no

17   personal knowledge on this topic.

18             Finally, Your Honor, the Fifth Circuit in *Reliable*

19   *Home* also held that evidence of a plan's unfunded status lies

20   in the fact that participants did not incur tax liability in

21   connection with the funds transferred to the plan for their

22   benefit.  They did not here, and that, too, is undisputed.

23             Because the plans were clearly unfunded, objectors

24   have raised a series of issues, by my count four, about why

25   this Court should purportedly find the plans to be funded,

1    even though they actually weren't.  None of them have merit.

2         First, objectors argue that, if the plans fail the

3    selectivity requirement, they should be retroactively treated

4    as funded and a constructive trust should be applied.  No case

5    has held that.  To the contrary, as long as the plans are

6    funded, a constructive trust is not an appropriate remedy.

7    That's the *Fenwick* case we cited at Paragraph 93 of our reply.

8         Indeed, in the Supreme Court's Great-West decision,

9    cited at Paragraph 94 of our reply, the Supreme Court held

10   that there must be money or property identified as belonging

11   in good conscience to the plaintiff that could be clearly

12   traced to particularly funds or property in the debtor's

13   possession -- sorry -- in the defendant's possession.  Because

14   these plans were unfunded, there are no funds or other

15   property that can be traced to participants.  That's the

16   Washington Mutual and Schwab cases cited in Paragraph 96 of

17   our reply and also in Footnote 9, on Page 9 of our

18   supplemental brief, which is ECF 4268.

19        Objectors also raised two arguments that relate to

20   actions Steward took while allegedly insolvent.  Essentially,

21   objectors argue that, as soon as Steward became insolvent, it

22   was obligated to stop payments both in and out of the plans.

23        I'll start first with the argument about paying

24   money out of the trusts.  The trust agreements, which govern

25   the rabbi trusts, provides that payments out of the trust are

23

1    supposed to stop if Steward becomes insolvent.  According to

2    objectors, because that provision in the trust agreement was

3    allegedly violated, we're supposed to pretend that the plans

4    were always funded.  The case law that we cite at Paragraphs

5    18 to 20 of our supplemental brief -- again, that's ECF 4268

6    -- clearly refute this.

7             In particular, the Cortina case, cited at

8    Paragraph 18, holds that, because provisions in a -- in rabbi

9    trusts relating to insolvency, quote -- were -- sorry -- were,

10   quote:

11            "-- obviously created to protect the general

12   creditors from having the Trustee distribute trust

13   proceeds to participants at a time when the institution was

14   insolvent."

15            Objectors, quote:

16            "-- ha[ve] no standing to raise a failure to

17   comply with those provisions as a bar to [the company]'s right

18   to the proceed."

19            In the Outboard Marine case, cited in Paragraph 19

20   of our supplemental brief, holds that violating a provision in

21   a rabbi trust doesn't -- and this is now the Court's language

22   that I'm quoting -- doesn't, quote, "magically" turn it into a

23   secular trust.

24            Your Honor, a "secular trust" is, essentially, just

25   the inverse of a rabbi trust; in other words, the type of

1    trust that objectors would need to show that there was a

2    funded plan here.  Rather, there needs to be an express intent

3    to convert the rabbi trusts to secular trusts, and the

4    participants would need to take -- to pay taxes on that money.

5        And while I'm on the topic of rabbi trusts and

6    secular trusts, there was an argument raised for the first

7    time yesterday about the IASIS plan, and that objectors

8    believe that assets were removed from the IASIS rabbi trust,

9    and now we don't know whether that somehow caused the IASIS

10    plan to morph into a funded plan.  But the very email

11    correspondence they rely on, Exhibit 146, says that assets are

12    held by the trustee, but not in a rabbi trust or a secular

13    trust.  And so this email just proves their theory because

14    they need this to be a secular trust.  That would be their

15    only path to having a funded plan.

16        And I apologize.  I may have gotten that exhibit

17    number wrong, so if we could double-check on that.

18        (Participants confer)

19        MR. LEVIN:  So going back to objectors' insolvency

20    theories.  We talked about the money coming into the -- we

21    talked about the money coming out of the plan.  I want to now

22    talk about the objectors' argument about the money coming into

23    the plan.

24        Objectors argue that, essentially, fraud occurred

25    because Steward continued accepting contributions in

1    November 2023, without adequately disclosing its financial

2    condition.  As we discuss at Paragraph 10 of our supplemental

3    brief, there was no duty to disclose under ERISA, and any

4    fraud theory would be preempted.  That is the Loffredo Sixth

5    Circuit decision.

6            In any event, the evidence is abundantly clear that

7    Steward's issues paying suppliers in the Fall of 2023 was a

8    widely known fact across the Steward organization.  There is

9    simply no evidence of fraud or bad faith here.

10           But even if there were a question of fraud, and even

11   if it were a potentially cognizable theory, that still would

12   not be a basis to impose a constructive trust for the same

13   reasons that a constructive trust could not be applied if a

14   plan failed the selectivity requirement alone, which is the

15   money was never in the possession of the participants, which

16   is why they didn't have to pay taxes on it.  And as numerous

17   cases have held, money can't be traced in an unfunded plan.

18           Nor would there be any basis for reformation.  As

19   discussed at Paragraphs 4 to 6 of our supplemental brief,

20   there was no alleged fraud about whether the plans were

21   unfunded or not.  And as discussed in Justice Scalia's

22   concurrence in *CIGNA v. Amara*, reformation can only apply when

23   there is fraud in the formation of the contract, not

24   retroactively, if there are subsequent misstatements.

25           So, ultimately, while objectors have spent a lot of

1    time on insolvency, it's not relevant to the issues pending

2    before the Court.

3           Moreover, although debtors were facing financial

4    challenges, they were working hard and doing all of the right

5    things to avoid a bankruptcy and to try to preserve value.

6           Maintaining a deferred compensation plan in the

7    hopes of avoiding bankruptcy is not objective evidence of a

8    transfer of company assets to participants.  The documents and

9    enrollment documents did not change.  The documents did not

10   say, upon insolvency, participants own the assets.  If they

11   did, the plans would have failed, they would not longer be top

12   hat plans, and deferrals would have been taxable since they

13   would never have been at risk, and that's just not how the

14   plans operated.

15          Finally, objectors argued yesterday that debtors

16   somehow breached Section 8.5 of the SHC rabbi trust agreement

17   -- that's ECF 4306-10, Exhibit 20 -- by taking out loans

18   against the trust assets to fund distributions to plan

19   participants in April 2024.  But as I mentioned earlier, the

20   Outboard Marine case, cited at Paragraph 19 of our

21   supplemental brief, makes clear that violating the terms of a

22   rabbi trust agreement doesn't magically make a plan funded if

23   the assets are still subject to the claims of the general

24   unsecured creditors, as they were here.

25          In any event, Section 8.5, on which objectors rely,

1    merely restricts the trustee from loaning property to any

2    person, not specifically to the company, which is a separately

3    defined term.  And if this were intended to be a prohibition

4    on how the company could use the assets of the rabbi trust, it

5    would presumably appear in Article 4 of that same trust

6    agreement, which is specifically entitled "Payments to the

7    Company," and restricts the company's ability to use funds in

8    certain circumstances.

9           And that provides that the company shall have no

10   right or power to direct the trustee to return to the company

11   or divert to others any assets of the trusts before all

12   payments of benefits have been made to plan participants and

13   their beneficiaries, pursuant to the terms of the plan.  There

14   was clearly no such diversion here when the money was used, by

15   objectors' own admission, to pay beneficiaries.

16          Your Honor, this is obviously an unfortunate

17   situation, but the risk of going bankrupt is inherent in the

18   existence of top hat plans.  Participants cannot take the tax

19   benefits of top hat plans and then seek to absolve themselves

20   of the risks they took that were required in order to get

21   those tax benefits.  And the plans were either top hat plans

22   under ERISA or they weren't.

23          And where the participant adequately understood or

24   appreciated the consequences of their decision, which were

25   disclosed to them, it's simply not relevant under the case

1    law.  Nor are their personal circumstances or what they were

2    planning to do with the money relevant to the statutory test.

3         The validity of top hat plans also does not depend

4    on companies completing a perfect juggling act of complying

5    with every provision in a trust agreement, while also doing

6    their best to try to save their businesses.  No case or legal

7    principle says otherwise.  Thank you, Your Honor.

8         THE COURT:  Thank you very much.

9    (Participants confer)

10         MR. KEACH:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. KEACH:  Robert Keach for the certain

13    participants.

14         I agree with one thing my opponent just said, and

15    that is they're either top hat plans or they're not.

16         With respect to the recitation of the law, we'll get

17    to that.  We actually believe in not citing the authority

18    until we actually have the facts, but we have the authority.

19         And more importantly, this is all interesting math,

20    but the metric they apply is thoroughly discredited in the

21    case law.  Averages are inherently unreliable beasts in this

22    kind of calculation, that's why courts don't use them, and

23    we'll get to that.

24         The important starting point, as it always is in

25    these cases, is burden of proof.  The debtors have the burden

1    of proof here.  They have to establish, by a preponderance of

2    evidence, not argument, that these plans are top hat plans or

3    they're not.  We cited numerous cases on burden of proof.

4    There is only one dissenting case I know of, which is the

5    Third Circuit's *Sikora* opinion.  And everybody else who's ever

6    looked at this issue has found that the burden is with the

7    party making the claim that the plan is a top hat plan.

8            Interestingly enough on this, on the issue of

9    bargaining power, for one second, I think counsel should talk

10    with one another because, in the opening, they acknowledged

11    that bargaining power was at least a significant factor in the

12    selectivity analysis.  There is case law that it is

13    dispositive, we believe that case law to be correct.  But the

14    one thing we don't disagree about is that it's a significant

15    factor, one way or the other.  And I'll address that in a bit.

16            I think it's important, following burden of proof,

17    to next go to the reason why these disputes exist and the

18    reason why top hat plans are defined in the case law as a rare

19    species of plan, and why the courts take a very cautious

20    approach to finding the plans are top hat plans, and that is

21    the rationale for creating the exception for top hat plans is

22    important to consider.

23            Remember, the presumption is if you -- if it's a

24    retirement plan, it's covered by ERISA, including all of the

25    fiduciary standards.  There's a reason for that.  Most people,

1    no matter how, frankly, highly educated, depending on what

2    they're highly educated in, or even people who are well

3    compensated are not going to fully appreciate the risks and

4    the need the protection of ERISA in these circumstances.

5         And the rationale behind excluding top hat plans

6    from ERISA's substitute requirements has been described in the

7    cases, including the Alpha National case that counsel just

8    referred to, the rationale behind excluding top hat plan from

9    ERISA's substantive requirements is that certain individuals,

10   by virtue of their positions or compensation level, have the

11   ability to effect or substantially influence, through

12   negotiation or otherwise, the design and operation of the

13   deferred compensation plan and would, therefore, not need the

14   substantive rights and protections of ERISA.  If it's one

15   thing the record in this case establishes is that these people

16   needed the substantive rights and protection of ERISA.

17        The statutory test, as articulated, is that, in

18   order to be a top hat plan, the plan must be unfunded and it

19   must cover only a select group of highly compensated or

20   management employees.  Counsel did not address this select

21   group requirement at all.  But if you -- if all of management

22   is in the plan, it's not a select group of management.  The

23   testimony in this case, including by Mr. Lombardo, is that

24   everybody who actually had a management role in Steward was

25   eligible to be in this plan.  It's, per se, not a top hat plan

1    for that reason.

2         But the one thing the evidence does establish is

3    that the participants had no ability to negotiate and never

4    had any ability to negotiate the design and operation of this

5    plan, and had no influence whatsoever over its administration.

6         As established by the testimony of Ms. Driscoll,

7    it's at her deposition transcript at Pages 92 and 93, which is

8    admitted in the record, and the live testimony of

9    Mr. Lombardo, as well as the testimony of Dr. Purohit and all

10   of the Declarations of all the other participants that were

11   filed, none of them had a role in negotiating the design of

12   the plan, none of them had an opportunity to influence the

13   operation of the plan at any point in time.  Ms. Driscoll

14   testified emphatically that no participant had ever had an

15   opportunity to negotiate any aspect of the plan.  And in fact,

16   when those requests were tendered, they were rejected

17   summarily.  This was a take-it-or-leave-it proposition for

18   everybody.

19        And again, their only defense in the record as to

20   the complete lack of negotiating leverage of all of these

21   participants is to say well, it was a voluntary plan.  Well,

22   if voluntariness were enough to negate the bargaining leverage

23   selectivity factor or the bargaining leverage independent

24   factor, that factor would be a nullity because, if there's a

25   mandatory deferred compensation plan somewhere, I'm not aware

1       of it.  But even if there were a minority of such plans, the

2       vast majority of deferred compensation plans are voluntary by

3       nature.  Nor is it negotiating leverage that you can pick

4       among options presented to you as to how much to defer or when

5       to receive your contributions.  Those are choices of options

6       made by other people; that's not negotiation.

7               Let's take these plans one at a time, with that by

8       way of opening, because there's been this tendency to treat

9       the plans as if they were one.

10              With respect to the IASIS plan, the debtors have

11      failed to establish that the IASIS plan is unfunded because

12      they have simply failed to establish that the rabbi trust

13      document that they purport to say governs this plan is

14      actually the document that still governs the plan.  The

15      debtors have no response by evidence, other than counsel's

16      argument.  And as articulate and as rapid as opposing counsel

17      is, it's not evidence.  They have no evidence whatsoever to

18      counter the testimony that the IASIS plan assets are not held

19      in a rabbi trust or a secular trust, but they are held by a

20      trustee, which means they're in a trust hold of some kind.

21              But what we don't know is what are the terms of that

22      hold.  What does it provide?  We do know that those assets

23      were being held solely for the purposes of distribution, and

24      we do know that the plan has been frozen from new

25      contributions since 2017.  By definition, it's not a deferred

1    compensation plan because nobody is deferring money into it

2    anymore, but it is a pension plan because, by the admission of

3    the witnesses, the money is being held for distribution to

4    beneficiaries and participants.  What we don't know is

5    anything else about it.  But those two facts along make the

6    application of ERISA's substantive fiduciary protections

7    mandatory.

8              THE COURT:  So I'm a little confused by that

9    statement, just on the IASIS.  So you're saying that, if any

10   -- let's just say you had a valid rabbi trust.

11             MR. KEACH:  Right.

12             THE COURT:  And the people, the select group is

13   already chosen and they're not deferring anything else in it.

14             MR. KEACH:  Right.

15             THE COURT:  Let's just say it stopped in 2020.  Does

16   that convert it?

17             MR. KEACH:  Not automatically, Your Honor.  The

18   burden --

19             THE COURT:  Does it ever change?

20             MR. KEACH:  Sure.  It's possible to do it and

21   it's --

22             THE COURT:  Under --

23             MR. KEACH:  -- under these facts it's possible.

24             THE COURT:  Under what statute?

25             MR. KEACH:  And let me --

34

1          THE COURT:  Under what statute does -- in other

2     words, I think it almost then sets up a situation where

3     someone thinks -- they haven't been paying taxes in five

4     years, and they think they've been going fine.  Then, all of a

5     sudden, you're saying that there's an ERISA statute out there

6     that converts this, but I don't see that in the text.

7          MR. KEACH:  Well, the text is it has to remain

8     unfunded.

9          THE COURT:  Well --

10          MR. KEACH:  But Your Honor, let me explain --

11          THE COURT:  -- where do you see the word "remain" in

12     the text?

13          MR. KEACH:  Well, if it's not unfunded --

14          THE COURT:  It's --

15          MR. KEACH:  -- it's not a top hat plan.

16          THE COURT:  And what does "unfunded" mean?

17          MR. KEACH:  Sure.  It means that it's -- it doesn't

18     have the protections built into the trust that make creditors

19     have priority in times of insolvency.

20          THE COURT:  So where does it say then that someone

21     has to continue to enroll people, if we're using that

22     definition?  That's where I'm a little struggling.  What --

23     the -- I get that you're saying IASIS didn't have the money in

24     the trust, but I'm struggling with the concept with the

25     fact -- in other words, there -- that could trips hundreds of

1    situations.

2              MR. KEACH:  But --

3              THE COURT:  You know?  I could trip hundreds of

4    rabbi trusts out there right now and people wouldn't even be

5    aware of it.

6              MR. KEACH:  Sure.  What normally happens isn't what

7    happened here, though, Your Honor.

8              THE COURT:  We don't know what normally happens,

9    that's the point that I'm saying.  We don't have anything in

10   the record, we don't have any experts; we just have texts and

11   we have facts.  But we don't have what normally happens in

12   cases and we don't have -- I guess, a lot of this, we have

13   case law, but we don't have --

14             MR. KEACH:  And --

15             THE COURT:  -- what happens in the real world.

16             MR. KEACH:  Your Honor is absolutely correct,

17   there's no record as to what this trust says or what the

18   intention of the parties were in moving it out of the rabbi

19   trust.

20             THE COURT:  I'm just talking about in general.

21             MR. KEACH:  The typical --

22             THE COURT:  We don't have --

23             MR. KEACH:  -- situation --

24             THE COURT:  -- any evidence --

25             MR. KEACH:  -- is it remains in the rabbi trust

1    until it distributes out.

2            THE COURT:  I'm with you there.  But what I'm saying

3    is I don't see the fact that it continues as a factor to being

4    unfunded.

5            MR. KEACH:  Oh, I'm not --

6            THE COURT:  If it --

7            MR. KEACH:  I'm not saying that deferred -- the fact

8    that nobody is deferring money into it makes it unfunded.  I'm

9    saying it's unfunded because it's no longer in a rabbi trust

10   and it's -- but it's apparently in a trust.  And again --

11           THE COURT:  And where does the text say that it has

12   to remain like where it's supposed to remain.

13           MR. KEACH:  Well, the -- what the case law says and

14   what the text says, Your Honor, is it's the rabbi trust that

15   makes it unfunded.  It's the provisions of the rabbi trust

16   that expose the assets to claims of creditors --

17           THE COURT:  So --

18           MR. KEACH:  -- that create --

19           THE COURT:  -- are you saying --

20           MR. KEACH:  -- the unfunded --

21           THE COURT:  -- this wasn't --

22           MR. KEACH:  -- status.

23           THE COURT:  -- subject to the -- are you saying this

24   wasn't subject to the claims of creditors?

25           MR. KEACH:  I am saying we know it's in a trust, we

1    don't know what those trust terms are, and it's their burden

2    of proof to establish that it's unfunded, and they can't meet

3    that burden on these facts.

4          THE COURT:  Yeah, I don't think they're saying that

5    it's not subject to the claims of creditors.  I think the

6    unsecured creditors' committee is saying it is.

7          MR. KEACH:  Well, I think they can say whatever they

8    want, but the only evidence we have --

9          THE COURT:  So now you're --

10          MR. KEACH:  -- is that --

11          THE COURT:  -- going to go --

12          MR. KEACH:  -- this money --

13          THE COURT:  -- back to the words.  See, that's what

14    I'm saying.  The you want to go back to the words of the

15    trust, but then you're saying that the words of the trust --

16          MR. KEACH:  I'm not going back --

17          THE COURT:  -- aren't allowed --

18          MR. KEACH:  -- to the terms of the trust, Your

19    Honor.  They have to establish that there are rabbi trust

20    terms around these assets or it is, by definition, as a matter

21    of law, unfunded, and they can't do that.

22          We -- the only evidence we have is this -- these

23    assets are in a trust of unspecified type and capacity.  Their

24    job is to prove that trust continues unfunded status through

25    this plan.  That's their burden, not mine, and they can't do

1       it.  There's not a sing -- as Your Honor just pointed out, I

2       completely agree with you, there's not a shred of record

3       evidence as to what the terms of this new trust are.  And

4       because there's no shred of evidence as to what the terms of

5       this new trust are, they lose on unfunded status.

6                    THE COURT:  Well, can you --

7                    MR. KEACH:  It's their burden.

8                    THE COURT:  What is the uncontroverted Castellano

9       testimony saying?

10                   MR. KEACH:  Mr. Castellano's testimony doesn't speak

11      to this at all.

12                   THE COURT:  Or any -- or the other Declarations.

13      Are you saying there's not a Declaration in the document [sic]

14      that says that this was maintained -- that they were both all

15      maintained?

16                   MR. KEACH:  There is not a shred of evidence that

17      says the IASIS assets remain in that remain rabbi trust --

18                   THE COURT:  No, no, no.

19                   MR. KEACH:  -- and are unfunded --

20                   THE COURT:  That's not what I'm saying.  Just that

21      they believe that they're subject to the claims of creditors.

22                   MR. KEACH:  Oh, I think that the debtors certainly

23      have made that claim in argument.  I don't think

24      Mr. Castellano's Declaration goes to this at all.  Mister --

25      all Mr. Castellano's Declaration says is that it's his belief

39

1    -- his belief is contradicted by the testimony of actual

2    witnesses -- that Steward's general funds funded the payment

3    of the premiums for the insurance policies and funded

4    distributions.

5         THE COURT:  Lombardo thought -- Lombardo testified

6    that he thought that the both plans were maintained in

7    accordance and that they did everything that they could to

8    maintain it.

9         MR. KEACH:  He testified that, when he was at IASIS,

10   that it was maintained as a top hat plan.  He made it very

11   clear he didn't know anything about what happened after the

12   merger.

13        THE COURT:  I got it.

14        MR. KEACH:  All right.

15        THE COURT:  I get the point.

16        MR. KEACH:  The other thing there is no evidence on

17   the record of whatsoever --

18        THE COURT:  Let's talk about "selectivity."  What

19   does that mean?

20        MR. KEACH:  Sure.  Well, selectivity has several

21   elements, right?

22        THE COURT:  That's what I'm saying.  What does the

23   word "select" mean?

24        MR. KEACH:  "Select" means a subset of the whole.

25        THE COURT:  So why isn't that just the answer.  What

40

1          -- where does negotiating power come into that?

2                  MR. KEACH:  Well, negotiating power has been

3      recognized as a --

4                  THE COURT:  I know.

5                  MR. KEACH:  -- significant --

6                  THE COURT:  Got it.

7                  MR. KEACH:  -- factor by --

8                  THE COURT:  But let's --

9                  MR. KEACH:  -- numerous --

10                 THE COURT:  -- just talk --

11                 MR. KEACH:  -- courts.

12                 THE COURT:  -- about the words of the text.

13                 MR. KEACH:  But --

14                 THE COURT:  What does the word of the text factually

15     say?  That's what I'm saying.  That's where I'm struggling

16     with do we -- and Tolbert didn't go there, right?  But --

17                 MR. KEACH:  Right.

18                 THE COURT:  -- Judge Ellison --

19                 MR. KEACH:  Well --

20                 THE COURT:  -- who I have an incredible amount of

21     respect for, didn't go there.  So what does the word "select"

22     mean?

23                 MR. KEACH:  I think the reason that --

24                 THE COURT:  In other words, can I have a select

25     group of highly compensated people who don't have the right to

1    negotiate, but they're still select because I chose them?

2           MR. KEACH:  The answer is I think not for ERISA

3    purposes and not for top hat purposes.

4           THE COURT:  Where do you see that in the text?

5           MR. KEACH:  Yeah.  I think -- well, this is a

6    construction of the text by the courts, Your Honor.

7           THE COURT:  I know, but --

8           MR. KEACH:  And the reason for that is -- goes to

9    the very purpose why the exception exists in the first place.

10           THE COURT:  Where do we get what the exception is

11    for in the text?

12           MR. KEACH:  I mean, again, you're talking about

13    courts and regulatory authorities construing that text.  And

14    the reason why the exemption was created in the first place --

15           THE COURT:  But the Southern --

16           MR. KEACH:  -- is the belief --

17           THE COURT:  -- District of Texas --

18           MR. KEACH:  -- that these people --

19           THE COURT:  -- didn't do that.

20           MR. KEACH:  -- could negotiate and protect

21    themselves.

22           THE COURT:  Where does it -- where does it say that

23    in the text?

24           MR. KEACH:  I think that what's --

25           THE COURT:  It has to be maintained by the company,

42

1    it has to be unfunded, and it has to be for a select group of

2    folks.

3                    MR. KEACH:  Right.

4                    THE COURT:  It's broad, right?  It's naturally

5    drafted in a way --

6                    MR. KEACH:  Well, I think it's naturally drafted to

7    be narrow.  "Select" suggests it's a small submit.

8                    THE COURT:  But you --

9                    MR. KEACH:  And again --

10                   THE COURT:  -- get to choose.

11                   MR. KEACH:  -- if you look --

12                   THE COURT:  But you get to choose.  In other words,

13    every company gets to choose, and the synagogue can choose the

14    rabbi, right?  The company can choose their select group of

15    employees.

16                   I'm not saying that they satisfied anything and I

17    got to go back and look at everything.  But I'm just wondering

18    where the significant third element comes from.  It wasn't

19    accepted by Judge Ellison --

20                   MR. KEACH:  Well, I --

21                   THE COURT:  -- and I think --

22                   MR. KEACH:  I think what --

23                   THE COURT:  -- he's right --

24                   MR. KEACH:  -- he said was --

25                   THE COURT:  -- about that.

43

1          MR. KEACH:  -- he believes it's an element of

2     selectivity, right?  And so there is no case law anywhere that

3     I know of, even the First Circuit case, the Brigham and

4     Women's case, by the way --

5          THE COURT:  Uh-huh.

6          MR. KEACH:  -- which had a -- which had a ratio of

7     something like five or six-to-one -- and by the way, the Court

8     really gave very little consideration to that factor because

9     the disparity was so huge, unlike this case.  The -- even if

10    the First Circuit didn't say it's not a consideration, it just

11    said --

12         THE COURT:  I'm not --

13         MR. KEACH:  -- it's definitely --

14         THE COURT:  -- saying it's --

15         MR. KEACH:  -- not a --

16         THE COURT:  -- not a --

17         MR. KEACH:  -- second factor.

18         THE COURT:  -- consideration.  But you're saying

19    that it's a primary one, is where I'm --

20         MR. KEACH:  It's a --

21         THE COURT:  -- getting --

22         MR. KEACH:  -- primary --

23         THE COURT:  -- into a --

24         MR. KEACH:  -- one because it's tied directly, Your

25    Honor, to the very purpose behind the creating of an exception

44

1    for top hat plans.

2              The reason why Congress was comfortable removing

3    ERISA's substantive protections from individuals is that these

4    plans were going to be limited to people who had significant

5    bargaining power by virtue of, either their status, or their

6    compensation, to design -- or to influence the design of

7    plans, so that they would understand the way they operated,

8    they would understand the risk, and they could deal with it

9    accordingly, also, that they could afford the loss.

10             THE COURT:  Where do you --

11             MR. KEACH:  But more importantly --

12             THE COURT:  -- see that?

13             MR. KEACH:  That's in --

14             THE COURT:  That's what I'm saying.  Where do you

15   see that, too, where Congress did all this?  I'm -- that's

16   what I'm wrestling with.  We're talking purpose, intent, and

17   we're not --

18             MR. KEACH:  Right.

19             THE COURT:  -- talking just statute.

20             MR. KEACH:  Well, I think --

21             THE COURT:  You're --

22             MR. KEACH:  -- as Your Honor has said, you're trying

23   to -- we're trying to get to the meaning of what's meant by

24   "select," and that has led --

25             THE COURT:  Why don't we just --

1      MR. KEACH:  -- virtually --

2      THE COURT:  -- use the -- what's wrong with just

3  using the dictionary?

4      MR. KEACH:  Well, I think, if you use the

5  dictionary, you'll still be back to the same question you're

6  asking, like select as to what criteria.  And the criteria

7  here are tied to the purpose of the statute.  That's why every

8  single court that's looked at this has treated this at least

9  as a factor, if not --

10     THE COURT:  It's a factor.

11     MR. KEACH:  -- dispositive.

12     THE COURT:  I agree with you, I think it's a factor.

13  I think courts have looked at them and said it's one of the

14  things that you can look at to determine whether the group is

15  select or not.

16     MR. KEACH:  Right.

17     THE COURT:  I agree with you there.  And it's a --

18  you're right, it's a factor and you got to look into it.  I do

19  agree.  But I'm just wondering whether it's dispositive or

20  not, that's where I'm trying to get to.

21     MR. KEACH:  Sure.  Look, I happen to favor the case

22  law that says it's dispositive, obviously.  I think the reason

23  why that case law is influential is because it's directly tied

24  to the articulated purpose of the exception.  It is most

25  closely tied to the purpose of the exception to say --

1          THE COURT:  And where --

2          MR. KEACH:  -- if you're --

3          THE COURT:  What is the articulated purpose?  Where

4     do you see the articulation of the purpose?

5          MR. KEACH:  Sure.  It's --

6          THE COURT:  Is that through case law --

7          MR. KEACH:  It's come out --

8          THE COURT:  -- or is that through statute?

9          MR. KEACH:  It's come out in the case law.  It

10    originates largely with the Department of Labor letter that's

11    been referred to, which is -- which influenced the cases that

12    treat this as a --

13          THE COURT:  In other words --

14          MR. KEACH:  -- as a factor.

15          THE COURT:  -- does the articulation of the

16    exception that people aren't going to have pay taxes on it --

17    right?  And that they're not going to derive an economic

18    benefit from it or that they can't be taxed for it, right?

19    It's --

20          MR. KEACH:  No, that wasn't the -- the original

21    creation -- the reason behind --

22          THE COURT:  But in other words, there's -- you can

23    look at it through a couple of different lenses, right?  Like

24    somebody doesn't have to pay taxes for 20 years on this, but

25    the trick is that it becomes subject to the claims of

1     creditors outside of bankruptcy, as well.  Everybody can be

2     become subject to the claims of creditors, so --

3            MR. KEACH:  No, the -- what I'm talking about is the

4     reason why Congress was -- and again, I appreciate, whenever

5     we're trying to, you know, determine the intent of Congress,

6     that's always an interesting exercise because Congress is a

7     body of a multiple people with multiple thoughts.

8            THE COURT:  Right.  But the Fifth Circuit just tells

9     me to look at the text, right?  The text is Alpha.

10            MR. KEACH:  Yeah.  But the text, again, gets you to

11     "select," and then the question is "select" as to what

12     criteria, which then leads you to consider purpose.

13            THE COURT:  Well, I don't --

14            MR. KEACH:  So I --

15            THE COURT:  "Select" can just be up to -- just look

16     at criteria.  I don't think we have to look at purpose, we can

17     just look at criteria.

18            MR. KEACH:  Well, again, every court that's looked

19     at this has said no, you've got to look at this as a factor.

20            THE COURT:  It's a factor.

21            MR. KEACH:  Right.  And I think, in this case, that

22     factor leans heavily in favor of not finding these cases to be

23     top hat plans.  There's no evidence of negotiating leverage

24     here at all, none.

25            THE COURT:  Tolbert doesn't require that, though.

1    Would you agree with that?

2           MR. KEACH:  I think Tolbert does -- I don't think

3    Tolbert gets to the point of determining --

4           THE COURT:  Tolbert doesn't call it primary, does

5    it?

6           MR. KEACH:  -- how to meet the burden of proof.

7           THE COURT:  Tolbert doesn't call it primary, though.

8    Would you agree with that?

9           MR. KEACH:  No, Tolbert says it's a factor among the

10   other selectivity factors to be balanced, I would agree with

11   that.  I happen to think --

12          THE COURT:  But --

13          MR. KEACH:  I happen to favor the cases that treat

14   it more weight.

15          THE COURT:  Oh, I --

16          MR. KEACH:  But Tolbert, I think, says it's a factor

17   among factors.

18          THE COURT:  Do you then get into the whole concept -

19   - to truly derive meaning of the word "select," there's got to

20   be negotiating power.  I get it.  I get the point.

21          MR. KEACH:  Right.

22          THE COURT:  I get the point.

23          MR. KEACH:  Right.

24          With respect to -- so let me move on to talk about

25   the Steward plan, specifically; since we're talking about

1    selectivity, let's go there.

2    In addition to management, there are the more sort

3    of basic metrics around selectivity.  And debtors' counsel

4    says we have not cited a case that's -- again, we're at

5    closing now, we have the facts in.  We'll now cite you cases.

6    The only brief we filed in the case to date is contained in

7    our original objection, when there were no facts.

8    But in -- the seminal case in this area is Daft v.

9    Advest, Inc., it's at 2008 WL 190436, it's a Northern District

10   of Ohio case decided in 2008.

11   THE COURT:  You said 190436?

12   MR. KEACH:  Yes, 2008 WL 190436 --

13   THE COURT:  Okay.

14   MR. KEACH:  -- at 6 and 7, specifically.

15   I will point out, for completeness, this -- the

16   holding I'm about to talk about was affirmed by the Sixth

17   Circuit.  The case itself was reversed for -- on other grounds

18   by the Sixth Circuit; it was remanded for, essentially,

19   exhaustion of administrative remedies.

20   THE COURT:  Okay.

21   MR. KEACH:  What Daft has said and has been applied

22   by many of the sophisticated courts that deal with these

23   issues regularly is the following:

24   "In this regard, the proper analysis is a comparison

25   of the salary earned by employees minimally qualifying for

1    participation in the plan against the average salary of all

2    employees."

3            That's exactly the test that Mr. Van Meter applied.

4            The -- going further, to quote the case more

5    extensively, it also is a case about the problem with averages

6    and why you don't use the average salary of the people who are

7    eligible to compare it to the total, the average of the total

8    employees, and that's because using that average gives you

9    completely skewed results.  So just to quote the case and then

10    to give an example:

11            "Further, averages are not as useful for determining

12    whether [or not] the plan participants count as 'a select

13    group of highly compensated employees.'  More relevant would

14    have been a comparison of the salary earned by employees

15    minimally qualifying for participation in the Plan against the

16    average salary of all Advest employees.  In this Court's

17    opinion, this Court made it abundantly clear that the proper

18    comparison was between the minimally qualifying participant

19    and the universe of all Advest employees."

20            That's exactly the test we want to employ here.

21            The reason for that -- and many cases, including

22    *Carrabba* in the Northern District of Texas; *Star v. JCI Data*,

23    which is a case at 757 F.Supp. 390, 394 (D.N.J. 1991), many of

24    these cases decry the use of averages for an obvious reason,

25    and that is it completely distorts the comparison around

1   disparity.

2       To give a perhaps somewhat absurd example, but an

3   illustrative one, if you put Elon Musk in an eligibility pool

4   with a hundred people making a million dollars, you know, the

5   average salary will be somewhere in the billions, right?

6   Because it's completely distorted by the fact that Elon Musk

7   is in the pool; and, therefore, you don't really get a fair

8   comparison as to whether or not there's a disparity between

9   the people in and the people out.

10      And so, for that reason, what Daft does and what

11  other cases who decry averages do is look at the average

12  salary of the total population compared to the eligibility

13  threshold.  That's how you can determine whether or not this

14  works.

15      And in this case -- and they hap -- they thankfully

16  put the numbers on the board, that ratio, in most years, was

17  under 2.  And in fact, if you actually apply the real -- the

18  35,000 was a stand-in while we were attempting to get the real

19  number.  It turns out the real number is 36,400, as testified

20  to by Ms. Potter.  And if you apply that number to the numbers

21  they put up there, every one of those years is below 2.

22      Now, as counsel thankfully conceded --

23      THE COURT:  Does that require me to do an state-by-

24  state analysis then?

25      MR. KEACH:  No, it doesn't.

1          THE COURT:  In other words -- in other words, the

2     doctor who was here was in Phoenix, right?

3          MR. KEACH:  Yeah.

4          THE COURT:  But that -- I don't know what minimum

5     wage is in Phoenix, but she participated in the plan.  How do

6     I --

7          MR. KEACH:  Sure.

8          THE COURT:  I'm just trying to think through -- and

9     I don't think any expert really spoke to this.  The one kind

10    of used --

11         MR. KEACH:  Right.

12         THE COURT:  -- the minimum wage, the 11,300 number,

13    and the other one used 35,000.

14         MR. KEACH:  And I don't think you need to get caught

15    up in that, Your Honor, because Ms. Potter wasn't saying --

16         THE COURT:  Thank you.

17         MR. KEACH:  -- this was a -- this was a minimum wage

18    calculation.

19       (Laughter)

20         MR. KEACH:  She just says -- I asked the question

21    what was the lowest gross amount of a full-time employee, and

22    it was 17.50 times 2080, so that's where you get the thirty-

23    six four number.  The -- again -- and if you do that, you're

24    below 2 for all of these years.

25            Now, as counsel helpfully pointed out, being at 2 or

1    above doesn't make it a top hat place, necessarily.  There's

2    no safe harbor here.  But what the cases do say is, if you're

3    below 2, it's not a top hat plan.  In other words, the lowest

4    --

5              THE COURT:  Is there a case --

6              MR. KEACH:  -- ever --

7              THE COURT:  Is there a case that says that?

8              MR. KEACH:  Actually, the Demery case that they

9    cited says exactly that.  And in fact, what it says is -- and

10   I'll cite the case.

11             "No plan has been found by a court to be limited to

12   highly compensated individuals where the ratio of the lowest

13   actual compensation of an employee eligible for plan

14   participation to the average salary of the employee population

15   as a whole was less than two-to-one."

16             That's Demery.

17             So we think, if you apply the right metric here,

18   it's clearly the case that this didn't qualify.  More

19   importantly, what the cases look for is some natural break

20   between salaries.  There's no natural break here at all.  The

21   person who was excluded was at one seventy -- the first person

22   excluded, according to their data, was at one seventy-nine

23   nine.  There's no break whatsoever.  There's no natural sort

24   of settling out of who's the selected group of senior

25   management people or highly compensated people, it just

1    doesn't exist.

2         The -- and then let me just go briefly to the

3    unfunded status of the Steward plan.  Counsel makes light of

4    the sort of issues around the conduct, the administration of

5    the plan and insolvency; I don't.  I think it's incredibly

6    concerning.  But let's go to each factor and why that's

7    important.

8         And I'll make it clear that the most significant

9    factor, in terms of whether it's unfunded or not, is this

10   issue around the loans.  And again, let me go back to the

11   fundamental point -- and Your Honor, I think, has agreed with

12   this, and I think -- I doubt it's in serious dispute by

13   debtors' counsel.  It's not how -- what the language of the

14   documents say, it's how the plan is administered that

15   determines the outcome here.

16        In what happened -- and again, to go to unfunded

17   status, the case law is pretty clear and we did cite a case in

18   our objection, and I'll be hap -- I'll happily cite more if

19   Your Honor would like us to file a supplemental brief, as well

20   -- is that if the plan and the trust are administered as if it

21   is funded, it's funded.  If the plan document has any

22   indication whatsoever that beneficiaries have a priority over

23   unsecured creditors and insolvency, it's funded.

24        And in this case, you get the first of those two

25   options.  The debtor, in April of 2024, was unquestionably

1    insolvent.  We're talking about what, a month from the filing

2    date, a little -- maybe a little more; maybe a little less,

3    when these distributions were made, when the loans were -- I

4    think the loans were made at March of 2024, at the earliest,

5    March of April, I think, is the testimony of the witnesses.

6         And if you're clearly insolvent at that point, the

7    trust clearly provides that distributions cannot be made.  And

8    if you're essentially ignoring that provision -- that's one of

9    the provisions that makes the plan unfunded; that, in

10   insolvency, you freeze the assets for unsecured creditors,

11   that's what you're supposed to do, that's what makes it

12   unfunded.  If you, essentially, ignore that provision in the

13   face of clear insolvency and make 10 million -- nine to $10

14   million of distributions to beneficiaries, you are clearly

15   prioritizing the interests of beneficiaries over the interests

16   of general creditors, and that is the exact opposite of what

17   makes plans unfunded.

18        So it's not an insignificant fact, it's not simply

19   continuing to administer the plan.  It's essentially ignoring

20   in administration the very provisions that provide you with

21   unfunded status.  You cannot have the documents say one thing

22   and then act like it's another thing.  When you act like it's

23   another thing, ERISA's equitable remedies provisions allow the

24   Court to take that into consideration and to treat it as

25   unfunded.

1          With respect to the -- and I'll close on this point,

2     unless Your Honor has further questions for me.  And again,

3     I'll -- I offer the --

4          THE COURT:  Just the concept of remedies.  I know I

5     wanted to walk you -- I wanted you to walk me through kind of

6     what you think the right remedy is.  I know it's in your

7     brief, but just sort of --

8          MR. KEACH:  Sure.

9          THE COURT:  -- after we've kind of closed all the

10    evidence, what you -- I wanted you to finish your point, but

11    that was the final list of stuff that I had.

12         MR. KEACH:  Sure.  Let me make this one point about

13    the distributions and then I will close with remedies, if that

14    works for Your Honor.

15         THE COURT:  Uh-huh.

16         MR. KEACH:  The continued enrollment of parties --

17         THE COURT:  Uh-huh.

18         MR. KEACH:  -- into the deferred compensation plan,

19    including the continued request that -- or provision of an

20    opportunity to re-defer distributions that otherwise would

21    have been paid while clearly insolvent is deeply troubling.

22         And I have the utmost respect for Ms. Potter,

23    frankly, as a witness.  I just met her the day before

24    yesterday.  But I think she was maybe the most credible

25    witness of anybody who testified yesterday.  And I don't, for

1    a minute, think the people who were at her level, who were

2    doing this, were knowingly doing anything, but there's no

3    question that senior management knew what was happening.  And

4    it certainly -- if we don't have fraud, we have something that

5    ought to be investigated.

6          But more importantly -- and this will segue

7    naturally into closing on remedies, Your Honor -- the

8    equitable remedies provisions of ERISA are broad.  What the

9    cases says, in this instance, when you have a determination

10   the plan is not a top hat plan, the full equitable powers of

11   the District Court and, in this case, Your Honor come into

12   play, and the entire panoply of equitable remedies is

13   available.

14         And one of the things we have alleged in our

15   complaint in the adversary is that ERISA recognizes estoppel

16   from fraud, and that estoppel can also then generate the

17   equitable remedies in the sections of ERISA that we cite.  And

18   so let's segue into remedies.

19         THE COURT:  Just one question.  Did -- I don't know

20   -- well, I don't know if it came out in the evidence.  Who

21   received the 9 million?  Like, in other words, did the plan

22   participants, all of them, receive the 9 million, like, in

23   other words, your clients?

24         MR. KEACH:  No.  I haven't seen the entire list -- I

25   have seen the list, our clients are not on the list.  But the

1      -- I think it was -- it was certainly not everybody, no; it

2      was a subset of participants.

3              The way the distributions work, Your Honor, is I

4      think you have to wait three years to take one.

5              THE COURT:  Uh-huh.

6              MR. KEACH:  And so, actually, the distributions that

7      occur in '24 are probably something that was generated years

8      before.

9              THE COURT:  Got it.  Okay.  Thank you.

10             MR. KEACH:  The -- so on remedies, the seminal case

11     here is CIGNA and the Supreme Court, which made it clear that

12     the full panoply of equitable remedies is available under the

13     ERISA remedies provision, and it made clear that reformation

14     is such a remedy.  I think it's significant that the only

15     quote they have on reformation is from the concurrence by

16     Justice Scalia.  It's not what the majority said and it's not,

17     frankly, what the lower courts have since done with Amara.

18             Reformation is consistently held to be an

19     appropriate remedy for a violation of ERISA.  And once you

20     have a plan that's no longer a top hat plan because it has

21     been administered as something else, you -- ERISA is violated.

22     And the reason ERISA is violated is because you are not, by

23     definition, holding those assets in trust for the sole benefit

24     of the beneficiaries.  And the remedy for that is to reform

25     the plan.

1          And there is some case -- there is some belief among

2     academics and practitioners on this, is that reformation is

3     unnecessary because ERISA's substantive provisions

4     automatically become imbued in the contract, and we've argued

5     that.  But even if that were not the case, CIGNA is certainly

6     broad enough to say that you could reform the trust and the

7     plan to remove those things that make the plan unfunded and to

8     make it a true trust, consistent with the full ERISA

9     substantive fiduciary requirements.

10          Importantly, I think, when we met for the first

11     time, we were talking about the late Judge Carey and our case

12     in New Century.  Judge Carey addressed this point of well,

13     there's no remedy anyway, so why don't you just let this go.

14     That was argued in New Century.

15          THE COURT:  Uh-huh.

16          MR. KEACH:  And Judge Carey said no, we have to

17     decide whether this is a top hat plan or not, and once we

18     decide whether it's a top hat plan or not, then the issue of

19     remedies comes into play.  It's not a preemptive issue that it

20     -- this is a remedy-less event.

21          And so, in closing, Your Honor, I would say the

22     record, I think, clearly establishes the things I said it

23     would establish yesterday, when I opened.  This record is as

24     complete as we could make it under the circumstances and I

25     think it is more than adequate to prevent the debtors from

1    meeting their burden of proof on whether these plans are top

2    hat plans.

3           More importantly, I think this case screams out for

4    a remedy.  I think -- look, I think Ms. Potter put it best, in

5    terms of describing the entirety of this situation, and that

6    is that everybody should be concerned about this.

7           This is a situation where these plans were not

8    administered as top hat plans.  These assets rightly belong to

9    our clients as the beneficiaries and participants of this

10   plan.  They should be found not to be top hat, they should be

11   reformed.  This money should be set aside for the sole benefit

12   of the participants and beneficiaries.

13          And unless Your Honor has questions, I'm --

14          THE COURT:  No.

15          MR. KEACH:  -- happy to rest.  I'm -- also, Your

16   Honor, if you would invite supplemental briefing on our part,

17   we'd be more than happy to provide it.

18          THE COURT:  Thank you very much.  I very much

19   appreciate it.  No, you've answered all of my questions.  I

20   very much appreciate it.  I thank everyone for their time.

21          I'm going to --

22          MR. LEVIN:  Your Honor?

23          THE COURT:  Yes, sir.

24          MR. LEVIN:  I have literally 60 seconds of rebuttal.

25          THE COURT:  No, we're done.

1          I appreciate all the briefing, all the work that
2    went into this, the evidence, the presentation.
3          I'll take the matter under advisement.  I don't --
4    it's just -- I don't know, I think I -- I know I said at least
5    280 exhibits that have been admitted into the record and a
6    bunch of cases and I need to go look and -- a few new ones
7    that I'm going to go look at.  I'll get right to work and I
8    will, more than likely, provide a -- kind of an oral ruling on
9    the transcript.  I won't take the time and make sure that my
10   blue-booking is right and all that stuff.  I'll get you a
11   decision just as quickly as I can.  I will let you know when
12   I'm ready.  I'll get right to work.
13         And I very much thank everyone for their time and
14   have a good day.  Thank you.
15         Please, you're excused.  I'm going to pack up.
16         COUNSEL:  Thank you, Your Honor.  Thank you, Your
17   Honor.
18      (Proceedings concluded at 10:21 a.m.)
19
20
21
22
23
24
25                  *  *  *  *  *

1          I certify that the foregoing is a correct transcript

2     to the best of my ability produced from the electronic sound

3     recording of the proceedings in the above-entitled matter.

4        /S./  MARY D. HENRY

5     CERTIFIED BY THE AMERICAN ASSOCIATION OF

6     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

7     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

8     JTT TRANSCRIPT #69737

9     DATE FILED:  MARCH 30, 2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

# Filed Under Seal

# EXHIBIT 5

# Filed Under Seal

# EXHIBIT 6

**From:**       Walker, Gwendolyn [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
                (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BA65728FDE544B26AB68D1A822A8681C-GWENDOLYN W]
**Sent:**       2/20/2024 1:20:08 PM
**To:**         Mccollum, Melissa [Melissa.Mccollum@steward.org]; Potter, Katchena [Katchena.Potter@steward.org]
**CC:**         Lombardo, Patrick [Patrick.Lombardo@steward.org]
**Subject:**    RE: IASIS Deferred Comp Question
**Attachments:** RE: Executive Savings Plan Documentation

Melissa,

I am researching my emails.   Please find attached the definition of Rabbi trust and sentence from
Kathie.....still digging.

To answer his question, while the nonqualified plan assets are held
by a trustee, they are not held in a rabbi trust or a secular trust.



Gwendolyn Ginger Walker
Vice President, Benefits
1900 N. Pearl Street | Dallas, TX 75201
(o) 469-341-8830 | (c) 430-302-2659
Email: Gwendolyn.Walker@steward.org

NOTICE: This email may contain PRIVILEGED and CONFIDENTIAL information and is intended only for the use of the specific individual(s) to which it is addressed. It may contain Protected Health Information that is privileged and confidential. Protected Health Information may be used or disclosed in accordance with law and you may be subject to penalties under law for improper use or further disclosure of the Protected Health Information in this email. If you are not an intended recipient of this email, you are hereby notified that any unauthorized use, dissemination or copying of this email or the information contained in it or attached to it is strictly prohibited. If you have received this email in error, please delete it and immediately notify the person named above by reply email. Thank you.

**From:** Mccollum, Melissa <Melissa.Mccollum@steward.org>
**Sent:** Tuesday, February 20, 2024 10:18 AM
**To:** Walker, Gwendolyn <Gwendolyn.Walker@steward.org>; Potter, Katchena <Katchena.Potter@steward.org>
**Subject:** IASIS Deferred Comp Question

Please see new questions below.

•       If the Steward Rabbi Trust doesn't contain assets of the IASIS Deferred Comp plan, are the IASIS assets then in a separate trust? If so, can you please provide us detail regarding that trust (including the trust document).
•       If they are not in a separate trust, does that mean the company doesn't hold any assets for the IASIS deferred compensation plan and only has book entries for account balances?

Thank you,

**Melissa McCollum**
Senior Vice President, Human Resources

Steward Health Care
1900 N Pearl Street | Suite 2400 | Dallas, TX 75201
Office: 469-341-8829

SHC_Purohit_015576

# EXHIBIT 7

# Filed Under Seal

# EXHIBIT 8

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM, | ) | |
| LLC, *at al.*, | ) | Case No. 24-90213 (CML) |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF JAMES D. THOMAS, M.D. IN SUPPORT OF THE OBJECTION OF CERTAIN PARTICIPANTS TO DEBTORS' (I) MOTION FOR AN ORDER (A) DIRECTING THE TRUSTEES TO TURN OVER AND DELIVER TRUST ASSETS OR PROCEEDS THEREOF TO THE DEBTORS, (B) AUTHORIZING THE DEBTORS TO EXERCISE OWNERSHIP RIGHTS OVER SUCH ASSETS, (C) AUTHORIZING TERMINATION OF THE TRUSTS, AND (D) GRANTING RELATED RELIEF; AND (II) OBJECTION TO DR. MANISHA PUROHIT'S LETTER**

      I, James D. Thomas, M.D., being over 18 years of age and competent in all respects to testify, having personal knowledge of the facts set forth below, and under penalties of perjury, hereby state, swear, and affirm the following, pursuant to § 1746 of title 28 of the United States Code:

      1.     I am a physician and a former employee of Steward St. Anne's Hospital Corporation ("**St. Anne's Hospital**"), one of the debtors and debtors in possession (collectively, the "**Debtors**") in the chapter 11 cases of *In re Steward Health Care System, LLC, et al.*, Case No. 24-90213 (Bankr. S.D. Tex.). I am currently employed as a physician at Brown University Health ("**BUH**"), which acquired St. Anne's Hospital after the Debtors filed for bankruptcy.

      2.     I submit this declaration in support of the *Objection of Certain Participants to Debtors' (I) Motion for an Order (A) Directing the Trustees to Turn Over and Deliver Trust Assets*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

*or Proceeds Thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets, (C) Authorizing Termination of the Trusts, and (D) Granting Related Relief; and (II) Objection to Dr. Manisha Purohit's Letter* [Docket No. 3497] (the "**Turnover Motion Objection**") filed by the Participants.[2] I am one of the Participants, as a participant in and beneficiary of the Steward Health Care Deferred Compensation Plan (the "**SHC DC Plan**" or the "**Plan**").

3.      Prior to 2010, I was employed as a physician by Caritas Christi Health Care ("**CCHC**"), which was then owned by the Archdiocese of Boston. At CCHC, I contributed to a 403(b) retirement savings program on account of CCHC's nonprofit status.

4.      The Archdiocese sold that healthcare system to Stewart Healthcare System LLC ("**Steward**") in 2010 pursuant to an agreement that enabled the healthcare system to maintain its catholic identity and existing policies on charitable care, community benefits and its approach to labor relations from a social justice perspective.

5.      In part due to the ability to continue my focus on charitable and community values, I continued my employment as a physician with Steward after the 2010 acquisition. In connection with my new position at Steward, in 2010 or 2011, I was offered participation, and became a participant, in the SHC DC Plan. From inception, I opted to defer 15-20% of my compensation each year to save toward retirement.

6.      When presented with the option to become a participant in the SHC DC Plan (and re-enroll in the Plan, in subsequent years), I was not provided the opportunity to negotiate the terms of my participation in such Plan—only the opportunity to elect the amount that I'd like to

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Turnover Motion Objection.

defer.  Once I enrolled in the Plan for a particular year, I could not unenroll until the following year's enrollment period.

7.      At no time—prior to becoming a participant in the Plan or before annual enrollment—was I presented with information regarding the financial condition of Steward, and at no point did Steward or any affiliate inform me that they were or might be insolvent.  Nor was I advised that any funds I deferred would ever be at risk; I understood this to simply be a deferral of my compensation to a later period when I might be in a lower tax bracket.

8.      While I was employed by Steward, I was appointed to the Board of Directors of the American Board of Emergency Medicine ("**ABEM**")—a great honor as a community physician. ABEM is the largest emergency medicine organization in the world, setting the standards for and administering the tests to certify emergency medicine physicians across the United States. ABEM's mission is to ensure the highest standards in the specialty of emergency medicine.[3] ABEM is essential to the functioning of our emergency healthcare system in the United States: without robust leadership that devotes significant time and effort to the board certification of new physicians, the quality of emergency medicine physicians in the United States would be in jeopardy.

9.      More recently, I was elected to become ABEM's next president—a role I will assume in July 2025.  As President Elect, I have committed to travel several days per month to lecture and visit various medical institutions, and have significant weekly and monthly time commitments for Board and committee meetings which limit the number of shifts I can take at BUH.  Although ABEM Board members and officers are offered a small stipend for lengthy travel obligations, Board seats and officer roles are unpaid positions.

---

[3] More information about ABEM can be found at its website here: https://www.abem.org/about.

10.     In preparation for becoming ABEM president, I ramped down my shifts at BUH to become a .75 full-time equivalent (FTE), and starting in April, will further ramp down to become a .5 FTE to prepare for stepping into the role of President in July.  My obligations as ABEM president will preclude me from taking on more shifts than I currently serve.

11.     It was a great honor to be nominated to become the next president of ABEM.  But I was only able to accept that honor (and ramp down my shifts to accommodate the time commitments I would have to make to ABEM) because I had developed and adhered to a financial plan earlier in my career—one that involved deferring a significant amount of my income to a later stage in life, when I knew it was possible I'd have less income.

12.     If the assets of the Plan are turned over to the Debtors' bankruptcy estates, I will suffer significant personal harm.  Although I had contributed to the 403(b) plan sponsored by CCHC earlier in my career, that is not nearly enough to cover my own expenses and those of my elderly mother, whose medical and living expenses I share with my brothers—one of whom is a priest, and the other is funding his children's college education.  Indeed, my aggressive contributions into the Plan were designed specifically to save for my future and that of my mother. If the salary I believed I had been deferring is not available for me in my retirement (but rather is repurposed for paying Steward's other creditors), I am not sure how I will cover both my own expenses and those of my mother while fulfilling my obligations to ABEM as President.

*[remainder of page is blank – signature page follows]*

Solemnly affirmed and signed this 12th day of March, 2025, under the penalties of perjury.

_____
James D. Thomas, M.D.

# EXHIBIT 9

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM, | ) | |
| LLC, *at al.*, | ) | Case No. 24-90213 (CML) |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF DIANE PAGGIOLI, D.O. IN SUPPORT OF THE OBJECTION OF CERTAIN PARTICIPANTS TO DEBTORS' (I) MOTION FOR AN ORDER (A) DIRECTING THE TRUSTEES TO TURN OVER AND DELIVER TRUST ASSETS OR PROCEEDS THEREOF TO THE DEBTORS, (B) AUTHORIZING THE DEBTORS TO EXERCISE OWNERSHIP RIGHTS OVER SUCH ASSETS, (C) AUTHORIZING TERMINATION OF THE TRUSTS, AND (D) GRANTING RELATED RELIEF; AND (II) OBJECTION TO DR. MANISHA PUROHIT'S LETTER**

I, Diane Paggioli, D.O., being over 18 years of age and competent in all respects to testify, having personal knowledge of the facts set forth below, and under penalties of perjury, hereby state, swear, and affirm the following, pursuant to § 1746 of title 28 of the United States Code:

1.       I am a physician and a former employee of (a) Steward Good Samaritan Medical Center, Inc. ("**Good Samaritan**"), which I joined in 2017, and (b) Steward St. Anne's Hospital Corporation ("**St. Anne's Hospital**"), which I joined in or around 2021 after leaving Good Samaritan.  Both Good Samaritan and St. Anne's Hospital are debtors and debtors in possession (collectively, the "**Debtors**") in the chapter 11 cases of *In re Steward Health Care System, LLC, et al.*, Case No. 24-90213 (Bankr. S.D. Tex.).  I am currently employed as a physician at Brown University Health, which acquired St. Anne's Hospital after the Debtors filed for bankruptcy.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

2.      I submit this declaration in support of the *Objection of Certain Participants to Debtors' (I) Motion for an Order (A) Directing the Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets, (C) Authorizing Termination of the Trusts, and (D) Granting Related Relief; and (II) Objection to Dr. Manisha Purohit's Letter* [Docket No. 3497] (the "**Turnover Motion Objection**") filed by the Participants.[2]  I am one of the Participants, as a participant in and beneficiary of the Steward Health Care Deferred Compensation Plan (the "**SHC DC Plan**" or the "**Plan**").

3.      When I started as an oncologist at Good Samaritan in 2017, I was offered participation, and became a participant, in the SHC DC Plan.  I was informed that as a part-time physician, I would not have the option to participate in a 401(k) plan, and that the SHC DC Plan was my only employer-sponsored option to plan for retirement.  The supervisor who explained this to me informed me that the SHC DC Plan was an excellent program and encouraged me to participate.

4.      When presented with the option to become a participant in the SHC DC Plan (and re-enroll in the Plan, in subsequent years), I was not provided the opportunity to negotiate the terms of my participation in such Plan—only the opportunity to elect the amount that I'd like to defer.  Once I enrolled in the Plan for a particular year, I could not unenroll until the following year's enrollment period.

5.      At no time—prior to becoming a participant in the Plan or before annual enrollment—was I presented with information regarding the financial condition of Steward, and

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Turnover Motion Objection.

at no point did Steward or any affiliate inform me that they were or might be insolvent.  Nor was I advised that any funds I deferred would ever be at risk; I understood this to simply be a deferral of my compensation to a later period when I might be in a lower tax bracket.  At no time until the Debtors filed the Turnover Motion did I have any indication that my retirement savings were at risk at all.

6.     When I moved to St. Anne's Hospital in or around 2021, I was informed that the same benefits policy applied as at Good Samaritan: as a part-time physician, I would not have the option to participate in a 401(k) plan, and that continuing with the SHC DC Plan was my only employer-sponsored option to plan for retirement.

7.     I work only part-time due to the length of my commute to the hospitals where I work (my commute to St. Anne's Hospital is worse than my commute had been to Good Samaritan).  Due in part to my retirement planning through contributions to the SHC DC Plan, I determined that I could afford to work part time in order to take a job at a hospital that required such a long commute.

8.     When the Debtors filed for bankruptcy, I considered leaving St. Anne's Hospital in order to find more stable employment elsewhere, but decided instead to continue working with my patients—many of whom are in the final stages of battles with cancer.  After the bankruptcy filing, day in and day out, I watched as my recommendations for treatment—treatment that would have and should have been approved at a financially healthy hospital—were not implemented, which in the case of some of my patients hastened losing their battles to cancer.  This caused me great mental angst, but I remained employed by St. Anne's Hospital in an effort to not cause greater disruption to my patients' care.

9.      If the assets of the Plan are turned over to the Debtors' bankruptcy estates, I will suffer significant personal harm.  I had planned to use my SHC DC Plan contributions not only to fund my own retirement but also to contribute to the college educations of my nieces.  If the salary I believed I had been deferring is not available for me in my retirement (but rather is repurposed for paying Steward's other creditors), I am not sure how I will cover my own expenses in retirement at all, let alone fulfill my commitment to helping my family pay for college.

*[remainder of page is blank – signature page follows]*

Solemnly affirmed and signed this 13th day of March, 2025, under the penalties of perjury.

Diane Paggioli, D.O.

# EXHIBIT 10

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| STEWARD HEALTH CARE SYSTEM, | ) |
| LLC, *at al.*, | ) Case No. 24-90213 (CML) |
| Debtors.[1] | ) (Jointly Administered) |

---

**DECLARATION OF PETER LYDON, M.D. IN SUPPORT OF THE OBJECTION OF CERTAIN PARTICIPANTS TO DEBTORS' (I) MOTION FOR AN ORDER (A) DIRECTING THE TRUSTEES TO TURN OVER AND DELIVER TRUST ASSETS OR PROCEEDS THEREOF TO THE DEBTORS, (B) AUTHORIZING THE DEBTORS TO EXERCISE OWNERSHIP RIGHTS OVER SUCH ASSETS, (C) AUTHORIZING TERMINATION OF THE TRUSTS, AND (D) GRANTING RELATED RELIEF; AND (II) OBJECTION TO DR. MANISHA PUROHIT'S LETTER**

I, Peter Lydon, M.D., being over 18 years of age and competent in all respects to testify, having personal knowledge of the facts set forth below, and under penalties of perjury, hereby state, swear, and affirm the following, pursuant to § 1746 of title 28 of the United States Code:

1.	I am a physician, and was employed by Steward Medical Group, Inc. ("**SMG**"), one of the debtors and debtors in possession (the "**Debtors**") in the chapter 11 cases of *In re Steward Health Care System, LLC, et al.*, Case No. 24-90213 (Bankr. S.D. Tex.).

2.	I submit this declaration in support of the *Objection of Certain Participants to Debtors' (I) Motion for an Order (A) Directing the Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets, (C) Authorizing Termination of the Trusts, and (D) Granting Related Relief; and (II) Objection to Dr. Manisha Purohit's Letter* [Docket No. 3497] (the "**Turnover Motion**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

**Objection**")  filed by the Participants.[2]  I am one of the Participants, as a participant in and beneficiary of the Steward Health Care Deferred Compensation Plan (the "**SHC DC Plan**" or the "**Plan**").

3.      I am a general surgeon, and have practiced in Norwood, Massachusetts since 1987. The medical facility in which I worked was eventually acquired by SMG, and I became an employee of SMG in 2014.

4.      I became a participant in the SHC DC Plan in 2016, and was a participant in the SHC DC Plan for four consecutive years.  When presented with the option to become a participant in the Plan (and re-enroll, in subsequent three years), I was not provided the opportunity to negotiate the terms of my participation in such Plan.

5.      Once I enrolled in the Plan for a particular year, I could not unenroll until the following year's enrollment period.

6.      At no time—prior to becoming a participant in the Plan or before annual enrollment—was I presented with information regarding the financial condition of SMG, and at no point was I informed that SMG was insolvent.

7.      If the assets of the Plan are turned over to the Debtors' bankruptcy estates, I will personally be harmed.  I am 68 years old.  The insolvency of SMG—leading up to and after the bankruptcy filing—affected my practice of medicine.  Beginning in late 2023, I would have uncertainty regarding the equipment and supplies that would be available to me when I arrived in an operating room.  Because of these challenging working conditions, I took a leave of absence in the summer of 2024.  In September 2024, SMG then told me that my medical office would be

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Turnover Motion Objection.

closed and that my position would be eliminated, effective October 21, 2024. Prior to the bankruptcy of SMG, I was planning on scaling back my hours, but had hoped to continue to practice medicine for a number of years before I fully retired. I am now unemployed, and am finding it challenging to find a medical practice that wants to hire me as a part-time surgeon, despite my years of experience and being recognized as a "Top Doctor" by Boston Magazine every year since 2014. Not only am I unemployed, but I had been relying on my final installment from my contributions to the SHC DC Plan in February 2025 to assist with my retirement plans. I will likely need to start withdrawals from an annuity plan soon and had hoped to delay this another year using my SHC DC assets. Given the lack of certainty regarding my payment from the SHC DC Plan, I am now collecting social security, something I had hoped to defer for a few more years. My contributions to the SHC DC Plan were a way for me to plan for my future, and to allow me to retire on my own terms. The failure to receive the final installment payment will greatly affect that.

*[remainder of page is blank – signature page follows]*

Solemnly affirmed and signed this 13th day of March, 2025, under the penalties of perjury.

Peter Lydon, M.D.

# EXHIBIT 11

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM, | ) | |
| LLC, *at al.*, | ) | Case No. 24-90213 (CML) |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF A. ANA BEESEN IN SUPPORT OF THE OBJECTION OF CERTAIN PARTICIPANTS TO DEBTORS' (I) MOTION FOR AN ORDER (A) DIRECTING THE TRUSTEES TO TURN OVER AND DELIVER TRUST ASSETS OR PROCEEDS THEREOF TO THE DEBTORS, (B) AUTHORIZING THE DEBTORS TO EXERCISE OWNERSHIP RIGHTS OVER SUCH ASSETS, (C) AUTHORIZING TERMINATION OF THE TRUSTS, AND (D) GRANTING RELATED RELIEF; AND (II) OBJECTION TO DR. MANISHA PUROHIT'S LETTER

I, A. Ana Beesen, being over 18 years of age and competent in all respects to testify, having personal knowledge of the facts set forth below, and under penalties of perjury, hereby state, swear, and affirm the following, pursuant to § 1746 of title 28 of the United States Code:

1. I am a physician, previously employed by Steward Health Care System, LLC, or an affiliate of Steward ("**Steward**"), one of the debtors and debtors in possession (the "**Debtors**") in the chapter 11 cases of *In re Steward Health Care System, LLC, et al.*, Case No. 24-90213 (Bankr. S.D. Tex.).

2. I submit this declaration in support of the *Objection of Certain Participants to Debtors' (I) Motion for an Order (A) Directing the Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets, (C) Authorizing Termination of the Trusts, and (D) Granting Related Relief;*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

*and (II) Objection to Dr. Manisha Purohit's Letter* [Docket No. 3497] (the "**Turnover Motion Objection**") filed by the Participants.[2]  I am one of the Participants, as a participant in and beneficiary of the Steward Health Care Deferred Compensation Plan (the "**SHC DC Plan**" or the "**Plan**").

3. I began working for Steward Healthcare System in April 2018, worked for them for 5 years, and resigned from Steward in April 2023. I am currently employed by University of Massachusetts Memorial Medical Center.

4. I became a participant in the SHC DC Plan in December 2022.  When presented with the option to become a participant in the SHC DC Plan (and re-enroll in the Plan, in subsequent years), I was not provided the opportunity to negotiate the terms of my participation in such a Plan.

5. Once I enrolled in the Plan for a particular year, I could not unenroll until the following year's enrollment period.

6. At no time—prior to becoming a participant in the Plan or before annual enrollment—was I presented with information regarding the financial condition of Steward, and at no point was I informed that Steward was insolvent. Nor was I advised that any funds I deferred would ever be at risk; I understood this to simply be a deferral of my compensation to a later period when I might be in a lower tax bracket.

7. If the assets of the Plan are turned over to the Debtors' bankruptcy estates, I will lose significant funds that I invested for my retirement. While I work full time, I am an early-career physician with a significant amount of educational debt from medical school in addition to

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Turnover Motion Objection.

standard living expenses.  It would be extraordinarily difficult for me to attempt to recreate those retirement savings while also servicing my educational debt and paying for living expenses.

*[remainder of page is blank – signature page follows]*

Solemnly affirmed and signed this 14th day of March, 2025, under the penalties of perjury.

A.Ana Beesen, MD