## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11<br>Case No. 24-90213 (CML) |
| STEWARD HEALTH CARE SYSTEM, LLC, *at al.*, | ) ) ) | (Jointly Administered) |
| Debtors.[1] | ) ) | Case No.: 4:25-cv-01584 |

### SUPPLEMENTAL DECLARATION OF ROBERT KEACH IN SUPPORT OF APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL (INCLUDING MOTION FOR IMMEDIATE STAY PENDING HEARING ON THE EMERGENCY MOTION FOR STAY PENDING APPEAL)

I, Robert Keach, being over 18 years of age and competent in all respects to testify, having personal knowledge of the facts set forth below, and under penalties of perjury, hereby state, swear, and affirm the following:

1.       I am lead counsel for Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lydon, Dr. Sridhar Ganda, Dr. A. Ana Beesen, Dr. Benjoy Zachariah, Dr. Barry Arkin, Dr. Bruce Kriegel, and Dr. Gary Miller (collectively, the "**Appellants**"), participants in certain deferred compensation plans sponsored by the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "**Debtors**").

2.       I am familiar with the facts, circumstances, and proceedings in this case relevant to this declaration, which I submit in support of *Appellants' Emergency Motion for Stay Pending Appeal (Including Motion for Immediate Stay Pending Hearing on the Emergency Motion for Stay Pending Appeal)* (the "**Motion**")

3.       On April 7, 2025, I filed a declaration in support of the Motion that described two

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

events that occurred on April 2, 2025 when the Bankruptcy Court rendered its Oral Decision[2] to grant the Turnover Motion because the transcript of the Oral Decision was not available at the time.

4.    After I executed my declaration yesterday, Appellants received the certified copy of the Oral Decision.  Attached as **Exhibit 1** to this declaration is a true and correct copy of that transcript.

5.    In paragraph four of the declaration I represented that the DIP Lender informed the Bankruptcy Court that it considered Plan Assets to be cash collateral of the DIP Lender following the Oral Decision and subject to the cash collateral and debtor-in-possession financing documents and orders. The Court can find the representations that I referred to in paragraph four at Exhibit 1 (Apr. 2, 2025 Tr.) at 60:12-61:20.

6.    In paragraph five of the Declaration, I described how Debtors' counsel confirmed the intent and need to immediately spend the Plan Assets and, additionally,  proffered testimony of John R. Castellano, Debtors' Chief Restructuring Officer,  that Debtors  intended to spend the Plan Assets immediately following the effective date of the Bankruptcy Court's order granting the Turnover Motion on, among other things, payments to the DIP Lender. The Court can find the part of the proceeding I described in paragraph 5 at Exhibit 1(Apr. 2, 2025 Tr.) at 54:18-55:2; 71:4-75:9.

7.    The Bankruptcy Court's ruling on the Turnover Motion can be found at Exhibit 1 (Apr. 2, 2025 Tr.) at 4:24- 50:9.

8.    Appellants  requested  that  the  Bankruptcy  Court  keep  the  default  14-Day administrative stay under Rule 6004(h) ("Administrative Stay") in place at Exhibit 1 (Apr. 2, 2025

---

[2] Capitalized terms, unless otherwise defined, have the same meaning as in the Motion.

Tr.) at 4:24- 50:9.

9.      Appellants requested that the Bankruptcy Court stay the effect of the Turnover Order pending appeal ("Motion to Stay Pending Appeal") at Exhibit 1 (Apr. 2, 2025 Tr.) at 56:22-60:11.

10.     The Bankruptcy Court heard argument and evidence on both the Administrative Stay and Motion to Stay Pending Appeal at Exhibit 1 (Apr. 2, 2025 Tr.) at 60:12-75:4

11.     The Bankruptcy Court denied Appellants' Motion to Stay Pending Appeal at Exhibit 1 (Apr. 2, 2025 Tr.) at 75:5-78:12.

12.     The Bankruptcy Court modified the Administrative Stay to make the Turnover Order effective on April 11 at 11:59 pm CT at Exhibit 1 (Apr. 2, 2025 Tr.) at 78:14-79:23.


Solemnly affirmed and signed this 8th day of April, 2025, under the penalties of perjury.


       */s/ Robert Keach*         
Robert Keach

# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO.24-90213-11 |
| | § | HOUSTON, TEXAS |
| STEWARD HEALTH CARE | § | WEDNESDAY, |
| SYSTEM, LLC, | § | APRIL 2, 2025 |
| DEBTOR. | § | 3:01 P.M. TO 3:45 P.M. |

## **ORAL RULING**

BEFORE THE HONORABLE CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:              SEE NEXT PAGE

CASE MANAGER:             ROSARIO SALDANA

ELECTRONIC RECORDING OFFICER:  YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES**:


FOR THE DEBTORS:                    WEIL, GOTSHAL & MANGES LLP
                                   David Cohen, Esq.
                                   Robert Keach, Esq.
                                   Robert Berizen, Esq.
                                   767 Fifth Avenue
                                   New York, NY 10153
                                   212-310-8000


FOR THE PLAN PARTICIPANTS:          DIAMOND MCCARTHY LLP
                                   Allan Diamond, Esq.
                                   Two Houston Center
                                   909 Fannin St., 37th Floor
                                   Houston, TX 77010
                                   713-333-5100


FOR THE OFFICIAL COMMITTEE          AKIN GUMP STRAUSS HAUER & FELD
OF UNSECURED CREDITORS:             Sarah Schultz, Esq.
                                   2300 N. Field St., Ste. 1800
                                   Dallas, TX 75201
                                   214-969-2800


FOR FILO SECURED PARTIES:           MILBANK LLP
                                   Michael Price, Esq.
                                   55 Hudson Yards
                                   New York, NY 10001
                                   212-530-5000


(Please also see Electronic Appearances.)

1          **HOUSTON, TEXAS; WEDNESDAY, APRIL 2, 2025; 3:01 P.M.**

2          THE COURT:  Okay.  Good afternoon, everyone.  This

3   is Judge Lopez.  Today is April 2nd.  I'm going to call the

4   3:00 p.m. case, Steward.  I will turn on my camera so we can

5   all see each other and we'll see where we are.

6          Anyone online wish to make an appearance, please hit

7   five, star, and I will unmute your line.  There's a 973

8   number.  A 973 number.

9          MR. BERIZEN:  Your Honor, I believe that's me.

10  Robert Berizen, Weil Gotshal & Manges, on behalf of the

11  Debtors.

12          THE COURT:  Okay.  Here's a 713 number.  A 713-539

13  number.

14          MR. DIAMOND:  539?

15          THE COURT:  Yes.

16          MR. DIAMOND:  Yeah.  Good afternoon, Your Honor.

17  This is Allan Diamond with Diamond & McCarthy on behalf --

18          THE COURT:  Oh.

19          MR. DIAMOND:  -- of the plan participants.

20          THE COURT:  Yes, absolutely.  Good afternoon.

21          Anyone else on the line wish to --

22          MR. DIAMOND:  Good afternoon.

23          THE COURT:  -- make an appearance?

24          Mr. Keach, I forgot to look in the courtroom first.

25  I was so busy looking online.  Good afternoon.

1          MR. KEACH:  Good afternoon, Your Honor.  Robert

2   Keach for the Debtors.

3          THE COURT:  Good afternoon.

4          Anyone else wish to make an appearance, please hit

5   five, star, and I will unmute your line.

6          Okay.  Before I go to the oral ruling, I think, Mr.

7   Cohen, I thought there may have been some other Stewart stuff

8   we were going to -- that was on the agenda already because I

9   know I picked the time because it was already something there,

10  and I don't know if it's still there.

11         MR. COHEN:  Your Honor, David Cohen for the record.

12  I believe everything else has been adjourned.  So this is the

13  only matter on the agenda today.

14         THE COURT:  Ah, okay.  Got it.  Okay.  Well then I

15  will put on my cheaters and I will get to reading.  Okay.

16         Oh, the -- just give me one moment.  Before I start,

17  Mr. Cohen, can you confirm that you can hear me okay before I

18  start reading?

19         MR. COHEN:  We can hear you, Your Honor.  Thank you.

20         THE COURT:  Yesenia, are we good?  Huh?

21         THE CLERK:  Yeah.

22         THE COURT:  Okay.

23         MR. COHEN:  We can hear you well.

24         THE COURT:  All right.  Perfect.  Okay.

25         Well, we're here in connection with an oral ruling

1    on the Debtors' motion at 3277.  This is Judge Lopez.  This

2    oral ruling will begin.  I appreciate everyone.  For those who

3    are on the line, I'd ask that you just mute your line just so

4    I can just read this into the record.

5           I would note it is 19 single-spaced pages.  So

6    you're going to be here for a while.  Okay.

7           The Steward Health Care Debtors started these

8    Chapter 11 cases in May of 2024.  At the time of filing,

9    Steward was the largest private physician-owned health care

10   system in America.  It provided care to over 2 million people

11   annually and employed over 30,000 people.

12          Several thousand of these employees were primary and

13   special care physicians.  The hospital system spanned over 10

14   states, had over 30 hospitals, and included several hundred

15   facility locations like ambulatory surgical centers and

16   diagnostic imaging centers.

17          The reason Steward ultimately filed these Chapter 11

18   cases is well documented in this case.  During the case,

19   Steward sold almost all of the hospitals.

20          The sales involved complex transactions between

21   secured creditors, landowners, and multiple state and federal

22   government agencies.

23          One hospital I know closed, and I still think about

24   that hospital and its patients all the time.  Several

25   hospitals almost closed.  I've held hearings whenever needed

1    to ensure access to the Court for any creditor, agency, state

2    government official, doctor, vendor, or employee.  Not every

3    case I have needs that much attention; this one does.

4          It's a really big case with constant moving parts.

5    Steward has accomplished much during these Chapter 11 cases.

6    Many hearings also involve unfortunate circumstances and

7    results for either a creditor or the estate.

8          The role of courts is to rule based on a strict

9    reading of the text, applicable case law, and the record.

10   Today's no different.  I'm going to provide some background,

11   then law, then apply the law to the facts, and then rule on

12   the motion.

13         On the petition date, Steward moved for an order

14   allowing them to pay employees up to the statutory priority

15   amounts permitted under the Bankruptcy Code.

16         In the same motion, Steward also sought permission

17   to terminate two deferred compensation plans retroactive to

18   the petition date.  The two deferred compensation plans are

19   the Steward Health Care Deferred Compensation Plan, which I

20   will refer to as the Steward Plan, and the IASIS Plan.  And

21   for the record, it's spelled I-A-S-I-S.

22         I will refer to both plans collectively as the

23   plans.  Under the plans and related trust agreements, Steward

24   established separate trusts that held the deferred

25   compensation assets managed by the Trustees.

1          The Court ultimately granted Steward's motion and

2    authorized Steward to terminate the plan.  Based on the

3    Court's order, Steward terminated the plans retroactive to the

4    petition date and sent communications to plan beneficiaries.

5          Steward also informed the Trustees that Steward was

6    insolvent.  And on August 12th, 2024, Steward informed plan

7    beneficiaries that they were general unsecured creditors and

8    could submit a proof of claim in the Steward bankruptcy cases.

9          The plans have been terminated about a year, but the

10   Trustee still manages the assets.  These terminated plans and

11   the related trusts are the focus of the dispute before the

12   Court.

13         In November of 2024, Steward filed a motion that I

14   will call the Rabbi Trust motion.  The Rabbi Trust motion

15   asked for an order under Sections 105, 363, 541, and 542 of

16   the Bankruptcy Code to authorize and direct the Trustees to

17   transfer the trust assets to Steward or to liquidate the trust

18   assets and transfer the proceeds to Steward; to authorize

19   Steward to exercise ownership rights over the trust assets; to

20   authorize Steward and the Trustees to terminate the trust and

21   discharge all the Trustees' obligations to the trust; and to

22   authorize Steward to terminate the respective record

23   bookkeeping, excuse me, yeah, record-keeping service

24   agreements; and to discharge all the record keeper's

25   obligations.

1          The Rabbi Trust motion also included an objection to

2     Dr. Manisha Purohit, and that's spelled P-U-R-O-H-I-T, a

3     letter filed at ECF 3134, asking the Court to prioritize

4     payment of deferred compensation funds to all previous or

5     current employees of Steward.

6          In December of 2024, certain plan participants

7     objected to the Rabbi Trust motion and asked the Court to deny

8     the requested relief.  For the record, Dr. Purohit,

9     P-U-R-O-H-I-T again, is one of the objecting parties.

10          The objectors do not believe Steward has the right

11     to use trust assets to pay creditors.  Instead, they want the

12     plans to remain for the sole benefit of the plan participant

13     and subject to ERISA regulations as a funded deferred

14     compensation plan.

15          The terms funded and unfunded have a specific legal

16     meaning that I'll discuss in a moment, but for now, I'll

17     continue with the background facts.

18          The hearing to consider the Rabbi Trust motion was

19     originally scheduled for February 14, 2025.  It was later

20     adjourned to March 11.  Eight days before the scheduled March

21     11 hearing on March 3rd, the objectors filed an emergency

22     motion with this Court asking to stay hearing on the Rabbi

23     Trust motion.

24          The objectors also started an adversary proceeding

25     by filing a complaint for injunctive, equitable, and

1    declaratory relief and a request for a class action.  And

2    that's adversary proceeding 25-03066.  They also filed a

3    motion to withdraw the reference.

4        On March 7th, this Court heard argument on the

5    objector's stay motion and denied it.  The Court's reasons for

6    denying the stay motions were stated on the record, and among

7    the reasons that the object -- was that the objectors filed an

8    objection to the Rabbi Trust motion in December 2024 and

9    expressed no hesitation about proceeding as a contested matter

10   rather than an adversary proceeding.

11       A hearing date was set out three months to give

12   parties time to prepare and conduct discovery.  The Court

13   heard nothing from objectors during this time.  And then at

14   the last minute, they started an adversary proceeding which

15   one could construe as an effort to delay a hearing on the

16   Rabbi Trust motion.

17       Bankruptcy Courts routinely address issues related

18   to Rabbi Trusts, and there's nothing especially difficult or

19   different about the plans or the related trust in this case.

20       Counsel for one of the objectors is a nationally-

21   recognized bankruptcy lawyer who has argued these issues many

22   times before Bankruptcy Courts, and I personally cannot think

23   of anyone better in America to litigate these issues in a

24   Bankruptcy Court than who they have.

25       That said, although the Court denied staying the

1    hearing, based on the concerns raised by the objectors about

2    certain discovery issues, the Court adjourned the March 11th

3    hearing to March 26th.

4         On March 13, the objectors filed with the District

5    Court for the Southern District of Texas an emergency motion

6    seeking a stay of the hearing on the Rabbi Trust motion.

7         On March 24, the District Court did not grant a

8    stay.  The Court conducted a hearing on the Rabbi Trust motion

9    on March 26th, and it concluded on March 27.  Over 200

10   exhibits were submitted and entered into the record.

11        The Court heard testimony from several fact

12   witnesses and two experts.  After the hearing, the Court took

13   the matter under advisement.  The Court now rules.

14        A central dispute is about whether the plans and the

15   related trust qualified as, quote, Rabbi Trusts or Top Hat

16   plans.  If they are Top Hat plans, then by definition, all

17   trust assets are property of the Steward Bankruptcy Estates

18   and subject to the general claims of creditors.

19        The trusts currently hold about 60 million in the

20   aggregate, so it's a significant source of assets to pay

21   potential creditors.

22        The Unsecured Creditors Committee supports the Rabbi

23   Trust motion.  If, however, they're not Top Hat plans,

24   objectors ask the Court to recognize that the trust assets are

25   subject to an ERISA statutory trust, or the Court could impose

1    a constructive trust to make them solely for the benefit of

2    the plan participants.

3            Objectors believe the Court could also reform the

4    plans to make them funded plans subject to ERISA.  In other

5    words, no matter how it's accomplished, objectors don't

6    believe trust assets currently are or should become subject to

7    the general claims of creditors in this case.

8            I'll now turn to some general information about

9    Rabbi Trusts or Top Hat plans.  Rabbi trusts originally got

10   their name due to a 1980 IRS letter ruling on a trust for the

11   benefit of a rabbi.

12           That's private letter ruling 811-3107, December 31,

13   1980.  I would also note that the Occidental Petroleum Corp.

14   v. Wells Fargo Bank, 117 F.4th 628, 633 pin cite, Fifth

15   Circuit 2024 case, cites the Bank of America N.A. v. M-O-G-L-

16   I-A, 330 F.3rd 942, pin cite 944, Seventh Circuit 2003 case,

17   discussing this very point.

18           A Rabbi Trust is essentially an unfunded arrangement

19   between an employer and an employee.  For the employee, the

20   Rabbi Trust provides that the employer will pay deferred

21   compensation benefits promised to an employee even if there's

22   a change in control of management.

23           The employee has to pay into it using assets of the

24   company subject to limitations.  Employees receive

25   distributions once retired.  Thus, they are taxed at a lower

1    rate than while employed, at site 2, Qualified Retirement Plan

2    Section 24, Section 56, 2024 edition.

3         Rabbi trusts are also exempt from the funding,

4    vesting, and fiduciary requirements under ERISA.  I'll cite

5    Reliable Home Health Care, Inc. v. Union Central Insurance,

6    295 F.3rd 505, pin cite 512, Fifth Circuit, 2002.

7         The employer is considered the owner of the trust,

8    and income the trust generates is taxable to the employer,

9    McAllister v. Resolution Trust Corp, 201 F.3rd 570, pin cite

10    573, Fifth Circuit, 2000.

11         This allows, quote, the participants to defer tax

12    liability on their individual shares until asset distributions

13    under the terms of the plan.  Same case.  It would make sense

14    that an employee would want this deferred compensation to be

15    outside of the reach of the company's creditors.

16         But that defeats the purpose of the Rabbi Trust.

17    Creditors of the employer company have access to the Rabbi

18    Trust assets, and it is the placing of assets in a trust that

19    avoids triggering adverse tax results for the plan

20    beneficiary.

21         Let me provide some examples of an adverse result.

22    Taxpayer may be subject to taxation on an amount before

23    actually receiving it if the employee is treated as having

24    constructively received the amount.

25         So, for example, if the money is set aside and the

1    taxpayer can access it without substantial limitations, like

2    the ability to receive a lump sum.  See, for example, 26 CFR,

3    Section 1.451-2(a).

4            An employee can also be taxed if the employee

5    receives the economic benefit of the compensation.  That's

6    when assets are unconditionally and irrevocably paid into a

7    trust to be used for the employee's sole benefit.  I'll cite

8    to that Rev. Rul. 60-31 to 1960-1.

9            The concept behind the economic benefit doctrine was

10   codified in 26 CFR 1.83, which governs the taxation of

11   compensatory transfers of property.  Thus, an employee would

12   be taxed on the amount of -- excuse me -- thus, an employee

13   would be taxed on an amount the employer places outside the

14   reach of its creditors when the employee's rights to the

15   amount is not subject to a substantial risk of forfeiture.

16           And to avoid early taxation of benefits, a deferred

17   compensation plan must place substantial restrictions on an

18   employee's ability to receive the benefits.

19           For an example, an employee cannot have the right to

20   demand an immediate lump sum or receive the entire deferred

21   compensation plan benefit at any time.  And as I said earlier

22   in this case, there are two deferred compensation plans at

23   issue here, the Steward plan and the IASIS plan, I-A-S-I-S.

24           The Steward plan was established in November of 2011

25   and was restated effective December 31, 2015.  And I'll cite

to the Steward admitted Exhibits 2 through 4.  The
introductory paragraph of the Steward Plan says its purpose is
to, quote, aid Steward in retaining and attracting executive
employees by providing them with tax-deferred savings
opportunities, Exhibit 2; and that the plan provides a select
group of management and highly-compensated employees within
the meaning of ERISA Sections 2012, 301(a)(3), and 401(a)(1)
with the opportunity to elect to defer receipt of specified
portions of compensation and to have those deferred amounts
treated as if invested in a specified hypothetical investment
benchmarks.

Section 4.01 is called participation.  Since the
plan is limited to physicians and executives who, one, meet
such eligibility criteria as the board shall establish from
time to time, including the requirement that such executive is
a member of a select group of management and highly-
compensated employees; two, has been notified by the board
that she or he has been designated by the board for
participation in the plan; and three, elects to participate in
the plan by filing a deferral agreement under rules
established by the plan and the board.

To qualify as highly compensated, the board
initially set a salary floor of $150,000.  See Steward's
Exhibits 4 and 5.  In 2019, the board amended the plan to
allow, along with physicians and executives, select highly-

15

1    compensated physicians assistants, nurse practitioners, and

2    certified registered nurse anesthetists, all of which had to

3    earn at least $180,000.

4              And you see that in Steward's 6 through 8, Exhibits

5    6 through 8, which are board resolutions, I'd note that the

6    Potter Declaration at paragraph 5, Steward 40, Exhibit 40,

7    speaks to this too.

8              The plan administrator annually circulated by

9    electronic email -- excuse me, by electronic mail an

10   enrollment announcement and a, quote, plan at a glance, close

11   quote, document to eligible participants.  That's Steward

12   Exhibits 7 through 9.  I'd cite Driscoll Declaration in

13   paragraph 27, which is Steward Exhibit 44.

14             The October 2023 plan at a glance, for example,

15   stated that unlike a 401(k) plan, if Steward Health Care

16   becomes insolvent, Steward's creditors will have access to

17   your account.

18             You'll have the rights of a general unsecured

19   creditor in such event.  Look at Steward Exhibit 7.  The

20   Steward plan document, Steward plan summary, and plan at a

21   glance were accessible to plan participants on the plan

22   resources tab of an online enrollment site.

23             Steward Exhibits 10 through 13 show the web pages

24   and their contents.  The 2024 plan summary had a Section

25   titled Security of Deferred Compensation, and it says that as

1    it is a non-qualified deferred compensation plan, it is

2    considered both unfunded and unsecured, making your employer's

3    promise to pay the full value of your deferred compensation

4    plan accounts and the additional retirement income as an

5    unfunded and unsecured promise to pay in the future.

6           As a participant, you are an unsecured creditor of

7    Steward Health Care and its subsidiaries and your payments

8    must come from the assets of the corporation.  The company has

9    established a Rabbi Trust to hold assets which -- with which

10   to pay benefits under the plans to provide the maximum

11   security permitted by law.

12          Section 9.01 was titled Unfunded Plan, and it

13   provides that the plan is, quote, is intended to be an

14   unfunded plan maintained primarily for the purpose of

15   providing deferred compensation for a select group of

16   management or highly-compensated employees, all within the

17   meaning of Sections 201, 301, and 401 of ERISA.

18          All payments pursuant to the plan shall be made from

19   the general funds of employers and no special or separate fund

20   shall be established or other segregation of assets made to

21   assure payment.

22          No participant or other person shall have under any

23   circumstances any interest in any particular property or asset

24   of employers as a result of participating in the plan, and

25   that employers may, but shall not be obligated to, create one

1    or more grantor trusts, the assets of which are subject to the

2    claims of the employer's creditors to assist in accumulating

3    funds to pay its obligations under the plan.  That's Steward

4    Exhibit 2.

5        Section 9.04, titled Rabbi Trust provides that

6    Steward may establish a Rabbi Trust for the purposes of

7    funding benefits payable under the plan or under any other

8    non-qualified deferred compensation plan.

9        The assets of such Rabbi Trust with respect to

10   benefits payable under the plan shall remain subject to the

11   claims of general creditors, Steward Exhibit 2, at 57.

12       Steward established a Rabbi Trust under a certain

13   trust agreement with Deutsche Bank Trust Company.  In 2016,

14   Steward appointed Matrix Trust Company as successor Trustee.

15   This is all found in Steward Exhibit 19.

16       The assets of Steward Trust primarily consist of

17   corporate-owned life insurance contracts and certain current

18   or former employees to fund Steward's obligations under the

19   plan.  Steward Exhibits 20 and 21 show that Steward used money

20   from its accounts to invest in insurance policies.  Steward

21   was the sole beneficiary of the policies.

22       The trust agreement says that trust assets remain

23   subject to the claims of Steward's creditors in the event of

24   Steward's insolvency, and that, quote, neither the Trustee nor

25   any plan participant or beneficiary shall have any right to

1    compel such additional deposits.

2         It also says that it is the intention of the parties

3    that this trust shall continue an unfunded arrangement and

4    shall not affect the status of the plan as an unfunded plan

5    maintained for the purpose of providing deferred compensation

6    for a select group of management or highly-compensated

7    employees for purposes of ERISA.

8         Section 3.1 of the trust agreement says that the

9    Trustee shall cease payment of benefits to plan participants

10   and their beneficiaries if the company is insolvent, Steward

11   Exhibit 19.

12        The trust agreement specifies that the company is

13   considered, quote, insolvent if Steward is subject to a

14   pending proceeding as a Debtor under the Bankruptcy Code.

15        Section 3.2 says that if at any time the trust has

16   determined that the company is insolvent -- excuse me -- if at

17   any time the Trustee has determined that the company is

18   insolvent, the Trustee shall discontinue payments to plan

19   participants or their beneficiaries and hold assets of the

20   trust for the benefit of the company's general creditors.

21        The IASIS plan was established in July 2006 by

22   IASIS, a company which was acquired by Steward in 2017.  In

23   March of -- excuse me, in March of 2009, IASIS filed a Top Hat

24   plan statement with the Department of Labor about the creation

25   of the Top Hat plan.  And that's at Exhibit 23.

1         The IASIS plan document says that its purpose is to
2    be an unfunded plan primarily for the purpose of providing
3    deferred compensation for a select group of management or
4    highly-compensated employees and intended to be within the
5    exemptions of ERISA.
6         The plan is intended to be unfunded for purposes of
7    both ERISA and the Code.  The plan is not intended to be a
8    qualified plan under Sections 4.01(a) of the Code.  Rather,
9    the plan is intended to be a non-qualified plan, the Code
10   being the Internal Revenue Code.
11        The IASIS plan was frozen effective 2017, meaning
12   that no new deferrals could be made into the IASIS plan.
13   Lombardo testified about that on the first day of the hearing,
14   March 26th, at transcript 92, lines 18 through 22.
15        Section 3.01 of the IASIS plan defines employees
16   eligible to participate as those whose basic compensation is
17   at least equal to the current compensation of highly-
18   compensated employees, which in 2017 was $120,000, and whose
19   job classification was CEO, COO, or Chief Nursing Officer of a
20   hospital, corporate officer at the director level or above, or
21   a physician employed by a participating company or otherwise
22   designated employees, Steward Exhibit 1.
23        Section 6.02 says that the assets of the trust with
24   respect to benefits payable to the employees of each
25   participating company shall remain the assets of such

1    participating companies subject to the claims of its general

2    creditors.

3            Any payments by a trust of the benefits to a

4    participant under the plan shall be considered payment by the

5    participating company and shall discharge the participating

6    company of any further liability on the plan for such

7    payments.

8            IASIS established a Rabbi Trust with Wells Fargo and

9    later Principal replaced Wells Fargo.  These are Steward

10   Exhibits 25 and 26.  The assets of the IASIS Trust consist of

11   mutual funds, cash, and cash equivalents as a means to fund

12   Steward obligations under the plan.

13           Section 1.4 of the trust agreement says the

14   principal of the trust and any earnings thereon shall be held

15   separate and apart from other funds of the company -- as funds

16   of company and shall be used exclusively for the uses and

17   purposes of plan participants and general creditors as here

18   set forth.

19           Plan participants and their beneficiaries should

20   have no preferred claim or any beneficial ownership interest

21   in any assets of the trust.  Any rights created under the plan

22   and the trust agreement shall be mere unsecured contractual

23   rights of the plan participants and their beneficiaries

24   against company.

25           Any assets held by the trust will be subject to the

1    claims, the company's general creditors under federal and

2    state law in the event of an insolvency.

3          And Section 3.2 of the trust agreement says that at

4    all times during continuation of the trust as provided in

5    Section 1.4, the principle of income of the trust shall be

6    subject to the claim of general creditors of the company under

7    state, excuse me, under federal and state law.  That's Steward

8    Exhibit 25.

9          Section 3.13 of the trust agreement provides that if

10   at any time Trustee has determined that the company is

11   insolvent, Trustee shall discontinue payments to plan

12   participants or their beneficiaries, shall hold the assets of

13   the trust for the benefit of the company's general creditors.

14         Section 5.01 stipulates that the deferred

15   compensation amount as defined in Section 2.13 says this

16   account is a separate book reserve account and consistent and

17   at all times assets of the participating company are subject

18   to the claims of the participating company's general

19   creditors.

20         Finally, the IASIS Plan also stipulates that any

21   employee or participant shall not have at any time any

22   interest in or to such deferred compensation account or in any

23   investment or asset thereof.

24         Participant's deferred compensation account shall

25   not constitute or be treated as a trust or trust fund of any

1    kind.  The objectors are all former physicians at Steward who

2    participated in the Steward plan.

3            But I would note that Dr. Purohit worked at IASIS

4    before it was acquired by Steward as stated in Dr. Purohit's

5    Declaration at paragraph three, Participants Exhibit 8.  She

6    also testified about that on the stand.  She participated in

7    the IASIS plan and then the Steward plan.

8            Each of these physicians, the objectors physicians,

9    has earned at least $350,000 with additional compensation and

10   benefits.  That is found at Steward Exhibits 34 through 36 and

11   45 through 49.

12           Before analyzing the merits of the objection,

13   objectors raised an issue about the procedural posture of the

14   dispute.  As I noted earlier, the Court is deciding the Rabbi

15   Trust motion and the objections which created a contested

16   matter.

17           Objectors raised in connection with starting the

18   adversary proceeding that the relief requested includes

19   Section 542 of the Bankruptcy Code, which implies that an

20   adversary proceeding is required.  And an adversary proceeding

21   under Bankruptcy Rule 7001 requires a separate complaint and

22   incorporates additional Federal Rules of Bankruptcy procedure.

23           Objectors also note that their adversary complaint

24   that they filed would serve that purpose.  A few points here.

25           First, the plans are terminated.  So there's no

additional enrollment.  The Trustees are in control.  So if I
find that the plans were Top Hat plans, that the trust assets
are property of the estate, and that this was a proper Top Hat
plan, then the assets are property in the estate under Section
541 of the Bankruptcy Code.  And by law, the objectors are
general unsecured creditors with no legal right to the funds.

Creditors have the right to file a claim in
bankruptcy and join in any distribution in accordance with the
priority set forth in the Code.  But they're entitled to no
greater right and no less right than other creditors of equal
rank.

Steward has the right to ask for the authority to
terminate the trust under Section 363 of the Bankruptcy Code.
So if I order that, then the Trustee agreement -- if I order
that the trust can be terminated, then the Trustee agreements
by themselves require the trust to turn over the funds to
Steward.

In other words, there's no real turnover action
required under Section 542.  It just happens by operation of
the agreements.  Nothing would force them to do so here.

The Trustees are also not contesting the motion.
They're not the ones -- and they're the ones who technically
would have legal standing to contest a request ordering them
to turn over the funds under Section 542 anyway.

I don't really think this is a Section 542 action

1    anyway.  I don't need to force the Trustees.  And regardless,

2    the Trustees are not objecting.  If I order a return of the

3    funds, I can do that under Section 363 of the Bankruptcy Code

4    because I'm authorizing the Trustees to -- I'm authorizing the

5    Debtors to terminate the trust and relieve of the Trustees of

6    their duties and the bookkeepers of their duties.

7            And the funds held in the trust are already subject

8    to the claims of creditors if I find that this is a Top Hat

9    plan.  And it's already subject to property of the estate

10   because that happens on the petition date.

11           The Debtors can hold the money in a segregated

12   account if they wanted.  But if the money is subject to the

13   claims of creditors, all I'm doing is telling the Trustees

14   they don't have to be a part of the bankruptcy process

15   anymore.

16           They can give the money to the Debtors.  And the

17   Debtors will need a further order of this Court to be able to

18   use any portion of that money.  There's no secrets about that.

19           Finally, I would remind everyone that the Rabbi

20   Trust motion was filed in November of 2024 and an objection

21   was filed in December of 2024.  The objection raised no

22   contested versus adversary case issues.

23           Months later, the adversary was filed on the eve of

24   trial.  I won't say any more than that other than I find a

25   contested matter is appropriate here and I can afford relief.

25

1          Next, I turn to the applicable Top Hat plan language

2     and the statute.  And with all matters, I turn to statutory

3     interpretation.  Text is always the alpha.  See Whitlock v.

4     Lowe, 945 F.3rd 943, pin cite 947, Fifth Circuit 2019 case;

5     Bedrock Ltd, LLC v. United States, 541 U.S. 176, pin cite 183,

6     2004 case.

7          The preeminent canon of statutory interpretation

8     requires the Court to presume that the legislature says in a

9     statute what it means and means in a statute what it says

10    there.  That's a quote from the United States Supreme Court.

11         The ERISA Top Hat plan when you quote and you look

12    at the applicable language, 29 USC 1101(a)(1), has to be

13    maintained by an employer primarily for the purpose of

14    providing deferred compensation for a select group of

15    management or highly-compensated employees.

16         Thus, I think about this in two prongs.  Top hat

17    plan has to be, one, unfunded; and two, maintained primarily

18    for the purpose of providing deferred compensation for a

19    select group of management or highly-compensated employees.

20         When determining whether a plan is funded or

21    unfunded, a Court must look to the surrounding facts and

22    circumstances.

23         Second, a Court should identify whether a policy is

24    funded by a res, R-E-S, separate from the general assets of

25    the company.  In doing so, the mere fact that a plan is funded

1    through an insurance policy and the Reliant case, Fifth

2    Circuit case, confirms this, if a plan is funded through an

3    insurance policy, it's not dispositive of the plan's funded or

4    unfunded status for ERISA purposes.

5         A plan is considered unfunded so long as

6    participants do not have, quote, a legal right any greater

7    than that of an unsecured creditor to a specific set of funds

8    from which the employer is under the plan obligated to pay the

9    deferred compensation.  That's the Reliable Home case, 295 --

10   I said Reliant earlier; I meant Reliable Homes, 295 F.3rd at

11   513, and it was quoting Demer, D-E-M-E-R, v. Exte Bank, E-X-T-

12   E, B-A-N-K, Deferred Comp Plan B, 216 F.3rd 283, pin cite,

13   287, Second Circuit 2000 case.

14        The Fifth Circuit in Reliable Homes also held that

15   evidence of the plan's unfunded status lies in the fact that

16   participants did not incur tax liability in connection with

17   funds transferred to the plan for their benefit.  That's at

18   pin cite 514 and 515.

19        Based on the record, the Court finds that both plans

20   meet the unfunded requirement.  We start with the words of the

21   plans.

22        Steward plan document says that it is, quote,

23   intended to be an unfunded plan and that no funds are to be

24   set aside beyond the Rabbi Trust, which is accessible to

25   general creditors.

1          The Rabbi Trust documents are all admitted into the

2    records.  They say they're assets subject to the claims of

3    company's creditors.  Steward used deferred compensation to

4    acquire life insurance policies owned by Steward.  Proof of

5    that is in the record, Driscoll Declaration at paragraph 32,

6    Steward Exhibit 34.

7          The policies show that Steward was the beneficiary.

8    Steward Exhibits 21 and 22, Castellano Declaration, Steward

9    Exhibit 43 at paragraph 7 reports the same.  That is

10    consistent with the Fifth Circuit's analysis in Reliable, 295

11    F.3rd at 514.  So it works.

12          The premiums for the insurance policies were paid

13    from Steward's general fund, Castellano Declaration at

14    paragraphs 8 and 10.  The evidence shows that it did not come

15    from money withheld from specific participants' paychecks.

16    Castellano support that at paragraphs 8 through 10.

17          And that's important.  Remember that is what makes

18    these plans different than regular ERISA-funded plans.

19    Participants also did not pay income tax on deferrals to the

20    plan.  See Driscoll Declaration at paragraph 20.

21          They never had to, and I heard of no real complaints

22    and there are nothing -- no complaints about that either.

23    Because the participants did not incur tax liability during

24    the year they made contributions, the plan is considered

25    unfunded.  And that's really important for the reasons I

1     stated earlier.

2          The IASIS plan was unfunded too.  The plan documents

3     describe it as unfunded.  It states that it's intended to be

4     for the -- it's intended to be unfunded for the purposes of

5     both ERISA and the Internal Revenue Code.  That was Steward

6     Exhibit 1.

7          IASIS established a Rabbi Trust using the IRS model

8     language for Rabbi Trust, Steward Exhibit 25.  The trust

9     agreement states that the trust funds were to be used

10    exclusively for the uses and purposes of plan participants and

11    general creditors, Steward Exhibit 25.

12         IASIS enrollment information explained to eligible

13    employees that deferrals and tax earnings are tax deferred and

14    you don't pay income taxes on that money until it is paid to

15    you, Steward Exhibit 43.

16         Plan participants did not incur tax liability

17    either.  The deferred compensation remained an asset of the

18    company; thus, the plan is unfunded.

19         Objectors, however, don't want the plans to be

20    unfunded.  They want the Court to refer -- excuse me -- to

21    reform them to be funded plans to find an ERISA statutory

22    trust exists or to place a constructive trust over the assets.

23         To be clear, they don't advocate to incur

24    retroactive tax liability in these scenarios.  They also don't

25    dispute that Steward and IASIS plan documents said the trust

1    would be unfunded and assets would be subject to the claims of

2    general -- the general claims of creditors.

3            But I understand they're legitimately concerned

4    about losing their deferred compensation.  And some of the

5    funds are -- some of the amounts are significant, and I

6    understand that, and that's understandable.

7            So they all raise all forms of arguments in hopes

8    that one of them changes the deal they agreed to and to

9    enforce the agreement differently, as it were to occur outside

10   of bankruptcy.

11           The Court disagrees with all of their arguments,

12   however, including a request for estoppel here.  The record is

13   robust and clear.  Bankruptcy Courts shouldn't rewrite

14   contracts.  Neither should any Court if the terms are plain

15   and enforceable on their face.

16           And there's no evidence of any or even allegations

17   that there was fraud at the outset of these documents.

18   Steward had the burden of proving matters today.  It was their

19   motion.

20           They've done so in my opinion by more than a

21   preponderance of the evidence.  The objectors argue that the

22   IASIS plan was not unfunded because at some point, it looks

23   like some funds were placed into an account that was not there

24   the same time.

25           But there's no evidence that the IASIS Trustee

1    stopped managing these trust assets.  Steward Exhibit 41,

2    which is Lombardo's Declaration, at paragraph 15 says that the

3    IASIS plan was always a Top Hat plan and it was unfunded and

4    established to provide a select group of management or highly-

5    compensated employees an opportunity to defer specified

6    income.

7          There's no evidence in the record that refutes this

8    testimony.  Both the documents and the testimony proved that

9    the plans were unfunded.  Nothing the objectors raised comes

10   close to requiring a different conclusion or a drastic remedy

11   of somehow changing the deal that they all agreed to by

12   changing an unfunded plan to a funded one.

13         The objectors also argue that an approximate 9

14   million distribution made to the plan participant while

15   Steward was insolvent shows evidence of potential fraud and

16   thereby requires the conversion to a funded plan.

17         They show that that may show that it was evidence

18   that it was being treated as a funded plan.  There was

19   testimony that Steward approved taking loans on trust assets

20   and making a larger than normal distribution to plan

21   participants and then filing for bankruptcy about one month

22   later.

23         Lombardo testified to this on March 26th, page 70,

24   line 21 through line -- excuse me -- line 21, starting there

25   and continuing.  Steward also appeared to allow plan

1     participants to deferred income without expressly disclosing

2     when it may have been insolvent.

3            Objectors believe this proves they treated the plans

4     as funded rather than unfunded, and the Court disagrees.  The

5     substantial distribution to plan participants appears to have

6     been made shortly before the Chapter 11 cases were started.

7            There's no evidence in the record of fraud or theft

8     of assets and this Court gets no impression of any such

9     either.  But it was about twice as much as prior plan

10    distribution.

11           The funds appear to have come from a loan taken

12    against Steward plan policies.  And Section 16.3 of the

13    Steward Rabbi Trust documents say that no benefit payable out

14    of the trust to any person shall be subject to a lien or a

15    pledge, and any attempt to pledge an amount payable is void,

16    and the payee won't be subject to a legal process.

17           This Section protects a payee from receiving a

18    payment and then being subject to a legal process by a third

19    party.  This protects payees.  It doesn't say the company

20    can't pledge assets now.  So I don't see any fraud or

21    illegality here.  But in any event, the process by which

22    assets were pledged and payments to payees were made, is at

23    most a pre-petition breach of contract giving rise to a

24    pre-petition claim.

25           I also note that bankruptcy is a specially well

1    equipped to deal payments where parties receive cash while the

2    Debtor may be insolvent or a party receives a distribution for

3    less than reasonable equivalent value.

4         Congress gives Debtors tools to analyze these

5    potential rights to bring such claims.  And there is a robust

6    Creditors Committee who I am confident is analyzing all these

7    issues along with the Debtors and the merits of any such

8    claims.  Bankruptcy is really good at dealing with these

9    issues.  But there's no evidence of fraud.

10        Objectors also argue they didn't get notice the

11   company was insolvent.  For example, Dr. Peroits (phonetic)

12   Declaration at paragraph 7 and Dr. Lydon, L-Y-D-O-N, at

13   paragraph 6 thru plan participants Exhibits 8 and 10.  There

14   was no contractual legal requirement to do so.

15        Irrelevant trust provisions are Sections 3.1 and 3.2

16   of the IA Assistant Trust agreements.  These Sections provide

17   that in the event of insolvency, the company has the duty to

18   inform the Trustee and the Trustee is required to discontinue

19   payments under the plans.

20        When there's a failure to adhere to the terms of the

21   Rabbi Trust, though, allegedly prohibited payments to a former

22   executive -- while the company was insolvent -- company's

23   creditors retain an interest in the funds such that they have

24   the right to bring an action to recover funds paid out in

25   violation of the Rabbi Trust.

1          That's c -- and that's what I was talking about.

2     It's also supported in cases like *In re: Amcast*, A-M-C-A-S-T,

3     Industries Corp -- *Industrial Corp*, 365 BR 91, pin site 102

4     and 110 and 114 talks about this as well --  Bankruptcy

5     Southern District of Texas -- excuse me, Southern District of

6     Ohio, 2007 case.

7          So based on the record, I'm going to find that the

8     plans are both unfunded.  And in addition to being unfunded, a

9     Top Hat plan must also be maintained by an employer and two,

10    primarily for the purpose of providing deferred compensation

11    for a group of highly selected men -- excuse me, for a select

12    group of management or highly compensated employees.

13         Both plans were maintained by Steward, right.  And

14    the IASIS plan was taken over by Steward.  Lombardo said that

15    the IASIS plan was always maintained as a Top Hat plan.  None

16    of that is contested.  So that's Steward Exhibit 41,

17    Lombardo's Declaration at paragraph 15.  So it was maintained

18    by an employer.

19         The evidence in the Record is also clear that the

20    primary purpose of the plan was to provide deferred

21    compensation based on the express language of the plan and the

22    testimony of witnesses like Lombardo.

23         The evidence in the related trust documents also

24    support that each plan was structured and treated as a

25    deferred compensation plan.  The objectors don't believe the

1    plans are Top Hat plans.

2         Whereas, a different question that whether the plans

3    are primarily for the purpose of providing deferred

4    compensation.

5         So now let's turn to the question of whether the

6    plans are primarily for the purpose of providing compensation

7    for a select group of management or highly compensated

8    employees.  Let's analyze the text carefully.

9         The plan must be for a "select group."  That word

10   select is not defined.  When words are undefined, the plain

11   ordinary meaning should be determined.  Merriam Webster

12   defines select as "chosen from a number or group by fitness or

13   preference."

14        Thus in this context, there must be a group of

15   participants were chosen by preference and it's established by

16   the company.  So by the preference of the company.

17        Objectors believe that eligible must have

18   "substantial influence through negotiation or otherwise" over

19   their participation in the plan.  The objectors note that they

20   had no leverage or bargaining power.  See for example,

21   Dr. Paroist Declaration at paragraphs 4 and 5 and Dr. Lidon's

22   Declaration at paragraph 4.  Again participants Exhibits 8 and

23   10.

24        The plans were voluntary and there was no

25   adjustment.  They also argue that there was not -- they were

1    not expressly told how the plans worked.  And you can see

2    participants Exhibit 8, Dr. Paroist Declaration at paragraph's

3    4 and 5.

4         I would note that there are a few cases outside of

5    this District giving consideration of bargaining power and

6    leverage, elevated status.  There's also some Department of

7    Labor guidance.  I'm not talking about negotiating power.  But

8    that doesn't make it right.

9         Select here is used as an adjective.  It modifies

10   the word group, which is the noun.  Select is used here as

11   defined and it refers to a chosen group by preference.  The

12   company sets the criteria, salary and title.  Thus a VP making

13   $180,000 can get in, but maybe an employee with a high salary

14   with no title, does not get in because they're not part of the

15   select group which requires both.

16        Strict textualism provides the answer here.  The

17   Court also notes for the record that the information in the

18   plan documents saying it's unfunded and subject to the claims

19   of creditors and the participants had no ownership in the

20   funds and that they may become unsecured creditors where

21   stated in plain English.  They were also stated plainly in the

22   document.

23        I think it's important that that information was not

24   buried in a footnote or kind of buried in small font after a

25   long legal description to hide these facts, right.  It wasn't

1    like in the last page of a hidden plan document, in small font

2    on page 60 of, you know, a document there.  It was plain and

3    simple on a four-page document.

4         The Court also notes that I think words matter.  Now

5    any participants must be held to the terms of what they agree

6    to the same way far less sophisticated parties are held to

7    legal documents.

8         I think words matter and they have to matter.  They

9    have to matter for every person -- whether you're a doctor or

10   you pick up the trash at the hospital.  Everybody gets treated

11   the same.  And everybody signed a contract.  It is my job to

12   enforce that contract as written.

13        The Court also notes that the Supreme Court in the

14   *Loper Bright* (phonetic) decision -- and that's 603 US 369 at

15   412, 413, 2024 confirmed that courts should conduct statutory

16   analysis and not give elevated prominence to any guidance --

17   agency guidance.  Text, again, is always the alpha.

18        Note that United States District Court Ellison

19   (phonetic) in what I would call the Tolder case -- *Tolder*

20   *versus RBC Cap Markets Corp.*, 2015 Westlaw 2138200, Southern

21   District of Texas, April 28, 2015 case said that he

22   acknowledges but does not expressly adopt a substantial

23   influence or bargaining power factor for use in determining

24   the Top Hat issue, which may be, as he said, at most the part

25   of the over arching selectivity factor and not a separate

1    independent test for purposes of the Top Hat exemption.

2    Judge Ellison is exactly right here.  It's a

3    consideration, but there is nothing in the text implying that

4    selectivity requires finding influence of the employee or

5    bargaining power.  Courts must read text literally.

6    If Congress wanted to add terms or qualifications,

7    it would have done so.  Text is always the alpha.

8    A select group must also be management or highly

9    compensated employees.  This is written in the disjunctive.

10    So it's management or highly compensated employees.  Highly

11    compensated is not defined either.  So I'll mention in a

12    moment, courts have considered factors to sort this out in a

13    case.

14    We know what compensated is and we know what high

15    is.  And each of the objectives is making over $350,000.  I do

16    not think that any of them would dispute that they are not

17    highly compensated employees.

18    It's also important to note that the text says it

19    must be primarily for providing deferred compensation to a

20    select group.  It's not exclusive.  So even if a hand full of

21    participants fell outside of this select group doesn't visaed

22    a plans Top Hat status.

23    Judge Ellison in Tolbert and the Second Circuit have

24    held that the inclusion of small groups of "extra

25    participants" is not fatal to the plans status.  And that's

1    *Tolbert,* 2015 WL 2138200 at Star 10; *Demory* (phonetic) 216 F3d

2    at 289.

3              I think it just makes sense, all right, and it makes

4    sense.  It gives effect to the use of the word primarily in

5    the statute.  And courts ought to read statutes as to give

6    effect to every word.

7              It also allows companies and, right, to avoid the

8    impossible standard and potentially protects employees by note

9    letting a company commit an accidental foot fault by including

10   someone else out of the select group and triggering like tax

11   exposure for plan participants on no fault of their own.

12             So next we turn to the case law.  And I'm on page 15

13   of 19.  To construe whether a plan is primarily for management

14   or highly compensated employee Courts have "considered

15   qualitative and quantitative factors such as, one the

16   percentage of the total eligible -- total work force, eligible

17   to participate in the plan.  That's a quantitative one.

18             The nature of their employment.  Duties,

19   qualitative.  The compensation disparity between Top Hat plan

20   members and non-members, qualitative.  And the actual language

21   of the plan agreement.  Again, that's *Tolbert* case at Star 9.

22             Judge Ellison sites First, Second and Ninth Circuit

23   cases in support.  And he says that qualitative and

24   quantitative factors must be considered holistically.  And

25   that no one factor carries more weight than any other factor

1      in determining whether a plan meets the Top Hat exemption.

2          Mr. Lombardo and Ms. Potter testified before the

3      Court and I think they testified credibly about their work.

4      There was a process and they followed the process.

5          The process was not perfect, though.  There were

6      some gaps and some missing information in the employee data.

7      So objectors and the Debtors each presented a financial expert

8      at trial.

9          Based on the record, the Steward plan I find

10     operated for the primary purpose of providing deferred

11     compensation to a select group of management or highly and

12     compensated employees.  Eligible participants in the Steward

13     plan were highly compensated or management.

14         From 2019 to 2024, the records shows that only

15     eligible employees who made at least $180,000 in base salary

16     could participate in the Steward plan.  Lombardo testified to

17     this at page 87, lines 1 through 5 of the transcript.

18         Many of the plan participants made over $300,000

19     including each of the physician objectors.  The average

20     employee salary at Steward appears to have been about 65,000.

21     In other words, to be eligible, an employee had to make almost

22     three times the average employee at Steward.  And participants

23     made more than five times the average employee

24         From 2018 to 2024, it appears that fewer than five

25     percent of total employees were eligible for the plan.  And

1    only about .5 percent participated.  I've recounted already

2    the text that the Steward plan and the trust documents all of

3    which show clear evidence of the intent and purpose of the

4    language. And it was intended to be a Top Hat plan.

5         Based on the record, the IASIS plan purpose was also

6    to provide deferred compensation to a select group of

7    management or highly compensated employees.  The IASIS plan

8    was frozen in 2017 and only one of the objectors, Dr. Peroric,

9    contributed to the IASIS.  And the last only time she did so

10   was more than a decade ago in 2013.

11        No one was eligible to make contributions after

12   2017.  Based on the record, the average salary of the 27

13   participants was about -- was over -- a little bit over

14   $350,000.  Based upon the record, it appears that there were

15   about 40 participants out of thousands.  And the participants

16   consisted of C-Suite executives -- C-Suite for the Record --

17   vice president and physicians.

18        That's Steward Exhibit 1.  The average salary of all

19   the IASIS employees, including those that participated in the

20   plan was about $68,000.  In other words, only about .5 percent

21   of the employees who participated and the average employee --

22   and the average participant in the plan was about five times

23   the average salary of all the IASIS employees.

24        And again, the text of the IASIS plan and the trust

25   all said deferred income remain property of IASIS.  You can

1    see that at Steward Exhibit 91 and everything was subject to

2    the claims of the general assets of IASIS -- was considered

3    part of the general participation -- general assets, excuse

4    me, let me back up again.

5        The text of the IASIS plan and trust all said that

6    the deferred income remain property of IASIS and was

7    considered part of the general IASIS Healthcare.

8        Exhibit Steward 91, for example, showed that the

9    compensation you defer become part of the general assets of

10   the IASIS Healthcare and you are considered a general creditor

11   of the company in the event of bankruptcy.  You may receive

12   less than 100 percent of your deemed account balance.

13       I note that the employee brochures encouraged the

14   employees to speak to a financial advisor before they enrolled

15   in the plan.

16       The objectors place a significant focus on the third

17   prong, the compensation disparity between the Top Hart plan

18   members and non-members.  And as I noted, Steward and the

19   objectors each provided an expert to opine.  Dr. Joseph Crock

20   (phonetic) was Steward's expert and I find that he testified

21   credible.

22       He evaluated employee data related to the Steward

23   plan.  That's at Steward Exhibit 42, he consolidated two sets

24   of data.  The Annual Steward Census Data, which is like the

25   entire employee data set and the Annual Steward Eligibility

1    Data.

2           There were inconsistencies between the two sets of

3    data.  Such as missing or inconsistent salary figures.  And

4    Dr. Crock made several adjustments to adjust for

5    inconsistencies.

6           For example, if there was an annual salary in both

7    sets of data, the salary from the employee data was used.  And

8    if gross compensation amount was zero or null, the maximum

9    salary was used.

10          Crock spoke with Ms. Potter about his assumptions.

11    Crock adjusted the data and assigned the salary to each

12    employee.  Crock identified salary amounts that were below the

13    average annualized minimum wage amounts for each year.

14          He then removed employees before the average

15    annualized minimum wage from the average salary calculation.

16    That's all found at Steward Exhibit 42. To calculable the

17    eligibility ratio, Crock's denominator was the average salary

18    of all employees.

19          Crock used two different inputs and then calculated

20    the outputs two different ways.  He used the average salary of

21    all eligible employees and the average salary of all

22    participants.

23          The First Circuit in *Alexander versus Bringham and*

24    *Women's Physician Org* -- that's at 513 F3d 37, pin site 46,

25    First Circuit 2008.  And the Second Circuit in the *Demory*

1    case, that was 216 F3d at 288.  They both approved use of the

2    average salary of all eligible employees.

3         I will note there was a bankruptcy case, *Alpha*

4    *Natural Resources*, 554 BR 787, pin site 796, 797, Bankruptcy

5    Eastern District of Virginia 2016 case.  That approved use of

6    the average salary of all participants.

7         So Crock did it kind of both ways based upon first

8    and the second circuit and the *Alpha Natural Resources* Case.

9    Crock ran for the Steward plan, he determined that the salary

10   ratio for the relevant years from four to 4.6 times.  And

11   Crock ran similar calculations for the IASIS plan and found

12   the ratio was about 5.0.

13        Case *Scott* Vanmeter from HKA testified for the

14   objectors.  I thought he was credible too.  He evaluated the

15   same data sets and reviewed Crock's report.  Vanmeter was

16   asked to determine the ratio of over all average salary to the

17   eligibility threshold and to offer a critic of Crock's expert

18   report.

19        Vanmeter agrees that there should be financial

20   adjustments to address the gaps of the Steward employee data.

21   He employed some different adjustments.  They don't -- I

22   didn't find that they differed materially from Crock's

23   numbers.  And you can look at plans participants exhibit 145,

24   which is the Vanmeter report.

25        And, in fact, if one uses the Vanmeter eligible

1    employee numbers in the Crock ratio calculations, the ratio

2    remains around four times.  But for purposes of calculating

3    the eligibility ratio, Vanmeter doesn't try to recreate

4    Crock's methodology with his adjustments for the number of

5    eligible employees.

6        He said, using the same denominator, but he

7    calculated the ratio using the minimum salary to meet the

8    eligibility threshold as the numerator.  It's different from

9    Crock's numerator which he used average salaries.

10       Vanmeter was asked by counsel to the objectors to

11   exclude employees with salaries less than $35,000.  And that's

12   found in his plan participant's 145, at paragraph 35.  He also

13   testified to that on the stand.

14       Vanmeter testified that counsel told him that there

15   was a document that supported his $35,000 exclusion

16   assumption.  But Vanmeter never saw it.  I would note, neither

17   did the Court.

18       He excluded those employees and determined that the

19   eligibility to total average ratio -- salary ratio for the

20   Steward plan during the relevant years was 1.8 times in 2019;

21   1.7 times in 2020; 2.1 in 2021; 2.0 in 2022; 2.0 in 2023, 2.0

22   in 2024.  And 1.8 times in 2025.

23       So it was less than 2.0 for years 2019, 2020 and

24   2025.  Going below 2.0 was important for the objectors.

25   That's because the cases.  Look the case law saying that no

1    court had found that a ratio below a Top Hat plan for highly

2    compensated employees had fewer than two times average salary.

3           So based on the record, if you get under 2.0 maybe

4    you get the Court finding that it's not a Top Hat plan.  But

5    to get the math working a difference maker is that you've got

6    to exclude everyone -- even using Vanmeter's calculations --

7    excluding everyone under $35,000.

8           And voila, the math works to get it under 2.0 for a

9    few years.  That's the assumption Vanmeter was given.

10   Vanmeter also used minimum salary as the numerator.  There's a

11   case -- there is a case out there that's not cited much.  It

12   was called the seminal case.  I think it was the objectors

13   counsel believe that it is seminal.

14          But I would -- that case is *Dafate versus Advest*

15   2008 Westlaw 190436, Northern District of Ohio, January 18,

16   2018.  I find that it's an outlier case, but I appreciate the

17   point that sometimes averages skew the data.

18          But I found Crock's analysis and metrics credible.

19   I think the Circuit Analysis in the *Alexander* case by the

20   First Circuit and the *Demory* analysis in the Second Circuit is

21   sound as well.

22          I also adhere to Judge Ellison's wisdom that the

23   prong should be viewed holistically.  Right, getting under 2.0

24   was certainly a goal.  But there's no set ratio that should be

25   a gate keeper.  And I'd note that Steward had over 30,000

1    employees at one point.

2         So the statute has to work for Steward, a small

3    company and the synagogue.  So for these reasons I'm going to

4    find that the plans are all Top Hat plans, right.  They all

5    get above -- if you adjust the numbers -- well above 2.0.  And

6    you've got to make math assumptions and employee non-circuit

7    level cases to kind of get there.

8         But again, if you look at it holistically, there's

9    nothing wrong with using them there.  And I think they're the

10   right analysis.  I think the plan documents are clear and

11   unambiguous.  They all say the plans are unfunded and subject

12   to the claims of creditors.

13        No one paid taxes.  Everybody was okay with that.

14   Nor became subject to taxation during the relevant period.

15   That was the deal.  I've got to enforce that deal.  I cannot

16   change contracts when the language is ambagious.

17        Steward has no choice in this case but to put all of

18   its assets on the table.  That's what happens in bankruptcy.

19   Steward has an absolute obligation to put all of its assets at

20   the property of the estate subject to the claims of creditors.

21   Unless there's a real basis to do so.

22        But not here.  It absolutely has to ask for the

23   authority to do so in this case.  All of the Debtors leader

24   and equitable interest in the plan automatically property of

25   the Debtors estate.  And that happened the minute a bankruptcy

1       case is filed.

2              It is what makes bankruptcy law very unique in all

3       different ways simply filing a bankruptcy petition creates an

4       estate of all legal and equitable interest and the Debtor's

5       interest in property.

6              And the Debtors certainly had an interest in all of

7       these documents and all these trusts and these plans on the

8       petition date.  It was funding all of them with general assets

9       of the estate. They all said that they were subject to the

10      claims of creditors.

11             So, it is no surprise to this Court, the official

12      committee of unsecured creditors and other creditors are

13      looking to this -- these funds.  When you look at it this way,

14      the funds in the plan were never the property, right, of a

15      plan participant.  But they are unsecured creditors and they

16      share as unsecured creditors.

17             And I would note they all share with equal rank to

18      that, but they don't have a special right to any of these

19      funds.  It leads to a difficult decision by the Court from a

20      human element but not from a legal element.  And it is the

21      legal element that I took an oath to uphold.

22             There are allegations that Steward may not have

23      closely followed the oasis trust documents.  I do find, again,

24      that those are best breaches in giving rise to pre-petition

25      claims.

1          Here the funds are subject to the claims of

2    creditors and the plan participants or general unsecured

3    creditors.  There are people who remain -- so are people -- I

4    would note, there are plenty of people who remain unpaid for

5    services.  Unpaid.  All right, for services rendered but

6    remain unpaid.

7          There are plenty of them.  I'm sure Ms. Schultz has

8    heard from plenty of them.  The unsecured Creditors Committee

9    has told me on many occasions that they're investigating

10   potential causes of actions to increase the estate, to get the

11   people, unsecured creditors, the greatest distribution

12   possible for all.

13         To make the pie as big as possible so that there is

14   a fair and equitable -- excuse me, fair and legal

15   distribution.  But to me Steward has established business

16   judgment to terminate the trust and to relieve the Trustees

17   and related bookkeepers from their duties.

18         The plans are already terminated.  And the trust

19   assets are already subject to the claims of creditors, all

20   right.  They always were.  They were before the case files for

21   bankruptcy.  They would be outside of bankruptcy.

22         Nothing has changed that in bankruptcy.  Steward is

23   in bankruptcy.  Use of the funds is subject to court approval.

24   So I'm going to order the Trustees to deliver the trust assets

25   to Steward, which is what is required in the trust agreements

1    already.

2            Note that today, for those who may be listening.

3    I'm not deciding how the assets maybe used.  That's for

4    another day. And that's no request about that for me.  I'm

5    only deciding where the Trustees must send them and relieving

6    the Trustees of their duties.  So they're not caught -- not

7    subject to any further responsibilities in connection with

8    this case.

9            And relieving the bookkeepers of their duties.  That

10   is the Court's ruling.  And I'm going to grant the motion as

11   requested -- I'm going to ask the Debtors to put the funds --

12   once I know that they can be either -- there's cash.  They can

13   bring cash.  They may be processed to liquidate them.

14           They're already subject to the claims of creditors

15   and I think it would certainly -- because these are subject to

16   the claims of general creditors, I want them at least

17   segregated until you file whatever you file when you ask me

18   for it.

19           So I think the process is what it is.  It's another

20   case for another day as to how you use them.  But just so

21   that -- I mean segregate just so I can tell that it got

22   accounted for.

23           Like we can tell that these are funds that came into

24   the estate from the trust.  And so that everybody can see

25   there was X amount in the trust and then X amount got

1    delivered from the Trustees.

2          And I want to make sure that the Trustees and the

3    bookkeepers are relieved of their duties and that they feel

4    comfortable that they have an order from the Court.  So any

5    kind of duties that they felt like they had -- certainly like

6    the Trustees under the trust agreement -- that they feel

7    relieved of those duties and that they can feel comfortable

8    that when they hand things over they did it under a court

9    order and they're safe.

10         So, that is the Court's rulings.  I'd ask if there

11   are any questions.

12         MR. KEACH:  May I approach, Your Honor?

13         THE COURT:  Yes, Mr. Keach.

14         MR. COHEN:  Your Honor, may I be heard?

15         THE COURT:  Mr. Keach got up first so I'm going to

16   let him ask the first question and then you can certainly go

17   Mr. Cohen.

18         Mr. Keach.

19         MR. KEACH:  Sure, I actually have a -- some motions

20   to make.  So if you want to take that question, I'll wait.

21         THE COURT:  Sure.  Mr. Cohen?

22         MR. COHEN:  Yeah, one question.  We had actually

23   uploaded a form of proposed order as an attachment to docket

24   number 3277, which I have included language --

25         THE COURT:  Yeah, that's what I plan on signing.

1            MR. COHEN:  Okay, great.  And then we just wanted

2     to --

3            THE COURT:  Hang on, what Mr. Keach was telling me.

4     That's what I was planning on signing.  Go ahead.

5            MR. COHEN:  And then the only question, Your Honor,

6     is you made some commentary at the end the funds maybe put

7     into an account and then there's a requirement for sort of a

8     separate request for how to use the funds.

9            Our understanding, Your Honor, once they're

10    transferred the funds have actually already been liquidated by

11    the Trustee.  They're sitting in a separate account already.

12    That was done by stipulation.

13           THE COURT:  I don't mean like segregated -- I don't

14    mean segregated like you opened up a new bank account.

15    They're already subject to the claims of general creditors,

16    right.  So what I mean is I just want a procedure,

17    Mr. Castalano, so that one can say you -- it's like you can

18    document.  Like I'm making something up.  There was a 20

19    million bucks here and here it gets transferred.  There were

20    some life insurance policies.  Those life insurance policies

21    got liquidated in this amount and that amount got transferred.

22           What I want is there just to be clear documentation

23    because I know that this is what's held in these trusts are in

24    several different forms or maybe they were at one point.  I'm

25    just kind of going -- you would know what's best.

52

1          But there was a mutual fund.  That the mutual fund

2     got liquidated and that generated X amount of dollars that one

3     can then say here it is.  And then it's not just one big --

4     someone can then kind of look at this.

5          I want there to be transparency in what happened

6     because it's -- and I'm protecting the Trustees as well, right

7     in that they feel comfortable that this got there.  So that's

8     my ruling.

9          And by segregated, I mean I meant not like you're

10    creating a separate account.  I meant segregated like you have

11    it and you can track it.  In my reading of this is that it's

12    always subject to the claims of creditors already.

13         So if somebody wants -- if the money is going to be

14    used, it has to be used, right, for the claims of creditors,

15    right.  And so somebody -- I just there to be clarity, you

16    know, about kind of what's happening.

17         So if there's a motion then one can then --

18    Mr. Castelano can -- I can feel comfortable that the money

19    came in and that if there is a request for relief that

20    everybody is clear that -- I'm doing this from a transparency

21    standpoint that there's no question that money subject to the

22    claims of creditors and I'm sure Ms. Schultz and the committee

23    is going to be all over this.

24         But I'm doing this -- that it was actually going to

25    pay creditors not for some other -- not some other purpose.

1    And I know nobody can do anything without Court approval.  I'm

2    just saying it so that it is said, that there is transparency

3    in the process.

4                Mr. Keach, let me turn things over to you, sir.

5                MR. KEACH:  Sure, thank you, Your Honor.  Robert

6    Keach for the certain participants in the deferred

7    compensation plan.

8                It's actually -- let me take a few things in order,

9    but the first point goes preciously to the point counsel was

10    just making about the form of order.  As Your Honor knows,

11    the motion for turn over was also a motion for turn over and

12    use of the funds.

13                And to the extent relying on Section 363 it also

14    implicates Bankruptcy Rule 6004(h) which would provide a

15    14-day stay with respect to any use of the funds.

16                The Debtors in their form of order at paragraph 5

17    propose that the entire 14-day stay be waived and that the

18    order be immediately effective and enforceable upon its entry.

19    The case law is pretty clear that when there is an objecting

20    party that intends to appeal. and obviously we do, that a

21    waiver of the automatic 14-day stay is completely

22    inappropriate and frankly has Article III implications.

23                And we would ask that that provision of the order be

24    stricken and that 6004(h) apply.  And that there be a 14-day

25    stay.

1        THE COURT:  What is going to happen in the next 14

2   days?  How is somebody going to use the money?

3        MR. KEACH:  Well the Debtor is posing, again, I'd

4   ask the Court to look carefully at the motion of the order.

5   But the Debtors proposed to use the money to the extent that

6   they can and they certainly could use it, for example, in the

7   ordinary course.  They could use it to pay fees that have

8   already been approved.  They could use it to pay their DIP

9   lenders under the terms of the DIP lending agreement.

10       And so we think it's important that the order not be

11  effective under 6004(h) and that that 14-day stay apply.  It's

12  certainly not appropriate to waive the entire stay period.

13       There are a number of cases we keep going back to

14  Little H Judge Cary in this case, but in filing, for example,

15  he specifically construed 6004 to say that if there's an

16  objecting party, it's always inappropriate to waive the 14-day

17  stay.

18       THE COURT:  So, Mr. Cohen or I'll hear from anyone.

19  What's the response?

20       MR. COHEN:  Judge I guess with I do intend to use

21  the funds.  You know, we do have a DIP that's maturing on

22  Friday at this time.  Your Honor, I think there was an intent

23  to use the funds to make sure we can get that DIP extension

24  and use, you know, what's really the lender's cash collateral

25  under the terms of the cash collateral order pursuant to

1    whatever terms you may agree with the DIP lender on a further

2    DIP extension.

3            But I can turn it over to Mr. Berezin if you'd like

4    a little more detail on that.

5            THE COURT:  Okay, Mr. Berezin.

6            MR. BEREZIN:  Yes, Your Honor.  Thank you.  Robert

7    Berezin, Wails, Gotshell and Manges on behalf of the Debtors.

8            Mr. Castellano is on the line.  If it's pleases the

9    Court I could provide a proffer that Mr. Castellano is

10   prepared to testify to and then he could be cross examined as

11   needed on exactly, you know, the justification for -- not just

12   the 14 days, but in general why these funds are needed and --

13           THE COURT:  I don't think you need to tell me that

14   they're needed.  I know why you need them.  And I mean, I know

15   that -- I think it's a more fundamental problem.  I don't

16   think -- there's no right to this money.

17           The documents, the case law is super clear, right.

18           MR. KEACH:  Well, with respect, Your Honor, we --

19           THE COURT:  It's super clear and everything has been

20   and I think the -- this is where I start to think about the

21   adversary proceeding.

22           Everything and it started with the adversary

23   proceeding.  Everything has been a run out the clock issue

24   here.  And I don't see -- I heard the evidence.  I read the

25   cases.  I heard the evidence.

1    The case law is -- there's circuit authority here.

2    There's district court authority.

3    MR. KEACH:  Well, Your Honor, with respect, we'll

4    respectfully disagree and I'll get to that point in a second.

5    But on the issue of 6004(h) there is no case that supports a

6    eliminating the 14-day stay in its entirety so that the

7    Debtors can dissipate these funds before we have an

8    opportunity to appeal.

9    THE COURT:  I think you can appeal.  I think you can

10   go upstairs tonight -- tomorrow.

11   MR. KEACH:  Well, we intend to Your Honor.  First I

12   intend to ask Your Honor for a stay.  But let me get through

13   these first two points first.

14   I think the order must be under applicable case law

15   and frankly under Article III consideration, must be modified

16   to allow the participants a reasonable opportunity to seek a

17   stay pending appeal.

18   Not only from Your Honor but at the next level.

19   Which we are prepared to do expeditiously.  But there is no

20   basis whatsoever for eliminating the entire 14-day stay under

21   6004(h).

22   In addition, Your Honor, we would ask with respect

23   to the remainder of the motion that the effective date of the

24   order, also be deferred for a similar period of time to the

25   extent it implicates Sections other than Section 363.

1          And the authority for that is under 8007(e) where

2     the Court can enter an order to protect the interest of the

3     parties pending appeal.

4          Again, we just want to make sure nothing happens to

5     this money until we can get in front of an appropriate court

6     respectfully request for a stay pending appeal assuming Your

7     Honor doesn't grant the motion I'm about to make.

8          THE COURT:  Okay, why don't we deal with that one

9     first and then we can --

10          MR. KEACH:  Sure.  Well, Your Honor, as is the

11     practice in these things, we move a stay pending appeal under

12     8007(a).  There is a four part test.  Obviously for that.

13     Likelihood for success on appeal, irreparable harm, no harm to

14     the Debtors or balance of funds favors of participants and

15     public interest.

16          Let me take those quickly one at a time.  The

17     lengthy success on appeal has been construed by the Fifth

18     Circuit in this context to mean that the participants have a

19     more than negligible chance of success on appeal.

20          With respect to -- with all respect to Your Honor,

21     there are in Your Honor's decision a number of issues of law

22     where Your Honor has gone one way or the other.

23          I think Your Honor's strict textual analysis is

24     frankly at odds with virtually all of the case law in this

25     area.  I accept the compliment on my expertise and would lean

1    on that expertise to say it's highly likely that the District

2    court would see it differently and certainly having likely

3    that the Fifth Circuit would see it differently.

4            So I think we do have a more than --

5            THE COURT:  Let me just get this right.  So you

6    think it's highly unlikely that the Fifth Circuit is going to

7    see it differently than Textualism and Tolbert?

8            MR. KEACH:  I think Your Honor's textual analysis

9    ignores the purpose of the statue and ignores the dominance

10   theme in the case law.

11           I could --

12           THE COURT:  I got it.  I just want to make sure.  I

13   just want to make sure that we --

14           MR. KEACH:  I'm not suggesting that I know the Fifth

15   Circuit better than Your Honor, but I do think the case law --

16           THE COURT:  Oh, I'm not saying --

17           MR. KEACH:  -- doesn't to favor that --

18           THE COURT:  I tend to stay out of Fifth Circuit

19   business.  I kind of just stay -- keep matters on the fourth

20   floor and let the folks above on the higher floors do what

21   they do.

22           So, but I just wanted to make sure that I take

23   that -- that I understood the argument.

24           MR. KEACH:  I think the argument is, Your Honor,

25   that there are number of issues of law.  One the rule of

1    bargaining power.  Two, what test you have to use in

2    selectivity.  Any of those issues of law could go in our favor

3    and would result in reversal.

4             And I think that establishes the more than

5    negligible chance standard.

6             THE COURT:  Understood.

7             MR. KEACH:  With respect to irreparable harm I think

8    you just heard it.  The Debtors intend to pay this money to

9    their DIP lender.  The Debtors intend to pay this money to

10   administrative creditors who's claims have already been

11   approved.

12            If there's no stay, then this money is gone.  And

13   the participants -- if they win on appeal and we think we have

14   a good chance to win on appeal -- doesn't have to chase the

15   recipient to those funds in an attempt to get them back.

16            That has been found by case after case to be

17   irreparable harm for this purpose.

18            The Debtor's frankly are not harmed.  Will creditors

19   just have to wait longer for payments they may get later?

20   Yes.  They've already waited a long time as it is.  They can

21   wait a little longer.

22            This really has to do with cleaning up a liquidating

23   case.  It's not a reorganization case.  There's no business to

24   be saved here.  To the extent the business could be saved,

25   they were saved through the sale process.

1          But there's no comparable harm to the Debtors to the

2     harm suffered by the participants if we have to chase the

3     funds.

4          And lastly there's a serious and strong public

5     interest in protecting retirement funds under ERISA.  We think

6     this case implicates that public interest.  But there's also a

7     public interest frankly in seeing that these participants have

8     a fair opportunity to appeal.

9          For those reasons, we think a stay pending appeal

10    under 8007(a) is justified and we move Your Honor for such a

11    stay.

12          THE COURT:  Okay.  Anyone wish to be heard on the

13    phone line?  There was a -- does anyone wish to be heard?

14          MR. PRICE:  Mr. Michael Price from Milbank on behalf

15    of the DIP Lenders.

16          THE COURT:  Okay.

17          MR. PRICE:  I just want to note that under the DIP

18    credit agreement and the DIP order, there's a requirement that

19    these proceeds be used and paid over to the DIP lender --

20          THE COURT:  Mr. Price, that's not going to move me

21    one way or the other today.

22          MR. PRICE:  No, I just wanted to --

23          THE COURT:  That kind of pay the DIP says it.  I

24    know what the DIP says.  I approved it.  It says what it says

25    and I understand the arguments.

1          I just want to know about 8007, that's what I'm

2    working on now.  Anything else, that's where I want to focus

3    respectfully.

4          There maybe consequences and the consequences will

5    be what they are.  If that's what I rule, that maybe there's

6    not.  But I'm well aware of what the DIP documents say.  I'm

7    incredible versed on all these things.  And I got it.

8          MR. PRICE:  I knew you would.  And I only raise it

9    to preserve our rights and also to just to speak to what I

10    think is a relevant consideration, which is that the DIP

11    matured in December.  It's been extended several times in

12    connection with allowing a mediation and negotiation around

13    the resolution of these cases and potentially the use of these

14    proceeds to facilitate the resolution of these cases.

15          That's ongoing.  The DIP is currently extended

16    through this Friday.  Obviously the availability of these

17    proceeds is going to be central to whether or not it makes

18    sense to continue that settlement discussion.

19          And also whether or not the DIP would be further

20    extended.  And so I rise to note that for Your Honor.

21          THE COURT:  Thank you.

22          Anyone else wish to be heard?  Mr. Berezin, hold on

23    a second.

24          MS. SCHULTZ:  Good afternoon, Your Honor.  Sarah

25    Schultz --

1           THE COURT:  Ms. Schultz.

2           MS. SCHULTZ:  -- for the Record, Akin Gump Hauer &

3      Feld on behalf of the Creditors Committee.

4           Can you hear me okay?

5           THE COURT:  Just fine.

6           MS. SCHULTZ:  Great, thank you, Your Honor.

7           Your Honor, I'll be very, very brief here.  But I

8      only want to address the question of harm to the estate.  I

9      heard counsel say that it was fine to make the creditors wait.

10     Respectfully I disagree with him.  As Mr. Price said we are in

11     the middle of plan negotiations that have the potential to

12     generate real returns for creditors.

13          And I think that a lengthy stay here has the real

14     impact of potentially upending that.  You know, it could have

15     a very negative impact for the rest of the estate creditors.

16          THE COURT:  Mr. Keach, why don't you put up a $60

17     million bond?

18          MR. KEACH:  Your Honor, we think a bond is

19     inappropriate here because the money can stay where it is and

20     there's no impact on the estate with the money staying where

21     it is.

22          I think, Your Honor frankly should be indifferent to

23     whether this case liquidates in a 7 or through a plan.

24          THE COURT:  I'm not worried about it.  I just -- I

25     can't find any basis to -- that based on the documents, the

1    testimony, the Southern District of Texas case law, Fifth

2    Circuit case law, and sister circuit case law that says that

3    you're right.  That's what I'm wresting with.

4              MR. KEACH:  I hear you.

5              THE COURT:  And I got it.  You want me to accept an

6    expert who was told to exclude $35,000 and then do a

7    calculation to get it under the 2.0.

8              MR. KEACH:  And, Your Honor's ignoring the fact that

9    there's actually testimony that that number was actually too

10   low to exclude all of the part-time people.

11             THE COURT:  But I'm not ignoring it.  I'm just

12   saying what your expert testified when they ran based upon the

13   information that they were given.  That testimony is

14   unrefuted.

15             MR. KEACH:  That testimony is actually supported by

16   Ms. Potter's testimony  --

17             THE COURT:  Got to connect.

18             MR. KEACH:  -- that the number was 36,400 not 35.

19             THE COURT:  But let me ask you.  What was -- what

20   was your experts testimony on the issue?  That he was told to

21   do it by counsel based upon a document that he never saw,

22   that's his testimony.

23             MR. KEACH:  And that assumption that we made for the

24   purposes of that testimony turned out to be correct.

25             THE COURT:  Tell me where in the evidence it shows

1    that you made that assumption.

2              MR. KEACH:  Potter's testimony is that the --

3              THE COURT:  No, not -- in --

4              MR. KEACH:  -- lowest --

5              THE COURT:  I'm not talking --

6              MR. KEACH:  -- well, that the lowest --

7              THE COURT:  -- about that.

8              MR. KEACH:  -- full-time salary --

9              THE COURT:  I'm talking about your --

10             MR. KEACH:  -- was thirty-six four.

11             THE COURT:  -- testimony from a witness of yours

12   that testifies that that's the assumption and that's the

13   reason you made the assumption.

14             MR. KEACH:  We don't need a witness of ours to do

15   it, their witness said it, Your Honor.

16             THE COURT:  No.  You're telling me why you made the

17   assumption that it was 36,000 --

18             MR. KEACH:  Right.  Because we --

19             THE COURT:  -- or why he was told --

20             MR. KEACH:  Because --

21             THE COURT:  -- it was less, to exclude $35,000, as

22   opposed to just a math calculation.

23             MR. KEACH:  Right.  Because we knew from our own

24   analysis of the documents we did have that no full-time

25   employee was making --

1           THE COURT:  Tell me where that's --

2           MR. KEACH:  -- 35,000 --

3           THE COURT:  Tell me where that's in the record, that

4    he knows that.

5           MR. KEACH:  No.  We asked him to make that

6    assumption because we knew it would be supported by the

7    witness testimony and it was.

8           THE COURT:  Okay.

9           MR. KEACH:  I mean, you --

10          THE COURT:  And again --

11          MR. KEACH:  You can't just ignore the fact --

12          THE COURT:  I'm not ignoring it.

13          MR. KEACH:  -- that their witness --

14          THE COURT:  I'm not --

15          MR. KEACH:  -- testified --

16          THE COURT:  -- ignoring it.

17          MR. KEACH:  -- that that actually is the threshold.

18          THE COURT:  I'm not --

19          MR. KEACH:  His calculation was correct.  In fact,

20   his calculation was too conservative.

21          THE COURT:  Well --

22          MR. KEACH:  And again, Your Honor, I'm not asking

23   Your Honor to reconsider here.  But I think --

24          THE COURT:  I got it.

25          MR. KEACH:  -- I'm highly confident that there is a

1      good case for appeal here on a number of grounds, and I say

2      that with all respect to --

3              THE COURT:  No, no, no.

4              MR. KEACH:  -- Your Honor's --

5              THE COURT:  I got it.

6              MR. KEACH:  -- careful consideration.

7              THE COURT:  No, no.  I got it.

8              MR. KEACH:  And look, it is inherent -- and I,

9      again, hate to bring Judge Carey back to this discussion.  We

10     had this discussion in New Century.  It is inherent in the

11     fact that one has to bring a motion to stay pending appeal

12     before the Bankruptcy Court that just ruled against it.

13             THE COURT:  Oh, I understand.  No, no, no.  I agree.

14             MR. KEACH:  Okay.

15             THE COURT:  No, no.  It's required.  Yeah.  No.

16     That's exactly right.

17             MR. KEACH:  Right.  So, in any event, Your Honor, we

18     do think there is a, again, more than negligible chance.  We

19     think that an appeal has substantial here.  And we believe a

20     stay is necessary to allow us to do it, particularly given

21     that the Debtors have just admitted they plan to spend all --

22     as much of the money as they can.

23             THE COURT:  No, no.  And I appreciate it.  And I

24     wanted to get that out on the record, too, so that we had a

25     good, clean record about the way that goes.

1          MR. KEACH:  And I would --

2          THE COURT:  Go ahead, Mr. Keach.

3          MR. KEACH:  Sure.  And I would say, Your Honor,

4     again, first and foremost, we ask Your Honor to stay this

5     pending appeal.  If Your Honor is not inclined to stay pending

6     appeal, I return to two points:

7          The 6004 point, which is this order should not

8     become effective, so that, if Your Honor denies the motion to

9     stay pending appeal, we can get to the next level.  I think

10    the order should, just generally, not be effective for the 14

11    days, so that we can file appropriate pleadings with the

12    District Court and take it up the ladder.

13         The last point I'll make, and it's the similar one

14    to the one Your Honor was making, except I would go a little

15    farther, and that is we would ask that, under 8007(e), Your

16    Honor also order the Debtors to disclose where the money has

17    been spent.  In other words, if the stay runs out and they

18    spend the money, we would like a disclosure as to who the

19    recipients of the money are -- consist of and what amounts

20    they were paid because --

21         THE COURT:  Money from --

22         MR. KEACH:  -- if we're right on appeal --

23         THE COURT:  Money from what time point?

24         MR. KEACH:  From this point forward.  In other

25    words, the funds, as Your Honor will recall, sit in two

1    segregated accounts now.  By agreement, we allowed them to

2    liquidate the securities --

3              THE COURT:  Right.

4              MR. KEACH:  -- and related assets and --

5              THE COURT:  Right, right.

6              MR. KEACH:  -- IASIS and to cash out the cash

7    surrender value of the policies.  So, as far as we know -- and

8    we haven't received a full accounting of this -- there's money

9    sitting in two separate accounts.  So, from those accounts,

10   we'd like to know where it goes, not only that it goes to the

11   Debtors' accounts, but also who do they pay with it.  That's

12   essential for tracing.  And I'll put everybody who's on the

13   phone on notice now.  If we win on appeal and they spend the

14   money, we're coming after the recipients because it's --

15   they're receiving my clients' money.

16             THE COURT:  So why don't you all give me about -- I

17   want to check something, and I didn't bring what I wanted to

18   bring.  Give me about ten minutes and I'll give you an answer

19   to these questions.  Thank you.

20             MR. KEACH:  Thank you, Your Honor.

21             THE COURT:  Oh, Mr. Cohen --

22             MR. BEREZIN:  Your Honor?

23             THE COURT:  -- did you wish --

24             MR. BEREZIN:  May I be heard?

25             THE COURT:  -- to say something before I broke?

1           MR. BEREZIN:  (Indiscernible) Your Honor, can you
2    hear me?
3           THE COURT:  Yeah.
4           MR. BEREZIN:  It's Robert Berezin.
5           THE COURT:  Yeah, go ahead.
6           MR. BEREZIN:  Okay.  Yeah, Your Honor, before you
7    rule, I was hoping to make a proffer for Mr. Castellano, so we
8    could have a record --
9           THE COURT:  I --
10          MR. BEREZIN:  -- regarding --
11          THE COURT:  I think that's fair.
12          MR. BEREZIN:  -- you know, injury.
13          MR. KEACH:  I have no objection --
14          MR. BEREZIN:  Okay.  May I proceed?
15          MR. KEACH:  -- to him making a proffer.
16          THE COURT:  That's okay.  So Mr. Castellano, can you
17   raise your right hand?  Do you swear to tell to truth, the
18   whole truth, and nothing but the truth?  Oh, hold on.  Let's
19   see.  Mr. Castellano, there you are.  I can't hear you, Mr.
20   Castellano.
21          UNIDENTIFIED:  He appears to be muted.
22          THE COURT:  Mr. Castellano?
23       (No verbal response)
24          THE COURT:  I can't hear you.
25          I think I just heard you.  Mr. Castellano?

1          (No verbal response)

2               THE COURT:  I still can't hear you.  I'm sure it

3     would have been a great proffer, Mr. Berezin.

4               MR. KEACH:  If the proffer is the Debtor has uses of

5     the funds, I think we understand that, Your Honor.

6               THE COURT:  Yeah.

7               MR. BEREZIN:  No, I'd like to make the proffer, if

8     possible.

9               THE COURT:  No, no, no.  I'll let you do it.  Let's

10    just get him on the line.  Mr. Berezin, are you --

11              MR. BEREZIN:  Yes.

12              THE COURT:  -- about to get Mr. Castellano?  Are you

13    there?  Why don't we -- why don't we figure all that out, get

14    him on the line.  I will get one of my law clerks in here --

15    oh, actually, you know what?  Yesenia, can just make sure,

16    once he's on the line, Yesenia, once he's on the line, can you

17    just work with these folks and just make sure.  There may be

18    someone who can click five-start to unmute the line.  Do you

19    know how to do that?

20         (Court and court personnel confer)

21              THE COURT:  Okay.  I'll get -- one of my law clerks

22    will do it.  Why don't we just try to figure this out in the

23    next few minutes and then I'll come back out.  Okay?  Thank

24    you.

25              MR. KEACH:  Thank you, Your Honor.

1              MR. BEREZIN:  Thank you, Your Honor.

2              THE COURT OFFICER:  All rise.

3         (Recess taken from 4:37 p.m. to 4:49 p.m.)

4              THE COURT:  Please be seated.  Okay.  Please be

5    seated.

6              All right.  Mr. Berezin, I see you there.

7              MR. BEREZIN:  Okay.  Can you hear me, Your Honor?

8              THE COURT:  Okay.  Mr. Castellano, can -- I hear

9    you're good.

10             MR. CASTELLANO:  Can you hear me, Your Honor?

11             THE COURT:  Yes.  Alrighty.  Mr. Castellano, let's

12   just do this officially.  So I'm going to have you raise your

13   right hand.

14        JOHN CASTELLANO, WITNESS FOR THE DEBTORS, SWORN

15             THE COURT:  Okay.  And do you understand -- you can

16   put your hand down.  Do you understand the oath that you took

17   is the same that you would take if you were live in the

18   courtroom here with me?

19             THE WITNESS:  I understand.

20             THE COURT:  Okay.  We're going to proceed by

21   proffer, which is that Mr. Berezin is going to make

22   statements, but they are statements that you would --

23   proffering your testimony that you would have provided if you

24   were testifying live before me.  Do you understand that?

25             THE WITNESS:  I do.

1          THE COURT:  Okay.  So, when he's done, I'm going to

2     ask you if those statements are true and correct and your --

3     if there are any corrections to anything that he said that you

4     would make.  Okay?  Because you would be adopting that proffer

5     as your testimony.

6          THE WITNESS:  I understand.

7          THE COURT:  Okay.  Mr. Berezin, whenever you're

8     ready.

9          MR. BEREZIN:  Okay, Your Honor.  For the Record,

10    Robert Berezin, Weil Gotshal & Manges, for the Debtors.

11         If asked to testify, Mr. Castellano would testify to

12    the following:

13         If the Debtors are unable immediately to access the

14    funds that were held in the two Rabbi Trusts, then Debtors'

15    ability to continue to operate over the next 14 days depends

16    on whether the FILO DIP lenders will agree to extend the DIP

17    loan's maturity date from April 4th, 2025, and to do so

18    without requiring the Debtors to make a further prepayment on

19    the DIP loan during that period.

20         A DIP maturity extension is required because the

21    Debtors have no unencumbered cash with which to operate and

22    presently lack the funds to repay the DIP loan.  An extension

23    without requiring additional prepayments is necessary because

24    such a prepayment could leave the Debtors without sufficient

25    liquidity to operate during the whole of the next fourteen-day

1    period.

2            I have no assurance that the FILO DIP lenders will

3    agree to extend the DIP loan or to do so without requiring a

4    prepayment.  The Debtors have, so far, made approximately $29

5    million I prepayments to obtain prior extensions of the DIP

6    loan's maturity date.  Even if such a two-week extension were

7    granted, I do not believe that the Debtors will be able to

8    continue to operate much beyond that period, and certainly not

9    for an additional month or longer, during the stay pending

10   appeal of Debtors' right to the approximately $62 million at

11   issue.

12           First, the DIP lenders would need to extend the DIP

13   loan's maturity date and do so with little or no prepayments

14   for the reasons previously mentioned.  I also have no

15   assurance that the FILO DIP lenders would agree to extend the

16   majority date or do so on those terms during a longer or

17   indefinite stay pending appeal.

18           Second, and most importantly, the Debtors would

19   require incremental new money financing to continue operating

20   while an appeal was pending, and the Debtors do not have

21   access to such financing.  Based on my interactions and

22   dealings with the FILO DIP lender, I believe that they will

23   not agree to provide additional incremental liquidity to fund

24   the Debtors' operations during an appeal.  I also do not

25   believe that the FILO DIP lenders would agree to subordinate

74

1    their claims or liens to another lender willing to provide

2    such incremental liquidity, nor do I believe that the Debtors

3    could obtain a loan from a third party that would be junior to

4    the FILO DIP lender's claims and liens.

5            I, therefore, believe that the Debtors will be

6    unable to continue operating in Chapter 11 during an

7    indefinite stay pending appeal; and, in that event, any

8    prospect of confirming a liquidating plan and monetizing

9    valuable litigation assets for the benefit of administrative

10    expense and other creditors, would be lost.

11            That's the end of the proffer, Your Honor.

12            THE COURT:  Mr. Castellano, you heard the

13    statements.  Do you believe they're true and correct?

14            THE WITNESS:  I do.

15            THE COURT:  Are there any corrections you would make

16    to anything he said?

17            THE WITNESS:  I would not.

18            THE COURT:  Okay.  Mr. Keach, do you have any

19    questions for --

20            MR. KEACH:  The only thing, Your Honor, I would move

21    to strike the testimony, to the extent that he was speculating

22    on what the DIP lenders might do in the future.  Beyond that,

23    I have no objection to the proffer.

24            THE COURT:  Any response, Mr. Berezin?

25            MR. BEREZIN:  Yes.  Given Mr. Castellano's

1    experience on this case dealing with the FILO DIP lenders

2    since at least January, if not earlier, of 2025 -- 2024, I

3    believe that his observations and beliefs are well grounded in

4    fact and are -- should be admissible.

5        THE COURT:  I'll take it that that's his

6    understanding and not for the truth of the matter of what they

7    may or may not do.  Although I do know that there were

8    certainly arguments made that would certainly that to be the

9    fact.

10        Here's what I'm going to -- here's what I'm going to

11    do.  I'm going to talk about the stay pending appeal first,

12    and then I'm going to talk about the order second.

13        So I'm going to -- we all know Bankruptcy Rule

14    8007(a)(2), and Mr. Keach is absolutely right.  There's got to

15    be -- a motion for a stay pending appeal must be first filed

16    in the Bankruptcy Court before it can be considered by the

17    District Court.  It just creates something where you then got

18    to come back down and it's just -- it's easier just to do it

19    right now, so I think that makes a lot of sense.

20        A party requesting the stay of a Bankruptcy Court's

21    order pending appeal, ordinarily, must move first in the

22    Bankruptcy Court.  It's written in (a)(1), 8007(a)(1).

23        And the motion may be made, either before, or after

24    the appeal is filed.  And that's Federal Rule -- Bankruptcy

25    Federal Rule 8007(a)(2).

1       The standards for granting a stay pending appeal,

2  Mr. Keach knows they're well established.  It's one where the

3  stay applicant has made a strong showing of likelihood of

4  success on the merits, whether the applicant will be

5  irreparably injured absent a stay, whether issuance of the

6  stay will substantially injure the other parties interested in

7  the proceeding, and where the public interests lies.  And I

8  would cite there *Voting For America Inc. v. Andrade*, A-n-d-r-

9  a-d-e, and that is 488 F. App'x 890, pin cite 893 (5th Cir.

10  2012).  And I would note that it is quoting *Hilton v. B-r-a-u-*

11  *n-s-k-I-l-l*, 481 U.S. 770, 776 (1987).  Courts have discretion

12  on whether to grant a stay.

13       So I'm going to -- I'm going to -- I'm going to note

14  that, for the standard of whether the stay applicant has made

15  a strong showing that they're likely to succeed on the merits,

16  I understand the arguments made by counsel; I just

17  respectfully disagree with that.  I think the ruling is

18  consistent with text, consistent with case law in this

19  Circuit, consistent with federal circuit authority and applied

20  to the law and the facts in this case.  So I don't think that

21  the applicant has made a strong showing of likelihood of

22  success on the merits there.

23       Whether the applicant will be irreparably injured

24  absent a stay, I think it comes down to what I do in the

25  order.  But I do note that, if the money -- there is potential

1    there for irreparable injury if the money is used under prior

2    court order authorizing use of cash and, therefore, creates an

3    issue before someone can actually even get to a district court

4    to ask for relief, asking for appellate review.

5         And it -- whether it substantially injures other

6    parties interested in the proceeding, I think the answer to

7    that is yes because some -- it injures the Debtor because the

8    Debtor is going to, arguably, be without money to use and the

9    Debtor is going to run out of cash, and that is -- that's just

10   a fact here.

11        And where the public interest lies I think is an

12   interesting question.  I think the public interest -- I think

13   the public interest supports reading contracts and agreements

14   and not introducing equity until you really have a basis to do

15   so, but you ought to stick to law and facts and reading what

16   words say and what people understood at the time, and not to

17   start -- Bankruptcy Courts, I'm even noting even in the most

18   recent Highland decision issued by our Chief Judge Elrod, and

19   she reemphasized that Bankruptcy Courts aren't roving

20   commissions to go do equity.  And I think there's a public

21   interest in holding that.

22        And if something has always been subject to the

23   claims of creditors and someone hasn't paid taxes on money in

24   years, to then -- maybe they just ought to be held liable to

25   the deal, the same way someone who doesn't pay their car note

1   or doesn't pay their home sometimes lose it in foreclosure, or

2   sometimes a -- they get -- cars get repossessed, or sometimes

3   someone who has a lien on cash can go exercise it and

4   sometimes it's a bank.  And you know, strict enforcement,

5   treating everybody the same, and I think the public interest

6   lies in equity.

7          So I'm going to -- I'm going to deny a stay pending

8   appeal in this case.  But I do think I have to provide access

9   to the courts and I've got to provide a meaningful opportunity

10  to the courts.  And today is Wednesday.  And I would note we

11  held a hearing March 26 and March 27.  It's just -- just give

12  me one second.

13         (Pause in the proceedings)

14         THE COURT:  I'm giving you a ruling 6 days after a

15  two-day hearing, after 200 exhibits.  That's been reviewed and

16  you got 18 and a half single-spaced pages of factual record,

17  review of evidence, and decision.  So I moved incredibly fast,

18  not rushed.  But I knew the parties had -- both had an

19  interest in getting an answer to this question.

20         And so I'm going to make the order effective, I'm

21  going to prove -- I'm going to amend the order and say that,

22  notwithstanding Bankruptcy Rule 6004(h), the order is going to

23  become effective on April 11th at 11:59 central time.  You're

24  going to have all next week to try to get a hearing in front

25  of -- I don't know if Judge Bennett will get it, I don't know

1      how that really works, to be honest with you, Mr. Keach.  I --

2              MR. KEACH:  Nor do I, Your Honor.

3              THE COURT:  I -- no, I don't.  I will -- I don't

4      know who it is.  But I do know that -- actually, the clock

5      would run out Sunday or something.  So I think, next Friday,

6      at 11:59 central, this order will not go effective.  So I will

7      deny, orally deny, the stay pending appeal, but I'll issue the

8      order.

9              And I understand that there are consequences to the

10     Court's decision on this.  And I think meaningful access to

11     and potential review of my ruling, I think, remains a central

12     -- I don't want to -- I think it's important that people have

13     the opportunity to do that.  And I -- there is no assurance

14     that I could give anyone that someone could file something

15     tomorrow and then have a hearing in -- I -- and I -- but I do

16     think a ten-day -- well, it's really like kind of a ten-day

17     stay of this, not counting the weekends, is appropriate and

18     very much in line with a 6004 reading of this.

19             So I will -- I'm just tweaking Paragraph 5 to say

20     this order shall become effective on April 11, 2025 at 11:59

21     p.m. central time.  So I guess the Court's ruling, I suspect

22     someone is going to order a transcript, or one of these fancy,

23     twenty-four-hours ones or something --

24             MR. KEACH:  I think we already have -- I think we

25     already have, Your Honor.

1          THE COURT:  Okay.  So I wish everyone a good day.

2     I'm finished.

3          MR. COHEN:  Your Honor?

4          THE COURT:  Yes, Mr. Cohen?

5          MR. COHEN:  Your Honor, may I be heard with just one

6     clarifying question?

7          THE COURT:  Yes, sir.

8          MR. COHEN:  We understand Your Honor's ruling that

9     the order will go effective on April 11th.  I think we just

10    wanted to clarify and make sure that, if it so happens that

11    the order goes into effect and it's not subject to a stay or

12    appeal or administrative stay at the district court level,

13    that there is not a requirement for a further motion to use

14    the funds; and that, once the funds are --

15         THE COURT:  It's the order.  It says -- the order

16    says what it says and it just goes effective on 11:59, April

17    11th, 2025, from my perspective.  If there any -- I don't --

18    you know, if nothing happens upstairs, then the order goes

19    effective and it is what it is.  It says what it says.  So I'm

20    not --

21         MR. COHEN:  Understood.

22         THE COURT:  I'm not changing anything other than

23    that.  All right?

24         MR. COHEN:  Thank you, Your Honor.

25         THE COURT:  Thank you.  You all have a good day.

1   Everyone is adjourned.  Thank you.

2          MR. KEACH:  Thank you, Your Honor.

3       (Proceedings concluded at 5:04 p.m.)

4                    * * * * *

5          *I certify that the foregoing is a correct transcript*

6   *to the best of my ability produced from the electronic sound*

7   *recording of the proceedings in the above-entitled matter.*

8      */S./  MARY D. HENRY*

9   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

10  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

11  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

12  *JTT TRANSCRIPT #69750*

13  *DATE FILED:  APRIL 7, 2025*

14

15

16

17

18

19

20

21

22

23

24

25