**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>STEWARD HEALTH CARE SYSTEM, LLC, et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-90213 (CML)<br>(Jointly Administered) |

**RESPONSE IN OPPOSITION TO**
**<u>MOTION FOR STAY PENDING APPEAL</u>**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

TABLE OF CONTENTS

Page

Summary of Argument ............................................................................... 1

Factual Background .................................................................................... 3

    **A.**   Debtors' Financial Need ............................................................. 3

    **B.**   The Top Hat Plans ..................................................................... 5

Procedural History ..................................................................................... 7

Bankruptcy Rule 8007(a) Standard ........................................................... 9

Argument .................................................................................................. 10

  **I.**    The Court Should Strike Appellants' Non-Compliant Motion ........................ 10

  **II.**   Appellants Have Not Shown Irreparable Harm ................................................ 10

 **III.**   A Stay Would Substantially Harm Debtors and Their Estates......................... 12

 **IV.**   Appellants Failed to Demonstrate They are Likely to Succeed on the Merits of Their Appeal ................................................................... 15

    **A.**   The Rabbi Trust Motion was properly resolved in the contested matter ........................................................................... 16

    **B.**   Appellants' appeal is unlikely to succeed because the plans are "top hat" plans .................................................................... 19

        1.   The deferred compensation plans are unfunded.............................. 20

        2.   The deferred compensation plans are selective................................ 21

        3.   The bankruptcy court accounted for bargaining power .................. 24

        4.   Appellants' evidentiary objections are meritless.............................. 25

Conclusion ............................................................................................... 25

Defendant Steward Health Care System LLC ("Steward") and its affiliated Debtor entities (the "Debtors"), respectfully submit this Response in Opposition to Appellants' emergency motion for a stay pending appeal (Doc. 2).

## Summary of Argument

These chapter 11 cases are at a critical juncture. Debtors will run out of money to administer the cases in weeks, if not sooner. No money means no confirmable chapter 11 plan. It also means Debtors will be unable to monetize highly valuable assets, including litigation claims seeking over $1 billion, to benefit creditors. The only current source of liquidity available to Debtors is the $62 million previously held in so-called "rabbi trusts." The bankruptcy court (Lopez, J.) found, after a two-day hearing, that this money belongs to Debtors, not to Appellants. Debtors need to use these rabbi trust funds right away. Otherwise, Debtors may be forced to relinquish *all* their assets, including their unliquidated litigation claims. For the estate's creditors, that would be value-destruction on a massive scale—the exact opposite of what a bankruptcy is supposed to achieve.

Appellants have long understood that they could, as the bankruptcy court put it, "potential[ly] weaponiz[e] the debtors' financial need." Ex. 1, Tr. 70:4-8. If Appellants can delay Debtors' use of the rabbi trust funds, then Appellants can demand a ransom payment just to give Debtors access to their own property that provides necessary liquidity. To that end, Appellants have repeatedly tried to postpone a court decision permitting Debtors to use Debtors' own money. As the bankruptcy court found when rejecting another stay motion Appellants filed just before the hearing, Debtors would be "substantially harmed" if Appellants' delay tactics succeed. *Id.* The District Court (Bennett, J.) also denied Appellants' attempt to stop the bankruptcy court from holding a trial on this matter. This

motion for a stay pending appeal is Appellants' latest attempt to prevent Debtors from accessing the rabbi trust funds until it is too late for Debtors to use them.

Appellants offer no justification for the extraordinary relief they seek. They have not shown irreparable injury absent a stay. Even if denying a stay would moot Appellants' appeal, that is not irreparable harm as a matter of law. Nor are Appellants irreparably harmed by enforcement of the plan terms they agreed to, which unambiguously state that trust assets will be available to general creditors in the event of insolvency.

Conversely, an indefinite stay of the bankruptcy court's order pending appeal would irreparably harm Debtors. Debtors have financed these Chapter 11 cases through a FILO DIP Credit Agreement. That agreement matures on April 11, 2025. In the past, Debtors have negotiated extensions of the agreement—but only by paying down $30 million for extensions in 2025 to date. Debtors do not have available funds to secure more extensions during Appellants' appeal of the bankruptcy court's order. Without an extension, the lenders can—and presumably will—attempt to foreclose on Debtors' assets. And even if the lenders, for some reason, did not foreclose, Debtors still would be unable to continue the cases for months without a substantial infusion of new money. There is no feasible path to obtaining the necessary funds without the rabbi trust assets.

Appellants also have not met their burden to show their appeal is likely to succeed on the merits. As the bankruptcy court concluded after thorough fact-finding and legal analysis, the trust assets are part of Debtors' estate because Debtors' deferred compensation plans qualify as "top hat" plans. The bankruptcy court reached its decision after hearing live testimony, including from two expert witnesses, and considering hundreds of exhibits.

2

There is no legal or factual basis to overturn it.

Finally, a stay would be contrary to the public interest. There is no benefit to the public from derailing these bankruptcy cases just so that Appellants can pursue a meritless appeal. Rather, the public is best served by confirmation of a plan that enables Debtors to pursue litigation claims and other assets to benefit the estate and its thousands of creditors.[2]

## **Factual Background**

### A.    **Debtors' Financial Need**

Once the largest private, physician-led hospital system in the United States, Steward Health Care and affiliated entities filed these chapter 11 bankruptcy cases in May 2024. Debtors have financed the chapter 11 cases through the use of cash collateral and access to debtor-in-possession financing under a FILO DIP Credit Agreement. Ex. 2, Castellano Declaration ¶¶ 7-8. Without this financing, Debtors would lack funds to administer the cases and would be unable to monetize their remaining assets or confirm a chapter 11 plan.

The credit agreement, Debtors' only access to financing, was originally due to expire in December 2024. Debtors were able to negotiate a series of short-term extensions of the agreement, but only at significant cost. To extend the credit agreement and obtain financing from December 2024 through April 11, 2025, Debtors repaid approximately $30 million to the lenders.

The credit agreement matures on April 11, 2025. *See* Bankr. Doc. No. 4472. Debtors do not have funds available to repay the loan or to secure additional financing. If a stay is granted, there is no source of liquidity that would permit Debtors to access financing for

---

[2] Any stay would also need to be conditioned on a bond, the amount of which would need to be determined at a hearing.

months (or even longer) while Appellants pursue appeals from the bankruptcy court's order. Castellano Declaration ¶¶ 8-11.

Under the DIP credit agreement's terms, the lenders have a superpriority lien on substantially all of Debtors' assets, including accounts receivable, joint venture interests and unliquidated litigation claims seeking over $1 billion in recoveries. If those claims are successful, the proceeds could be used to repay all of Debtors' secured claims, all administrative expense claims, and provide meaningful recoveries to unsecured creditors too. Granting a stay pending appeal would likely prevent Debtors from monetizing their litigation claims and all other estate assets for the benefit of all creditors. Without the rabbi trust assets, Debtors will run out of money within a month and will have no funds to finance the chapter 11 cases or operate the estates. Castellano Declaration ¶ 11.

If Debtors cannot fund the bankruptcy, the lenders will presumably foreclose on Debtors' assets, including Debtors' highly valuable unliquidated claims against third parties. But even if the lenders did not foreclose on Debtors' assets, Debtors still would need to obtain incremental new money financing to continue operating the estates and administering the bankruptcy cases during an appeal. If a stay pending appeal is granted and Debtors cannot use the rabbi trust assets, there is no realistic opportunity for Debtors to obtain the new money that will be required. Without the trust assets, Debtors will lack sufficient funds to continue operations and administration of their estate through April 2025, and these bankruptcy cases will almost certainly fail. Castellano Declaration ¶¶ 11, 16.

A failure of the bankruptcy would cause significant and irreversible harm not only to Debtors but also to the estates' creditors. Over the past several months, Debtors and other

stakeholders in these chapter 11 cases have been in mediation assisted by Judge Isgur. The mediation has been highly productive. Debtors are optimistic that the mediation will result in the lenders providing funding to pursue a confirmable plan that permits Debtors to monetize assets, including the unliquidated litigation claims, and recover significant amounts of money for the estate and its creditors. But Debtors will lose their ability to control and monetize those litigation claims for the benefit of all creditors if the secured lenders foreclose on Debtors' assets or if Debtors cannot remain in operation long enough to confirm a chapter 11 plan.

## B.    The Top Hat Plans

This stay motion and the underlying appeal concern deferred compensation plans available to a select group of highly placed and highly compensated employees. The plans permitted certain medical professionals and other high-earning employees to defer a portion of their annual compensation to reduce their tax liability. Appellants are former Steward employees who participated in the Steward Health Care ("SHC") plan and/or the IASIS plan. Both plans were limited to select, highly paid employees and both were funded with assets owned by Steward, not by plan participants like Appellants. Deferred compensation plans like these, known as "top hat" plans, are exempt from most ERISA fiduciary requirements.

The SHC plan was originally available only to physicians and employees at (or more senior to) the Vice President level, and then only if they earned more than $150,000 per year. In 2019, the plan was amended to allow additional health care professionals to participate, and the salary threshold was raised to $180,000 per year. No employee was required or directed to participate in the plan. Eligible employees chose, on a completely

voluntary basis, whether to defer compensation. Those who did elect to participate received a valuable benefit: they did not pay taxes on the income they chose to defer. In exchange for that benefit, they knowingly assumed a risk: if Steward became insolvent, the assets set aside to fund the plan belonged not to the participants but to Steward and would therefore be available to Steward's general creditors. The plan documents repeatedly and unambiguously informed Appellants and other participants of this risk. For example, a one-page "Plan at a Glance" document given each year to eligible employees cautioned: "[U]nlike a 401(k) plan, if Steward Health Care becomes insolvent, Steward's creditors will have access to your account. [You will] have the rights of a general unsecured creditor in such event." Doc. 7, Ex. 1, Oral Ruling 15:8-19.

Steward acquired the IASIS plan in 2017 in connection with a merger.[3] Like the SHC plan, the IASIS plan documents unambiguously informed participants that the assets set aside to pay deferred compensation belonged to the company and would be available to the company's general creditors in case of insolvency. *See, e.g.*, *id.* at 19:23-20:2 (assets "shall remain the assets of [the company] subject to the claims of its general creditors").

Each year, the employer sponsors of both plans (first IASIS, then Steward) placed assets into so-called "rabbi trusts." Employers establish rabbi trusts "to create a source of funding for otherwise unfunded benefit plans." *In re Outboard Marine Corp.*, 278 B.R. 778, 785 (N.D. Ill. 2002) *aff'd sub nom. Bank of Am., N.A. v. Moglia*, 330 F.3d 942 (7th Cir. 2003). In a rabbi trust, the "trust corpus … remains property of the employer," so

---

[3] The IASIS plan was frozen shortly after Steward acquired it, and former IASIS employees who became Steward employees could no longer participate in it. They could, however, participate in the SHC plan, provided they met its eligibility requirements.

employee participants in deferred compensation plans are not taxed on the assets placed into the trust. *Id.* "As a condition for this tax benefit, rabbi trusts are required to remain at all times subject to the claims of the grantor's general creditors. Thus, once a grantor files for bankruptcy, the rabbi trust corpus becomes property of the grantor's bankruptcy estate." *Id.* Just like the plan documents, the trust documents in this case clearly explained these terms to plan participants, including Appellants. For example, the IASIS trust agreement stated that plan participants' rights "under the plan and the trust agreement shall be mere unsecured contractual rights … against [the] company," and that "[a]ny assets held by the trust will be subject to the claims [of] the company's general creditors … in the event of an insolvency." Oral Ruling 20:8-21:2.

## Procedural History

On November 24, 2024, Debtors moved the bankruptcy court for an order directing the trustees of the deferred compensation plans to turn over the trust assets to Debtors. *See* Bankr. Doc. 3277 ("Rabbi Trust Motion.") Appellants, former Steward employees who participated in the deferred compensation plans, objected to the motion on December 17, 2024, creating a contested matter. *See* Bankr. Doc. 3497. In that objection, Appellants consented to the bankruptcy court resolving the Rabbi Trust Motion on the merits in the contested matter, provided Appellants received discovery. *See, e.g.*, *id.* ¶ 36 ("[T]his Court should defer a ruling on the [Rabbi Trust] Motion until the Participants are provided the opportunity to take discovery …."); *id.* at ¶ 7 (similar).

The parties then conducted discovery for months, without any indication from Appellants that they objected to the bankruptcy court resolving the Rabbi Trust Motion as a contested matter. The hearing to resolve the Rabbi Trust Motion was originally scheduled

for February 14, 2025. *See* Bankr. Doc. No. 3745. But at Appellants' request, Debtors agreed to adjourn the hearing until March 11, 2025. *See* Bankr. Doc. No. 3850.

On March 3, 2025, eight days before the hearing date, Appellants reversed course, attempting to halt the contested matter—after it had been pending for ninety-nine days—and start all over again in a newly filed adversary proceeding raising the same issue. *See* Adv. Proc. No. 25-03066 (CML), Doc. No. 1. To that end, Appellants filed a motion to withdraw the reference of the adversary proceeding, Adv. Proc. No. 25-03066 (CML), Doc. No. 3, and a parallel motion to stay the contested matter, claiming the issue could be resolved only in the adversary proceeding. *See* Bankr. Doc. No. 4089.

On March 7, 2025, the bankruptcy court heard oral argument on the motion to stay the hearing and denied the relief requested by Appellants. The bankruptcy court found Appellants had waived any right to have the Rabbi Trust Motion resolved in an adversary proceeding instead of a contested matter. *See* Tr. at 69:15-17 & 71:13-21 ("requesting an adversary proceeding at this point … has been waived"). It also found Debtors would be "substantially harmed" by further delay and recognized "a need to go forward" because of "potential weaponization of the debtors['] financial need." *Id.* at 70:4-8. Because Appellants claimed they needed more time to prepare for the hearing due to discovery delays, the bankruptcy court adjourned the hearing to March 26, 2025. *Id.* at 70:9-71:2. By this point, Appellants had gotten the hearing adjourned twice, and it was scheduled for nearly six weeks behind its initial February 14 date.

But Appellants continued seeking more delay, filing with the District Court on March 13, 2024, a motion to stay the rabbi trust hearing. *See* No. 25-mc-00461 (AHB),

Doc. No. 1.  After hearing argument, No. 25-mc-00461 (AHB), Doc. No. 33, the District Court (Bennett, J.) similarly denied Appellants' motion.  *See* No. 4:25-mc-00461 (AHB), Doc. No. 46. Undeterred, the very next day, on March 24, 2025, Appellants filed with the bankruptcy court a new motion to continue the hearing.  *See* Bankr. Doc. No. 4289. The bankruptcy court denied that motion on March 25, 2025. *See* Bankr. Doc. No. 4310.

The hearing proceeded on March 26 and 27, 2025, and the bankruptcy court, after taking extensive evidence from both parties, entered an order approving the Rabbi Trust Motion. Bankr. Doc. 4418. The bankruptcy court found that the deferred compensation plans are "top hat" plans and, accordingly, that the trust assets belong to Debtors, not to Appellants or other plan participants. Appellants appealed from that order and, after the bankruptcy court denied their motion for a stay pending appeal, *see* Oral Ruling 57:4-81:1 on April 7, 2025, filed this motion to stay the bankruptcy court's order pending appeal.

### Bankruptcy Rule 8007(a) Standard

A stay pending appeal under Bankruptcy Rule 8007(a)(1)(A) "is an extraordinary remedy," and "i[t] is also an equitable one committed to th[e] court's discretion." *In re Barrow Shaver Res. Co.*, No. 24-33353 (ARP), 2025 WL 685513, at *2 (Bankr. S.D. Tex. Mar. 3, 2025) (first alteration in original) (citing *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019)). Put simply, "a stay of a bankruptcy matter pending appeal is an extraordinary form of relief requiring a substantial showing by the movant, and is not to be granted lightly." *Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Rests., LLC*, No. 14-0609, 2014 WL 1871889, at *2 (W.D. La. May 6, 2014).

To determine whether to grant a Rule 8007 motion, courts consider: (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant

has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest. *Barrow Shaver*, 2025 WL 685513, at *2-3 (citing *In re First S. Savs. Ass'n*, 820 F.2d 700,704 (5th Cir. 1987); *see also In re Dernick*, Nos. 18-32417 & 18-32494, 2019 WL 236999, at *2 (Bankr. S.D. Tex. Jan. 16, 2019) (same).

"[Appellants] bear the burden of proving by a preponderance of the evidence that the stay pending appeal should be granted." *Dernick*, 2019 WL 236999, at *2. "Whether to grant a stay is committed to [the Court's] discretion," and a "stay is not a matter of right, even if irreparable injury might otherwise result." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)).

## <u>Argument</u>

### I.   The Court Should Strike Appellants' Non-Compliant Motion

This Court's Individual Rule 7A limits motions to twenty-five pages in 13-point font. Without seeking leave from the Court, Appellants filed a fifty-seven-page motion in what appears to be 12-point font. To Debtors' knowledge, no judge on this Court permits motions longer than twenty-five pages without leave of the Court. Most of the content of Appellants' motion is irrelevant or unnecessary. The Court should strike Appellants' motion in its entirety or decline to consider any content beyond the limit set by Rule 7A.

### II.   Appellants Have Not Shown Irreparable Harm

Appellants would not be irreparably harmed absent a stay. The only harm Appellants assert is that their appeal from the bankruptcy court's order may become moot, ending Appellants' pursuit of the money the court held belongs to Debtors. Mot. 29-30.

That is not irreparable injury as a matter of law. "[T]he possibility that an appeal

10

may become moot does not constitute irreparable harm for purposes of obtaining a stay." *In re Salubrio, LLC*, No. 5:20-CV-1194-DAE, 2021 WL 2744631, at \*3 (W.D. Tex. Feb. 8, 2021); *see also, e.g.*, *Yucaipa*, 2014 WL 1871889, at \*4 (same); *In re Camp Arrowhead*, No. SA-10-CV-11-XR, 2010 WL 363773, at \*7 (W.D. Tex. Jan. 22, 2010) (same); *Voltaire Asset Managers II, LLC v Tresha-Mob, LLC*, No. SA-19-CV-341-XR, 2019 WL 13191885, at \*4 (W.D. Tex. Apr. 10, 2019) (same); *In re Boy Scouts of Am. & Del. BSA, LLC*, No. 20-10343-LSS, 2023 WL 2891519, at \*7 (D. Del. Apr. 11, 2023) (same); *In re Pub. Serv. Co*, 116 B.R. 347, 350 (Bankr. D.N.H. 1990) (same).

That is especially true here, where granting a stay would prevent Debtors from accessing the only viable source of liquidity needed to continue operating and pursuing a chapter 11 plan. *See Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 938 (7th Cir. 2006) (affirming denial of stay pending appeal because "it was not an abuse of discretion … to prioritize the debtor's ability to operate over [appellant's] right to pursue an appeal."); *cf.* Castellano Dec. ¶ 16 ("Debtors will be unable to continue operating in chapter 11 during an indefinite stay pending appeal").

The cases Appellants cite (at Mot. 29) do not reckon "with the majority of courts in this circuit finding that the risk of mooting a bankruptcy appeal, standing alone, does not constitute irreparable harm warranting a stay." *SR Constr. Inc. v. Hall Palm Springs, LLC*, No. 3:20-CV-3487-B, 2020 WL 7047173, at \*3 (N.D. Tex. Dec. 1, 2020) (citing cases). And they give scant support to Appellants anyway. Unlike in Appellants' cases, the distribution of trust assets to creditors that Appellants complain of is simply the implementation of the deal that Appellants struck. The plan documents could not have been

clearer that, in the event of insolvency, the trust assets will be subject to the claims of general creditors. That was a tradeoff for the tax deferral benefits that Appellants and other plan participants willingly accepted. It is not irreparable harm to hold Appellants to the terms of their agreements, particularly since the bankruptcy court has already found the assets belong to Debtors.

## III.    A Stay Would Substantially Harm Debtors and Their Estates

Granting a stay, on the other hand, would substantially and irreparably harm Debtors and other creditors, and those harms would "outweigh any likely irreparable injury to the movant absent a stay." *See Dernick*, 2019 WL 236999, at *4. "While no strict definition of 'substantial harm' exists, courts have generally found that a significant delay in the administration of an estate, or a delay in the distribution to creditors under a plan generally satisfies the criterion of harm to other parties." *Id.* (collecting cases); *see also In re Bob Hamilton Real Est., Inc.*, 164 B.R. 703, 705 (Bankr. M.D. Fla. 1994) ("[T]he delay which would result from the granting of the stay would cause the estate to suffer harm and would create a substantial hardship to the creditors"); *In re F.G Metals, Inc.*, 390 B.R. 467, 478 (Bankr. M.D. Fla. 2008) ("[S]ignificant delay in the administration of an estate … generally satisfies the criterion of harm to other parties" and "[d]elay in the distribution to creditors under a plan constitutes 'substantial harm to other parties.'") (citations omitted).

When Appellants previously attempted to put off the hearing on the Rabbi Trust Motion, the bankruptcy court found that delay in *resolution* of the dispute would substantially harm Debtors. Recognizing the potential for "weaponization of the debtors[']  financial need," the court found "a need to go forward" with the hearing because Debtors would be "substantially harmed" by further delay. Tr. 70:4-8.

The delay Appellants seek by this stay motion, while they pursue a meritless appeal, would be even more harmful, for three reasons. First, the extended delay Appellants seek now would last longer than the delay already found to be substantially harmful to Debtors. When Appellants sought to stay the Rabbi Trust hearing, they estimated it would take "60 to 90" days to resolve the issue. *See id.* at 51:8-11. As the bankruptcy court found on March 7, 2025, in "90 days, this case is without money." *See id.* at 50:18-19. Now, weeks later, Appellants ask this Court to impose an *indefinite* stay pending appeal. Even an expedited appeal could take months to reach decision. And if Appellants lose at this stage, they will presumably appeal to the Fifth Circuit too.

Second, the bankruptcy court has now determined, after a fact hearing, that the trust assets belong to Debtors. If, as the bankruptcy court found in early March, delay would have substantially harmed Debtors *before* the bankruptcy court confirmed Debtors' ownership of the trust assets, a longer delay—after even more time has passed—with no ownership issues left to resolve, would be doubly harmful.

Third, and most important, Debtors are out of time and out of money. Debtors' FILO DIP Credit Agreement will mature on April 11, 2025. Bankr. Doc. No. 4472. To obtain prior extensions of the credit agreement, from December 31, 2024, through April 11, 2025, Debtors had to repay the lenders $30 million. Castellano Declaration ¶ 9. Debtors do not have funds available to secure additional extensions while Appellants pursue meritless appeals. Without an extension of the credit agreement, the lenders will presumably foreclose on Debtors' assets, including valuable litigation claims that, if successful, would allow Debtors to repay their secured and administrative expense claims in full and provide

a meaningful recovery to unsecured creditors. And even if the lenders would extend the credit agreement without requiring a substantial payment (which is highly unlikely), Debtors still would not have the cash necessary to operate the estates. *See* Oral Ruling 73:6-11 (Offer of Proof: Debtors could "certainly not [operate] for an additional month or longer, during [a] stay pending appeal"). "Debtors would require incremental new money financing to continue operating while an appeal was pending, and the Debtors do not have access to such financing." *Id.* at 73:18-21. The rabbi trust assets are the only currently viable source of necessary liquidity. A stay would make those assets unavailable when Debtors need them, inflicting severe and irreparable injury.

And Debtors are not the only ones that would suffer substantial harm. A stay, and the critical loss of funding it would cause, threatens the estates' creditors too. "One of the primary purposes behind bankruptcy proceedings is to 'bring about a ratable distribution among creditors of a bankrupt's assets [and] to protect the creditors from one another.'" *Liberty Mut. Ins. Co. v. Devere Constr. Co.,* No. 16-cv-10423, 2016 WL 4800796, at *3 (E.D. Mich. Sept. 14, 2016) (alteration in original) (quoting *Young v. Higbee Co.*, 324 U.S. 204, 210 (1945)). The best outcome for the estates' creditors is to confirm a chapter 11 plan and monetize Debtors' remaining assets, including litigation claims. Granting a stay pending appeal puts that out of reach.

Because "this appeal is a primary factor in delaying the distribution to [the debtor's] creditors of funds they are owed, the grant of a stay pending appeal would [also] directly cause further delay of that distribution." *See In re Metiom, Inc.*, 318 B.R. 263, 272 (S.D.N.Y. 2004). "In addition, litigation of the appeal would further deplete the resources available

14

to be distributed to the creditors." *Id.*; *see also Yucaipa*, 2014 WL 1871889, at *5 (finding "substantial harm to [administratively insolvent debtor's] creditors if the case [was] stayed pending the appeals, which could take a significant amount of time to resolve").

Appellants ignore all these harms. They say it makes no difference if Debtors cannot confirm a chapter 11 plan because Debtors are liquidating, not reorganizing. Mot. 31 ¶ 59. But Debtors are progressing toward a chapter 11 plan with financing to monetize estate assets, including litigation claims, for the benefit of all creditors. And there is a world of difference between *monetizing* claims seeking over $1 billion and *relinquishing* those claims. If Debtors win the litigations, they could repay all secured and administrative expense creditors (over $400 million in the aggregate) and provide a meaningful recovery to unsecured creditors (claiming billions of dollars). If Debtors' litigation claims and other assets are wrested away from them by their lenders because Debtors are denied access to the rabbi trust funds, all that value goes out the window.

## IV.    Appellants Failed to Demonstrate They are Likely to Succeed on the Merits of Their Appeal

The balance of equities tips decidedly in Debtors' favor, which is reason enough to deny the stay motion. Beyond that, Appellants have not met their burden to demonstrate they are likely to succeed on the merits of their appeal. To show a likelihood of success, Appellants must prove it is more likely than not the bankruptcy court's order will be reversed on appeal. "[I]t is not enough that the movant's chance of prevailing be merely 'better than negligible.'" *In re Royal St. Bistro, LLC*, No. 21-2285, 2022 WL 326636, at *3 (E.D. La. Feb. 3, 2022) (quoting *Abbott*, 961 F.3d at 397). Even "presentation of a

substantial case alone is not sufficient." *Id.* (quoting *Abbott*, 961 F.3d at 397).[4]

## A.    The Rabbi Trust Motion was properly resolved in the contested matter

Appellants' lead argument on the merits is one that Judge Lopez and Judge Bennett have already rejected. Appellants contend the bankruptcy court should not have resolved the Rabbi Trust Motion in the contested matter because "[t]he matter could only proceed as an adversary proceeding." Mot. 33 ¶ 66. But Appellants consented to the bankruptcy court deciding this issue in the contested matter. In any event, as the bankruptcy court found, "a contested matter is appropriate here." Oral Ruling 24:23-25.

Debtors filed the Rabbi Trust Motion in November 2024. Appellants objected to the motion a month later, giving rise to the contested matter. If they believed—as they now contend—that the bankruptcy court could not decide the motion, they could have said so then. But they said the exact opposite. In their December 2024 objection, Appellants told the bankruptcy court it "should defer a ruling on the [Rabbi Trust] Motion until the Participants are provided the opportunity to take discovery . . ." Bankr. Doc. 3497 ¶ 36; *id.* at ¶ 7 ("[T]he Court, if not inclined to deny the [Rabbi Trust] Motion, should defer a ruling on it until the Participants have conducted discovery ….").

The bankruptcy court gave Appellants what they asked for—it deferred ruling on the motion and granted them extensive discovery—but now Appellants won't take yes for an answer. Appellants waited to reverse their position until just before the hearing, when

---

[4] In rare circumstances—not present here—a movant may satisfy the first stay factor by showing that an appeal presents "a substantial case on the merits," rather than a likelihood of success. *Abbott*, 961 F.3d at 397 (citation omitted). That standard applies only "if (1) a *serious legal question* is involved and (2) the balance of the equities weighs *heavily* in favor of granting the stay." *Id.* (internal quotation marks omitted) (emphasis in original). This appeal sits on the opposite end of that spectrum. Appellants do not present a serious legal question and the equities weigh heavily against a stay.  But even if the "substantial case on the merits" standard applied, Appellants could not meet it.

they filed an adversary proceeding that had, in their words, "near complete overlap" with the contested matter. Case No. 4:25-mc-00461 Doc 1 at ¶ 23 n.4. The objective of the copycat adversary proceeding was to delay Debtors' access to the rabbi trust assets until Debtors could no longer use them. As the bankruptcy court put it, "at the last minute, [Appellants] started an adversary proceeding which one could construe as an effort to delay a hearing on the Rabbi Trust motion." Oral Ruling 9:11-16.

By expressly consenting to resolution of the Rabbi Trust Motion and litigating it to the eve of trial, Appellants waived their demand for an adversary proceeding, as the bankruptcy court found. *See* Tr. 71:12-14 ("requesting an adversary proceeding at this point … has been waived"). "[T]he Fifth Circuit has ruled that a non-debtor third party may implicitly consent to litigating a turnover motion without the necessity of an adversary proceeding in instances 'when the court afforded them all the protections of an adversary proceeding yet they knowingly failed to litigate a Rule 7001 issue ….'" *In re McCray*, No. 14-10124, 2018 WL 6422719, at *3 (Bankr. W.D. La. Dec. 4, 2018) (quoting *In re Zale Corp.*, 62 F.3d 746, 763 (5th Cir. 1995)); *see also In re Ulmer*, 203 F.3d 828, at *1 (5th Cir. 1999) (unpublished) (appellant "waived any objection [to resolving turnover motion in contested matter rather than adversary proceeding] because he had notice of the … motion and failed to object").

In any event, as the bankruptcy court also determined, a contested matter is appropriate to resolve this issue. "No adversary proceeding was required in this case because the party holding the Debtors' property consented to the relief. An adversary proceeding to 'recover money or property' is only required when *the party holding the*

17

*property* contests the estate's entitlement to the property and refuses to return it." *In re Alpha Nat. Res. Inc.*, 554 B.R. 787, 799-800 (Bankr. E.D. Va. 2016) (emphasis added). Here, like in *Alpha Nat. Res.*, "[t]he Trustees are … not contesting the motion." Oral Ruling 23:21. There is no need to "force the Trustees," who hold the trust assets, to do anything because "the Trustees are not objecting" to the Rabbi Trust Motion. *Id.* at 24:1-6; *see also In re RTI Holding Co.*, No. 20-12456, Doc. No. 425 at 33:23-34:10 (Bankr. D. Del. Nov. 12, 2020) ("[S]ince the trustee is not objecting to the relief and the trustee is the one who holds the property, there's no need to proceed by adversary and [the dispute] can proceed by motion in the form of a contested matter.").

Appellants also contend that, by deciding the Rabbi Trust Motion, the bankruptcy court violated Article III because its decision could moot Appellants' eleventh-hour motion to withdraw the reference in their waived adversary proceeding. Mot. 34-36. Nonsense. Even assuming the Rabbi Trust decision would moot the withdrawal motion (it wouldn't), there is no Article III violation.[5] Bankruptcy courts routinely decide issues that moot motions to withdraw the reference. *See, e.g., In re Lloyd*, 200 F.3d 815, at *1 (5th Cir. 1999) (unpublished) (the "motion to withdraw reference of the adversary proceeding became a moot issue when the adversary proceeding was dismissed" by the bankruptcy court); *Gibbs v. Goddard Riverside Cmty. Ctr.*, No. 3:23-cv-1108, 2024 WL 554141, at *1 (M.D. Pa. Feb. 12, 2024) ("While this motion was pending, the bankruptcy court dismissed the adversary complaint. Accordingly, the court must DENY the motion to withdraw the reference

---

[5] The motion to withdraw the reference in the adversary proceeding is not moot. The District Court may still decide who should preside over the adversary proceeding—the District Court or the bankruptcy court—the sole question presented by the withdrawal motion. Regardless of who presides over it, the copycat adversary proceeding was always dead on arrival because Appellants waited until just before trial on the Rabbi Trust Motion to file it.

regarding that now dismissed adversary complaint as moot.").[6]

No court has ever held that bankruptcy court decisions mooting withdrawal motions violate Article III. The out-of-circuit case Appellants hang their hat on, *In re Parklane/Atlanta Joint Venture*, 927 F.2d 532 (11th Cir. 1991), is completely irrelevant. *Parklane* did not involve mootness at all. It merely held that a motion to dismiss, which (under then-existing law) could not be appealed, had to be decided by the district court in the first instance. That issue is not presented here. And even if the bankruptcy court's decision here did present an Article III issue, Appellants' consent to the bankruptcy court's resolution of the Rabbi Trust Motion would resolve it. As the Supreme Court held some fifteen years after *Parklane*, "Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge," and such consent may be "implied." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669, 684 (2015).

## B.   Appellants' appeal is unlikely to succeed because the plans are "top hat" plans

Appellants also cannot meet their burden of showing a likelihood success on appeal because the Debtors' deferred compensation plans qualify as "top hat" plans. A "top hat" plan is "a plan which is unfunded" and provides "deferred compensation for a select group of management *or* highly compensated employees."  29 U.S.C. § 1101(a)(1) (emphasis added). So to determine whether a deferred compensation plan qualifies, courts need answer only two questions: (1) whether the deferred compensation plan is unfunded; and

---

[6] *See also, e.g.*, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:22-CV-2802-B, 2023 WL 4768188, at *2 (N.D. Tex. July 26, 2023) ("[T]he bankruptcy court's order granting dismissal effectively resolves the adversary proceeding; nothing is left to withdraw."); *In re Byrnes*, No. 20-12086-t7, 2022 WL 17752369, at *1 (D.N.M. Dec. 19, 2022) (motion to withdraw reference was moot where bankruptcy judge issued final judgment in underlying adversary proceeding); *In re Lear Corp.*, 418 B.R. 47, 48 (S.D.N.Y. 2009) ("a bankruptcy court order dismissing an adversary proceeding moots a motion to withdraw reference").

(2) whether the deferred compensation plan is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management *or* highly compensated employees. *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 512 (5th Cir. 2002). Both prongs are met here, as the bankruptcy court found.

1.     **The deferred compensation plans are unfunded**

"Unfunded," in this context, is a term of art. The deferred compensation plans are unfunded if the trust assets remain property of the Debtors. To determine whether a plan is unfunded, courts examine the plan's language and whether the participant paid income taxes on the deferred compensation. *See id.* at 513-15.

Appellants do not, and cannot, dispute that the plan documents and related trust agreements here require the deferred compensation plans to be unfunded. Oral Ruling 26:19-27:11, 28:2-11, 35:16-36:3, 41:5-15. In addition to relying on the trust documents' unambiguous language, the bankruptcy court made critical factual findings. First, it found that Appellants did not pay taxes on deferred income, a point that is undisputed. *Id.* at 26:14-18, 27:7-28:24, 46:13-16; *see Reliable Home*, 295 F.3d at 513-15. Second, it found that premiums on insurance policies in the trust corpus were paid for from Steward's general fund, rather than participants' paychecks, and Steward was the beneficiary of those policies. Oral Ruling 27:3-16. Since Debtors, not Appellants, own the trust assets, Appellants have no property interest in these assets as a matter of law. Instead, Appellants have, at most, a general unsecured claim for deferred compensation.

The bankruptcy court correctly rejected Appellants' challenges to this conclusion. Appellants claim that an e-mail, which says that IASIS plan assets "were not in … a secular trust," contradicts the Bankruptcy Court's finding that "that the IASIS plan was 'unfunded.'"

Mot. 53, ¶ 110. But that e-mail only further supports the bankruptcy court's finding because a secular trust—*i.e.*, a trust that is not "subject to the claims of the general creditors of the employer," Howard J. Saks, Secular Trusts Addressed in First Letter Ruling, 16 Est. Plan. 249, 1989 WL 298586 (July/Aug. 1989)—is precisely what would make a plan funded.

The court also correctly rejected Appellants' argument that the plans suddenly became funded because (in Appellants' view) the trusts made distributions to participants while Steward was insolvent. Mot. 53 ¶ 110. Even if Appellants were right that these distributions breached trust provisions, it would make no difference. Those trust provisions protect *creditors*, not plan participants, so Appellants lack standing to enforce them. Oral Ruling 32:15-33:6. The provisions "[were] obviously created to protect the *general creditors* from having the Trustee distribute trust proceeds to participants …." *Cortina v. Sorvan Bank, N.A.*, 927 F. Supp. 439, 447-48 (S.D. Fla. 1994) (emphasis added). Appellants accordingly "ha[ve] no standing to raise" a failure to comply with these provisions "as a bar to [the company's] right to the proceeds" of the Rabbi Trusts. *See id.*

Even if Appellants had standing to make this argument, it fails. Rabbi trusts cannot "magically become … no longer part of [the] estate —merely" because of actions inconsistent with their terms. *Outboard Marine Corp.*, 278 B.R. at 785-86.

## 2.    The deferred compensation plans are selective

The bankruptcy court was also correct to conclude the deferred compensation plans qualify as "top hat" plans under the second prong: The plans are maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. *See Reliable Home*, 295 F.3d at 512.

This prong is known as the "selectivity test." The test is disjunctive; eligible

21

employees must be *either* management *or* highly compensated. *See Sikora v. UPMC*, 153 F. Supp. 3d 820, 825 n.6 (W.D. Pa. 2015), *aff'd*, 876 F.3d 110 (3d Cir. 2017). In making this determination, courts have "consider[ed] … qualitative and quantitative factors such as (1) the percentage of the total workforce eligible to participate in the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative)." *Tolbert v. RBC Cap. Mkts. Corp.*, No. H-11-0107, 2015 WL 2138200, at *9 (S.D. Tex. Apr. 28, 2015) (collecting cases). Because either compensation or management duties satisfies the selectivity test, participants' lack of management responsibility does not affect whether a "top hat" plan qualifies as "primarily for highly compensated employees." *Callan v. Merrill Lynch & Co.*, No. 09-cv-0566 BEN (BGS), 2010 WL 3452371, at *11 (S.D. Cal. Aug. 30, 2010); *see also Sikora v. UPMC*, 876 F.3d 110, 114 (3d Cir. 2017) (same).

The bankruptcy court properly applied this law to the deferred compensation plans, correctly concluding that they satisfied the selectivity test. Both witness and expert testimony support that conclusion. Oral Ruling 39:2-46:12. To participate in the SHC plan, employees had to make almost three times Steward's average employee salary. Under five percent of Steward employees were eligible. Fewer than one percent participated. *Id.* at 39:19-40:1. The IASIS plan looks similar. Participants' average salary was over $350,000. The average IASIS employee salary was under $70,000. Around forty employees participated in the plan, out of thousands. *Id.* at 40:5-23.

The plan participants are highly compensated employees. The bankruptcy court

heard testimony from experts presented by Appellants and Debtors, explained the methodologies employed by each, and ultimately found Debtors' expert's analysis more persuasive. *Id.* at 41:16-46:7. Debtors' expert compared the company's average employee salary with two metrics: the average salary of all *eligible employees*, and the average salary of all *plan participants*. *Id.* at 41:19-42:22.

Both approaches showed the plans are selective and, as the bankruptcy court found, both approaches are well-established. *See Demery v Extebank Deferred Comp. Plan(b)*, 216 F.3d 283, 289 (2d Cir. 2000) ("[T]he average salary of plan participants was more than double that of the average salary of [the company's] employees"); *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 41 (1st Cir. 2008) (comparing participants' average salaries to employees' average salaries); *Alpha Nat. Res.*, 554 B.R. at 796 (comparing average salary of eligible employees to the average salary of non-eligible employees).

Appellants' argument that the plans were not selective rests on what the bankruptcy court found to be an "outlier case," comparing the average salary of all employees to a plan's minimum qualifying salary. Oral Ruling at 45:10-17 (discussing *Daft v. Advest*, No. 5:06-cv-1876, 2008 WL 190436 (N.D. Oh. Jan. 18, 2008)). That decision from a district court in a different circuit is the linchpin for Appellants' assertion that the bankruptcy court "ignored" evidence of eligibility thresholds. Mot. 51, ¶ 107. But the court did not ignore that evidence. It expressly considered it and rejected Appellants' argument, which rests on a disfavored calculation method. Oral Ruling 44:3-46:7. And even using Appellants' skewed methodology would not show the plans were not primarily for highly compensated

employees. *See id.* 44:22-25 ("I also adhere to Judge Ellison's wisdom that the prong should be viewed holistically…. [T]here's no set ratio that should be a gate keeper.")]).

### 3.    The bankruptcy court accounted for bargaining power

Both statutory prongs are satisfied, so the deferred compensation plans are top hat plans. In a final effort to disturb this finding, Appellants argue the bankruptcy court erred by not applying a purported third factor of "bargaining power"—one wholly absent from ERISA's text. Mot. 51, ¶ 108. The bankruptcy court deemed bargaining power "a consideration" in the selectivity analysis but found "nothing in [ERISA's] text implying that selectivity requires finding influence of the employee or bargaining power." Oral Ruling 35:4-37:7. Appellants ask this Court to substitute the bankruptcy court's "textual analysis" with "the purpose of the statute," *id.* at 58:8-10, but "the text of a law controls over purported legislative intentions unmoored from any statutory text; the Court may not replace the actual text with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (internal quotation marks and citation omitted); *see also Barr v. SEC*, 114 F.4th 441, 452 (5th Cir. 2025) ("[A] statute's purpose may not override its plain language.") (quotation omitted).

The purported bargaining-power factor is rooted in a Department of Labor opinion letter. But that letter "does not require that participants in a top-hat plan possess bargaining power." *Sikora*, 876 F.3d at 115-16. "Rather than suggest that courts inquire into whether a particular participant wielded the requisite level of 'bargaining power,' the opinion letter observes that participants in top-hat plans were deemed by Congress to possess bargaining power '*by virtue of their position or compensation level.*'" *Id.* at 116 (emphasis added); *see also Alexander*, 513 F.3d at 47 (declining to "depart from the plain language of [ERISA]

24

and jerry-build onto it a requirement of individual bargaining power" and explaining that the opinion letter "does not present itself as an interpretation of [ERISA]'s requirements" or indicate employers need to "demonstrate their employees' ability to negotiate the terms of deferred compensation plans").[7] In other words, ERISA exempts top hat plans *because* participants satisfying the two-part test possess bargaining power; it does not require a standalone showing of it. *Cf. Tolbert*, 2015 WL 2138200, at *8 ("substantial influence … is but one part of the selectivity issue as a whole, and is not a determinant factor in isolation from consideration of other selectivity factors").

### 4.    Appellants' evidentiary objections are meritless

Appellants devote over seven pages of their fifty-seven-page motion to privilege issues left to the sound discretion of the trial court. *See* Mot. 36-43*; Janvey v. Alguire*, No. 3:09-CV-724-N-BQ, 2018 WL 11362638, at *6 (N.D. Tex. Oct. 17, 2018) ("courts retain significant discretion in evaluating possible waivers of an asserted privilege"). Judge Lopez heard all those arguments and properly found no waiver of privilege. And because the plans are "top hat" plans, they are exempt from ERISA's fiduciary exception. *See* Mot. 39-42.

### <u>Conclusion</u>

For the reasons set forth above, the Court should deny the Motion in its entirety.

---

[7] The bankruptcy court also did not rely on the opinion letter because *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) "confirmed that courts should … not give prominence to any … agency guidance." Oral Ruling 36:13-17.)

Dated: April 10, 2025
Houston, Texas

*/s/ Clifford W. Carlson*

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Clifford.Carlson@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Gregory Silbert (*pro hac vice* pending)
Robert Berezin (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Greg.Silbert@weil.com
           Robert.Berezin@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (*pro hac vice* forthcoming)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:  DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

-and-

**GROOM LAW GROUP, CHARTERED**
Samuel I. Levin (*pro hac vice* forthcoming)
David N. Levine  (*pro hac vice* forthcoming)
Shai D. Bronshtein (*pro hac vice* forthcoming)
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 857-6648
Fax: (202) 659-4503
Email:  slevin@groom.com

*Attorneys for Debtors*
*and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2025 a true and correct copy of the foregoing Defendants' Objection to Appellants' Motion for an Order Staying the Turnover Motion was electronically served on all parties registered to receive electronic notice in this case pursuant to the Court's CM/ECF filing system.

/s/ <i>Clifford W. Carlson</i>
Clifford W. Carlson
