# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

---

### CIVIL NO.  4:25-CV-01584

---

### Bankruptcy Case No. 24-90213

---

### IN RE STEWARD HEALTH CARE SYSTEM, LLC, ET AL., Debtor

---

### BRIEF OF APPELLANTS

---

Dated: June 27, 2025

DR. MANISHA PUROHIT, DR. DIANE PAGGIOLI, DR. JAMES THOMAS, DR. THOMAS ROSS, DR. MICHAEL REGAN, DR. PETER LYDON, DR. SRIDHAR GANDA, DR. A. ANA BEESEN, DR. BENOY ZACHARIAH, DR. BARRY ARKIN, DR. BRUCE KRIEGEL, and DR. GARY MILLER

By their attorneys:

Allan B. Diamond, Esq.
Christopher D. Johnson, Esq.
Diamond McCarthy, LLP
909 Fannin Street, 37th Floor
Houston, TX 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199
Email:
allan.diamond@diamondmccarthy.com
chris.johnson@diamondmccarthy.com

Robert J. Keach, Esq. (*pro hac vice*)
Lindsay K. Milne, Esq.
Bernstein, Shur, Sawyer & Nelson, P.A.
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
Telephone: (207) 774-1200
Facsimile:  (207) 774-1127
Email: rkeach@bernsteinshur.com
         lmilne@bernsteinshur.com

*Counsel for the Appellants*

# **TABLE OF CONTENTS**

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................................... 1

STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION ............................. 1

STATEMENT OF ISSUES PRESENTED ......................................................................... 2

APPLICABLE STANDARD OF REVIEW ...................................................................... 5

STATEMENT OF THE CASE AND SUMMARY ........................................................... 6

SUMMARY OF THE ARGUMENT ............................................................................... 12

ARGUMENT ..................................................................................................................... 14

    I.    The Bankruptcy Court Erred in Ruling that the Debtors Could Proceed
Through the Contested Matter Rather Than an Adversary Proceeding,
Notwithstanding Well Settled Law Within the Fifth Circuit to the Contrary. ... 14

    II.    The Bankruptcy Court Erred in Proceeding with and Ruling on the
Contested Matter When the Motion to Withdraw Reference was Pending. ...... 17

        A.    Ruling on the Contested Matter While the Motion to Withdraw
Reference Remained Pending Was in Contravention of Article
III Principles .......................................................................................... 17

        B.    The Bankruptcy Court was Limited to Submitting Proposed Findings
and Recommendations of Law to the District Court Because It Had
Only "Related to" Jurisdiction ............................................................. 19

    III.    The Bankruptcy Court Abused Its Discretion by Not Staying or
Continuing the Contested Matter in Light of the Debtors' Discovery
Abuses. .................................................................................................... 20

    IV.    The Bankruptcy Court Erred by Failing to Rule (or Ruling "*Sub Silentio*")
on Alleged Privileged Evidence that Was Wrongly Used, at Trial, as
Both Sword and Shield .......................................................................... 22

        A.    Debtors Have Not Carried Their Burden to Demonstrate Disclosure of
the Disputed Emails was Inadvertent .................................................. 22

        B.    The Disputed Emails are Subject to the Fiduciary Exception and Thus
Not Protected by Attorney-Client Privilege ........................................ 25

        C.    Debtors Used Privilege as a Sword in the Driscoll Declaration and
at Trial and Waived the Privilege ........................................................ 27

    V.    The Bankruptcy Court Erred in Failing to Exclude and then Relying
Upon and Affording Weight to the Debtor's Expert Witness
Testimony. ............................................................................................... 28

VI.    The Bankruptcy Court Erred in Discounting the Appellants' Expert
Witness Testimony. ..................................................................................... 29

   A.    The Bankruptcy Court Failed to Adequately Consider Appellants'
   Sealed Expert Testimony Associated with the Disputed Emails ............. 29

   B.    The Bankruptcy Court Erred by Disregarding Appellants' Expert
   Testimony Based Upon Expert's Assumption Provided by Appellants'
   Counsel ................................................................................................. 30

VII.    The Bankruptcy Court Erred in Shifting the Burden of Proof to the
Appellants and Ruling that the Deferred Compensation Plans were
"Top Hat" Plans Based Entirely on the Plan Documents. ................................. 31

VIII.   The Bankruptcy Court Erred in Its Interpretation of ERISA Provisions. .......... 38

IX.    The Bankruptcy Court Erred by Concluding the Deferred Compensation
Plans were "Top Hat" Plans Exempt from ERISA Protections Despite
Significant Evidence to the Contrary. ............................................................... 42

CERTIFICATE OF COMPLIANCE .......................................................................... 48

CERTIFICATE OF SERVICE ................................................................................... 48

## TABLE OF AUTHORITIES

**Cases**

Alexander v. Brigham & Women's Physicians Org., Inc.,
   467 F. Supp. 2d 136 (D. Mass. 2006) ........................................................... 36

Alexander v. Brigham & Women's Physicians Org., Inc.,
   513 F.3d 37 (1st Cir. 2008) ............................................................ 40, 45, 46

Alfa Laval, Inc. v. Nichols,
   Civil No. 3:06CV306, 2007 WL 984111 (E.D. Va. 2007) ........................... 34

Asadi v. G.E. Energy (USA) L.L.C.,
   720 F.3d 620 (5th Cir. 2013) ....................................................................... 42

Bakri v. Venture Mfg Co.,
   473 F. 3d 677 (6th Cir. 2007) ................................................................. 34, 41

Belka v. Rowe Furniture Corp.,
   571 F.Supp. 1249 (D.Md.1983) ................................................................... 41

Berry v. Wells Fargo & Co.,
   No. CV 3:17-00304-JFA, 2018 WL 9989652 (D.S.C. Oct. 10, 2018) ......... 40

Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits Plan,
   No. 16-cv-00486-EDL, 2016 WL 11187255 (N.D. Cal. July 25, 2016) ...... 38

Broussard v. State Farm Fire & Cas. Co.,
   523 F.3d 618 (5th Cir. 2008) ......................................................................... 5

Browe v. CTC Corp.,
   15 F.4th 175 (2d Cir. 2021) ..................................................................... 34, 39

Browe v. CTC Corp.,
   331 F. Supp. 3d 263 (D. Vt. 2018) .............................................................. 35

Callan v. Merrill Lynch,
   No. 09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ............ 38

Carrabba v. Randalls Food Mkts., Inc.,
   38 F. Supp. 2d 468 (N.D. Tex. 1999) ................................................ 34, 36, 41

Charter Crude Oil Co. v. Exxon Co. (In re Charter Co.),
   913 F.2d 1575 (11th Cir. 1990) ................................................................... 14

Colburn v. Hickory Springs Mfg. Co.,
    448 F. Supp. 3d 512 (E.D.N.C. 2020) ........................................................ 35

Corona v. Chevron Corp.,
    No. H-07-3190, 2008 WL 11483069 (S.D. Tex. June 18, 2008) ..................... 22, 23, 27

Crawford v. Guar. State Bank & Tr. Co.,
    No. 22-2542-JAR-GEB, 2024 WL 2700668 (D. Kan. May 24, 2024) ................. 26, 36

Daft v. Advest, Inc.,
    658 F.3d 583 (6th Cir. 2011) ................................................................... 35

Daft v. Advest, Inc.,
    2008 WL 190436 (N.D. Ohio Jan. 18, 2008) .............................................. 40, 41

Daubert v. Merrell Dow Pharms., Inc.,
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ............................ 28

Deal v. Kegler Brown Hill & Ritter Co. L.P.A.,
    551 F. Supp. 2d 694 (S.D. Ohio 2008) ..................................................... 35

Fishman v. Zurich Am. Ins. Co.,
    539 F. Supp. 2d 1036 (N.D. Ill. 2008) ...................................................... 41

Guiragoss v. Khoury,
    444 F. Supp. 649 (E.D. Va. 2006) ...................................................... 34, 36, 39

Hathaway v. Bazany,
    507 F.3d 312 (5th Cir. 2007) ................................................................... 31

In re Alpha Nat. Res., Inc.,
    554 B.R. 787 (Bankr. E.D. Va. 2016) ........................................................ 33

In re Bass,
    171 F.3d 1016 (5th Cir. 1999) ................................................................... 5

In re Canion,
    196 F.3d 579 (5th Cir. 1999) ..................................................................... 5

In re New Century Holdings, Inc.,
    387 B.R. 95 (Bankr. D. Del. 2008) ....................................................... 33, 36

In re Parklane/Atlanta Joint Venture,
    927 F.2d 532 (11th Cir. 1991) ................................................................. 18

In re TransAmerican Natural Gas Corp.,
    978 F.2d 1409 (5th Cir. 1992) ................................................................... 16

In re Wood & Locker, Inc.,
    868 F.2d 139 (5th Cir.1989) ....................................................................... 16

Key v. Warren Averett, LLC,
    No. 2:19-cv-01443-JHE, 2021 WL 12240918 (N.D. Ala. Sept. 30, 2021) ............ 39, 43

Kornman & Assocs., Inc. v United States,
    527 F.3d 443 (5th Cir. 2008) ...................................................................... 42

Kumho Tire Co. v. Carmichael,
    526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ............................. 28

MacDonald v. Summit Orthopedics, Ltd.,
    681 F. Supp. 2d 1019 (D. Minn. 2010) ...................................................... 35

Matter of RE Palm Springs II, L.L.C.,
    106 F.4th 406 (5th Cir. 2024) ....................................................................... 5

Matter of Shurley,
    115 F.3d 333 (5th Cir. 1997) ....................................................................... 5

Matter of Wood,
    825 F.2d 90 (5th Cir. 1987) .......................................................................... 5

Moore v. Int'l Paint, L.L.C.,
    547 Fed. Appx. 513 (5th Cir. 2013) .......................................................... 28

Pedersen v. Kinder Morgan, Inc.,
    344 F.R.D. 452 (S.D. Tex. 2023) ............................................................... 24

Perkins v. PM Realty Group, L.P.,
    No. CV H-24-0566, 2024 WL 4171349 (S.D. Tex. Sept. 12, 2024) .................. 38

Pry v. Maxim Glob. Inc. (In re Maxim Truck Co. Inc.),
    415 B.R. 346 (Bankr. S.D. Ind. 2009) ....................................................... 15

Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.,
    295 F.3d 505 (5th Cir. 2002) ...................................................................... 33

Rewis v. U.S.,
    369 F.2d 595 (5th Cir. 1966) ...................................................................... 31

S. Cal. Pub. Power Auth. v. Ultra Res., Inc.,
    No. 4:19-cv-00090, 2020 WL 13413726 (S.D. Tex. Mar. 27, 2020) .................... 14, 16

Schlossberg v. Madeoy (In re Madeoy),
    576 B.R. 484 (Bankr. D. Md. 2017)................................................................................ 14

Sikora v. UPMC,
    876 F.3d 110 (3d Cir. 2017)........................................................................................... 36

Stanziale v. Pepper Hamilton, LLP (In re Student Fin. Corp.),
    335 B.R. 539 (D. Del. 2005) .......................................................................................... 14

Starr v. JCI Data Processing, Inc.,
    757 F.Supp. 390 (D.N.J.1991) ....................................................................................... 41

Stern v. Marshall,
    564 U.S. 462, 131 S. Ct. 2594 (2011) ........................................................................... 17

Stevens Shipping & Terminal Co. v. JAPAN RAINBOW, II MV,
    334 F.3d 439 (5th Cir. 2003)............................................................................................ 5

Tao v. Wu,
    No. C 11- 3248, 2012 WL 1123540 (N.D. Cal. Apr. 3, 2012) ...................................... 39

Tolbert v. RBC Capital Markets Corp.,
    758 F.3d 619 (5th Cir. 2014)..................................................................................... 38, 39

Tolbert v. RBC Capital Markets, Corp.,
    No. H-11-0107, 2012 WL 1067629 (S.D. Tex. Mar. 28, 2012) ................................... 27

Tolbert v. RBC Capital Markets Corp.,
    No. CIV.A. H 11-0107, 2015 WL 2138200, (S.D. Tex. Apr. 28, 2015) .......... 34, 35, 39

Tow v. HBK Main St. Invs., L.P., (In re ATP Oil & Gas Corp.),
    No. 12-36187, 2015 WL 1093568 (Bankr. S.D. Tex. Mar. 11, 2005).......................... 14

United States v. Inslaw, Inc.,
    932 F.2d 1467 (D.C. Cir. 1991) ..................................................................................... 14

United States v. Koutsostamatis,
    956 F.3d 301 (5th Cir. 2020).......................................................................................... 42

United States v. Moore,
    71 F.4th 392 (5th Cir. 2023)........................................................................................... 42

Virta v. DeSantis Enters., Inc.,
  No. 94-CV-1378, 1996 WL 663970 (N.D.N.Y. Nov. 7, 1996) .............................36, 39

Viterbo v. Dow Chem. Co.,
  826 F.2d 420 (5th Cir. 1987).................................................................................31

Wildbur v. ARCO Chem. Co.,
  974 F.2d 631 (5th Cir. 1992)...........................................................................25, 26

**Statutes**

11 U.S.C. § 542 .....................................................................................................passim

28 U.S.C. § 157 ...............................................................................................................1

28 U.S.C. § 157(b)(1)......................................................................................................5

28 U.S.C. § 157(c) ...................................................................................................19, 20

28 U.S.C. § 157(c)(1) ................................................................................................2, 19

28 U.S.C. § 157(d)...........................................................................................................8

28 U.S.C. § 158(a) ...........................................................................................................2

28 U.S.C. § 1334 .............................................................................................................1

28 U.S.C. § 1408 .............................................................................................................2

28 U.S.C. § 1409(a) .........................................................................................................2

29 U.S.C. § 1001(a)-(c) .................................................................................................32

29 U.S.C. § 1002(3) .......................................................................................................32

29 U.S.C. § 1051(2)...........................................................................................32, 33, 34

29 U.S.C. § 1056(d) .......................................................................................................32

29 U.S.C. § 1081(a)(3) ...................................................................................................32

29 U.S.C. § 1101(a)(1) ...................................................................................................32

29 U.S.C. § 1103(c)(1) ...................................................................................................32

29 U.S.C. § 1132(a)(3) ...................................................................................................32

## Rules

Fed. R. Bankr. P. 5011(c) ........................................................... 17

Fed. R. Bankr. P. 7001(2) ........................................................... 16

Fed. R. Bankr. P. 7001(7) ........................................................... 16

Fed. R. Bankr. P. 8009(f) ........................................................... 22

Fed. R. Bankr. P. 8019 ............................................................... 1

Fed. R. Bankr. P. 8019(b) ........................................................... 1

Fed. R. Evid. 502 ..................................................................... 23

Fed. R. Evid. 702 ..................................................................... 28

Fed. R. Evid. 702(b) ................................................................. 28

Southern District of Texas Bankruptcy Rule 2004-1(e) .................... 8

Southern District of Texas Bankruptcy Rule 5011-1 ....................... 17

## Other Authorities

9 COLLIER ON BANKRUPTCY, ¶ 9014.05 (15th ed. 1992) ................... 16

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Rule 8019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), which establishes a rebuttable presumption in favor of allowing oral argument, Appellants Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lydon, Dr. Sridhar Ganda, Dr. A. Ana Beesen, Dr. Benoy Zachariah, Dr. Barry Arkin, Dr. Bruce Kriegel, and Dr. Gary Miller (the "**Appellants**"), request oral argument. This appeal satisfies the standards in Bankruptcy Rule 8019(b) for allowing oral argument. Indeed, as detailed below, this appeal involves significant constitutional issues regarding the constitutional authority of the bankruptcy court and the limits on that authority, as well as the due process rights of litigants before the bankruptcy court. Among those issues are whether the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), through inaction or its own ruling, can prevent the Article III United States District Court for the Southern District of Texas (the "**District Court**") from ruling upon a mandatory withdrawal of the reference and from subsequently adjudicating the necessarily withdrawn matter. In addition, among other issues, the appeal implicates significant issues regarding the proper interpretation and implementation of the Employee Retirement Income Security Act ("**ERISA**"). Appellants believe that oral argument will materially assist this Court on all such issues.

## STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION

The Bankruptcy Court had jurisdiction over the Turnover Motion and related Contested Matter (both as defined below) pursuant to 28 U.S.C. §§ 157, 1334, and this

Court's standing order of reference, subject to this Court's authority to withdraw the reference.  Venue of the underlying chapter 11 bankruptcy cases of the Debtors (as defined below) in this District is proper pursuant to 28 U.S.C. § 1408, and venue of the Turnover Motion and Contested Matter was proper under 28 U.S.C. § 1409(a).[1]

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) because the Appellants are appealing the Bankruptcy Court's order granting the Turnover Motion (the "**Turnover Order**"), and all interlocutory decisions, orders, rulings, and opinions that are merged therein, including its oral ruling on April 2, 2025 (the "**Oral Ruling**"). Appendix at 1.[2]  The Turnover Order, therefore, is a final order.[3]

Following the Bankruptcy Court's issuance of the Turnover Order, on April 3, 2025, the Appellants timely filed their Notice of Appeal.  App. at 4.  Thus, the Appellants have a right to appeal the Turnover Order because they have properly and timely appealed a final order under Bankruptcy Rules 8002 and 8003.

## STATEMENT OF ISSUES PRESENTED

1.    Whether the Bankruptcy Court erred as a matter of law in ruling that the Debtors could proceed by a contested matter under section 542 of title 11 of the United

---

[1] The jurisdictional statement is, of course, without prejudice to the arguments below that the Bankruptcy Court was <u>without</u> constitutional authority to adjudicate the Turnover Motion.

[2] Citations to Appellant's Appendix are designated as "App. at ___."

[3] Alternatively, if the Bankruptcy Court did not have authority to issue a final judgment in the Contested Matter, the District Court may treat the decision below as recommended findings of fact and conclusions of law and exercise full *de novo* review.  28 U.S.C. § 157(c)(1).

States Code (the "**Bankruptcy Code**") to seek the turnover of assets in the Deferred Compensation Plans (as defined below) where ownership of such assets was in *bona fide* dispute and (a) settled law within the Fifth Circuit and the clear mandate of Bankruptcy Rule 7001(b) required that the matter be adjudicated only in an adversary proceeding; and (b) the Appellants had filed a complaint seeking equitable relief under ERISA thus mandating that the matter proceed only as an adversary proceeding under Bankruptcy Rule 7001(b).

2.    Whether the Bankruptcy Court erred as a matter of law in refusing to stay the hearing on the Turnover Motion pending resolution of Appellants' motion to withdraw the reference, and in ruling on the Turnover Motion, as such ruling unconstitutionally usurped the exclusive jurisdiction and authority of the District Court to adjudicate the motion to withdraw the reference in violation of Article III of the Constitution.

3.    Whether the Bankruptcy Court erred as a matter of law in entering a final judgment on the Turnover Motion when the Bankruptcy Court had only "related to" jurisdiction over the matter and was thus required to submit proposed findings and recommendations of law to the District Court for final adjudication.

4.    Whether the Bankruptcy Court abused its discretion in denying Appellants' motions to stay or continue the hearing on the Turnover Motion in light of (a) the Debtors' clear abuses during discovery; (b) the additional facts, documents, and witnesses revealed during the eve-of-hearing depositions; and (c) the fact that so proceeding denied Appellants' rights to due process.

5.    Whether the Bankruptcy Court erred as a matter of law in failing to rule (or

3

ruling *sub silentio*) regarding whether the Debtors could shield certain evidence on attorney-client privilege grounds when (a) the evidence was not privileged in the first instance under the "fiduciary exception" to the privilege; and (b) the Debtors, in any event, had waived any privilege by (i) voluntary production of such evidence; and (ii) by invoking advice of counsel in direct testimony, particularly where, had the evidence been fully admitted, such evidence mandated a ruling in favor of the Appellants on the underlying merits.

6.      Whether the Bankruptcy Court erred in failing to exclude and then relying upon and affording weight to the testimony of the Debtors' expert witness despite such witness relying on admittedly unreliable data.

7.      Whether the Bankruptcy Court erred in apparently discounting certain conclusions provided by the Appellants' expert witness, who the Bankruptcy Court expressly found to be credible, because of an assumption that the Appellants' expert used (as suggested by the Appellants' attorneys) where evidence in the record proved that assumption to be true.

8.      Whether the Bankruptcy Court erred as a matter of law in placing the burden of proof on the Appellants to prove that the Deferred Compensation Plans were not "top hat" plans by ruling, contrary to all available authority, that the Deferred Compensation Plans were "top hat" plans based entirely on the plan documents in the absence of contrary evidence submitted by Appellants.

9.      Whether the Bankruptcy Court erred as a matter of law in interpreting sections 1051(2), 1081(a)(2), and 1101(a)(1) of ERISA in a manner contrary to the stated

purpose of ERISA and established legal precedent.

10.     Whether the Bankruptcy Court clearly erred, and erred as a matter of law, in finding and concluding that the Deferred Compensation Plans qualified as "top hat" plans exempt from ERISA's substantive protections despite the weight of the evidence presented at trial establishing that the Deferred Compensation Plans did not qualify as "top hat" plans.

## APPLICABLE STANDARD OF REVIEW

Upon appeal, all "non-core" matters are reviewed *de novo*.  Matter of RE Palm Springs II, L.L.C., 106 F.4th 406, 411 (5th Cir. 2024).  For appeals of bankruptcy court determinations on "core" matters,[4] findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*.  RE Palm Springs II, 106 F.4th at 411; *see also*, In re Bass, 171 F.3d 1016, 1021 (5th Cir. 1999); Matter of Shurley, 115 F.3d 333, 336 (5th Cir. 1997).  "Mixed questions of fact and law are reviewed *de novo*."  In re Canion, 196 F.3d 579, 584 (5th Cir. 1999).   Allocations on the burden of proof are also reviewed *de novo*.  Broussard v. State Farm Fire & Cas. Co., 523 F.3d 618, 625 (5th Cir. 2008) (quoting Stevens Shipping & Terminal Co. v. JAPAN RAINBOW, II MV, 334 F.3d 439, 443 (5th Cir. 2003)).

---

[4] "Core" matters are those that "arise under" or "arise in" a bankruptcy case.  28 U.S.C. § 157(b)(1).    Matters "arising under" the Bankruptcy Code are those "that involve a cause of action created or determined by a statutory provision of [the Bankruptcy Code]."  Matter of Wood, 825 F.2d 90, 96 (5th Cir. 1987).  Matters "arising in" the Bankruptcy Code are "those that are not based on any right expressly created by [the Bankruptcy Code], but nevertheless, would have no existence outside of the bankruptcy."  Id. at 97.

## STATEMENT OF THE CASE AND SUMMARY
## OF FACTS RELEVENT TO THE ISSUES ON APPEAL

Steward and certain of its affiliates ("**Debtors**") sponsored two deferred compensation plans: the (1) Steward Health Care Deferred Compensation Plan ("**Steward Plan**") and (2) the IASIS Healthcare Executive Savings Plan ("**IASIS Plan**," and with the Steward Plan, the "**Deferred Compensation Plans**").   The Appellants are certain participants in the Deferred Compensation Plans.  Debtors allegedly maintained assets meant to fund Debtors' obligations under the Deferred Compensation Plans in one of two "Rabbi Trusts" pursuant to either the *Amended and Restated Rabbi Trust Agreement* ("**Steward Trust Agreement**") or the *IASIS Healthcare Executive Savings Plan Trust Agreement* ("**IASIS Trust Agreement**," and with the Steward Trust Agreement, the "**Trust Agreements**").[5]

On May 6, 2024 ("**Petition Date**"), Debtors filed for relief under Chapter 11 of the Bankruptcy Code, and both Deferred Compensation Plans were terminated.  No participant deferrals have been made into the Steward Plan since the Petition Date.

On November 11, 2024, approximately six months after termination of the Deferred Compensation Plans, Debtors filed a *Motion for an Order (A) Directing Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors, (B) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets, (C) Authorizing Termination of*

---

[5] Evidence adduced at trial on this matter revealed that Debtors did not hold the IASIS Plan's assets in a Rabbi Trust or a secular trust at the commencement of the chapter 11 case.  App. at 13 (¶¶ 4, 6); App. at 142 (126:12-22); App. at 184-88 (168:18-172:1); App. at 435.

*Trusts, and (D) Granting Related Relief* ("**Turnover Motion**" and the contested matter created thereby, the "**Contested Matter**").  App. at 460.  The Debtors argued that the plan assets (the "**Plan Assets**") were Debtors' property because the Deferred Compensation Plans were "top hat" plans exempt from the presumptive fiduciary protections of ERISA rather than, as is the default, assets held in trust for the exclusive benefit of the plan participants and their beneficiaries (the admitted outcome if the Deferred Compensation Plans are not "top hat" plans).

The Appellants objected to the Turnover Motion on December 17, 2024 ("**Turnover Objection**").  App. at 480.  In the middle of the first sentence of the Turnover Objection, the Appellants footnoted and highlighted a clear reservation of all rights to pursue equitable and other relief in a class action in the event pre-litigation discovery revealed evidence that the Deferred Compensation Plans were not "top hat" plans.  *See* App. at 480, fn. 2.  If discovery revealed a good-faith basis to allege that the Deferred Compensation Plans were not "top hat" plans, as it did, class action litigation was legally and constitutionally required to resolve the disputed material facts and legal and equitable issues necessary to determine "top hat" status and to afford class-wide affirmative equitable relief under ERISA.

As stated in the Turnover Objection, the Appellants initiated pre-litigation discovery under Bankruptcy Rule 2004 concurrently with the filing of the Turnover Objection and issued a notice of examination under Bankruptcy Rule 2004 in December 2024 ("**2004 Notice**").  App. at 1190.  In so doing, the Appellants purposefully did <u>not</u> proceed with discovery under Bankruptcy Rule 9014 (the procedure applicable to a contested matter).

The Debtors never objected to the 2004 Notice, and by local rule, the 2004 Notice acquired the force of an order of court. Southern District of Texas Bankruptcy Rule ("**BLR**") Rule 2004-1(e) ("If no response is served, the notice to conduct an examination under this rule is deemed ordered, without requiring the entry of an order.").

Following delayed initial document production by the Debtors under the 2004 Notice—and little more than 2 months after reserving the right to do so—on March 3, 2025, the Appellants initiated an adversary proceeding (the "**Adversary Proceeding**") by filing a class-action complaint seeking the equitable relief they had reserved the right to seek in the Turnover Objection ("**Adversary Complaint**"). App. at 520. In short, the Appellants did exactly what they said from the outset that they would do.

With the filing of the Adversary Complaint, the Appellants filed a motion seeking mandatory withdrawal of the reference under 28 U.S.C. §157(d) because the Adversary Complaint required detailed consideration of ERISA—and only ERISA—and adjudication of certain issues under ERISA not settled in the Fifth Circuit. App. at 570 ("**Motion to Withdraw**"). At the same time, the Appellants moved the Bankruptcy Court for an order staying the hearing on the Turnover Motion pending resolution of the Motion to Withdraw ("**First Emergency Stay Motion**"). App. at 594. The First Emergency Stay Motion and Motion to Withdraw presented to the Bankruptcy Court the various constitutional and jurisdictional bases requiring a pause of the hearing on the Turnover Motion so that a district court, as it must, could decide whether reference of the Adversary Proceeding would be withdrawn and the Turnover Motion stayed or dismissed (or merged into the Adversary Proceeding).

On March 7, 2025, the Bankruptcy Court held a hearing on the First Emergency Stay Motion (the "**Stay Hearing**").  At the hearing, over the objections of the Appellants, the Bankruptcy Court cancelled a hearing on the Turnover Motion originally scheduled for March 11, 2025, ordered that Debtors complete document production by Sunday, March 9, and set the Turnover Motion for a full evidentiary hearing on March 26 ("**Turnover Evidentiary Hearing**").  *See* App. at 630.  Under this ruling, the Appellants had just 16 days to review yet-unproduced documents, depose witnesses, retain experts, and prepare for trial—all of which would normally take six months or more—while at the same time protecting their rights and ensuring a complete record.[6]

On March 11, 2025, the Debtors moved to seal the March 7 hearing because a case-dispositive series of emails ("**Disputed Emails**") were merely referenced at that hearing that Debtors only subsequently attempted to claw back, baselessly claiming that the Disputed Emails were protected by the attorney-client privilege and that Debtors had inadvertently produced those documents.  App. at 631; App. at 675 (amended) (as amended, the "**Motion to Seal**").  The Appellants opposed the Motion to Seal, App. at 719 (the "**Opposition to Motion to Seal**"), demonstrating that the case-dispositive Disputed Emails did not contain privileged materials and that the Debtors had waived the privilege in multiple ways in any event, including through reference to the Disputed Emails in a declaration filed by the Debtors.  App. at 733 (the "**Driscoll Declaration**").  The Bankruptcy Court did not rule on the Motion to Seal prior to the Turnover Evidentiary

---

[6] Mar. 7 Tr. at 60:19-24 (filed under seal) (The Court: "I'm now hearing 13 witnesses.").

Hearing.  Given the Bankruptcy Court's silence, the Appellants filed a motion to compel the production of the Disputed Emails as well as a privilege log.  App. at 741 (the "**Motion to Compel**").  The Bankruptcy Court similarly did not rule on the Motion to Compel prior to the Turnover Evidentiary Hearing.

Meanwhile the Appellants subsequently commenced a miscellaneous proceeding with the district court and filed the *Emergency Motion for an Order Staying Hearing on Turnover Motion* [App. at 750] (the "**Second Emergency Stay Motion**") on March 13, 2025, seeking to stay proceedings on the Turnover Motion while the Motion to Withdraw remained pending.  The district court denied the Second Emergency Stay Motion on March 24, 2025, App. at 755, without reaching the constitutional and procedural issues discussed below.

Meanwhile, between March 7 and March 26, left with no other choice, the Appellants, under protest and with a full reservation of rights, took or defended a total of ten (10) depositions, the last one concluding after hours on March 25, 2025, the literal eve of the March 26 evidentiary hearing.  Throughout this time, discovery continued to reveal new evidence, including previously undisclosed documents and material witnesses, including members of the Debtors' board of directors—facts that contradicted Debtors' prior representations to the Bankruptcy Court and the Appellants that the board was not involved in critical decisions about the Deferred Compensation Plans.  Obviously, there was no time for follow-up discovery on such revelations.

In light of the newly discovered evidence finally being reluctantly produced by the Debtors, on March 24, 2025, the Appellants filed the *Plan Participants' Emergency Motion*

*to Continue March 26, 2025 Hearing on Turnover Motion* [App. at 758] (the "**Motion to Continue**") with the Bankruptcy Court, seeking to continue the Turnover Evidentiary Hearing to afford both parties reasonable time to develop the record necessary for the Bankruptcy Court to reach the best conclusion on the Turnover Motion.

Nevertheless, on March 26, 2025, the Bankruptcy Court held the Turnover Evidentiary Hearing as scheduled. In opening argument, counsel for the Appellants reserved the rights and contentions outlined below regarding the need for an adversary proceeding and the need for the district court to rule on the motion to withdraw reference, as well as due process challenges. At that hearing, the Court admitted nearly 300 exhibits, heard live testimony from five (5) witnesses, and took into evidence eleven (11) witness declarations and related deposition transcripts for the eleven witnesses (which constituted cross examination). The need to use written testimony from the majority of witnesses was completely driven by the compressed timetable. Despite the lack of due process and truncated hearing, Appellants contend that the evidence of trial established that the Debtors had failed to, and could not, meet their burden of proof that the Deferred Compensation Plans were "top hat" plans.

On April 2, 2025, against the weight of that evidence, the Bankruptcy Court issued its Oral Ruling granting the Turnover Motion, reading into the record its reasoning, and separately entered the Turnover Order. The Bankruptcy Court, in response to the Appellants' oral motion to stay the Turnover Order pending appeal, denied the motion for a stay but nonetheless ordered that its Turnover Order would become effective on 11:59 CT on April 11, 2025.

Following the Bankruptcy Court's ruling on the Turnover Motion, on April 4, 2025, the Appellants filed a Notice of Appeal with respect to the Turnover Order with the Bankruptcy Court.  App. at 4.  On April 7, 2025, the matter was assigned to this Court (the "**Turnover Appeal**").  App. at 771; App. at 1189.

Also on April 7, 2025, the Appellants filed *Appellants' Emergency Motion for Stay Pending Appeal (Including Motion for Immediate Stay Pending Hearing on the Emergency Motion for Stay Pending Appeal)* [App. at 848] (the "**Third Emergency Stay Motion**"), seeking a stay of the effective date of the Turnover Order while the Turnover Appeal was pending.  This Court denied the Third Emergency Stay Motion on April 11, 2025, App. at 907, again without reaching the constitutional and procedural issues discussed herein.

## SUMMARY OF THE ARGUMENT

Both procedural and substantive errors of law abound regarding the proceeding and ruling from which this appeal arises.  The contest over the Trust Assets, premised on a dispute as to whether the subject retirement funds were or were not, under ERISA, so-called "top hat" plans could not, as a matter of law, be conducted in a compressed, accelerated and limited discovery "contested matter" under section 542 of the Bankruptcy Code and Bankruptcy Rule 9014. Those issues, decided exclusively under ERISA and its pertinent decisional law, could only be adjudicated through an adversary proceeding pursuant to Bankruptcy Rule 7001, with accompanying full due process rights.  The Bankruptcy Court further erred by proceeding with—and ruling on—the Contested Matter notwithstanding controlling Article III considerations and the Appellant's pending Motion to Withdraw; that ruling plainly usurped the exclusive authority of the district court.

Failure to stay or continue the Contested Matter—resulting in the Contested Matter progressing on an unrealistic accelerated timetable, exacerbated by the Debtors' discovery abuses recognized by the Bankruptcy Court—was also legal error.

The Bankruptcy Court's failure to rule (or *sub silentio* ruling) on the admissibility of alleged privileged evidence despite an applicable exception to privilege and unquestionable waiver of any privilege, including that such evidence was improperly used as both sword and shield, was also legal error.  Additionally, the Bankruptcy Court erred with regards to the handling of expert witness testimony by (1) failing to exclude and then relying upon the testimony of Debtors' expert witness and (2) discounting the testimony of Appellants' expert witness because of a factual assumption the Appellants' expert witness used that was established as a matter of fact at trial.  Further, the Bankruptcy Court erred in shifting the burden of proof onto the Appellants when ruling the Deferred Compensation Plans were "top hat" plans based solely on the language of the plan documents and the alleged absence of contrary factual evidence provided by Appellants.

Finally, the Bankruptcy Court erred in its interpretation of ERISA provisions and its ultimate ruling—in the face of considerable contrary evidence and despite abbreviated and incomplete discovery—that the Deferred Compensation Plans were "top hat" plans exempt from ERISA protections.  The numerosity and severity of these errors necessitate the reversal of the Turnover Order.

## ARGUMENT

**I.  The Bankruptcy Court Erred in Ruling that the Debtors Could Proceed Through the Contested Matter Rather Than an Adversary Proceeding, Notwithstanding Well Settled Law Within the Fifth Circuit to the Contrary.**

The Bankruptcy Court committed clear and reversible error by resolving a bona fide dispute over asset ownership through a turnover motion brought under section 542 of the Bankruptcy Code.  Settled law in this district—and nationwide—prohibits a bankruptcy court from resolving property ownership disputes via section 542 of the Bankruptcy Code. *See, e.g.*, S. Cal. Pub. Power Auth. v. Ultra Res., Inc., No. 4:19-cv-00090, 2020 WL 13413726, at *1 (S.D. Tex. Mar. 27, 2020) (stating that "[i]t is settled law that turnover actions under § 542 cannot be used to demand assets whose title is in dispute." (quoting United States v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir. 1991), *cert denied*, 502 U.S. 1048 (1992)); Tow v. HBK Main St. Invs., L.P., (In re ATP Oil & Gas Corp.), No. 12-36187, 2015 WL 1093568, at *3 (Bankr. S.D. Tex. Mar. 11, 2005) (Isgur, J.) (same).

The same principles are well settled in other circuits and districts. Stanziale v. Pepper Hamilton, LLP (In re Student Fin. Corp.), 335 B.R. 539, 554 (D. Del. 2005) (to "state a claim for turnover of property under § 542, a plaintiff must allege that transfer of the property has already been avoided or that the property is otherwise the undisputed property of the bankruptcy estate"); Charter Crude Oil Co. v. Exxon Co. (In re Charter Co.), 913 F.2d 1575, 1579 (11th Cir. 1990) (agreeing with the bankruptcy court and holding that the turnover of funds pursuant to section 542 was improper when title to funds in dispute was governed by non-core, non-bankruptcy law).  Accordingly, turnover claims for disputed assets are routinely dismissed as not ripe. *See* Schlossberg v. Madeoy (In re

14

Madeoy), 576 B.R. 484, 505 (Bankr. D. Md. 2017); Pry v. Maxim Glob. Inc. (In re Maxim Truck Co. Inc.), 415 B.R. 346, 357 n. 4 (Bankr. S.D. Ind. 2009) ("[T]he Trustee's remedy under § 542 for turnover . . . only ripens upon a determination by the Court that the property in dispute is, in fact, property of the estate.").

In this case, Appellants legitimately claimed exclusive rights to the Plan Assets because the Deferred Compensation Plans, given the lack of selectivity and how they were administered, were not "top hat" plans and were therefore subject to ERISA's substantive protections and, under ERISA, the Plan Assets were held for the exclusive benefit of Appellants. Debtors, on the other hand, claimed ownership of the Plan Assets alleging that the Deferred Compensation Plans were so-called "top hat" plans and, thus, that the Debtors' insolvency and subsequent bankruptcy triggered trust provisions exposing the Trust Assets to the claims of general creditors. As detailed below, resolving who owned the Plan Assets could not be accomplished by simply reviewing the plan documents, but rather required a detailed factual and legal analysis after full and complete discovery of all relevant facts; these issues, as a matter of law, can only be decided on a full evidentiary record.

The rushed all-day hearing, the hundreds of exhibits submitted, the number of depositions taken, and the live testimony presented at the evidentiary hearing shows one thing for certain: a legitimate dispute existed over who owned the assets, and that dispute required resolving complex factual disputes and unsettled questions of law. Until those disputes were resolved, which required full blown litigation in an adversary proceeding (and Appellants contend, litigation before a district court), no undisputed estate property

existed as to which the Bankruptcy Court could order turnover. Section 542 could not be used to determine the threshold question of whether the Plan Assets were property of the Debtors' estate. *See* S. Cal. Pub. Power Auth., 2020 WL 13413726 at *2 ("Because the title of this property is contingent upon the Court's interpretation of the contracts governing the net profit interest payments, there is no property to turn over under § 542."). The matter could only proceed as an adversary proceeding with the full complement of discovery and due process rights provided under the applicable Bankruptcy Rules. *See* In re TransAmerican Natural Gas Corp., 978 F.2d 1409, 1416 (5th Cir. 1992) (citing 9 COLLIER ON BANKRUPTCY, ¶ 9014.05 (15th ed. 1992); In re Wood & Locker, Inc., 868 F.2d 139, 142 (5th Cir.1989)) (noting that contested matters afford less procedural protections than adversary proceedings and are designed for adjudication of simple issues often on an expedited basis). Indeed, Bankruptcy Rule 7001 expressly provides that disputes to determine an interest in property must be adjudicated in an adversary proceeding. Fed. R. Bankr. P. 7001(2) ("The following are adversary proceedings . . . a proceeding to determine the . . . extent of . . . [an] interest in property.").

In addition, Appellants sought equitable relief under ERISA by commencing the Adversary Proceeding. Such relief is only available in an adversary proceeding. Fed. R. Bankr. P. 7001(7) ("The following are adversary proceedings . . . a proceeding to obtain . . . equitable relief"). The Bankruptcy Court erred as a matter of law in denying the Appellants' request to proceed pursuant to a timely filed adversary proceeding. *See* App. at 594; Mar. 7 Tr. at 66-73 (filed under seal) (denying First Emergency Stay Motion). The Bankruptcy Court clearly erred in resolving this complex dispute over rights in the trust

assets in a truncated contested matter.  The Turnover Order must be reversed and vacated.

**II.     The Bankruptcy Court Erred in Proceeding with and Ruling on the Contested Matter When the Motion to Withdraw Reference was Pending.**

**A.     Ruling on the Contested Matter While the Motion to Withdraw Reference Remained Pending Was in Contravention of Article III Principles**

A district court has <u>sole and exclusive authority</u>, grounded in Article III, to decide a motion to withdraw the reference, and the absolute necessity of access to an Article III court is prescribed by multiple opinions of the Supreme Court.  *See, e.g.*, <u>Stern v. Marshall</u>, 564 U.S. 462, 484, 131 S. Ct. 2594, 2609 (2011).  Only a district court can rule on a motion to withdraw reference; the Bankruptcy Court cannot do so, directly or indirectly.  While most jurisdictions require motions to withdraw reference to be filed directly with the district court, in the Southern District of Texas, the local rules provide that the bankruptcy court presiding over the matter first consider a motion to withdraw the reference and file a report and recommendation with the applicable district court, which then must decide the Motion.  BLR 5011-1 ("Unless the district court orders otherwise, the matter will first be presented to the bankruptcy judge for recommendation.").

While a motion to withdraw the reference does not, as a procedural matter, automatically stay proceedings in the bankruptcy court, Fed. R. Bankr. P. 5011(c), a bankruptcy court is nonetheless constitutionally barred from taking any action in such proceedings that would interfere with or moot the district court's ultimate decision on the motion to withdraw the reference.  As the Eleventh Circuit definitively held, based on painfully apparent and unassailable reasoning, the bankruptcy court cannot take any action,

including even issuing an order dismissing the entire chapter 11 case, that preempts the district court's ruling on a motion to withdraw the reference without running afoul of Article III:

> Therefore, the district court did not err when it found that Article III barred the bankruptcy court from issuing a section 305 order [dismissing the case] and granted the plaintiff's motion to withdraw the instant case from the bankruptcy court.
>
> The bankruptcy court exists to provide debtors and creditors with a specialized forum for the prompt and speedy resolution of bankruptcy proceedings. There is no question that they perform necessary and useful service by minimizing the dislocation suffered by individual debtors and creditors as well as the economy as a whole. Nevertheless, Congress has vested original jurisdiction over cases and proceedings under title 11 in the district courts. The bankruptcy courts obtain jurisdiction over title 11 cases or proceedings only by referral at the discretion of the district courts, and the district court may withdraw such reference for cause. As discussed above, this is not a hollow requirement. Nevertheless, the cause prerequisite [for withdrawal] should not be used to prevent the district court from properly withdrawing reference either to ensure that the judicial power of the United States is exercised by an Article III court in order to fulfill its supervisory function over the bankruptcy courts.

In re Parklane/Atlanta Joint Venture, 927 F.2d 532, 538 (11th Cir. 1991).  The Adversary Complaint seeks determination of Appellants' ownership and rights to the Plan Assets, which necessarily requires a determination of the rights and responsibilities of Appellants and Debtors under ERISA—and only ERISA.  The ERISA issues are not settled within the Fifth Circuit and are complex; this case involves more than just a mechanical application of clear statues.  That triggers mandatory withdrawal of the reference at Appellants' request.

The Turnover Order, based on a controversial and, Appellants' contend, erroneous interpretation of ERISA provisions and decisional law, nonetheless declared Debtors to be the owners of the Plan Assets after a truncated and abbreviated process that deprived Appellants of the due process to which they were entitled. The Bankruptcy Court was, however, barred under Article III from issuing that ruling in the face of the pending Motion to Withdraw because the ruling prevented the Article III court from performing its exclusive function and was the equivalent of the Bankruptcy Court deciding on a final basis a question it had no authority to decide. The Bankruptcy Court lacked constitutional authority to so rule, and its doing so offended the Article III principles articulated by the Eleventh Circuit and reaffirmed in numerous decisions by the Supreme Court. The Turnover Order must be vacated as issued without constitutional authority and treated as null and void *ab initio*.

**B.** **The Bankruptcy Court was Limited to Submitting Proposed Findings and Recommendations of Law to the District Court Because It Had Only "Related to" Jurisdiction**

Pursuant to 28 U.S.C. § 157(c), bankruptcy courts may hear non-core "related to" matters but are limited to "submit[ting] proposed findings of fact and conclusions of law to the district court" for entry of a final order. 28 U.S.C. § 157(c)(1). In their Adversary Complaint, the Appellants asserted that the matter was subject only to the Bankruptcy Court's "related to" jurisdiction and expressly refused to consent to a final adjudication by the Bankruptcy Court. App. at 524 (¶¶ 15-16). Identically, the matter underpinning the Contested Matter was based entirely in ERISA and was, at best, within the Bankruptcy Court's "related to" jurisdiction; the matter does not arise in (or solely because of) the

bankruptcy case or arise under the Bankruptcy Code. The Appellants expressly did not consent to the Bankruptcy Court entering a final judgment in the matter, and at no time thereafter did Appellants consent to the Bankruptcy Court entering final judgment by action, inaction or waiver. The Appellants litigated below because they were left with no choice and protested that lack of choice at every stage, including via the Motions for Stay, the Motion to Continue, and the Motion to Withdraw. In opening argument before the Bankruptcy Court at the Turnover Evidentiary Hearing, counsel stated to the court that all such arguments were preserved and not waived by proceeding. Accordingly, in light of this and the additional Article III concerns noted above, the Turnover Order, at best, should be treated as recommended findings of fact (to the extent it contains any such findings) and recommended conclusions of law. *See* 28 U.S.C. § 157(c).

### III.    The Bankruptcy Court Abused Its Discretion by Not Staying or Continuing the Contested Matter in Light of the Debtors' Discovery Abuses.

The Bankruptcy Court's refusal to stay the hearing on the Turnover Motion in favor of the Adversary Proceeding or, alternatively, continue the Turnover Evidentiary Hearing to allow proper discovery severely prejudiced Appellants' rights to due process. The Bankruptcy Court shoehorned a timely filed class action lawsuit, which normally takes six months to a year to process, into a compressed timetable for completing all discovery in a fact-intensive dispute.  The proceeding below progressed on an unrealistic accelerated timetable despite the Debtors' discovery abuse, abuse (including a belated "documents dump") acknowledged by the Bankruptcy Court (and yet in fact rewarded by the compressed timetable).  The Debtors—faced with an order under Bankruptcy Rule 2004 to

produce relevant documents (an order that the Debtors never objected to or sought to modify)—produced virtually no meaningful documents for three months and then engaged in what the court below found was a "documents dump" on the actual eve of the then-scheduled March 11, 2025 hearing.

No time was given to resolve discovery disputes. When issues continued to arise, Appellants sought relief in the form of a continuance (which was denied) and in the form of an order compelling production (which was ignored). The Debtors continued to produce long-overdue documents, including producing critical documents on the very eve of the newly-scheduled hearing. The few depositions that could be scheduled, for both sides, took place in the nine days before the hearing, including multiple depositions on the day before the hearing. Multiple critical witnesses, identified for the first time in those eve-of-hearing depositions could not be deposed. Additionally, Debtors misrepresented that board members had nothing to do with the issues involved in this dispute on March 7, only for Appellants to find out that the board included material fact witnesses related to the administration of the Deferred Compensation Plans on March 19. Appellants wanted a continuance to notice the depositions of these new witnesses that Debtors had told the Bankruptcy Court did not exist and moved to compel the production of documents from the Debtors that would be in these custodians' possession, custody or control. All to no avail. At every turn, the matter was driven by the Debtors' alleged need to obtain and spend the assets of the Rabbi Trusts rather than the due process rights of the Appellants. This refusal to extend due process to the Appellants (and thus to reward the Debtors' violations of Bankruptcy Rule 2004) was also legal error, and mandates reversal of the Turnover

Order.

**IV.    The Bankruptcy Court Erred by Failing to Rule (or Ruling "*Sub Silentio*") on Alleged Privileged Evidence that Was Wrongly Used, at Trial, as Both Sword and Shield.**

As explained above, Debtors' Motion to Seal claimed that certain case-dispositive Disputed Emails were subject to the attorney-client privilege and were inadvertently produced to Appellants. The Debtors' motivation was apparent; the emails, if admissible, mandated a ruling for the Appellants that the subject plans were not eligible for "top hat" status. The Disputed Emails, in fact, were never privileged and even if ever privileged, the privilege had been waived (on multiple grounds).  The Appellants sought to have the issue determined via the Motion to Compel. The Bankruptcy Court's failure to decide the issue prior to or during the Turnover Evidentiary Hearing (or its decision, *sub silentio*, to find that the privilege applied) was legal error.[7]

**A.    Debtors Have Not Carried Their Burden to Demonstrate Disclosure of the Disputed Emails was Inadvertent**

"The burden to demonstrate attorney-client privilege is on the party asserting privilege." Corona v. Chevron Corp., No. H-07-3190, 2008 WL 11483069, at *2 (S.D. Tex. June 18, 2008).

The Disputed Emails are emails exchanged between employees of the Debtors and Debtors' ERISA counsel with respect to the administration of the Deferred Compensation

---

[7] Appellants have filed a motion under Bankruptcy Rule 8009(f) to have this Court accept all documents filed under seal with the Bankruptcy Court that are relevant to the issues on appeal.

Plans on the subject of eligibility standards for the plans.[8]  Debtors have not and cannot show that the Disputed Emails were inadvertently produced, and therefore destruction or claw-back of those unredacted emails is not required under the protective order that governed discovery in this case ("**Protective Order**").  Under the terms of the Protective Order, any production of alleged privileged or otherwise protected material must have been "inadvertently produce[d]" to claim the Protective Order's protection against waiver of the applicable privilege or protection. App. at 701-02 (¶ 27). Further, the Protective Order specifically requires that "[i]t is the Producing Party's burden to show that it took reasonable steps to prevent disclosure of privileged material as required by Rule 502 of the Federal Rules of Evidence." App. at 702 (emphases added); *see also* <u>Corona</u>, 2008 WL 11483069, at *2 (stating that, under federal common law of privilege, "the party seeking to preserve privilege has the burden to demonstrate that the circumstances surrounding disclosure favor continued protection").

Debtors have not attempted to prove (nor can they prove) either that the Disputed Emails are privileged or that their production of those Disputed Emails was inadvertent and was subject to reasonable steps to prevent disclosure as required by the Protective Order. Rather, Debtors merely assert, with no further analysis, that the contents of the Disputed Emails are subject to the attorney-client privilege and that they were inadvertently disclosed. *See* App. at 676; App. at 679-82. Accordingly, Debtors have failed to satisfy their burden of proving inadvertent production or use of reasonable steps to prevent

---

[8] A copy of the Disputed Emails is attached as Exhibit B to the Motion to Seal and was filed under seal with the Bankruptcy Court.  *See* App. at 687.

23

disclosure of the allegedly privileged material as required by the Protective Order.

Nor could Debtors satisfy their burden of showing inadvertence and reasonable steps to prevent disclosure under the circumstances of this case. Debtors produced five separate versions of the Disputed Emails on February 21, 2025 in a relatively small set of 685 documents that was or should have been subject to a privilege review by Debtors' counsel, which is comprised of two different prominent international law firms who are no strangers to this sort of privilege review. *See* App. at 725 (¶ 23); Bankr. Case No. 24-90213 (CML), ECF 4217 (Keach Decl. ISO Opposition to Motion to Seal) at ¶ 4 (filed under seal). Moreover, this was not a situation where there was a single stray missing redaction—rather, every time the Disputed Email chain was produced, it was produced in unredacted form. Id. at ¶ 5 (filed under seal).

In addition, several weeks passed between the time that the Disputed Emails were produced and when Appellants submitted the unredacted version of the Disputed Emails as part of their exhibit list in anticipation of the Stay Hearing. Despite Appellants' submission of a version of the Disputed Emails as a proposed exhibit prior to the Stay Hearing, Debtors remained silent and continued not to assert any privilege as to the Disputed Emails even though they had the opportunity to do so. Even after Appellants' counsel generally discussed the Disputed Emails during the Stay Hearing, Debtors continued to fail to assert any objection on the record at the Stay Hearing as to the Disputed Emails on the grounds that they were protected by the attorney-client privilege. *See* Pedersen v. Kinder Morgan, Inc., 344 F.R.D. 452, 458 (S.D. Tex. 2023) (allowing deposition of ERISA plan attorney to proceed and placing burden on defendants to object

on the record at the deposition to any questions they believe fell outside the fiduciary exception). It was not until after the Stay Hearing that Debtors requested that Appellants destroy any unredacted versions of the Disputed Emails as inadvertently produced under the Protective Order, and not until days later that they notified the Bankruptcy Court of their objection to the discussion of the Disputed Emails at the Stay Hearing.

Under these circumstances, Debtors cannot show that the production of the allegedly privileged Disputed Emails was inadvertent or subject to reasonable steps to prevent disclosure and preserve any alleged privilege. The Disputed Emails were part of a relatively small production that should have been relatively easy to review for privilege (a search for "attorney" would have revealed all 5 copies). The Disputed Emails were nevertheless produced in unredacted form not just once, but five times. Debtors had several opportunities to object to the unredacted Disputed Emails and assert attorney-client privilege after the unredacted version of the Disputed Email was submitted as an exhibit ahead of the Stay Hearing, but they nevertheless failed to do so.

### B.    The Disputed Emails are Subject to the Fiduciary Exception and Thus Not Protected by Attorney-Client Privilege

The Disputed Emails, in any event, are not subject to a claim of privilege because the fiduciary exception to the attorney-client privilege applies. In the Fifth Circuit, "[w]hen an attorney advises a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator." Wildbur v. ARCO Chem. Co., 974 F.2d 631, 645 (5th Cir. 1992). Accordingly, "an ERISA fiduciary cannot assert the attorney-client privilege against a plan

beneficiary about legal advice dealing with plan administration." Id.

As discussed extensively below, given that the burden is on the Debtors to establish that the plans are "top hat" plans, the Deferred Compensation Plans are presumptively not "top hat" plans until proven otherwise, and the administrators of those Deferred Compensation Plans are presumptively ERISA fiduciaries until proven otherwise. *See* Crawford v. Guar. State Bank & Tr. Co., No. 22-2542-JAR-GEB, 2024 WL 2700668, at *7 (D. Kan. May 24, 2024) (applying fiduciary exception to ERISA plan that otherwise met criteria as a "top hat" plan, where the plan explicitly designated the Board of Directors as an ERISA fiduciary).

Until Debtors satisfied their burden of establishing that the Deferred Compensation Plans are, indeed, "top hot" plans, the default rule is that the ERISA plan administrators are acting as fiduciaries to the plan beneficiaries and therefore any communications with the plan administrator's counsel concerning plan administration are not subject to the attorney-client privilege. *See* Wildbur, 974 F.2d at 645. The Disputed Emails here relate to plan administration and thus fall within the scope of the fiduciary exception. Indeed, the Disputed Emails discuss the appropriate salary level for eligibility for the Steward Plan. *See* Motion to Seal, Ex. B (filed under seal). Moreover, as the record below provides, the threshold for eligibility is not set forth in the Deferred Compensation Plans but is rather set by the administrators annually at their discretion and the list of eligible employees is constructed by the Debtors' administrative staff on an annual basis. It does not require an amendment to the Deferred Compensation Plans and is not an element of the "construction" of the Deferred Compensation Plans. Because the Debtors could not establish that the

Disputed Emails are privileged, *see* <u>Corona</u>, 2008 WL 11483069, at *2, the Disputed Emails were admissible at the Turnover Evidentiary Hearing. [9]

**C.    Debtors Used Privilege as a Sword in the Driscoll Declaration and at Trial and Waived the Privilege**

The Debtors waived the attorney-client privilege over the entire subject matter of the Disputed Emails with the Driscoll Declaration, which constituted her direct testimony at trial.  Ms. Ann-Marie Driscoll, in her declaration in support of the Turnover Motion, explicitly states that she sought legal advice on the "top hat" issue.  App. at 737 (¶ 23) ("I specifically sought legal advice related to the requirements of top hat plans and the meaning of 'highly compensated.'"); *see also* App. at 30 (14:16-19) (noting that the Driscoll Declaration would serve as Ms. Driscoll's testimony during the Turnover Evidentiary Hearing); App. at 103 (87:12-20); App. at 121 (105:8-24); App. at 131-32 (115:25-116:16).

This testimony suggests that the Debtors followed advice of counsel in setting eligibility limits; that is the only reason to include the sentence quoted above.  The Disputed Emails put that issue directly into question. Based on Debtors' strategic decision to use attorney-client privileged communications offensively through Driscoll's direct testimony

---

[9] <u>Tolbert v. RBC Capital Markets, Corp.</u>, No. H-11-0107, 2012 WL 1067629, at *4-5 (S.D. Tex. Mar. 28, 2012) provides no support for a finding that the Disputed Emails are not subject to the fiduciary exception to the attorney-client privilege. The district court's decision in that case was based on the defendants' particular pleadings and exhibits, which it found were sufficient to show that the ERISA plan in that case was a "top hat" plan for purposes of that discovery dispute in the early stages of the litigation. <u>Id.</u> at *5. That was a fact-specific determination based on the specific pleadings and exhibits at an early stage of discovery in that case. *Tolbert* simply did not address or decide which party has the burden of proving that an ERISA plan is a "top hat" plan and thus not subject to the fiduciary exception, particularly in later stages of the litigation.

in the form of a declaration and the related trial testimony of Mr. Lombardo, App. at 737 (¶ 23); App. at 103 (87:12-20); App. at 121 (105:8-24); App. at 131-32 (115:25-116:16), Debtors waived attorney-client privilege over the subject matter of the Disputed Emails.

## V.    The Bankruptcy Court Erred in Failing to Exclude and then Relying Upon and Affording Weight to the Debtor's Expert Witness Testimony.

Pursuant to the Federal Rules of Evidence Rule 702, an expert witness may testify if there is a showing that "more likely than not . . . the testimony is based on sufficient facts and data."  Fed. R. Evid. 702(b).  The judge must act as "gatekeeper" and ensure that such testimony is both relevant and reliable.  *See* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993); *see also* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (clarifying that the "gatekeeping" role applies to all expert testimony).  "[A]n opinion based on insufficient, erroneous information" is not reliable.  Moore v. Int'l Paint, L.L.C., 547 Fed. Appx. 513, 515 (5th Cir. 2013) (internal quotations omitted).

The Debtors relied on the expert testimony of Dr. Joseph Krock to provide economic consulting and testify on the average salary of Debtors' employees for purposes of "top hat" plan analysis.  Dr. Krock based his analysis and report on documents provided by the Debtors.  However, at the Turnover Evidentiary Hearing, prior testimony from a separate witness, Ms. Katchena Potter, revealed that the information provided to Dr. Krock—and Appellants' expert—was incorrect and unreliable.  App. at 247-48 (231:15-232:23); App. at 189-90 (173:14-174:21).  In light of that information, the Appellants moved to exclude Dr. Krock's testimony because his report relied on incorrect information.  App. at 247

(231:6-10).  However, the Bankruptcy Court denied that oral motion.  App. at 250 (234:12-13).  Further, the Bankruptcy Court, finding Dr. Krock's testimony to be credible, relied on his analysis in its Oral Ruling.  App. at 952 (41:19-21); App. at 956-57 (45:18-46:10).

Dr. Krock's testimony, based on undisputedly stale and incorrect data, is clearly not reliable.  Thus, pursuant to the Federal Rules of Evidence and Supreme Court and Fifth Circuit precedent, his testimony should not have been admitted, let alone relied upon.  The Bankruptcy Court provided no justification for not immediately excluding the evidence in accordance with such precedent, other than that it had not yet heard the testimony.  App. at 250 (234:14-21) ("I don't know if it's reliable or not yet because I haven't heard it yet . . . [b]ut . . . I think I can make the determination whether it's helpful to me or not.").  Such actions were clear legal error.

## VI.    The Bankruptcy Court Erred in Discounting the Appellants' Expert Witness Testimony.

### A.    The Bankruptcy Court Failed to Adequately Consider Appellants' Sealed Expert Testimony Associated with the Disputed Emails

As discussed in greater detail above, the Bankruptcy Court erred in failing to rule definitively on the admissibility of the Disputed Emails.  The Bankruptcy Court's failure to rule on these privilege issues, and to affirmatively admit the Disputed Emails, also impacted whether a portion of the report of the Appellants' expert was admissible.

In reliance on the Disputed Emails, Appellant's expert, Mr. Scott Van Meter, included in his report an independent analysis of the employee compensation data from 2020-2025. He concluded that to reach an acceptable eligibility ratio, Debtors' eligibility threshold would have had to have been in the range of $297,000 to $356,000 depending on

the year—significantly higher than Debtors' actual eligibility threshold of $150,000 to $180,000. Because the Bankruptcy Court did not expressly rule on the privilege and admissibility issue, it is unclear how much—if at all—the Bankruptcy Court considered this testimony.  This lack of clarity clearly prejudiced the Appellants.  This was a clear legal error.

### B.    The Bankruptcy Court Erred by Disregarding Appellants' Expert Testimony Based Upon Expert's Assumption Provided by Appellants' Counsel

The Appellants retained Mr. Van Meter in part to analyze the eligibility of Debtors' employees to participate in the Deferred Compensation Plans.  As part of his analysis, Mr. Van Meter was advised by Appellants' counsel to make one assumption that would be supported by future discovery.  Specifically, Mr. Van Meter assumed for purposes of his analysis a base salary of $35,000 for the lowest paid full-time Steward employees, excluding from his calculations as part time employees any employees who made less than that figure.  This assumption was subsequently validated through the testimony of Ms. Potter, who testified that the calculation for minimum annual salary was based upon state-specific minimum wage.[10]  App. at 1017 (25:9-25:17); *see also* App. at 363 (347:4-14). Notwithstanding Mr. Van Meter's credibility and his assumption being confirmed through Ms. Potter's testimony, the Bankruptcy Court disregarded his testimony because Appellant's counsel could not point to a specific, alleged document that formed the basis

---

[10] Indeed, the $35,000 minimum assumption was more conservative than the actual minimum annual salary of $36,400 (which equals 2080 hours at the Massachusetts minimum wage rate of $17.50 per hour).  App. at 363 (347:12-14).

for the assumption.  App. at 955-56 (44:10-45:9); App. at 974-76 (63:5-65:20).  The accuracy of the assumption is unquestioned, and the Bankruptcy Court's disregard of case dispositive testimony on this basis was clear legal error.

Expert testimony must be supported by sufficient facts.  *See* Hathaway v. Bazany, 507 F.3d 312, 318 (5th Cir. 2007) ("[T]he existence of sufficient facts . . . is in all instances mandatory.  '[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.'" (quoting Viterbo v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987)); Rewis v. U.S., 369 F.2d 595, 602 (5th Cir. 1966) ("Of course, in order for the opinion to have any value it must be based on assumptions which the trier of facts can find to have been proved.").  Mr. Van Meter's testimony and his assumption is supported by the trial record.  In pertinent part, Ms. Potter's testimony clearly supports an underlying assumption to his analysis regarding the annual minimum salary.  Therefore, the Bankruptcy Court's disregard for Mr. Van Meter's testimony for lack of supporting evidence regarding that assumption is manifestly unfounded and in clear error.

## VII.    The Bankruptcy Court Erred in Shifting the Burden of Proof to the Appellants and Ruling that the Deferred Compensation Plans were "Top Hat" Plans Based Entirely on the Plan Documents.

The Bankruptcy Court simply ignored the correct legal standards under ERISA when it determined that the Deferred Compensation Plans were "top hat" plans outside of ERISA's broad regulatory ambit.  A review of those standards makes clear the Bankruptcy Court's reversible errors of law. At a minimum, there are multiple serious and substantial issues of law that deserve to be resolved upon appeal.

Whether the Deferred Compensation Plans are so-called "top hat" plans exempt

from the substantive protections of ERISA requires substantial interpretation of several

ERISA provisions and federal courts' interpretations of those provisions. Chief among the

material ERISA provisions that must be applied and interpreted are:

> **29 U.S.C. § 1002(3),** defining "employee benefit plans" under ERISA;
>
> **29 U.S.C. § 1051(2)**, exempting from the substantive requirements of ERISA any plan "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees";
>
> **29 U.S.C. §§ 1081(a)(3), 1101(a)(1)**, exempting the type of plan described in 29 U.S.C. §§ 1051(2) from ERISA's participation, vesting, funding and fiduciary requirements;
>
> **29 U.S.C. § 1103(c)(1) and the "exclusive benefits rule,"** prescribing that the assets of non-exempt plans shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants;
>
> **29 U.S.C. § 1056(d)**, protecting plan assets by preventing voluntary or involuntary transfer or alienation; and
>
> **29 U.S.C. § 1132(a)(3)**, prescribing equitable remedies available for ERISA violations.

ERISA represents a comprehensive regulatory scheme that Congress created for the

express purpose of creating minimum standards that assure the equitable character of

employee retirement plans and their financial soundness. 29 U.S.C. § 1001(a)-(c). To that

end, unless a statutory exception applies, assets of employee benefit plans under ERISA

never inure to the benefit of any employer, shall be held for the exclusive purpose of

providing benefits to participants, and are subject to various participation, vesting, funding,

and fiduciary requirements that protect plan assets against mismanagement or improper

alienation. *See, e.g.*, 29 U.S.C. §§ 1002(3); 1056(d); 1081(a)(3); 1101(a)(1); 1081(a)(3);

1132(a)(3). One of the few exceptions to these rules is for so-called "top hat" plans. The

term "top hat" does not appear in ERISA; it is a "colloquial term used to refer to certain unfunded plans specially exempted from ERISA's participation, vesting, funding, and fiduciary requirements." In re Alpha Nat. Res., Inc., 554 B.R. 787, 793 (Bankr. E.D. Va. 2016) (internal quotation omitted); *see also* Reliable Home Health Care, Inc. v. Union Cent. Ins. Co., 295 F.3d 505, 512 (5th Cir. 2002) (explaining the exception under ERISA for "top hat" plans). According to ERISA, a "top hat" plan is "a plan which is **unfunded and** is maintained by an employer primarily for the purpose of providing deferred compensation for a **select group of management or highly compensated employees**." 29 U.S.C. § 1051(2) (emphasis added). The rationale behind excluding "top hat" plans from ERISA's substantive requirements is that "certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan [and] would therefore, not need the substantive rights and protections of ERISA." Alpha Nat. Res., 554 B.R. at 793 (internal quotation omitted).

The determination as to whether a deferred compensation plan is a "top hat" plan turns on (among other things) whether it was sufficiently selective under 29 U.S.C. § 1051(2). Whether a deferred compensation plan is sufficiently selective to qualify as a "top hat" plan is a detailed factual and legal analysis involving several qualitative and quantitative factors, each prescribed by federal courts interpreting ERISA. *See e.g.,* In re New Century Holdings, Inc., 387 B.R. 95, 110 (Bankr. D. Del. 2008). Among those factors are: "(1) the percentage of the total workforce eligible to participate in the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation

disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative)." Tolbert v. RBC Capital Markets Corp., No. CIV.A. H 11-0107, 2015 WL 2138200, at *9 (S.D. Tex. Apr. 28, 2015*) ("***Tolbert II***"*); see also* Browe v. CTC Corp., 15 F.4th 175, 194 (2d Cir. 2021) (explaining that courts must consider quantitative and qualitative factors when analyzing whether a plan is "maintained primarily for a select group of management or highly compensated employees" (quoting 29 U.S.C. § 1051(2))).

Determining if a plan is a "top hat" plan involves a ***fact-specific and fact-intensive inquiry***. As the statute and relevant guidance from the Department of Labor requires, and consistent with the rationale for the exception, an apparent majority of courts look at three distinct and indispensable requirements, as to all of which the party asserting that the plan is a "top hat" plan has the burden of proof. To be designated a "top hat" plan, ERISA requires the court to determine (1) whether the plan is "unfunded"; (2) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a *select* group of management or highly compensated employees"; and (3) whether the employees participating in the alleged "top hat" plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply." Guiragoss v. Khoury, 444 F. Supp. 649, 658-659 (E.D. Va. 2006) (emphasis supplied); *see also* Bakri v. Venture Mfg Co., 473 F. 3d 677, 678-80 (6th Cir. 2007) (three elements cited; court finds plan not a "top hat" plan); Alfa Laval, Inc. v. Nichols, Civil No. 3:06CV306, 2007 WL 984111 (E.D. Va. 2007) (citing three-part analysis); Carrabba v. Randalls Food Mkts., Inc., 38 F. Supp. 2d 468, 476-78 (N.D. Tex.

1999) (citing three-part test and finding plan not a "top hat" plan). Critical to the issue of negotiating leverage and substantial influence is whether eligible participants have access to information that permits them to understand the underlying business and also appreciate and plan for risk. *See* Colburn v. Hickory Springs Mfg. Co., 448 F. Supp. 3d 512, 527 (E.D.N.C. 2020) ("As high-ranking employees, they had access to information concerning their rights and obligations, so they did not need the extra protections afforded by ERISA." (citing Fed. Reg. 34530)).[11]

"Defendants [employers] bear the burden of proving that the [ERISA] Plan is a top hat plan." Browe v. CTC Corp., 331 F. Supp. 3d 263, 294 & n.8 (D. Vt. 2018), *aff'd in part and vacated in part on other grounds*, Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021); *see also* Daft v. Advest, Inc., 658 F.3d 583, 596-97 (6th Cir. 2011) (observing that "the defendant-employer typically advocates for the top-hat status of an ERISA plan in order to avoid statutory liability, and therefore the defendant-employer typically bears the burden of proof on this issue in the district court"); MacDonald v. Summit Orthopedics, Ltd., 681 F. Supp. 2d 1019, 1023 (D. Minn. 2010) (concluding that "Defendants bear the burden of showing that the Plan is a top hat plan"); Deal v. Kegler Brown Hill & Ritter Co. L.P.A., 551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) (observing that "[t]he burden is on Defendant

---

[11] Other courts, when analyzing the "selectivity" requirement, consider whether the participants in a deferred compensation plan had a "substantial influence" over the particular "terms and provisions of the plan, such that they did not need the full panoply of protections provided by ERISA" as but one of the considerations to be weighed and balanced in determining selectivity rather than as a standalone and separate required element. Tolbert II, 2015 WL 2138200, at *5-8 (collecting cases and leaning toward position that the "substantial influence" factor is part of the selectivity analysis without deciding point).

to show that the . . . Plan is a top hat plan"); Alexander v. Brigham & Women's Physicians Org., Inc., 467 F. Supp. 2d 136, 142 (D. Mass. 2006), aff'd, 513 F.3d 37 (1st Cir. 2008) (noting that defendant "has the burden of proving that [deferred compensation plans] were each top hat plans"); Virta v. DeSantis Enters., Inc., No. 94-CV-1378, 1996 WL 663970, at *3 (N.D.N.Y. Nov. 7, 1996) ("Defendants have failed to controvert plaintiffs' evidence that this Plan was not administered as a Top Hat plan, and they bear the burden of proof on this affirmative defense"); New Century Holdings, 387 B.R. at 110 ("The burden of establishing the existence of a top hat rests on the party asserting that it is a top hat plan."); Carrabba, 38 F. Supp. 2d at 476-78 (stating that it was defendant's burden to prove ERISA plan was a "top hat" plan and holding that defendant failed to meet that burden despite evidence that the plan was intended to be a "top hat" plan). But see Sikora v. UPMC, 876 F.3d 110, 113 (3d Cir. 2017) (applying the opposite burden). Accordingly, the Deferred Compensation Plans are presumptively not "top hat" plans until proven otherwise, and the administrators of those Deferred Compensation Plans are presumptively ERISA fiduciaries until proven otherwise. See Crawford, 2024 WL 2700668, at *7 (applying fiduciary exception to ERISA plan that otherwise met criteria as a "top hat" plan, where the plan explicitly designated the Board of Directors as an ERISA fiduciary).

A failure to prove any element mandates a finding that the plan is not a "top hat" plan. Moreover, in applying the three-part test, courts must take into account that "ERISA is a remedial statute that should be liberally construed in favor of employee benefit fund participants. To that end, exemptions from . . . ERISA coverage should be confined in their narrow purpose." Khoury, 444 F. Supp. 2d at 659 (internal quotations omitted).

36

Despite the clear admonition that whether or not a plan qualifies as a "top hat" plan cannot be decided on the documents alone, even a cursory review of the ruling by the Bankruptcy Court shows that is precisely what the court below did. Ultimately, the Bankruptcy Court simply found that the plan documents were contracts that needed to be enforced and simply ignored, or paid mere lip service to, the substantial body of ERISA case law cited above. The Bankruptcy Court similarly ignored substantial evidence that the Deferred Compensation Plans were not "top hat" plans because they were consistently administered in a fashion contrary to established principles under ERISA.

Finally, and without limitation, the Bankruptcy Court erred because, while giving lip service to the Debtors having the burden of proof on all issues, the court clearly allocated that burden to the Appellants. Under the Bankruptcy Court's "the contract is the contract" mindset and hypertextual approach to the ERISA statutes, the language of the relevant plan documents prevailed unless the Appellants overcame the presumption in favor of that language. A classic example of the burden reversal was the Bankruptcy Court's statement in the ruling that there was "no evidence that the IASIS trustee stopped managing the assets" as a basis for finding the IASIS Plan to be unfunded. But there was no evidence that the IASIS trustee continued to manage the assets after 2017, and the uncontroverted evidence established that the IASIS Plan assets were not in the Rabbi Trust as the Debtors claimed. It was for the Debtors to prove unfunded status, not for the Appellants to prove funded status, but the court below placed this burden on Appellants. While the Appellants contend that they proved the Deferred Compensation Plans were not "top hat" plans, it was legal error for the Bankruptcy Court to, in reality, allocate that

burden of proof to Appellants.

## VIII.  The Bankruptcy Court Erred in Its Interpretation of ERISA Provisions.

As discussed in greater detail above, the "top hat" plan analysis is a fact intensive inquiry that considers both qualitative and quantitative factors.  The "top hat" issue can never be decided merely based on the language of the deferred compensation plan documents and any accompanying rabbi trusts, but rather the decision depends on evidence that the plan has been consistently administered in a manner consistent with the purpose of the exception for "top hat" plans: "Rather, the management and administration of the plan must demonstrate that [the] top hat exception applies." Callan v. Merrill Lynch, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *12 (S.D. Cal. Aug. 30, 2010); *see also* Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits Plan, No. 16-cv-00486-EDL, 2016 WL 11187255, at *13 (N.D. Cal. July 25, 2016) ("True, the language of the Compensation Agreement attempts to mirror the ERISA top hat definition. However, tracking the language is not enough; the Plan must also operate as a top hat plan.").

Furthermore, analysis of the language and implementation of a plan in determining its "top hat" status requires extensive discovery and a full factual record. *See* Perkins v. PM Realty Group, L.P., No. CV H-24-0566, 2024 WL 4171349, at *4 (S.D. Tex. Sept. 12, 2024) (relying on the fact-intensive nature of "top hat" determination to hold "[p]lan language alone is not sufficient to establish that the primary purpose of the plan is to provide deferred compensation for a select group of management or highly compensated employees" and finding that any disposition required extensive discovery and an evidentiary record); Tolbert v. RBC Capital Markets Corp., 758 F.3d 619, 127 (5th Cir.

2014) ("**Tolbert I**") (explaining that "top hat" analysis involves multiple factual determinations); Tolbert II, 2015 WL 2138200, at *3-5 ("top hat" inquiry, including selectivity factor is "multifaceted" and involves "qualitative and quantitative elements."); Tao v. Wu, No. C 11- 3248, 2012 WL 1123540, at *1 (N.D. Cal. Apr. 3, 2012) ("The question of whether, in practice, the [deferred compensation] plan functioned as a top hat plan—and therefore was, in fact a top hat plan—is fundamentally a factual one, and it must be resolved with a proper factual and evidentiary record.").

Whether a plan is qualitatively selective is dependent on "the nature of [participants'] employment duties, the compensation disparity between top hat plan members and non-members, and the actual language of the plan agreement." Khoury, 444 F. Supp. 2d at 660. The mere statement that a plan is for "select employees" is not sufficient. See Tolbert II, 2015 WL 2138200, at *10 (holding that a plan statement that is limited to a select group of management or highly compensated employees is "not dispositive"); Virta, 1996 WL 663970, at *3 (same). Nor is it sufficient to state that all qualifying employees are "managers." See Virta, 1996 WL 663970, at *3. Rather, the **nature** of the duties of qualified employees, as opposed to non-qualifying employees, is critical. See id. (emphasis added) (holding that plan offered to lower-wage employees, cooks, and the "managers" of one-man departments was not a "top hat" plan); see also Key v. Warren Averett, LLC, No. 2:19-cv-01443-JHE, 2021 WL 12240918 (N.D. Ala. Sept. 30, 2021) (holding that participants' titles are not dispositive as to whether someone was truly management and that a material number of non-qualifiers (more than 10%) destroyed "top hat" status); Browe, 15 F.4th at 196-97 (considering "indicia of management status"

when determining selectivity of participants and finding that many eligible employees "had minimal management responsibilities" and therefore were not eligible despite titles ).

The qualitative analysis likewise requires "comparing the compensation of plan participants to that of non-participants." Berry v. Wells Fargo & Co., No. CV 3:17-00304-JFA, 2018 WL 9989652, at *2 (D.S.C. Oct. 10, 2018). "To come within the compass of the top-hat provision, the employer must be able to show a *substantial* disparity between the compensation paid to members of the top-hat group and the compensation paid to all other workers." Alexander v. Brigham & Women's Physicians Org., Inc., 513 F.3d 37, 46 (1st Cir. 2008) (emphasis added) (determining that participants were comparatively highly compensated because their incomes were roughly five times that of non-participants).

Comparing the *average* salary of a participant to the *average* salary of a nonparticipant alone, however, is insufficient. Berry, 2018 WL 9989652, at *2. Indeed, an average salary can be skewed significantly by one or two outliers within a pool of participants, statistically stretching the disparity between participants and non-participants in a way that does not reflect the true divergence (or lack thereof) between the salaries of participants and non-participants. *See* id. at *4 (noting that "averages 'can mask wide divergence in compensation and show little regarding whether participation is restricted to highly compensated individuals'" (quoting Daft v. Advest, Inc., 2008 WL 190436, at *6 (N.D. Ohio Jan. 18, 2008*), rev'd on other grounds*, 658 F.3d 583 (6th Cir. 2011))). Thus, in order to make a determination as to whether the plan is sufficiently selective, "the compensation data must be individualized." Id.

Rather than comparing averages, a "[m]ore relevant [calculation] would . . . be[] a

comparison of the salary earned by employees minimally qualifying for participation in the

Plan against the average salary of all [company] employees." <u>Daft</u>, 2008 WL 190436, at

*6. As the *Daft* court noted:

> Rather than the average salary, the range of salaries is more useful. <u>Carrabba v. Randalls Food Markets, Inc.</u>, 38 F.Supp.2d 468, 477 (N.D.Tex.1999) cited in <u>Bakri</u>, 473 F.3d 677; *see also* <u>Starr v. JCI Data Processing, Inc.</u>, 757 F.Supp. 390, 394 (D.N.J.1991) (considering the range of salaries and not the averages); <u>Belka v. Rowe Furniture Corp.</u>, 571 F.Supp. 1249, 1253 (D.Md.1983) (noting the potential of averages to skew the numbers and considering median salaries). As Carrabba was cited in the case that laid out the Sixth Circuit test, the Court considers it more persuasive.

<u>Id.</u> at *7; *see also* <u>Fishman v. Zurich Am. Ins. Co</u>., 539 F. Supp. 2d 1036, 1045 (N.D. Ill.

2008) ("But on analysis it would seem that a set of comparisons of the average employee's

compensation with that of ***each*** Plan participant would far better inform a decision on

whether the Plan satisfies the "primarily" criterion of section 1051(2). By contrast, a

bottom-line comparison of averages with averages provides less—and less reliable—

input.") (emphasis in original).

In this case, the Bankruptcy Court committed reversible error when it failed to

consider whether the Deferred Compensation Plans' participants had any influence to

negotiate compensation agreements or otherwise had access to the tools and transparency

necessary to protect their interests and appreciate and plan for the risk involved in

participating in the Deferred Compensation Plans. Repeating as mantra "text is alpha," the

Bankruptcy Court noted that ERISA only requires plans to be "unfunded" and for a "select

group of management or highly compensated employees." The Bankruptcy Court turned

to Merriam Webster and used its definition of "select" (chosen from a number or group by

fitness or preference) to conclude that "select group of management or highly compensated employees" means that "top hat" status requires only that the employer choose to make eligible for plan participation some subset of its management or employees with high compensation.  This was clearly reversible error.

Cannons of statutory construction do not compel this radical result and departure from well settled ERISA law. United States v. Moore, 71 F.4th 392, 395 (5th Cir. 2023) ("Plain meaning is always the start."); United States v. Koutsostamatis, 956 F.3d 301, 306 (5th Cir. 2020) ("Text should never be divorced from context."); Asadi v. G.E. Energy (USA) L.L.C., 720 F.3d 620, 622 (5th Cir. 2013) (noting context means both immediate clause and "the broader context of the statute as a whole."); Kornman & Assocs., Inc. v United States, 527 F.3d 443, 451 (5th Cir. 2008) (holding courts may "deviate from the literal language of a statute . . . if such an interpretation would defeat the intent of Congress.").  The Bankruptcy Court's "text is alpha" mantra ignored reams of ERISA precedent and the fundamental intent of Congress to presumptively protect employees.  The court below erred, fundamentally, as a matter of law.

## IX.    The Bankruptcy Court Erred by Concluding the Deferred Compensation Plans were "Top Hat" Plans Exempt from ERISA Protections Despite Significant Evidence to the Contrary.

First and foremost, the Bankruptcy Court ignored uncontroverted evidence that beginning in the 2020 plan year, the Debtors made eligible for participation in the Steward Plan hundreds of nurses and physician's assistants, mid-level employees who were unquestionably not management employees and not highly compensated, and Debtors' management kept the eligibility threshold for the Steward Plan lower to ensure their

eligibility and with full knowledge that keeping the eligibility threshold at those established levels risked making the Steward Plan ineligible for "top hat" status. *See* Warren Averett, 2021 WL 12240918 (making eligible a category of employees known as "principals" and whose salaries were in the $120,000 range destroyed alleged "top hat" status of plan). Similarly, the court ignored evidence that the eligibility threshold of base salary of $180,000 that was too low in 2020 obviously continued to be too low for all subsequent plan years as average salaries of the general employee population otherwise rose by comparison. *See* App. at 13; App. at 433 (Expert Report of Scott Van Meter (filed under seal)). This evidence was case dispositive, and ignoring it was an abuse of discretion as well as legal error.

In addition, Debtors admitted ***no evidence*** that the only eligible employees were employees holding and capable of exercising enough power and influence over the Deferred Compensation Plans or with access to critical financial information about the Debtors such that they were capable of appreciating the risks the Deferred Compensation Plans imposed. Instead, the uncontroverted and admitted evidence showed only that eligible and actual plan participants had no influence or bargaining power and did not have access to information or understand the risks associated with the Deferred Compensation Plans. This evidence was provided by the Debtors' witnesses. App. at 232 (216:13-21). Ms. Driscoll testified in her deposition—admitted as cross examination testimony—that employees were never given an opportunity to negotiate plan terms when the Steward Plan was amended and restated, and that no employee was ever given an opportunity to influence the administration of the plan thereafter. Driscoll Dep. Tr. at 92:1-93:3 (filed

under seal). Mr. Lombardo and Ms. Potter concurred. App. at 140-41 (124:25-125:15); App. at 183 (167:14-20). Every witness for the Appellants corroborated this testimony. App. at 232 (216:13-21); App. at 440-41 (¶ 6); App. at 446-47 (¶¶ 4-5); App. at 452 (¶¶ 4, 6); App. at 457 (¶¶ 4, 6).

Here, the only "evidence" that the Bankruptcy Court relied upon to find that the Deferred Compensation Plans were unfunded were that the Trust Agreements said they were unfunded. Appellants, however, put into evidence an email from the Steward employee considered an expert on the IASIS Plan that stated that assets under the Deferred Compensation Plans were not in either a rabbi trust or a secular trust. App. at 184-88 (168:18-172:1); App. at 435. This evidence controverts that the IASIS Plan was "unfunded" under the supposedly relevant Trust Agreement. No contrary evidence was introduced by the Debtors. Debtors did not object that the document was hearsay, and the evidence came in for the truth of the matter asserted. In addition, Appellants submitted uncontroverted evidence that distributions were made to participants under the Steward Plan when Debtors were unquestionably insolvent. Because plan participants were being preferred in administration of the Deferred Compensation Plans to general creditors at a time of insolvency, thus ignoring the very provision of the alleged Trust Agreements that make the Deferred Compensation Plans potentially unfunded, the Debtors were administering the Deferred Compensation Plans as funded. The Bankruptcy Court, however, relied only on the terms of the supposedly relevant Trust Agreement and based on those terms alone found the Deferred Compensation Plans to be unfunded, completely disregarding the uncontroverted evidence that the Deferred Compensation Plans were

44

otherwise administered. The Bankruptcy Court's conclusion ignores well settled law and constitutes legal error.

In addition, the Debtors' witnesses stated that the Debtors made no inquiry as to whether any eligible employee had any actual management responsibilities, but rather simply made eligible all vice presidents and up who met the compensation standard. No effort was made to determine whether employees managed anyone or anything. App. at 192-93 (176:6-177:9). This, too, is fatal to "top hat" status but was ignored or given no weight by the Bankruptcy Court.

The Appellants' expert, Mr. Van Meter—whose testimony the Bankruptcy Court found credible— applied the rule of the *Daft*, *Fishman*, and *Berry* decisions in determining that the Steward Plan was not sufficiently selective and that there was no material disparity between the average salary of the entire employee population and the minimum compensation necessary for plan eligibility. The Debtors' expert, Dr. Krock, ignored this test. Instead, Debtors submitted as evidence Dr. Krock's calculations and conclusions that the average salary of eligible plan participants was a multiple of the average salary of the employee population as a whole. In doing so, Dr. Krock failed to eliminate part-time employees from his calculation of the average salary for the entire population and relied on data that Mr. Van Meter characterized, without serious opposition from the Debtors, as unreliable. But more critically, Dr. Krock and the Bankruptcy Court both disregarded the admonition of the case law on the distortive effect of relying on a calculation of the average salary of eligible plan participants. In doing so, both relied on the First Circuit opinion in *Alexander*, but the First Circuit opinion provides no such support. While the court made a

comparison based on average salaries, it did so only after finding that the subject plan was clearly selective on other grounds; the plan was limited to unquestionably highly compensated surgeons whose net practice income exceeded a certain cap, insuring that only a very few members of the physician population were eligible, most making nearly half a million dollars annually. The First Circuit found that the eligible group was highly compensated both relatively and absolutely under any standard. Alexander, 513 F.3d at 46. The court's passing reference to comparative averages as an indication of disparity was in no way an endorsement of using such a test or a rejection of the inescapable logic of *Daft* and progeny regarding the distortive effect of averages.

The Bankruptcy Court's clear disregard for case dispositive evidence in the Appellants' favor was yet another legal error.

## **CONCLUSION**

For all of the foregoing reasons, the Appellants requests that the Court reverse the Turnover Order and remand the matter to the Bankruptcy Court for further adjudication consistent such reversal.

*{Remainder of Page Intentionally Left Blank}*

Dated: June 27, 2025

DR. MANISHA PUROHIT, DR. DIANE PAGGIOLI, DR. JAMES THOMAS, DR. THOMAS ROSS, DR. MICHAEL REGAN, DR. PETER LYDON, DR. SRIDHAR GANDA, DR. A. ANA BEESEN, DR. BENOY ZACHARIAH, DR. BARRY ARKIN, DR. BRUCE KRIEGEL, and DR. GARY MILLER

By their attorneys:

Allan B. Diamond, Esq.
Christopher D. Johnson, Esq.
Diamond McCarthy, LLP
909 Fannin Street, 37th Floor
Houston, TX 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199
Email: allan.diamond@diamondmccarthy.com
        chris.johnson@diamondmccarthy.com

Robert J. Keach, Esq, *admitted pro hac vice*
Lindsay K. Milne, Esq.
Bernstein, Shur, Sawyer & Nelson, P.A.
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
Email:
        rkeach@bernsteinshur.com
        lmilne@bernsteinshur.com

*Counsel for the Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Bankruptcy Rule 8015(a)(7)(b) because it contains 12,901 words and has been prepared in a proportionally spaced typeface (13-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Christopher D. Johnson*
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2025, I caused the foregoing pleading to be filed via the Court's CM/ECF system and it was served by the Court's electronic noticing service to all parties registered to receive ECF notice.

*/s/ Christopher D. Johnson*

48