**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>STEWARD HEALTH CARE SYSTEM,<br>LLC, et al.,<br><br>        Debtors.[1] | Chapter 11<br><br>Bankruptcy Case No. 24-90213 (CML)<br>(Jointly Administered)<br><br>Case No. 4:25-cv-01584 |

**BRIEF FOR APPELLEES**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204. Corporate disclosure statements for each Debtor are attached as Exhibit 1.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

QUESTIONS PRESENTED ....................................................................................... 2

STATEMENT OF FACTS .......................................................................................... 2

PROCEDURAL HISTORY ........................................................................................ 5

STANDARD OF REVIEW ......................................................................................... 8

ARGUMENT ............................................................................................................... 9

    I.    The Deferred Compensation Plans Are Top Hat Plans ................................. 9

        A.    The deferred compensation plans are unfunded ................................. 9

        B.    The deferred compensation plans are selective ............................... 13

        C.    The bankruptcy court accounted for bargaining power .................. 17

    II.    Appellants' Jurisdictional, Procedural, and Evidentiary Objections All Fail ................................................................................................................. 19

        A.    The bankruptcy court had jurisdiction to decide whether the plans are top hat plans ................................................................................. 19

            1.    Appellants' eleventh-hour motion to withdraw the reference did not deprive the bankruptcy court of jurisdiction ............. 19

            2.    The contested matter is a core proceeding and, regardless, Appellants consented to resolution by the bankruptcy court 24

        B.    The bankruptcy court soundly rejected Appellants' procedural delay tactics ............................................................................................... 27

            1.    The bankruptcy court properly resolved the Turnover Motion in the contested matter ........................................................... 27

            2.    The bankruptcy court did not abuse its discretion by denying Appellants' stay motions ....................................................... 30

        C.    The bankruptcy court did not abuse its discretion by rejecting Appellants' evidentiary objections ................................................... 34

1.   The bankruptcy court properly admitted and relied on Steward's expert's testimony, which was corroborated by Appellants' own expert ........................................................ 34

2.   The bankruptcy court properly discounted Appellants' expert's testimony to the extent he relied on a fabricated assumption given to him by Appellants' counsel ................. 37

3.   The bankruptcy court properly did not admit privileged emails ..................................................................... 40

   i    The emails were inadvertently produced ................... 40

   ii   The emails are not subject to the fiduciary exception 43

   iii  Steward did not waive the privilege .......................... 45

CONCLUSION ............................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. Brigham & Women's Physicians Org., Inc.*,
  513 F.3d 37 (1st Cir. 2008) ................................................................... 15, 18

*Allen v. Int'l Truck & Engine Corp.*,
  No. 1:02-cv-00902-2RLY-MJD, 2017 WL 1382610 (S.D. Ind. Apr. 18,
  2017) ......................................................................................................... 36

*In re Alpha Nat. Res. Inc.*,
  554 B.R. 787 (Bankr. E.D. Va. 2016) ................................... 15, 25, 26, 28

*In re Asarco, L.L.C.*,
  650 F.3d 593 (5th Cir. 2011) ..................................................................... 8

*Barr v. SEC*,
  114 F.4th 441 (5th Cir. 2024), *petition for cert. filed*, No. 24-1233 (U.S.
  Mar. 28, 2025) .................................................................................... 17, 18

*In re Battram*,
  214 B.R. 621 (Bankr. C.D. Cal. 1997) ..................................................... 25

*Berry v. Wells Fargo & Co.*,
  No. CV 3:17-00304-JFA, 2018 WL 9989652 (D.S.C. Oct. 10, 2018) ....... 16

*In re Bill Heard Enters., Inc.*,
  419 B.R. 858 (Bankr. N.D. Ala. 2009) ..................................................... 25

*In re Byrnes*,
  No. 20-12086-t7, 2022 WL 17752369 (D.N.M. Dec. 19, 2022) ................ 21

*Callan v. Merrill Lynch & Co.*,
  No. 09-cv-0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30,
  2010) ......................................................................................................... 16

*In re Camden Ordnance Mfg. Co. of Ark., Inc.*,
  245 B.R. 794 (E.D. Pa. 2000) ................................................................... 23

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*,
  No. 3:22-CV-2802-B, 2023 WL 4768188 (N.D. Tex. July 26, 2023)......... 21

*Ciavarra v. BMC Software, Inc.*,
   CIV. A. H-07-0413, 2008 WL 352273 (S.D. Tex. Feb. 7, 2008) ............................... 35

*In re Citimortgage, Inc. Home Affordable Modification Program
   ("HAMP") Litig.*,
   No. ML 11-2274 DSF, 2013 WL 8844095 (C.D. Cal. Oct. 7, 2013),
   *aff'd*, 637 F. App'x 471 (9th Cir. 2016) ........................................................ 36

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024) ............................................................................ 17

*Corona v. Chevron Corp.*,
   No. H-07-3190, 2008 WL 11483069 (S.D. Tex. June 18, 2008) ............................... 44

*Cortina v. Sorvan Bank, N.A.*,
   927 F. Supp. 439 (S.D. Fla. 1994) ............................................................ 13

*Crawford v. Guar. State Bank & Tr. Co.*,
   No. 22-2542-JAR-GEB, 2024 WL 2700668 (D. Kan. May 24, 2024) ................. 44, 45

*Daft v. Advest, Inc.*,
   No. 5:06-cv-1876, 2008 WL 190436 (N.D. Oh. Jan. 18, 2008), *rev'd on
   other grounds*, 658 F.3d 583 (6th Cir. 2011) ......................................... 15, 16

*In re Dean*,
   18 F.4th 842 (5th Cir. 2021) ................................................................. 8

*Demery v. Extebank Deferred Comp. Plan(B)*,
   216 F.3d 283 (2d Cir 2000) ............................................................. 12, 15

*In re Downey Reg'l Med. Ctr. Hosp, Inc.*,
   441 B.R. 120 (B.A.P. 9th Cir. 2010) ......................................................... 29

*Dresser-Rand Co. v. Virtual Automation Inc.*,
   361 F.3d 831 (5th Cir. 2004) ................................................................. 37

*In re Eagle Enters., Inc.*,
   259 B.R. 83 (Bankr. E.D. Pa. 2001) ......................................................... 22

*In re Envision Healthcare Corp.*,
   655 B.R. 701 (Bankr. S.D. Tex. 2023) ....................................................... 26

*In re Equinox Oil Co.*,
   No. 00-3502, 2001 WL 649806 (E.D. La. June 11, 2001), *aff'd*, 300
   F.3d 614 (5th Cir. 2002) ................................................................ 30, 31

iv

*Exec. Benefits Ins. Agency v. Arkison*,
573 U.S. 25 (2014) ............................................................................... 26, 27

*Fishman v. Zurich Am. Ins. Co.*,
539 F. Supp. 2d 1036 (N.D. Ill. 2008) ......................................................... 16

*In re Fortune Nat. Res. Corp.*,
350 B.R. 270 (Bankr. E.D. La. 2005) .......................................................... 46

*Gibbs v. Goddard Riverside Cmty. Ctr.*,
No. 3:23-cv-1108, 2024 WL 554141 (M.D. Pa. Feb. 12, 2024) ................. 21

*Goodman v. Resolution Tr. Corp.*,
7 F.3d 1123 (4th Cir. 1993) ....................................................................... 12

*In re Haber Oil Co.*,
12 F.3d 426 (5th Cir. 1994) ....................................................................... 29

*In re IT Grp., Inc.*,
448 F.3d 661 (3d Cir. 2006) ....................................................................... 12

*JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*,
936 F.3d 251 (5th Cir. 2019) ............................................................... 31, 33

*In re Lear Corp.*,
418 B.R. 47 (S.D.N.Y. 2009) ...................................................................... 21

*In re Linn Energy, L.L.C.*,
936 F.3d 334 (5th Cir. 2019) ..................................................................... 30

*In re Lloyd*,
200 F.3d 815, 1999 WL 1095336 (5th Cir. 1999) (unpublished) ............... 21

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ................................................................................... 18

*In re McCray*,
No. 14-10124, 2018 WL 6422719 (Bankr. W.D. La. Dec. 4, 2018) ........... 29

*Moore v. Int'l Paint, L.L.C.*,
547 F. App'x 513 (5th Cir. 2013) ............................................................... 36

*Moore v. Willis Indep. Sch. Dist.*,
233 F.3d 871 (5th Cir. 2000) ............................................................... 31, 33

v

*In re New Century Holdings, Inc.*,
   387 B.R. 95 (Bankr. D. Del. 2008) ......................................................... 25, 26

*In re Outboard Marine Corp.*,
   278 B.R. 778 (N.D. Ill. 2002) ................................................................. 4, 13

*In re Parklane/Atlanta Joint Venture*,
   927 F.2d 532 (11th Cir. 1991) ..................................................................... 23

*In re Perfect Home, L.L.C.*,
   231 B.R. 358 (Bankr. N.D. Ala. 1999) ....................................................... 23

*In re Point Blank Sols., Inc.*,
   449 B.R. 446 (Bankr. D. Del. 2011) ........................................................... 26

*Reliable Home Health Care, Inc. v. Union Cent. Ins. Co*.,
   295 F.3d 505 (5th Cir. 2002) ............................................................... *passim*

*In re Royce Homes, LP*,
   652 B.R. 488 (Bankr. S.D. Tex. 2023) ....................................................... 26

*In re RTI Holding Co.*,
   No. 20-12456 (Bankr. D. Del. Nov. 12, 2020) ........................................... 28

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*.,
   161 F.3d 77 (1st Cir. 1998) ......................................................................... 36

*Sikora v. UPMC*,
   153 F. Supp. 3d 820 (W.D. Pa. 2015), *aff'd*, 876 F.3d 110 (3d Cir.
   2017) .......................................................................................................... 14

*Sikora v. UPMC*,
   876 F.3d 110 (3d Cir. 2017).......................................................... 14, 16, 18

*In re The Colonial BancGroup, Inc.*,
   436 B.R. 695 (Bankr. M.D. Ala. 2010)................................................. 25, 26

*Tolbert v. RBC Cap. Mkts. Corp.*,
   758 F.3d 619 (5th Cir. 2014) ..................................................................... 8, 9

*Tolbert v. RBC Cap. Mkts., Corp.*,
   No. H-11-0107, 2012 WL 1067629 (S.D. Tex. Mar. 28, 2012) .................... 43, 44, 45

*Tolbert v. RBC Cap. Mkts. Corp.*,
   No. H-11-0107, 2015 WL 2138200 (S.D. Tex. Apr. 28, 2015)........................ 8, 14, 18

*In re Ulmer*,
   203 F.3d 828, 1999 WL 1240788 (5th Cir. 1999) (unpublished) ................................ 29

*United States v. White*,
   887 F.2d 267 (D.C. Cir. 1989) ...................................................................................... 46

*In re Wash. Mut., Inc.*,
   450 B.R. 490 (Bankr. D. Del. 2011) ............................................................................. 25

*Wellness Int'l Network, Ltd. v. Sharif*,
   575 U.S. 665 (2015)............................................................... 23, 24, 25, 26, 27

*Wildbur v. ARCO Chem. Co.*,
   974 F.2d 631 (5th Cir. 1992) ........................................................................................ 45

*In re Zale Corp.*,
   62 F.3d 746 (5th Cir. 1995) .......................................................................................... 29

**Statutes**

11 U.S.C. § 541 ..................................................................................................................... 26

28 U.S.C. § 157 ......................................................................................................... 25, 26, 27

29 U.S.C. § 1101 .............................................................................................................. 9, 17

**Rules**

Fed. R. Bankr. P. 5011..................................................................................................... 21, 22

Fed. R. Civ. P. 26.................................................................................................................. 46

Fed. R. of Evid. 502 ............................................................................................................. 40

Model Rule of Professional Conduct Rule 4.4 .................................................................... 41

**Regulations**

Howard J. Saks, Secular Trusts Addressed in First Letter Ruling, 16 Est.
   Plan. 249, 1989 WL 298586 (July/Aug. 1989)............................................................. 12

**Other Authorities**

*State Minimum Wages Laws*, U.S. Department of Labor
   (updated Jan. 1, 2025) https://www.dol.gov/agencies/whd/minimum-
   wage/state ..................................................................................................................... 39

## INTRODUCTION

This appeal presents a straightforward question: whether two deferred compensation plans maintained by Steward qualify as "top hat" plans, such that they are exempt from the Employee Retirement Income Security Act of 1974 ("ERISA") and therefore constitute property of Steward's bankruptcy estates. They do, so they are.

As Appellants acknowledge, "[d]etermining if a plan is a 'top hat' plan involves a fact-specific and fact-intensive inquiry." Br. 34 (emphasis removed). The bankruptcy court (Lopez, J.) made this determination after a two-day trial in which it considered testimony from eleven witnesses and admitted almost 300 exhibits. Based on this extensive factual record, the court correctly found the plans met both the Fifth Circuit's requirements for top hat plans: they were "(1) unfunded and (2) maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co*., 295 F.3d 505, 512 (5th Cir. 2002). The court set forth the grounds for this decision in a ruling spanning nearly 50 transcript pages, citing reams of evidence. This Court should affirm that ruling in all respects.

Appellants barely mention the bankruptcy court's ruling and ignore most of the evidence the court relied on. They disregard the factual record for a reason: the evidence overwhelmingly supports the bankruptcy court's finding that the plans qualify as top hat plans. Most of Appellants' arguments (six of their nine argument points) do not even address whether the plans were top hat plans. Instead, they ask this Court to vindicate Appellants' delay tactics in the bankruptcy court. At the time of the hearing, Steward

1

needed access to the plan assets to obtain the liquidity necessary to continue the bankruptcies. Knowing this, Appellants repeatedly attempted to delay the proceeding to run out the clock without having to litigate their case on the merits. The bankruptcy court properly rejected Appellants' delay attempts and this Court should do the same.

## QUESTIONS PRESENTED

1.    To qualify as a top hat plan, a deferred compensation plan must be (1) unfunded and (2) selective. After a two-day hearing, the bankruptcy court found that Steward's plans are top hat plans. Should this fact-intensive decision be affirmed?

2.    At the time of the hearing, Steward needed the top hat plan assets to continue administering the bankruptcies. Appellants employed a series of delay tactics, attempting to prevent Steward from accessing the plan assets until it was too late for Steward to use them. Did the bankruptcy court properly reject Appellants' delay tactics?

## STATEMENT OF FACTS

Once the largest private, physician-led hospital system in the United States, Steward Health Care and affiliated entities filed these chapter 11 bankruptcy cases in May 2024. This appeal concerns two deferred compensation plans made available to a select group of highly placed, highly compensated Steward employees. These plans permitted certain medical professionals and other high-earning employees to defer a portion of their annual compensation. Employees who participate in deferred compensation plans like these receive a valuable benefit: they reduce their tax liability. In exchange, plan participants knowingly assume a risk: until the deferred funds are distributed to participants, the funds belong to the employer (not participants), so if the employer becomes insolvent the funds

are included in its bankruptcy estate. *See* Bankr Doc. No. 4441 ("Ruling") 12:7–13:21 (APPX_00923–24).

Appellants are former Steward employees who were highly compensated and participated in the Steward Health Care ("SHC") plan and/or the IASIS plan. *See id.* 22:8–11 (APPX_00933) ("Each [Appellant] … earned at least $350,000 ….."). Both plans were limited to select, highly paid employees. Both were funded with assets owned by Steward rather than plan participants like Appellants. Deferred compensation plans like these, known as "top hat" plans, are exempt from nearly all ERISA's substantive requirements.

The SHC Plan, established in 2011, was initially available only to physicians and employees at or more senior to the Vice President level earning more than $150,000 per year. In 2019, the SHC Plan was amended to allow additional health care professionals to participate and the salary threshold was increased to $180,000 per year. *See id.* 14:22–15:3 (APPX_00925–26). No employees were told to participate in the plan. Eligible employees could choose to defer compensation. Those who did so received a valuable benefit (lower taxes) and assumed a clearly communicated risk: if Steward became insolvent, the assets set aside to fund the plan belonged to Steward and would therefore be subject to the claims of Steward's general creditors. *See id.* 15:8–17:15 (APPX_00926–28).

This risk was readily apparent to Appellants. The plan documents repeatedly and unambiguously highlighted it. For instance, a one-page "Plan at a Glance" document given each year to eligible employees warned: "unlike a 401(k) plan, if Steward Health Care becomes insolvent, Steward's creditors will have access to your account. [You will] have the rights of a general unsecured creditor in such event." *Id.* 15:8–19 (APPX_00926).

3

Steward acquired the IASIS plan in connection with a merger in 2017.[2] *See id.* 18:21–22 (APPX_00929). The IASIS plan documents also unambiguously informed participants that the assets set aside to pay deferred compensation belonged to the company, not to participants. *See, e.g.*, *id.* 19:23–20:2 (APPX_00930–31) (assets "shall remain the assets of [the company] subject to the claims of its general creditors").

Every year, the employer sponsors of both plans (first IASIS, then Steward) placed employer-owned assets into "rabbi trusts." Employers establish rabbi trusts "to create a source of funding for otherwise unfunded benefit plans." *In re Outboard Marine Corp.*, 278 B.R. 778, 785 (N.D. Ill. 2002). Since the trust corpus "technically remains property of the employer, the beneficiaries of the trust are not taxed on their portion of the [t]rust corpus or [t]rust proceeds until the assets are actually distributed to the beneficiaries." *Id.* "As a condition for this tax benefit, rabbi trusts are required to remain at all times subject to the claims of the grantor's general creditors." *Id.* So if the employer files for bankruptcy, the trust assets become part of the bankruptcy estate. *Id.*

Just like the plan documents did, the trust documents clearly explained these terms to plan participants, including Appellants. The IASIS trust, for instance, explained that plan participants' rights "under the plan and the trust agreement shall be mere unsecured contractual rights … against [the] company," and that "[a]ny assets held by the trust will

---

[2] The IASIS plan was frozen shortly after Steward acquired it, and former IASIS employees who became Steward employees could no longer participate in it. Eligible employees could, however, participate in the SHC plan.

be subject to the claims [of] the company's general creditors … in the event of an insolvency." Ruling 20:8–21:2 (APPX_00931–32).

## PROCEDURAL HISTORY

On November 24, 2024, Steward moved the bankruptcy court for an order directing the trustees to turn the trust assets over to Steward. *See* Bankr. Doc. No. 3277 ("Turnover Motion") (APPX_00460). Appellants objected to the motion on December 17, creating a contested matter in the bankruptcy court. *See* Bankr. Doc. No. 3497 ("Turnover Objection") (APPX_00480). Although Appellants opposed the motion on the merits, they also consented to its resolution by the bankruptcy court in the contested matter. They expressly asked the court to "defer a ruling on the Turnover Motion until [Appellants were] provided the opportunity to take discovery." *Id.* ¶ 36 (APPX_00497–98); *see also id.* ¶ 7 (similar) (APPX_00485).

Appellants filed a discovery request on December 24, 2024, which they amended on December 30. *See* Bankr. Doc. No. 3560; 3581 (SUPP.APPX_00023; APPX_01190). The parties then engaged in discovery for several months. "The [bankruptcy] [c]ourt heard nothing from [Appellants] during this time." Ruling 9:12–13 (APPX_00920). And Appellants "expressed no hesitation about proceeding as a contested matter rather than an adversary proceeding." *Id.* 9:4–10 (APPX_00920). The bankruptcy court scheduled a hearing on the Turnover Motion for February 14, 2025, *see* Bankr. Doc. No. 3745 (SUPP.APPX_00038), but Steward agreed, again at Appellants' request, to adjourn it to March 11. *See* Bankr. Doc. No. 3850 (SUPP.APPX_00042).

As the hearing date approached, Steward was running out of cash to administer the bankruptcy estates. The rabbi trust assets owned by Steward were the only feasible source of liquidity. *See* Ruling 72:11–74:10 (APPX_00983–85). Steward therefore needed a prompt decision on the Turnover Motion so Steward could access the rabbi trust assets to continue the bankruptcies and maximize recoveries for the estates' creditors. Steward's cash crunch created an opportunity for Appellants to, as the bankruptcy court put it, "weaponize[e] … the debtors['] financial need." Mar. 7 Hr'g Tr. 70:4–8 (filed under seal). Appellants therefore engaged in a series of delay tactics to prevent Steward from accessing the rabbi trust assets until it was too late for Steward to use them.

For instance, on March 3, only eight days before the scheduled hearing date, Appellants attempted to halt the contested matter—which by that point had been pending for ninety-nine days—and start over in a newly filed adversary proceeding raising the same issue. *See* Bankr. Doc. No. 4089 ("First Emergency Motion") (APPX_00594). The adversary proceeding was wholly duplicative of the contested matter. In Appellants' own words, the contested matter and adversary proceeding have "near-complete legal and factual overlap." Adv. Proc. No. 25-03066 (CML), Doc. No. 19 ¶ 30 (SUPP.APPX_00121–22). Appellants also moved to withdraw the reference of the adversary proceeding, Adv. Proc. No. 25-03066 (CML), Doc. No. 3 (APPX_00570), and filed a parallel motion to stay the contested matter, claiming the issue could be resolved only in the adversary proceeding. *See* First Emergency Motion (APPX_00594).

On March 7, after hearing oral argument, the bankruptcy court denied Appellants' First Emergency Motion. The court found that "requesting an adversary proceeding

[instead of a contested matter] at this point … has been waived." Mar. 7 Hr'g Tr. 69:15–17, 71:13–21. The bankruptcy court later observed, accurately, that "one could construe [the adversary proceeding] as an effort to delay a hearing on the [Turnover] [M]otion." Ruling 9:11–16 (APPX_00920). Nevertheless, the court adjourned the hearing on the Turnover Motion to March 26, allowing Appellants additional time for discovery. *See* Mar. 7 Hr'g Tr. 70:9–71:2.

Although by this point Appellants had already twice adjourned the hearing date, they sought further delay, filing on March 13 another motion to stay the hearing, this time with the district court. *See* No. 25-mc-00461 (AHB), Doc. No. 1 (S.D. Tex) ("Second Emergency Motion") (SUPP.APPX_00045). After hearing argument on March 21, the district court (Bennett, J.) on March 24 denied the Second Emergency Motion. *See* No. 4:25-mc-00461 (AHB), Doc. No. 46 (APPX_00755). Undeterred, Appellants the very same day filed with the bankruptcy court yet another motion to continue the hearing, *See* Bankr. Doc. No. 4289 (APPX_00758), which the bankruptcy court denied the following day. *See* Bankr. Doc. No. 4310 (SUPP.APPX_00073).

The hearing on the Turnover Motion proceeded on March 26 and 27. At the hearing, the bankruptcy court heard live testimony from five witnesses, admitted testimony by deposition or declaration from another six witnesses, and received 291 additional exhibits. *See* Bankr. Doc. No. 4315 (SUPP.APPX_00074); 4323 (SUPP.APPX_00089).

On April 2, the bankruptcy court ruled "that the plans are all Top Hat plans" and are accordingly "exempt from the funding, vesting, and fiduciary requirements under ERISA." ("Ruling") 12:3–4 (APPX_00923); 46:3–4 (APPX_00957). Appellants immediately

moved the bankruptcy court for a stay pending appeal. *Id.* 57:4–60:11 (APPX_00968–71). The bankruptcy court denied the motion, explaining it could not "find any basis …. [in] the documents, the testimony, the Southern District of Texas case law, Fifth Circuit case law, and sister circuit case law that says [Appellants were] right." *Id.* 62:24–63:3 (APPX_00973–74), 78:7–8 (APPX_00989). Memorializing its ruling, the bankruptcy court entered an order dictating that "[t]he Trust Assets constitute property of the Debtors' estates under [S]ection 541." Bankr. Doc. No. 4418 ("Order") ¶¶ 1, 3 (APPX_00002–03).

On April 7, Appellants again sought a stay pending appeal, this time with this Court. *See* Doc. No. 2 ("Fourth Emergency Motion") (APPX_00848). The Court denied that motion on April 11. Doc. No. 15 (APPX_00907).

## STANDARD OF REVIEW

A district court "sitting in its appellate capacity" reviews a bankruptcy court's conclusions of law de novo. *In re Dean*, 18 F.4th 842, 843–44 (5th Cir. 2021). The bankruptcy court's factual findings are reviewed for clear error. *Id.* Factual findings may be reversed "[o]nly upon a definite and firm conviction that the bankruptcy court erred." *In re Asarco, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (alteration in original).

Whether a plan constitutes a top hat plan is a question of law. *Tolbert v. RBC Cap. Mkts. Corp.*, No. H-11-0107, 2015 WL 2138200, at *3 (S.D. Tex. Apr. 28, 2015). However, "factors *underlying the* top hat exemption—such as selectivity and high compensation—can constitute fact issues." *Id.* at *3; *see also Tolbert v. RBC Cap. Mkts. Corp.*, 758 F.3d 619, 627 (5th Cir. 2014) ("The resolution of the dispute over the 'top hat' exemption may

require factual determinations regarding, for example, selectivity and high compensation.").

## ARGUMENT

## I.    The Deferred Compensation Plans Are Top Hat Plans

ERISA exempts some deferred compensation plans—colloquially known as "top hat" plans—from its fiduciary requirements. A top hat plan is "a plan which is unfunded" and provides "deferred compensation for a select group of management *or* highly compensated employees." 29 U.S.C. § 1101(a)(1) (emphasis added). Following the statute's plain text, the Fifth Circuit directs courts to consider these two factors and no others: to "qualif[y] as a top hat plan exempt from ERISA's fiduciary duties [the plan] must be (1) unfunded and (2) maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Reliable Home*, 295 F.3d at 512. Appellants' contention (Br. 34) that courts must also find a "distinct" third factor—participants' bargaining power—contradicts ERISA's text and is foreclosed by controlling Fifth Circuit precedent. Regardless, as discussed *infra* at I.C, proper consideration of Appellants' bargaining power only further supports the bankruptcy court's finding that the plans are top hat plans.

### A.    The deferred compensation plans are unfunded

"Unfunded" is a term of art in this context. Deferred compensation plans are unfunded if the trust assets remain property of the employer (here, Steward). To determine whether a plan is unfunded, courts examine the plan's language and determine whether the participant paid income taxes on the deferred compensation. *See* 295 F.3d at 513–15. In

*Reliable Home*, the Fifth Circuit canvassed the law of sister circuits and guidance from the Department of Labor "indicat[ing] that great weight should be given to the tax consequences of such plans." *Id.* at 513; *see also id.* at 514 ("[A] 'plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made.'") (citation omitted).

The SHC and IASIS plan documents and related trust agreements undisputedly require the plans to be unfunded. Ruling 26:19–27:11 (APPX_00937–38), 28:2–11 (APPX_00939), 35:16–36:3 (APPX_00946–47), 41:5–15 (APPX_00952). For example, the SHC plan states that it is "intended to be an unfunded plan and that no funds are to be set aside beyond the Rabbi Trust, which is accessible to general creditors." *Id.* 26:22–25 (APPX_00937). The IASIS plan likewise states that "it's intended to be unfunded for the purposes of both ERISA and the Internal Revenue Code." *Id.* 28:2–6 (APPX_00939).

In addition to relying on the trust documents' unambiguous language, the bankruptcy court made other critical factual findings, which are also undisputed. First, it found that Appellants did not pay taxes on deferred income. *Id.* 26:14–18 (APPX_00937), 27:7–28:24 (APPX_00938–39), 46:13–16 (APPX_00957). Appellants do not contest this finding—in fact, their brief does not mention taxes even once—despite the Fifth Circuit's express direction that the plans' tax consequences should be given "great weight." *Reliable Home*, 295 F.3d at 513.

These findings alone—the plans' language and tax consequences—would be sufficient to show the plans were unfunded. *See id.* at 514 ("The language of the Plan in addition to the jurisprudence and the DOL advisory opinion [on the importance of tax

10

consequences] lead [the Fifth Circuit] to the conclusion that the Reliable Plan was an unfunded top hat plan ….”). But the bankruptcy court supported its determination with other factual findings too—which, again, are undisputed.

For example, the court found that the “premiums for the insurance policies [that made up the corpus of the rabbi trusts] were paid from Steward’s general fund. The evidence shows that it did not come from money withheld from specific participants’ paychecks.” Ruling 27:12–16 (citation omitted) (APPX_00938). As the court explained, “that’s important. Remember that is what makes these plans different than regular ERISA-funded plans.” *Id.* 27:17–18 (APPX_00938). The bankruptcy court also found “that Steward was the beneficiary” of the insurance policies that were funded with Steward’s assets. *Id.* 27:7 (APPX_00938). Since Steward, not Appellants, owns the trust assets, Appellants have no property interest in these assets as a matter of law.

Although Appellants dispute none of these factual findings, they contend “the *only* ‘evidence’ that the bankruptcy court relied upon to find that the Deferred Compensation Plans were unfunded were that the Trust Agreements said they were unfunded.” Br. 44 (emphasis added); *see also id.* (“The Bankruptcy Court … relied *only* on the terms of the supposedly relevant Trust Agreement and *based on those terms alone* found the … Plans to be unfunded.”) (emphasis added). Appellants cite nothing for this proposition because it isn’t true. To be sure, the bankruptcy court considered the plans’ language, just as the Fifth Circuit did in *Reliable Home.* But the bankruptcy court also relied on other documents and witness testimony to find that Appellants did not incur tax liability for contributions to the trust, that premiums on insurance policies in the trust corpus were paid for from Steward’s

11

general fund rather than participants' paychecks, and that Steward was the beneficiary of those policies. *See* Ruling 26:5–28:18 (APPX_00937–39). All these facts show the assets set aside to pay deferred compensation belonged to Steward, not to participants—in other words, the plans were unfunded.

Appellants argue an email, which says that IASIS plan assets "were not in … a secular trust," contradicts the bankruptcy court's finding that "that the IASIS plan was 'unfunded.'" Br. 44. But this email only further support's the court's ruling because a secular trust—*i.e.*, a trust that is *not* "subject to the claims of the general creditors of the employer," Howard J. Saks, Secular Trusts Addressed in First Letter Ruling, 16 Est. Plan. 249, 1989 WL 298586 (July/Aug. 1989)—is precisely what would make a plan funded. *See Demery v. Extebank Deferred Comp. Plan(B)*, 216 F.3d 283, 287 (2d Cir 2000) (plan is unfunded where a beneficiary cannot "establish, through the plan documents, a legal right [to plan assets] any greater than that of an unsecured creditor").[3] For the plans to be unfunded, plan assets do not have to be placed in a rabbi trust (or any trust). What matters is the assets belong to the employer rather than participants. *See id.* And, as the bankruptcy court found, the assets in this case unambiguously belonged to Steward.[4]

---

[3] *See also Goodman v. Resolution Tr. Corp.*, 7 F.3d 1123, 1128 (4th Cir. 1993) (similar); *In re IT Grp., Inc.*, 448 F.3d 661, 665 (3d Cir. 2006) (similar).

[4] Appellants incorrectly state the IASIS plan was unfunded because there supposedly was no evidence that the IASIS trustee continued managing trust assets after 2017. Br. 37. That is irrelevant because assets need not be held in trust for a plan to be unfunded. Rather, a plan is unfunded if benefits are paid from the employer's assets, rather than assets owned by plan participants. *See Reliable Home*, 295 F.3d at 513–14. In any event, the IASIS trustee did manage the assets. *See id.* 7:9–10 (APPX_00918) ("The plans have been terminated about a year, but the Trustee still manages the assets."). That's why the trustee of the IASIS plan was the party from whom Steward sought turnover of the IASIS plan assets. *See* Turnover Motion (APPX_00460).

The bankruptcy court also rightly rejected Appellants' argument that the plans suddenly became funded because (in Appellants' view) the trusts made distributions to participants while Steward was insolvent. Br. 44. Even if Appellants were correct that these distributions to participants breached trust provisions, nothing would change. The trust provisions Appellants rely on protect *creditors*, not plan participants like Appellants. Appellants accordingly lack standing to enforce them. *See* Ruling 32:15–33:6 (APPX_00943–44). The provisions "[were] obviously created to protect the *general creditors* from having the Trustee distribute trust proceeds to participants …." *Cortina v. Sorvan Bank, N.A.*, 927 F. Supp. 439, 447–48 (S.D. Fla. 1994) (emphasis added), *adopted by* 927 F. Supp. 439 (S.D. Fla. 1994).  As plan participants, Appellants "ha[ve] no standing to raise" a failure to comply with these creditor-protection provisions "as a bar to [the company's] right to the proceeds" of the rabbi trusts. *See id.*

And even if Appellants had standing to make this argument about payments to participants, it would fail. Rabbi trusts cannot "magically become … no longer part of [the] estate—merely" because of actions inconsistent with their terms. *In re Outboard Marine Corp.*, 278 B.R. at 785–86; *see also* Ruling 31:20–24 (APPX_00942) ("I don't see any fraud or illegality here. But in any event, the process by which assets were pledged and payments to payees were made, is at most a pre-petition breach of contract giving rise to a pre-petition claim.").

## B.    The deferred compensation plans are selective

The bankruptcy court also correctly concluded the deferred compensation plans qualify as top hat plans under the second prong of the test: The plans were "maintained by

an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Reliable Home*, 295 F.3d at 512.

This prong is known as the "selectivity test." The test is disjunctive; eligible employees must be *either* management *or* highly compensated. *See Sikora v. UPMC*, 153 F. Supp. 3d 820, 825 n.6 (W.D. Pa. 2015), *aff'd*, 876 F.3d 110 (3d Cir. 2017). In making this determination, courts have "consider[ed] … qualitative and quantitative factors such as (1) the percentage of the total workforce eligible to participate in the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative)." *Tolbert*, 2015 WL 2138200, at *9 (collecting cases).

The bankruptcy court properly applied this law to the deferred compensation plans, correctly concluding that they satisfied the selectivity test. Both witness and expert testimony support this conclusion. *See* Ruling 39:2–46:12 (APPX_00950–57). To participate in the SHC plan, employees had to make almost three times Steward's average employee salary. Under five percent of Steward employees were eligible. Fewer than one percent participated. *See id.* 39:19–40:1 (APPX_00950–51). The IASIS plan looks similar. Participants' average salary was over $350,000, whereas the average IASIS employee salary was under $70,000. Around forty employees participated in the plan, out of thousands. *See id.* 40:5–23 (APPX_00951).

The plan participants are highly compensated employees. The bankruptcy court heard testimony from experts presented by both sides, explained the methodologies employed by each, and ultimately found Steward's expert's analysis more persuasive. *See*

14

*id.* 41:16–46:7 (APPX_00952–57). Steward's expert compared the company's average employee salary with two metrics: the average salary of all *eligible employees*, and the average salary of all *plan participants*. *See id.* 41:19–42:22 (APPX_00952–53). As the bankruptcy court found, each approach is well-established. *See Demery*, 216 F.3d at 289 (comparing plan participants' average salaries to employees' salaries); *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 41 (1st Cir. 2008) (same); *In re Alpha Nat. Res. Inc.*, 554 B.R. 787, 796 (Bankr. E.D. Va. 2016) (comparing average salary of eligible employees to the average salary of non-eligible employees).

Each approach showed the plans are selective. For example, the bankruptcy court found that "[m]any of the [SHC] plan participants made over $300,000 including each of the [Appellants]. The average employee salary at Steward appears to have been about $65,000." Ruling 39:18–20 (APPX_00950). That ratio—almost 5:1—is far higher than ratios found sufficient to make a plan selective in other cases. *See Demery*, 216 F.3d at 289 ("[T]he average salary of plan participants was more than double that of the average salary of all [the company's] employees"). Same goes for the IASIS plan. "[T]he average participant in the plan [made] about five times the average salary of all the IASIS employees." Ruling 40:18–23 (APPX_00951).

Appellants' argument that the plans were not selective rests on what the bankruptcy court found to be an "outlier case," comparing the average salary of all employees to a plan's minimum qualifying salary. Ruling 45:10–17 (discussing *Daft v. Advest, Inc.*, No. 5:06-cv-1876, 2008 WL 190436 (N.D. Oh. Jan. 18, 2008), *rev'd on other grounds*, 658

F.3d 583 (6th Cir. 2011)).[5] That decision from a district court in a different circuit is the basis for Appellants' assertion that the bankruptcy court "ignored" evidence of eligibility thresholds. Br. 42–43. But the bankruptcy court did not ignore this evidence. It expressly considered and rejected Appellants' argument, which rests on a disfavored calculation method. *See* Ruling 44:2–46:7 (APPX_00955–57). And even using Appellants' skewed methodology, the plans were still primarily for highly compensated employees. *See id.* 45:22–25 (APPX_00956) ("I also adhere to Judge Ellison's wisdom that the prong should be viewed holistically…. [T]here's no set ratio that should be a gate keeper.").

Appellants also complain that Steward "made no inquiry as to whether any eligible employee had any actual management responsibilities." Br. 45. This is a red herring. Either compensation *or* management duties satisfies the selectivity test. So even if no participant had any management responsibility, the plans still would be "top hat" plans because, as the bankruptcy court found, they were "primarily for highly compensated employees." *Callan v. Merrill Lynch & Co.*, No. 09-cv-0566 BEN (BGS), 2010 WL 3452371, at *11 (S.D. Cal. Aug. 30, 2010); *see also Sikora v. UPMC*, 876 F.3d 110, 114 (3d Cir. 2017) (similar).

Appellants' contention that the bankruptcy court shifted the burden of proof to them is likewise incorrect. *See* Br. 31–38. The court unambiguously placed the burden on

---

[5] Appellants claim that two other cases also support their view. *See* Br. 45 (citing "the rule of the *Daft*, *Fishman*, and *Berry* decisions" for "the minimum compensation necessary for plan eligibility"). But *Fishman* expressly *rejected* this supposed "rule," holding that it was "unsound" because even "if a few of the lowest compensated Plan participants were to be viewed as missing the mark … the 'primarily' standard called for by Section 1051(2) would still be satisfied, and their exclusion would cause an even higher multiple to be generated as to the remaining lowest paid participants." *Fishman v. Zurich Am. Ins. Co.*, 539 F. Supp. 2d 1036, 1046 (N.D. Ill. 2008). And *Berry* said nothing about using minimum eligibility as a threshold. *See Berry v. Wells Fargo & Co.*, No. CV 3:17-00304-JFA, 2018 WL 9989652, at *4 (D.S.C. Oct. 10, 2018).

Steward. *See* Ruling 29:18–21 (APPX_00940) ("Steward had the burden of proving matters today…. They've done so in my opinion by more than a preponderance of the evidence.").

### C.    The bankruptcy court accounted for bargaining power

Both statutory prongs are satisfied, so the deferred compensation plans are top hat plans. Appellants argue the bankruptcy court erred by not applying a purported "distinct" third factor of "bargaining power"—one wholly absent from ERISA's text. Br. 34, 41–44; 29 U.S.C. § 1101(a)(1) (exempting top hat plans from ERISA coverage). Appellant's position is foreclosed by *Reliable Home*—controlling Fifth Circuit precedent—which enumerates two and only two requirements for a "plan [to] qualif[y] as a top hat plan." 295 F.3d at 512.

The bankruptcy court deemed bargaining power "a consideration" in the selectivity analysis but found "nothing in [ERISA's] text implying that selectivity requires finding influence of the employee or bargaining power." Ruling 35:4–37:7 (APPX_00946–48). Appellants asked the bankruptcy court to substitute "textual analysis" with "the purpose of the statute," *id.* 58:8–10 (APPX_00969). They renew that request here. *See* Br. 41–42 (criticizing the "Bankruptcy Court's 'text is alpha' mantra"). But "the text of a law controls over purported legislative intentions unmoored from any statutory text; the Court may not replace the actual text with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (internal quotation marks and citation omitted); *see also Barr v. SEC*, 114 F.4th 441, 452 (5th Cir. 2024) ("[A] statute's

purpose may not override its plain language." (citation omitted)), *petition for cert. filed*, No. 24-1233 (U.S. Mar. 28, 2025).

The purported bargaining-power factor is rooted in a Department of Labor opinion letter. But that letter "does not require that participants in a top-hat plan possess bargaining power." *Sikora*, 876 F.3d at 115–16. "Rather than suggest that courts inquire into whether a particular participant wielded the requisite level of 'bargaining power,' the opinion letter observes that participants in top-hat plans were deemed by Congress to possess bargaining power '*by virtue of their position or compensation level*.'" *Id.* at 116 (emphasis added); *see also Alexander*, 513 F.3d at 47 (declining to "depart from the plain language of [ERISA] and jerry-build onto it a requirement of individual bargaining power" and explaining that the opinion letter "does not present itself as an interpretation of [ERISA]'s requirements" or indicate employers need to "demonstrate their employees' ability to negotiate the terms of deferred compensation plans").[6]

In other words, ERISA exempts top hat plans *because* participants satisfying the two-part test possess bargaining power; it does not require a standalone showing of it. *Cf. Tolbert*, 2015 WL 2138200, at *8 ("'substantial influence' … is but one part of the selectivity issue as a whole, and is not a determinant factor in isolation from consideration of other selectivity factors").

---

[6] The bankruptcy court also did not rely on the opinion letter because *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) "confirmed that courts should … not give elevated prominence to any … agency guidance." Ruling 36:13–17 (APPX_00947).

*      *      *

After weighing the testimony of eleven witnesses and admitting hundreds of exhibits, the bankruptcy court found the deferred compensation plans were unfunded and selective. That checks all the boxes to make them top hat plans. *See Reliable Home*, 295 F.3d at 512. The plans are therefore "exempt from ERISA's fiduciary duties," *id.*, so the bankruptcy properly directed the trustees to turn over the trust assets to Steward to be included in Steward's bankruptcy estates.

## II. Appellants' Jurisdictional, Procedural, and Evidentiary Objections All Fail

Appellants' attempt to shoo the Court away from the ultimate question on appeal— whether the plans are top hat plans. In fact, Appellants do not get around to explaining what a top hat plan is until their *seventh* argument point. *See* Br. 31. They devote most of their arguments to miscellaneous jurisdictional, procedural, and evidentiary objections. All these objections fail.

### A. The bankruptcy court had jurisdiction to decide whether the plans are top hat plans

#### 1. Appellants' eleventh-hour motion to withdraw the reference did not deprive the bankruptcy court of jurisdiction

In their first jurisdictional challenge, Appellants assert that, because they moved to withdraw the reference from the bankruptcy court in a separate proceeding, the "Bankruptcy Court was … barred under Article III from issuing that ruling" in the contested matter. Br. 19. That is incorrect. Nothing barred the bankruptcy court from granting the Turnover Motion. Certainly not the Constitution.

Recall that, as the hearing on the Turnover Motion was about to begin, Steward was running out of cash to administer the bankruptcy estates and the rabbi trust assets were its only viable source of liquidity. Delaying Steward's use of those assets would have jeopardized the bankruptcies and could have forced Steward to settle just to get timely access to its own property. Appellants knew of Steward's financial need and set out to weaponize it. Just eight days before the scheduled hearing date in the contested matter, they filed a new copycat adversary proceeding, which, in their own words, had "near-complete legal and factual overlap" with the contested matter that was about to go to trial. Adv. Proc. No. 25-03066 (CML), Doc. No. 19 ¶ 30 (SUPP.APPX_00121–22). They simultaneously moved to withdraw the reference in the adversary proceeding. As the bankruptcy court observed, "one could construe [the adversary proceeding] as an effort to delay a hearing on the [Turnover] [M]otion." Ruling 9:11–16 (APPX_00920).

According to Appellants, Article III of the Constitution made their delay strategy a sure winner. As Appellants tell it, anyone can grind bankruptcy proceedings to a halt at any time by moving to withdraw the reference at the eleventh hour. A withdrawal motion, Appellants insist, prohibits a bankruptcy court from deciding any issue that would moot or otherwise "interfere with" the district court's resolution of the motion to withdraw the reference. *See* Br. 17–19. No court has ever endorsed this view. Just the opposite: bankruptcy courts issue rulings that moot withdrawal motions all the time. Anyway, the issue Appellants raise is not even presented here. The bankruptcy court's resolution of the *contested matter* did not moot Appellants' motion to withdraw the reference in the *adversary proceeding*.

Appellants contend that "a bankruptcy court is … constitutionally barred from taking any action … that would … moot the district court's ultimate decision on [a] motion to withdraw the reference." Br. 17. But, in fact, bankruptcy courts routinely decide issues that moot motions to withdraw the reference. *See, e.g.*, *In re Lloyd*, 200 F.3d 815, 1999 WL 1095336, at *1 (5th Cir. 1999) (unpublished) (the "motion to withdraw reference of the adversary proceeding became a moot issue when the adversary proceeding was dismissed" by the bankruptcy court); *Gibbs v. Goddard Riverside Cmty. Ctr.*, No. 3:23-cv-1108, 2024 WL 554141, at *1 (M.D. Pa. Feb. 12, 2024) ("While this motion was pending the bankruptcy court dismissed the adversary complaint. Accordingly, the court must DENY the motion to withdraw the reference regarding that now dismissed adversary complaint as moot."); *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:22-CV-2802-B, 2023 WL 4768188, at *2 (N.D. Tex. July 26, 2023) ("[T]he bankruptcy court's order granting dismissal effectively resolves the adversary proceeding; nothing is left to withdraw."); *In re Lear Corp.*, 418 B.R. 47, 48 (S.D.N.Y. 2009) ("[A] bankruptcy court order dismissing an adversary proceeding moots a motion to withdraw reference."); *In re Byrnes*, No. 20-12086-t7, 2022 WL 17752369, at *1 (D.N.M. Dec. 19, 2022) (motion to reconsider denial of motion to withdraw reference was moot where bankruptcy court issued final judgment in underlying adversary proceeding).

As these cases illustrate, the mere filing of a motion to withdraw the reference does not paralyze the bankruptcy court, even in the proceeding that is the subject of the withdrawal motion. The Federal Rules of Bankruptcy Procedure say so expressly. *See* Fed. R. Bankr. P. 5011(c) (a motion to withdraw "does not stay proceedings in a case or affect

its administration"); *In re Eagle Enters., Inc.*, 259 B.R. 83, 86 (Bankr. E.D. Pa. 2001) ("The rule clearly states that the bankruptcy court is not required to abstain or stay proceedings pending the district[] court's decision on the motion to withdraw the reference."). A district court's *decision* to withdraw the reference in a given proceeding prevents the bankruptcy court from acting in that proceeding; a party's *motion* to withdraw the reference does not, as Rule 5011(c) states. Were Appellants correct, Rule 5011(c) would be unconstitutional. Needless to say, it isn't. Article III does not contain a no-mootness guarantee. Just as parties (or non-parties) can take steps that moot questions before an Article III court, so can a bankruptcy court.

Appellants' novel Article III argument is not only wrong, it's unpresented. Appellants sought to withdraw the reference only in their late-filed adversary proceeding, not in the contested matter. Second Emergency Motion ¶ 23 at n.4 (SUPP.APPX_00054). The bankruptcy court's ruling in the contested matter—*i.e.*, granting the Turnover Motion—did not moot the withdrawal motion in the separate adversary proceeding. The withdrawal motion addresses only which court—a bankruptcy court or a district court— should hear the adversary proceeding. That motion is not moot. The district court could still withdraw the reference and preside over the adversary proceeding.

To be sure, the adversary proceeding fails on the merits. It was dead on arrival because it raised the same issues as the already pending contested matter. But that is true regardless of which court hears the adversary proceeding. The Turnover Order precludes re-litigation of the same issues in the adversary proceeding; it does not dictate whether a district court rather than a bankruptcy court must be the one to hold it is precluded.

22

Because no authority supports Appellants' argument that Article III forbids mooting withdrawal motions, they hang their hat on a completely irrelevant decision from a different circuit. *See* Br. 17–18. *In re Parklane/Atlanta Joint Venture*, 927 F.2d 532 (11th Cir. 1991) did not involve mootness at all. The Eleventh Circuit there held only that a motion to dismiss, which at that time could not be appealed, had to be decided by a district court in the first instance. *Id.* at 536–38. In other words, because only one court could ever address the issue, the Eleventh Circuit held it should be an Article III court. *Id.* at 534, 538. No such issue is presented here—or anywhere at this point. *See In re Camden Ordnance Mfg. Co. of Ark., Inc.*, 245 B.R. 794, 805 n.11 (E.D. Pa. 2000) ("Notably, § 305 now permits appeal to a district court, thus negating the problem described in *Parklane/Atlanta*.").[7] If the adversary proceeding is dismissed, Appellants are free to appeal that dismissal, just as they are appealing the Turnover Order to this Court. Unlike in *Parklane*, the doors to an Article III court are wide open.

Even if Appellants were right that their withdrawal motion created an Article III problem, Appellants' consent to the bankruptcy court's jurisdiction would cure it. Appellants consented to the bankruptcy court's jurisdiction in the contested matter by litigating there until the eve of trial. As the Supreme Court explained after *Parklane*, "Article III is not violated when the parties knowingly and voluntarily consent to

---

[7] If *Parklane* swept as broadly as Appellants contend, that would be news to the courts in the Eleventh Circuit, which continue to recognize "that no stay is created simply as a result of the filing of a motion for withdrawal of the reference." *In re Perfect Home, L.L.C.*, 231 B.R. 358, 361 (Bankr. N.D. Ala. 1999).

23

adjudication by a bankruptcy judge," and this remains true if the consent is "implied" rather than express. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669, 683–85 (2015).

By consenting to resolution of the Turnover Motion as a contested matter, Appellants necessarily consented to the bankruptcy court's jurisdiction. Steward filed the Turnover Motion in November 2024. If Appellants believed that the bankruptcy court could not resolve the matter at all, they could have moved to withdraw the reference then. They did the opposite: Appellants created a contested matter by filing the Turnover Objection and asked the bankruptcy court to "defer a ruling on the Turnover Motion until" Appellants had "the opportunity to take discovery …." Turnover Objection ¶ 36 (APPX_00497–98); *see also id.* ¶ 7 (APPX_00485) (similar).

The bankruptcy court gave them what they wanted—deferring its ruling to accommodate discovery and a trial—but now Appellants won't take yes for an answer. As the bankruptcy court observed, Appellants "expressed no hesitation about proceeding as a contested matter rather than an adversary proceeding" in this case, Ruling 9:4–10 (APPX_00920), much less with proceeding before the bankruptcy court in either instance. Now, after losing at trial, Appellants want to start over again. It's too late for that.

### 2. The contested matter is a core proceeding and, regardless, Appellants consented to resolution by the bankruptcy court

Appellants next contend that the bankruptcy court could not decide the contested matter because it supposedly had only non-core "related to" jurisdiction. Br. 19–20. Not so. Because the Turnover Motion is a core proceeding, the bankruptcy court was authorized

to enter final judgment. And once again, even if it weren't, Appellants consented to the bankruptcy court's resolution of the contested matter.

A bankruptcy court's authority to enter judgment depends on whether the proceeding is core or non-core. *Sharif*, 575 U.S. at 670–71 (citing 28 U.S.C. §§157(b), (c)). Congress in Section 157(b)(2) listed sixteen nonexclusive types of core proceedings, "in which it thought bankruptcy courts could constitutionally enter judgment." *Id.* at 670.

The issues presented in the contested matter are core, permitting the bankruptcy court to enter final judgment. For starters, Congress expressly designated "orders to turn over property of the estate" as core proceedings. *See* 28 U.S.C. § 157(b)(2)(E). That was precisely the relief Steward sought with the Turnover Motion. Accordingly, numerous courts recognize that cases involving the determination whether deferred compensation plans constitute top hat plans are core proceedings. *In re Wash. Mut., Inc.*, 450 B.R. 490, 493–94 (Bankr. D. Del. 2011) (motion "to terminate [deferred compensation] [p]lans and their related trusts and to exercise ownership rights in the trust assets" is "a core proceeding"); *In re The Colonial BancGroup, Inc.*, 436 B.R. 695, 698 (Bankr. M.D. Ala. 2010) (addressing "whether the debtor's deferred compensation plan is a 'top hat' plan" and explaining that "because the dispute at issue concerns whether the assets of the plan are property of the debtor's estate, this is a core proceeding").[8]

---

[8] *See also Alpha Nat. Res.*, 554 B.R. at 790–91, 793–98 (similar); *In re Battram*, 214 B.R. 621, 622–23 (Bankr. C.D. Cal. 1997) (similar); *In re Bill Heard Enters., Inc.*, 419 B.R. 858, 860, 863–67 (Bankr. N.D. Ala. 2009) (similar); *In re New Century Holdings, Inc.*, 387 B.R. 95, 100–06 (Bankr. D. Del. 2008) (similar).

More broadly, "[v]arious courts have concluded that matters requiring a declaration of whether certain property comes within [11 U.S.C. §] 541's definition of 'property of the estate' are core proceedings." *New Century*, 387 B.R. at 105 (collecting cases); *see also Colonial BancGroup*, 436 B.R. at 698; *In re Envision Healthcare Corp.*, 655 B.R. 701, 709 (Bankr. S.D. Tex. 2023) ("A proceeding to determine whether a debtor's interest in property is 'property of the estate' is a core proceeding …. This is as core of a proceeding as it gets in bankruptcy."); *In re Royce Homes, LP*, 652 B.R. 488, 495–96 (Bankr. S.D. Tex. 2023); *In re Point Blank Sols., Inc.*, 449 B.R. 446, 449 (Bankr. D. Del. 2011). That these proceedings involve other non-bankruptcy legal issues, such as the application of ERISA, does not change this fact. *See Point Blank Sols.*, 449 B.R. at 449–50 (collecting cases).

Appellants tellingly cite no authority to the contrary. *See* Br. 19-20. They merely state in conclusory fashion that the proceeding must be non-core because it is "based entirely in ERISA." Never mind that in numerous core proceedings, bankruptcy courts have addressed the same issues presented by the Turnover Motion. *See, e.g.*, *Alpha Nat. Res.*, 554 B.R. at 790–91, 793–98; *New Century*, 387 B.R. at 100–03, 109–13; *Colonial BancGroup*, 436 B.R. at 703–13. Or that Appellants' counsel litigated other top hat cases in bankruptcy court. *See* Mar. 7 Hr'g Tr. 53:18–19 ("MR. KEACH: …. I mean, I'll be candid. The only difference between this and *New Century* and *Nortel* is, we asked [for withdrawal of the reference] here, we didn't ask there.").

Even if this weren't a core proceeding, nothing would change. In non-core proceedings, bankruptcy courts may still enter final judgment "with the consent of all the parties to the proceeding." *Sharif*, 575 U.S. at 671 (quoting 28 U.S.C. § 157(c)(2)); *see also*

*Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 38 (2014) (Section "157 permits a bankruptcy court to adjudicate a claim to final judgment … in non-core proceedings 'with the consent of all the parties.'" (quoting 28 U.S.C. § 157(c)(2)). It is only "[a]bsent consent" that "bankruptcy courts in non-core proceedings" must "'submit proposed findings of fact and conclusions of law,' which the district courts review *de novo*." *Sharif*, 575 U.S. at 671 (quoting 28 U.S.C. § 157(c)(1)).

This was a core proceeding so no consent was needed. But regardless, as discussed *supra* II.A.1, Appellants consented to the bankruptcy court's jurisdiction. *See also* Mar. 7 Hr'g Tr. 69:15–17, 71:11–21; Ruling 9:4–10 (APPX_00920), 24:19–25 (APPX_00935). So even if the proceeding was non-core, the bankruptcy properly entered judgment.

### B. The bankruptcy court soundly rejected Appellants' procedural delay tactics

#### 1. The bankruptcy court properly resolved the Turnover Motion in the contested matter

Eight days before the scheduled hearing date in the contested matter, Appellants filed a duplicative adversary proceeding raising the same issues and demanded that the bankruptcy court start again in that new proceeding—a delay Appellants knew would prevent Steward from accessing the rabbi trust assets when Steward needed liquidity. Contrary to Appellants' contentions (Br. 14–17), the bankruptcy court properly resolved the Turnover Motion in the contested matter rather than in the late-filed adversary proceeding. No adversary proceeding was required because the parties holding the property—the trustees—consented to the requested relief. Regardless, Appellants waived

any right to an adversary proceeding by consenting to the bankruptcy court's resolution of the Turnover Motion as a contested matter.

The Turnover Motion sought an order directing the trustees of the rabbi trusts to turn over the trust assets to Steward. The trustees did not oppose the motion or dispute that Steward owned the assets. As the bankruptcy court observed, "I don't need to force the Trustees…. [T]he Trustees are not objecting." Ruling 24:1–2 (APPX_00935).

Accordingly, "[n]o adversary proceeding was required in this case because the party holding the Debtors' property consented to the relief. An adversary proceeding to 'recover money or property' is only required *when the party holding the property* contests the estate's entitlement to the property and refuses to return it." *Alpha Nat. Res.*, 554 B.R. at 799–800 (emphasis added) (no adversary proceeding required because trustee of rabbi trust did not contest debtors' turnover motion). "Nothing in the Federal Rules of Bankruptcy Procedure requires the commencement of an adversary proceeding every time a voluntary turnover of estate property is requested." *Id.* at 800; *see also* Hr'g Tr. 33:23–34:10, *In re RTI Holding Co.*, No. 20-12456 (Bankr. D. Del. Nov. 12, 2020), Doc. No. 425 ("[S]ince the trustee is not objecting to the relief and the trustee is the one who holds the property, there's no need to proceed by adversary and [the dispute] can proceed by motion in the form of a contested matter.").

Appellants claim an adversary proceeding was required because "*Appellants …* claimed exclusive rights to the Plan Assets." Br. 15 (emphasis added). But Appellants did not hold those assets, so Appellants had nothing to turn over. And the parties who did hold

28

the property—the trustees—did not object to the Turnover Motion. A contested matter was therefore the appropriate vehicle.

Even if an adversary proceeding were required, Appellants waived their right to demand one. "[T]he Fifth Circuit has ruled that a non-debtor third party may implicitly consent to litigating a turnover motion without the necessity of an adversary proceeding in instances 'when the court afforded them all the protections of an adversary proceeding yet they knowingly failed to litigate a Rule 7001 issue ....'" *In re McCray*, No. 14-10124, 2018 WL 6422719, at *3 (Bankr. W.D. La. Dec. 4, 2018) (quoting *In re Zale Corp.*, 62 F.3d 746, 763 (5th Cir. 1995)); *see also In re Ulmer*, 203 F.3d 828, 1999 WL 1240788, at *1 (5th Cir. 1999) (unpublished) (appellant "waived any objection [to resolving turnover motion in contested matter rather than adversary proceeding] because he had notice of the … motion and failed to object").

Courts find waiver in situations like this one, where "the parties are apprised of and have a chance to address all the issues being decided." *In re Haber Oil Co.*, 12 F.3d 426, 440 (5th Cir. 1994); *see also In re Downey Reg'l Med. Ctr. Hosp, Inc.*, 441 B.R. 120, 127 (B.A.P. 9th Cir. 2010) (reviewing a bankruptcy court's decision not to require an adversary proceeding for harmless error and explaining that "[t]he question then is whether some procedural difference between contested matters and adversary proceedings prejudice[s]" the creditor). Appellants have identified no prejudice, nor could they.

As discussed *supra* II.A.1, Appellants could have requested an adversary proceeding in November 2024, when Steward filed the Turnover Motion. They didn't. They barely breathed a word about adversary proceedings, merely stating in passing that

they might later file a class action. Turnover Objection 1 n.2 (APPX_00480); *see also* Ruling 24:19–22 (APPX_00935) (Appellants' "objection raised no contested versus adversary case issues."). The parties then engaged in discovery for months, during which Appellants "expressed no hesitation about proceeding as a contested matter rather than an adversary proceeding." Ruling 9:7–13 (APPX_00920). Then, eight days before the hearing in the contested matter, they filed an adversary proceeding raising the same issues. As the bankruptcy court found, "requesting an adversary proceeding at this point … has been waived." Mar. 7 Hr'g Tr. 71:12–14.

### 2.    The bankruptcy court did not abuse its discretion by denying Appellants' stay motions

The eleventh-hour adversary proceeding was not Appellants' only delay tactic. They also filed multiple motions to stay or adjourn the contested matter. Without citing any authority, Appellants argue that the bankruptcy court abused its discretion by denying these motions. Br. 20–22. That is incorrect. The "compressed timetable" Appellants complain of was largely their own fault. They received ample discovery with sufficient time before the hearing to make use of it. And the bankruptcy court had already postponed the hearing to allow more discovery. It was not required to do so again.

The gist of Appellants' stay motions is that they wanted more time to conduct discovery. *See* Br. 20 ("stay … to allow proper discovery"). That triggers a highly deferential standard of review. Bankruptcy courts' discovery decisions are reviewed for abuse of discretion, as are decisions denying a stay. *In re Linn Energy, L.L.C.*, 936 F.3d 334, 345 (5th Cir. 2019); *see also In re Equinox Oil Co.*, No. 00-3502, 2001 WL 649806,

at *14–15 (E.D. La. June 11, 2001), *aff'd*, 300 F.3d 614 (5th Cir. 2002). The bankruptcy court's decisions must be affirmed "unless they are arbitrary or clearly unreasonable." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 876 (5th Cir. 2000). It is therefore "unusual to find an abuse of discretion in discovery matters." *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 936 F.3d 251, 255 (5th Cir. 2019).

The bankruptcy court acted well within its discretion when it rejected Appellants' efforts to delay the Turnover Motion hearing. The "compressed timetable" Appellants complain of resulted from their own strategic delay. They waited until March 7, only two business days before the scheduled hearing of March 11, to raise objections because they expected the court would postpone the hearing. The court did so with reservation, expressing concern about Appellants' "potential weaponization of the debtors' financial need." Mar. 7 Hr'g Tr. 70:7–8.

As the bankruptcy court found, Appellants "sat on their rights" by failing to seek discovery relief for nearly four months, until the eve of trial. *Id.* 50:22–51:3. Calling out Appellants' delay, the court noted that "[w]hat is abundantly clear is that no one informed this Court about any of these issues." *Id.* 68:18–25. It emphasized that it "would have considered motions to compel. I would have considered motions to continue hearings. I would have done it all." *Id.* 69:4–8. Appellants' own dilatory conduct and gamesmanship are not grounds for overturning the court's considered rulings on discovery disputes.

Contrary to Appellants' claims of "discovery abuse" (Br. 20), Steward provided documents to Appellants expeditiously. Appellants filed their first discovery request on December 24, 2024, and amended it on December 30, 2024. *See* Bankr. Doc. No. 3560;

3581 (SUPP.APPX_00023; APPX_01190). Steward made an initial production on January 2, 2025, only 3 days later. That first production contained crucial information, including plan documents, trust materials, and communications sent to plan participants regarding enrollment and eligibility criteria for the SHC Plan. The January 2 production also included a substantial portion of the key exhibits used by both sides at the hearing. *See* Bankr. Doc. No. 4331 (SUPP.APPX_00092) (referencing Exhibits 1, 2, 3, 6, 7, 9, 12, 19, 27, 28, 30, and 32).

By mid-February, Steward provided, among other important documents, a complete census of all Steward employees, with salary and job description information, as well as a census of all Steward employees eligible to participate in the plan. In short, more than a month before the hearing, and only two months after serving their discovery requests, Appellants had virtually everything they needed, and everything an expert would need, to evaluate the top hat plans.

Appellants complain that they faced a "document[] dump" in March. Br. 21. But the production they refer to—made nearly three weeks before the hearing—resulted from Appellants' overbroad discovery requests, which Appellants refused to narrow.  Bankr. Doc. No. 4144 ¶¶ 54–56 (APPX_01309–10). Steward made rolling productions of thousands of responsive (but immaterial, and irrelevant) emails, yet Appellants continued to complain of "incompleteness." *See id.* (APPX_01309–10). Of the documents produced, only a handful were used either in depositions or at trial—because the emails were largely unrelated to the questions addressed at the hearing. What mattered was who was eligible

for the top hat plans, how those plans were funded, and how they were administered—the subject of the materials produced before March.

Appellants also deposed all the key witnesses. There were no additional witnesses under Steward's control with any material knowledge. The trial witnesses made clear that they were the ones responsible for the operation of the plan during the relevant period, and that no other current Steward employees were involved in decision making. *See, e.g.*, Doc. No. 3 Ex. 2, Mar. 26 Hr'g Tr. 91:22–92:4 (APPX_00107–08) (Mr. Lombardo testifying that he spoke only to Ms. Driscoll and Mr. de la Torre about SHC Plan eligibility); Bankr. Doc. No. 4229 ("Driscoll Decl.") ¶¶ 23–24 (APPX_00737–38) (Ms. Driscoll spoke only to Mr. Lombardo and counsel about changes to eligibility).

And though Appellants do not acknowledge it, the bankruptcy court *did* give them extra time for discovery. Originally, the hearing was scheduled for March 11, 2025. Appellants raised concerns with the court about discovery for the first time on March 7. The court, despite its reservations regarding Appellants' tactical delay, granted them an additional 15 days of discovery. Mar. 7 Hr'g. Tr. 70:9–71:2.

The bankruptcy court's discovery rulings were not an abuse of discretion and would not be reversible error even if they were. "Even if a [lower] court abuses its discretion, the reviewing court will not overturn its ruling unless it substantially affects the rights of the appellant." *DataTreasury,* 936 F.3d at 256. An appellant must show, at a minimum, what relevant evidence it expected to uncover with additional discovery. *Moore*, 233 F.3d at 876. Appellants do none of this. The bankruptcy court did not deny Appellants due process; they

obtained all the key documents and testimony and were granted additional time despite their own strategic delay.

### C. The bankruptcy court did not abuse its discretion by rejecting Appellants' evidentiary objections

Appellants challenge the bankruptcy court's credibility determinations regarding expert testimony and the court's refusal to allow Appellants to use privileged materials at trial. These challenges also fail.

### 1. The bankruptcy court properly admitted and relied on Steward's expert's testimony, which was corroborated by Appellants' own expert

Steward's expert, Dr. Krock, demonstrated at trial that the deferred compensation plans were selective, with Appellants earning four to five times as much as the average Steward employee. Ruling 43:7–12 (APPX_00954). The bankruptcy court found that Dr. Krock was "credible" and that his methodology was "approved" by caselaw. *Id.* 41:19–21 (APPX_00952), 43:1–2 (APPX_00954). The court also considered the testimony of Appellants' expert, Mr. Van Meter, and "didn't find that [his results] differed materially from [K]rock's numbers." *Id.* 43:21–23 (APPX_00954). "[I]n fact, if one uses the [Van Meter] eligible employee numbers in the [K]rock ratio calculations, the ratio remains around four times [the average salary]." *Id.* 43:25–44:2 (APPX_00954–55). So, as the court found, both experts' analyses showed the plans were selective.[9]

---

[9] Mr. Van Meter attempted to skew these results by using an unreliable methodology the bankruptcy court found to derive from "an outlier case" "that's not cited much." Ruling 45:10–16 (APPX_00956).

Appellants claim that salary data "provided to [Steward's expert] Dr. Krock—and Appellants' expert [Mr. Van Meter]—was incorrect and unreliable." Br. 28. According to Appellants, the bankruptcy court was required to completely exclude Steward's expert testimony because of supposedly flawed data yet was also required to adopt every word of Appellants' expert testimony based on almost exactly the same data. *See id.* 29–31. The bankruptcy court properly rejected this attempt at gamesmanship. *See, e.g.*, Mar. 26 Hr'g Tr. 233:5–234:18 (APPX_00249–50) ("THE COURT: So, if Krock doesn't testify, does Van Meter testify then? [COUNSEL FOR APPELLANTS]: … You need expert testimony …. I think you can strike Dr. Krock's preferred testimony, and Mr. Van [Meter] can still testify. THE COURT: I'm sure you do. I know you do. (Laughter.) THE COURT: … I'm going to overrule the objection …. I think everybody testifies and we see where this goes.").[10]

Appellants can't have it both ways.  If the data were good enough for Appellants' expert to rely upon, they were good enough for Steward's expert to rely upon. The only difference in the data available to the experts at the time of their reports was plainly immaterial. Between the time Steward's expert submitted his report and the time Appellants' expert submitted his report, Steward discovered that some of the data its expert relied on was in draft form and that final data was available—which Steward then

---

[10] Appellants' contention that it was "clear legal error" for the bankruptcy court to "not immediately exclude[e]" testimony from Debtors' expert before it "heard the testimony," Br. 29, is unsupported by case law and directly contrary to well-established practice in bench trials. *See, e.g.*, *Ciavarra v. BMC Software, Inc.*, CIV. A. H-07-0413, 2008 WL 352273, at *5 (S.D. Tex. Feb. 7, 2008) ("Because this is a bench trial and because Defendants can challenge Easley's and McCrary's opinions during cross-examination, the Court denies the Motion to Exclude.").

produced. Bankr. Doc. No. 4323-3, Potter Tr. 14:15–25 (APPX_01006). Steward's expert testified that he did not "adjust [his] expert opinion … based on those new files" because "it would not make … a material difference …."  Mar. 26 Hr'g Tr. 242:2–243:2 (APPX_00258–59).

Tellingly, Appellants do not claim the differences *were* material. The mere fact that some data were updated after Dr. Krock's report is not grounds to exclude his opinion. *See, e.g.*, *In re Citimortgage, Inc. Home Affordable Modification Program ("HAMP") Litig.*, No. ML 11-2274 DSF (PLAx), 2013 WL 8844095, at *2 (C.D. Cal. Oct. 7, 2013) ("The question under *Daubert* is not whether an expert's report relies on and analyzes perfect data—if that were the inquiry, there would be no data-based expert testimony in federal court—but rather whether an expert's report is sufficiently reliable to warrant consideration."), *aff'd*, 637 F. App'x 471 (9th Cir. 2016); *Allen v. Int'l Truck & Engine Corp.*, No. 1:02-cv-00902-2RLY-MJD, 2017 WL 1382610, at *8 (S.D. Ind. Apr. 18, 2017) ("These discrepancies show that the data is not perfect, but that does not make [the] testimony wholly unreliable under *Daubert*."). "As one Court of Appeals has stated, trial judges are gatekeepers, not armed guards." 29 Wright & Miller's Federal Practice & Procedure § 6268.2 (2d ed. updated May 2025) (citing *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 86 (1st Cir. 1998)). Not only do Appellants cite no case law that supports their position, but the case law they do cite only further confirms that "reliable expert testimony often involves estimation and reasonable inferences from a sometimes incomplete record." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 516 (5th Cir. 2013).

Even if Appellants could show the bankruptcy court erred in admitting Dr. Krock's testimony, this Court's review of that alleged error would be "subject to a harmless error analysis," which places "[t]he burden of proving substantial error and prejudice … [on] the appellant." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 842 (5th Cir. 2004). Appellants do not acknowledge this burden, much less make any effort to satisfy it. Any purported error in admitting or relying on Dr. Krock's testimony was clearly harmless because Appellants' expert's analysis of the data was not materially different. *Compare* Bankr Doc. No. 4258 (APPX_01337) (Debtors' expert's report showing ratios of eligible employee salaries to all employee salaries of between 4.4 and 4.6 depending on the year); Mar. 26 Hr'g Tr. 337:3–7 (APPX_00353) (Appellant's expert testifying that when he "attempt[ed] to replicate Dr. Krock's calculations" none of the "eligible versus total salary ratios … fall below 4 ….").

### 2. The bankruptcy court properly discounted Appellants' expert's testimony to the extent he relied on a fabricated assumption given to him by Appellants' counsel

The report by Appellants' expert, Mr. Van Meter, stated that, based on IRS guidelines and the federal minimum wage, *"$11,310"* was "the threshold for determining the minimum compensation for full time employment." Bankr. Doc. No. 4323-10 ("Van Meter Report") 13 (APPX_01443) (emphasis added). On the same page, Mr. Van Meter stated incongruously that he "was asked to exclude any employee with a salary less than *$35,000* as an approximate cutoff for the minimum compensation level for full-time employees." *Id.* (APPX_01443) (emphasis added). When asked about this obvious discrepancy, Mr. Van Meter testified that the $35,000 assumption came from Appellants'

counsel—who told him "they believed they had seen some testimony or something that indicated that the lowest full-time employee salary at Steward … was … between $35- and $40,000." Counsel later told the expert "they couldn't find [the] document or deposition testimony they thought they'd seen," but nevertheless "asked [him] … to just make that assumption" "instead" of "find[ing] the supporting data for it …." Mar. 26 Hr'g Tr. 345:6–346:2 (APPX_00361–62).

The bankruptcy court properly declined to credit this unsupported assumption. The court noted that "[Appellants' expert] testified that counsel told him that there was a document that supported his $35,000 exclusion assumption.  But [he] never saw it.  [And] neither did the Court." Ruling 44:14–17 (APPX_00955). Indeed, based on the data in the record, Appellants' expert conceded that he had no "reason to doubt that there were full-time employees at Steward … making under $35,000 in a year[.]" Bankr. Doc. No. 4344 ("Van Meter Deposition") 106:18–24 (filed under seal).

Appellants ignore these portions of the record and now claim their expert was "advised by Appellants' counsel to make [the $35,000] assumption [because it] would be supported by future discovery." Br. 30. And Appellants now insist it "is unquestioned" that "the actual minimum annual salary" for full-time employees at Steward was "$36,400 (which equals 2080 hours at the Massachusetts minimum wage rate of $17.50 per hour)." Br. 30–31 & n.10. But the "evidence" Appellants cite was testimony by Appellants' expert that was not in his report and was stricken by the bankruptcy court, and, therefore, is not part of the record. *See* Mar. 26 Hr'g Tr. 347:9–18 (APPX_00363) (sustaining motion to strike).

In any event, the stricken testimony inaccurately summarized testimony by a Steward employee. The Steward employee did not testify that, no matter what state an employee was based in, "for purposes of determining full-time employees, … [Steward] would look to the Massachusetts minimum wage, which is 17.50." Mar. 26 Hr'g Tr. 347:10–12 (APPX_00363). Rather, she testified that she did *not* "have any concept of what the lowest annual gross wages are for the … lowest paid full time employee at Steward" and could not determine it "without . . . looking at … some sort of report, but I think I would have an idea based on minimum wage." Potter Tr. 24:19–25:15 (APPX_01016–17). She then testified that, while *she did not know what the minimum wage was in Massachusetts or any other state in which Steward operated "[w]ithout . . . [g]oogling" it*, she thought it was "around" "$17 an hour *in Massachusetts*" and that she "assume[d] the "minimum wages differ[ed]" in other states. *Id.* 25:18–26:20, 182:4–19 (emphasis added) (APPX_01017–18, 01174).

In reality, the Massachusetts minimum wage is $15.00 per hour and the other primary states in which Steward did business have even lower prevailing minimum wages of $14.70 (Arizona), $13.00 (Florida), $11,00 (Arkansas), $10.70 (Ohio), and $7.25 (Louisiana, Pennsylvania, and Texas). *See id.* 182:4–12 (APPX_01174) (Steward had hospitals in each of these states); *State Minimum Wages Laws*, U.S. Department of Labor (updated Jan. 1, 2025).[11] Even assuming that Steward paid the Massachusetts minimum wage of $15 in every state—which nothing in the record supports—that would, under

---

[11] https://www.dol.gov/agencies/whd/minimum-wage/state.

Appellants' own methodology, at most justify an assumption of an exclusion for employees making under $31,200 ($15 x 2080), not $35,000. *See, e.g.*, Bankr. Doc. No. 4311-1 3–4 (filed under seal) (showing thousands of employees making less than $36,500).

### 3. The bankruptcy court properly did not admit privileged emails

During discovery, Steward inadvertently produced privileged emails containing legal advice from outside counsel. The emails did not and could not alter whether the plans were top hat plans—a determination made by the court based on the factual record establishing that the plans were unfunded and selective. Appellants knew the emails were likely privileged but—in violation of the protective order—did not sequester them or notify Steward. When Steward learned of the inadvertent production, it immediately sought to claw the emails back. Appellants now claim the bankruptcy court abused its discretion by not admitting the emails, and seek a new trial on this basis. Appellants falsely describe the emails as "case dispositive" and say they "mandated" a finding for Appellants. Appellants dispute (1) the inadvertence of the production; (2) the privileged nature of the emails; and (3) the lack of waiver of the privilege. Each argument fails.

### i    The emails were inadvertently produced

Under Federal Rule of Evidence 502(b), privilege is not waived by disclosure if (1) the disclosure is inadvertent; (2) the privilege holder took reasonable steps to prevent disclosure; and (3) the privilege holder promptly took reasonable steps to rectify the error. Fed. R. Evid. 502(b)(1)–(3). Steward has consistently maintained that the disclosure of attorney-client privileged emails was inadvertent. Steward withheld numerous other attorney-client communications as privileged. Steward engaged a team of document

reviewers who specifically sought to withhold privileged documents—a reasonable step. And as soon as Steward learned of the inadvertent disclosure, it immediately sought to claw back the documents, first verbally, then via email, and finally by motion to the court.

Appellants contend that Steward waived privilege because "weeks passed between the time that the Disputed Emails were Produced" and when Steward sought to claw back the privileged materials. Br. 24. That argument turns privilege upside down. The protective order in this matter required that, "[i]f the *Receiving Party* becomes aware during the review of any material that is likely to be privileged or subject to other protection, the *Receiving Party shall* within seven (7) days notify the Producing Party and sequester the material until the Producing Party has had a reasonable opportunity to respond." Bankr. Doc. No. 770 14 (emphasis added) (SUPP.APPX_00014). This requirement aligns with the Model Rules of Professional Conduct, which require that a "lawyer who receives a document … relating to the representation of the lawyer's client and knows or reasonably should know that the document … was inadvertently sent shall promptly notify the sender." Model Rule 4.4(b).

Appellants did not comply with the protective order or the model rule. They acknowledge that for "*weeks*" they *knew* they were looking at privileged documents, and neither notified Steward nor sequestered the materials. Br. 24 (emphasis added). Instead, Appellants used them in open court on March 7. *See* Mar. 7 Hr'g Tr. 41:12–17 (referring

to privileged materials); Bankr. Doc. No. 4203 ¶ 1 (APPX_00632). Appellants violated the protective order, and did not give Steward the opportunity to correct the error.[12]

Appellants' assertion of "delay" on Steward's part is also incorrect. At the March 7th hearing, Steward's counsel approached Appellants' counsel during a break, stated that the privileged materials had been inadvertently produced, and requested that they be destroyed. *Id.* ¶ 11 (APPX_00634). That evening, counsel emailed Appellants the same request and followed up again the next day. *Id.* ¶ 12 (APPX_00634–35). Appellants did not respond. *Id.* (APPX_00634–35). Steward then filed a motion on March 10, the next business day, seeking relief from the court. *Id.* ¶ 13 (APPX_00635). Appellants continued to use the materials, disregarding both the protective order and the model rule of professional conduct.[13]

Appellants argue the documents could not have been inadvertently produced because there were multiple copies of the same email. Br. 24. That ignores the reality of modern document review, where multiple documents may be tagged at once in the same way. Steward would not have produced any of the emails if the reviewers had correctly tagged them as privileged.

---

[12] Appellants argue that the bankruptcy court erred when it declined to consider Appellants' expert's opinion to the extent it was based on the privileged emails. Br. 29–30. This argument fails for the same reason as Appellants' contention that the privileged emails should have been admitted.

[13] Appellants' contention that Steward "fail[ed] to assert any objection *on the record* at the Stay Hearing as to the Disputed Emails" is misleading. Br. 24 (emphasis added). Steward's counsel made a claw-back demand *during a pause* in the proceedings. Bankr. Doc. No. 4203 ¶ 11 (APPX_00634).

Appellants further argue that the production could not have been inadvertent because relatively few documents were produced. Br. 24. But Steward had to comb through a mountain of emails from multiple custodians to respond to Appellants' overbroad document requests. That thirteen emails slipped through—a miniscule percentage of the documents reviewed—does not prove lack of care or attention. This circumstance is precisely why the protective order was entered; because in document-intensive cases like this one, mistakes happen. Had Appellants followed the procedures outlined in the protective order and the model rules, this entire episode could have been avoided. Appellants cannot use their own violations as a weapon to strip privileged materials of their protections.

### ii    The emails are not subject to the fiduciary exception

Appellants incorrectly rely on ERISA's fiduciary exception to contend the emails are not privileged. *See* Br. 25–27. Because "top hat plans are exempt from … ERISA fiduciary duties … the fiduciary exception to the attorney-client privilege has no bearing." *See Tolbert v. RBC Cap. Mkts., Corp.*, No. H-11-0107, 2012 WL 1067629, at *5 (S.D. Tex. Mar. 28, 2012). As the bankruptcy court found, the plans were top hat plans so the fiduciary exception is inapplicable.

Appellants argue the fiduciary exception applied at the beginning of the hearing, right up until the point the court rendered its decision. *See* Br. 26. In other words, because there was a period of time—as there necessarily is in every case—before the bankruptcy court had ruled on the merits as to top hat status, Appellants argue the fiduciary exception

43

applies by "default" and the privileged emails had to be admitted. *Id.* Not only has no case ever endorsed this approach, but the very cases Appellants cite squarely foreclose it. As this Court held in *Corona*, the party seeking to invoke the fiduciary exception has the burden of showing it applies, a burden Appellants did not even attempt to meet before the hearing. *See Corona v. Chevron Corp.*, No. H-07-3190, 2008 WL 11483069, at *5–6 (S.D. Tex. June 18, 2008) (the party "argu[ing] ... the fiduciary exception" applied "fail[ed] to establish that ERISA compels production of the … E-mail"); Br. 22–23, 27 (citing *Corona*, but ignoring this portion of the opinion).

If Steward had any burden prior to the bankruptcy court's ruling on the merits, it was only to make a *prima facie* showing that the plans were top hat plans, not to prevail at a trial that had not yet occurred. *See Tolbert*, 2012 WL 1067629, at *5 ("Defendants' pleadings and exhibits sufficiently show, *for the limited purpose of this discovery dispute only*, that the WAP is a top hat ERISA plan. Thus, the fiduciary exception does not apply.") (emphasis added)).[14] Consistent with *Tolbert*, at the outset of the hearing the bankruptcy court held that "as of right now there's a *prima facie* case" that the plans are top hat plans and, therefore, the privileged communications would be "sealed until [the Court] determine[d] otherwise." Mar. 26 Hr'g Tr. 12:10–22 (APPX_00028).[15]

---

[14] Appellants incorrectly claim *Tolbert* applies only at some unspecified "early stage of discovery[.]" Br. 27 n.9. As Steward explained when Appellants made this same argument to the bankruptcy court, the *Tolbert* decision was not made at an "early stage of discovery," *id.*, but several months after the already-extended discovery period had closed and after the deadline for dispositive motions. *See* Bankr. Doc. No. 4273, ¶ 18 (APPX_01383–84).

[15] Tellingly, no other cases Appellants cite even mentioned the burden of proof issue (at trial or for purposes of the fiduciary exception). *See* Br. 25–26 (citing *Crawford v. Guar. State Bank & Tr. Co.*,

Separately, as in *Tolbert*, documents—like the privileged emails—relating to "the amount of production and/or compensation that an employee needed to achieve, [annually], in order to be … eligib[le]" "fall outside the scope of the fiduciary exception" because they concern "the design, modification, or amendment, but not administration, of an ERISA plan." *Tolbert*, 2012 WL 1067629, at *4–5. As Appellants conceded below, the emails in question here are virtually identical to those in *Tolbert*: they address (in Appellants' own words) "the appropriate salary … threshold for eligibility," which is "set … annually." Bankr. Doc. No. 4216, ¶¶ 31–32 (APPX_00729). Appellants nevertheless claim, without authority, that because "the threshold for eligibility is not set forth in the Deferred Compensation Plans" and "does not require an amendment to the Deferred Compensation Plans," the fiduciary exception must apply. Br. 26. But, once again, that position is exactly the one rejected in *Tolbert*.

### iii        Steward did not waive the privilege

Citing no case law, Appellants argue that Steward "waived" attorney-client privilege when one of its former employees, Ann-Marie Driscoll, stated that she consulted with counsel as part of Steward's consideration of changing eligibility requirements for the SHC Plan. Br. 27. All Ms. Driscoll said was that she "sought legal advice related to the requirements of top hat plans and the meaning of 'highly compensated.'" Driscoll Decl. ¶

---

No. 22-2542-JAR-GEB, 2024 WL 2700668, at *6–8 (D. Kan. May 24, 2024); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992)).

23 (APPX_00737). Ms. Driscoll's simple statement—one sentence—is not a waiver because Steward did not use any privileged information offensively.

"The privilege is not waived" if a witness discusses the "general nature of legal services provided by counsel." *In re Fortune Nat. Res. Corp.*, 350 B.R. 270, 274–75 (Bankr. E.D. La. 2005) (citation omitted) (no waiver where a witness testified that "he did rely on [an] attorney's advice … but not specific communications"). "A general assertion lacking substantive content that one's attorney has examined a certain matter is not sufficient to waive the attorney-client privilege." *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989).

Ms. Driscoll did not say anything about the specific questions she asked the attorneys or the advice she received from them. Ms. Driscoll is not a legal expert so it is hardly surprising that she sought legal advice as part of her decision-making process. That she confirmed this unremarkable fact is not a privilege waiver. Her generic statement that she sought legal advice on a particular topic is the type of comment that would be included in a privilege log.[16] It cannot be that a witness stating the content of a privilege log entry waives privilege.

Steward never used advice of counsel offensively as a sword, as Appellants contend. *See* Br. 27. Steward did not ask the bankruptcy court to rely—nor did the court rely—on the advice of Steward's counsel to find the plans were top hat plans. The court made that

---

[16] *See* Fed. R. Civ. P. 26(b)(5)(A)(ii) (requiring that parties asserting privilege "describe the nature of the documents … and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim").

determination based on the extensive factual record before it. Steward did not waive any privilege.

## CONCLUSION

For all the foregoing reasons, the Court should affirm the judgment of the bankruptcy court.

Dated: July 28, 2025
Houston, Texas

*/s/  Clifford W. Carlson*

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Gabriel.Morgan@weil.com
       Clifford.Carlson@weil.com
       Stephanie.Morrison@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Gregory Silbert (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Jeffrey.Saferstein@weil.com
        Greg.Silbert@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:  DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

-and-

**GROOM LAW GROUP, CHARTERED**
Samuel I. Levin (admitted *pro hac vice*)
David N. Levine (admitted *pro hac vice*)
Shai D. Bronshtein (admitted *pro hac vice*)
Emily M. Gerard (admitted *pro hac vice*)
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 857-6648
Fax: (202) 659-4503
Email:  slevin@groom.com

*Attorneys for Debtors*
*and Debtors in Possession*

48

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. Bankr. P. 8015(h) that this document complies with the type-volume limitation of Fed. R. Bankr. P 8015(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 12,980 words.

This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5), the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) and this Court's Procedures because this document has been prepared in a proportionally spaced type-face using Times New Roman font in 13 point size.

/s/     *Clifford W. Carlson*

Clifford W. Carlson

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025 a true and correct copy of the foregoing was electronically served on all parties registered to receive electronic notice in this case pursuant to the Court's CM/ECF filing system.

/s/    *Clifford W. Carlson*

Clifford W. Carlson