UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CIVIL NO.  4:25-CV-01584

Bankruptcy Case No. 24-90213

IN RE STEWARD HEALTH CARE SYSTEM, LLC, ET AL., Debtor

REPLY BRIEF OF APPELLANTS

Dated: August 11, 2025

DR. MANISHA PUROHIT, DR. DIANE PAGGIOLI,
DR. JAMES THOMAS, DR. THOMAS ROSS, DR.
MICHAEL REGAN, DR. PETER LYDON, DR.
SRIDHAR GANDA, DR. A. ANA BEESEN, DR.
BENOY ZACHARIAH, DR. BARRY ARKIN, DR.
BRUCE KRIEGEL, and DR. GARY MILLER

By their attorneys:

Allan B. Diamond, Esq.
Christopher D. Johnson, Esq.
Diamond McCarthy, LLP
2200 Post Oak Boulevard, Suite 1000
Houston, TX 77056-4716
Telephone: (713) 333-5100
Facsimile: (713) 333-5199
Email: allan.diamond@diamondmccarthy.com
        chris.johnson@diamondmccarthy.com

Robert J. Keach, Esq, *admitted pro hac vice*
Lindsay K. Milne, Esq.
Letson D. Boots, Esq., *admitted pro hac vice*
Jennifer Novo, Esq., *admitted pro hac vice*
Verrill Dana LLP
One Portland Square, 10th Floor
Portland, ME 04101

i

Telephone: (207) 774-4000
Facsimile: (207) 774-7499
Email:
      rkeach@verrill-law.com
      lmilne@verrill-law.com
      lboots@verrill-law.com
      jnovo@verrill-law.com

*Counsel for the Appellants*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ...........................................................................................................6

I.    The Evidentiary Record Below Makes Clear that the Debtors-Appellees Failed to Meet Their Burden of Proof to Establish that the Plans Were Top Hat Plans. ...............................................................................................6

II.    Debtors-Appellees Failed to Meet the Burden of Proof to Demonstrate Attorney-Client Privilege and Impermissibly Used Alleged Privilege Evidence as Both Sword and Shield. .............................................................14

III.    Adjudication of the Contested Matter by the Bankruptcy Court is Violative of Article III Principles. .....................................................................................17

IV.    Appellants' Actions Clearly Indicate that Appellants Did Not Consent to the Bankruptcy Court Issuing a Final Judgment on the Contested Matter and Were Not "Delay Tactics" Used to "Weaponize" Debtors-Appellees' Financial Need. ......................................................................................................18

    A.    Appellants Did Not Voluntarily Consent—Expressly or Impliedly—to Final Resolution by the Bankruptcy Court ...................18

    B.    Debtors-Appellees' Financial Exigencies Were the Product of Debtors-Appellees' Actions, Not Appellants' Alleged "Delay Tactics" 21

CONCLUSION .......................................................................................................23

CERTIFICATE OF COMPLIANCE .................................................................................24

CERTIFICATE OF SERVICE .......................................................................................24

**TABLE OF AUTHORITIES**

**Cases**

Alexander v. Brigham & Women's Physicians Org., Inc.,
   467 F. Supp. 2d 136 (D. Mass. 2006) ........................................................................10

Alexander v. Brigham & Women's Physicians Org., Inc.,
   513 F.3d 37 (1st Cir. 2008) ........................................................................................2

Alfa Laval, Inc. v. Nichols,
   Civil No. 3:06CV306, 2007 WL 984111 (E.D. Va. 2007) ...........................................9

Bakri v. Venture Mfg Co.,
   473 F. 3d 677 (6th Cir. 2007) .....................................................................................9

Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits Plan,
   2016 WL 11187255 (N.D. Cal. July 25, 2016)............................................................11

Browe v. CTC Corp.,
   15 F.4th 175 (2d Cir. 2021) ........................................................................................8

Browe v. CTC Corp.,
   331 F. Supp. 3d 263 (D. Vt. 2018)...............................................................................10

Callan v. Merrill Lynch,
   2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ......................................................11, 12

Carrabba v. Randalls Food Mkts., Inc.,
   38 F. Supp. 2d 468 (N.D. Tex. 1999) .....................................................................9, 10

Colburn v. Hickory Springs Mfg. Co.,
   448 F. Supp. 3d 512 (E.D.N.C. 2020)..........................................................................9

Corona v. Chevron Corp.,
   2008 WL 11483069 (S.D. Tex. June 18, 2008) ...........................................................15

Cramer v. Appalachian Regional Healthcare, Inc.,
   No. CIV.A. 5:11-49-KKC, 2012 WL 5332471 (E.D. Ky., October 29, 2012) .........12

Crawford v. Guar. State Bank & Tr. Co.,
   2024 WL 2700668 (D. Kan. May 24, 2024)................................................................11

Daft v. Advest, Inc.,
  658 F.3d 583 (6th Cir. 2011) ...................................................................... 10

Deal v. Kegler Brown Hill & Ritter Co. L.P.A.,
  551 F. Supp. 2d 694 (S.D. Ohio 2008) ...................................................... 10

Guiragoss v. Khoury,
  444 F. Supp. 2d 649 (E.D. Va. 2006) ..................................................... 9, 11

In re Alpha Nat. Res., Inc.,
  554 B.R. 787 (Bankr. E.D. Va. 2016) ....................................................... 7, 8

In re Bumshteyn,
  637 B.R. 211 (Bankr. S.D. Fla. 2022) ......................................................... 19

In re Goerg,
  930 F.2d 1563 (11th Cir. 1991) ................................................................. 18

In re Mule Sky LLC,
  2021 WL 4314231 (Bankr. W.D. Okla. Sept. 22, 2021)............................... 19

In re Parklane/Atlanta Joint Venture,
  927 F.2d 532 (11th Cir. 1991) ............................................................. 17, 18

In re Price,
  2007 WL 2332536 (M.D. Ala. Aug. 13, 2007).......................................... 17

In re Serta Simmons Bedding, L.L.C.,
  125 F.4th 555 (5th Cir. 2024) ................................................................... 19

MacDonald v. Summit Orthopedics, Ltd.,
  681 F. Supp. 2d 1019 (D. Minn. 2010) ..................................................... 10

New Century Holdings,
  387 B.R. 95 (Bankr. D. Del. 2008) ............................................................ 10

Nguyen v. Excel Corp.,
  197 F.3d 200 (5th Cir. 1999) .................................................................... 15

Owens v. W. & S. Life Ins. Co.,
  717 F. App'x 412 (5th Cir. 2018)............................................................. 2, 8

Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.,
  295 F.3d 505 (5th Cir. 2002) ........................................................................ 8, 13

Roell v. Withrow,
  538 U.S. 580, 123 S. Ct. 1696, 155 L. Ed. 2d 775 (2003).......................... 19

Sikora v. UPMC,
  876 F.3d 110 (3d Cir. 2017)......................................................................... 10

Stern v. Marshall,
  564 U.S. 462, 131 S. Ct. 2594 (2011) ......................................................... 17

Tolbert v. RBC Capital Markets Corp,
2015 WL 2138200 ............................................................................................ 8

U.S. v. Robinson,
  121 F.3d 971 (5th Cir. 1997) ....................................................................... 15

Virta v. DeSantis Enters., Inc.,
  1996 WL 663970 (N.D.N.Y. Nov. 7, 1996) ................................................ 10

Ward v. Succession of Freeman,
  854 F.2d 780 (5th Cir. 1988) ....................................................................... 16

Wellness Intern. Network, Ltd. v. Sharif,
  575 U.S. 665 (2015)................................................................................. 17, 19

**Statutes**

11 U.S.C. § 542....................................................................................................21

29 U.S.C. § 1001(a)-(c)..........................................................................................7

29 U.S.C. § 1002(3) ................................................................................................7

29 U.S.C. § 1051(2) .............................................................................................7, 8

29 U.S.C. § 1056(d) ................................................................................................7

29 U.S.C. § 1103(c)(1)............................................................................................7

29 U.S.C. § 1081(a)(3) ........................................................................................... 7

29 U.S.C. § 1101(a)(1) ........................................................................................... 7

29 U.S.C. § 1132(a)(3) ...................................................................................... 7, 20

Appellants Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lydon, Dr. Sridhar Ganda, Dr. A. Ana Beesen, Dr. Benoy Zachariah, Dr. Barry Arkin, Dr. Bruce Kriegel, and Dr. Gary Miller (the "**Appellants**") hereby reply to the brief (the "**Appellee Brief**") filed by Steward Health Care System, LLC ("**Steward**") and certain of its affiliates (collectively, the "**Debtors-Appellees**"). The Appellants preserve and incorporate by reference all arguments raised in the *Brief of Appellants* [Dkt. No. 19] (the "**Appellants Brief**")[1] and further state as follows:

## PRELIMINARY STATEMENT

The Appellee Brief is notable, first and foremost, for its two significant—and fatal—concessions. The Debtors-Appellees concede that there is no evidence that the Plans were limited to management employees, acknowledging that the vast majority of participants in the Plans had no management responsibilities whatsoever. Appellee Br. at p. 16. The Debtors-Appellees also concede that while the court below "considered" the fact that all courts require top hat plan proponents to prove that the participants either individually or collectively had sufficient bargaining power, influence and access to information to negotiate the subject plans or changes thereto (either treating influence as a necessary standalone condition to top hat status or an element of selectivity), the Debtors-Appellees concede that the court below completely disregarded this factor in determining that the Plans were top hat plans, attempting to justify that disregard on strict construction

---

[1] Except as otherwise indicated, any capitalized terms used but not defined herein shall have the same meaning as ascribed in the Appellants Brief.

grounds. Appellee Br. at pp. 17-18.  Faced with the need to make both of these concessions given the uncontroverted evidence that the participants were not limited to management employees and had no bargaining power, influence or access to critical financial information, the Debtors-Appellees contend that they meet their burden of proof on the "top hat" issue merely by establishing that all of the participants are "highly compensated." Appellee Br. at p. 16.  That contention is wrong as a matter of law—the absence of bargaining power, at least on a collective basis, fails the plans as alleged top hat plans even if the participants are highly compensated—but also a moot point.[2] The Debtors-Appellees failed to prove that the participants were highly compensated on a relative basis as the relevant statutes and case law requires.  Indeed, the uncontroverted evidence below established that the Debtors-Appellees consistently ignored the advice of counsel with respect to the minimum salary required for eligibility for the Plans; the minimum salary was too low as early as 2019 and became increasingly too low as it remained the same for the plan years 2020-2024. The most egregious example of the lack of selectivity was the inclusion of nurses, nurse practitioners and physicians' assistants as eligible participants, despite the fact that—as the evidence established—such employees were understood by Steward to be "mid-level" employees from a compensation and responsibility standpoint rather than "high echelon" employees or executives.  *See* Driscoll Dep. Tr. at 147:21-

---

[2] The Fifth Circuit has recognized plan participants' bargaining power in the top hat analysis.  *See* Owens v. W. & S. Life Ins. Co., 717 F. App'x 412, 418 (5th Cir. 2018) ("ERISA's regulation of top hat plans is more relaxed because of Congress's view that 'high-echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interests.'" (quoting Alexander v. Brigham & Women's Physicians Org., Inc., 513 F.3d 37, 43 (1st Cir. 2008))).

148:16 (filed under seal), Appellants Appendix at 139-40 (123:18-124:15).[3]

Uncontroverted evidence also established that the Debtors-Appellees administered the Plans as fully funded plans, not "unfunded" top hat plans.   The evidence established that (1) the Debtors-Appellees continued to solicit deferral of compensation in 2023 and 2024 despite the knowledge of the board of directors and various officers that the Debtors-Appellees were hopelessly insolvent in the sense of being unable to pay—and not paying—their debts as they became due, meaning that, if the Debtors-Appellees believed the Plans to be top hat plans, they were soliciting deferral of compensation that would never be paid to employees as retirement benefits because the Plans' insolvency provisions were triggered; in other words, if those deferrals would never be paid to the employees and Steward knew that, the solicitation of the deferrals was fraudulent, Appellant Appendix at 210-11 (194:7-195:8); (2) the Debtors-Appellees borrowed against the cash surrender value of the life insurance policies held by the Steward Plan's trust to pay benefits to eligible participants in 2024 at a time when the Debtors-Appellees were insolvent and not paying creditors, thus preferring participants and, as a matter of plan administration, giving participants greater rights in the plan assets than those granted to unsecured creditors, App. at 132-34 (116:19-118:5); (3) the Debtors-Appellees, when cash was insufficient to pay creditors, used the deferred compensation of current employees rather than the assets of the debtor companies to fund benefits then due to certain participants (essentially a Ponzi scheme like arrangement), Driscoll Dep. Tr. at 108:16-113:8 (filed under seal); and (4) the

---

[3] Citations to Appellants' Appendix are designated as "App. at ___."

IASIS Plan assets were not held in a rabbi trust or secular trust, and there was no evidence presented by the Debtors-Appellees as to how the assets were held (other than that the assets were being held for distribution to employees), thus triggering the presumption, under ERISA, that the assets were held for the sole benefit of the plan participants and beneficiaries, App. at 141-43 (125:20-127:18), App. at 184-88 (168:18-172:1). On the first of these points (continued solicitation of deferrals while insolvent), the testimony of the Debtors' witness, Ms. Potter, was compelling:

> Q: . . . Based on what you now know, or now understand, were you sending this [deferral solicitations] when Steward was already insolvent under the terms of the trust?
>
> A: I was sending this unaware that we were insolvent so yes, I did send that but I was not aware of the condition—the financial condition of the corporation.
>
> Q: And you now are though, right?
>
> A: I am, yes.
>
> Q: And do you now understand you were sending it while the company was insolvent?
>
> A: Yes.
>
> Q: And does that concern you?
>
> A: I think it should concern everybody.

App. at 210 (194:7-19). This was especially concerning given that Steward was holding meetings with the physicians and other employees during this period to reassure them that Steward was financially sound (despite knowing that the opposite was true). App. at 228-32 (212:5-216:12) (direct testimony of Dr. Purohit). Either the Debtors-Appellees were

4

treating the Plans as fully funded or they were committing fraud (and should be estopped from asserting top hat status).

However, this testimony was disregarded by the Bankruptcy Court, as was considerable and uncontroverted evidence establishing that the Plans were not administered as top hat plans. Despite an unbroken line of precedents—including in this district—that it is always insufficient to merely rely on the plan and trust language to establish that a plan is a top hat plan, the court below relied on just the language of the Plans and related documents. The majority of the Bankruptcy Court's ruling focused only on that language, guided by the "text is alpha" mantra. **Because there was nothing else to rely on to establish top hat status.** That was legal error, but one of several. The Turnover Order must be reversed.

The Appellee Brief is also notable for its candid admission as to what drove the proceedings below and the ultimate ruling. As the Debtors-Appellees concede, "Steward was running out of cash to administer the bankruptcy estates. The rabbi trust assets . . . were the only feasible source of liquidity." Appellee Br. at p. 6. Forget that the Debtors-Appellees waited more than six months after terminating the Plans to seek the turnover of the rabbi trust assets, and forget about the fact that the Debtors-Appellees and their lenders extended the "doomsday deadline" by which they needed this cash multiple times, always setting the new deadline on the day of an upcoming hearing or near to it. This pretext of absolute need for this money—with the lenders' alleged (and vacuous) foreclosure threat the dangling Sword of Damocles—was used to deny the Appellants fundamental due process, to justify the disregard of Article III considerations, to excuse the Debtors-

Appellees' clear abuse of discovery and strategic use of privilege to guard unfavorable and case-dispositive evidence, to characterize the Appellants as having waived rights or consented to processes that they steadfastly and consistently objected to and fought, and, ultimately, to disregard the weight of the evidence and find the Plans to be top hat plans. The Debtors-Appellees did not prevail on the merits below, they merely succeeded in perpetuating a false narrative that their alleged need for the rabbi trust assets trumped all other considerations. The court below committed legal error in accepting this premise and allowing it to drive a truncated and unfair process and a fundamentally incorrect and unfair outcome.

## **ARGUMENT**

**I.      The Evidentiary Record Below Makes Clear that the Debtors-Appellees Failed to Meet Their Burden of Proof to Establish that the Plans Were Top Hat Plans.**

The Bankruptcy Court simply ignored the correct legal standards under ERISA when it determined that the Plans were top hat plans outside of ERISA's broad regulatory ambit. A review of those standards makes clear the Bankruptcy Court's reversible errors of law.

Whether the Plans are so-called "top hat" plans exempt from the substantive protections of ERISA requires substantial interpretation of several ERISA provisions and federal courts' interpretations of those provisions. Chief among the material ERISA provisions that must be applied and interpreted are:

> **29 U.S.C. § 1002(3)**, defining "employee benefit plans" under ERISA;
> **29 U.S.C. § 1051(2)**, exempting from the substantive requirements of ERISA any plan "which is unfunded and is maintained by an

employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees";

**29 U.S.C. §§ 1081(a)(3), 1101(a)(1)**, exempting the type of plan described in 29 U.S.C. §§ 1051(2) from ERISA's participation, vesting, funding and fiduciary requirements;

**29 U.S.C. § 1103(c)(1) and the "exclusive benefits rule,"** prescribing that the assets of non-exempt plans shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants;

**29 U.S.C. § 1056(d)**, protecting plan assets by preventing voluntary or involuntary transfer or alienation; and

**29 U.S.C. § 1132(a)(3)**, prescribing equitable remedies available for ERISA violations.

ERISA represents a comprehensive regulatory scheme that Congress created for the express purpose of creating minimum standards that assure the equitable character of employee retirement plans and their financial soundness. 29 U.S.C. § 1001(a)-(c). To that end, unless a statutory exception applies, assets of employee benefit plans under ERISA never inure to the benefit of any employer, shall be held for the exclusive purpose of providing benefits to participants, and are subject to various participation, vesting, funding, and fiduciary requirements that protect plan assets against mismanagement or improper alienation. See, e.g., 29 U.S.C. §§ 1002(3); 1056(d); 1081(a)(3); 1101(a)(1); 1081(a)(3); 1132(a)(3). One of the few exceptions to these rules is for so-called top hat plans. The term "top hat" does not appear in ERISA; it is a "colloquial term used to refer to certain unfunded plans specially exempted from ERISA's participation, vesting, funding, and fiduciary requirements." In re Alpha Nat. Res., Inc., 554 B.R. 787, 793 (Bankr. E.D. Va. 2016) (internal quotation omitted); *see also* Reliable Home Health Care, Inc. v. Union Cent. Ins. Co., 295 F.3d 505, 512 (5th Cir. 2002) (explaining the exception under ERISA

7

for top hat plans). According to ERISA, a top hat plan is "a plan which is **unfunded *and*** is maintained by an employer primarily for the purpose of providing deferred compensation for a **select group of management or highly compensated employees**." 29 U.S.C. § 1051(2) (emphasis added). The rationale behind excluding top hat plans from ERISA's substantive requirements is that "certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan [and] would therefore, not need the substantive rights and protections of ERISA." Alpha Nat. Res., 554 B.R. at 793 (internal quotation omitted); *see also* Owens, 717 F. App'x at 418.

The determination as to whether a deferred compensation plan is a top hat plan turns on (among other things) whether it was sufficiently selective under 29 U.S.C. § 1051(2). Whether a deferred compensation plan is sufficiently selective to qualify as a top hat plan is a detailed factual and legal analysis involving several qualitative and quantitative factors, each prescribed by federal courts interpreting ERISA. *See e.g.*, Tolbert v. RBC Capital Markets Corp., No. CIV.A. H 11-0107, 2015 WL 2138200, at *9 (S.D. Tex. Apr. 28, 2015); *see also* Browe v. CTC Corp., 15 F.4th 175, 194 (2d Cir. 2021) (explaining that courts must consider quantitative and qualitative factors when analyzing whether a plan is "maintained primarily for a select group of management or highly compensated employees" (quoting 29 U.S.C. § 1051(2))).

Determining if a plan is a top hat plan involves a ***fact-specific and fact-intensive inquiry***. As the statute and relevant guidance from the Department of Labor requires, and

8

consistent with the rationale for the exception, an apparent majority of courts look at three distinct and indispensable requirements, as to all of which the party asserting that the plan is a top hat plan has the burden of proof. To be designated a top hat plan, ERISA requires the court to determine (1) whether the plan is "unfunded"; (2) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees"; and (3) whether the employees participating in the alleged top hat plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply." Guiragoss v. Khoury, 444 F. Supp. 649, 658-659 (E.D. Va. 2006) (emphasis supplied); *see also* Bakri v. Venture Mfg Co., 473 F. 3d 677, 678-80 (6th Cir. 2007) (three elements cited; court finds plan not a "top hat" plan); Alfa Laval, Inc. v. Nichols, Civil No. 3:06CV306, 2007 WL 984111 (E.D. Va. 2007) (citing three-part analysis); Carrabba v. Randalls Food Mkts., Inc., 38 F. Supp. 2d 468, 476-78 (N.D. Tex. 1999) (citing three-part test and finding plan not a "top hat" plan). Critical to the issue of negotiating leverage and substantial influence is whether eligible participants have access to information that permits them to understand the underlying business and also appreciate and plan for risk. *See* Colburn v. Hickory Springs Mfg. Co., 448 F. Supp. 3d 512, 527 (E.D.N.C. 2020) ("As high-ranking employees, they had access to information concerning their rights and obligations, so they did not need the extra protections afforded by ERISA." (citing Fed. Reg. 34530)).

"Defendants [employers] bear the burden of proving that the [ERISA] Plan is a top hat plan." Browe v. CTC Corp., 331 F. Supp. 3d 263, 294 & n.8 (D. Vt. 2018), *aff'd in part*

*and vacated in part on other grounds*, Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021);

*see also* Daft v. Advest, Inc., 658 F.3d 583, 596-97 (6th Cir. 2011) (observing that "the

defendant-employer typically advocates for the top-hat status of an ERISA plan in order to

avoid statutory liability, and therefore the defendant-employer typically bears the burden

of proof on this issue in the district court"); MacDonald v. Summit Orthopedics, Ltd., 681

F. Supp. 2d 1019, 1023 (D. Minn. 2010) (concluding that "Defendants bear the burden of

showing that the Plan is a top hat plan"); Deal v. Kegler Brown Hill & Ritter Co. L.P.A.,

551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) (observing that "[t]he burden is on Defendant

to show that the . . . Plan is a top hat plan"); Alexander v. Brigham & Women's Physicians

Org., Inc., 467 F. Supp. 2d 136, 142 (D. Mass. 2006), *aff'd*, 513 F.3d 37 (1st Cir. 2008)

(noting that defendant "has the burden of proving that [deferred compensation plans] were

each top hat plans"); Virta v. DeSantis Enters., Inc., No. 94-CV-1378, 1996 WL 663970,

at *3 (N.D.N.Y. Nov. 7, 1996) ("Defendants have failed to controvert plaintiffs' evidence

that this Plan was not administered as a Top Hat plan, and they bear the burden of proof on

this affirmative defense"); New Century Holdings, 387 B.R. 95, 110 (Bankr. D. Del. 2008)

("The burden of establishing the existence of a top hat rests on the party asserting that it is

a top hat plan."); Carrabba, 38 F. Supp. 2d at 476-78 (stating that it was defendant's burden

to prove ERISA plan was a top hat plan and holding that defendant failed to meet that

burden despite evidence that the plan was intended to be a top hat plan). *But see* Sikora v.

UPMC, 876 F.3d 110, 113 (3d Cir. 2017) (apparently contrary). Accordingly, the Plans are

presumptively not top hat plans until proven otherwise, and the administrators of those

Plans are presumptively ERISA fiduciaries until proven otherwise. *See* Crawford v. Guar.

10

State Bank & Tr. Co., No. 22-2542-JAR-GEB, 2024 WL 2700668, at *7 (D. Kan. May 24, 2024) (applying fiduciary exception to ERISA plan that otherwise met criteria as a top hat plan, where the plan explicitly designated the Board of Directors as an ERISA fiduciary).

A failure to prove any element mandates a finding that the plan is not a top hat plan. Moreover, in applying the three-part test, courts must take into account that "ERISA is a remedial statute that should be liberally construed in favor of employee benefit fund participants. To that end, exemptions from . . . ERISA coverage should be confined in their narrow purpose." Khoury, 444 F. Supp. 2d at 659 (internal quotations omitted).

The top hat issue can never be decided merely based on the language of the deferred compensation plan documents and any accompanying rabbi trusts, but rather the decision **depends on evidence that the plan has been consistently administered in a manner consistent with the purpose of the exception for top hat plans**: "A plan, however, cannot merely state it complies with ERISA's top hat exemptions in order to qualify thereunder . . . Rather, the management and administration of the plan must demonstrate that [the] top hat exception applies." Callan v. Merrill Lynch, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *12 (S.D. Cal. Aug. 30, 2010) (internal citations omitted); see also Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits Plan, No. 16-cv-00486-EDL, 2016 WL 11187255, at *13 (N.D. Cal. July 25, 2016) ("True, the language of the Compensation Agreement attempts to mirror the ERISA top hat definition. However, tracking the language is not enough; the Plan must also operate as a top hat plan."); Cramer v. Appalachian Regional Healthcare, Inc., No. CIV.A. 5:11-49-KKC, 2012 WL 5332471 (E.D. Ky., October 29, 2012) (citing Callan and holding that: "In other words,

merely inserting the ERISA definition of a top hat plan into a document is insufficient if the actual plan does not satisfy the top hat requirements . . . Instead, the plan's management and administration control the analysis." (internal quotation marks and citations omitted)).

The evidence below established beyond doubt that the Plans were not consistently operated as top hat plans. The Debtors-Appellees instead operated the Plans as if they were fully funded and did so even well beyond the point of total insolvency. As noted above, the evidence established that the Debtors-Appellees continued to solicit deferral of compensation in 2023 and 2024 despite the knowledge of the board of directors and various officers that the Debtors-Appellees were hopelessly insolvent in the sense of being unable to pay—and not paying—their debts as they became due, meaning that, if the Debtors-Appellees believed the Plans to be top hat plans, they were soliciting deferral of compensation that would never be paid to employees as retirement benefits because the Plans' insolvency provisions were triggered; in other words, if those deferrals would never be paid to the employees and Steward knew that, the solicitation of the deferrals was fraudulent. App. at 210-11 (194:7-195:8). While continuing to solicit deferrals the Debtors-Appellees held meetings of their employees, including the physicians and nurses eligible for the Plans, to persuade them that all was right financially with the Steward Health empire (despite its known—to management—insolvency). *See, e.g.*, App. at 228-32 (212:5-216:12). The Debtors-Appellees borrowed against the cash surrender value of the life insurance policies held by the Steward Plan's trust to pay benefits to eligible participants in 2024 at a time when the Debtors-Appellees were insolvent and not paying creditors, thus preferring participants and, as a matter of plan administration, giving

12

participants greater rights in the plan assets than those granted to other unsecured creditors. App. at 132-34 (116:19-118:5); *see also* <u>Reliable Home</u>, 295 F.3d at 512-14 (citing authority that a plan is funded when plan beneficiaries have greater right to plan assets than a general unsecured creditor). The Debtors-Appellees, when cash was insufficient to pay creditors, used the deferred compensation of current employees to fund benefits then due to certain participants (essentially a Ponzi scheme like arrangement). Driscoll Dep. Tr. at 108:16-113:8 (filed under seal). Again, this means that—in the administration of the Plans—the Debtors-Appellees gave participants greater rights than general unsecured creditors even when the Debtors-Appellees were deeply insolvent.

Particularly telling, the uncontroverted evidence established that the IASIS Plan assets were not held in a rabbi trust or secular trust, and there was no evidence presented by the Debtors-Appellees as to how the assets were in fact held or administered (other than that the assets were being held for distribution to employees), thus triggering the presumption, under ERISA's anti-inurement and fiduciary provisions, that the assets were held for the sole benefit of the plan participants and beneficiaries. *See* App. at 141-43 (125:20-127:18), App. at 184-88 (168:18-172:1). The Appellee Brief contends that the assets need not be held in a rabbi trust for the Plans to be unfunded, but it is unquestionably the case that the Plan Assets are presumed, under ERISA, to be held for the exclusive benefit of the plan participants in the absence of evidence that they were not clearly so held. The Debtors-Appellees provided no such evidence, and the presumption governs.

As to the critical element of the Plans' selectivity, the Debtors-Appellees concede that they cannot rely on the management status of the participants and the evidence is

uncontroverted that the eligible participants had no negotiating leverage, influence or opportunity to influence the construction, operation or administration of the Plans, from the time of original adoption forward. The Debtors-Appellees' witness, Ms. Driscoll, was unequivocal in emphasizing that participants had absolutely no influence or say in the construction, amendment or administration of the Plans. Driscoll Dep. Tr. at 92:1-93:3 (filed under seal); *see also* App. at 140-41 (124:25-125:15); App. at 183 (167:14-20). The Debtors-Appellees hang their (top) hat solely on the claim that all eligible participants were highly compensated, but the uncontroverted evidence below established that the Debtors-Appellees consistently ignored the advice of counsel with respect to the minimum salary required for eligibility for the Plans; the minimum salary was too low as early as 2019 and became increasingly too low as it remained the same for the plan years 2020-2024, as established by the testimony of the Appellants' expert, testimony conceded by the court below to be credible. The Debtors-Appellees did not adjust the minimum salary for eligibility into the Plans upward for five years at a time when salaries in health care were continually increasing. *See* Expert Report of K. Scott Van Meter (filed under seal). The evidence as to how the Plans were operated and administered—as opposed to what the documents merely said—compelled a conclusion that the Plans were not top hat plans. This is why the Debtors-Appellees fought to exclude case dispositive evidence on privilege grounds, an argument that necessarily failed.

## II. Debtors-Appellees Failed to Meet the Burden of Proof to Demonstrate Attorney-Client Privilege and Impermissibly Used Alleged Privilege Evidence as Both Sword and Shield.

Debtors-Appellees' claimed that certain case-dispositive Disputed Emails were

14

subject to the attorney-client privilege and were inadvertently produced to Appellants. The Debtors-Appellees' motivation was apparent; the emails, if admissible, mandated a ruling for the Appellants that the subject plans were not eligible for top hat status. The Debtors-Appellees do not dispute the import of these emails. However, the Disputed Emails were never privileged and even if they were, the privilege had been waived.

"The burden to demonstrate attorney-client privilege is on the party asserting privilege." Corona v. Chevron Corp., No. H-07-3190, 2008 WL 11483069, at *2 (S.D. Tex. June 18, 2008); *see also* U.S. v. Robinson, 121 F.3d 971, 974 (5th Cir. 1997). In the Appellee Brief, the Debtors-Appellees still fail to prove that the Disputed Emails were subject to attorney-client privilege and do not argue against the outcome-determinative nature of the Disputed Emails. Rather, they simply reassert that such communications were inadvertently disclosed—while again shifting the blame to Appellants—and not subject to the fiduciary exception to the attorney-client privilege. *See* Appellee Br. at p. 40-45. Debtors-Appellees additionally minimize the import of Ms. Driscoll's declaration, stating that the mention of seeking legal advice was akin to what is found in a privilege log. *See* id. at p. 46.

Testifying about allegedly-privileged attorney-client communications serves as an implicit waiver of that privilege. *See* Nguyen v. Excel Corp., 197 F.3d 200, 207-08 (5th Cir. 1999) (holding that executive testimony about privileged attorney-client communications waived the attorney-client privilege). Accordingly, the Debtors-Appellees waived the attorney-client privilege over the entire subject matter of the Disputed Emails with the Driscoll Declaration, which constituted her direct testimony at

trial and reads as follows:

> 23. In order to ensure that, even with the addition of these new categories of employees, the SHC Plan remained available only to a select group of management and highly compensated employees, I and Patrick Lombardo discussed increasing the required salary threshold. I specifically sought legal advice related to the requirements of top hat plans and the meaning of "highly compensated." Patrick Lombardo discussed adding the additional employee categories, as well as raising the threshold salary requirement, with members of Steward's Board, including Ralph de La Torre. Ultimately, Patrick Lombardo, in consultation with the Board, determined to raise the required salary to participate in the SHC Plan to $180,000.

App. at 737 (¶ 23); *see also* App. at 121 (105:8-24); App. at 131-32 (115:25-116:16).

The only purpose of the reference to legal advice is to suggest that the Debtors-Appellees followed advice of counsel in setting eligibility limits.  The Disputed Emails provide otherwise. Based on the Debtors-Appellee's strategic decision to use attorney-client privileged communications offensively through Ms. Driscoll's direct testimony in the form of a declaration and the related trial testimony of Mr. Lombardo, App. at 737 (¶ 23); App. at 103 (87:12-20); App. at 121 (105:8-24); App. at 131-32 (115:25-116:16), Debtors-Appellees waived attorney-client privilege over the subject matter of the Disputed Emails. They should have been fully considered as evidence and were outcome determinative.  (Indeed, the Appellants should have been able to depose ERISA counsel to Steward). *See, e.g.*, Ward v. Succession of Freeman, 854 F.2d 780, 787-88 (5th Cir. 1988) ("Where . . . a party asserts as an essential element of his defense reliance upon the advice of counsel, we believe the party waives the attorney-client privilege with respect to all communications, whether written or oral, to or from counsel concerning the transactions for which counsel's advice was sought." (internal quotation omitted)).

16

## III. Adjudication of the Contested Matter by the Bankruptcy Court is Violative of Article III Principles.

The absolute necessity of access to an Article III court is prescribed by multiple opinions of the Supreme Court. *See, e.g.*, Stern v. Marshall, 564 U.S. 462, 484, 131 S. Ct. 2594, 2609 (2011). Further, Supreme Court precedent has established that parties can consent to adjudication by an Article I court as long as Article III courts retain supervisory authority. *See, e.g.*, Wellness Intern. Network, Ltd. v. Sharif, 575 U.S. 665, 678 (2015) ("[A]llowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers so long as Article III courts retain supervisory authority over the process."); *see also* In re Price, No. CIVA206MC3317-MHT, 2007 WL 2332536, at *2 (M.D. Ala. Aug. 13, 2007) ("By granting district court judges the discretion to refer Title 11 cases to the bankruptcy courts and the authority to withdraw the reference once made, Congress ensures that 'the judicial power of the United States will be ultimately exercised by an Article III Court.'" (quoting In re Parklane/Atlanta Joint Venture, 927 F.2d 532, 538 (11th Cir. 1991))). However, where parties do not consent to adjudication by non-Article III courts, such courts cannot deny those parties access to Article III courts. *See* Wellness, 575 U.S. at 682-83 ("[T]he cases in which this Court [the Supreme Court] has found a violation of a litigant's right to an Article III decisionmaker have involved an objecting defendant forced to litigate involuntarily before a non-Article III court."). Non-Article III courts cannot act in a way that deprives Article III courts of their adjudicatory authority. *See* Parklane, 927 F.2d at 538 (holding that the bankruptcy court cannot take any action, including even issuing an order dismissing the entire chapter 11 case, that

preempts the district court's ruling on a motion to withdraw the reference without running

afoul of Article III); In re Goerg, 930 F.2d 1563, 1565-66 (11th Cir. 1991) (upholding the

rationale underpinning the Parklane decision after amendments were made to the relevant

Bankruptcy Code provision, noting that "permitting a bankruptcy court to issue an

unreviewable section 305 order dismissing or suspending a district court's jurisdiction over

a bankruptcy case would violate Article III of the Constitution by impermissibly placing

the jurisdiction of an Article III court within the unreviewable discretion of an Article I

court.").

The Appellants continued litigating the Contested Matter under protest and were

abundantly clear at every stage that they did not consent to the Bankruptcy Court's final

adjudication of the Contested Matter.   By moving forward with adjudication of the

Contested Matter, the Bankruptcy Court forced the Appellants to litigate an issue before a

non-Article III court in contravention of Supreme Court precedent and violation of Article

III principles, which merits reversal of the Turnover Order.

**IV.    Appellants' Actions Clearly Indicate that Appellants Did Not Consent to the Bankruptcy Court Issuing a Final Judgment on the Contested Matter and Were Not "Delay Tactics" Used to "Weaponize" Debtors-Appellees' Financial Need.**

**A.    Appellants Did Not Voluntarily Consent—Expressly or Impliedly—to Final Resolution by the Bankruptcy Court**

The Supreme Court has held that bankruptcy courts may issue final judgments when

all parties provide their knowing and voluntary consent.  *See* Wellness, 575 U.S. 665; In re

Serta Simmons Bedding, L.L.C., 125 F.4th 555, 573 (5th Cir. 2024) ("[T]he Supreme Court

recognizes a major exception to the [doctrine permitting a non-Article III court to enter a

final judgment]: consent. Claims otherwise barred by <u>Stern</u> may be adjudicated by bankruptcy courts where parties have expressly or impliedly consented to their jurisdiction."); *see also* <u>In re Mule Sky LLC</u>, No 20-35561 (DRJ), 2021 WL 4314231, at *7 (Bankr. W.D. Okla. Sept. 22, 2021) (noting that while the bankruptcy court had jurisdiction over an adversary proceeding, it lacked "jurisdiction to enter a final order and judgment on the claims asserted in the Adversary Proceeding because the Adversary Proceeding [was] a related-to, but non-core, proceeding, and the Plaintiffs [did] not consent to the Bankruptcy Court's authority to adjudicate the matter."). Consent may be express or implied. <u>Wellness</u>, 575 U.S. at 685. "[T]he key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still *voluntarily* appeared to try the case' before the non-Article III adjudicator." <u>Id.</u> (emphasis added) (quoting <u>Roell v. Withrow</u>, 538 U.S. 580, 590, 123 S. Ct. 1696, 155 L. Ed. 2d 775 (2003)). Implicit consent can be given if an objection is not timely made. *See* <u>In re Bumshteyn</u>, 637 B.R. 211, 216 (Bankr. S.D. Fla. 2022). "[I]ncreasing judicial efficiency and checking gamesmanship" are also key considerations in the analysis. <u>Serta Simmons</u>, 125 F.4th at 574 (quoting <u>Wellness</u>, 575 U.S. at 685).

Debtors-Appellees contend that appellants consented to the Bankruptcy Court's jurisdiction over the contested matter by "litigating there until the eve of trial." Appellee Br. at p. 23. This allegation ignores reality. At every step, Appellants made every effort to *contest* the Bankruptcy Court's jurisdiction to issue a final judgment on the Contested Matter. At the inception of the Contested Matter, on the first page of their Turnover Objection, Appellants footnoted and highlighted a clear reservation of all rights to pursue

19

equitable and other relief in a class action suit in the event pre-litigation discovery revealed evidence that the Plans were not top hat plans. *See* App. at 480, fn. 2 ("[T]he [Appellants] have sought discovery under Rule 2004 regarding the critical legal and factual issues raised by the Turnover Motion. Assuming discovery confirms the understanding of the [Appellants] that the deferred compensation plans at issue do not qualify as "top hat" plans, the [Appellants] intend to file a class action seeking plan-wide equitable relief under 29 U.S.C. § 1132(a)(3)."). Concurrently with filing the Turnover Objection, the Appellants commenced pre-litigation discovery under Bankruptcy Rule 2004. In so doing, the Appellants intentionally chose <u>not</u> to proceed with discovery under Bankruptcy Rule 9014, which is the appropriate mechanism for discovery within a contested matter.

The Appellants, following discovery under Bankruptcy Rule 2004, did what they said they would in the Turnover Objection and commenced the Adversary Proceeding and filed the Motion to Withdraw, seeking to have determination of whether the Plans constituted top hat plans heard by the District Court. In the Adversary Complaint, the Appellants expressly did not consent to the Bankruptcy Court entering a final judgment in the matter. Meanwhile, as adjudication of the Contested Matter progressed over their protests, the Appellants continued to object to the Bankruptcy Court's jurisdiction over this issue by filing multiple Emergency Stay Motions and a Motion to Continue. At no time did Appellants consent to the Bankruptcy Court entering final judgment by action, inaction or waiver.

Other than their Turnover Objection, the Appellants **never** participated in or litigated in the Contested Matter because should a class action be commenced due to a bona

20

fide dispute as to the ownership of the Plan Assets, a turnover motion under Section 542 of the Bankruptcy Code would be moot as an improper procedural vehicle to decide the question and runs awry of Article III considerations. The Appellants litigated within the Contested Matter following the denial of their Emergency Stay Motions and Motion to Continue under protest and because they were left with no choice but to prepare for the Turnover Evidentiary Hearing while the Motion to Withdraw remained (and still remains) pending. The Appellants continued to express their lack of consent through to the start of the Turnover Evidentiary Hearing, stating in opening argument that all arguments regarding jurisdiction and consent to final adjudication were preserved and not waived by proceeding with the hearing. There is no logical interpretation of the Appellants conduct that suggests they consented to or knowingly waived any right. If what the Appellants did or did not do amounts to waiver or consent, it is impossible not to waive or consent.

**B.    Debtors-Appellees' Financial Exigencies Were the Product of Debtors-Appellees' Actions, Not Appellants' Alleged "Delay Tactics"**

Debtors-Appellees assert that the Appellants' actions relating to the Contested Matter "weaponized" Steward's financial need. *See* Appellee Br. at p. 20. However, Appellants were merely acting to assert and protect their rights to due process. The Debtors-Appellees admit that the Contested Matter was driven by their need for "cash to administer the bankruptcy estates." Id. Gaining access to the Plan Assets was allegedly their only viable option. Id. If so, Debtors-Appellees' liquidity concerns were a problem of their own making. The Debtors-Appellees terminated the Plans near the beginning of their bankruptcy cases in May 2024. *See* Appellant Br. at p. 6. However, they did not file

the Turnover Motion, requesting turnover of the Plan Assets, until November 2024, approximately six months later.  Id.  Despite the fact that the Debtors-Appellees needed cash during the entirety of their cases, the Debtors-Appellees tactically delayed requesting access to those funds.  Surely, if the Debtors-Appellees were facing such financial constraints, they could have filed the Turnover Motion sooner, yet they decided not to.  It is worth noting, additionally, that the Turnover Motion was not filed until after the deadline for creditors to file proofs of claim—August 23, 2024 for non-governmental entities and November 4, 2024 for governmental entities—which limited avenues of recovery for general unsecured creditors potentially impacted by the Turnover Motion.[4]

The Debtors-Appellees' actions leading up to the filing of the Turnover Motion express a cavalier attitude towards gaining access to the rabbi trust assets, yet they blame Appellants, accusing Appellants of "weaponizing" Debtors-Appellees' financial distress—for simply acting to preserve Appellants' rights, partially in response to the Debtors-Appellees' discovery abuses recognized by the Bankruptcy Court.  The Debtors-Appellees' approach to the Contested Matter—their delay in seeking initial relief in the Turnover Motion, discovery abuses, and subsequent attempt to lay all blame on Appellants despite a clear record to the contrary—are gamesmanship tactics that should not be encouraged or condoned by this Court. The Debtors-Appellees allegations bear no resemblance to reality, are in contrast to the clear record below, and are more instances of projection than legitimate argument.

---

[4] *Notice of Deadlines for Filing Proofs of Claim* [Case No. 24-90213 (CML), Docket No. 1585].

## **CONCLUSION**

For all of the foregoing reasons and the reasons set forth in the Appellants Brief, the Appellants request that the Court reverse the Turnover Order and enter such additional relief as is consistent with such reversal.

Dated: August 11, 2025

DR. MANISHA PUROHIT, DR. DIANE PAGGIOLI, DR. JAMES THOMAS, DR. THOMAS ROSS, DR. MICHAEL REGAN, DR. PETER LYDON, DR. SRIDHAR GANDA, DR. A. ANA BEESEN, DR. BENOY ZACHARIAH, DR. BARRY ARKIN, DR. BRUCE KRIEGEL, and DR. GARY MILLER

By their attorneys:

Allan B. Diamond, Esq.
Christopher D. Johnson, Esq.
Diamond McCarthy, LLP
2200 Post Oak Boulevard, Suite 1000
Houston, TX 77056-4716
Telephone: (713) 333-5100
Facsimile: (713) 333-5199
Email: allan.diamond@diamondmccarthy.com
     chris.johnson@diamondmccarthy.com

Robert J. Keach, Esq, *admitted pro hac vice*
Lindsay K. Milne, Esq.
Letson D. Boots, Esq., *admitted pro hac vice*
Jennifer Novo, Esq., *admitted pro hac vice*
Verrill Dana LLP
One Portland Square, 10th Floor
Portland, ME 04101
Telephone: (207) 774-4000
Facsimile: (207) 774-7499
Email:
     rkeach@verrill-law.com
     lmilne@verrill-law.com
     lboots@verrill-law.com
     jnovo@verrill-law.com

*Counsel for the Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with: (1) the type-volume limitation of Bankruptcy Rule 8015(a)(7)(b)(ii) because it contains 6,363 words and has been prepared in a proportionally spaced typeface (13-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Christopher D. Johnson*
*Counsel for Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2025, I caused the foregoing pleading to be filed via the Court's CM/ECF system and it was served by the Court's electronic noticing service to all parties registered to receive ECF notice.

*/s/ Christopher D. Johnson*

24